IN THE UNITED STATED DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DR. RICH EMANUEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-07-819-WKW |
| | ) | |
| GEORGE C. WALLACE | ) | |
| COMMUNITY COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

**NARRATIVE STATEMENT OF UNDISPUTED FACTS AND BRIEF FILED IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Comes now defendant, George C. Wallace Community College ("GCWCC"), and

hereby files this narrative statement of undisputed facts and legal argument supporting its

motion for summary judgment in the above-styled action, and demonstrating that there is

no genuine issue as to any material fact and that this defendant is entitled to a judgment

as a matter of law.

**NARRATIVE STATEMENT OF UNDISPUTED FACTS**

This case involves Dr. Richard Emanuel's claims of disparate treatment and

disparate impact arising out of GCWCC's decision not to hire him for a speech instructor

position and, instead, hiring an allegedly less qualified black female applicant.

**A. College Guidelines and *Shuford* Criteria**

1.     The State Board of Education serves as the board of control for GCWCC,

as well as the other community and technical colleges in the Alabama Community

College System; and the Chancellor of the Alabama Department of Postsecondary

Education serves as the Chief Executive Officer for the System.  All statewide policies that apply to GCWCC are adopted by the State Board at the recommendation of the Chancellor.  The College's President also has the authority to adopt institutional policies that are consistent with State Board of Education policies. (Affidavit of Dr. Linda Young).

2.      Each community college president is granted the authority, by State statute and by State Board of Education regulations, to make the final hiring decisions for the respective college.  *Ala. Code* (1975), §16-60-111.7 states:

> The president of each junior college and trade school shall appoint faculty and staff of each junior college and trade school according to qualifications prescribed by the board and such other regulations which may be adopted by the board in accordance with Section 16-60-111.4.

3.      That appointing authority is reiterated in Policy No. 602.01 of the regulations adopted by the State Board of Education for the Alabama College System, which includes all public community and technical colleges.  (Ex. 26).  All full-time instructor positions at GCWCC, as well as all other State of Alabama community colleges, are filled in compliance with a selection process that was approved by the U.S. District Court for the Middle District of Alabama in the case of *Shuford, et al. v. Alabama State Board of Education, et al*., Civil Action No. 89-T-196-N.  (Ex. 27).

4.      A Partial Consent Decree was entered into by the State Board of Education and approved by the Court on March 15, 1994, as a means of ensuring that African-American applicants for full-time instructor positions at all colleges within the Alabama College System would receive non-discriminatory treatment.   A follow-up Partial

Consent Decree was approved by the Court on August 11, 1995, as a means of ensuring

that female applicants would receive non-discriminatory treatment.

     5.    The Court-approved hiring criteria in the two Decrees are stated in the

following manner:

    (1)    minimum education, certification and experience requirements, or a combination thereof, for the position;

    (2)    additional education, certification and/or experience considered desirable for the position;

    (3)    evidence of past performance and/or occupational competency that is accompanied by reliable indicia that it is free of racial or gender-based bias;

    (4)    any particular needs of students or others who will work with or who may be served by the person selected; and

    (5)    the particular needs of the college and community it serves for racial, ethnic, cultural and/or gender diversity.

(Ex. 27).  The Court-approved process goes on to state:

    b.    In addition, selection shall take into consideration the following criteria, which cannot be spelled out in the job description:

    (1) that demonstrably enhance or detract from the applicant's ability to perform the job duties;

    (2) the employment goals adopted by the State Board of Education pursuant to Section B.3. hereinabove; and

    (3) the best interests of the college, its students, faculty and staff, and the public.

The Decrees' provisions on selection criteria conclude with the following statement:

    c.    Except for the minimum education, experience and certification requirements, the preceding selection criteria shall be applied flexibly and in their totality and shall not be used to create rigid or mathematical measurements.

     6.    Under the Alabama College System procedures, a selection committee is

appointed that must consist of at least forty percent black persons and at least fifty

percent females.  (Young Affidavit; Ex. 26).  The selection committee is charged with reviewing all applications, interviewing qualified applicants, and selecting three of the qualified applicants to be presented to the President as the final candidates for the respective position.  (Young Affidavit; Ex. 27, p. 3).  Once the President receives the names of the three finalists, she will appoint one of the three candidates submitted for consideration.  (Ex. 27, p.3).  The President may consult with other college administrators before she makes his final decision.  (Ex. 27, p. 3).  If the President is not satisfied that any of the finalists fully meets the College's needs, he has the discretion to reinitiate the selection process.  (Ex. 27, p. 3).  The President must justify her hiring decision in writing.  (Ex. 27, p. 3).

7.     Under the Uniform Guidelines, the State Board of Education requires that all two-year colleges be equal opportunity employers.  Policy number 601.01 states "the State Board of Education and the entities under its direction and control are equal opportunity employers.  It is their policy to provide an equal opportunity for employment and advancement to all applicants and employees without regard to race, color, national origin, religion, age, disability, marital status, or gender, as provided in federal and state law."  (Ex. 26).

8.     In addition, policy number 601.02 is a nondiscrimination policy which provides that "no employee or applicant for employment or promotion . . . shall be discriminated against on the basis of any impermissible criteria or incorrect characteristic, including, without limitation, race, sex, age, or any other protected class."  (Ex. 26).  Although the *Shuford* Decree set forth certain goals associated with the employment of

females, blacks, and black females, the Decree expressly states that the goals are not deemed to be "quotas" as that term is generally applied. (Ex. 27, p. 8). "The nonattainment or over-attainment of any of the respective goals shall not be considered to be, per se, a violation of this consent decree." (Ex. 27, p. 8).

9.    The *Shuford* Decree further states "this consent decree ***shall not be construed*** to require the defendants or any of the colleges to hire or promote any person, *regardless or race or gender*, who is not qualified for the position in question, ***or preclude them from hiring or promoting the best qualified applicant regardless of race or gender*.**" (Ex. 27, p. 8) (emphasis added).

**B.  Application and Interviews of Plaintiff and Ms. Ware**

10.    Both Shatangi Ware and Richard Emanuel applied for the position for speech instructor that was advertised by GCWCC. (*See* Advertisement, Def. Exs. 14 & 15 to Emanuel's Depo.; Application of Shatangi Ware, Ex. 28; Application of Richard Emanuel, Ex. 29). The position advertised had both "required" and "preferred" qualifications listed. The required qualifications were as follows: "a master's degree from a regionally accredited institution with 18 graduate semester hours or 27 graduate quarter hours in speech, speech communication, communication studies, communication arts, or communication management." (Def. Ex. 15 to Emanuel's Depo.). The preferred qualifications were as follows: (1) additional 18 graduate semester hours or 27 graduate quarter hours in another discipline taught at the college; (2) teaching experience in a community college; (3) demonstrated experience in integrating technology innovations into the curriculum; (4) experience in producing and directing student drama activities;

(5) experience in coaching student teams for speech and/or debate competition. (Def. Ex. 15 to Emanuel's Depo.).

11.    These qualifications were listed in the job announcement. Emanuel testified in deposition that he did *not* have any concerns about the job announcement. (Emanuel Depo., p. 62, l. 19-21). By the time the search committee came to the interview process, there were only three applicants who met the minimum qualifications: Jill Coons, Shatangi Ware, and Richard Emanuel. (Ex. 32, Affidavit of Terry Schembera). The GCWCC Search Committee/Hiring Procedures Manual 2005-2006 provides that the selection committee is responsible for interviewing all of the minimally qualified applicants and forwarding the names of the top three applicants to the president for the president's consideration. (*See* Ex. 30; Ex. 32, Affidavit of T. Schembera; Ex. 33, Affidavit of Dr. Linda C. Young). With respect to this particular position, there were only three minimally qualified applicants. Therefore, the selection committee submitted, as its list of finalists, an alphabetical listing of the names of all three of those applicants. (Ex. 32, Affidavit of T. Schembera; Ex. 30, Employee Personnel Hiring Handbook). Terry Schembera, Chairman of the selection committee for the position at issue, testified that the race and gender of applicants was at no time taken into consideration during the application or interview process. (Exs. 31 & 32, Affidavits of T. Schembera).

12.    Interviews were conducted by the selection committee and also by a final interview committee selected at the pleasure of the president. (Ex. 33, Affidavit of Dr. Young). Between the selection committee and the final interview committee, there were four females and three males serving as members. (Emanuel Depo., p. 133, l. 5-11). Dr.

Emanuel testified that he interviewed a total of three times, once with the selection committee, once with the final interview committee, and once on the telephone with Dr. Young.  (Emanuel Depo., p. 65-70).  Emanuel admitted that there were no inappropriate questions asked during the interviews regarding his race or gender.  (Emanuel Depo., pp. 66, l. 7-11; 68, l. 3-9; 70, l. 2-8).

13.    Emanuel claims that the disparity of qualifications between him and the person selected for the position, Shatangi Ware, proves that he was the object of discrimination.  (Emanuel Depo., p. 72, l. 22-73, l. 4).

14.    Emanuel also appears to attack the Uniform Guidelines and the *Shuford* Consent Decree concerning the stated goals of those decrees.  (Emanuel Depo., p. 86-89).  Emanuel admits that the Consent Decrees provide latitude for the colleges to achieve or not achieve the respective goals depending on the various circumstances.  (Emanuel Depo., p. 90, l. 11-18).  Dr. Young testified that the goals set forth in the *Shuford* Decree are not quotas that must be attained at the risk of sanction.  (Ex. 33; see also, Ex. 27).

15.    Dr. Young testified that it was her understanding that the goals did not necessitate consideration of the applicant's race or gender in assessing the applicant for the job.  (Dr. Young Depo., p. 26, l. 4-8).  She further testified that there were no ramifications to the college if the goals were not met regarding the hiring of African-Americans and/or females.  (Dr. Young Depo., p. 26, l. 9-13).

16.    Dr. Young adamantly denied considering or hiring anyone based upon his/her race or sex.  There was no reward for making the goals.  (Dr. Young Depo., p. 27, l. 9-11).  She testified that she felt it was her job to follow a fair process, and if, in doing

so, the college happened to also reach the *Shuford* goals, then that would be great.  (Dr.

Young Depo., p. 28, l. 18-23).

> **Q:    So you are saying that you felt no obligation to try to reach the goals.**
>
> **A:    Not—I was going to follow the fair process, and if we reached the goals, that was great, but I would not, I would not try to reach the goals and have an unfair process in the employment process.**

(Dr. Young Depo., p. 29, l. 1-7).

***

> **Q:    In other words, I'm not asking you did you think that you should meet, meet the goals at any cost, and, you know, through any means, I'm not asking you that, I'm just asking you generally did you think that it was your obligation to try to see the goals met consistent with what, the way you think the rules and regulations should be applied?**
>
> **A:    I thought it was an obligation because we were under a consent decree.**
>
> **Q:    Okay.**
>
> **A:    But I'm going, I'm not going to say yes or no to that question because I'm going to tell you that I followed the process fairly, and I did not consider race and gender in making a decision.**
>
> **Q:    Never?**
>
> **A:    Never.**

(Dr. Young Depo., p. 31, l. 12-p. 32, l. 7).

17.    The *Shuford* Decree was reached between the Alabama Department of

Postsecondary Education and the litigants in those cases.  (See Ex. 27, *Shuford* Decree).

GCWCC was not a signatory to that decree.  Further, Emanuel admitted that the Uniform

Guidelines that must be followed by GCWCC were not issued by GCWCC.  (Emanuel

Depo., p. 93, l. 8-11).  Rather, they were issued by the Department of Postsecondary

Education, the entity that oversees all of the community colleges.  (Emanuel Depo., p. 93,

l. 12-14).  To be more precise, it should be noted that the guidelines were actually
adopted by the  State Board of Education upon the recommendation of the Chancellor of
the Department of Postsecondary Education.

18.     Emanuel claims that the Uniform Guidelines require an unfair composition
of females on the search committees.  (Emanuel Depo., p. 94, l. 5-18).  It is undisputed,
however, that the initial search committee passed Emanuel's name onto the next level.
Therefore, there is no evidence of any bias on the part of the selection committee since
they forwarded Emanuel's name on with the other applicants.

19.     It is undisputed that Shatangi Ware met all of the minimum qualifications
for the position at issue.  (*See* Ex. 28, Application of Shatangi Ware; Ex. 33, Affidavit of
Dr. Young).  Emanuel also met all of the minimum qualifications and also met the
preferred qualifications.  Ms. Ware did not meet all of the preferred qualifications.  (Dr.
Young Depo., p. 130, l. 11-13).  However, despite the fact that Emanuel had attained a
higher educational degree (doctorate) than Ms. Ware (master's), and despite Emanuel's
more extensive overall teaching experience, Dr. Young was still of the opinion that Ms.
Ware was a more appropriate fit for GCWCC.  (Ex. 33, Affidavit of Dr. Young).  Dr.
Young testified that the position at the Eufaula-Sparks campus was better suited to an
instructor who had experience as a graduate from the two year college system, had taught
part-time at a similar community college for a year, and could relate more directly to the
students.  (Ex. 33, Affidavit of Dr. Young).  Dr. Young testified that the ability to relate
to students in this rural setting was very important to this position.  (Ex. 33, Affidavit of
Dr. Young).

20.    Dr. Young testified that she did not have at her disposal during her interview of the applicants any of the initial papers generated by the selection committee. (Dr. Young Depo., p. 69, l. 8-11). She did have complete packets on all of the applicants including the interview forms, the personal profile, documents regarding their speech demonstration, and their applications and CVs (along with transcripts and letters of recommendation). (Dr. Young Depo., p. 71, l. 9-13).

21.    Dr. Young did not participate in the interview with the finalists since she was conducting phone interviews. She stated that she did not want to cloud her judgment with the perceptions of others. (Dr. Young Depo., p. 74, l. 15-22). Although she would consult with the final interview committee prior to making her final decision, she testified that she would not normally consult with the initial selection committee members. (Dr. Young Depo., p. 75, l. 6-8).

22.    Dr. Young testified that, prior to making her decision regarding the position at issue, she received a telephone call from Enterprise-Ozark Community College ("Enterprise") President Stafford Thompson. (Dr. Young Depo., p. 78, l. 2-7; 82, l. 12-16). She testified that she was in her office when the call came in. (Dr. Young Depo., p. 66, l. 13-15). Dr. Young testified that she has known Dr. Thompson since the mid 1980s, but that they are not necessarily close friends. (Dr. Young Depo., p. 78, l. 11-13). Although they have had disagreements in the past, Young and Thompson have maintained a cordial and professional relationship. (Ex. 33, Affidavit of Dr. Young). Although she cannot recall exactly when she received the phone call, she testified that she did receive it before she made the decision on which applicant to select. (Dr. Young

Depo., p. 82, l. 4-16; Ex. 33, Affidavit of Dr. Young).

      23.     Dr. Young testified that Dr. Thompson told her that he understood that Dr.

Emanuel had made application for an instructor position at GCWCC and that he needed

to let her know that there was a potential problem.  (Dr. Young Depo., p. 82, l. 19-23).

Dr. Young testified that his phone call was certainly out of the ordinary.  (Dr. Young

Depo., p. 83, l. 2-3).  Dr. Young testified that she had not contacted Thompson earlier

and had done nothing to solicit his phone call.  (Dr. Young Depo., p. 83, l. 4-8).

> **Q:**    **Okay.  He called you, right?**
> **A:**    **He called, which is out of the ordinary.**
> **Q:**    **You had not contacted him earlier?**
> **A:**    **No.**
> **Q:**    **Or you had not done anything to solicit his call?**
> **A:**    **No.**
> **Q:**    **Okay.**
> **A:**    **And he did not elaborate on what the problem was, but just said it was a problem.**
> **Q:**    **Did he put an adjective on problem, big problem, ugly problem?**
> **A:**    **I don't remember that, but a problem of, I knew from the phone call from him because he does not normally call me, that was out of the ordinary for him to call me, and for him to indicate to me that this was a problem employee and for him to make that call to me – he had never made a call to me in all my years, 20 years as a president of knowing him – he had never made a call to me about an application, I knew that it was something major, and for him not to be employed at Enterprise anymore, I knew there was something major, but he did not elaborate as to what the problem was and I didn't ask him because I felt like he needed, that he wouldn't go there.**

(Dr. Young Depo., p. 83, line 1-p. 84, line 7).

      24.     Although Thompson did not elaborate on any specific problems with regard

to Emanuel, Dr. Young testified that he did not have to in that she inferred that there must

have been a major problem when Emanuel was employed at Enterprise.  (Dr. Young

Depo., p. 84, l. 3-p. 85, l. 12).  Dr. Young testified that Thompson stated "you do not

need this problem," or something to that effect.  (Dr. Young Depo., p. 85, l. 20-21).

25.     Although Emanuel testified that he left Enterprise for a "better

opportunity," (Emanuel Depo., p. 20, l. 10-p. 21, l. 7), he later admitted when confronted

with the documentary evidence that he had been given a letter of termination by the

Enterprise president, Stafford Thompson, with multiple allegations of sexual misconduct

concerning multiple students.  (Emanuel Depo., p. 21-33).

> **Q:    As early as January 8, 1999, and here later in—later in January
> of the same year, you were aware that the college was accusing
> you of sexual impropriety with more than one student, weren't
> you?**
> **A:    I was aware that their claims suggested more than one student,
> but I was unaware of more than one claim.**
> **Q:    Well, there are multiple instances of alleged sexual impropriety
> in the letter that you hold in your hand, are there not?**
> **A:    There are multiple bulleted items if that's what you mean.**
>
> **\*\*\***
>
> **Q:    And there are different claims, different types of activity that
> you are accused of, right?**
> **A:    Those are—yes, there are different claims listed here.**

(Emanuel Depo., p. 31, l. 1-13; p. 32, l. 12-16; Ex. 2 & 3 to Emanuel Depo.,
Termination Letters; See also Ex. 5 to Emanuel Depo., Student Complaints
regarding Emanuel).

26.     Dr. Young testified that she took Dr. Thompson's warning seriously and

that it gave her great concern as to the gravity of the problem Emanuel may pose to

GCWCC if hired.  (Ex. 33, Affidavit of Dr. Young).

27.     Although Emanuel initially claimed in his deposition to have left Enterprise

for a "better opportunity," the evidence reveals that he was issued a termination letter that

he subsequently contested under the appeal provisions of the Alabama Fair Dismissal Act. (*See* Exs. 2, 3, 9, 10, and 11to Emanuel Depo.). Ultimately, Emanuel's departure was the product of a settlement agreement between Enterprise. (See Ex. 8 to Emanuel Depo., Settlement Agreement). Emanuel's resignation on April 8, 1999, from Enterprise was a direct result of this settlement agreement. (*See* Def. Ex. 13 to Emanuel Depo.).

28.    In addition to the disturbing phone call from Dr. Thompson, Dr. Young testified that employing Emanuel with his higher educational attainment and more experience would have cost the college approximately $33,000 more than Shatangi Ware whom Dr. Young found to actually be better suited for the position. (Ex. 33, Affidavit of Dr. Young; Dr. Young Depo., p. 121, l. 1- p. 122, l. 20). It is undisputed that Ms. Ware would cost the college approximately $33,000 per year less than Dr. Emanuel if hired for the same position.

29.    Dr. Young testified "I selected her, Ms. Ware, because I believed that she was the best suited for this particular job because she had graduated from a community college, she was from the Dothan area, she had the qualifications of a master's degree that I thought was suitable for teaching this level of courses in speech communication and that we could employee her at $33,000 a year less than Dr. Emanuel and that I had gotten a call from Dr. Stafford Thompson indicating that there was a problem with him at Enterprise and I did not want to inherit a problem and pay $33,000 more a year and have a problem." (Dr. Young Depo., p. 139, l. 16- p. 140, l. 6).

30.    Dr. Thompson issued an affidavit as the President of Enterprise-Ozark Community College confirming that he had a conversation with Dr. Young in which he

expressed that she should be careful in considering Dr. Richard Emanuel for employment. Thompson testified that he was left with the impression that Dr. Young had concluded Dr. Emanuel would be a problem if hired at GCWCC. (Affidavit of Stafford Thompson, Ex. 18 to Dr. Young Depo.).

31.    Emanuel testified that he thinks he has been the object of discrimination because the college hired a younger Black female who had a master's degree and who he thought was not as qualified as he was. (Emanuel Depo., p. 72, l. 22- p. 73, l. 4).

32.    Emanuel testified that he also perceived there to be a pattern of hiring more minorities and females and minority females because of the *Shuford* Consent Decree. (Emanuel Depo., p. 73, l. 14-23). However, he does not point out any specific hiring practices (other than the selection committee referred to above) that related in any way to his not getting the job. (Emanuel Depo., p. 73, l. 14-23). Emanuel testified that, after becoming concerned regarding the alleged disparity in qualifications between he and Ms. Ware, he began to look into the *Shuford* Decrees and the Uniform Guidelines as the source of potential discrimination. (Emanuel Depo., p. 80, l. 16-23). Emanuel concedes that the Uniform Guidelines are to be followed by all two-year colleges in the system and that they are approved by the State Board of Education. (Emanuel Depo., p. 87, l. 7-11). In other words, GCWCC has no control over the implementation or terms of the Uniform Guidelines.

> **Q:    . . . We know for sure that females outnumbered males at the rate of 75 percent, 25 percent in the first committee that you sat in front of, right?**
> **A:    I believe that's correct.**
> **Q:    And you moved on to the second committee, right?**

A:    Yes.

Q:    You weren't washed out by that first committee, were you?

A:    I was not.

Q:    So you don't claim that there's been any discrimination as a result of the racial composition for you individually as a result of the make up of the first committee because they didn't wash you out, right?

A:    All I know is that I went on to the next level.

(Emanuel Depo., p. 129, line 20-p. 130, l. 14).

33.    Emanuel claims that White males are underrepresented on the D Salary Schedule (for Instructors, Counselors, and Librarians) at GCWCC. (Emanuel Depo., p. 148, p. 7-13). He has determined this underrepresentation by comparing White males employed against the percentages of Blacks, females, and Black females based on the *Shuford* reports. (Emanuel Depo., p. 151, l. 21-p. 152, l. 17).

34.    Emanuel claims that, in 1995, women comprised 45 percent of all D Salary Schedule employees throughout the two year college system statewide, according to the *Shuford* reports. (Emanuel Depo., p. 153, l. 19-23; Ex. 19 to Emanuel Depo., p. 0014). According to Emanuel, this percentage is only one point off of the number of women who make up the "relevant labor pool" at 46 percent. He claims to have obtained this information from the U.S. Census data. (Emanuel Depo., p. 154, l. 2-4). Emanuel claims that the relevant labor pool is "the people in this country who have at least a master's degree or higher." Emanuel did not obtain Census Bureau data on Alabama specifically as opposed to the entire United States. Emanuel claims that what is distinctive about the salary D schedule is that the relevant labor pool would only be comprised of those who have obtained a master's degree or higher. (Emanuel Depo., p. 154, l. 9- p. 155, l. 22).

35.     However, as established by the testimony of Dr. Young, Emanuel's claimed labor pool is flawed and based upon a fallacy.  D Schedule employees at community colleges do not necessarily have master's degrees.  (Affidavit of Dr. Young).  Because community colleges also have technical divisions, technical and vocational instructors are hired on the D Salary Schedule but are not necessarily required to have master's degrees. (Affidavit of Dr. Young).

36.     Dr. Young also testified that the position announcement and search for the position at issue was not nationwide.  The search was conducted in accordance with the guidelines and procedures which require only publication in a daily or weekly publication in the service area and in a daily or weekly publication in the state or region.  (Ex. 33, Affidavit of Dr. Young).  Therefore, Emanuel's claimed "relevant labor pool" data is flawed and not based upon competent evidence.  Furthermore, his alleged "labor pool" did not take into account the element of the degree to which respective qualified applicants would be willing to leave their home areas and accept a position in Dothan, Alabama.

37.     Notwithstanding the flaws in Emanuel's claimed labor pool, he admitted that the *Shuford* goal in the Consent Decree was not established by GCWCC.  (Emanuel Depo., p. 159, l. 2-4).  He further admits that GCWCC did not have anything to do with evaluating the appropriate labor pools.  (Emanuel Depo., p. 159, l. 5-8).

38.     Interestingly, Emanuel admits that "just about every document that I saw related to this hiring process says that the two-year college 'doesn't discriminate based on these things.'"  (Emanuel Depo., p. 162, l. 22- p. 163, l. 2).  Just a short while later in his

deposition, Emanuel admitted "I'm not sure what's motivating Wallace-Dothan in their decision. What I do see is that they hired someone who is less qualified than me who is a black female—happens to be a black female and when I start looking at the data and the numbers of females and black females hired or the lack of males and white males hired, it seems to me clearly that whites and particularly white males are being under-represented at every turn particularly in hiring." (Emanuel Depo., p. 165, l. 1-11). When asked whether he had any evidence that Dr. Young did not hire him because he is white and male, other than the statistics that he has compiled, he testified that he did not have anything to that effect. (Emanuel Depo., p. 165, l. 15-19).

39.    Emanuel also admitted in deposition that GCWCC has never met the *Shuford* goal for the hiring of black females. (Emanuel Depo., p. 197, l. 12). Emanuel claims that the relevant labor pool for black females on the D Salary Schedule is around four percent. (Emanuel Depo., p. 197, l. 17-20; See also Def. Ex. 19 to Emanuel's Depo.). Again, this labor pool is based upon U.S. Census data based upon educational attainment. The *Shuford* reports admittedly reflect that GCWCC has been at four percent in the hiring of black females and has never reached higher than four percent since the institution of the *Shuford* Decrees. (Emanuel Depo., p. 198, l. 2-4). Despite the fact that GCWCC has never met the *Shuford* goals, the college has never been sanctioned, penalized, or reprimanded for failing to meet this goal. (Ex. 33, Affidavit of Dr. Young).

40.    Emanuel has no evidence that Ms. Ware did not meet the minimum qualifications for the position at issue as he had not studied her application. (Emanuel Depo., p. 200, l. 2-6). Dr. Young testified that Ms. Ware did meet the minimum

qualifications.  (Ex. 33, Affidavit of Dr. Young).

## SUMMARY JUDGMENT PROCEDURE AND STANDARD

Defendants in this case bear the initial burden of demonstrating the basis for their motion for summary judgment, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that they believe show an absence of any genuine issue of material fact.  *Hairston v. Gainesville Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993).  In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the United States Supreme Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment is due to be granted.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial . . . .  We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment . . . .  Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves . . . ."

*Id.* at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" if the record taken as a

whole could lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must review the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987). But, "[I]f the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson*, 477 U.S. at 240-50 (citations omitted). When responding to a motion for summary judgment, the non-movant "may not rely on bare allegations of wrongdoing, but must come forward with some evidence of specific facts." *Pennington v. City of Huntsville*, 93 F. Supp.2d 1201, 1206 (N.D. Ala. 2000).

## LEGAL ARGUMENT

Plaintiff Richard Emanuel alleges in his Complaint, which contains only one Count, that GCWCC passed him over for a position as speech instructor because of his race and/or sex in violation of Title VII. (Complaint, ¶ 15). Plaintiff references the legal theories disparate treatment and disparate impact. (Complaint, ¶ 15). Since the elements of proof and legal analysis for disparate treatment and disparate impact are entirely distinct, the Defendant will address each in turn.

I.    **Defendant GCWCC is Entitled to Summary Judgment as to the Plaintiff's Claims of Disparate Treatment as the President of the College had Legitimate Non-Discriminatory Reasons for Selecting the Individual Who was Ultimately Employed in the Position.**

The elements of proof in a disparate treatment claim for failure to hire are well settled: "In a traditional failure to hire case, the plaintiff establishes a *prima facie* case by

demonstrating that: (1)[he] was a member of the protected class; (2) [he] applied and was qualified for a position for which the employer was accepting applications; (3) despite [his] qualifications, [he] was not hired; and (4) the position remained open or was filled by another person outside of [his] protected class." *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1273 (11ᵗʰ Cir. 2002). The plaintiff must demonstrate intentional discrimination on the part of the defendant to prevail on a claim of disparate treatment under Title VII. *Vessels v. Atlanta Ind. Sch. Sys.,* 408 F.3d 763, 767 (11th Cir.2005).

Under Title VII, if a plaintiff alleges that he or she has been treated differently than other employees, as Plaintiff has in the present case, courts have construed this claim as a disparate treatment claim. *Ricky Grider v. Alabama Department of Corrections*, 2007 WL 2254405 (M.D.Ala. 2007). When alleging discrimination under the disparate treatment or pattern and practice theories, the plaintiff has the burden of proving discriminatory intent. *Joe's Stone Crabs*, 296 F.3d at 1273. See also *Holifield v. Reno*, 115 F.3d 1555, 1565 (11ᵗʰ Cir. 1997). ("In a disparate treatment case, the plaintiff bears the burden of proving that the employer intentionally discriminated against him because of his race.")

Discriminatory intent can be established through either direct or circumstantial evidence. To allege intentional discrimination, a plaintiff must show that a defendant acted in a way that: "…implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker…selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects…" *Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979). The applicable

standard for direct evidence of discriminatory intent is "when it is sufficient to prove discrimination without inference or presumption. Only the most blatant remarks whose intent could be nothing other then to discriminate constitute direct evidence." *Clarks v. Coats and Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993). Direct evidence has also been characterized as evidence "composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir.1999).

A plaintiff may establish his case under Title VII through circumstantial evidence, using the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See EEOC v. Joe's Stone Crabs, Inc.,* 296 F.3d 1265, 1272-73 (11th Cir. 2002). Under this framework, the plaintiff first must establish a *prima facie* case of discrimination, which creates a rebuttable presumption of discrimination. *Id.* at 1272. Once a plaintiff has made a *prima facie* showing of discrimination, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the employment action. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254-55, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981). If the defendant articulates a legitimate, non-discriminatory reason, the plaintiff must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were pretextual. *Holifield v. Reno,* 115 F.3d 1555, 1565 (11th Cir.1997).

The obligation placed on the defendant to provide evidence of legitimate, non-discriminatory reasons for the employment action taken is easily established. "It is

important to bear in mind … that *the defendant's burden of rebuttal is exceedingly light*…. At this state of the inquiry, the defendant need not persuade the court that its proffered reasons are legitimate; the defendant's burden is merely one of production, not proof." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983) (citation and internal quotation marks omitted) (emphasis added). If the offered reason by the defendant employer is one that might motivate a reasonable employer, a plaintiff must confront and address it directly. *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). If the plaintiff only quarrels with that reason, a pretext has not been established. *Id.*

> Because an employer may use legitimate, non-discriminatory subjective factors in its decision-making, we "ha[ve] refused to adopt a lower standard when employers use subjective criteria." *Wilson* [*v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2005)] at 1088. A plaintiff also cannot prove pretext merely by asserting that he was better qualified than the person who received the position at issue…We "must not judge which employee was more qualified, but determine whether any disparity is so great that a reasonable fact-finder could infer that [the employer] did not believe" that the comparator was better qualified…. Moreover, "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason," as long as "the reason is one that might motivate a reasonable employer." *Penning v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001); see also *Rowell v. BellSouth Corp.*, 433 F.3d 794, 798-99 (11th Cir. 2005)…" *Price v. M & H Valve Co.*, 177 F. Appx. 1 (11th Cir. (Ala) 2006).

The above-cited standard must be considered within the context of the discretion that is given the President of GCWCC in the appointment of faculty members under the Court-approved selection criteria that were stated above, particularly the admonition that, "Except for the minimum education, experience and certification requirements, the preceding selection criteria shall be applied flexibly and in their totality and shall not be

used to create rigid or mathematical measurements."

In the present case, GCWCC does not dispute that the Plaintiff can establish a *prima facie* case. Plaintiff Emanuel applied for a job for which he was qualified and for which the GCWCC was seeking applicants, he was rejected, and that the position was filled by someone outside of his protected class. However, GCWCC has clearly set forth specific and legitimate nondiscriminatory reasons for the employment decisions.

First, Dr. Young testified that, prior to making the employment decision, she received a telephone call from Stafford Thompson, President of Enterprise-Ozark Community College, warning her that employing Dr. Emanuel might pose a problem for GCWCC. Dr. Young testified that her relationship with Dr. Thompson was such that his unsolicited phone call was very much out of the ordinary. (Ex. 33, Affidavit of Young). She further testified that his comment to her that he thought she should know that Dr. Emanuel would be a potential problem for the institution caused her great alarm. (Depo. of Dr. Young, p. 84, l. 1-7; p. 85, l. 17-p. 86, l. 5; Ex. 33, Affidavit of Dr. Young). Dr. Young was already aware that Emanuel had worked for Dr. Thompson at Enterprise and was no longer employed there. This fact, along with Dr. Thompson's warning, demonstrated to her that there must have been a serious problem with his employment at Enterprise. (Depo. of Dr. Young, p. 84, l. 1-7; p. 85, l. 17-p. 86, l. 5; Ex. 33, Affidavit of Dr. Young). Dr. Young testified that she had no intention of knowingly employing an instructor who would likely cause problems. (Ex. 33, Affidavit of Dr. Young).

Second, Dr. Young testified that the instructor selected for the position, Shatangi Ware, was a better fit for the institution. Although Dr. Emanuel has attained a higher

level of education (Ph.D.) in comparison to Ms. Ware (Master's degree), Dr. Young

testified that the position being filled did not require such a high level of academic

attainment.  In fact, Dr. Young testified that Emanuel's Ph.D. and years of teaching

experience in the four year college setting was not necessary or even desirable for the

position at issue.  Dr. Young testified that the position being filled was at a small rural

campus and involved a teaching position only.  Therefore, Dr. Emanuel's publication

experience and Ph.D. would be of little benefit.  (Ex. 33, Affidavit of Dr. Young).

Further, Dr. Young testified that she believed Ms. Ware would be more effective at

relating to the student body in light of the fact that she was from the area, had attended

and graduated from a two-year institution, and recently taught part time at a two year

institution.  Dr. Young testified that she believed Ms. Ware's enthusiasm, level of

education, and experience at that time made her a more suitable candidate for the

particular position at issue.  (Ex. 33, Affidavit of Dr. Young, Depo. of Dr. Young, p. 150,

l. 1-19).  Although Dr. Young agrees that Emanuel performed well in the interview and

had good qualifications, she testified that she was more impressed with Ms. Ware's

interview and believes that she was the best suited overall candidate for the job.

Finally, Dr. Young testified that Dr. Emanuel's higher degree and more total years

of teaching experience (even though much of it was in a university setting) would have

resulted in approximately $33,000.00 a year more in salary as compared to Ms. Ware.

(Ex. 33, Affidavit of Dr. Young, Depo. of Dr. Young, p. 121, l. 18-23; p. 122, l. 13-20).

In light of the needs of the institution for the particular position open at the Eufaula

campus, Dr. Young could not justify the expenditure of an additional $33,000.00 a year

for qualifications and experience that were neither necessary for nor beneficial to the available position.  Dr. Young summarized her decision best, "I selected her, Ms. Ware, because I believed that she was the best suited for this particular job because she had graduated from a community college, she was from the Dothan area, she had the qualifications of a master's degree that I thought was suitable for teaching this level of courses in speech communication and that we could employee her at $33,000 a year less than Dr. Emanuel and that I had gotten a call from Dr. Stafford Thompson indicating that there was a problem with him at Enterprise and I did not want to inherit a problem and pay $33,000 more a year and have a problem."  (Dr. Young Depo., p. 139, l. 16-p. 140, l. 6).  Based on the above legitimate nondiscriminatory reasons for Young's decision to hire Ware instead of Emanuel, GCWCC is entitled to summary judgment as to the Plaintiff's claim of disparate treatment.

II. **The Plaintiff cannot Demonstrate a *prima facie* Case of Disparate Impact as the Plaintiff has Failed to Identify a Specific Facially Neutral Policy Which Caused a Disparate Impact, the Relevant Applicant Pool Referenced by Plaintiff is Based Upon a Faulty Premise, and the Plaintiff Cannot Demonstrate that He was Individually Harmed by the Policy Challenged.**

The Eleventh Circuit has discussed the proof requirements in individual disparate impact claims as follows:

> Disparate impact claims brought pursuant to Title VII seek to show that facially neutral employment practices have significant adverse effects on protected groups, even in the absence of proof that the practice was adopted with discriminatory intent.  To establish a prima facie case of disparate impact, a plaintiff must show that "(1) there is a significant statistical disparity among members of different racial groups; (2) there is a specific, facially-neutral employment policy or practice; and (3) there is a causal nexus between the specific policy or practice and the statistical disparity."

> *Cooper v. S. Co.,* 390 F.3d 695, 724 (11th Cir.2004). If the plaintiff establishes a prima facie case, the employer can then respond with evidence that the challenged practice is both related to the position in question and consistent with business necessity. *Spivey v. Beverly Enters., Inc.,* 196 F.3d 1309, 1314 (11th Cir.1999). "However, even if the defendant satisfies this burden, a plaintiff may still prevail by proving that an alternative, non-discriminatory practice would have served the defendant's stated objective equally as well." *EEOC v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1275 (11th Cir.2000).

*Johnson v. Bd. of Trustees of University of Ala.,* 191 Fed. Appx. 838, 843-844, 2006 WL 2167616, *4 (11th Cir. 2006).

The Eleventh Circuit has further held that the establishment of individual harm by a disparate impact plaintiff is necessary to survive judgment as a matter of law.

> Even if the court ultimately finds that the employer has violated the disparate impact provisions of Title VII, **the plaintiff still must prove individual harm**: "[I]f an individual plaintiff has shown that he or she was within the class of persons negatively impacted by the unlawful employment practice, then **the employer must be given an opportunity to demonstrate a legitimate nondiscriminatory reason why, absent the offending practice, the individual plaintiff would not have been awarded the job or job benefit at issue anyway**."

*Id.* (emphasis added) (quoting *In re Employment Discrimination Litig. Against the State of Ala.,* 198 F.3d 1305, 1315 (11th Cir. 1999); *Stephen v. PGA Sheraton Resort, Ltd.,* 873 F.2d 276, 278-79 (11th Cir.1989)).

In *Stephen*, the Eleventh Circuit recognized decisions from Courts in other jurisdictions which have "required a plaintiff to show as part of his ***prima facie case*** that he has been a victim of the practice or policy which allegedly resulted in discriminatory impact." *Stephen*, 873 F.2d at 279 (emphasis added) (citing *Robinson v. Polaroid Corporation,* 732 F.2d 1010, 1016 (1st Cir. 1984) ("[w]here the disparate impact doctrine

has been used by the courts in individual actions rather than class actions, a plaintiff has been required to show that he personally has been the victim of discrimination by the general practice which allegedly resulted in a discriminatory impact on a protected group. It is not sufficient for an individual plaintiff to show that the employer followed a discriminatory policy without also showing that plaintiff himself was injured"); *Coe v. Yellow Freight System, Inc.,* 646 F.2d 444, 451 (10th Cir. 1981) (same); *Tagatz v. Marquette University,* 681 F.Supp. 1344, 1358 (E.D. Wis. 1988), *aff'd,* 861 F.2d 1040 (7th Cir. 1988) (same in context of age and religion discrimination suit)).

In *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 576 -577 (6th Cir. 2004), the Sixth Circuit recognized that a disparate impact claim could be maintained by an individual rather than a class, but the individual must prove personal harm to establish standing.

> In *Warth v. Seldin,* the Supreme Court explained the basic principles of standing, which mandate that a plaintiff have a 'personal stake in the outcome of the controversy' and that the plaintiff must have suffered some real or threatened injury. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (quotation marks and citation omitted). From these basic principles, it is natural for us to hold that an individual plaintiff arguing a disparate impact theory must show that the challenged policy directly disadvantaged him in some fashion. *See Bowdish v. Cont'l Accessories, Inc.,* No. 91-1548, 1992 WL 133022, at *5 (6th Cir. June 12, 1992) (noting an 'individual plaintiff in an employment discrimination case must present some evidence that demonstrates that his or her *individual* discharge was the result of discrimination') (unpublished opinion) (citing *Gilty v. Village of Oak Park,* 919 F.2d 1247, 1253 n. 8 (7th Cir.1990)).

The Court concluded that, whatever the validity of the disparate impact claims and supporting statistical evidence, since the plaintiffs could not prove that the policies injured them personally, the claims failed. *Bacon*, 370 F.3d at 576 -577.

It is also crucial to note that, in a disparate impact case, the employment policy at issue must be facially neutral.   In *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000), the Eleventh Circuit distinguished between *facially-neutral* and *facially-discriminatory* practices challenged under disparate impact theory.  The Court held that Plaintiff must prove that at least one "facially neutral" employment practice proximately caused the disparity at issue.  *Id.* at 1278.  "This finding is essential to avoid potential conflation of disparate treatment and disparate impact claims.  As we have noted, the essential difference between disparate treatment and disparate impact claims is that disparate treatment requires a showing of discriminatory intent and disparate impact does not."  *Id.*  The Court specifically noted that the judicial doctrine of disparate impact was initially created to redress *facially-neutral* policies or practices.  The Court further pointed out, "we are aware of no case in which a *facially-discriminatory* practice has been challenged successfully under disparate impact theory."  *Id.* (emphasis original).  "Simply put, disparate impact theory is available for the challenge of *facially-neutral* employment practices."  *Id.*

The primary focus during the disparate impact analysis is defining the qualified applicant pool to determine whether a disparate impact has in fact occurred.  *In re Employment Discrimination Litigation Against the State of Alabama*, 198 F. 3d 1305, 1312 (11th Cir. 1999).  "In order to determine whether an employment practice causes a 'disparate' impact, the Court must gain some handle of the baseline racial composition that the impact is 'disparate' from; that is, what should the racial composition of the job force look like absent the offending employment practice."  *Id.*  Quoting U. S. Supreme

Court precedent, the Eleventh Circuit explained that statistics based on applicant pools containing individuals lacking minimum qualifications are of little probative value. *Id*. Further, "the Supreme Court has described as 'nonsensical' comparisons to a baseline pool that is not adequately tailored to reflect only those potential applicants who are actually qualified for the job or job benefit at issue." *Id*. (internal citations omitted). The definition of a qualified applicant pool will shift with the nature of the job or job benefit and the nature of the challenged employment practice at issue. *Id*. The courts have found qualified applicant pools to be adequately represented by both regional and national population statistics depending upon the circumstances. *Id*. at 1313. "Using population figures as a proxy for the qualified applicant pool becomes troublesome, however, '[w]hen special qualifications are required to fill particular jobs.'" *Id*. (citing *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308 n. 13 (1977). The Eleventh Circuit has recognized that an employer may challenge the Plaintiff's claim of disparate impact by discerning fallacies or deficiencies in the data offered by the Plaintiff . *Id*. at 1313. "This includes evidence that the Plaintiffs have simply erred in their calculations or evidence that the Plaintiffs have failed sufficiently to tailor their qualified applicant pool." *Id*.

### A. Emanuel has failed to identify a specific facially neutral employment practice that caused him harm

First, Emanuel's disparate impact claims fail from the outset in that he has failed to specifically identify a *facially-neutral* employment practice that allegedly caused him harm. As noted by the U. S. Supreme Court, "the plaintiff must begin by identifying the specific employment practice that is challenged." *Watson v. Fort Worth Bank and Trust*,

487 U.S. 977, 994 (1988). Emanuel has failed to establish exactly which particular employment practice implemented by GCWCC has caused the alleged disparate impact. Emanuel generally complains that the goal structure of the *Shuford* Consent Decree has resulted in a disproportionate representation of white males. (Emanuel Depo., p. 95, l. 2-11; p. 148, l. 7-p. 149, l. 14; p. 154-157) However, he has failed to demonstrate that the college was under any specific obligation to implement those goals under threat of sanction or penalty. In fact, the *Shuford* Decree expressly states that the Decree is not to be construed as requiring the College to hire or promote any person, regardless of race or gender, who is not qualified for the position in question or to preclude the College from hiring or promoting the best qualified applicant regardless of race or gender. (Ex. 27).

Moreover, the Uniform Guidelines have express antidiscrimination provisions requiring that college officials not base hiring decisions on race or sex. Dr. Young testified that she at no time took race or gender into consideration in making the employment decision at issue and did not feel that the *Shuford* Decree placed any pressure on her to do so. (Ex. 33, Affidavit of Dr. Young.) In other words, the mere existence of goals set forth in the *Shuford* Consent Decree, which expressly states shall not be deemed as "quotas," does not sufficiently identify an employment practice that caused any harm to the Plaintiff. In fact, Dr. Young testified that the College has never met the *Shuford* goal for the employment of black females since the institution of the Consent Decree and has never been sanctioned for failing to do so. There is absolutely no evidence that the existence of the *Shuford* Decree goals had any impact on the hiring decision at issue in this case.

Moreover, to the extent that Emanuel is alleging that the *Shuford* goals are inherently discriminatory, he cannot at the same time hold out the Guidelines that set those goals as a "facially neutral" policy. To survive summary judgment, Emanuel must prove that a specific facially neutral employment practice has a disparate impact on a protected class provable by statistics. Emanuel claims that the *Shuford* Consent Decree establishes goals based on race and gender—obviously not facially neutral—while at the same time admitting that GCWCC has not achieved the *Shuford* goals—obviously not a disparate impact. The Eleventh Circuit has expressly rejected recovery under a disparate impact theory for allegedly *facially-discriminatory* employment practices. See *EEOC v. Joe's Stone Crab, Inc.*, 220 F. 3d at 1278.

Furthermore, to the extent that Emanuel is attempting to challenge the composition of the search committee (50% female and 40% black) as an inherently discriminatory practice resulting in a disparate impact, again, he suffers from a non-*facially-neutral* employment practice. Again, this provision is a direct result of the *Shuford* Decree which was designed to eradicate the history of discrimination in the two-year college system. Such remedial provisions are by their terms not *facially-neutral*. Moreover, Emanuel can certainly not demonstrate that he was harmed by the composition of the search committee in that the committee passed his application on to the next level of the employment process, and in that his name was ultimately submitted to the President as a finalist for the position. Obviously, the composition of the committee is irrelevant where its only action was to send the Plaintiff's employment application to the next level of the employment process.

**B.  Plaintiff's statistics are faulty and largely meaningless as they are based on a flawed labor pool.**

The Plaintiff's disparate impact claim also fails as he has based his analysis on a fallacy concerning the relevant labor pool.  Plaintiff claims that white males are under-represented on the D Salary Schedule at GCWCC in that (as of Sept. 2005) only 44% of the faculty at GCWCC were male, but males in the United States comprise 54% of the labor market.  (Ex. 19 to Emanuel Depo, p. 12).  Similarly, plaintiff claims that *white* males in the United States constitute 51% of the labor market, but only 40% of the faculty at GCWCC.  (Ex. 19 to Emanuel Depo., p. 13).  The labor market data upon which the Plaintiff relies is based upon U.S. Census data for all United States residents who have attained a Master's Degree or higher.  (Emanuel Depo., p. 154, l. 9-17)  What Emanuel fails to recognize, however, is that his labor pool is not appropriately tailored.

The undisputed evidence established by Dr. Young demonstrates that the D Salary Schedule is not always constrained to individuals who have obtained a Master's Degree or higher.  Because the community colleges have technical divisions, instructors employed in that division for technical or vocational courses are not necessarily required to have a Master's Degree.  Since the Plaintiff's relevant labor pool has been constrained to only those individuals who have attained a Master's Degree or higher, it is flawed and unreliable.

In addition, the Plaintiff has not shown where the Master's Degrees that are held by the persons in the purported applicant pool are in subjects for which GCWCC hired instructors within the 180-day period applicable to Title VII claims or within the two-

year statute of limitations period for other discrimination claims.  The U. S. District Court

presiding over the *Shuford* case approved of the usage of each college's respective

service area, not the nation as a whole, as the target area for setting employment goals.

Therefore, any analysis of the respective applicant pools should be based not on national

data, but on the education achievements of the persons within those various pools.   (Ex.

27).

Dr. Young testified that the position at issue was not advertised on a national

basis.  The Uniform Guidelines and school policies do not require national circulation of

the position.  There is absolutely no basis upon which to assume that the Plaintiff's U. S.

Census data for the entire United States is a reliable source for evaluating the relevant

labor pool.  Emanuel admitted in deposition that he did not obtain U. S. Census data from

Alabama alone, much less on the specific geographical service area for GCWCC.  Even if

he had, he would ostensibly have constrained those statistics to only those individuals

who have attained a Master's Degree or higher.  As discussed above, this would be an

inappropriate constraint on the relevant labor market.  Emanuel's statistics are therefore

unreliable, speculative, and based upon false premises.  Therefore, the Plaintiff cannot

hold out the data that he has referenced as establishing a *prima facie* case of disparate

impact.

### C.   Plaintiff has suffered no individual injury as a result of the alleged disparate impact.

Finally, the Plaintiff cannot demonstrate that he was personally harmed by the

challenged policy or practice.  As argued above, GCWCC can easily establish that,

notwithstanding the Shuford goals and Uniform Guidelines, Emanuel was not selected for the position for three legitimate, nondiscriminatory reasons, 1) Dr. Young received a telephone call from the President of another community college stating that Dr. Emanuel would be a problem if hired, 2) in the opinion of Dr. Young, Shatangi Ware was the best fit for the institution given her overall education and experience, and 3) Ms. Ware was $33,000.00 a year less expensive to employ that Dr. Emanuel would have been.  Because the evidence is undisputed that Dr. Young would not have selected Dr. Emanuel for the position, regardless of the *Shuford* Decree or the Uniform Guidelines, Emanuel cannot establish individual harm.  Without first establishing that he was harmed by the challenged employment practice, Emanuel's claims must fail.

Because the Plaintiff failed to identify a particular *facially-neutral* employment practice that has caused the disparate impact alleged, failed to demonstrate that he has individually suffered harm as a result of this employment practice, failed to demonstrate any causal connection between the challenged employment practice and the alleged disparate impact, failed to demonstrate a legally significant disparity between the racial composition caused by the challenged employment practice and the racial composition of the qualified applicant pool, and (most importantly) failed to present any evidence whatsoever that Dr. Young took his race or gender into account in making her selection, he has failed to establish a *prima facie* case.  As a result, GCWCC is entitled to summary judgment.

## CONCLUSION

Plaintiff's Complaint vaguely alleges disparate treatment and disparate impact against GCWCC based only on the fact that he was not hired after applying for a job at GCWCC and Ms. Ware, whom he claims had less qualifications, was hired. While the Cmplaint includes a single allegation of disparate treatment, there are no facts or allegations in the Complaint supporting a claim of disparate impact. The undisputed evidence establishes that Plaintiff was not hired because (1) President Young received a phone call from President Thompson warning her that plaintiff would be a problem, (2) Present Young thought Ms. Ware was a more suitable applicant overall for the position, and (3) Plaintiff would have cost GCWCC $33,000.00 a year more to employ than Ms. Ware. In light of these legitimate nondiscriminatory reasons, Plaintiff's disparate treatment claim fails as a matter of law. Further, Plaintiff's disparate impact claim fails because (1) he has failed to specifically identify a "facially neutral" employment practice that has caused a disparate impact, (2) the alleged "labor pool" upon which his statistical arguments rely is based on false premises and is unreliable, (3) he has failed produce any evidence that the challenged employment practice caused him to suffer personal harm, and (4) there is no evidence whatsoever that Dr. Young's hiring decision had anything to do with Plaintiff's race or gender. Therefore, GCWCC is entitled to summary judgment.

Respectfully submitted,


s/Andrew W. Christman (CHR024)
Attorney for Defendant
George C. Wallace Community College

OF COUNSEL:
Gidiere, Hinton, Herndon & Christman
P. O. Box 4190
Montgomery, AL  36103
Telephone:  (334) 834-9950
Facsimile:  (334) 834-1054

## CERTIFICATE OF SERVICE

I hereby certify that on this 9<u>th</u> day of <u>July</u>, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Adam M. Porter
2301 Morris Avenue, Ste. 102
Birmingham, AL 35203


s/Andrew W. Christman

# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

---

## CV-07-819-WKW

---

## DR. RICH EMANUEL,
**Plaintiff**

### v.

## GEORGE C. WALLACE COMMUNITY COLLEGE,
**Defendant**

---

**Narrative Statement of Undisputed Facts and Brief Filed in Support of
Defendant's Motion for Summary Judgment**

---

## BRIEF OF DEFENDANT
## GEORGE C. WALLACE COMMUNITY COLLEGE

---

### July 9, 2008

**ANDREW W. CHRISTMAN
Attorney for Defendant
Gidiere, Hinton, Herndon &
    Christman
P.O. Box 4190
Montgomery, AL 36103-4190
334-834-9950**

## <u>TABLE OF CONTENTS</u>

**Narrative Statement of Undisputed Facts**                                    1

    A.    College Guidelines and *Shuford* Criteria                    1

    B.    Application and Interviews of Plaintiff and Ms. Ware          5

**Summary Judgment Procedure and Standard**                                    18

**Legal Argument**                                                             19

    I.    Defendant GCWCC is Entitled to Summary Judgment as to the     19
Plaintiff's Claims of Disparate Treatment as the President of the
College had Legitimate Non-Discriminatory Reasons for
Selecting the Individual Who was Ultimately Employed in the
Position.

    II.    The Plaintiff cannot Demonstrate a *prima facie* Case of     25
Disparate Impact as the Plaintiff has Failed to Identify a Specific
Facially Neutral Policy Which Caused a Disparate Impact, the
Relevant Applicant Pool Referenced by Plaintiff is Based Upon a
Faulty Premise, and the Plaintiff Cannot Demonstrate that He
was Individually Harmed by the Policy Challenged.

        A.    Emanuel has failed to identify a specific facially neutral     29
employment practice that caused him harm

        B.    Plaintiff's statistics are faulty and largely meaningless as     32
they are based on a flawed labor pool.

        C.    Plaintiff has suffered no individual injury as a result of the     33
alleged disparate impact.

**Conclusion**                                                                 35

Certificate of Service                                                         36

## <u>TABLE OF AUTHORITIES</u>

| <u>*CASES*</u> | <u>PAGE</u> |
|---|---|
| *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) | 18, 19 |
| *Bacon v. Honda of America Mfg., Inc.*,  370 F.3d 565 (6th Cir. 2004) | 27 |
| *Bowdish v. Cont'l Accessories, Inc.,* No. 91-1548, 1992 WL 133022, at *5 (6th Cir. June 12, 1992) | 27 |
| *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) | 18 |
| *Chapman v. AI Transport*, 229 F.3d 1012 (11th Cir. 2000) | 22 |
| *Clarks v. Coats and Clark, Inc.*, 990 F.2d 1217 (11th Cir. 1993) | 21 |
| *Coe v. Yellow Freight System, Inc.,* 646 F.2d 444 (10th Cir. 1981) | 27 |
| *Cooper v. S. Co.,* 390 F.3d 695 (11th Cir.2004) | 26 |
| *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265 (11th Cir. 2002) | 20, 21, 26, 28, 31 |
| *Gilty v. Village of Oak Park,* 919 F.2d 1247 (7th Cir.1990) | 27 |
| *Hairston v. Gainesville Publ'g Co.*, 9 F.3d 913 (11th Cir. 1993) | 18 |
| *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299 13 (1977) | 29 |
| *Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997) | 20, 21 |
| *In re Employment Discrimination Litig. Against the State of Ala.,* 198 F.3d 1305 (11th Cir. 1999) | 26, 28, 29 |
| *Johnson v. Bd. of Trustees of University of Ala.,* 191 Fed. Appx. 838, 2006 WL 2167616, *4 (11th Cir. 2006) | 26 |
| *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) | 19 |
| *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) | 21 |

*Penning v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001)   22

*Pennington v. City of Huntsville*, 93 F. Supp.2d 1201 (N.D. Ala. 2000)   19

*Perryman v. Johnson Prods. Co.*, 698 F.2d 1138 (11th Cir. 1983)   22

*Personnel Adm'r v. Feeney*, 442 U.S. 256 (1979)   20

*Price v. M & H Valve Co.*, 177 F. Appx. 1 (11th Cir. (Ala) 2006)   22

*Ricky Grider v. Alabama Department of Corrections*, 2007 WL 2254405   20
(M.D.Ala. 2007)

*Robinson v. Polaroid Corporation,* 732 F.2d 1010 (1st Cir. 1984)   26

*Rollins v. TechSouth, Inc.*, 833 F.2d 1525 (11th Cir. 1987)   19

*Rowell v. BellSouth Corp.*, 433 F.3d 794 (11th Cir. 2005)   22

*Schoenfeld v. Babbitt*, 168 F.3d 1257 (11th Cir.1999)   21

*Shuford, et al. v. Alabama State Board of Education, et al.*, Civil Action   2
No. 89-T-196-N.

*Spivey v. Beverly Enters., Inc.,* 196 F.3d 1309 (11th Cir.1999)   26

*Stephen v. PGA Sheraton Resort, Ltd.,* 873 F.2d 276 (11th Cir.1989)   26

*Tagatz v. Marquette University,* 681 F.Supp. 1344 (E.D. Wis. 1988),   27
*aff'd,* 861 F.2d 1040 (7th Cir. 1988)

*Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089,   21
67 L.Ed.2d 207 (1981)

*Vessels v. Atlanta Ind. Sch. Sys.,* 408 F.3d 763 (11th Cir.2005)   20

*Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)   27

*Watson v. Fort Worth Bank and Trust*, 487 U.S. 977 (1988)   29

*Welch v. Celotex Corp.*, 951 F.2d 1235 (11th Cir. 1992)   19

*Wilson* [*v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2005)] at 1088     22

**<u>STATUTES</u>**                                                     **PAGE**

*Ala. Code* (1975), §16-60-111.7                                         2

# Emanuel's professional vita



EMANUEL--0245--PLF DOX

# Richard Emanuel

## PROFESSIONAL PROFILE

Teacher ♦ Trained Problem Solver ♦ Team Player
Effective Public Speaker and Presenter
Excellent Writer ♦  Strong Administrative Leadership Abilities

Creative, Published Scholar with strong background in
Communication, Research, and Computer Science

Active Community Service Volunteer ♦ Speech Consultant

Computer Skills – Online instruction via Blackboard,
Word processing, Spreadsheet, Desktop Publishing

Goal Oriented ♦  Attentive to Detail ♦ Self Motivated
Principled ♦ Enthusiastic ♦ Dedicated

EMANUEL--0246--PLF DOX

# EDUCATIONAL BACKGROUND

FLORIDA STATE UNIVERSITY   Tallahassee, Florida / 1989
   **Doctor of Philosophy Degree**
   Major Concentration: Communication Theory and Research
   Teaching Assistantship: College of Communication
   President, Graduate Student Advisory Council

AUBURN UNIVERSITY   Auburn, Alabama / 1984
   **Master of Speech Communication Degree**
   Major Concentration: Speech Communication
   Teaching Assistantship: College of Liberal Arts
   Professional Internship: Minority Student Recruiting

GEORGE WASHINGTON UNIVERSITY   Washington, D.C. / 1982
   Graduate Coursework
   Major Concentration: Information Systems Technology
   Scottish Rite Fellow - School of Government & Business Administration

UNIVERSITY OF MONTEVALLO   Montevallo, Alabama / 1982
   **Bachelor of Science Degree**
   Major Concentration: Speech & Theater
   Minor Concentrations: English, Math
      Awards and Activities:
         Algernon Sydney Sullivan Award (most outstanding male graduate)
         Student advisor to the University President
         Student Government Association – Vice President,
                Senate President, Senator
         Omicron Delta Kappa National Leadership Honor Society
         Lambda Pi Eta National Communication Studies Honor Society
         Sigma Tau Delta English Honor Society
         Alpha Psi Omega Theatre Honor Society
         Speech Department Senior Elite Award
         Civitan Citizenship Scholarship
         Forensics Team Member
         Dean's List
         College Night Production (a unique campus tradition)
         Who's Who Among Students in American Colleges & Universities

EMANUEL--0247--PLF DOX

Richard Emanuel                                                                                    3

# PROFESSIONAL EXPERIENCE

**Associate Professor of Communication**
Alabama State University / Montgomery, AL / 2002-Present
      Teach undergraduate Communication courses
      Chair – College of Arts & Sciences Courtesy Committee
      Chair – College of Arts & Sciences Curriculum Committee
      Chair – Communication Department Retention Committee
      Chair – Communication Department Forensics Committee
      Chair – Faculty Senate Budget Review Committee
      Faculty Senate - Senator-at-large
      Provide academic advising for student academic plans
      Participate in national professional organizations

**Assistant Professor of Communication**
University of Montevallo College of Fine Arts / Montevallo, AL / 1999-2002
      Teach graduate and undergraduate Communication courses
      Member of the Graduate Faculty
      Advisor/Founder – Lambda Nu Chapter - Lambda Pi Eta National Honor Society
      Chair – Communication Arts Scholarship Committee
      Provide instruction, guidance and supervision for student academic plans
      Sponsor and advise student organizations
      Review textbooks
      Participate in national professional conventions

**Instructor of Communication**
Enterprise State Junior College / Enterprise, AL / 1989-1999
      Chair - Committee responsible for campus Internet connection
      Chair - Student Publications Scholarship Committee
      Pilot-test Alabama's first web-based Public Speaking course using WebCT
      Direct Communication Internship Program
      Direct Student Publications
      Direct Readers Theater presentations
      Curriculum Committee

**Assistant Professor of Communication and Acting Chair, Fine Arts Department**
Tift College of Mercer University / Macon, GA / 1984-1986
      Responsible for budget, student employees, and theater facilities
      Theater Director – College and Community Theater

**Adjunct Instructor of Communication**
USAF Air Command and Staff College –
   Qualified Distance Learning Instructor    Montgomery, AL   Fall 2007
Auburn University – Montgomery              Montgomery, AL   2005-2006
Trenholm State Technical College           Montgomery, AL   Summer & Fall 2005
Lurleen B. Wallace Community College      Andalusia, AL     2003-2005

## Richard Emanuel                                                                 4

PROFESSIONAL EXPERIENCE (continued):

**Adjunct Instructor of Communication**

| | | |
|---|---|---|
| Huntingdon College | Montgomery, AL | Spring 2005 |
| Wallace Community College Selma | Selma, AL | Summer 2003 |
| Shelton State Community College | Tuscaloosa, AL | Spring 2002 |
| Michael E. Stephens College of Business | Montevallo, AL | 1999-2000 |
| Troy University | Troy, AL | 1999 |
| Faulkner University | Montgomery, AL | 1993 |
| Central Alabama Community College | Phenix City, AL | 1983 |

**Graduate Student Instructor**

| | | |
|---|---|---|
| Florida State University | Tallahassee, FL | 1986-1989 |
| Auburn University | Auburn, AL | 1983-1984 |

# PUBLICATIONS

Communication Education in U.S. Community Colleges: A Status Report. Accepted for publication in *Communication Education*, 2008.

How college students spend their time communicating. Accepted for publication in the *International Journal of Listening*, Spring 2008.

Assessing college student perceptions of instructor customer service via the Quality of Instructor Service to Students (QISS) Questionnaire. *Journal of Assessment and Evaluation in Higher Education*, October 2006.

The Case for Fundamentals of Oral Communication. *Community College Journal of Research and Practice*, February 2005.

Do students' style preferences differ by grade level, orientation toward college, and academic major? *Research in Higher Education*, June 1992.

Student's preferences for communication styles and their relationship to achievement. *Communication Education*, July 1990.

The Montgomery Bus Boycott: A Readers Theater Production Compiled, Edited and Directed by Richard C. Emanuel. *Readers Theatre Digest*, Issue #10, Fall 2005. On-line at www.readerstheatredigest.com.

I Rise: A Testimony of Commitment and Sacrifice for Civil Rights: A Readers Theater Production Compiled, Edited and Directed by Richard C. Emanuel. *Readers Theatre Digest*, Issue #8, Spring 2005.

*The Status of Communication Education in the Nation's Community Colleges: Who are we and What do we do?* Accepted for presentation at the National Communication Association Convention, Chicago, IL, November 2007.

*Talk about campus sustainability: Do students know what this means? Do they care?* Accepted for presentation at the Humanities and Technology Association annual conference, Terre Haute, IN, October 2007.

*The State of Communication Education in Alabama.* Presented at the Alabama Articulation and General Studies Committee meeting, Montgomery, AL, March 2007.

*How African-American college students spend their time communicating.* Presented at the Alabama State University College of Arts and Sciences Research and Creative Activities Symposium, Montgomery, AL, March 2007.

*The Communication Curricula in the Nation's Community Colleges: Our Next Steps.* Presented at the National Communication Association Convention, San Antonio, TX, November 2006.

*How college students spend their time communicating.* Presented at the National Communication Association Convention, San Antonio, TX, November 2006.

*What NCA does and is doing for two-year college instructors.* Presented at the National Communication Association Convention, Boston, MA, November 2005.

*Applying the Quality of Instructor Service to Students (QISS) approach to Student Relationship Management (SRM).* Invited presentation at the International Alliance of Teachers/Scholars Lilly North Conference on College Teaching and Learning, Traverse City, MI, September 2005.

*Assessing college student perceptions of instructor customer service via the Quality of Instructor Service to Students (QISS) questionnaire.* Presented at the Southern States Communication Association Convention, Baton Rouge, LA, April 2005.

*Teaching in the Community College: How and why it is different than 4-year institutions.* Presented at the National Communication Association Convention, Chicago, IL, November 2004.

Association Convention, Miami Beach, FL, November 2003.

XQQ-1Td-J9ZO-JJONVWJ3

*Reaching out beyond the traditional classroom: Online Public Speaking.* Presented at the National Communication Association Convention, Miami Beach, FL, November 2003.

*Progressive Persuasion: A Great Idea for Teaching Speech (G.I.F.T.S.).* Presented at the National Communication Association Convention, Miami Beach, FL, November 2003.

*Developing and using an on-line speech journal as a resource for rhetorical analysis.* Presented at the National Communication Association Convention, Atlanta, GA, November 2001.

*Alabama Speeches: On-line resource for rhetorical analysis.* Presented at the National Communication Association Convention, Atlanta, GA, November 2001.

*Professional Development Workshop for Alabama's Two-Year College Speech Instructors.* Montevallo, AL, March 2001

*Public Speaking: Your Ally or Your Enemy.* Presented to the State Association of Admissions Counselors & Registrars, Mobile, AL, Spring 1997.

*Leadership and Communication.* An invited presentation at the Wiregrass Leadership Conference, Dothan, AL, Spring 1996.

*Taming Your Southern Accent.* A short-course in accent reduction offered to the Wiregrass community, Enterprise, AL, Spring 1994.

*Address to Seniors.* Presented to the University of Montevallo degree candidates, Montevallo, AL, Spring 1991.

*Grade level differences in preferences for learning styles and instructor communicator style.* Presented at the International Communication Association Convention, San Francisco, CA, 1989

*Adolescents' preferences for instructional styles and their relationship to achievement.* Presented at the International Communication Association Convention, San Francisco, CA, 1989.

# COURSES TAUGHT

ADVANCED PUBLIC SPEAKING
This is a performance course that includes study of the history and theory of public address, with emphasis on composition and delivery. Prerequisite: Fundamentals of Public Speaking.

BUSINESS COMMUNICATION
This course covers written, oral and nonverbal forms of communication. Topics include the application of communication principles to the production of clear, correct, and logically organized faxes, e-mail, memos, letters, résumés, reports, and other business communications.

COMMUNICATION RESEARCH METHODS
This course examines the relationship of theory and methods, research design, and measurement in communication contexts.

COMMUNICATION THEORY
This course offers an in-depth exploration of communication theories as they relate to interpersonal, group, public, and other communication contexts. Emphasis is placed on how theories are formulated and evaluated. This course carries Writing Reinforcement credit.

FUNDAMENTALS OF ORAL COMMUNICATION
This is course provides an overview of communication that includes the principles of human communication in a variety of contexts. The course focuses on public speaking, theory, and group communication. It provides students with opportunities for practical application of communication principles.

FUNDAMENTALS OF PUBLIC SPEAKING
This course explores principles of audience and environment analysis as well as the actual planning, rehearsing and presenting of formal speeches to specific audiences. Historical foundations, communication theories and student performances are emphasized.

GROUP DISCUSSION
This course explores the principles and theories of small group processes with an emphasis on group problem-solving. This course also provides opportunities for service-learning application of group problem-solving skills.

INTERPERSONAL COMMUNICATION
Students study effective dyadic communication in family, social, and work environments. The course explores such topics as the development of the self-concept, perception, language, nonverbal communication, and conflict management

## Richard Emanuel                                                                                8

COURSES TAUGHT (continued):

INTRODUCTION TO MASS COMMUNICATION
A general study of mass communication and journalism. This course includes history, theory, development, regulation, operation, and effects of mass communication upon society.

INTRODUCTION TO THEATER
A general study of the history and development of theater. This course introduces basic theatrical elements and techniques.

NEWS WRITING
This course is a first writing course in journalism. It features journalistic style, copy reading, story types, headlines, and page make-up. This course also includes instruction and practice in news gathering and news writing techniques.

ORGANIZATIONAL COMMUNICATION
This course is a study of the principles of group discussion, leadership, conflict, and communication patterns in businesses and organizations.

ORAL INTERPRETATION
This course helps students develop specific skills in the analysis and oral interpretation of poetry, prose, and drama.

RADIO AND TELEVISION NEWSWRITING
A study of basic styles, principles and techniques of broadcast news writing and editing.

RHETORICAL CRITICISM
An analysis of speeches, campaigns, and other rhetorical artifacts, using established methodologies. Prerequisite: English Composition and six hours of Communication Studies courses.

VOICE AND DICTION
This course provides training for improvement in use of the speaking voice. Attention is focused on standards of Standard American English. A study of the International Phonetic Alphabet is included.

# PROFESSIONAL MEMBERSHIPS

*National Communication Association*
Active Member of the Community College Section
Chair, Outstanding Community College Educator Award Committee
Founder, Community College Section web site

*Southern States Communication Association*
Executive Director Search Committee Member

EMANUEL--0253--PLF DOX

## Richard Emanuel                                                                 9

## Community Service
- *Montgomery's Civil Rights Tour brochure.* A self-guided driving tour of historic Civil Rights landmarks in Montgomery, Alabama. Presented to the city of Montgomery. October 18, 2005.
- *Monumental Statements of Faith.* Presented to the Governor and State Auditor of Alabama. May 2005.
- *Individual Professional Certification.* Proposal submitted to the American Communication Association. March 2002.
- *Dr. King had it right.* Letter to the editor of the *Birmingham News.* February 2002.
- *The Great State Game.* Idea submitted to The American Village and Citizenship Trust. September 2001.
- *Penny Press.* Idea submitted to The American Village and Citizenship Trust. September 2001.
- *Alabama State quarter.* Design submitted to the Alabama State Department of Education. August 2001.
- EF Educational Tours Spring Break Travel Leader – Italy 2001
- *Algernon Sydney Sullivan Award pin.* Idea submitted to the Algernon Sydney Sullivan Foundation. February 2001.
- *Noise Ordinance legislation.* Submitted to the Alabama League of Municipalities. June 2000.
- *Textbook rental project.* Submitted to the Enterprise State Junior College Business Office. March 1998.
- Montevallo Class of 1982 Representative
- "Remember Columbine" – created fund-raising vinyl-cling sticker
- American Heart Association – fund-raising volunteer
- Boy Scouts of America – Assistant Den Leader
- Habitat for Humanity – construction volunteer, fund-raising volunteer
- National Cancer Society – fund-raising volunteer
- Special Olympics - volunteer
- YMCA – little league tee-ball coach

## Church-Related Service
- Los Hurtados, Nicaragua – short-term volunteer evangelism mission project
- Juan Griego, Venezuela – Autauga Baptist Association dental/evangelism project
- Montevallo, AL – College and Career Sunday School teacher; Finance committee
- Malindi, Kenya – participated in a two-week evangelism effort
- Enterprise, AL – Ordained Deacon; evangelism trainer
- Inlet, NY – construction mission volunteer
- Oklahoma City, OK –downtown rescue mission volunteer
- Providence, RI – backyard Bible club leader
- Navajo Reservation, NM – church construction and evangelism team
- Washington, DC –inner-city day camp leader
- Huntsville, AL – inner city day camp leader; Tour Choir member

# What students are saying* about Dr. Emanuel at Alabama State University

"Dr. Emanuel is a good teacher who cares about his students."

"The teacher takes time to help the class when we don't understand."

"I am glad that this class is taught at a reasonable rate. It is so organized. You take the class step by step."

"He never wastes a minute of class time!"

"Dr. Emanuel is determined to help the class pass if they are willing to help themselves. I am also glad that he starts on time and finishes on time. Punctuality is a plus."

"Dr. Emanuel is a good teacher who explains the material very well and does everything he can to help you get an A."

"Dr. Emanuel is an excellent instructor. I was very encouraged by him. He's an understanding, fair teacher."

"He relates Public Speaking to everyday life."

"Dr. Emanuel is a very good instructor. He takes the time to help you understand and he makes the class interesting."

"He is an extremely talented teacher. He makes the class interesting and fun."

"Your class was great overall!"

"I always felt comfortable coming to class for the simple fact that I knew I would learn something different every day."

"I feel that this was the best class I have been in since I've been at ASU. You are a great professor and a lot of fun even when you are serious."

"I loved this class. I looked forward to coming to class. I learned a lot. I would recommend this class to all of my friends."

"You are very organized and always on time. I give you an A+ as a teacher."

"I love the way you conducted your class. If I were you I wouldn't change a thing – it can't get any better than that."

* Comments voluntarily provided on Instructor/Course evaluations at Alabama State University.

# What students said* about Dr. Emanuel at
# LBW Community College

"I liked being in your class and I think you are a great teacher."

"I really enjoyed the class. It helped me to become a more confident public speaker."

"I have really enjoyed your class. I hope that your next speech class enjoys your class as much as I have. Thanks for the rewarding experience."

"This speech class was a great experience for me. In this class I learned how to interact with others. At first I was pretty nervous about doing a public speech, but since I have been in this class I have learned how to prepare and present a speech. This speech class also taught me about the most important factor in a conversation – Listening. This was a great class and I enjoyed it."

"Your relaxed demeanor makes class enjoyable. It also makes you approachable as an instructor."

"The course was well taught and very organized."

"I have enjoyed this class. I think that you are a great teacher; students can learn a lot in your class if they are willing to learn. Thank you, Dr. Emanuel, for a great speech class."

"I enjoyed this class and I would recommend it to anyone."

* Comments voluntarily provided by students at LBW Community College.

## What others are saying about Dr. Emanuel

"Richard is a valuable addition to this department. His comments in faculty meetings are reasoned and thoughtful. He brings maturity and teaching experience to a relatively inexperienced faculty."
— COMMUNICATION ARTS DEPARTMENT CHAIR

"Dr. Emanuel knows his subject matter. The material presented was very significant. He gave very good examples of points made. In all, his classroom presentation was well prepared and well organized."
— ENGLISH & COMMUNICATION DIVISION CHAIR

"Dr. Emanuel is an excellent classroom instructor. He knows his subject area, is well prepared for his class instruction, [and he] is comfortable with a variety of classroom presentations including the lecture, discussion groups, projects, student reports, student panels, and seminar-type discussions."
— VICE PRESIDENT FOR EDUCATIONAL PROGRAMS AND DEAN

"In the community, Dr. Emanuel readily gives his time to work with the Arts Alliance, to judge literary competitions, and most recently to serve as a consultant to a local high school as they consider building an auditorium for their institution."
— DIVISION OF ARTS & SCIENCES CHAIR

"Dr. Emanuel is a man of extraordinary competence and caring commitment to the highest ideals of the profession. He is a role model who believes, as I do, that we should practice what we preach. He is a capable teacher and creative researcher, whose quiet manner sometimes may conceal the dedication and passion he possesses."
— DEPARTMENT OF SPEECH & THEATER CHAIR

"I have seen Dr. Emanuel make presentations, I have heard him discuss pedagogical issues, and I have heard his students talk about his courses. I am convinced that he is a solid teacher, one who has high standards and also cares about individual students and their learning."
— ASSOCIATE PROFESSOR OF COMMUNICATION

"Thanks again for your letters of reference which helped our daughter obtain scholarships and Wheaton College admission."
— GRATEFUL PARENTS

# What students said* about Dr. Emanuel at the University of Montevallo

"Dr. Emanuel is a wonderful professor. He is so down to earth and understanding. All teachers need this trait. I thoroughly enjoyed being in his class."

"Dr. Emanuel is a great teacher. He is knowledgeable and he truly cares about his students."

"I wish I could bubble in a 10 (the highest rating only goes to '5') on 'clearly explains concepts, ideas, or theories'."

"Dr. Emanuel is a wonderful instructor. He truly cares about his students. He is passionate about his subject and he sets a good example for students. He is extremely personable. He believes that all experiences are learning experiences and is not afraid to share them with his students."

"Dr. Emanuel is the best instructor that I have had since my college career began. He is well rounded and should be considered an asset to the University of Montevallo."

"Dr. Emanuel is always prepared for class, he is knowledgeable in the subject and always seems eager to teach - great instructor."

"The instructor motivated me to excel. He worked really well with the students. He was always available to get help from and was very approachable. He was a really encouraging instructor."

"Dr. Emanuel is an extremely gifted professor who offers students more than an incredible intellect and knowledge of the subject matter. He is also a great motivator and an incredible example of a man of initiative, self-drive, and compassion. I wish all my teachers would care as much as he does."

"In my opinion, Dr. E. has made a significant impact on my wanting to learn as much as possible. He has helped me understand the importance of class and made me want to go to class."

"Dr. Emanuel deserves to be considered an elite among professors. GREAT TEACHER! He is very expressive in class. He was also very respectful and kind."

---

* Comments voluntarily provided on Instructor/Course evaluations at the University of Montevallo

## What students said* about Dr. Emanuel at the Enterprise State Junior College

"Dr. Emanuel is a good teacher with great knowledge of the subject. I would be happy to have him for every subject. He relates well to students."

"Excellent job. He keeps our attention in class, not boring."

"Dr. Emanuel is a good and interesting teacher. He does very well using real life stories to demonstrate the points he is trying to make."

"Dr. Emanuel really encourages student input. He was willing to listen and help students when they confronted him with a problem."

"Good job! I have enjoyed this class very much! I would recommend him to anybody."

"Dr. Emanuel clearly and honestly works to build our self-confidence and our ability to communicate more effectively. He has made a difference in our lives."

"I have enjoyed Dr. Emanuel's class. He has taught me how to believe in myself and how to accept others as they are. He has made a difference in my life."

"Dr. Emanuel is energetic. He makes learning enjoyable."

"He is very willing to work with students on any work, projects, tests, etc."

"Dr. Emanuel is an enthusiastic man with a mature style of teaching. Great speaker. Able to keep my attention."

"He did a good job making the topics interesting and relevant. Dr. Emanuel teaches with excitement."

"Dr. Emanuel is a very good teacher. He makes the subject very understandable. He makes me feel like this really will be useful in the rest of my life."

"Although I thought I would strongly dislike this speech class because I am terrified of public speaking, he really made this my favorite class."

---

* Comments voluntarily provided on Instructor/Course evaluations at the Enterprise State Junior College.

# Richard Emanuel

Total graduate semester hours of **Communication** related courses = 56

<u>Florida State University – College of Communication</u>
Analysis of Communication Theory
Colloquium in Communication
Methods of Communication Research
Organizational Communication Theory
Quantitative Methods of Communication Research
Supervised Research
Supervised Teaching
Dissertation

Total graduate semester hours of **Computer Science** related courses = 18

<u>University of Montevallo – College of Business</u>
COBOL Programming
<u>Auburn University – Department of Communication</u>
Statistical Package for the Social Sciences (SPSSx)
<u>George Washington University – Graduate School of Business and Public Management</u>
Information Systems Development
Data Base Systems
Cybernetics and Artificial Intelligence
Directed Reading & Research in Information Systems Technology

EMANUEL--0260--PLF DOX

**ENTERPRISE STATE JUNIOR COLLEGE**
*Your Investment in Excellence*
January 8, 1999

OFFICE OF THE PRESIDENT

Dr Richard Emanuel
202 Pinehurst Drive
Enterprise, AL 36330

Dear Dr Emanuel:

This is to notify you that it is my intention to terminate your employment as an instructor with Enterprise State Junior College effective at the close of the business day on February 15, 1999 As of the effective date of this termination, if imposed, your employment relationship, and all benefits and compensation related thereto, shall cease  You will, however, be able to retain your health insurance coverage under the COBRA Act by making the premium payments yourself You will receive further information regarding such health insurance coverage from the Business Office

If this intended termination action is taken, it will be taken pursuant to the *Fair Dismissal Act* and the Revised Hearing Procedures of the Alabama State Board of Education  A copy of the Revised Hearing Procedures and guidelines are enclosed  Your termination, if imposed, would be based upon good and just causes, including inappropriate and unprofessional conduct on your part which occurred within, or related to, your capacity as an instructor at Enterprise State Junior College  The inappropriate and unprofessional conduct to which I refer includes the following:

- unwelcome sexual advances toward female students
- solicitation of sexual favors from female students in exchange for grades or grade changes
- engaging in sexual intercourse with a female student on college property
- making degrading and other sexually demeaning and unnecessary comments about and to female students in the classroom and in the faculty office
- stalking female students
- using college equipment for unwelcome sexual advances toward a female student
- failure to heed the counsel of the Dean of Instruction to cease inappropriate behavior toward female students
- failure to act in conformance with sexual harassment training provided by the college

Under the *Fair Dismissal Act* and the Revised Hearing Procedures of the Alabama State Board of Education, you are entitled, subject to the terms and conditions of the *Fair Dismissal Act* and the Revised Hearing Procedures, to appeal my decision, if imposed, that your employment be terminated  If you intend to appeal the termination, if imposed, then you must notify Chancellor Fred Gainous and me in writing within fifteen (15) calendar days of your receipt of this letter of your intent to contest the intended termination, if imposed.  If you do not intend to contest the termination action, if imposed, then you need not respond to this letter.



DEFENDANT'S
EXHIBIT
2

Dr Emanuel
Page 2
January 8, 1999

If you timely appeal your termination. if imposed, then a hearing will be scheduled on your appeal  This hearing will be scheduled and conducted in accordance with the Revised Hearing Procedures and Guidelines  In the event that a hearing is conducted. the names of the witnesses who may appear and testify on behalf of the college, and the nature of their respective testimony. would be as stated below.

1   Dr  Joan Newman. Interim Dean of Instruction at Enterprise State Junior College, may testify concerning her investigation of sexual harassment complaints against you  She may also testify about previous warnings and counseling received by you regarding inappropriate conduct toward female students  She may also testify about training provided to you by the college regarding sexual harassment  She may also testify about your inappropriate conduct and your violation of federal law and Alabama State Board of Education policy

2   Dr  Stafford Thompson, President of Enterprise State Junior College. may testify generally concerning the reasons for his decision to terminate your employment  He may also testify about the detrimental effect upon the mission and goals of Enterprise State Junior College arising from your inappropriate conduct and contact relating to female students at the college. including the detrimental effect upon the morale of Enterprise State Junior College employees and students  He may also testify about your inappropriate conduct and your violation of federal law and Alabama State Board of Education policy

3   Ms  Suzanne Dubose may testify regarding an e-mail from you requesting her to participate in an inappropriate and unwanted act of a sexual nature.   ?

4   Eric Reynolds may testify that he witnessed an e-mail from you to Ms  Dubose

5   Ms  Jacqueline M  Detty may testify about unprofessional and disrespectful statements made to her, and her fear of unwanted touching by you.

6   Ms  Jennifer Harriman may testify regarding the attendance policy of the English Department which makes no allowances for parents with children who may become ill from time to time. and if so, student's grades are penalized for missing class

7   Ms  Donna Milstead may testify regarding the grading practice and your request for personal information from female students, and her subsequent withdrawal from the College rather than to continue to be ridiculed in class by you.

8   Ms  Lisa Cowart-Brown may testify regarding a request for sexual favor in exchange for a grade change

Dr Emanuel
Page 3
January 8, 1999

9   Dr Judy Miller may testify indicating counsel with Ms Sheetal Donahue due to inappropriate statements of a sexual nature, unwelcome touching, and parking in front of Ms Donahue's home.

10   Dr Betty Cully may testify indicating counsel with a female student concerning discomfort with conversations with you and your actions which were interpreted as your desire of an inappropriate relationship. She may also testify about her counsel with Ms Suzanne Dubose concerning an e-mail said to have been sent by you.

11   Ms Teresa Pearcy, substitute speech instructor, may testify that a fall semester student, Mindy Clarke petitioned to complete the speech class after she stopped attending class rather than have any further contact with you.

12   Enterprise State Junior College may also call one or more rebuttal witnesses to testify.

Please contact me if you have any questions regarding this Notice of Intent to Terminate Employment

Sincerely,

Stafford L. Thompson
President

SLT/md

Enclosures - 2

ENTERPRISE STATE JUNIOR COLLEGE



OFFICE OF THE PRESIDENT

January 26, 1999

Dr. Richard Emanuel
202 Pinehurst Drive
Enterprise, AL 36330

Dear Dr. Emanuel,

This is to notify you of my decision to terminate your employment as an instructor with Enterprise State Junior College effective at the close of the business day on February 15, 1999. As of the effective date of this termination, your employment relationship, and all benefits and compensation related thereto, shall cease. You will, however, be able to retain your health insurance coverage under the COBRA Act by making the premium payments yourself. You will receive further information regarding such health insurance coverage from the Business Office.

This action is pursuant to the *Fair Dismissal Act* and the Revised Hearing Procedures of the Alabama State Board of Education. A copy of the Revised Hearing Procedures and guidelines were enclosed with my January 8, 1999, correspondence. Your termination is based upon good and just causes, including inappropriate and unprofessional conduct on your part which occurred within, or related to, your capacity as an instructor at Enterprise State Junior College. The inappropriate and unprofessional conduct to which I refer includes the following:

* unwelcome sexual advances toward female students
* solicitation of sexual favors from female students in exchange for grades or grade changes
* engaging in sexual intercourse with a female student on college property
* making degrading and other sexually demeaning and unnecessary comments about and to female students in the classroom and in the faculty office
* stalking female students
* using college equipment for unwelcome sexual advances toward a female student
* failure to heed the counsel of the Dean of Instruction to cease inappropriate behavior toward female students
* failure to act in conformance with sexual harassment training provided by the college

Under the *Fair Dismissal Act* and the Revised Hearing Procedures of the Alabama State Board of Education, you are entitled, subject to the terms and conditions of the *Fair Dismissal Act* and the Revised Hearing Procedures, to appeal my decision to terminate your employment. If you intend to appeal the termination, then you must notify Chancellor Fred Gainous and me in writing within fifteen (15) calendar days of your receipt of this letter of termination. If you do not intend to contest the termination action, then you need not respond to this letter.



DEFENDANT'S
EXHIBIT
3

Dr Emanuel
Page 2
January 26, 1999

If you timely appeal your termination, then a hearing will be scheduled on your appeal. This hearing will be scheduled and conducted in accordance with the Revised Hearing Procedures and Guidelines. In the event that a hearing is conducted, the names of the witnesses who may appear and testify on behalf of the college, and the nature of their respective testimony, would be as stated below.

1. Dr. Joan Newman, Interim Dean of Instruction at Enterprise State Junior College, may testify concerning her investigation of sexual harassment complaints against you. She may also testify about previous warnings and counseling received by you regarding inappropriate conduct toward female students. She may also testify about training provided to you by the college regarding sexual harassment. She may also testify about your inappropriate conduct and your violation of federal law and Alabama State Board of Education policy.

2. Dr. Stafford Thompson, President of Enterprise State Junior College, may testify generally concerning the reasons for his decision to terminate your employment. He may also testify about the detrimental effect upon the mission and goals of Enterprise State Junior College arising from your inappropriate conduct and contact relating to female students at the college, including the detrimental effect upon the morale of Enterprise State Junior College employees and students. He may also testify about your inappropriate conduct and your violation of federal law and Alabama State Board of Education policy.

3. Ms. Suzanne Dubose may testify regarding an e-mail from you requesting her to participate in an inappropriate and unwanted act of a sexual nature.

4. Eric Reynolds may testify that he witnessed an e-mail from you to Ms. Dubose.

5. Ms. Jacqueline M. Detty may testify about unprofessional and disrespectful statements made to her, and her fear of unwanted touching by you.

6. Ms. Jennifer Harriman may testify regarding the attendance policy of the English Department which makes no allowances for parents with children who may become ill from time to time, and if so, student's grades are penalized for missing class.

7. Ms. Donna Milstead may testify regarding the grading practice and your request for personal information from female students, and her subsequent withdrawal from the College rather than to continue to be ridiculed in class by you.

Page 3
January 26, 1999

8  Ms. Lisa Cowart-Brown may testify regarding a request for sexual favor in exchange for a grade change

9  Dr. Judy Miller may testify indicating counsel with Ms. Sheetal Donahue due to inappropriate statements of a sexual nature, unwelcome touching, and parking in front of Ms. Donahue's home

10  Dr. Betty Cully may testify indicating counsel with a female student concerning discomfort with conversations with you and your actions which were interpreted as your desire of an inappropriate relationship. She may also testify about her counsel with Ms. Suzanne Dubose concerning an e-mail said to have been sent by you

11  Ms. Teresa Pearcy, substitute speech instructor, may testify that a fall semester student, Mindy Clarke petitioned to complete the speech class after she stopped attending class rather than have any further contact with you.

12  Dr. Tommy M. Guthrie may testify indicating counsel with you concerning your behavior toward female students. He may also testify about a conference held with you and a female student over sexual harassment charges

13  Enterprise State Junior College may also call other witnesses who may testify regarding unwarranted behavior on your part of a sexual nature

14  Enterprise State Junior College may also call one or more rebuttal witnesses to testify

    Please contact me if you have any questions regarding this Notice to Terminate Employment.

                                        Sincerely,

                                        Stafford L. Thompson
                                        Stafford L. Thompson
                                        President

SLT/md

cc: Attorney Brantley

OFFICE OF THE PRESIDENT

November 13, 1998

Dr. Richard Emanuel
Instructor
Enterprise State Junior College

Dear Dr. Emanuel:

This is to inform you that Enterprise State Junior College is officially investigating complaints of sexual harassment lodged against you by several current and former students. We have already made informal contact with the students. The investigation will now enter the formal phase. We will be taking written statements from the students, from you, and from anyone else with knowledge of the incidents complained by the students. For specific information on the process to be followed by the college in this matter, please see State Board of Education Policy 601.04 and Guidelines (attached), as well as the policy of Enterprise State Junior College (also attached). Enterprise State Junior College will discharge its legal responsibilities both to the complaining students and to you in the fairest and most expedient way possible; however, the college will take the appropriate amount of time to perform a thorough and fair investigation of these charges.

It is of great concern to me that this is not the first time that a student has complained about you exhibiting inappropriate conduct. You have been counseled and warned several times about your behavior towards students. Because this is a very serious matter and because the college will not compromise or endanger the educational environment of its students, effective immediately you are placed on administrative leave with pay. You are hereby relieved for an indeterminate period of time of all of your teaching, advising, sponsorship, and other responsibilities at Enterprise State Junior College. During the course of this investigation and until further notice, you will not be permitted access to the institution or to any of its facilities, events, or functions. You are instructed not to have any further contact with current or former students. You will not be allowed access to any Enterprise State Junior College equipment.

This investigation will be kept confidential by Enterprise State Junior College. We strongly urge you to keep it confidential as well. During the course of the investigation, we will need to interview you and to take a written statement from you. We will also ask you to provide us with the names of any witnesses or other individuals that you would like for us to interview. You are not required by law to provide such a statement; however, the investigation will proceed and a determination will be made, regardless of whether or not you agree to provide us with a written statement or to participate in an interview. Dr. Joan Newman will be conducting the investigation on behalf of Enterprise State Junior College, and you can expect to hear from her very soon.

You will need to turn over today your grade books, all test papers, and other evaluation instruments or documents on which students have received or will receive grades to Dr. Scott Smith, Division Chairman, English and Communications Division. Dr. Smith will also collect all your keys to facilities, rooms, and spaces at Enterprise State Junior College.

We appreciate your cooperation in completing this difficult task.

Sincerely,

Stafford L. Thompson

Stafford L. Thompson
President

SLT/lg

Enclosures

DEFENDANT'S EXHIBIT
4

# STUDENT COMPLAINTS RE: DR. EMANUEL



DEFENDANT'S
EXHIBIT

5

PENGAD 800-631-6989

Dear Dr. Newman,                                              October 2, 1997

The reason I am writing this letter is to acquaint you with certain abberrations which have made me suspicious of the behavior of my Public Speaking Instructor, Dr. Richard Emanuel.

On September 25, 1997, I met with Dr. Emanuel in his office regarding my topic for an upcoming speech.  After having discussed the speech, I prepared to leave when Dr. Emanuel commented on my engagement ring and asked to see it.  I held out my hand and, although he did not touch my hand, he did look at the ring.  He asked if I was married or engaged and, upon hearing that I was newly married, asked if I had been on a honeymoon.  I then proceeded to leave his office.

On September 30, I was the last person in my Public Speaking class (SPH 107-101) to complete a test.  I approached the desk where Dr. Emanuel was seated to turn in my work and as I sorted the papers into their proper piles, Dr. Emanuel suddenly grabbed hold of my wrist and, holding it tightly, asked me if the watch I was wearing was a Rolex.  I told him no and he let go.  He then grabbed my hand and told me what a beautiful engagement ring I was wearing.  In neither of these instances did Dr. Emanuel ask to take a closer look at my watch or my ring; he just grabbed me.  I found it peculiar that he was desired to see a ring he had just seen several days prior.  I stood there partly in shock and partly in fear of what he might do next. When he finally let me go, he asked me about the carat weight of my ring and upon hearing my answer replied, "what bank did you marry?" I told him that my husband was not in debt and could afford to buy me whatever he wanted (not that our finances should be any concern of his).  Dr. Emanuel asked me how my husband "managed that" and I told him that my husband took advantage of the opportunities the United States Air Force  and United States Army afforded him.  A student in the next class then entered the room and I quickly left.

The following day, October 1, 1997, myself and nine classmates waited for Dr. Emaunuel to begin class.  He was rearranging some of the desks and as he came up behind me (I was sitting in the last seat in the row) he put his hand in the middle of my back and told me that he thought I'd left a notebook in the classroom after I completed the test yesterday. I told him that I didn't own a notebook and he questioned me by saying, "you don't own a spiral notebook?"   I again told him that I did not own a notebook and he removed his hand from my back and walked to the front of the room to begin class. I cannot understand why he had to touch me to ask a question, which, logically, should have been addressed to the entire class, not just me.

I find Dr. Emanuel's physical behavior and his comments

directed towards me not only extremely unprofessional, but also hugely disrespectful. I will not tolerate it! I will not go to school wondering whether or not my instructor is going to put his hands on me and, for that matter, where he will put them. I refuse to go to class and be frightened of my instructor's actions. Attending classes at Enterprise State Junior College as a transient student was my choice; however, I did not choose for Dr. Emanuel to treat me in such an aggressive, discourteous manner.

I have not confronted Dr. Emanuel about this matter, partly because I do not want to be alone with him. Also, I feel that if I brought it to his attention that I was uncomfortable with his actions, he may simply move on to another student. Furthermore, I presently have an A average in Public Speaking and fear a confrontation may jeopardize my standing in the class. I am not trying to cause trouble, but am merely trying to protect myself and others from being subjected to what is clearly unwanted, unwarranted behavior at the hands of an Enterprise State Junior College professor.

Dr. Newman, I thank you for reading this letter and for taking time out of your schedule to speak with me. Should you need to contact me for any reason regarding this matter, please feel free to call me at 393-3584.

Sincerely,

Jacqueline M. Detty

Oct. 5, 1997

Jacqueline Detty came by the Dean's office with a written complaint about Dr. Emanuel's physical contact with her in class. The complaint is attached. After reading the complaint I asked Ms. Detty what course of action she would prefer: changing course sections to study under another instructor; a meeting with Dr. Emanuel to confront him about his actions; or for the Dean to discuss the situation with Dr. Emanuel without Ms. Detty present. She preferred the latter option. She would like to continue the course without Dr. Emanuel's attentions. I responded to Ms. Detty that I would have a discussion with Dr. Emanuel about his behavior and for her to report immediately to me if his behavior did not change in the classroom.

Oct. 5, 1997

I informed Dr. Scott Smith of the complaint and my intent to schedule a meeting with Dr. Emanuel. Dr. Smith will not be present at that session. I think the Division Chair needs to be kept up to date with any action involving his faculty members.

Oct. 6, 1997

I met with Dr. Emanuel in the Dean's office and explained the nature of the complaint brought by the student. Dr. Emanuel appeared to be very surprised and upset by the accusation. He said "Give me a minute, my heart is racing". I instructed Dr. Emanuel under no circumstance should he ever touch a student, particularly a female student. He could not remember a particular incident to which I may have been referring. I did not mention Ms. Detty's name. I alerted him again not to make any physical contact with a student unless there was a medical emergency. He committed to try and be more careful of student contacts.

Student complaint about Dr. Emanuel

Oct 9, 1998

An employee on campus called to report a contact from a student who was withdrawing from class. The student said she was leaving because of several personal problems and Dr. Emanuel. I got the telephone number of the student and contacted her for an appointment. It was several days before the student returned by call and then we set up an appointment on campus at her convenience.

Oct 23, 1998

Donna Milstead came by several weeks after withdrawing from school to file a report on Dr. Emanuel. She admitted that she was going through a very difficult time in her personal life that contributed to the college anxiety. She had hoped that coming to school everyday would be "a relief from her personal problems instead in added to them." She explained that Dr. Emanuel had targeted her in class and made fun of her. Donna has a young child who had been ill. Dr. Emanuel was not very sympathetic to her situation as a single parent. When he did agree to allow her to make up some work she had missed he insisted that she bring the work to his home. She was very uncomfortable with idea of going by his house. Ms. Milstead felt targeted in Dr. Emanuel's grading system. She got applause for her speech and he gave her an F. He made comments about her in class: "She's cheap . . . .labor that it." She finally gave up and withdrew completely from the college. Ms. Milstead reported the situation because she does not want it to happen to other students. She does not want her name to be used. She fears retaliation. She does not know why Dr. Emanuel gets all their telephone numbers, etc. for his class. She reported that he wrote her a postcard after she withdrew from college. I asked her to keep the card. Ms. Milstead does plan to reenter ESJC in January. She does not plan to take Dr. Emanuel for speech.

Student Complaint about Dr. Rich Emanuel,

Oct 22, 1998, Jennifer Harriman called and requested an appointment to discuss a problem with her instructor. I asked if she had discussed the problem with her instructor and she said yes. She also reported contacting the division chair, Dr. Scott Smith, with her concerns. She was still not satisfied and so requested an appointment with the Dean of Instruction.

Oct 23, 1998
Jennifer Harriman came in and expressed her concerns about Dr. Emanuel's treatment of her in class. She has a child who was sick and had to be taken for a medical appointment resulting in Ms. Harriman missing class. She disagreed with the Attendance Policy for Dr. Emanuel's class because there was absolutely no allowance for ill health. She said there was only allowance for jury duty or military duty. She feels strongly that motherhood is just as strong a calling or responsibility as civic or military duty. When she tried to explain the situation to Dr. Emanuel he said he was really not interested. She feels very strongly that he has mocked motherhood in general and her in particular because she is quite proud of her family status. She feels that Dr. Emanuel has ridiculed her in class and she is quite anxious about this complaint fearing retaliation from him. I inquired of Ms. Harriman if the comments directed to her by Dr. Emanuel were ever sexual in nature and she replied no. I told Ms. Harriman that I would relay her concerns to Dr. Smith and to Dr. Emanuel about the ridicule in class. I did not commit to her that I would recommend changing the Attendance Policy. I also instructed Ms. Harriman to contact me immediately if she felt the subject of any retaliation in class.

Oct 27, 1998
I called Ms. Harriman to let her know that I had followed up on her complaint with a conversation with Dr. Emanuel. He expressed concern that his remarks might have been taken incorrectly and promised to be more sensitive and cautious with his remarks.

Meeting with Dr. Richard Emanuel, October 27, 1998

I called and requested that Dr. Emanuel meet with me at his convenience today, Oct 27. Our appointment was for 2pm.

I explained to Dr. Emanuel the nature of the two complaints that I had received recently. Both of the students had requested that I not use their name for fear of retaliation. I tried to address the nature and seriousness of the complaint without revealing the identities of the students. I told Dr. Emanuel that both complaints were because students felt ridiculed and targeted in his classroom. They expressed his lack of concern about mothers with sick children and even his mocking their concerns. He denied having done anything intentionally. Dr. Emanuel seemed very concerned that he was offensive to his students. I also reminded him that both complaints came from female students and they must be extremely cautious in his remarks or attention to students. He asked what he should do. I suggested that he examine everything he says for misleading innuendo or double meaning. He recommended videotaping his class and letting a colleague critique his remarks. I agreed that videotaping would be a very constructive step. I admonished him again to be extremely cautious with his comments in class. I mentioned the complaint about the Attendance Policy but did not get into it. Attendance is the business of the instructor.

Student complaint re: Dr. Emanuel

Nov 9, 1998

Dr. Betty Cully called and sent a memo with a sexual harassment complaint from a student. A member of the FIT team, which Dr. Cully advises, had come to her office visibly upset by a contact from a faculty member. Dr. Cully listened to the student and then called my office to report the complaint. I made an appointment to meet with the student on Nov 10, 1998. Dr. Cully's memo about the complaint also contained a copy of a memo the student received from Dr. Emanuel.

Nov 10, 1998

Suzanne Dubose came by at the appointed time to report an incident that made her very uncomfortable and angry. Suzanne works on the staff of the Weevil Eye. She attends ESJC with the assistance of a Publications scholarship. This is her second year at ESJC and she is one of the veterans working on the newspaper. In this capacity she works closely with Dr. Emanuel. She stated that she had been increasingly uncomfortable working with Dr. Emanuel and tried not to ever be in the office with him alone. She said that he had become more attentive and their conversations more personal. He asked about her boyfriend often, told her of sexual offers made to him by other students, and showed her his journal with records of all those invitations. He told her more than once that he wasn't interested in those offers and left the comment open ended. She inferred that he was interested in her. The contact she came to report was a note he left for her in his computer. Dr. Emanuel emailed Suzanne at her Hotmail address directing her to check a WordPerfect file in his computer. Apparently it is not uncommon for the Publications staff to check his computer for assignments, etc. He left the email last week (Nov 5 or 6) and she just checked the file on Monday (Nov 9). She printed the note and then deleted it from the file. She has not spoken to Dr. Emanuel since she retrieved the note. He does not know if she read it or printed it. Suzanne is considering giving up her Publications scholarship and paying her own tuition for the spring semester in order to avoid any contact with Dr. Emanuel. She does not want to work with him. She has not taken Speech class because she does not want to be in his class. I explained that I had made a contact with the President after hearing from Dr. Cully and that he would be involved in a conversation with Dr. Emanuel. She said she would pursue any course of action we recommended. She feels strongly that the note was out of line and does not trust Dr. Emanuel to treat her fairly after this episode.

A copy of the note is attached and a copy was given to Dr. Thompson.

Memo

COPY

To:   Dr. Joan Newman

From:  Dr. Betty Cully

Re:   Sexual Harassment Complaint

Date:  November 9, 1998

Suzanne Dubose, SSN 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 and phone: 774-1350, discussed the following information with me today. Her instructor, Dr. Richard Emanuel left an e-mail message for her last week. She did not read it and print it out until today, Monday, November 9 in the S.A.S. Lab. She immediately wanted to address this situation, but is quite uneasy as she is enrolled in Dr. Emanuel's class now and has worked with him on the college newspaper, "The Weevil Eye" for over one year. She showed me the note and confided in me as I am her sponsor on the F.I.T. Team.

I am following our new sexual harassment policy by contacting you and sharing this information. I will keep my conversation with Suzanne and this information confidential.

I told Suzanne someone else would be contacting her regarding this matter. She was quite distraught and uncomfortable, but wants the matter handled properly.

Thanks.

COPY

My name is Eric Reynolds. On November 7, 1998 I witnessed an E-mail sent from Dr. Rich Emanuel to Suzanne Dubose. This E-mail contained a symbol (:1) and referenced suzanne to a WordPerfect file, Suzanne's Secret file and said that he couldn't send the message on regular E-mail. He said that if these messages were found to be offensive then disregard them.

Eric Reynolds

COPY

Friday, Nov 13 19
Pg

To whom it may concern:

Please allow this letter to serve as a formal complaint against Dr. Richard Emanuel. I am a former student of his and I feel urged to proceed with this complaint due to a matter of morality.

Dr. Emanuels teaching methods are not only rigid, controlling and high-schoolish, but are also self defeating, un-motivating and discouraging. I returned to this institution to better myself, not to be challenged with such a difficult non-caring instructor who takes off points from my grade for absences due to my child's fever (a situation I haven't control over

I have noticed no other instructor here require such personal information from students, such as home phone numbers, Emergency contact numbers, addresses,

pg 2

social security numbers, etc.
Should this ever need to be
accessed, this information
can be obtained from the
college central computer
system. for what purpose
would requiring this personal
info serve?

I've observed several
remarks that seemed to be
female-oriented only, calling
women stupid, cheap or
inadequate in some way. He
remained anonymous with
names but you get the feeling
whoever he was referring to
knew who they were. This is
not the type of treatment I
can tolerate. I am a single
parent who works, and I
have enough stress in my
life, as does everyone else
that must suffer this verbal
abuse & favoritism.
Dr. Emanuel gave me in
particular a hard time about
a recent speech I gave. At least

3

that's how I felt.) I attended
school M-W & F. I was absent
on a Wed - the same day as
outline was due to him. I
brought the outline to his
office Wed night - the guard
allowed me to place it on his
desk. I returned to school on
Fri. & he informed me my
speech was to be re-typed
re-written and returned to
him that day as my speech
was to be delivered that
coming Monday. I attempted
to explain I had to work that
day & it would be difficult
for me to return it that day
but I would try. I completed
work at 4:30. I called ESU
to find out if I could
access an electric typewriter
to retype my outline - I do not
own one - The sas labs closed
at 2 the library closed at
4. So I called Dr. Emanuel
at home, when he then told
me to try the public library

4

The public library was also closed. Dr. Emanuel then proceeded to give me his home address & told me when I completed the typed outline to bring it to his house. Is this not slightly odd? Is this seeming to lack any sense of understanding on his part? He displayed absolute, no sympathy to my dilemma. I would have gladly brought it to him Saturday morning at a neutral meeting ground, such as the college campus. I borrowed a typewriter from a co-worker, and after tending to my daughter who is 2 and cooking dinner for her, I re-wrote, and retyped the outline. It took me until 9:30 at night, but I did it and I brought it to his house by 10 pm. He met me in the driveway - said nothing more to me than "OK" - when I handed it to hi

pg 5

I gave my speech on Monday morning - got applause - and felt good about what I had done. I returned to school WED. to learn my speech was failed due to minor mistake. For example, I started my speech with Goes morning - I asked the class to raise their hands & encourage some participation - (an activity he suggested that we do ) and I was seconds over the alotted time to give a speech. HE allows 6 min. no more no less. Perhaps I just too longer breaths. He passed other women in the class that in my opinion, gave poor speeche I made mistakes. I admit but he made me feel that no matter how hard I tried it was useless. I don't want to hurt his carrees, but he is wrong. That's why I withdre one girl dave a speech and

pg 6

when she motioned for someon
to cut off the lights so she
could display her visual AD,
Dr Emanuel remarked-"she
do it. she's cheap." "Labor th
is." No one found that humorous
The young high school graduate
with delicate self-esteem is
who I felt for in that class
They need guidance, not
egotisit egotistical rude
comments. He picks on the
weak, shy ones. He never
made sexual advances to
me because I think he knew
better. He did, however, come
on to an old friend of mine
who used to attend here. She
never came forward because
she feared no one would
beleive her because she was
black I hope this situation
is soon rectified. It wri
improve ESJC and people's
scholastic interests 100%.
        Thank you for your time.
        sincerely, Donna

Jennifer Harriman
408 Melbourne Drive
Enterprise, AL 36330
(334) 347-1904

November 16, 1998

Dr. Jean Newnan
Dean of Academics
Enterprise State Junior College

To Whom It May Concern:

This letter concerns my grievance with the discriminatory attendance policy of the English department of Enterprise State Junior College, as executed by Dr. Richard Emanuel, instructor of Speech 101, and Dr. Scott Smith, chair of the English department.

It has come to my attention that ESJC does not utilize a campus-wide attendance policy; rather, attendance policies are left up to the discretion of the department chairs, and then implemented by the instructors. These individual policies are not made known to the students until after the class has begun.

The English department's policy states that absence due to official school function, military duty, and jury duty are not counted as absences. After the third unexcused absence, a comprehensive final exam must be taken at the end of the term. Dr. Emanuel's policy, however, attempts to use an attendance point system to "reinforce the behaviors I want." In his system, perfect attendance, worth 50 points, is applied to the points earned in class, to be figured into the final grade. The first absence carries a penalty of 5 points; the second absence, 10 points; the third absence, 15 points, etc. While on the surface, this system seems strict, yet manageable, it fails to take into account one very important factor – a significant minority of the ESCJ students are also parents who carry responsibility for their children along with their classwork.

On the first class day for the second compressed term, October 15, Dr. Emanuel asked the students who had jobs, and how many hours they worked, for purposes of determining how much time the class would have to study. Another mother in the class raised her hand, and timidly asked, "I have kids, does that count?" Dr. Emanuel replied, "NO, I'm talking about a real job that you get paid money to do." This makes his feeling about the validity of parenting as a job abundantly clear. He also clearly stated that there would be occasional sick days for the students, their relatives, their friends, their dogs, etc. He compared it missing a day of work and not being paid for it, and said emphatically that he was not interested in hearing any excuses.

On Sunday, October 17, my two-year-old daughter developed a high fever. On Monday, October 18, I missed class to stay home with her. Tuesday, October 19, I again missed class to take my daughter to Lyster Army Hospital for treatment. On Wednesday, October 20, I reluctantly left my sick daughter with a neighbor, exposing her own child to infection, in order to attend Dr. Emanuel's class. These absences cost me a total of fifteen attendance points.

After class, I spoke with him briefly to let him know that his attendance policy was not, in this case, punishing an eighteen-year-old freshman with a hangover, but a responsible parent who made her child the first priority. Dr. Emanuel expressed concern for my daughter's health and suggested that I could still perform well in the class. I shared with Dr. Emanuel my worry that my daughter would not be better by the next day, and that her illness would pass to my older daughter, thereby causing me to miss even more class days. I also shared with Dr. Emanuel my determination to earn an "A" in the class, along with my concern that the lost attendance points could make the difference between an "A" and a "B" grade.

My daughter continued to run fever up to 105 degrees for another 2 days and needed medication. By leaving her with a neighbor a separate household with a child was exposed to my daughter's virus. If the situation were reversed I would not have taken in a sick child. It is an unreasonable expectation. Given the reasonable choice I would have stayed home with her all three days.

The attendance policy as it now stands affirms the worth of doing one's school duty, patriotic duty and civic duty. It refuses to recognize that the job of parenthood is equally educational, patriotic and publicly and economically valuable as that of the student, the soldier, and the juror. It also fails to take into account that is a vitally necessary job. ESJC's own KinderCollege will not accept a sick child; neither will any day care facility in Enterprise or Fort Rucker. Responsibility for this job rests on the parent alone. *in effect, the attendance policies of Drs. Emanuel and Smith say that taking care of a sick child is not as important as a college baseball game. In effect, their policies say that the jobs of soldier and juror are more important that the job of parenthood.*

Taking care of a sick child is a valid reason to miss or delay military or jury duty. The fact that Dr. Emanuel and Dr. Smith are arrogant enough to think it is not a good enough reason to miss a one-hour class is unconscionable and ill informed. One may also go so far as to say this policy is discriminatory on the basis of gender. as the majority of child-rearing tasks are still performed by the mothers. and the majority of military duties are performed by men.

On Wednesday, October 20, I called Dr. Smith to talk about my problem with the policy, and to seek solutions. He said "You can tell me but it won't do you any good." As a paying client of this college I found this unprofessional and insulting. After patiently attempting to explain my difficulty to him, he interrupted me to tell me that I was not being penalized. This was the point at which I read Dr. Emanuel's attendance policy to him verbatim. Dr. Smith used this opportunity to tell me that I should stop complaining and start studying. After thanking him for his time and professional opinion, I made an appointment to see Dr. Joan Newnan Dean of Academics for ESJC.

On Friday, October 22, I spoke with Dr. Newnan in her office. She listened to my whole account and took notes. She indicated that ESJC has had difficulties with the attendance policies in the past. I suggested that an allowance for make-up work would satisfy me at this time, although for the long term I would like to see policy changes that reflect the needs of the non-traditional students. Dr. Newnan stated that she was disturbed about the rude treatment I received and wanted the policies to reflect the needs of the student population. so far as that is possible. She indicated that she would speak to Drs. Emanuel and Smith and call me with the results.

Tuesday, Oct. 27. Dr. Newnan called me with an update. She said that Dr. Emanuel was sorry that he caused offense but his policy stood. She said that Dr. Smith claimed that this was the first time he heard of this particular attendance policy, and that he still thinks it is fair and equitable.

In a later class meeting, another student asked if make-up work could be done, to which Dr. Emanuel replied, "There is no allowance for make-up work in this class." My understanding is that this is in fact up to the instructor's discretion. There is no allowance for make-up work because he wants it that way.

Subsequent research done at the ESJC registrar's office yielded the fact that 41% of the college's students are over the age of 25. and that most of that 41% have young children. The presence of the KinderCollege makes this evident. Statistics show that older students who have family responsibilities tend to have better attendance and score better than their traditional counterparts. Parenting students. in general, show greater motivation and determination.

I know I am not the only one penalized for doing my job of caring for my sick child — but as far as I know, I have been the only one willing to speak out about it. I hope to see the policies of ESJC inclusive of the needs of all the students. I also hope to see professors who are educated and aware enough to comprehend these needs.

November 16, 1998

Sincerely

Jennifer Harriman

11/17/98

Donna Milstead filed a written complaint about Dr. Rich Emanuel. During the course of our conversation at Ryan's (Donna's employer), Donna suggested that I talk to Lisa Cowart. Lisa was one of Donna's classmates and had experienced some problems with Dr. Emanuel also. I called the telephone number listed in our student files and left a message for Donna to call me back. Donna does not live at that address but the party agreed to deliver the message.

11/19/98

I had not received a return call from Lisa Cowart so I called and left another message at the same telephone number (484-3458).

11/20/98

Lisa Cowart returned my call. The telephone number I called was her mother's home and Lisa does not live there anymore. She is a recent graduate of Troy State University. I explained that one of her classmates had given her name as a student who also had an unpleasant experience with Dr. Emanuel and that I was involved in an investigation of complaints from current and former students. Ms. Cowart's first response was, "I'm so glad someone is finally doing something about him." I asked her to tell me about her experiences while a student at ESJC. Here are her comments as I recorded them during our conversation. I also asked Ms. Cowart to record her comments and mail them to me. She agreed to write her complaint and commented that she would be available to assist the investigation in any way.

"I had Dr. Emanuel for Speech class during the summer quarter. It was my 2nd or 3rd quarter at ESJC. I gave a Speech in class as assigned and thought I had done very well on it. I was planning on majoring in communications. When Dr. Emanuel gave us our grades the next week I received a grade of C which surprised me, I thought I deserved a better grade. During this class session Dr. Emanuel remarked that if anyone had a question or concern about his grade on this speech to stop by his office to talk about it. I went by his office and expressed my concern over receiving a C on my speech. He asked if I wanted to improve my grade and I said "Yes". He told me to meet him at the gym at 3pm to work on it. I did not know why he wanted to meet at the gym but I took my speech with me to the gym at 3pm that day. He met me in the breezeway between the B building and the gym. He told me how pretty I looked. I pulled out my speech to go over it with him. He looked at the paper and then at me and said, "would you have sex with me to make that grade better?" I responded absolutely not and he began to stammer and back away. He said he must have misread my intentions. I was shocked and upset. I watched him go to his car. He went around the gym and his car was parked in the back of the gym. It gave me the distinct impression that this meeting was well planned and he intended to take me to his car and leave campus. I went home and was quite upset so I told my brother-in-law about the incident. He convinced me to go back to campus and report the incident. I talked to the Dean at ESJC. He told me he would take the matter into consideration but there wasn't much he could do. The next week in Speech class we

took a test and when my graded paper was returned it had a sticky note on it that said, "every test in life is a test of character . . . you're doing great." I think I may have saved that note. During the rest of the quarter I tried to avoid Dr. Emanuel and was never in the classroom alone with him.

I avoided taking Dr. Emanuel for class for awhile but then wanted to take some PUB courses for my major. During those courses there was an obvious double standard in what he required of me and of a male friend also in those classes. I was not required to attend class, I turned my assignments in at my leisure and always made an A. My friend was constantly harassed about attendance, tardiness, assignment quality, etc., and never made a good grade. On one other occasion it was if Dr. Emanuel wanted to try me out one last time. I was in the lab working on a project for a publication when he suggested that I stay late to finish the assignment (a mosaic). I was suspicious but thought I'd see what he was up to. He worked in the lab in my presence for a few minutes and seemed to be willing to leave me alone but then looked over my shoulder at the mosaic. He then went to the desk and asked me to come look at his fingernails. I decided he had crossed the line again and was expecting additional contact. I left immediately. I got an A in every class I took from Dr. Emanuel after the initial incident.



Report of Contact with Holly Daniels

11/18/98

An ESJC faculty member reported a former student who talked openly in her class about an involvement with Dr. Rich Emanuel. I looked the student up and called the last telephone number listed in her records. The party now at the telephone number returned my message and stated she did not know Holly Daniels so could not deliver my message. My secretary, Lawrann Gamble, used the locator service on the Internet and found a Holly Daniels in our area and emailed her.

11/23/98

I received an email from Holly Daniels in response to my email inquiry last week. The email listed her work telephone number at TSU-D as a good place to contact her. That number is (334)983-6556.

I contacted Holly Daniels at TSU-D at approximately 3:45pm. She works from 3 – 7pm. She was eager to hear why anyone from ESJC would be searching for her. When I explained the nature of my call she was very surprised. She wanted to know who had given me her name and if Dr. Emanuel knew we were contacting her. I explained that I had received student names from employees at ESJC who had received information/complaints from students and from other students who knew of incidents with Dr. Emanuel. I also told Holly that Dr. Emanuel knew the investigation was about current and former students but he did not have a list of the students I was contacting. Holly said that she did have a sexual relationship with Dr. Emanuel but that we could not list her as a complainant because her affair with Dr. Emanuel was entirely consensual. She was originally a journalism major at ESJC. She was on a Publications scholarship when she was involved with Dr. Emanuel. She could not remember how the relationship started or who initiated the relationship. She reminded me that she was a willing partner in the relationship. She said that she often babysat for Dr. Emanuel's children. She said that they talked openly of their relationship in front of other publication staffers and "he didn't seem to care who knew." They were involved sexually on campus and away from campus. Holly changed her major to music before leaving ESJC. She attended Montevallo for two semesters before marrying and moving to Birmingham. She is now divorced, living back at home and attending TSU-D. She continues to "talk" with Dr. Emanuel. They are good friends even though their relationship is no longer a sexual one. As I closed the conversation Holly said I don't want to get Dr. Emanuel in any trouble but I guess he's done that already.

November 20, 1998

Dr. Joan Newman
Dean of Instruction
Enterprise State Junior College
Enterprise, AL 36331

Dear Dr. Newman,

In the spring of 1991, a young married female student who was then on the First Impressions Team, came to me with a complaint about her Speech instructor, Dr. Richard Emanuel. Dr. Emanuel had invited her to go to lunch with him several times. His nonverbal behavior also made her feel uncomfortable. He would request that she meet with him after class and stand uncomfortably close to her while making proposals for lunch. The student felt that the instructor wanted an inappropriate relationship with her and did not know how to handle the situation, as she did not want to jeopardize her grades in his class. He persisted in his requests, and she continued to come up with a variety of excuses about lunch.

At the time, we had no sexual harassment policy, and the student did not want her military husband to know anything about this situation. My advice to her was to say to her instructor directly that she was not interested in any relationship other that faculty-instructor and that she was not going to go to lunch with him at any time.

I do not recall her telling me the end result of her conversation with Dr. Emanuel. The student's husband received orders, and she moved at the end of the spring semester before the summer orientation program. I do not know where she is living at this time.

Sincerely,

Betty Cully, Ed.D., Director
Student Academic Support Services

Summary of Conversation with Shannon Hankerson, May 1996.

Shannon Hankerson. an "A" student in English 252, came to my office on a Thursday before the last class day in Spring Quarter, 1996, to ask which department included speech courses. She was visibly upset about several incidents involving her speech instructor, Dr. Richard Emanuel. She told me that while she and her husband were enrolled in his speech class in a classroom on the second floor of Wallace Hall, Dr Emanuel sent another student to the classroom to get her. When she opened the door to Dr. Emanuel's office, he was standing behind the door, completely unclothed. She said she was shocked and terrified because her husband was sitting in the classroom one door down from the office. She also described numerous incidents in which Dr. Emanuel stood outside of her classrooms, waving, or making gestures, and occasionally sending her notes. She claimed that he had made her several tapes describing his childhood, and that he had sent her on a scavenger hunt which ended with several colored condoms hidden under the President's picture in the student center. Her purpose in coming to see me was to say that she might be absent on Monday due to a problem that had occurred recently. Dr. Emanuel had phoned her at home on numerous occasions, and she claimed that she had begged him to stop because she was afraid of her husband's reaction. When she arrived at the bus stop on Ft. Rucker to pick up her child from school, Dr. Emanuel was waiting in his parked car near the bus stop. At this point, she asked him again not to pursue her, call her, or try to meet her. When I tried to get her to report these incidents to the Dean (Dr. Tommy Guthrie), she said that she could not report them because her husband was jealous (she had had an affair earlier in the marriage), and she felt that her husband would not believe that she was innocent. She was also afraid that Dr. Emanuel would lower her speech grade or keep her from graduating. She reported that she had discussed the situation with one other instructor and made me promise not to tell anyone about the events. I advised her to keep any evidence (notes, tapes, gifts, condoms) in a safe place in case she changed her mind about reporting the incident and needed to substantiate her claims. Her story was credible in its detail and because she had no motivation in my class to fabricate a story or excuse.

Becky Armstrong, 23, Nov 1998

*Becky Armstrong*



To Whom It May Concern:

Sheetal Donahue, a student at ESJC and our work-study student during Summer 1996, confided in me and asked for guidance in a situation involving her speech instructor, Dr. Richard Emanuel. This has been over two years ago and I cannot remember exact words. She simply told me he had a made a pass at her in his office one day and mentioned grades. I recall her saying something to the effect of "a normal person would be beside themselves but I am pregnant and I just can't believe it." She later on told me she had seen him sitting in his car in front of her home/apartment on more than one occasion. My response to her each time was that I personally could not do anything but Dr. Miller should be able to point her in the right direction if she wanted to make a complaint.

Linda Hodges      11 26 98

Linda Hodges            Date

,

COPY

To Whom It May Concern:

During the 1996 summer quarter, a work-study student under my supervision, Sheetal Donahue, asked if she could talk with me about a situation that was beginning to frighten her. She stated that her speech instructor, Dr. Richard Emanuel, was making inappropriate remarks and suggestive approaches toward her. For example, he placed his hand on her stomach and made comments about pregnant women being sexy. She also stated that he had taken her soft drink while she was sitting outside studying and took it to his office, so that she would follow him there. She would not go to his office for anything after these incidents without having another student accompany her. Additionally, she was frightened because she said that Dr. Emanuel had driven by and parked outside her apartment complex–her husband was in flight school and was gone frequently at night. She did not want her husband to find out about the situation.

While working in my office, she frequently had to run copies in the library. However, she said that when she walked by his office on the way to the library, Dr. Emanuel would make some excuse to stop her to talk or would follow her to wherever she was going. She felt so uncomfortable with this situation that she began taking the long way around to avoid him.

Dr. Emanuel came to my office during this time to ask for Ms. Donahue's work schedule; I did not give him this information. When Ms. Donahue talked with me about the problem, I advised her to make a formal complaint to the Dean and/or to confront Dr. Emanuel and ask him to stop harassing her. She chose to confront him, and later told me that he was no longer being a problem for her. I relayed the situation to the Academic Dean, who took no action because there was no formal complaint from the student.

Judy Miller

_____ 11/23/98 _____
Date

COPY

Record of Student Contact re: Dr. Rich Emanuel

11/25/98

Miranda Wilkins came by my office about 11:45am. Miranda is a member of the Publications staff this semester. She was inquiring about her responsibilities/assignments while Dr. Emanuel is out. I explained that while Dr. Emanuel is out that the campus Publications were on "hold." She said that each member of the publications staff checks in during the week to get an assignment and then meet together at appointed time to build the Weevil Eye. I replied that the speech classes had a substitute instructor but that the publication students would not be penalized for work missed during Dr. Emanuel's absence. She then said she had some information about Dr. Emanuel that she wanted to share. I inquired how she knew I was gathering information about Dr. Emanuel. She replied that she is a good friend of Suzanne Dubose who had reported receiving email from Dr. Emanuel and Suzanne was upset and told her about her complaint. The conversation with Miranda Wilkins went like this:

"I started attending here this summer quarter. When I was trying to decide on a summer schedule no less than 5 students told me that if I wore a short skirt to class everyday in Dr. Emanuel's class I could get an A in speech. I did register for speech class. I typically wear jeans all the time but decided to test their theory. The first day I wore a short skirt to class Dr. Emanuel noticed and said something about my appearance and how much he liked my outfit. He did not ever comment on my appearance when I did not wear a skirt. He consistently remarked on the appearance of female students in class. This fall term I am on the Publications staff. Initially we met together at an appointed time for general instructions and direction. For some time now we have been meeting individually with Dr. Emanuel each week. Then we meet as a group to actually put together each issue of the Weevil Eye. We are allowed to use his office computer to do research for our assigned articles. Each week I would use the Internet for my article. I searched using Microsoft Explorer. I often looked at the other sites recently visited for shortcuts in my research, more often than not the sites listed on Dr. Emanuel's computer were pornographic sites. At first I thought it was funny and that the other publications staffers must have been using his computer but I showed the site list to most of them and they were really disgusted. The conversations between Dr. Emanuel and the staffers became increasingly offensive. He asked about our date lives, even our sex lives. I had a discussion with my mother about this. I could not understand why a man with a wife and two children would have an interest in the things he asked us. His comments were constantly sexual . . . he's kind of a pervert. He has never actually made a pass at me but the climate in our publications session is sleazy. I showed the list of pornographic sites to Donna Spencer, Brandy and several other staffers. I really think something should be done to change the situation but please don't use my name. I am really worried that it will effect my grade in there."

I asked Miranda to prepare a written version of her comments and she agreed to bring them to me on Monday.

Student Comments re:  Dr. Rich Emanuel

12/3/98

Mindy Clark came be my office after contacting the substitute speech instructor.  The substitute instructor suggested that Ms. Clark come by my office with her concerns.  Mindy explained that she was enrolled in Dr. Emanuel's speech class this fall but quit attending class.  She stopped going to Dr. Emanuel's class because of two remarks he made to her.  She went by his office with a question about a speech assignment and happened to be wearing overalls at the time.  She said he looked her up and down and said I always liked overalls.  She said "why?"  Dr. Emanuel's response was because they're easy to get into.  This comment made her very uncomfortable.  She was standing in his office waiting on him to give her the information she needed when she saw a hershey wrapper pinned to his bulletin board.  She asked why he would save a candy wrapper and he replied "juicy memories."  She told him he was weird!  She was so upset over the conversation that she decided not to attend his class anymore and to enroll in speech another term with a different instructor.  The reason Ms. Clark sought out the speech substitute teacher was because a fellow student came by her workplace and told her Dr. Emanuel was on leave and they had a different instructor.  Mindy had completed her speech assignment but did not want to have any contact with Dr. Emanuel.  She has contacted the new instructor about completing the speech course this term.

Record of Conversation with Lydia Fleming re: Dr. Rich Emanuel

12/22/98

Called Lydia Fleming at her office after another of Dr. Emanuel's students suggested I contact her. Ms. Fleming was out of the office. She returned my call but I was out and she left me a message.

12/23/98

I talked to Ms. Lydia Fleming at her home after work. When I explained the nature of my inquiry she immediately asked if Dr. Emanuel would know about our conversation. Her remark is consistent with many of the other faculty and student contacts. There is a fear or concern that Dr. Emanuel will retaliate against anyone who complains or accuses him. Ms. Fleming said I live very close to the college and he knows my car. He has been by my house before and I do not trust him. I asked Ms. Fleming to tell me about any incidents she may have had with Dr. Emanuel. The following statement is my account of her remarks:

"In the summer of 1995 I was enrolled in speech class at ESJC. I had heard rumors about his involvement with students and he acted pretty weird in class. I was not very concerned because I was under the impression he liked blondes. Toward the end of the term I asked for permission to take my exam a day early because I had committed to work a cheerleader camp out of town and would miss the exam date. He said there was no need for me to take the final since I had such a high average in the class, I would make an A anyway. During this discussion in the classroom he invited me to come by the Weevil Eye office after class and discuss the publications program with him. He said he could tell I liked to write and wrote very well. When I stopped by the office there was no one there but Dr. Emanuel. He started talking about how talented I was and what a great addition to the publications staff I would be and then he paused and said, "May I kiss you?" I was very shocked and responded, "Did you really say that?" He immediately started backing off and stammering about miscues. I left the office. Oh yeah, when this really started was a speech I gave before then. I used a book called The Day America Told the Truth as one of my references. I left the book at school and he brought it by my house which made me a little uncomfortable but I live very close and you can easily observe if my car is in the driveway or not. Dr. Emanuel talked to me that day about college publications and kept saying what a good book that was. Later I realized he had circled two sections about race relations and sexual relations, specifically "have you ever dated outside your race and have you ever had sex outside your race." I did not notice his marks in the book until later. He asked me in his office that day if I saw what he circled in the book, so I know he did it. On two different occasions he came by my place of employment at Payless Shoes in Enterprise. One time I was not there but had gone to lunch with someone else so my car was there. My supervisor can verify that he came by looking for me. When I transferred to the University of Montevallo Dr. Emanuel called me when he came up there for an alumni activity. I told my roommate I was afraid he would contact me. I did not see him when he came, I did not respond to the message he left. The last time he came by Payless was last summer. I was pretty rude to him then and said things like, "don't you have

something better to do and where is your wife these days?"  I was just tired of him bugging me.  He has not bothered me recently.  I told Broderick Andrews about these contacts from Dr. Emanuel  Broderick was a friend of mine at ESJC that played on the basketball team  He can verify my comments.

I thanked Lydia for her candor and requested that she write her comments down and send them to me at ESJC.  She expressed concern again that Dr. Emanuel was crazy enough to retaliate.

December 14, 1998
Rt. 1 Box 19-B
Rutledge, AL. 36071

COPY

Dr. Scan Newman
P.O. Box 1300
Enterprise, AL 36331

Dr. Newman,

I hope this statement helps to conclude your investigation and hopefully Dr. Richard Emmanue will get what he deserves, finally.

Thank you for contacting me. I'm sorry it took so long to write this statement. I wanted to get the facts as right as possible.

Again Thanks,
Lisa Cowart-Brown
Lisa Cowart-Brown

During Summer Quarter 1992, Dr. Richard Emmanuel made a pass at me. This is a statement of what happened on that day and some events that followed.

One Summer day the class and I gave speeches. The following day I recieved a grade of "C" on my speech. I was disappointed. After class, I went to Dr. Richard Emmanuel's office to get help or at least some advice on how to make the speech better. In his office, I told him that I was disappointed and why did I get a "C." He said that my speech ran longer than the time alloted. This automatically dropped the grade one level.

"What would you do to make the grade better," Dr. Emmanuel said.

"I don't know," I replied. "There was so much important information, I couldnot cut it any shorter."

Suddenly, Dr. Emmanuel changed the subject.

"I was wondering. Just how far is Goshen?" That's where I lived at the time.

"About 40 miles," I said.

"Where is that? East, South, West, North?", he said.

"It's a small town with a big heart," I said when he asked me questions about my daily routine.

"I usually stay at school for a couple of hours after my last class. I study and then I go to my sister's house which is here in Enterprise. I check on my neices and my nephew. I make sure that they are doing their homework. And then I leave for Goshen."

While still in his office, Dr. Emmanuel also asked about my family.

"How many sisters and brothers do you have?"

"I have 6 sisters and one brother who is the youngest," I said.

"What number are you?" he asked.

"I'm girl number 6," I said.

He commented on how much fun a big family must be. He said that he didn't come from a family that large. He told me how many sisters and brothers he had.

31

...he went back to our previous discussion my grade.

> "What would you do to make this grade better?" he asked again.

> "I would do anything, like say the speech over again. I would try to talk a little faster and not be so hesitant and cut down on explaining figures that I drew on the board," I explained.

He said my speech was overall interesting. I thanked him.

> "Could you meet me at the gym at 3 o'clock?" he asked.

> "Sure. O.K.," I said happily.

Then I left his office.

After I went to my other classes, I had about 2 hours left. I went to the library to study my speech. My thoughts were to do the speech over in the gym in front of a panel of teachers and instructors.

About 10 minutes til 3 o'clock, I started walking towards the gym. I saw Dr. Emmanuel walk from the administration building to the student center. Then he walked into the Arts building and out the other...

I met Dr. Emmanuel just a few yards from the gym.

"Hello. How are you," he said.
"I'm o.K.," I said.

We continued walking towards the gym. All of a sudden, this feeling came over me. I began walking behind him. He motioned with his hands for me to come on.

"Come on," he said
"I'm not going to hurt you," he said with a smurky grin on his face.

So, I caught up.

"What would you do to better your grade," he asked

"I would do anything, like saying the speech again in front of an audience," I explained.

"Would you have sex with me for it?" he asked suddenly.

"No. No. I'm not like that. I would say the speech again," I quickly replied

"I'm sorry. You are a very pretty girl. I've never done this before. This is my first time. I just thought you meant something else," he quickly explained.

that's when I turned around and walked off quickly.

Je were just a couple of feet before the gym door. While walking off, I turned around and saw Dr. Emmanuel walk down, behind the gym towards the parking lot. I continued walking to my car parked behind the library and the Science/History building.

I went to my sister's house. My brother-in-law met me at the door. He saw something was wrong. I told him what had happened at school and how bad I felt. He talked me into getting-my self-together and going back to talk with the Dean to report Dr. Emmanuel. So, 30 minutes later, I went back to ESJC to talk with the Dean. He was available. I told him what happened. He said that he would take my complaint into consideration. He did not ask for a written statement.

The next day Dr. Emmanuel passed out graded tests to the class. A yellow post-it note was stuck my test. None of the other students had post-it notes on their tests. The note

read "Every test in Diction is A- Trust me,
you are doing great." I took this to the dean as
evidence. He just read it and said it really
didn't prove anything happened. He said it was
his word against mine and vice versa. He gave
the note back to me. The dean did not make
a copy of it.

After that summer quarter, It was hard for me
to continue anymore Communications courses.
I took classes that did not pertain to an
AS degree in Communications. During my last
year, I couldn't get around the classes any more

I signed up for Dr. Emmanuel's classes in
Summer Quarter 1993. By this time, I had a
platonic friendship with a guy named Vincent
Cheatham, also a student at ESJC. I told
Vincent about Dr. Emmannuel's proposal to
have sex with me to better my grade. We
came up with the idea of getting to Dr.
Emmanuel before he got to me.

These are some instances that stand-out in
my mind.

In mass Communications class Dr. Emmanuel told the class "if you do what I say you'll get an easy 'A'." Vincent and I laughed hysterically. Dr. Emmanuel just looked at us, rolled his eyes, and continued talking to the class. I remember being automatically excused from tardies and absences. It did not count against me or my grade. My friend Vincent was always getting into trouble with Dr. Emmanuel. Even though we would miss classes and arrive to class at the same time, Vincent was tardied and absent. I had perfect attendance and Vincent did not.

Once I was eating some yogurt in student publications class. I felt uncomfortable. Dr. Emmanuel was staring at me as I ate yogurt. I threw the rest of it away. During my last Publications class, Dr. Emmanuel asked me to make a Callonge ( pasting photographs to background) from some old photos.

It was for a calendar he was making. On the third day, he asked if I could stay after class to finish the collauge. He began typing on the computer and making bird noises. He asked if I recognized the sound he made. I said "Chimney Sweeps" and continued working quickly. About 20 minutes later, I was almost finished. He asked If I would look as his nails. He said they were not growing correct. I stood up and looked over at his nails as he held out his hands. I did not touch him. I said "They look fine to me." Whether the collauge was finished or not, I left it and walked out of the room.

As a work-study student in the English department, Dr. Emmanuel never asked me to make any copies for him or grade tests. There were times when I was left in the department alone while instructors were in class, during the evenings. Dr. Emmanuel

will pass the city entrance to the attic as if he did not want to be seen.

This concludes my written statement of the incident brought forth by Dr. Emman during Summer Quarter 1992.

If I am needed please write to me at:

Lisa Brown (Cowart)
Rt. 4 Box 19-B
Rutledge, AL 36071
or
Call 334-335-3665
(leave message please)

Lisa Brown



1/21/99
Record of conversation with Holly Daniels

I called Holly Daniels at TSU-D where she works. I reminded her of our last conversation about her relationship with Dr. Emanuel. I explained that I would appreciate it if she would write out a statement for my records verifying her sexual relationship with Dr. Emnauel. She was hesitant at first because of her fear of retaliation from Dr. Emanuel. This concern about retaliation is consistent with the responses I have gotten from several other students. She said Dr. Emanuel knew where she lived and worked and she was afraid he would make her life miserable. I explained that he did, in fact, already know that I had discussed their relationship with her. I told her I had gotten similar responses from other students about Dr. Emanuel. I explained that I needed written verification of our conversation and their relationship for our records and the upcoming hearing. She said she did not want to testify but would provide me with a written statement about their relationship. I explained about the hearing process and how we would use her statement. She got my address and said she would write a statement and send it to us.

Rich Emanuel made inappropriate remarks and appeared unwanted and unsolicited in places where he knew I would be

July 1996
Dr Emanuel told me I did not have to take the final exam for my speech class  He then took me to the Weevil Eye room. under the pretense of showing me how the Weevil Eye was put together  He asked me if I minded if he kissed me. but quickly withdrew the question  I later found that he had written in a book that I owned  He had circled studies about having sex with someone younger and concerning having sex with someone outside of one's race

August 1996
Dr  Emanuel came to my house. just to say "hi"  I found the action inappropriate

Founders Day-University of Montevallo 1996
Dr  Emanuel. while speaking at Montevallo's Founders Day, called to arrange a meeting with me  He mentioned that his wife had not accompanied him  I was not at home to receive his call, so he left a message  My roommate also heard the message.

Summer 1997
Dr  Emanuel came to Payless Shoe Source. where I was employed. and asked to see me  My boss told him that I was not there  He seemed not to believe her story, but finally left the store  One evening in May, Dr  Emanuel came by Payless at closing time  He had been to a state meeting and was driving a state vehicle  When we spoke. I made it clear to him that I did not want his advances  That was the last time that I saw him

Lydia Fleming
January 25, 1999

*Lydia Fleming*

2-2-99

When I began college at ESJC this summer, several students told me that if I would wear a short skirt in Dr. Emmanuel's speech class that I would get a good grade. I didn't really believe it but I decided to see if it had any effect in class. The first day that I did dress nicely, Dr. Emmanuel noticed and commented on my apparel. He also commented on every other females dress when they wore skirts to class.

I am on the student publications staff at ESJC and I am a friend of Suzanne's. I work primarily on the computer in Dr. Emmanuel's office and I search the internet. I use the sites most commonly accessed section on Internet Explorer because I figured that since I use the computer on a day to day basis my site should have been on that list. Instead, I found that the list was filled with X-rated internet sites. I thought that some of the other staffers might have done this as a joke but when I showed it to a couple of them they had no idea how it got there. It continued to happen everyday that I used the computer so finally I stopped looking under that list.

Our conversation in publications staff class was on a friendly basis. Dr Emmanuel loved to tell dirty jokes, thinking that it didn't really offend anyone. He often made comments of a sexual nature to several of the staffers. I guess everybody just overlooked it. It wasn't really

directed at any certain staffer but there was only one guy on our staff so the comments were made after to all of the females.

Miranda
Wilkins

Enterprise State Junior College
Enterprise. AL 36330
17 February 1999


To Whom It May Concern:

I am writing the following narrative at the request of Dr. Joan Newman, Interim Dean of Instruction of this college. The incidents concern the case of Dr. Richard C. Emanuel.

To the best of my recollection, these incidents occurred in the spring quarter of 1993. The first incident occurred when Dr. Emanuel came to my office while I was between classes. He asked if he could get my advice on a matter. I responded positively. He then requested me to tell him what I would do if I knew someone was spreading a false rumor about me. I was taken aback by the question. I thought at first he was referring to me personally; then, I assumed that he was asking a hypothetical question. I responded that I would either ignore the rumor and let others think whatever they wished; or, if I knew who was spreading the rumor, I would confront that person and try to resolve the matter.

A few days later, Dr. Emanuel again came to my office and asked if I had time to "hear something." I said yes, and I believe we set up a date and a time for me to "hear" the matter. I did not know what I was going to hear or why.

At the time and date appointed, Dr. Emanuel and a student named Amelia appeared in my office. I cannot recall Amelia's surname. I closed the door to the outer office, and Dr. Emanuel indicated that Amelia wanted to make a statement to me. I indicated that I was ready to hear it. Then, Amelia stated that her friend Holley Daniels had been "dating" Dr. Emanuel and that they had been having a romantic relationship; I do not recall whether or not she said the relationship was sexual. Amelia stated that Dr. Emanuel had promised Holley that he would divorce his wife and marry her and that Holley had believed these promises. She said that Holley had fallen in love with Dr. Emanuel and that he had led her to believe that the two of them would raise his sons together. She further stated that Dr. Emanuel had reneged on these promises and that Holley was despondent. She said that the entire affair was known by many students, especially those who were members of the Entertainers, of which Amelia and Holley were members. She stated that the affair had caused problems in morale among the members of that group. Amelia was obviously concerned over the emotional state of her friend Holley. It was never clear to me whether her major concern was with the legitimacy of the alleged affair or with the fact that it had not turned out the way her friend Holley had expected. At the end of her statement, I thanked Amelia for her concern and stated that I could do nothing unless her friend Holley lodged a complaint--at the time, that was the policy in dealing with such matters. I never received a complaint by Holley Daniels against Dr. Emanuel.

After Amelia left my office, Dr. Emanuel asked, "How do you defend yourself against a charge like that?" I remember that I responded, "I don't know how you can. Whatever the truth may be, Amelia believes what she is saying."

I did not report the above incident to anyone in authority at the college at that time. I did relate the general contents of the converstion to my wife, a professional counselor who has a duty to maintain confidentiality. I spoke to my wife about the issue  mainly because I was puzzled by the fact that a student would have the courage to lodge such a charge in the presence of the accused and his department chair. In my thirty years of teaching at Enterprise State, I have never had another student to complain in the face of an accused instructor about anything concerning the behavior of that instructor. Usually, the last thing a student wants to do is to confront an instructor, especially in the presence of another teacher, let alone the chairman of that instructor's division.

At the time of the incident summarized above, I used the word "bizarre" in my conversation with my wife to characterize the incident. I continue to think of the episode as bizarre, mainly because I did not understand how Dr. Emanuel could have felt that bringing a matter to my attention that I was unaware of and which, quite obviously, was in his best interests to keep quiet would have been of benefit to him. I believe that he thought I had heard rumors of his relationship with Holley Daniels; the truth is that I had not heard such rumors. Further, the incident was bizarre because Amelia was absolutely convincing; she did not have a personal complaint against Dr. Emanuel. Her concern was for her friend. And, whatever the relationship between Dr. Emanuel and Holley Daniels may have been, I have **no doubt that Holley's friend Amelia told me what she believed to be the truth.**

In summary, I have no doubt that Amelia's concerns were legitimate.

Scott R. Smith, Ed.D., Chairman
English, Foreign Languages, and Communication

November 13, 1998

COPY

Dr. Joan Newman
Dean of Instruction
Enterprise State Junior College
Enterprise, AL 36330

Dr. Newman.

On November 6, at work, I received a telephone call from Dr. Richard Emanuel, but I was not there to receive it.  I knew that he had told me that he had a message for me and thought that I had already received and read the message, but I hadn't.  He had never called my work before, so I thought it a little strange.

On November 9, 1998, I received an e-mail message from Dr. Richard Emanuel which told me to check a file under Word Perfect in his office.  I did so and found an inappropriate letter.  The letter shocked me, and I started crying when I first read it. I printed it out and then deleted it because I didn't want him to know that I had received it.  I proceeded to talk to Dr. Betty Cully about the situation.

In the past Dr. Emanuel had tried to discuss the fact that he had opportunities to have affairs with other students, but I ignored these remarks  and continued my work for the newspaper.

I have very strong feelings about this harassment and am here to get an education and not to get "hit on" by a faculty member. I hope my complaint is taken seriously.  I feel very uncomfortable around Dr. Emanuel now, but since I am on a Publications Scholarship for next semester, I want to keep my scholarship and finish my education here.

Sincerely,

Suzanne Dubose

Suzanne Dubose



DEFENDANT'S EXHIBIT
6
PENGAD 800-631-6989

COPY

I had written a note similar to this the other day (on your birthday) but I erased it when you came back to the office with Eric. I guess God or fate or destiny was trying to protect me (or something like that).

What the note said was that in keeping with the day (your birthday) I would like to give you a birthday kiss. I know, I'm crazy.........this could very easily put me in some "hot water".....

First, you could be repulsed by the idea of it and become paranoid about being around me...and I would become another "Dr Murph" in your eyes.

Second, even that did not happen, you might feel uncomfortable around me and the relaxed, fun that we now enjoy would be harmed or lost completely.

I said it could put me in some "hot water"...but ....some people who find themselves in "hot water" decide to just take a bath. I'm not really sure what that means...I just read it somewhere.

You seem to me to be the type of person that if you <u>were</u> "put off" or offended by such an idea that you would give a friendly smile and probably say nothing. Instead, I'd like you to respond one way or the other so we could "clear the air" and get on with the day.

Suz, you're like a puppy dog...nice, easy to be around, easily embarrassed, etc. I would never want to offend you or put an uncomfortable distance between us.

I know, I'm crazy. Like you said....I'm at least a ½ a bubble off level. And yes, beans CAN make a meal. So stop reading and respond already!



DEFENDANT'S
EXHIBIT

7

PENGAD 800-631-6989

STATE OF ALABAMA

COFFEE COUNTY.

## SETTLEMENT AGREEMENT

This Agreement made and entered into, in duplicate, on this the /2ᵗʰ day of April, 1999, by and between **DR. RICHARD EMANUEL**, party of the first part and hereinafter referred to as "DR. EMANUEL", and **ENTERPRISE STATE JUNIOR COLLEGE**, a division of the Post Secondary Education System of the State of Alabama, hereinafter referred to as "COLLEGE",

## WITNESSETH

**WHEREAS**, Dr. Emanuel has been employed by the COLLEGE as an instructor since September 1989, and

**WHEREAS**, the parties have reached an agreement, and have agreed to settle all claims, charges, and disputes between them.

**NOW THEREFORE**, for and in consideration of the mutual promises of the parties and of the consideration each party is to receive by this Agreement, the receipt and sufficiency of said consideration being acknowledged by the respective parties to this Agreement, it is agreed by and between the parties hereto as follows:

1. Upon receipt of a letter of resignation effective May 17, 1999, from Dr. Richard Emanuel, Enterprise State Junior College will restore Dr. Emanuel to the payroll

DEFENDANT'S EXHIBIT

as of February 15, 1999. This paragraph is conditioned upon Dr. Emanuel's

resignation being delivered to the office of Cassady, Fuller and Marsh, LLP, on or

before the expiration of ten days from Thomas K. Brantley, as attorney for Dr.

Emanuel, receiving a duplicate original of this fully executed "Settlement

Agreement".

2.    Dr. Emanuel will remain on the payroll through the end of May 1999, which is the

end of the present semester. Dr. Emanuel will receive the full compensation

under his current contract payable at the end of May, 1999; and, further said full

compensation is hereby stated to be $47,888.00 less any amounts previously paid.

3.    The College and Dr. Emanuel will not publicize the settlement, the circumstances

surrounding the case or the act of resignation; and further all memos, notes, files,

documents, physical evidence and any other evidence relating to the charge of

sexual harassment shall be placed in a separate file, and shall be closed and

maintained in the possession of the President of the College and only available

upon the direction of the President of the College or his lawful designee, or

pursuant to specific rule, regulation, subpoena or order to produce in a court of

competent jurisdiction.

4.    If Dr. Emanuel breaches this agreement, his pay will be immediately terminated

and his resignation would become effective immediately upon breach. If the

College breaches this agreement prior to May 31, 1999, Dr. Emanuel will be

reinstated with full pay as of the date of the breach. After May 31, 1999, each

party would be limited to damages occurring after May 31, 1999. It is the express

intent of this paragraph that actions for breach of this agreement and actions for

breach of confidentiality of the agreement shall survive any limitations, if any, of this paragraph.

5.  The College shall communicate to the Teacher's Retirement System with regard to Dr. Emanuel's balance of leave days that said leave days shall be held "in the account" of Dr. Emanuel for purpose of retirement calculations.

6.  Dr. Emanuel may return to the campus of the College when the College is not in session, and students are not present, viz., on a Saturday afternoon or Sunday or during Spring Break, only to retrieve his personal items of property, accompanied by a representative of his choosing and accompanied by a representative of the College.

7.  The College and/or Dr. Emanuel shall not volunteer any information to any person regarding Dr. Emanuel's employment, will not volunteer the reason for Dr. Emanuel's resignation, other than what is stated in his letter of resignation, but the College and/or Dr. Emanuel will truthfully answer direct questions asked by any person or school concerning employment; and further the College will affirmatively communicate in its answers to direct questions asked by any person or school concerning the sexual harassment allegations against Dr. Emanuel that Dr. Emanuel denied all of the sexual harassment allegations.

8.  The College shall notify those faculty and staff members, and students who were involved in the allegations against Dr. Emanuel that the matter has been resolved and a hearing will not be held.

9.  Dr. Emanuel will not be eligible for re-employment with the College at any time in the future nor will the College be eligible to seek to employ Dr. Emanuel.

10.  It is understood and agreed that this Agreement is the compromise of a doubtful and disputed claim, and that the compensation paid under this Agreement is not to be construed as an admission of liability of either party, and that both parties deny liability therefore and intend to merely avoid further dispute, hearings, and possible litigation and buy their peace.

**IN WITNESS WHEREOF** the parties have executed this Agreement on the day and date above written.

DR. RICHARD EMANUEL

**ENTERPRISE STATE JUNIOR COLLEGE**

By
STAFFORD L. THOMPSON
Its President

STATE OF ALABAMA
COUNTY OF  Houston  .

I, the undersigned, a Notary Public, in and for said County and State, hereby certify that **DR. RICHARD EMANUEL**, whose name is signed to the foregoing Settlement Agreement, and who is known to me, acknowledged before me on this day that being informed of the contents of said Settlement Agreement, he executed the same voluntarily on the day the same bears date.

Given under my hand and seal this the 1st day of April , 1999.

NOTARY PUBLIC
My Commission Exp.: 3-24-2000

STATE OF ALABAMA
COUNTY OF COFFEE

I, the undersigned, a Notary Public, in and for said state and County, hereby certify that **STAFFORD L. THOMPSON**, in his capacity as President of Enterprise State Junior College, whose name is signed to the foregoing Settlement Agreement, and who is known to me, acknowledged before me on this day that being informed of the contents of the Settlement Agreement, he executed, in his capacity as President, the same voluntarily on the day the same bears dated.

Given under my hand and seal this the *12th* day of _*April*_ , 1999.

_*Martha B. Donaldson*_
NOTARY PUBLIC
My Commission Exp.: _*4-6-2002*_

# BEFORE THE PRESIDENT OF
# ENTERPRISE STATE JUNIOR COLLEGE
# (FAIR DISMISSAL ACT PROCEEDINGS)

IN THE MATTER OF:            )
                            )
RICHARD EMANUEL, PH.D.,      )
                            )
       RESPONDENT.          )

## NOTICE OF APPEAL AND MOTION FOR
## APPOINTMENT OF EMPLOYEE REVIEW PANEL

**COMES NOW** the Respondent, Richard Emanuel, Ph.D., by and through his undersigned counsel and hereby notifies President Stanford L. Thompson that he appeals his decision dated January 6, 1999 terminating his employment with Enterprise State Junior College; and, further Respondent, Richard Emanuel, Ph.D., would show:

1.      That Respondent requests a panel of three persons, one selected by Enterprise State Junior College, one selected by the Respondent and the third agreed upon by Respondent and Enterprise State Junior College which shall constitute an Employee Review Panel to hear the employee's appeal.

Respectfully submitted,

**PARKMAN, BRANTLEY, LAMERE & ATWELL**

**THOMAS K. BRANTLEY**
**ATTORNEY FOR RESPONDENT**
**401 NORTH FOSTER STREET**
**DOTHAN, ALABAMA 36303**
**(334) 793-9009**



DEFENDANT'S
EXHIBIT
9

**BEFORE THE PRESIDENT OF
ENTERPRISE STATE JUNIOR COLLEGE
(FAIR DISMISSAL ACT PROCEEDINGS)**

IN THE MATTER OF:        )
                                      )
RICHARD EMANUEL, PH.D.,    )
                                      )
     RESPONDENT.          )

## MOTION TO DISMISS ENTERPRISE STATE JUNIOR COLLEGE'S REQUEST FOR TERMINATION OF RESPONDENT

**COMES NOW** the Respondent by and through her undersigned counsel and hereby moves this Honorable Panel to dismiss the Enterprise State Junior College's request to terminate the Respondent; and, as grounds therefore would show:

1.    That the Fair Dismissal Act, Section 36-16-100 thru 36-26-106, denies the Respondent the right to compel witnesses to be present at the Hearing on said termination; and, further said failure to compel witnesses to be present to testify and give pertinent information to the Review Panel denies the Respondent the inherent right to due process and the right to be heard.

**WHEREFORE,** premises considered, Respondent prays that this Review Panel dismiss the above-referenced matter and order that the Respondent be reinstated his employment with Enterprise State Junior College.

Respectfully submitted,
PARKMAN, BRANTLEY, LAMERE & ATWELL

_____
THOMAS K. BRANTLEY
ATTORNEY FOR RESPONDENT
401 NORTH FOSTER STREET
DOTHAN, ALABAMA 36303
(334) 793-9009



DEFENDANT'S
EXHIBIT
10

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing Motion upon the Honorable Ken Fuller, Cassady, Fuller and Marsh, Attorneys at Law, P. O. Box 310910, Enterprise, Alabama 36331-0910 and Honorable William Pryor, Attorney General, by placing a copy of same in the United States Mail, properly addressed and postage prepaid, on this the *1* day of _____, 1999.

_____
OF COUNSEL

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing Motion upon the Honorable Ken Fuller, Cassady, Fuller and Marsh, Attorneys at Law, P. O. Box 310910, Enterprise, Alabama 36331-0910 by placing a copy of same in the United States Mail, properly addressed and postage prepaid, on this the _7_ day of _____, 1999.

_____
OF COUNSEL

# BEFORE THE PRESIDENT OF
# ENTERPRISE STATE JUNIOR COLLEGE
# (FAIR DISMISSAL ACT PROCEEDINGS)

| | |
|---|---|
| **IN THE MATTER OF:** | ) |
| | ) |
| **RICHARD EMANUEL, PH.D.,** | ) |
| | ) |
| **RESPONDENT.** | ) |

## MOTION IN BAR OF FURTHER PROSECUTION
## PURSUANT TO BOLTON V. BOARD, 514 SO.2D 820 (1987)

**COMES NOW** the Respondent by and through his undersigned counsel and hereby moves the College pursuant to <u>Bolton v. Board</u>, 514 So.2d 820 (Ala 1987) for an Order barring further prosecution of Respondent of the allegations contained in the College's letter dated January 8, 1999 and of the allegations contained in the College's letter to Respondent dated January 26, 1999 and in support thereof would show:

1. That Stanford L. Thompson, President of Enterprise State Junior College, did serve notice on January 8, 1999 under the Fair Dismissal Act to the Respondent (Section 36-26-103 et seq. <u>Code of Alabama 1975</u>) as follows: "This is to notify you that it is my intention to terminate your employment as an instructor with Enterprise State Junior College effective at the close of the business day on February 15, 1999." (Please see Exhibit "A");

2. That further Stanford L. Thompson, President of Enterprise State Junior College did send to the Respondent a second letter dated January 26, 1999 renotifying the Respondent as follows: "This is to notify you that it is my intention to terminate your employment as an instructor with Enterprise State Junior College effective at the close of the business day on February 15, 1999."(Please see Exhibit "B");

3. That the Respondent gave notice of intent to contest the College's letter containing notice of termination dated January 8, 1999 on January 20, 1999 by Overnight Mail (Please see Exhibit "C");

4. That by virtue of the College re-noticing Respondent pursuant to the College's January 26, 1999 letter the College has abandoned its original notice of intent to terminate which was contained in the College's letter of notice of intent

DEFENDANT'S
EXHIBIT

11

PENGAD 800-631-6989

terminate dated January 8, 1999 (Please see Exhibit "A"),

5    That the grounds for termination that the College listed in its' letter of notice of
     termination of January 26, 1999 are as follows:

     A    unwelcome sexual advances toward female students,
     B    solicitation of sexual favors from female students in exchange for grades or
          grade changes,
     C    engaging in sexual intercourse with female student on college property,
     D    making degrading and other sexually demeaning and unnecessary
          comments about and to female students in the classroom and in the faculty
          office,
     E    stalking female students;
     F    using college equipment for unwelcome sexual advances toward a female
          student
     G    failure to heed the counsel of the Dean of Instruction to cease
          inappropriate behavior toward female students
     H    failure to act in conformance with sexual harassment training provided by
          the college

6    That the grounds for termination that the College listed in its letter of January 8,
     1999 are identical to the grounds the College listed in its second notice of
     termination dated January 26, 1999;

7    That therefore the College's authority to re-notice the Respondent of proposed
     termination on the same grounds as alleged previously is barred,

8    That <u>Bolton v. Board of School Commissioners</u> (copy attached) states among
     other things that the College's original notice of intent to Respondent was
     **abandoned** on the College's re-notice to Respondent. <u>Bolton</u> states that after the
     Respondent had given notice of intent to contest the College's re-notice (the
     College's letter dated January 26, 1999) on the same grounds was an abandonment
     of the original notice of intent to terminate; and, further the College's notice of
     intention to terminate Respondent's employment contract and its subsequent
     failure to follow statutory prescribed procedures operated as a bar to the College's
     authority to re-notice Respondent of proposed termination on the same grounds as
     previously alleged,

9    That the College has failed and refused to offer the Respondent a pretermination
     hearing (due process hearing) prior to the time that President Thompson issued his
     decision to Respondent that Respondent's employment was terminated; and,
     further said action by the College of notifying Respondent of the College's
     decision to terminate Respondent's employment prior to a pretermination hearing
     (due process hearing) was a failure to follow the statutorily prescribed procedures
     as set out in the Fair Dismissal Act;

10    That the College now offers to belatedly and untimely set Respondent a post-termination hearing, and, further the Fair Dismissal Act provides no authority for a posttermination hearing, and, further Respondent cannot agree to attend a posttermination hearing as same is not authorized or provided in the Fair Dismissal Act, and, further said posttermination hearing would be an unlawful hearing under the guidelines of the Fair Dismissal Act;

11    That any posttermination hearing that the Respondent would attend would not provide Respondent due process in any event since the College has already stated in its letter to Respondent of January 26, 1999 that the College has already made up its mind to terminate the employment of the Respondent; and, further said post-termination hearing would therefore not be before an impartial tribunal; and, further the fundamental cornerstone of due process is a hearing before a fair and impartial tribunal and therefore a posttermination hearing before a tribunal that had already made up its mind would deny Respondent due process and would place a greater burden on the Respondent than would a hearing before a tribunal that has not made up its mind,

12    That Allen vs Bessemer State Community College, 703 So.2 383 (1997) requires that pursuant to a Fair Dismissal Act Hearing a pretermination hearing is mandated before Respondent can be dismissed from employment;

13    That the College is barred from further prosecuting the Respondent on the charges outlined in the College's letter dated January 26, 1999, and, further the College has failed and refused to follow the proper statutory procedures in conducting the instant matters pursuant to the Fair Dismissal Act;

14    That this cause is due to be dismissed on grounds of bar to prosecution;

15    That therefore Respondent demands immediate entry onto the premises of Enterprise State Junior College for the purposes of teaching his classes and performing his duties as an instructor at Enterprise State Junior College instanter and without delay.

**WHEREFORE,** premises considered, Respondent prays that this Motion be granted for the grounds stated herein-above.

Respectfully submitted,

PARKMAN, BRANTLEY, LAMERE & ATWELL

THOMAS K. BRANTLEY
ATTORNEY FOR RESPONDENT
401 NORTH FOSTER STREET
DOTHAN, ALABAMA 36303
(334) 793-9009

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing Motion upon the Honorable Ken Fuller, Cassady, Fuller and Marsh, Attorneys at Law, P O Box 310910, Enterprise, Alabama 36331-0910 by placing a copy of same in the United States Mail, properly addressed and postage prepaid, on this the 3 day of Feb , 1999

OF COUNSEL



## UNITED STATES DEPARTMENT OF EDUCATION
### OFFICE FOR CIVIL RIGHTS
ATLANTA OFFICE, SOUTHERN DIVISION
61 FORSYTH STREET, SW
SUITE 19T70
ATLANTA, GEORGIA  30303

October 25, 1999



Dr. Stafford Thompson, President
Enterprise State Junior College
600 Plaza Drive
Enterprise, Alabama  36330

Dear Dr. Thompson:

Re:  Complaint Number 04-00-2003

On October 7, 1999, the U.S. Department of Education (Department), Office for Civil Rights (OCR), received a complaint alleging discrimination on the part of the Enterprise State Junior College (College) Specifically, Mr. Richard Emanuel (complainant), alleged that the College discriminated against him on the bases of race and sex in the area of employment

OCR is responsible for enforcing Title VI of the Civil Rights Act of 1964, 42 U.S.C. Sections 2000d et seq., and its implementing regulation, 34 C.F.R. Part 100; and Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. Sections 1681 et seq., and its implementing regulation, 34 C.F.R. Part 106, which prohibit discrimination on the bases of race and sex, respectively, in programs and activities that receive Federal financial assistance from the Department. The College is a recipient of such assistance and is, therefore, subject to the provisions of these regulations.

This letter is to inform you that this individual allegation regarding employment discrimination has been referred to the Equal Employment Opportunity Commission (EEOC), Birmingham District Office, located at 1900 Third Avenue North, Birmingham, Alabama  35203, for investigation and conciliation (where appropriate) pursuant to 29 C.F.R. Part 1691. We are referring the complaint to EEOC as of the date of this letter. The date the complaint was received by OCR shall be deemed the date the complaint was received by EEOC unless an earlier charge was received by that agency. A representative from EEOC will contact you concerning the processing of this complaint.

We are closing our file on this complaint as of the date of this letter. If you have any additional questions, please contact Nancy Soden, Equal Opportunity Specialist, or me, at (404) 562-6429.

Sincerely,

Vickie A. Barrows
Vickie A. Barrows
Team Leader, Team E

DEFENDANT'S
EXHIBIT

*Orig. in personnel file*
*RCE*

April 8, 1999

Dr. Stafford Thompson
President, Enterprise State Junior College
P.O. Box 1300
Enterprise, AL 36331

Dear Dr. Thompson

    I hereby tender my resignation effective at the close of the business day May 17, 1999. This resignation recognizes that the College has agreed to provide me the full benefits of my current contract.

                                   Sincerely,

                                   Richard C. Emanuel, Ph.D.
                                   Instructor of Communication



DEFENDANT'S EXHIBIT 13

PENGAD 800-631-6989

# Wallace-Dothan's 2001
# Speech Instructor search
# (start date January 2, 2002)

EMANUEL--0001--PLF DOX

 # WALLACE COMMUNITY COLLEGE
*Dothan • Eufaula • Ozark • Fort Rucker • Mobile*

## VACANCY ANNOUNCEMENT

## SPEECH INSTRUCTOR

### Start Date: January 2, 2002

The Speech Instructor position will initially be based at the Wallace Campus in Dothan.

**QUALIFICATIONS:** <u>Required</u>: Master's degree with 18 graduate semester hours or 27 quarter hours in Speech OR Master's degree in English, reading, or closely related field AND a willingness to complete 18 graduate semester hours in Speech at own expense within two years from date of employment. <u>Preferred</u>: Additional 18 graduate semester hours or 27 graduate quarter hours in English, reading, or another closely related subject. Teaching experience in a community college. Demonstrated commitment to, and experience in, integrating technological innovations into the curriculum.

**DUTIES:** In addition to adhering to guidelines as specified by the Wallace Community College Personnel Handbook, the Alabama State Board of Education, and Wallace Community College's President, duties will include the following: Under the supervision of the Division Director, Program Director, and/or instructional dean, employee instructs students according to established policies and procedures. Employs appropriate teaching strategies in the instructional setting. Serves as advisor in the institutional advisement program. Plans, develops, implements and evaluates classroom policies and procedures consistent with College policies.

**SALARY:** Based on education and experience commensurate with Salary Schedule D-1 (range: $31,042 - $56,321 for 9 months). 12-month employment possible, depending on student enrollment and College needs.

**SCREENING COMMITTEE:** The President will appoint a Screening and Interview Committee to include representatives of the College faculty and staff. This committee will employ appropriate procedures, including the interview and demonstration of competency, to determine which applicants are to be recommended to the President for further consideration. Applicants must travel at their own expense. If you have a disability and require accommodations, please notify us at (334) 983-3521, ext. 425.



DEFENDANT'S
EXHIBIT
14

PENGAD 800-631-6989

Wallace Community College
Vacancy Announcement
Page 2

**APPLICATION DEADLINE/PROCEDURE:** **A complete application file must be received in the Office of Personnel no later than 1:00 P.M. on Tuesday, November 13, 2001.** A complete application file consists of a Wallace Community College employment application with three work references; resume; a letter describing specifically how your experience and qualifications meet the qualifications outlined for the position; and complete college transcripts (copies of transcripts will suffice until employed). All application materials should be submitted as a complete package. Applicants who fail to submit all required information will be disqualified. Only applications received during the period of this announcement will be considered. Applications are available from and should be submitted to:

Office of Personnel
ATTN: 2001-02:03
Wallace Community College
Route 6, Box 62
Dothan, AL  36303
(334) 983-3521, 425

**Wallace Community College is an Equal Opportunity Employer and complies with the Americans with Disabilities Act. As required by the Shuford/Kennedy Consent Decrees, Wallace Community College is seeking applications in particular from black persons and women, including black women.**

EMANUEL--0003--PLF DOX

 **Wallace Community College**

Dothan • Eufaula • Ozark • Fort Rucker • Mobile

January 9, 2002

Dr. Richard Emanuel
245 Walden Court
Montevallo, AL 35115

Dear Dr. Emanuel:

We have completed the interview process for the recently advertised Speech Instructor position at Wallace Community College, and we appreciate your interest. However, we have decided to reopen the search.

We wanted you to be aware of our intention to expand this search and let you know that the position will be readvertised for the next budget year. At that time, you will be provided with the vacancy announcement and given the opportunity to reapply.

If I can be of further assistance, please contact me. Again, thank you for your interest in employment at Wallace Community College.

Sincerely,

Ralph Purvis, Chair
Search Committee

acl

*I interviewed on campus in NOV 2001.*
*I was notified I was in the top three candidates.*
*I interviewed a second time in NOV 2001.*
*I received this letter JAN 2002.*
*The next Speech Instructor position was advertised May 2006.*

EMANUEL--0004--PLF DOX

# Wallace-Dothan's 2006
# Speech Instructor search
# (start date August 14, 2006)



PENGAD 800-631-6989

DEFENDANT'S
EXHIBIT
15



WALLACE
COMMUNITY
COLLEGE

## VACANCY ANNOUNCEMENT

### SPEECH INSTRUCTOR

**Start Date: August 14, 2006**

The Instructor position will be based initially at the Sparks Campus in Eufaula.

**QUALIFICATIONS:**  Required: Master's degree from a regionally accredited institution with 18 graduate semester hours or 27 graduate quarter hours in speech, speech communication, communication studies, communication arts, or communication management. Preferred: Additional 18 graduate semester hours or 27 graduate quarter hours in another discipline taught at the College.  Teaching experience in a community college.  Demonstrated experience in integrating technological innovations into the curriculum, including, but not limited to, Web-based teaching.  Experience in producing and directing student drama activities.  Experience in coaching student teams for speech and/or debate competition.

**DUTIES:**  In addition to adhering to guidelines as specified by the Wallace Community College Personnel Handbook, the Alabama State Board of Education, and College President, duties will include the following: Under the supervision of the division director, instructional coordinator or instructional dean, employee instructs students according to established policies and procedures.  Employs appropriate teaching strategies in the instructional setting.  Serves as advisor in the institutional advisement program.  Plans, develops, implements, and evaluates classroom policies and procedures consistent with College policies.

**SALARY:**  Based on education and experience commensurate with Salary Schedule D-1 for 9 months (range: $33,891 - $65,071 ) or 12 months (range: $44,355 - $85,188).  Summer term is customary but not guaranteed.

*(OVER)*

www.wallace.edu

EMANUEL--0006--PLF DOX

Wallace Community College
Vacancy Announcement- Speech Instructor
Page 2

**APPLICATION DEADLINE/PROCEDURE: A complete application file must be received in the Office of Personnel no later than 1:00 p.m. on Friday, June 9, 2006.** A complete application file consists of a Wallace Community College employment application with three work references; resume; documentation (from current and/or former employers) verifying employment experience (if applicable); a letter describing specifically how your experience and qualifications meet the qualifications outlined for the position; and copies of individual transcripts from each college attended (photocopies of transcripts will suffice until employed). Must meet eligibility requirements to work in the U.S. at time of appointment. All application materials should be submitted as a complete package. Applicants who fail to submit all required information will be disqualified. Only applications received during the period of this announcement will be considered. Applications are available from and should be submitted to:

Office of Personnel
ATTN: 2004-05:28
Wallace Community College
1141 Wallace Drive
Dothan, AL 36303-0943
(334) 556-2425

**Wallace Community College is an Equal Opportunity Employer and complies with the Americans with Disabilities Act. As required by the Uniform Guidelines, Wallace Community College is seeking applications in particular from black persons and women, including black women.**

EMANUEL--0007--PLF DOX



**Office of Personnel**

1141 Wallace Drive
Dothan, Alabama 36303
334.556.2425
Fax: 334.556.2463

July 12, 2006

Dr. Richard Emanuel
1937 Tara Drive
Prattville, AL 36066

Dear Dr. Emanuel:

Thank you for the interest you have shown in Wallace Community College by submitting your application for the Speech Instructor position. We realize this search process was very lengthy, and we appreciate your patience.

Although another applicant has been selected for the position, we invite you to apply for any future vacancies. Again, thank you for your interest in Wallace Community College.

Sincerely,

Terry S. Schembera

Terry Schembera, Chair
Search Committee

acl

www.wallace.edu
DOTHAN • EUFAULA • FORT RUCKER



**DEFENDANT'S EXHIBIT** 16
PENGAD 800-631-6989

EMANUEL--0009--PLF DOX

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form

| AGENCY | | CHARGE NUMBER |
|---|---|---|
| | FEPA | 420-2007-00605 |
| x | EEOC | |

_____ and EEOC

_State or local Agency, if any_

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Dr. Rich Emanuel | (334) 491-1269 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1937 Tara Dr. | Prattville, AL 36066 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Wallace State Community College- Dothan | + 15 | (334) 983-3521 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1141 Wallace Drive | Dothan, AL 36303-0943 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| [x] RACE  [ ] COLOR  [x] SEX  [ ] RELIGION  [ ] AGE | EARLIEST (ADEA/EPA)    LATEST (ALL) |
| [ ] RETALIATION  [ ] NATIONAL ORIGIN  [ ] DISABILITY  [ ] OTHER (Specify) | July 14, 2006 |
| | [ ] CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am a Caucasian male. In June 2006, Wallace State Community College-Dothan advertised an intent to employ a full-time Speech Instructor. I met the qualifications for the position and applied for it in June. I was interviewed three times and was among the three finalists.   On July 14, 2006, I was notified that I was not being hired. The College hired an African-American female who was less qualified for the position than I and who did not meet the qualifications for the position. I believe that I was passed over on the basis of my race and/or gender due to the College's policy or practice of promoting the hiring of African-Americans and females. I am therefore making claims of disparate impact and disparate treatment under Title VII to the Civil Rights Act of 1964, as amended.

NOV  6 2006

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| 31 OCT 2006 _Richard C. Emanuel_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month and year) |
| Date   Charging Party (Signature) | |

EEOC FORM 5 (10/94)



EMANUEL--0042--PLF DOX



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 211-2105

*Adam M. Porter, Attorney*
*2301 Morris Avenue – Suite 102*
*Birmingham, AL 35203*

*Reference:* <u>*Rich Emanuel v Wallace State Community College*</u>
        *Charge No. 420 2007 00650*

*Dear Mr. Porter:*

*The above-referenced charge has been assigned to me for investigation. This correspondence is submitted in reference to your client's charge of employment discrimination filed on the basis of her race, Caucasian. and sex, male.*

*Based upon my analysis of the material and testimony which your client presented and information obtained from other sources, I have concluded that it is unlikely that further investigation of your client's charge would result in a finding that the law was violated, as alleged.*

*Your client alleged that he was discriminated against because of his race, Caucasian, and sex, male, inasmuch as, he was not selected for the position of Speech Instructor.*

*Evidence from the Respondent indicates that your client was not selected because he was not deemed the best qualified for the position. Respondent contends that the decision to appoint the individual for the speech instructor's position was based strictly upon her overall suitability for the position.*

*Your client has not provided sufficient evidence to show that the Respondent discriminated against him as alleged.*

*If your client has additional information or evidence which was not submitted previously, please provide to me by March 15, 2007. You can send the information to me at the address above, fax (205) 212-2105 or contact me at (205) 212-2070. If you come to the office without making an appointment, I may or may not be able to see you.*



DEFENDANT'S
EXHIBIT
12

EMANUEL--0050--PLF DOX

*In the event that I do not hear from you, I will recommend that the charge be dismissed, that your client be issued a Notice of Right to Sue and that the Commission consider this matter closed.*

*Sincerely,*

*March 6, 2007*
*Date*

*Devoralyn J. McGhee*
*Investigator*

EMANUEL--0051--PLF DOX

# My arguments supporting
# my claims of gender and race discrimination



DEFENDANT'S
EXHIBIT
19
PENGAD 800-631-6989

**RICHARD C. EMANUEL** [Emanuel], Plaintiff,                Current as of 12 OCT 2007

v.

Defendants:    Linda C. Young, President of George C. Wallace Community College – Dothan,
               George C. Wallace State Community College – Dothan ["Wallace-Dothan"],

Civil Action No. _____

      Plaintiff EMANUEL, who is a 46-year-old white male, alleges that he was denied a position as a full-time Speech Instructor at Wallace State Community College – Dothan ["Wallace-Dothan"] because of his gender, race and age. EMANUEL alleges causes of action based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., on the Fourteenth Amendment, on 42 U.S.C. § 1983 and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) and 42 U.S.C. § 1981.

### Wallace-Dothan's *Intent to Employ*

      In June 2006, EMANUEL applied for a full-time Speech Instructor position at Wallace-Dothan. EMANUEL interviewed for this position on June 22, 2006. The initial interview search committee consisted of three females and one male. EMANUEL was among the three finalists who interviewed a second time on the same day. The second interview committee consisted of two males and one female. On June 29, 2006, a third and final interview was conducted via telephone by the president of the college (who is female). Of the eight people who interviewed EMANUEL, five were female (62%) and only three (38%) were male. The person who made the final hiring decision was a white female. On July 14, 2006, EMANUEL was notified in writing that he was not being hired. The person Wallace-Dothan hired was a young, black female who was less qualified than EMANUEL.

      The person Wallace-Dothan hired has a Master's degree. The Southern Association of Colleges and Schools Commission on Colleges (SACS-COC) web site (section 3.7.1) states that "when determining acceptable qualifications of its faculty, an institution gives primary consideration to the highest earned degree in the discipline…" (underlining added). EMANUEL has a Ph.D. in communication.

Below is a summary comparison of the selected candidate and EMANUEL in relation to the qualifications Wallace-Dothan listed in their summer 2006 job announcement for a Speech Instructor.

| Qualification | Selected candidate | EMANUEL |
|---|---|---|
| Master's degree | Master's degree | Doctoral degree |
| 18 additional graduate hours in another discipline taught at the college | NO | YES – computer science |
| Teaching experience in a community college | 1 year part-time | 10 years full-time plus 11 courses on part-time basis with Alabama two-year colleges PLUS 10 years full-time and 27 courses part-time at four-year universities |
| Experience integrating technology including web-based teaching | Experience using WebCT and Internet | Experience using WebCT, Blackboard, PowerPoint, and Internet.  Offered Alabama's first on-line communication course. |
| Experience producing/directing student drama activities | NO | Served as Director of College Theater for two years; Directed several plays and Readers Theater |
| Experience in coaching student teams for speech and/or debate competition | ? | Coached students for speech competitions for several years |

In addition to these qualifications listed in the job announcement (Exhibit C), the President of Wallace-Dothan noted in Exhibit E that she selected the candidate for the following additional reasons:

| Reason | Selected Candidate | EMANUEL |
|---|---|---|
| Record of successful teaching in the courses to be taught | One year of part-time instruction | A record of more than 20 years of full-time instruction |
| Strong record of involvement in professional activities including presentations to the Southern States Communication Association (SSCA) -- a regional association | A few presentations at the SSCA regional conference | 24+ professional presentations at regional, national and international conferences PLUS 7 published journal articles (and another pending) |

The President of Wallace-Dothan stated that her decision was based "strictly on…overall suitability for the position." (Pres. Young's letter to EEOC dated Dec. 13, 2006, page 3).  One would reasonably assume that "suitability" is determined by the criteria/qualifications the

College set out in their job announcement. However, the selected candidate was clearly not the most "suitable" based on the College's own list of qualifications.

Therefore, "suitability" must be related to the Shuford and Kennedy Partial Consent Decrees. The President states in her EEOC letter that "the employment search for the Speech Instructor position was conducted as required under the Shuford and Kennedy Partial Consent Decrees by the court-approved employee selection procedures adopted by the Alabama State Board of Education…" (Pres. Young's letter to the EEOC, Dec. 13, 2006, page 1). The letter also states that "all of Alabama's two-year colleges…are required to follow the procedures that were specifically adopted to provide fair employment opportunities for all applicants" (Ibid, page 2). The Shuford/Johnson Consent Decree expired in Spring 2006. However, upon expiration, the Alabama College System immediately and voluntarily adopted (Approved by BOE, 25 May 2006) the Consent Decree hiring procedures and hiring goals in its *Human Resources Uniform Guidelines Handbook*. The goals were in place and were in effect at the time EMANUEL applied at Wallace-Dothan. These procedures and hiring goals extend indefinitely the disproportionate and discriminatory hiring goals for blacks, and females, and black females on Salary Schedule D (faculty).

Wallace-Dothan hired a lesser-qualified black female in their effort to achieve hiring goals that are arbitrary, unfounded, and discriminatory.

## Background

The Shuford/Johnson Consent Decree (Civil Action Number 89-T-196-N) set hiring goals for blacks, women, and black women at Alabama's two-year colleges. The Decree was the result of a complaint by **mid-level administrators** who had been passed over for promotion and who claimed race and gender discrimination as the reason. Their argument was based solely on a claim that "historical circumstances created systematic barriers to equal opportunity in employment" for black, female, and black female administrators throughout the two-year college system (Shuford/Johnson Partial Consent Decree, p.3). The claim was that "[g]ender stereotypes of long standing are perpetuated in hiring and promotion practices," which "is manifested by the disproportionately few women who hold key **decision-making posts** in the System's institutions" (Doc. #454, p. 46, emphasis added).

However, no evidence was presented to identify or describe these "historical circumstances" or the "systematic barriers." No statistical evidence (such as the proportion of blacks and females in the relevant labor pool) of any kind was ever presented or considered in this case. Renee Culverhouse, the Alabama College System's top attorney at the time of the Shuford/Johnson case, defended the system's hiring records. She questioned whether, in fact, there was any systemic discrimination by the two-year college system. Entered as evidence in the gender portion of the partial Consent Decree was the fact that, in 1995, women comprised 45% of all salary schedule D employees throughout the state-wide system of two-year colleges. This is important because women comprise only 46% of those in the relevant labor pool. Throughout the complaint, the claim was that women had been denied "powerful positions," "policy-making positions," "administrative positions," "high administrative positions," and "high level administrative jobs." And yet, a faculty position is none of these. The fact is, there was no discrimination of women in faculty hiring.

An examination of the percent of females on Salary Schedule D (faculty) from 2001-2005 further contradicts the notion that there were ever any "systematic barriers" preventing females from being hired as faculty members in the two-year college system. In 2001, 52% of faculty system-wide were female. In 2002, females comprised 55% of faculty system-wide. By 2005, females comprised 58% of faculty system-wide (Shuford Report, 2000-2005). From the time Shuford Reports were first made available, the proportion of female faculty system-wide exceeded the proportion in the relevant labor pool. Thus, the evidence does not support the claim that "systematic barriers" prevented females from being hired as faculty members.

Similarly, an examination of the percent of blacks on Salary Schedule D (faculty) from 2001-2005 contradicts the notion that there were any "systematic barriers" preventing blacks from being hired as faculty members in the two-year college system. In 2001, 19% of faculty system-wide were black. In 2002, blacks comprised 20% of faculty system-wide. By 2005, blacks comprised 21% of faculty system-wide (Shuford Report, 2000-2005). From the time Shuford Reports were first made available, the proportion of black faculty system-wide already far exceeded the proportion in the relevant labor pool.

**None of the plaintiffs in the Shuford/Johnson case were faculty nor were they seeking a faculty position.** Yet, **the judge generalized his ruling** to apply not just to the plaintiffs, but to faculty (Salary Schedule D employees) as well. A faculty position is <u>not</u> a

decision-making post in an institution. Another distinctive difference is that **faculty must have at least a Master's degree in the teaching field to be qualified; staff and administrators do not have that requirement**. This oversight resulted in a discriminatory Consent Decree relative to faculty hiring. In Wygant v. Jackson Board of Education, 476 U.S. 267 (1986); City of Richmond v. J.R. Croson Co., 488 U.S. 469 (1989); and Adarand Constructors v. Peña 115 S.CT. 2097 (1995), the U.S. Supreme Court held that where an affirmative action program is justified on remedial grounds, the size of any numerical goal must bear a relationship to the qualified minorities in the relevant labor market. No such comparison was ever considered in this case.

Statewide hiring goals

The Consent Decree states that blacks will comprise <u>25%</u>, women will comprise <u>50%</u>, and black women will comprise <u>12.5%</u> of all employees in the Alabama College System. Specifically, each two-year college is to have appointed a total number of blacks which equals 75% of the percentage of black persons in the general population of the college's primary service area. Each two-year college is to have appointed a total number of females which equals 50% of the total number employed in each salary schedule (A, B, C, and D). And each two-year college is to have appointed, in each salary schedule, a total number of black women which equals 37.5% of the percentage of black women in the general population of the college's primary service area. Title VII imposes no requirement that a work force mirror the general population, particularly when there are special requirements for employees such as having ~~and earned~~ an advanced degree.

Wallace-Dothan's hiring goals

For Wallace-Dothan, the percentage of black persons in the general population of the college's primary service area is 28%. Therefore, Wallace-Dothan's hiring goal for blacks is 21% (28% x 75%), their hiring goal for black women is 10.5% (28% x 37.5%), and their hiring goal for women is 50%.

As of September 2005, 56% of Wallace-Dothan's faculty were women, 8% were black, and 4% were black women. In order to reach their hiring goal of 21% for blacks, they must hire more blacks. In order to reach their hiring goal of 10.5% for black women, more women,

particularly black women, must be hired. Therefore, Wallace-Dothan and the entire two-year college system are striving to meet these hiring goals for faculty despite the fact that the proportions of women, blacks, and black women in the relevant labor market are substantially smaller than the designated goals (See Tables 7, 8 & 9). The result is hiring goals and practices that continue to be discriminatory to males and white males in particular.

Constitutional "strict scrutiny"

A race- and/or gender-based hiring program that is effective, enforceable, and legally defensible, must meet the judicial test of constitutional "strict scrutiny" to determine the legality of such initiatives. Strict scrutiny requires current "strong evidence" of persistent discrimination, and any remedies adopted must be "narrowly tailored" to that discrimination. And yet, hiring goals were set in place for more than a decade under the Consent Decree, and identical hiring goals were adopted by the Alabama Board of Education (See Tables 8 & 9). These hiring goals have no end date, nor are they narrowly tailored. Neither the plaintiffs in the Consent Decree nor the members of the Alabama Board of Education ever provided any evidence of persistent discrimination against hiring black and female faculty members at Alabama's two-year colleges. Instead, they have created a pattern and practice of discrimination against males and white males in Alabama's two-year colleges.

Previous application

In the Fall of 2001, Wallace-Dothan advertised for a full-time Speech Instructor position that was to begin January 2, 2002. EMANUEL applied and interviewed for the position in November 2001. EMANUEL was among the three finalists for the position and was interviewed a second time on the Dothan campus. In January 2002, EMANUEL received a letter stating that "we have decided to reopen the search. We wanted you to be aware of our intention to expand the search and let you know that the position will be readvertised for the next budget year. At that time, you will be provided with the vacancy announcement and given the opportunity to reapply" (Letter from Ron Purvis, Search Committee Chair, January 9, 2002). The next time Wallace-Dothan advertised for a full-time Speech Instructor was in late Spring 2006. No one from Wallace-Dothan ever provided EMANUEL with a vacancy announcement as promised.

## Disparate Treatment

Wallace-Dothan and the entire two-year college system have discriminated against and continue to discriminate against whites, men, and white men because of the disparate treatment they are given. The Alabama College System's stated intent to hire blacks, females, and black females, the administration of the *Applicant Pool*, and the hiring goals relative to the labor market are evidence of this ongoing discrimination and disparate treatment.

Stated intent to hire blacks, females, and black females

The June 2006 Alabama College System Vacancy Announcements web site (http://www.acs.cc.al.us/employment/acsempl.htm) and Wallace-Dothan's *Intent to Employ* stated that "we are seeking applications, in particular, from black persons and women, including black women, in order to increase the representation of blacks and women in all professional positions" (underlining added). Wallace-Dothan's stated intent, then, was to hire blacks and women and black women. This policy is the result of the Shuford/Johnson Consent Decree. Wallace-Dothan's 2001-2002 Shuford Report states that the college "will need to continue trying to employ women who are qualified to fill positions on B, C1, and D salary schedules as vacancies occur." So, it is Wallace-Dothan's stated intent to hire women. This is being done despite the fact that females, blacks, and black females on Wallace-Dothan's salary schedule D already match or exceed their respective proportions in the relevant labor market. Wallace-Dothan's pattern and practice of faculty hiring has had and continues to have a discriminatory affect on males and white males in particular.

Applicant Pool

Another aspect of the Shuford/Johnson Consent Decree was the creation of an *Applicant Pool*. The Alabama College System provided pre-printed address labels of *Applicant Pool* members to colleges so that pool members could receive vacancy announcements in a timely manner (Source: Shuford Combined Report 2001-2005). When a potential faculty person joined the *Applicant Pool*, they indicated the academic discipline(s) for which they were qualified. Therefore, members of the *Applicant Pool* would be given timely notice of any and all positions for which they indicated interest. From 2001-2005 the *Applicant Pool* averaged 1,080 members. Every year, however, "the Department excluded white males from the Applicant Pool" (Source:

Shuford Combined Report 2001-1005). There is no data available showing the number or percent of white males that were in the *Applicant Pool* before being purged. While this did not prohibit white males from applying for faculty positions, it was exclusionary and it clearly signaled that white males were not being sought. It also skewed the composition of the applicant pool for any faculty position.

One case in point occurred when EMANUEL applied for a full-time Speech Instructor position at Ingram State Technical College. The deadline for the advertised position was March 3, 2006. However, EMANUEL was informed on or about March 4th that he was the only applicant and that the *Uniform Guidelines* set forth by the Consent Decree required that they extend the search. Ms. Turner, personnel director at Ingram, told EMANUEL that the search was being extended to secure applications from minorities and females. This was done despite the fact that Ingram had mailing labels for all *Applicant Pool* members and despite the other advertising methods proscribed in the Consent Decree. In other words, even though EMANUEL was clearly a well-qualified candidate who completed a job application before the deadline, Ingram extended the search for the express purpose of seeking qualified minority and female applicants. EMANUEL was not hired.

On average, females made up more than 60% of the *Applicant Pool*, and blacks made up more than half. This effectively renders useless any hiring rate comparisons using <u>applicant</u> demographics. Instead, **hiring rates must be compared to the relevant national labor pool**. On average, more than three-fourths of *Applicant Pool* members were Alabama residents. This may suggest that the relevant labor pool for faculty should be confined to those qualified within Alabama versus nation-wide.

<u>Hiring goals versus relevant labor market</u>

In Ensley Branch, NAACP v. Seibels (31 F.3d 1548, 11th Cir. 1994), the Eleventh Circuit rejected hiring goals imposed by consent decree. The main fault with the City of Birmingham's affirmative action plan was that rather than ending discrimination, the goals in the plan were "designed to create <u>parity between the racial composition of the labor pool and the race of the employees in each job position</u>" (underlining added). Hiring goals had been arbitrarily set at twenty-five to fifty percent for minorities and had been "mechanically" applied as "rigid quotas."

On remand, the district court was ordered to "re-write the decrees to relate the annual goals to the proportion of blacks in the <u>relevant, objectively qualified labor pool</u>" and "to make clear that the annual <u>goals cannot last indefinitely</u>" (Id. at 1577; underlining added). In addition, the court noted that once a valid selection procedure is in place, hiring and promotion may not continue according to a race-conscious 'goal' absent proof of ongoing racial discrimination, or of lingering effects of past racial discrimination, with respect to that position.

In terms of EMANUEL's racial discrimination charge, Wallace-Dothan's 2004-2005 Shuford report states that even though 8% of their faculty are black, they have not reached their Shuford/Johnson Consent Decree hiring goal of 21% (See Table 8). The report indicates that the college will "strive to employ" black women who are qualified to fill positions as vacancies occur. Salary schedule D employees (faculty) at Alabama's two-year colleges must have at least a Master's degree in an academic discipline to be qualified to teach in that discipline. Thus, **those with a Master's degree or higher constitute the relevant labor market for faculty hiring**. The U.S. Census Bureau's report of educational attainment indicates that of those with a Master's degree or higher, only 7% are black (See Table 1). Wallace-Dothan's proportion of black faculty already exceeds the proportion of qualified blacks in the relevant labor market (See Table 5), but their stated hiring goal is three times the proportion of qualified blacks in the relevant labor market! Wallace-Dothan's 2004-2005 Shuford report also states that while 4% of their faculty are black women, they have not reached their hiring goal of 10.5% (See Table 9). Again, the U.S. Census Bureau's report of educational attainment indicates that of those with a Master's degree or higher, only 4% are black females. Thus, while Wallace-Dothan's proportion of black female faculty members already matches the proportion of qualified black females in the relevant labor market (See Table 5), their stated hiring goal is two-and-a-half times the proportion of qualified black females in the relevant labor market!

**Disparate Impact**

Because of the disparate impact resulting from their hiring policies and practices, Wallace-Dothan and the entire two-year college system have discriminated against and continue to discriminate against whites, men, and white men. The Supreme Court first announced the disparate impact theory in Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849, 28 L.Ed.2d 158 (1971). Disparate impact discrimination is a theory under which "proof of a discriminatory

motive is not required." Smith v. Consolidated Rail Corp, 168 Mich. App 773, 776; 425 NW2d 220 (1988). The disparate impact theory involves "employment practices that are facially neutral in their treatment of different groups but that, in fact, fall more harshly on one group than on another and cannot be justified by business necessity." Id.

"To succeed on a disparate impact theory of liability, a plaintiff must show that a policy of practice that appears neutral on its face, in fact, had a disparate impact or effect on a protected class." LaFleur v. Wallace State Community College, 955 F.Supp. 1406, 1417 fn. 14 (M.D. Ala. 1996) (citing Teamsters v. United States, 431 U.S. 324, 335-36 n. 15, 97 S.Ct, 1843, 1854-55 n. 15 52 L.Ed.2d 396 (1977)). See also Young v. Montgomery County Board of Education, 922 F.Supp 544, 549 (M.D. Ala 1996) (Albritton, J.) (citing Georgia State Conference, 775 F.2d at 1417). "If the plaintiff makes such a showing, the burden shifts to the defendant to prove a substantial legitimate justification for the practice." Young, supra (citation omitted).

Wallace-Dothan and the entire two-year college system have discriminated and continue to discriminate against whites, males, and white males via the disparate impact of their hiring policies and practices. The under-representation of males on search committees, hiring rates of males versus females, the proportion of male/female faculty at Wallace-Dothan and system-wide, and the proportion of white male faculty at Wallace-Dothan and system-wide all give evidence to this discrimination and disparate impact.

Under-representation of males on faculty search committees

Wallace-Dothan's hiring process has had and continues to have a disparate impact on males via the under-representation of males on faculty search committees. Since 2001, slightly more than a third of search committee members have been male (See Table 2). The Shuford/Johnson Consent Decree specified that faculty search committees "shall include membership which is at least forty percent (40%) black and fifty percent (50%) female." The Alabama College System's *Search Committee Guidelines* (revised 4/27/06) requires this same composition. No reason or rationale has ever been given for this composition. In its attempt to meet this committee composition, Wallace-Dothan has discriminated and continues to discriminate against males and white males by placing a disproportionate number of blacks and females on search committees. While males comprise 54% of the relevant labor market and 44% of the faculty (salary D employees) at Wallace-Dothan (See Table 5), they comprise an average

of only 37% of search committee members (see Table 2). And despite the fact that <u>white</u> males comprise 51% of the relevant labor market and 40% of the salary schedule D employees at Wallace-Dothan (see Table 5), they comprise an average of only 19% of faculty search committee members (See Table 2). Thus, males and specifically white males are woefully under-represented on search committees at Wallace-Dothan.

An examination of the gender composition of search committees throughout the two-year college system reveals a dramatic under-representation of males. This is significant because empirical evidence suggests that gender similarity is often a more salient characteristic in the judgment processes of women than of men (See: Elkins, Teri J. in *Sex Roles: A Journal of Research, 44*, 1-15). In other words, there is a greater potential for a favorable female bias in candidate selection than there is for a favorable male bias (See: Dillingham, Ferber, & Hamermesh, 1994 in *Industrial and Labor Relations Review, 47*, 622-633).

<u>Hiring rates of males versus females at Wallace-Dothan</u>

Of the 57 people hired on salary schedule D at Wallace-Dothan from 2001-2005, only 25% have been male (See Table 3). Based on the Equal Employment Opportunity Commission's (EEOC) 80% rule, a disparate impact exists when the members of a particular group are selected at a rate that is less than 80% or four-fifths of the rate at which the group with the highest rate is selected. Since females are being selected (hired) on salary schedule D at a higher rate than males, the 80% threshold would be computed by finding 80% of the hiring rate for females. Table 3 shows that for 2001-2002, 71% of all salary D hires at Wallace-Dothan were female. So, to determine if a disparate impact exists, 80% is multiplied by 71% (the hiring rate for females). The product, and therefore the minimum threshold, is 57%. That is, any hiring percentage for males less than 57% would represent a disparate impact against males in faculty hiring. Since only 29% of the 2001-2002 salary D hires were male, and since 29% is substantially smaller than the minimum threshold of 57%, a disparate impact exists.

An examination of the hiring rates for 2002-2003, 2003-2004, and 2004-2005 (Table 3) clearly shows that Wallace-Dothan's pattern and practice of faculty hiring has had a disparate impact on males every year. Further statistical analysis comparing expected hiring rates versus actual hiring rates for males at Wallace-Dothan indicates a statistically significant difference ($p < .05$) for the four-year period 2001-2005.

Hiring rates of males versus females system-wide

An examination of faculty (salary D employees) hiring rates of males versus females throughout Alabama's two-year college system reveals an ongoing disparate impact on males (See Table 4). During the four-year period 2001-2005, at least 60% of hires in any given year were females. Males were never more than 40% of the hires in any given year. Every year the proportion of males hired fell well below the EEOC established 80% threshold required to prove disparate impact. Further statistical analysis comparing expected hiring rates versus actual hiring rates for males system-wide indicates a statistically significant difference ($p<.05$) for the four-year period 2001-2005.

Proportion of male/female faculty at Wallace-Dothan

In 2002, 53% of faculty (salary D employees) at Wallace-Dothan were male and 47% were female. By September 2005, only 44% were male and 56% were female. However, Table 5 shows that **males comprise 54% of the relevant labor market**; females comprise only 46% of the relevant labor market. Wallace-Dothan would need to hire at least 13 males to replace 13 females to achieve proportionate representation for males. That is a net shift of 26 faculty members. Further statistical analysis of the proportion of male versus female faculty members at Wallace-Dothan indicates a statistically significant under-representation of males ($p<.05$) over the four-year period 2001-2005.

Proportion of male/female faculty system-wide

As of September 2005, females comprise 58% of faculty (salary D employees) system-wide (See Table 7). Females comprise <u>more</u> than 46% of the faculty in 22 of 24 schools. This is significant since females comprise 46% of the relevant labor market. Females comprise 60% or more of the faculty in nine of the schools. While males comprise 54% of the relevant labor market, they comprise only 42% of the faculty at Alabama's two-year colleges (See Table 6). Thus, males are woefully under-represented system-wide. Based on the 2004-05 Shuford report figure of 1,887 faculty (salary D employees), Alabama's two-year colleges would have to hire 206 males to replace 206 females to achieve proportionate representation for males! That is a net shift of 412 faculty members. Further statistical analysis of the proportion of male versus female

EMANUEL--0022--PLF DOX

faculty members system-wide indicates a statistically significant under-representation of males (p<.05) over the four-year period 2001-2005.

Proportion of *white* male faculty at Wallace-Dothan

White males constitute 51% of the relevant labor market but only 40% of faculty members at Wallace-Dothan (See Table 5). In fact, white males are the only under-represented group when comparing race and gender of faculty members at Wallace-Dothan to the relevant labor market. To establish a proportional representation of white male faculty, Wallace-Dothan would need to hire 14 white males to replace faculty from other demographic categories. That is a net shift of 28 faculty members. This disparity is even more pronounced system-wide.

Proportion of *white* male faculty system-wide

For all of Alabama's two-year colleges, only 35% of faculty are white males versus 51% white males in the relevant labor market (See Table 6). To establish a proportional representation of white male faculty, the Alabama College System would have to hire 293 white males to replace faculty from other demographic categories! That is a net shift of 586 faculty members. Thus, the system-wide policies and procedures for faculty hiring are having a disparate impact on white males.

## Conclusion

It is noteworthy that EMANUEL is a desirable part-time instructor within the two-year college system. Since 1999, Shelton, Wallace-Selma, Trenholm, and LBW community colleges each asked EMANUEL to teach classes for them on a part-time basis. And he has. Yet Wallace-Dothan chose to hire a younger, less qualified, black female instead of EMANUEL for their full-time Speech instructor.

Dr. EMANUEL is committed to increasing the proportion of blacks (and women) who hold advanced degrees. He is a tenured, associate professor at one of Alabama's HBCUs.

Dr. Martin Luther King, Jr., once shared his hope and dream that we would one day live in a nation where people would not be judged by the color of their skin, but by the content of

their character. It is sadly true that the two-year college system, with its discriminatory hiring policies and practices, is not hastening that day.

### Burden of proof

An employee may establish a prima facie case of discrimination by showing (1) membership in a protected group, (2) qualification for the position sought, (3) non-selection, and (4) selection of a less qualified or equally qualified person outside the protected group. See Blistein v. St. John's College, 74 F.3d 1459, 1470 (4th Cir. 1996) (reduction in force cause); Seman V. Coplay Cement Co., 26 F.3d 428, 432 (3rd Cir. 1994); LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993), cert denied, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994).

If the employee establishes a prima facie case, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer discriminated against the employee.

### Private cause of action before administrative remedies sought

In Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court noted that Title IX does not require a plaintiff to exhaust administrative remedies before pursuing a private cause of action in federal court. Id. at 707 n. 41, 99 S.Ct. at 1963 n. 41. The Court found that Title IX administrative remedies do not provide adequate relief for private persons. Id. At 706-08 n. 41, 99 S.Ct. at 1963 n. 41; see also Does v. Covington County School Board of Education, 930 F.Supp. 554, 566 (M.D. Ala. 1996) (Thompson, J.) (students were not required to exhaust administrative remedies before pursuing action against board of education under Title IX).

### Individual Relief

Because Wallace-Dothan discriminated against EMANUEL when they hired a lesser qualified, younger, black female instead of him, EMANUEL is entitled to individual relief.

First, Plaintiff EMANUEL is presumptively entitled to back pay and other benefits that he would have received in the absence of discrimination. Lengen v. Dept. of Transp., 903 F.2d 1464, 1468 (11th Cir. 1990). As a result of this ongoing pattern of gender discrimination in

faculty hiring by the Alabama College System, plaintiff EMANUEL has been denied full-time employment as a Speech Instructor in the two-year college system, and plaintiff EMANUEL has been denied the salary he would have earned had he been employed at Wallace-Dothan in the Fall of 2006. The loss of income from back pay is the difference between what EMANUEL earned at his current place of employment and what he would have earned in the absence of discrimination from September 2006 until this case is settled. For 2006-07 that difference is **$17,716** (Step 21), for 2007-08 that difference is **$26,468** (Step 22).

In addition, EMANUEL is entitled to loss of income from paying higher health and dental insurance premiums than he would have in the absence of discrimination. The two-year college system's PEEHIP insurance is $134 per month for family health insurance plus $38 per month for family dental insurance. The total insurance premium for this coverage in the two-year college system is $172.00 per month. The insurance premium for the same coverage at EMANUEL's current place of employment is $518.40 per month. Thus, the lost income from health and dental insurance premiums is **$346.40 per month**. From September 2006 through September 2008, the total amount of lost income is **$8,314**.

Second, EMANUEL suffered emotional pain and distress, inconvenience, mental anguish, loss of enjoyment of life and personal embarrassment resulting from his denied employment due to the discrimination. As such, EMANUEL is seeking **$100,000** in compensatory damages. Because Wallace-Dothan has 101-200 employees, the compensatory damages sought are within the limits set for Title VII compensatory and punitive damages as found in 42 U.S.C. § 1981a(b).

Third, EMANUEL was denied the opportunity to accumulate personal leave time at the rate of **five personal leave days per year beginning with the 2006-2007 academic year**. Plaintiff EMANUEL was, therefore, denied the opportunity to have these personal leave days converted to sick leave days. As such, EMANUEL is entitled to an additional **five sick leave days per academic year** to be credited to his account with the Teacher Retirement System of Alabama beginning with the 2006-2007 academic year until this case is settled.

Fourth, as a victim of discrimination, EMANUEL is presumptively entitled to **immediate instatement** to the position that he would have had at this time in the absence of discrimination. Nord. V. United States Steel Corp., 758 f.2d 1462, 1470 (11th Cir. 1985). Whether or not such positions still exist, whether others would have to be bumped to place the plaintiff in the

EMANUEL--0025--PLF DOX

position, or whether there are comparable positions available at this or another two-year college is uncertain. See Hicks v. Dothan City Board of Educ., 814 F.Supp. 1044 (M.D. Ala. 1993) (Thompson, J.) (discussing how a court should approach reinstatement, in particular when the position sought may already be filled). However, instatement to a similar position would necessarily mean that EMANUEL would be the <u>only</u> full-time Speech Instructor employed on a campus where SPH 106 (Fundamentals of Oral Communication) is required in the general education curriculum. This is the employment condition EMANUEL would have had in the absence of discrimination. This condition has a direct bearing on summer employment.

**Alternatively**, EMANUEL is entitled to **front pay** from the position that he would have had in the absence of discrimination. Front pay is based on the <u>difference</u> between what EMANUEL can reasonably expect to earn in his current employment and what he would have earned on salary schedule D in the absence of discrimination. There is no other full-time teaching position in Alabama for which EMANUEL is qualified that would come close to paying as much as Wallace-Dothan or any other two-year college in the State. Not only did EMANUEL suffer lost salary both past and future, but this lost future salary would dramatically and adversely affect his monthly retirement income as well as his D.R.O.P. earnings and dividends. Under section 706(g) of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5 (g)], EMANUEL is entitled to this future loss of income. As of Fall 2010, EMANUEL will be at step 25. As of Fall 2012, EMANUEL will be at step 27. Based on an 18-year salary trend for schedule D and a 7-year salary trend at EMANUEL's current place of employment, the front pay from lost future salary is estimated to be **$489,833**. This figure does not include future insurance premium amounts, retirement income, or D.R.O.P. program benefits. Loss of income from future insurance premiums would total **at least $54,038**. Future lost retirement income is estimated to be **at least $1,688 per month every month EMANUEL is retired**. Future loss of income from the D.R.O.P. program is estimated to be **at least $120,349**. In Pollard v. E.I. DuPont de Nemours & Co., 121 S.Ct. 1946 (2001) the U.S. Supreme Court ruled unanimously that Title VII's limit on the damages a successful plaintiff may be awarded does not apply to damages awarded as "front pay." Wallace-Dothan shall be responsible for any Teachers Retirement System contributions they would have made beginning September 2006. Plaintiff EMANUEL shall assume individual responsibility for any tax or social security contribution that may accrue to or be required from him because of this front pay.

Additionally, based on projections of salary schedule D, EMANUEL's **retirement computation** should include the three highest actual or projected salary schedule D figures he would be entitled to upon retirement in the absence of discrimination. Similarly, if EMANUEL enters the **D.R.O.P. program**, his salary figures for this program would be based on the actual or projected salary schedule D figures he would be entitled to in the absence of discrimination.

Fifth, EMANUEL is further entitled to **tenure, seniority**, and **dependent benefits** (such as EMANUEL's dependents attending any Alabama two-year college tuition-free or at a reduced tuition rate) retroactive to September 2006 or the equivalent dollar amount. That amount would be **$9,900** for a 2/3 tuition waiver for one son for 2008-09, a full tuition waiver for both sons for 2009-2010, and a full tuition waiver for one son for 2010-2011. The parties shall be granted an opportunity to agree upon any other benefits to which EMANUEL is entitled.

Sixth, both declaratory and injunctive relief requested by the plaintiff should be granted to assure that, in the future, EMANUEL will be **able to work in a bias-free environment** that is free of any threat of retaliation and that his dependents, should they choose to attend a two-year college in Alabama, would do so in a bias-free environment that is free from any retaliation or threat of retaliation of any kind.

Seventh, EMANUEL is entitled to recover reasonable **attorney's fees and expenses**. 42 U.S.C.A. Section 20003-5 (k) (West 1994). The parties shall be given an opportunity to agree upon the amount of such fees and expenses.

Eighth, Alabama's two-year college system will implement employment practices that will provide **race and gender proportionality on faculty search committees** as compared to the relevant labor pool.

Ninth, Alabama's two-year college system will implement faculty hiring goals and employment practices that will provide **race and gender proportionality in faculty hiring and composition** as compared to the relevant labor pool.

* NOTE: The total loss of income, insurance premiums, tuition waivers, and D.R.O.P. benefits that EMANUEL would be entitled to in the absence of discrimination plus compensatory damages ($100,000) totals at least $706,268 PLUS $1,688 per month every month EMANUEL is retired. EMANUEL would also be entitled to 75 additional sick leave days.

EMANUEL--0027--PLF DOX

Table 1.
**Population 15 years and over with a**
**Master's degree or higher by race and gender**

|        | White | Black | Totals |
|--------|-------|-------|--------|
| Male   | 51%   | 3%    | 54%    |
| Female | 42%   | 4%    | 46%    |
| Totals | 93%   | 7%    | 100%   |

Source: U.S. Census Bureau, Internet Release June 29, 2004

Table 2.
**Percent of males and white males on Wallace-Dothan's search committees**

|           | Total # on search committees | # M on search committees | % M on search committees | #WM on search committees | % WM on search committees |
|-----------|------------------------------|--------------------------|--------------------------|--------------------------|---------------------------|
| 2001-2002 | 106 | 33  | 31% | 17 | 16% |
| 2002-2003 | 56  | 24  | 43% | 14 | 25% |
| 2003-2004 | 94  | 36  | 38% | 19 | 20% |
| 2004-2005 | 107 | 40  | 37% | 20 | 19% |
| Totals    | 363 | 133 | 37% | 70 | 19% |

Source: Wallace-Dothan Shuford Reports 2001-2005
(Each position was considered to have its own search committee)

Table 3.
**Faculty (Salary D) hiring rates at Wallace-Dothan compared to the 80% threshold**

|            | Total # of hires | Number of Female hires | % of Female hires | Number of Male hires | % of Male hires | 80% threshold |
|------------|------------------|------------------------|-------------------|----------------------|-----------------|---------------|
| 2001-2002* | 21 | 15 | 71% | 6  | 29% | 57% |
| 2002-2003  | 9  | 6  | 67% | 3  | 33% | 53% |
| 2003-2004  | 14 | 10 | 71% | 4  | 29% | 57% |
| 2004-2005  | 13 | 12 | 92% | 1  | 8%  | 74% |
| Total      | 57 | 43 | 75% | 14 | 25% | 60% |

Source: Wallace-Dothan Shuford Report 2001-2005
* Does not include one temporary appointment

Table 4.
**Faculty (Salary D) hiring rates system-wide compared to the 80% threshold**

|           | Total # of hires | Number of Female hires | % of Female hires | Number of Male hires | % of Male hires | 80% threshold |
|-----------|------------------|------------------------|-------------------|----------------------|-----------------|---------------|
| 2001-2002 | 201 | 121 | 60% | 80  | 40% | 48% |
| 2002-2003 | 180 | 121 | 67% | 59  | 33% | 54% |
| 2003-2004 | 215 | 140 | 65% | 75  | 35% | 52% |
| 2004-2005 | 201 | 131 | 65% | 70  | 35% | 52% |
| Total     | 797 | 513 | 64% | 284 | 36% | 51% |

Source: Shuford Combined Reports 2001-2005

EMANUEL--0028--PLF DOX

Table 5.
**Number and percent of male & female faculty at Wallace-Dothan**
**(as of September 2005)**
**compared to the proportions in the relevant labor market**

| | | | Labor Market | Proportionate Number on D | Adjustment to be proportionate |
|---|---|---|---|---|---|
| **Total on Salary D** | **126** | | | | |
| Black males | 5 | 4% | 3% | 4 | -1 |
| Black females | 5 | 4% | 4% | 5 | -- |
| Total Blacks | 10 | 8% | 7% | 9 | -1 |
| | | | | | |
| **White males** | **50** | **40%** | 51% | 64 | **14** |
| White females | 66 | 52% | 42% | 53 | -13 |
| Total Whites | 116 | 92% | 93% | 117 | 1 |
| | | | | | |
| Total females | 71 | 56% | 46% | 58 | -13 |
| **Total males** | **55** | **44%** | 54% | 68 | 13 |

Sources: 2004-2005 Wallace-Dothan Shuford Report; U.S. Census Bureau – Release June 29, 2004

Table 6.
**Number and percent of male & female faculty system-wide**
**(as of September 2005)**
**compared to the proportions in the relevant labor market**

| | | | Labor Market | Proportionate Number on D | Adjustment to be proportionate |
|---|---|---|---|---|---|
| **Total on Salary D** | **1,887** | | | | |
| Black males | 140 | 7% | 3% | 53 | - 87 |
| Black females | 252 | 13% | 4% | 81 | - 171 |
| Total Blacks | 392 | 20% | 7% | 134 | - 258 |
| | | | | | |
| **White males** | **660** | **35%** | 51% | 953 | **293** |
| White females | 835 | 44% | 42% | 800 | - 35 |
| Total Whites | 1,495 | 79% | 93% | 1,753 | 258 |
| | | | | | |
| Total females | 1,087 | 58% | 46% | 881 | - 206 |
| **Total males** | **800** | **42%** | 54% | 1,006 | **206** |

Sources: 2004-2005 System-wide Shuford Report; U.S. Census Bureau - Release June 29, 2004
(The sum of Black females and White females, when rounded, equals 58% and not 57%)

Table 7.
**Proportion of female faculty system-wide**
(as of September 2005)

| | | | | |
|---|---|---|---|---|
| Chattahoochee | Valley | Community | College | 68% |
| Jefferson | State | Community | College | 66% |
| Wallace-Hanceville | State | Community | College | 66% |
| Lurleen B. | Wallace | Community | College | 64% |
| Snead | State | Community | College | 63% |
| Reid | State | Technical | College | 61% |
| Wallace-Selma | State | Community | College | 61% |
| Drake | State | Technical | College | 60% |
| Gadsden | State | Community | College | 60% |
| Alabama | Southern | Community | College | 58% |
| Lawson | State | Community | College | 58% |
| Northeast | Alabama | Community | College | 58% |
| Shelton | State | Community | College | 58% |
| Southern Union | State | Community | College | 58% |
| *Wallace-Dothan* | | *Community* | *College* | *56%* |
| Faulkner | State | Community | College | 55% |
| Trenholm | State | Technical | College | 55% |
| Bevill | State | Community | College | 54% |
| Jefferson | Davis | Community | College | 54% |
| Bishop | State | Community | College | 53% |
| Calhoun | | Community | College | 50% |
| Northwest-Shoals | | Community | College | 47% |
| ***Females constitute 46% of the relevant labor market*** | | | | |
| Enterprise-Ozark | | Community | College | 44% |
| Central | Alabama | Community | College | 44% |
| | | | **System-wide average** | **58%** |

Source: 2004-2005 Shuford Report

EMANUEL--0030--PLF DOX

Table 8.
**Hiring goals for blacks on Salary Schedule D**
Hiring goals based on 75% of blacks in the college's service area
(as of Sept. 15, 2005)

| College | | | | Hiring Goal | Current Percent | Over/Under Goal | % Over or Under Goal |
|---|---|---|---|---|---|---|---|
| Lawson | State | Community | College | 26.00% | 64% | Over | 38.00% |
| Bishop | State | Community | College | 23.30% | 59% | Over | 35.70% |
| Drake | State | Technical | College | 12.00% | 56% | Over | 44.00% |
| Trenholm | State | Technical | College | 30.60% | 49% | Over | 18.40% |
| Wallace | State | Community | College-Selma | 27.40% | 41% | Over | 13.60% |
| Reid | State | Technical | College | 30.00% | 39% | Over | 9.00% |
| Alabama | Southern | Community | College | 35.20% | 31% | Under | -4.20% |
| Ingram | State | Technical | College | 19.00% | 30% | Over | 11.00% |
| Chattahoochee | Valley | Community | College | 27.50% | 29% | Over | 1.50% |
| Shelton | State | Community | College | 26.40% | 18% | Under | -8.40% |
| Jefferson | Davis | Community | College | 30.80% | 17% | Under | -13.80% |
| Jefferson | State | Community | College | 24.00% | 17% | Under | -7.00% |
| Calhoun | | Community | College | 14.30% | 17% | Over | 2.70% |
| Faulkner | State | Community | College | 9.70% | 16% | Over | 6.30% |
| Lurleen | Wallace | Junior | College | 18.00% | 15% | Under | -3.00% |
| Central | Alabama | Community | College | 25.40% | 14% | Under | -11.40% |
| Enterprise-Ozark | State | Community | College | 17.00% | 10% | Under | -7.00% |
| Northwest-Shoals | | Community | College | 11.00% | 9% | Under | -2.00% |
| Wallace | State | Community | College-Dothan | 21.00% | 8% | Under | -13.00% |
| Gadsden | State | Community | College | 12.50% | 8% | Under | -4.50% |
| | | | | *Percent of blacks in relevant labor pool = 7%* | | | |
| Southern | Union | Community | College | 21.00% | 7% | Under | -14.00% |
| Bevill | State | Community | College | 8.80% | 6% | Under | -2.80% |
| Northeast | Alabama | Community | College | 2.20% | 3% | Over | 0.80% |
| Wallace | State | Community | College-Hanceville | 1.00% | 1% | --- | 0.00% |
| Snead | State | Community | College | 1.50% | 0% | Under | -1.50% |
| | | | **SYSTEM TOTAL** | 25.00% | 21% | Under | -4.23% |

22 of 25 colleges have hiring goals that are greater than the proportion of blacks in the relevant labor market.
Data based on 2004-2005 Shuford Reports

EMANUEL--0031--PLF DOX

Table 9.
**Hiring goals for black women on Salary Schedule D**
Hiring goals based on 37.5% of blacks in the college's service area
(as of Sept. 15, 2005)

| College | | | | Hiring Goal | Current Percent | Over/Under Goal | % Over or Under Goal |
|---|---|---|---|---|---|---|---|
| Lawson | State | Community | College | 13.00% | 42% | Over | 29.00% |
| Trenholm | State | Technical | College | 15.30% | 40% | Over | 24.70% |
| Bishop | State | Community | College | 11.65% | 37% | Over | 25.35% |
| Drake | State | Technical | College | 6.00% | 36% | Over | 30.00% |
| Wallace | State | Community | College-Selma | 13.70% | 28% | Over | 14.30% |
| Reid | State | Technical | College | 15.00% | 26% | Over | 11.00% |
| Alabama | Southern | Community | College | 17.60% | 20% | Over | 2.40% |
| Ingram | State | Technical | College | 9.50% | 18% | Over | 8.50% |
| Central | Alabama | Community | College | 12.70% | 14% | Over | 1.30% |
| Chattahoochee | Valley | Community | College | 13.75% | 13% | **Under** | **-0.75%** |
| Shelton | State | Community | College | 13.20% | 13% | **Under** | **-0.20%** |
| Jefferson | State | Community | College | 12.00% | 12% | **Under** | **0.00%** |
| Calhoun | | Community | College | 7.15% | 11% | Over | 3.85% |
| Faulkner | State | Community | College | 4.85% | 9% | Over | 4.15% |
| Lurleen | Wallace | Junior | College | 9.00% | 8% | **Under** | **-1.00%** |
| Jefferson | Davis | Community | College | 15.40% | 7% | **Under** | **-8.40%** |
| Enterprise-Ozark | State | Community | College | 8.50% | 6% | **Under** | **-2.50%** |
| Bevill | State | Community | College | 4.40% | 5% | Over | 0.60% |
| Gadsden | State | Community | College | 6.25% | 5% | **Under** | **-1.25%** |
| | | | | *Percent of black women in relevant labor pool = 4%* | | | |
| Southern | Union | Community | College | 10.50% | 4% | **Under** | **-6.50%** |
| Wallace | State | Community | College-Dothan | 10.50% | 4% | **Under** | **-6.50%** |
| Northeast | Alabama | Community | College | 1.10% | 3% | Over | 1.90% |
| Northwest-Shoals | | Community | College | 5.50% | 3% | **Under** | **-2.50%** |
| Snead | State | Community | College | 0.75% | 0% | **Under** | **-0.75%** |
| Wallace | State | Community | College-Hanceville | 0.50% | 0% | **Under** | **-0.50%** |
| | | | **SYSTEM TOTAL** | 12.25% | 13.35% | Over | 1.10% |

22 of 25 colleges have hiring goals that are <u>greater</u> than the proportion of black women in the relevant labor market.
Data based on 2004-2005 Shuford Reports

EMANUEL--0032--PLF DOX

# Annual Kennedy (formerly <u>Shuford</u>) Report
## 2000-2005



DEFENDANT'S
EXHIBIT

PENGAD 800-631-6989

# 2000-2001 ANNUAL REPORT
# KENNEDY (FORMERLY SHUFORD), ET AL., V. ALABAMA STATE
# BOARD OF EDUCATION, ET AL.
# CIVIL ACTION NUMBER 89-T-196-N

## Introduction

This is the eighth annual report in the above matter, the seventh full year of operation under the *Kennedy (formerly known as Shuford)* Partial Consent Decree (approved in March of 1994) involving race based relief, and the sixth full year of operation under the *Johnson* Partial Consent Decree (approved in August of 1995) involving gender based relief. In accordance with the Uniform Guidelines established in April 2000, a training session was held on April 14 and 15, 2001 for all Presidents as well as all college Human Resources professionals. The purpose of this training session was to reinforce the importance of following the guidelines and to discuss new ideas and strategies for recruitment. A copy of the materials provided to the attendees is attached as Attachment 'A '. Also, pursuant to the Uniform Guidelines, the Monitor conducted

s during the 2000-

meetings with representatives of Plaintiffs 'counsel to discuss issues relating to the enforcement of the Partial Consent Decrees.

Pursuant to the Uniform Guidelines, Dr. Karen Berryhill filed a formal objection on

-Shoals

search be commenced. Defendants responded to the objection, vigorously denying the

-Shoals Community

Northwest-                              to hear the objection raised by Dr. Karen Berryhill. The Monitor issued a decision on October 20, 2000, overruling Dr. Berryhill's objection to the

unbiased and fair manner in accordance with the prescribed policies and procedures of the

*Shuford/Johnson* Partial Consent Decrees. On November 13, 2000, Dr. Berryhill filed individual rather than class claim for injunctive relief alleging retaliation and discrimination, and

EMANUEL--0151--PLF DOX

the complaint filed served as Plaintiff's Petition to the Court to review the Monitor's decision of October 20, 2000.

**Efforts of the Alabama Department of Postsecondary Education**

The Department has the responsibility for implementation and monitoring of compliance with the requirements of both Partial Consent Decrees. The Department continues to provide services both to the Alabama College System institutions and to the members of the Applicant Pool in order to increase the number of individuals who receive notices of System vacancies and to provide a broad base of applicants for those vacancies. The Department engages in the following activities:

1. Operates a telephone information 'Job Line "in the Division of Legal and Human Resources, providing callers with information on all vacancies within the Alabama College System;

2. Updates annually information on members of the Applicant pool, making necessary changes in addresses and credentials for the database;

3. Provides pre-printed address labels of Applicant Pool members to colleges, so that pool members can receive vacancy announcements in a timely meaner;

4. Publishes and distributes a Job Newsletter, listing current vacancies within the System;

5. Places advertisements in national publications, seeking additions to the Applicant Pool;

6. Posts job vacancy notices on the Alabama College System web site at www.acs.cc.al.us; and

7. Allows individuals desiring to become members of the Applicant Pool to apply online at the web site.

Further, the Defendants have engaged in other activities that will have an effect on the number of applications from blacks and women. During the 2000-2001 report year, the Defendants engaged in the following activities:

1. Participated in the National Conference of the National Association of African American Studies and the National Association of Hispanic and Latino Studies in

tendees from each college attached as Attachment

'B ');

2.                                        –IMDiversity Job

-development

res the African-

village, the Asian-                    -American village, the Native

American village, the Women's village, and the Minorities Global village. As a

member, we post Alabama College System vacancies, have access to the Res

Database, have listing in the Director of Employers, and have an Employer

Profile with the System logo and hyperlink to our Home page;

3.

the University of Alabama;

Encouraged a Pr

Conference of the National Multicultural Institute in June, 2001;

Placed Shuford advertisement in the AEA Journal;

6.                                                              ts

be coordinated through the Career Counseling and Placement Centers at each

7. Incorporated the use of a reporting form for the required annual meetings which

presidents are required

(a copy of the form is attached in Attachment 'A '); and

Established the Alabama College System Human Resources Association (a copy

As of

increase of 38.4 percent from last year's total of 695 records. During the 2000-

the Department excluded white men from the Applicant Pool. Approximately 49.6 percent of

Applicant Pool members are unknown/other. Approximately 65.6 percent of Applicant Pool

members are women. By race and gender, Applicant Pool members are a

white women, 31.6 percent black women; and 18.0 percent black men. The races of 68 women

and 116 men are unknown/other. Eighteen individuals declined to provide information on either

race or gender. Approximately 70.0 percent of individuals in the Applicant Pool reside within the State of Alabama.

**Presidential Vacancies**

There were two (2) continuing presidential vacancies at Alabama College System institutions during the 2000-2001 report year: MacArthur State Technical College and Trenholm State Technical College. Mr. Wayne Bennet (a white man) continues to serve as interim president at MacArthur. Dr. Alma Freeman (a black woman) was appointed temporarily to serve as interim president at Trenholm.

There were five (5) Alabama College System institutions that conducted presidential searches during the 2000-2001 report year: Drake State Technical College; Gadsden State Community College; Northeast Alabama Community College; Reid State Technical College; and Trenholm State Technical College. The following individuals served as interim presidents during the presidential search at the respective colleges: Mr. Louis Garner (a black man) served at Drake State Technical College from August 21, 2000 to November 2, 2000; Dr. William Osborn (a white man) served at Northeast Alabama Community College from April 21, 2001 to July 16, 2001; Dr. Jim Krudop (a white man) served at Reid State Technical College from August 31, 2000 to October 8, 2000; and Dr. Alma Freeman (a black woman) served at Trenholm State Technical College from April 20, 2001 to current. There was not a need for an interim president at Gadsden State Community College.

Searches were conducted at the five (5) Alabama College System institutions pursuant to the State Board of Education policy 203.01. The Department of Postsecondary Education created a color brochure describing each college and announcing each vacancy at each of the five institutions. Each vacancy announcement appeared in the following publications:

| | |
|---|---|
| Chronicle of Higher Education | Mobile Register |
| Affirmative Action Register | Huntsville Times |
| Community College Times | Black Issues in Higher Education |
| Alabama School Journal | Women in Higher Education |
| Birmingham News | Community College Week |
| Montgomery Advertiser | |

mailed to 115 Applicant Pool members, to 669 members of the National Institute for Leadership

D

37 other individuals requesting applications, and to 93 agencies of postsecondary education

across the United States. A total of 47 individuals submitted completed

Of that number, fourteen (14) were members of the Applicant Pool. Dr. Helen McAlpine (a

black woman) was recommended by the Chancellor and appointed by the State Board of

ctive November 3, 2000.


was mailed to 170 Applicant Pool members, to 97 members of the Presidents' Roundtable, to 46

other individuals requesting applications, and to 93

the United States. In addition to the aforementioned publications, the vacancy announcement

appeared on several websites such as                     and *Higheredjobs.com*

individuals submitted completed application packages. Of that number, fourteen (14) were


the Chancellor and appointed by the State Board of Education as President of Gadsden State

Community Col

     During the presidential search for Northeast Alabama Community College, the color


Roundtable, to 53 other individuals requesting applications, and to 93 agencies of postsecondary


announcement appeared on several websites such as *Execsearches.com,*        *Higheredjobs.com.*

     submitted completed application packages. Of that number, thirteen

(13) were members of the Applicant Pool. Dr. David Campbell (a white man) was


Northeast Alabama Community College, effective July 17, 2001.

     During the presidential search for Reid State Technical College, the color brochure was

mailed to 111 Applicant Pool members, to 253 members of the National Institute for Leadership

     male members), to 98 members of the Presidents' Roundtable, to

31 other individuals requesting applications, and to 93 agencies of postsecondary education

NARRATIVE

2000-2001 ANNUAL REPORT
*Shuford, et al., v. Alabama State Board of Education, et al.*

GEORGE C. WALLACE COMMUNITY COLLEGE-DOTHAN
Name of College

The progress George C. Wallace Community College (WCC) has made toward achieving goals relative to the hiring and/or appointment of blacks and women is described as follows. Goals reflect Service Area's Black Population for Wallace Community College.

**(1)    GOALS RELATING TO THE APPOINTMENT OF BLACK PERSONS:**

      **a.**    **The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black persons employed at each college on B and C1 Salary Schedules combined shall equal that number which most closely represents 75% of the percentage of black persons in the general population of the primary service area of the respective college."**

                Service Area Average Black Population: 28%
                Goal: 21% (28% x 75%)
                WCC Employees on B/C1: 12
                Black Employees on B/C1: 2 (17%)

<u>WCC IS WITHIN 4% OF REACHING ITS GOAL FOR SALARY SCHEDULES B AND C1.</u>

      **b.**    **The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black persons employed at each college on C2 and C3 Salary Schedules combined shall equal at least that number which most closely represents 75% of the percentage of black persons in the general population of the primary service area of the respective college."**

                Service Area Average Black Population: 28%
                Goal: 21% (28% x 75%)
                WCC Employees on C2/C3: 28
                Black Employees on C2/C3: 8 (29%)

<u>WCC   HAS MET ITS GOAL OF 21% FOR SALARY SCHEDULES C2  AND C3.</u>

EMANUEL--0156--PLF DOX

GEORGE C. WALLACE COMMUNITY COLLEGE-DOTHAN
Name of College

PERSONNEL BY SALARY SCHEDULE (A, B, C1, C2, C3, D)
As of September 15, 2001

| Salary Schedule** | White (non-hispanic) | | | | | Black (non-hispanic) | | | | | Other Minorities | | | | | Total | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Men | % | Women | % | Total | Men | % | Women | % | Total | Men | % | Women | % | Total | Men | % | Women | % | Total |
| A | 0 | 0% | 1 | 100% | 1 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 1 | 100% | 1 |
| B | 6 | 67% | 3 | 33% | 9 | 0 | 0% | 1 | 100% | 1 | 0 | 0% | 0 | 0% | 0 | 6 | 60% | 4 | 40% | 10 |
| C1 | 0 | 0% | 1 | 100% | 1 | 1 | 100% | 0 | 0% | 1 | 0 | 0% | 0 | 0% | 0 | 1 | 50% | 1 | 50% | 2 |
| C2 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 0 | 0% | 0 |
| C3 | 5 | 25% | 15 | 75% | 20 | 2 | 25% | 6 | 75% | 8 | 0 | 0% | 0 | 0% | 0 | 7 | 25% | 21 | 75% | 28 |
| D | 67 | 56% | 52 | 44% | 119 | 5 | 56% | 4 | 44% | 9 | 0 | 0% | 0 | 0% | 0 | 72 | 56% | 56 | 44% | 128 |

** Only presidential appointments are listed on Salary Schedule A.  Those appointments such as Vice President and Provost, on neither Salary Schedule A nor B, are shown with a #.

2000-2001 Annual Report
*Stulord, et al., Alabama State Board of Education*
Civil Action No. 89-T-195-N

EMANUEL-0157--PLF DOX

GEORGE C. WALLACE COMMUNITY COLLEGE-DOTHAN
(Name of College)

VACANT POSITIONS FILLED (Salary Schedules A, B, C, & D)
September 15, 2000 - September 15, 2001

| Position Title | Salary Schedule | Name | Race | Gender | Position Filled By: (Check one) | | | | Member of the Applicant Pool? Yes/No |
| | | | | | Search | Temporary Appt. | Reorganization | Lateral Transfer | |
| ADULT EDUCATION SUPERVISOR | C-3 | RAMONA L. IVEY | W | F | X | | | | NO |
| COUNSELOR-UPWARD BOUND | C-3 | AMANDA WILLIAMS STEE | W | F | X | | | | NO |
| T-TEN (TOYOTA) INSTRUCTOR | D-1 | THOMAS A. SHEFF | W | M | X | | | | NO |
| ATHLETIC COACH/GROUNDS WORK | C-3 | MACKEY D. SASSER | W | M | X | | | | NO |
| COORDINATOR OF SERVICES, STUD | C-3 | LISA ADAMS-HORSLEY | B | F | | X | | | NO |
| JOB RESOURCE SPECIALIST | C-3 | CATRINA R. COPELAND | B | F | | X | | | NO |
| BUSINESS INSTRUCTOR | D-1 | TERESA E. SALTER | W | F | | | X | | NO |
| COMPUTER SCIENCE INSTRUCTOR | D-1 | JOHN R. SKINNER | W | M | | X | | | NO |
| DIRECTOR, MOBILE CENTER | D-1 | LARRIE F. ZIMMER | W | M | | | X | | NO |
| COORDINATOR OF SERVICES, STUD | C-3 | LISA ADAMS-HORSLEY | B | F | X | | | | NO |
| DIRECTOR, WORK KEYS SERVICES | C-3 | JANET W. ORMOND | W | F | | | X | | NO |
| DIRECTOR, CORPORATE AND CONT | C-3 | PAT C. BYRNE | W | F | | | X | | NO |
| WORKFORCE DEVELOPMENT COORD | C-3 | AMY C. BRABHAM | W | F | | | X | | NO |

2000-2001 Annual Report
*Shuford, et al., v. Alabama State Board of Education, et al.*
Civil Action No. 89-T-196-N

EMANUEL--0158--PLF DOX

**GEORGE C. WALLACE COMMUNITY COLLEGE-DOTHAN**
(Name of College)

**RECRUITING AND SELECTION COMMITTEES ( Salary Schedules A, B, C, & D)**
September 15, 2000 - September 15, 2001

| Date Appointed | Names | Race | Gender | Vacancy For Which Appointed |
|---|---|---|---|---|
| 8/23/00 | PEGGY BAKER | W | F | ADULT EDUCATION SUPERVISOR |
| | KAY RONEY | W | F | ADULT EDUCATION SUPERVISOR |
| | DENISE STANFORD-BOWERS | B | F | ADULT EDUCATION SUPERVISOR |
| | MARY WIGGINS | B | F | ADULT EDUCATION SUPERVISOR |
| 11/1/00 | BRENDA BARNES | W | F | COUNSELOR-UPWARD BOUND |
| | HELEN NICHOLS | B | F | COUNSELOR-UPWARD BOUND |
| | LINDA STRICKLAND | W | F | COUNSELOR-UPWARD BOUND |
| | MARY WIGGINS | B | F | COUNSELOR-UPWARD BOUND |
| 11/13/00 | EVONNE BENNETT | B | F | T-TEN (TOYOTA) INSTRUCTOR |
| | MANUAL EDWARDS | B | M | T-TEN (TOYOTA) INSTRUCTOR |
| | MARY LIVINGSTON | W | F | T-TEN (TOYOTA) INSTRUCTOR |
| | FRANK PALMER | W | M | T-TEN (TOYOTA) INSTRUCTOR |
| 12/12/00 | SHALETHA BARNES | B | F | ATHLETIC COACH/GROUNDS WORKER |
| | GENE DEWS | W | M | ATHLETIC COACH/GROUNDS WORKER |
| | JACKIE SCREWS | B | F | ATHLETIC COACH/GROUNDS WORKER |
| | MARK SHOPE | W | M | ATHLETIC COACH/GROUNDS WORKER |
| 6/21/01 | MIKE ABBOTT | W | M | COORDINATOR OF SERVICES, SSS |
| | MICKEY BAKER | B | M | COORDINATOR OF SERVICES, SSS |
| | AMANDA WILLIAMS STEELE | W | F | COORDINATOR OF SERVICES, SSS |
| | VICKIE WILLIAMS | B | F | COORDINATOR OF SERVICES, SSS |

2000-2001 Annual Report
*Stuford, et al., v. Alabama State Board of Education, et al.*
Civil Action No. 89-T-196-N

EMANUEL--0159--PLF DOX

## 2001-2002 ANNUAL REPORT
## KENNEDY (FORMERLY SHUFORD), ET AL., V. ALABAMA STATE BOARD OF EDUCATION, ET AL.
## CIVIL ACTION NUMBER 89-T-196-N

### Introduction

This is the eighth annual report in the above matter, the seventh full year of operation under the *Kennedy (formerly known as Shuford)* Partial Consent Decree (approved in March of 1994) involving race based relief, and the sixth full year of operation under the *Johnson* Partial Consent Decree (approved in August of 1995) involving gender based relief. In accordance with the Uniform Guidelines established in April 2000, a training session was held on May 2, 2002 for all college Human Resources professionals. The purpose of this training session was to reinforce the importance of following the guidelines and to discuss new ideas and strategies for recruitment. Also, pursuant to the Uniform Guidelines, the Monitor conducted audits of all colleges during the 2001-2002 report year. The Monitor also held quarterly meetings with representatives of Plaintiffs' counsel to discuss issues relating to the enforcement of the Partial Consent Decrees.

### Efforts of the Alabama Department of Postsecondary Education

The Department has the responsibility for implementation and monitoring of compliance with the requirements of both Partial Consent Decrees. The Department continues to provide services both to the Alabama College System institutions and to the members of the Applicant Pool in order to increase the number of individuals who receive notices of System vacancies and to provide a broad base of applicants for those vacancies. The Department engages in the following activities:

1. Operates a telephone information "Job Line" in the Division of Legal and Human Resources, providing callers with information on all vacancies within the Alabama College System;

2. Updates annually information on members of the Applicant pool, making necessary changes in addresses and credentials for the database;

EMANUEL--0160--PLF DOX

3. Provides pre-printed address labels of Applicant Pool members to colleges, so that pool members can receive vacancy announcements in a timely meaner;

4. Publishes and distributes a Job Newsletter, listing current vacancies within the System;

5. Places advertisements in national publications, seeking additions to the Applicant Pool;

6. Posts job vacancy notices on the Alabama College System web site at www.acs.cc.al.us; and

7. Allows individuals desiring to become members of the Applicant Pool to apply online at the web site.

Further, the Defendants have engaged in other activities that will have an effect on the number of applications from blacks and women. During the 2001-2002 report year, the Defendants engaged in the following activities:

1. Participated in the National Diversity Conference entitled *Celebrating Diversity – Strengthening America*, sponsored by the Alabama College System Human Resources Management Association on September 18-20, 2002 (see attachment);

2. Participated as a member in the Black Collegiate Services – IMDiversity Job Bank, which is dedicated to providing career, job, and self-development information to members of minority groups. It features the African-American village, the Asian-American village, the Hispanic-American village, the Native-American village, the Women's village, and the Minorities Global village. As a member, we post Alabama College System vacancies, have access to the Resume Database, have listing in the Director of Employers, and have an Employer Profile with the System logo and hyperlink to our Home page;

3. Participated in the Alabama Community College Leadership Academy hosted by the University of Alabama;

4. Encouraged a President or designee from each college to attend the National Conference of the National Multicultural Institute in June, 2002;

5. Placed Shuford advertisement in the AEA Journal.

As of September 15, 2002, the Applicant Pool contained a total of 1036 records, an increase of 7.7 percent from last year's total of 962 records. During the 2001-2002 report year, the Department excluded white men from the Applicant Pool. Approximately 50.7 percent of Applicant Pool members are black; 24.3 percent are white; and the races of 19.6 percent of Applicant Pool members are unknown/other. Approximately 67.1 percent of Applicant Pool members are women. By race and gender, Applicant Pool members are as follows: 24.2 percent white women, 33.7 percent black women; and 17.1 percent black men. The races of 65 women and 123 men are unknown/other. Sixteen individuals declined to provide information on either race or gender. Approximately 72.3 percent of individuals in the Applicant Pool reside within the State of Alabama.

**Presidential Vacancies**

There was one (1) continuing presidential vacancies at Alabama College System institutions during the 2000-2001 report year: MacArthur State Technical College and Trenholm State Technical College. Mr. Wayne Bennet (a white man) continues to serve as interim president at MacArthur State Technical College. Dr. Theresa Hamilton was appointed temporarily to serve as interim president at Calhoun Community College. Dr. Laurel Blackwell was appointed temporarily to serve as interim president at Chattahoochee Valley Community College. Dr. Joanne Jordan was appointed temporarily to serve as interim president at Southern Union Community College.

There was one (1) Alabama College System institutions that conducted a presidential search during the 2001-2002 report year: Trenholm State Technical College. The following individuals served as interim presidents during the presidential search at the respective colleges: Dr. Alma Freeman (a black woman) served at Trenholm State Technical College from April 20, 2001 to November 18, 2001.

A search was conducted at the one (1) Alabama College System institutions pursuant to the State Board of Education policy 203.01. The Department of Postsecondary Education created a color brochure describing the college and announcing the vacancy at the institution. The vacancy announcement appeared in the following publications:

Chronicle of Higher Education                    Mobile Register

| Affirmative Action Register | Huntsville Times |
| Community College Times | Black Issues in Higher Education |
| Alabama School Journal | Women in Higher Education |
| Birmingham News | Community College Week |
| Montgomery Advertiser | |

In addition, each vacancy announcement appeared in local newspapers.

During the first presidential search for Trenholm State Technical College, the color brochure was mailed to 160 Applicant Pool members, to 800 members of the National Institute for Leadership Development (predominantly female members), to 97 members of the Presidents' Roundtable, to 13 other individuals requesting applications, and to 93 agencies of postsecondary education across the United States. In addition to the aforementioned publications, the vacancy announcement appeared on several websites such as *Execsearches.com,* and *Higheredjobs.com.* A total of 46 individuals submitted completed application packages. Of that number, six (6) were members of the Applicant Pool. A candidate was not selected from this first search and a second search was conducted.

During the second presidential search for Trenholm State Technical College, the color brochure was mailed to 160 Applicant Pool members, to 800 members of the National Institute for Leadership Development (predominantly female members), to 97 members of the Presidents' Roundtable, and to 93 agencies of postsecondary education across the United States. In addition to the aforementioned publications, the vacancy announcement appeared on several websites such as *Higheredjobs.com.* A total of 32 individuals submitted completed application packages. Of that number, eight (8) were members of the Applicant Pool. Dr. Anthony Molina was recommended by the Chancellor and appointed by the State Board of Education as President of Trenholm State Technical College, effective November 19, 2001.

## Progress Toward Goals on Salary Schedules B, C, and D

Black Persons. The goals for appointment of black person on Salary Schedules B & C1, C2 & C3, and D are 25 percent by Fall 1999. Data as of September 15, 2002 shows that of 207 total employees on Salary Schedules B and C1, 53 (25.6 percent) are black. On Salary

EMANUEL--0163--PLF DOX

Schedules C2 and C3, 151 of 535 total employees (28.2 percent) are black. On Salary Schedule D 367 of 1843 total employees (19.9 percent) are black. Defendants continue to meet or exceed their goals on Salary Schedules B & C1 and C2 & C3. Defendants continue their extensive efforts in meeting the goals for Salary Schedule D.

Women. The goals for appointment of women on Salary Schedules B, C1, C2, C3 and D are 33 percent by Fall 1999 and 50 percent by Fall 2005. On Salary Schedule B, 46 of 106 employees (43.4 percent) are women. On Salary Schedule C1, 51 of 101 employees (50.5 percent) are women. On Salary Schedule C2, 30 of 90 employees (33.3 percent) are women. On Salary Schedule C3, 280 of 445 employees (62.9 percent) are women. On Salary Schedule D, 1006 of 1843 employees (54.6 percent) are women. On Salary Schedules B and C2, Defendants continue to meet and exceed the goals set for Fall 1999. On Salary Schedule C1, C3 and D, Defendants have exceeded the goals for women set for Fall 2005.

Black Women. The goals for appointment of black women on Salary Schedules B & C1, C2 & C3, and D are roughly one-half of the goals set for blacks, or 12.5 percent by Fall 1999. As of September 15, 2002, there were 207 employees on Salary Schedules B & C1, 544 employees on Salary Schedules C2 & C3, and 1843 employees on Salary Schedule D. There were 30 black women (14.5 percent) on Salary Schedule B & C1, 106 black women (19.5 percent) on Salary Schedules C2 & C3, and 229 black women (12.4 percent) on Salary Schedule D. Defendants continue to exceed the goal for black women on Salary Schedules B, C1, C2 and C3 and are approximately one percentage point away from meeting the goals for black women on Salary Schedule D.

**Conclusion**

Defendants will continue their extensive efforts to recruit and hire qualified black persons, women, and black women. The Alabama State Board of Education, the Chancellor, the Alabama Department of Postsecondary Education, and the institutions of the Alabama College System remain committed to compliance with these decrees. That commitment is obviously reflected in the progress made and the goals attainment already achieved throughout the System.

Other required information for this report can be found herein, including information on progress made by the Alabama College System individual institutions in meeting the established

goals for black persons, women, and black women, and narrative information received from individual colleges on their progress. This report also includes detailed information and analysis on Applicant Pool members; a sample letter sent to Applicant Pool members to update information; Applicant Pool information forms; Job Newsletters; advertisements and brochures announcing the presidential vacancies.

EMANUEL--0165--PLF DOX

# NARRATIVE

## 2001 - 2002 ANNUAL REPORT
*Shuford, et al., v. Alabama State Board of Education, et al*

### *Wallace Community College-Dothan*

The progress George C. Wallace Community College (WCC) has made toward achieving goals relative to the hiring and/or appointment of blacks and women is described as follows.   Goals reflect Service Area's Black Population for Wallace Community College.

(1)    GOALS RELATING TO THE APPOINTMENT OF BLACK PERSONS:

      a.    The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black persons employed at each college on B and C1 Salary Schedules combined shall equal that number which most closely represents 75% of the percentage of black persons in the general population of the primary service area of the respective college."

                Service Area Average Black Population: 28%
                Goal: 21% (28% x 75%)
                WCC Employees on B/C1: 13
                Black Employees on B/C1: 2 (15%)

WCC IS WITHIN 6% OF REACHING ITS GOAL FOR SALARY SCHEDULES B AND C1.

      b.    The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black persons employed at each college on C2 and C3 Salary Schedules combined shall equal at least that number which most closely represents 75% of the percentage of black persons in the general population of the primary service area of the respective college."

                Service Area Average Black Population: 28%
                Goal: 21% (28% x 75%)
                WCC Employees on C2/C3: 29
                Black Employees on C2/C3: 9 (31%)

WCC HAS EXCEEDED ITS GOAL OF 21% FOR SALARY SCHEDULES C2 AND C3.

EMANUEL--0166--PLF DOX

c. The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black persons employed at each college on the D Salary Schedule shall equal at least that number which most closely represents 75% of the percentage of black persons in the general population of the primary service area of the respective college."

Service Area Average Black Population: 28%
Goal: 21% (28% x 75%)
WCC Employees on D: 140
Black Employees on D: 10 (7%)

WCC HAS NOT MET ITS GOAL FOR SALARY SCHEDULE D.

(2) GOALS RELATING TO THE APPOINTMENT OF WOMEN:

a. The Shuford Consent Decrees require that "By the end of Fall Quarter 2005, the percentage of women employed at each college on each of the B, C1, C2, C3, and D Salary Schedules, respectively, shall equal at least that number which most closely represents 50% of the total number of persons employed at each of the respective colleges on the B, C1, C2, C3, and D Salary Schedules."

| Salary Schedule | Total Number At WCC | Total/(Percentage of Women Employed) | +/-Goal Accomplished |
|---|---|---|---|
| B | 10 | 4 (40%) | -10% |
| C1 | 3 | 1 (33%) | -17% |
| C2 | 0 | 0 | N/A |
| C3 | 29 | 21 (72%) | +22% |
| D | 140 | 66 (47%) | -3% |

WCC HAS EXCEEDED ITS GOAL FOR SALARY SCHEDULE C3 BUT WILL NEED TO CONTINUE TRYING TO EMPLOY WOMEN WHO ARE QUALIFIED TO FILL POSITIONS ON B, C1, AND D SALARY SCHEDULES AS VACANCIES OCCUR.

(3)     GOALS RELATING TO THE APPOINTMENT OF BLACK WOMEN:

    a.    The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black women employed at each college on B and C1 Salary Schedules combined shall equal at least that number which most closely represents 37.5% of the percentage of black persons in the general population of the primary service area of the respective college."

> Service Area Average Black Population: 28%
> Goal: 10.5% (28% x 37.5%)
> WCC Employees on B/C1: 13
> Black Women Employees on B/C1: 1 (7.69%)

WCC HAS NOT MET ITS GOAL FOR SALARY SCHEDULES B AND C1.

    b.    The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black women employed at each college on the C2 and C3 Salary Schedules combined shall equal at least that number which most closely represents 37.5% of the percentage of black persons in the general population of the primary service area of the respective college."

> Service Area Average Black Population: 28%
> Goal: 10.5% (28% x 37.5%)
> WCC Employees on C2/C3: 29
> Black Women on C2/C3: 6 (21%)

WCC HAS EXCEEDED ITS GOAL FOR SALARY SCHEDULES C2 AND C3.

    c.    The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black women employed at each college on the D Salary Schedule shall equal at least that number which most closely represents 37.5% of the percentage of black persons in the general population of the primary service area of the respective college."

> Service Area Average Black Population: 28%
> Goal: 10.5% (28% x 37.5%)
> WCC Employees on D: 140
> Black Women Employees on D: 5 (4%)

WCC HAS NOT MET ITS GOAL FOR SALARY SCHEDULE D.

EMANUEL--0168--PLF DOX

WALLACE COMMUNITY COLLEGE-DOTHAN

PERSONNEL BY SALARY SCHEDULE (A, B, C1, C2, C3, D)

As of September 15, 2002

| Salary Schedule** | White (non-hispanic) | | | | | Black (non-hispanic) | | | | | Other Minorities | | | | | Total | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Men | % | Women | % | Total | Men | % | Women | % | Total | Men | % | Women | % | Total | Men | % | Women | % | Total |
| A | 0 | 0% | 1 | 100% | 1 | 0 | 0% | | 0% | 0 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 1 | 100% | 1 |
| B | 6 | 60% | 3 | 30% | 9 | 0 | 0% | 1 | 10% | 1 | 0 | 0% | 0 | 0% | 0 | 6 | 60% | 4 | 40% | 10 |
| C1 | 1 | 33% | 1 | 33% | 2 | 1 | 33% | 0 | 0% | 1 | 0 | 0% | 0 | 0% | 0 | 2 | 67% | 1 | 33% | 3 |
| C2 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 0 | 0% | 0 |
| C3 | 5 | 17% | 15 | 52% | 20 | 3 | 10% | 6 | 21% | 9 | 0 | 0% | 0 | 0% | 0 | 8 | 28% | 21 | 72% | 29 |
| D | 69 | 49% | 60 | 43% | 129 | 5 | 4% | 5 | 4% | 10 | 0 | 0% | 1 | 1% | 1 | 74 | 53% | 66 | 47% | 140 |

** Only presidential appointments are listed on Salary Schedule A. Those appointments such as Vice President and Provost, on neither Salary Schedule A nor B, are shown with a #.

2001-2002 Annual Report
Shuford, et al., Alabama State Board of Education
Civil Action No. 89-T-196-N

EMANUEL--0169--PLF DOX

WALLACE COMMUNITY COLLEGE-DOTHAN

VACANT POSITIONS FILLED (Salary Schedules A, B, C, & D)
September 15, 2001 - September 15, 2002

| Position Title | Salary Schedule | Name | Race | Gender | Search | Temporary Appl. | Reorg | Lateral Transfer |
|---|---|---|---|---|---|---|---|---|
| COORDINATOR, ACADEMIC/SUPPORT SERVICES | C3 | DEBBIE MCCOLLOUGH | W | F | X | | | |
| LPN INSTRUCTOR | D1 | MARCIA THOMPSON | W | F | X | | | |
| ADN INSTRUCTOR | D1 | JOY F. WHITLOW | W | F | X | | | |
| BUSINESS INSTRUCTOR | D1 | NASER M. KAMLEH | W | M | X | | | |
| COMPUTER INFORMATION SCIENCE INSTRUCTOR | D1 | MARY KAY MCDANIEL | W | F | X | | | |
| AMT INSTRUCTOR | D1 | DONALD R. MARTIN | W | M | X | | | |
| AMT INSTRUCTOR | D1 | JOSEPH G. SHERRARD | B | M | X | | | |
| COORDINATOR OF STUDENT/EVENING SERVICES | C3 | KEITH B. SAULSBERRY | B | M | X | | | |
| TECH PREP SPECIALIST | C3 | ELIZABETH C. LIVINGS | W | F | X | | | |
| ADN INSTRUCTOR | D1 | CHARLOTTE V. FARMER | W | F | X | | | |
| ADN INSTRUCTOR | D1 | PEGGY D. JOHNDROW | W | F | X | | | |
| LPN INSTRUCTOR | D1 | CONNIE B. PARRISH | W | F | X | | | |
| AMT INSTRUCTOR | D1 | CLARENCE L. CARNES | W | M | X | | | |
| TALENT SEARCH COUNSELOR | C3 | TAMEKA H. WILLIAMS | B | F | X | | | |
| PSYCHOLOGY INSTRUCTOR | D1 | LOURDES MORALES | H | F | X | | | |
| PSYCHOLOGY INSTRUCTOR | D1 | CHRISTINA L. SUGGS | W | F | X | | | |
| CLINICAL NURSING INSTRUCTOR | D1 | CHARLOTTE L. FULLER | W | F | X | | | |
| CLINICAL NURSING INSTRUCTOR | D1 | WENDY W. MORRIS | W | F | X | | | |
| CLINICAL NURSING INSTRUCTOR | D1 | JACQUELYN M. PEARCE | B | F | X | | | |
| CLINICAL NURSING INSTRUCTOR | D1 | SARA-JO WISCOMBE | W | F | X | | | |
| AMT INSTRUCTOR | D1 | HAROLD J. SLOANE, JR. | W | M | X | | | |
| AMT INSTRUCTOR | D1 | GEORGE WESLEY THOMPSON | W | M | X | | | |
| CHILD DEVELOPMENT INSTRUCTOR | D1 | VANESSA DICKENS | B | F | X | | | |
| ENGLISH INSTRUCTOR | D1 | MARCIA B. BURKETT | W | F | X | | | |
| MATHEMATICS INSTRUCTOR | D1 | CRISTI E. WHITFIELD | W | F | X | | | |
| PHYSICAL THERAPY ASSISTANT INSTRUCTOR | D1 | NIVA N. HARRISON | W | F | | X | | |
| DIRECTOR OF MANAGEMENT INFORMATION SYSTEMS A | C1 | FRANK BAREFIELD | W | M | | | | X |

2001-2002 Annual Report
*Shuford, et al., v. Alabama State Board of Education, et al.*
Civil Action No. 89-T-196-N

EMANUEL--0170--PLF DOX

| Member of the Applicant Pool? Yes/No |
| --- |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |
| NO |

EMANUEL--0171--PLF DOX

EMANUEL--0172--PLF DOX

*WALLACE COMMUNITY COLLEGE-DOTHAN*

**RECRUITING AND SELECTION COMMITTEES ( Salary Schedules A, B, C, & D)**
September 15, 2001 - September 15, 2002

| Date Appointed | Names | Race | Gender | Vacancy For Which Appointed |
|---|---|---|---|---|
| 07/31/2001 | Locy Baker | B | M | Coordinator of Academic and Support Services, SSS |
| | Kay Roney | W | F | |
| | Mark Shope | W | M | |
| | Shannon Thomas | B | F | |
| | Mary Wiggins | B | F | |
| 08/21/2001 | Angie Livingston | W | F | Associate Degree/Practical Nursing Instructor |
| | Helen Nichols | B | F | |
| | Fred Ortman | W | M | |
| | Denise Stanford-Bowers | B | F | |
| 10/01/2001 | George Baxter | B | M | Business Instructor (Accounting) |
| | Earl Jernigan | W | M | |
| | Phyllis Murdock | W | F | |
| | Mary Wiggins | B | F | |
| 10/01/2001 | Catherine Packer | B | F | Computer Information Science Instructor |
| | Donna Petty | W | F | |
| | Lisa Sanders | W | F | |
| | Shannon Thomas | B | F | |
| 10/01/2001 | Erma Perry | B | F | *Speech Instructor |
| | Ralph Purvis | W | M | |
| | Terry Schembera | W | M | |
| | Shannon Thomas | B | F | |

## RECRUITING AND SELECTION COMMITTEES ( Salary Schedules A, B, C, & D)
### September 15, 2001 - September 15, 2002

| Date Appointed | Names | Race | Gender | Vacancy For Which Appointed |
|---|---|---|---|---|
| 10/01/2001 | Mike Babb | W | M | Aviation Maintenance Technology Instructor (2 positions) |
| | Bob Lee | W | M | |
| | Helen Nichols | B | F | |
| | Catherine Packer | B | F | |
| 10/05/2001 | R. Jean Dagostin | W | F | Coordinator of Student/Evening Services |
| | Helen Nichols | B | F | |
| | Leslie Reeder | W | F | |
| | Vickie Williams | B | F | |
| 10/12/2001 | Michael Babb | W | M | Tech Prep Specialist |
| | Peggy Hill | B | F | |
| | Donna Stokes | W | F | |
| | Shannon Thomas | B | F | |
| 02/06/2002 | Debbie Brown | W | F | Associate Degree/Practical Nursing Instructor (3 positions) |
| | Mary Wiggins | B | F | |
| | Keith Saulsberry | B | M | |
| | Jackie Spivey | W | F | |
| 02/12/2002 | Bob Lee | W | M | Aviation Maintenance Technology Instructor |
| | Helen Nichols | B | F | |
| | Dan Riley | W | M | |
| | Denise Stanford-Bowers | B | F | |
| 04/15/2002 | Jeanette Baxley | W | F | Talent Search Counselor |
| | Earl Bynum | B | M | |
| | Dorothy Hawkins | B | F | |
| | Amanda Steele | W | F | |

EMANUEL–0173–PLF DOX

RECRUITING AND SELECTION COMMITTEES ( Salary Schedules A, B, C, & D)
September 15, 2001 - September 15, 2002

| Date Appointed | Names | Race | Gender | Vacancy For Which Appointed |
|---|---|---|---|---|
| 04/24/2002 | Shannon Thomas | B | F | Psychology Instructor (2 positions) |
| | Vickie Williams | B | F | |
| | Linda York | W | F | |
| 04/24/2002 | Debbie Brown | W | F | Clinical Instructor-Associate Degree Nursing/Practical Nursing |
| | Keith Saulsberry | B | M | (4 positions) |
| | Jackie Spivey | W | F | |
| | Mary Wiggins | B | F | |
| 06/12/2002 | David Cruz-Wells | H | M | *Computer Information Science Instructor |
| | Gary LeFan | W | M | |
| | Jackie Screws | B | F | |
| | Tangela Washington | B | F | |
| 06/12/2002 | Manuel Edwards | B | M | Aviation Maintenance Technology Instructor (2 positions) |
| | Helen Nichols | B | F | |
| | Leslie Reeder | W | F | |
| | George Alan Williams | W | M | |
| 06/12/2002 | Mickey Baker | B | M | Child Development Instructor |
| | Shannon Thomas | B | F | |
| | Rebecca Troutman | W | F | |
| 06/12/2002 | Betty Hutchinson | W | F | English Instructor |
| | Shannon Thomas | B | F | |
| | Mary Wiggins | B | F | |
| | Linda York | W | F | |

EMANUEL--0174--PLF DOX

RECRUITING AND SELECTION COMMITTEES ( Salary Schedules A, B, C, & D)
September 15, 2001 - September 15, 2002

| Date Appointed | Names | Race | Gender | Vacancy For Which Appointed |
|---|---|---|---|---|
| 06/12/2002 | Evonne Bennett | B | F | Mathematics Instructor |
| | Billie Faye Bush | W | F | |
| | Jim Kinney | W | M | |
| | Keith Saulsberry | B | M | |
| | | | | |
| 06/12/2002 | Quincy Banks | B | M | *Systems/Network Administrator |
| | Frank Barefield | W | M | |
| | Brenda Barnes | W | F | |
| | Tangela Washington | B | F | |
| | | | | |
| | | | | *No one was selected; search will be reopened at a later date. |

2001-2002 Annual Report
*Shuford, et al., v. Alabama State Board of Education, et al.*
Civil Action No. 89-T-196-N

EMANUEL--0175--PLF DOX

across the United States. In addition to the aforementioned publications, the vacancy announcement appeared in the *Conecuh Countian*, and *Evergreen Currant*. A total of 41 individuals submitted completed application packages. Of that number, twelve (12) were members of the Applicant Pool. Dr. Doug Littles (a black man) was recommended by the Chancellor and appointed by the State Board of Education as President of Reid State Technical College, effective October 9, 2000.

During the presidential search for Trenholm State Technical College, the color brochure was mailed 160 Applicant Pool members, to 800 members of the National Institute for Leadership Development (predominantly female members), to 97 members of the Presidents' Roundtable, to 13 other individuals requesting applications, and to 93 agencies of postsecondary education across the United States. In addition to the aforementioned publications, the vacancy announcement appeared on several websites such as *Execsearches.com*, and *Higheredjobs.com*. A total of 32 individuals submitted completed application packages. Of that number, six (6) were members of the Applicant Pool. A final candidate is expected to be selected in October 2001.

### Progress Toward Goals on Salary Schedules B, C, and D

Black Persons. The goals for appointment of black person on Salary Schedules B & C1, C2 & C3, and D are 25 percent by Fall 1999. Data as of September 15, 2001 shows that of 183 total employees on Salary Schedules B and C1, 49 (26.8 percent) are black. On Salary Schedules C2 and C3, 127 of 446 total employees (28.5 percent) are black. On Salary Schedule D 356 of 1746 total employees (20.4 percent) are black. Defendants continue to meet or exceed their goals on Salary Schedules B & C1 and C2 & C3. Defendants continue their extensive efforts in meeting the goals for Salary Schedule D.

Women. The goals for appointment of women on Salary Schedules B, C1, C2, C3 and D are 33 percent by Fall 1999 and 50 percent by Fall 2005. On Salary Schedule B, 42 of 98 employees (42.9 percent) are women. On Salary Schedule C1, 52 of 83 employees (62.7 percent) are women. On Salary Schedule C2, 32 of 78 employees (41.0 percent) are women. On Salary Schedule C3, 234 of 366 employees (63.9 percent) are women. On Salary Schedule D, 971 of 1793 employees (54.2 percent) are women. On Salary Schedules B and C2, Defendants

ue to meet and exceed the goals set for Fall 1999. On Salary Schedule C1, C3 and D, Defendants have exceeded the goals for women set for Fall 2005.

Black Women. The goals for appointment of black women on Salary Schedules B & C1, ly one-

As of September 15, 2001, there were 183 employees on Salary Schedules B & C1, 432 employees on Salary Schedules C2 & C3, and 1793 employees on Salary Schedule D. There women (14.2 percent) on Salary Schedule B & C1, 82 black women (19.0 percent) on Salary Schedules C2 & C3, and 223 black women (12.4 percent) on Salary Schedule D.

and are approximately one percentage point away from meeting the goals for black women on Salary Schedule D.

## Conclusion

Defendants will continue their extensive efforts to recruit and hire qualified black te Board of Education, the Chancellor, the Alabama Department of Postsecondary Education, and the institutions of the Alabama College

reflected in the progress made and the goals attainment already achieved throughout the System.

Other required information for this report can be found herein, including information on

goals for black persons, women, and black women, and narrative information received from

on Applicant Pool members; a sample letter sent to Applicant Pool members to update

announcing the presidential vacancies.

SHUFORD, ET AL., V. ALABAMA STATE BOARD OF EDUCATION, ET AL.
CIVIL ACTION NO. 89-T-196-N

APPLICANT POOL

The Department of Postsecondary Education created an applicant pool to meet the requirements of the Partial Consent Decrees. As of September 15, 2001, the applicant pool has 962 records. An analysis of the applicant pool records is as follows:

| Race | Number of Race |
|------|----------------|
| White, not of Hispanic Origin | 231 |
| Black, not of Hispanic Origin | 477 |
| Asian or Pacific Islander | 22 |
| American Indian or Alaskan Native | 14 |
| Hispanic | 16 |
| Unknown/Other | 202 |

| Gender | Number of Gender |
|--------|------------------|
| Female | 631 |
| Male | 313 |
| Declined | 18 |

Applicant Pool Analysis
Page 2

| *Race & Gender | Number of Race & Gender |
|---|---|
| Female White, not of Hispanic Origin | 231 |
| Female Black, not of Hispanic Origin | 304 |
| Female Asian or Pacific Islander | 11 |
| Female American Indian or Alaskan Native | 6 |
| Female Hispanic | 11 |
| Female Unknown/Other | 68 |
| | |
| Male Black, not of Hispanic Origin | 173 |
| Male Asian or Pacific Islander | 11 |
| Male American Indian or Alaskan Native | 8 |
| Male Hispanic | 5 |
| Male Unknown/Other | 116 |

* Eighteen (18) applicant pool members declined to provide race and gender

| Number of In-State & Out-of-State | |
|---|---|
| In-State | 673 |
| Out-of-State | 289 |

EMANUEL--0179--PLF DOX

THE ALABAMA COLLEGE SYSTEM
RACE CLASS - GOALS VS. ACTUAL

BLACKS

As of September 15, 2001

Goals and Timetables for Salary Schedules

| SALARY SCHEDULE | Fall 95 | Fall 96 | Fall 97 | Fall 99 | Actual # | Actual % | Total # of Staff |
|---|---|---|---|---|---|---|---|
| A | ----- | 25% | ----- | ----- | 9 | 31% | 29 |
| B & C1 | 21% | ----- | 23% | 25% | 49 | 27% | 183 |
| C2 & C3 | 21% | ----- | 23% | 25% | 127 | 27% | 446 |
| D | 21% | ----- | 23% | 25% | 356 | 20% | 1746 |

EMANUEL--0180--PLF DOX

THE ALABAMA COLLEGE SYSTEM
GENDER CLASS - GOALS VS. ACTUAL

WOMEN

Goals and Timetables for Salary Schedules

As of September 15, 2001

| SALARY SCHEDULE | Fall 96 | Fall 99 | Fall 2005 | Actual # | Actual % | Total # of Staff |
|---|---|---|---|---|---|---|
| A | 25% | 33% | 50% | 7 | 24.1% | 29 |
| B | ----- | ----- | 50% | 42 | 43% | 98 |
| C1 | ----- | ----- | 50% | 52 | 63% | 83 |
| C2 | ----- | ----- | 50% | 32 | 41% | 78 |
| C3 | ----- | ----- | 50% | 234 | 64% | 366 |
| D | ----- | ----- | 50% | 971 | 54% | 1793 |

EMANUEL--0181--PLF DOX

THE ALABAMA COLLEGE SYSTEM
GENDER CLASS - GOALS VS. ACTUAL

BLACK WOMEN

Goals and Timetables for Salary Schedules

As of September 15, 2001

| SALARY SCHEDULE | Fall 95 | Fall 96 | Fall 97 | Fall 99 | Actual # | Actual % | Total # of Staff |
|---|---|---|---|---|---|---|---|
| A | ----- | 12.5% | ----- | ----- | 3 | 10.3% | 29 |
| B & C1 | 10.5% | ----- | 11.5% | 12.5% | 26 | 14% | 183 |
| C2 & C3 | 10.5% | ----- | 11.5% | 12.5% | 82 | 19% | 432 |
| D | 10.5% | ----- | 11.5% | 12.5% | 223 | 12% | 1793 |

EMANUEL-0182-PLF DOX

## SHUFORD GOALS FOR APPOINTMENT OF BLACKS

1) By end of FallQuarter 1999, B and C1 combined-75% of the percentage of black persons in the general population of the primary service area of each college
2) By end of FallQuarter 1999, C2 and C3 combined-75% of the percentage of black persons in the general population of the primary service area of each college
3) By end of FallQuarter 1999, D-75% of the percentage of black persons in the general population of the primary service area of each college

## As of September 15, 2001

| College | Shuford % (75% of Black SVC Area) | ACTUAL % OF B & C1 COMBINED | ACTUAL # B& C1 COMBINED | TOTAL # OF STAFF ON B & C1 COMBINED | ACTUAL % OF C2 & C3 COMBINED | ACTUAL # C2 & C3 COMBINED | TOTAL # OF STAFF ON C2 & C3 COMBINED | ACTUAL % OF D | ACTUAL # OF D | TOTAL # OF STAFF ON D |
|---|---|---|---|---|---|---|---|---|---|---|
| Alabama Southern Community College | 35.2% | 14% | 1 | 7 | 30% | 6 | 20 | 18% | 7 | 40 |
| Ayers State Technical College | 12.5% | 0% | 0 | 3 | 31% | 5 | 16 | 7% | 2 | 29 |
| Bessemer State Technical College | 26.0% | 50% | 1 | 2 | 27% | 4 | 15 | 9% | 4 | 47 |
| Bevill State Community College | 8.7% | 0% | 0 | 11 | 6% | 3 | 47 | 5% | 5 | 94 |
| Bishop State Community College | 23.3% | 67% | 8 | 12 | 82% | 14 | 17 | 61% | 71 | 117 |
| Calhoun Community College | 14.3% | 38% | 3 | 8 | 32% | 7 | 22 | 16% | 21 | 132 |
| Central Alabama Community College | 25.4% | 0% | 0 | 6 | 0% | 0 | 7 | 13% | 6 | 47 |
| Chattahoochee Valley Community College | 27.5% | 0% | 0 | 1 | 29% | 2 | 7 | 36% | 9 | 25 |
| Drake State Technical College | 12.0% | 75% | 3 | 4 | 50% | 3 | 6 | 50% | 10 | 20 |
| Enterprise State Junior College | 17.0% | 17% | 1 | 6 | 0% | 0 | 9 | 13% | 6 | 45 |
| Faulkner State Community College | 9.7% | 33% | 2 | 6 | 23% | 3 | 13 | 16% | 9 | 56 |
| Gadsden State Community College | 12.3% | 19% | 3 | 16 | 25% | 3 | 12 | 12% | 18 | 153 |
| Ingram State Technical College | 18.0% | 20% | 1 | 5 | 0% | 0 | 4 | 26% | 13 | 50 |
| Jefferson Davis Community College | 30.8% | 40% | 2 | 5 | 40% | 4 | 10 | 24% | 11 | 46 |
| Jefferson State Community College | 24.0% | 31% | 4 | 13 | 23% | 10 | 43 | 19% | 21 | 110 |
| Lawson State Community College | 26.3% | 100% | 9 | 9 | 75% | 6 | 8 | 88% | 51 | 58 |
| Lurleen B. Wallace Junior College | 17.9% | 0% | 0 | 1 | 25% | 1 | 4 | 13% | 3 | 23 |
| MacArthur State Technical College | 12.4% | 0% | 0 | 3 | 11% | 1 | 9 | 23% | 6 | 26 |
| Northeast Alabama Community College | 2.1% | 0% | 0 | 4 | 0% | 0 | 10 | 3% | 1 | 30 |
| Northwest-Shoals Community College | 8.4% | 0% | 0 | 7 | 9% | 3 | 35 | 17% | 5 | 29 |
| Patterson State Technical College | 30.5% | 0% | 0 | 4 | 17% | 1 | 6 | 18% | 6 | 34 |
| Reid State Technical College | 30.6% | 100% | 1 | 1 | 44% | 4 | 9 | 29% | 7 | 24 |
| Shelton State Community College | 26.3% | 25% | 3 | 12 | 38% | 11 | 29 | 16% | 13 | 74 |
| Snead State Community College | 1.5% | 0% | 0 | 4 | 0% | 0 | 6 | 3% | 1 | 32 |
| Southern Union State Community College | 20.9% | 13% | 1 | 8 | 20% | 3 | 15 | 4% | 3 | 74 |
| Trenholm State Technical College | 30.5% | 60% | 3 | 5 | 79% | 15 | 19 | 74% | 25 | 34 |
| Wallace Community College-Dothan | 16.4% | 17% | 2 | 12 | 29% | 8 | 28 | 7% | 9 | 128 |
| Wallace State Community College-Hanceville | 1.0% | 0% | 0 | 5 | 25% | 2 | 8 | 2% | 2 | 123 |
| Wallace State Community College-Selma | 27.4% | 33% | 1 | 3 | 67% | 8 | 12 | 24% | 11 | 46 |
| SYSTEM TOTAL | | 27% | 49 | 183 | 27% | 127 | 446 | 20% | 356 | 1746 |

EMANUEL--0183--PLF DOX

# SHUFORD GOALS FOR APPOINTMENT OF BLACK WOMEN

1) By end of FallQuarter 1999, B and C1 combined-37.5% of the percentage of black persons in the general population of the primary service area of each college
2) By end of FallQuarter 1999, C2 and C3 combined-37.5% of the percentage of black persons in the primary service area of each college
3) By end of FallQuarter 1999, D-37.5% of the percentage of black persons in the general population of the primary service area of each college

## As of September 15, 2001

| College | Shuford % (37.5% of B & C1 Combined Black SVC Area) | ACTUAL % OF B & C1 COMBINED | ACTUAL # B & C1 COMBINED | TOTAL # OF STAFF ON B & C1 COMBINED | ACTUAL % OF C2 & C3 COMBINED | ACTUAL # C2 & C3 COMBINED | TOTAL # OF STAFF ON C2 & C3 COMBINED | ACTUAL % OF D | ACTUAL # OF D | TOTAL # OF STAFF ON D |
|---|---|---|---|---|---|---|---|---|---|---|
| Alabama Southern Community College | 17.6% | 14% | 1 | 7 | 25% | 5 | 20 | 10% | 4 | 40 |
| Ayers State Technical College | 6.3% | 0% | 0 | 3 | 25% | 4 | 16 | 0% | 0 | 29 |
| Bessemer State Technical College | 13.0% | 50% | 1 | 2 | 20% | 3 | 15 | 4% | 2 | 47 |
| Bevil State Community College | 4.4% | 0% | 0 | 11 | 2% | 1 | 47 | 4% | 4 | 94 |
| Bishop State Community College | 11.6% | 25% | 3 | 12 | 41% | 7 | 17 | 38% | 44 | 117 |
| Calhoun Community College | 7.1% | 25% | 2 | 8 | 18% | 4 | 22 | 11% | 15 | 132 |
| Central Alabama Community College | 12.7% | 0% | 0 | 6 | 0% | 0 | 7 | 11% | 5 | 47 |
| Chattahoochee Valley Community College | 13.8% | 0% | 0 | 1 | 14% | 1 | 7 | 24% | 6 | 25 |
| Drake State Technical College | 6.0% | 0% | 0 | 4 | 50% | 3 | 6 | 25% | 5 | 20 |
| Enterprise State Junior College | 8.5% | 17% | 1 | 6 | 0% | 0 | 9 | 11% | 5 | 46 |
| Faulkner State Community College | 4.9% | 33% | 2 | 6 | 8% | 1 | 13 | 9% | 5 | 56 |
| Gadsden State Community College | 6.2% | 13% | 2 | 16 | 25% | 3 | 12 | 8% | 13 | 153 |
| Ingram State Technical College | 9.5% | 0% | 0 | 5 | 0% | 0 | 4 | 12% | 6 | 50 |
| Jefferson Davis Community College | 15.4% | 0% | 0 | 5 | 20% | 2 | 10 | 11% | 5 | 46 |
| Jefferson State Community College | 12.0% | 15% | 2 | 13 | 19% | 8 | 43 | 14% | 15 | 110 |
| Lawson State Community College | 13.2% | 67% | 6 | 9 | 67% | 4 | 6 | 53% | 31 | 58 |
| Lurleen B. Wallace Junior College | 9.0% | 0% | 0 | 1 | 25% | 1 | 4 | 9% | 2 | 23 |
| MacArthur State Technical College | 6.2% | 0% | 0 | 3 | 11% | 1 | 9 | 15% | 4 | 26 |
| Northeast Alabama Community College | 1.1% | 0% | 0 | 4 | 0% | 0 | 10 | 3% | 1 | 30 |
| Northwest-Shoals Community College | 4.2% | 0% | 0 | 7 | 9% | 3 | 35 | 1% | 1 | 76 |
| Patterson State Technical College | 15.3% | 0% | 0 | 4 | 17% | 1 | 6 | 12% | 4 | 34 |
| Reid State Technical College | 15.3% | 100% | 1 | 1 | 44% | 4 | 9 | 21% | 5 | 24 |
| Shelton State Community College | 13.2% | 8% | 1 | 12 | 28% | 8 | 29 | 14% | 10 | 74 |
| Snead State Community College | 0.75% | 0% | 0 | 4 | 0% | 0 | 6 | 3% | 1 | 32 |
| Southern Union State Community College | 10.5% | 0% | 0 | 8 | 0% | 0 | 15 | 3% | 2 | 74 |
| Trenholm State Technical College | 15.3% | 40% | 2 | 5 | 58% | 11 | 19 | 56% | 19 | 34 |
| Wallace Community College-Dothan | 8.2% | 8% | 1 | 12 | 21% | 6 | 28 | 3% | 4 | 128 |
| Wallace State Community College-Hanceville | 0.5% | 0% | 0 | 5 | 13% | 1 | 8 | 0% | 0 | 123 |
| Wallace State Community College-Selma | 13.7% | 33% | 1 | 3 | 0% | 0 | 0 | 11% | 5 | 46 |
| SYSTEM TOTAL | | 14% | 26 | 183 | 19% | 82 | 432 | 12% | 223 | 1793 |

EMANUEL--0184--PLF DOX

SHUFORD GOALS FOR APPOINTMENT OF WOMEN

B, C1, C2, C3, AND D
By end of Fall Quarter 2005 - 50% of the total number employed at each college on each of the above salary schedules.

## As of September 15, 2001

| College | ACTUAL % OF B | ACTUAL # OF B | TOTAL # STAFF ON B | ACTUAL % OF C1 | ACTUAL # OF C1 | TOTAL # STAFF ON C1 | ACTUAL % OF C2 | ACTUAL # C2 | TOTAL # STAFF ON C2 | ACTUAL % OF C3 | ACTUAL # OF C3 | TOTAL # STAFF ON C3 | ACTUAL % OF D | ACTUAL # OF D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama Southern Community College | 40% | 2 | 5 | 100% | 2 | 2 | 0% | 0 | 0 | 80% | 16 | 20 | 55% | 22 |
| Ayers State Technical College | 33% | 1 | 3 | 0% | 0 | 0 | 100% | 1 | 1 | 73% | 11 | 15 | 41% | 12 |
| Bessemer State Technical College | 50% | 1 | 2 | 0% | 0 | 0 | 67% | 2 | 3 | 33% | 4 | 12 | 51% | 24 |
| Bevill State Community College | 25% | 1 | 4 | 57% | 4 | 7 | 33% | 1 | 3 | 70% | 31 | 44 | 46% | 43 |
| Bishop State Community College | 25% | 1 | 4 | 38% | 3 | 8 | 50% | 2 | 4 | 54% | 7 | 13 | 56% | 66 |
| Calhoun Community College | 67% | 2 | 3 | 60% | 3 | 5 | 25% | 2 | 8 | 36% | 5 | 14 | 53% | 70 |
| Central Alabama Community College | 67% | 2 | 3 | 67% | 2 | 3 | 0% | 0 | 1 | 33% | 2 | 6 | 49% | 23 |
| Chattahoochee Valley Community College | 100% | 1 | 1 | 0% | 0 | 0 | 0% | 0 | 0 | 57% | 4 | 7 | 68% | 17 |
| Drake State Technical College | 0% | 0 | 1 | 0% | 0 | 3 | 60% | 3 | 5 | 100% | 1 | 1 | 50% | 10 |
| Enterprise State Junior College | 33% | 1 | 3 | 67% | 2 | 3 | 50% | 1 | 2 | 86% | 6 | 7 | 64% | 29 |
| Faulkner State Community College | 50% | 2 | 4 | 100% | 2 | 2 | 0% | 0 | 3 | 70% | 7 | 10 | 52% | 29 |
| Gadsden State Community College | 50% | 2 | 4 | 50% | 6 | 12 | 43% | 3 | 7 | 80% | 4 | 5 | 63% | 96 |
| Ingram State Technical College | 33% | 1 | 3 | 50% | 1 | 2 | 0% | 0 | 3 | 100% | 1 | 1 | 26% | 13 |
| Jefferson Davis Community College | 0% | 0 | 4 | 100% | 1 | 1 | 75% | 3 | 4 | 67% | 4 | 6 | 46% | 21 |
| Jefferson State Community College | 50% | 3 | 6 | 71% | 5 | 7 | 25% | 1 | 4 | 59% | 23 | 39 | 63% | 69 |
| Lawson State Community College | 67% | 2 | 3 | 67% | 4 | 6 | 50% | 1 | 2 | 75% | 3 | 4 | 59% | 34 |
| Lurleen B. Wallace Junior College | 0% | 0 | 1 | 100% | 6 | 6 | 100% | 1 | 1 | 67% | 2 | 3 | 57% | 13 |
| MacArthur State Technical College | 100% | 2 | 2 | 0% | 0 | 0 | 0% | 0 | 0 | 56% | 5 | 9 | 62% | 16 |
| Northeast Alabama Community College | 0% | 0 | 3 | 100% | 1 | 1 | 0% | 0 | 1 | 78% | 7 | 9 | 53% | 16 |
| Northwest-Shoals Community College | 40% | 2 | 5 | 100% | 2 | 2 | 33% | 2 | 6 | 59% | 17 | 29 | 50% | 38 |
| Patterson State Technical College | 33% | 1 | 3 | 0% | 0 | 1 | 0% | 0 | 0 | 50% | 3 | 6 | 32% | 11 |
| Reid State Technical College | 100% | 1 | 1 | 0% | 0 | 0 | 83% | 5 | 6 | 100% | 3 | 3 | 58% | 14 |
| Shelton State Community College | 33% | 1 | 3 | 78% | 7 | 9 | 0% | 0 | 0 | 58% | 14 | 24 | 58% | 43 |
| Snead State Community College | 0% | 0 | 3 | 100% | 1 | 1 | 0% | 0 | 1 | 80% | 4 | 5 | 56% | 18 |
| Southern Union State Community College | 50% | 2 | 4 | 75% | 3 | 4 | 0% | 0 | 3 | 50% | 6 | 12 | 66% | 50 |
| Trenholm State Technical College | 50% | 2 | 4 | 100% | 1 | 1 | 75% | 3 | 4 | 80% | 12 | 15 | 65% | 22 |
| Wallace Community College-Dothan | 40% | 4 | 10 | 50% | 1 | 2 | 0% | 0 | 0 | 75% | 21 | 28 | 44% | 56 |
| Wallace State Community College-Hanceville | 100% | 3 | 3 | 100% | 2 | 2 | 100% | 1 | 1 | 43% | 3 | 7 | 60% | 74 |
| Wallace State Community College-Selma | 67% | 2 | 3 | 0% | 0 | 0 | 0% | 0 | 0 | 67% | 8 | 12 | 48% | 22 |
| SYSTEM TOTAL | 43% | 42 | 98 | 63% | 52 | 83 | 41% | 32 | 78 | 64% | 234 | 366 | 54% | 971 |

EMANUEL--0185--PLF DOX

| TOTAL #<br>STAFF ON<br>D |
|---|
| 40 |
| 29 |
| 47 |
| 94 |
| 117 |
| 132 |
| 47 |
| 25 |
| 20 |
| 45 |
| 58 |
| 153 |
| 50 |
| 46 |
| 110 |
| 58 |
| 23 |
| 26 |
| 30 |
| 76 |
| 34 |
| 24 |
| 74 |
| 32 |
| 74 |
| 34 |
| 128 |
| 123 |
| 46 |
| 1793 |

EMANUEL--0186--PLF DOX

## 2002-2003 ANNUAL REPORT
## KENNEDY (FORMERLY SHUFORD), ET AL., V. ALABAMA STATE BOARD OF EDUCATION, ET AL.
## CIVIL ACTION NUMBER 89-T-196-N

### Introduction

This is the ninth annual report in the above matter, the eighth full year of operation under the *Kennedy (formerly known as Shuford)* Partial Consent Decree (approved in March of 1994) involving race based relief, and the seventh full year of operation under the *Johnson* Partial Consent Decree (approved in August of 1995) involving gender based relief. In accordance with the Uniform Guidelines established in April 2000, a training session was held on March 5 - 7, 2003 for all college Human Resources professionals. The purpose of this training session was to reinforce the importance of following the guidelines and to discuss new ideas and strategies for recruitment. Also, pursuant to the Uniform Guidelines, the Monitor conducted audits of all colleges during the 2002-2003 report year. The Monitor also held quarterly meetings with representatives of Plaintiffs' counsel to discuss issues relating to the enforcement of the Partial Consent Decrees.

### Efforts of the Alabama Department of Postsecondary Education

The Department has the responsibility for implementation and monitoring of compliance with the requirements of both Partial Consent Decrees. The Department continues to provide services both to the Alabama College System institutions and to the members of the Applicant Pool in order to increase the number of individuals who receive notices of System vacancies and to provide a broad base of applicants for those vacancies. The Department engages in the following activities:

1. Operates a telephone information "Job Line" in the Division of Legal and Human Resources, providing callers with information on all vacancies within the Alabama College System;

2. Updates annually information on members of the Applicant pool, making necessary changes in addresses and credentials for the database;

3. Provides pre-printed address labels of Applicant Pool members to colleges, so that pool members can receive vacancy announcements in a timely meaner;

4. Publishes and distributes a Job Newsletter, listing current vacancies within the System;

5. Places advertisements in national publications, seeking additions to the Applicant Pool;

6. Posts job vacancy notices on the Alabama College System web site at www.acs.cc.al.us; and

7. Allows individuals desiring to become members of the Applicant Pool to apply online at the web site.

Further, the Defendants have engaged in other activities that will have an effect on the number of applications from blacks and women  During the 2002-2003 report year, the Defendants engaged in the following activities:

1. Participated in the National Diversity Conference entitled *Dynamics of Diversity: Using Uniqueness As A Strategic Advantage*, sponsored by the Alabama College System Human Resources Management Association on September 17-18, 2003 (see attachment);

2. Participated as a member in the Black Collegiate Services – IMDiversity Job Bank, which is dedicated to providing career, job, and self-development information to members of minority groups. It features the African-American village, the Asian-American village, the Hispanic-American village, the Native-American village, the Women's village, and the Minorities Global village. As a member, we post Alabama College System vacancies, have access to the Resume Database, have listing in the Director of Employers, and have an Employer Profile with the System logo and hyperlink to our Home page;

3. Participated in the Alabama Community College Leadership Academy hosted by the University of Alabama;

4. Encouraged a President or designee from each college to attend the National Conference of the National Multicultural Institute in June, 2003;

5. Placed Shuford advertisement in the AEA Journal.

As of September 15, 2003, the Applicant Pool contained a total of 1201 records, an increase of 15.9 percent from last year's total of 1036 records. During the 2002-2003 report year, the Department excluded white men from the Applicant Pool. Approximately 50.0 percent of Applicant Pool members are black; 26.8 percent are white; and the races of 18.7 percent of Applicant Pool members are unknown/other. Approximately 69.0 percent of Applicant Pool members are women. By race and gender, Applicant Pool members are as follows: 26.8 percent white women, 33.9 percent black women; and 15.7 percent black men. The races of 69 women and 135 men are unknown/other. Twenty individuals declined to provide information on either race or gender. Approximately 74.4 percent of individuals in the Applicant Pool reside within the State of Alabama.

**Presidential Vacancies**

There were one (1) continuing presidential vacancies at Alabama College System institutions during the 2002-2003 report year: Southern Union State Community College. Dr. Joanne Jordan (a white female) continues to serve as interim president at Southern Union State Community College.

There were four (4) Alabama College System institutions that conducted presidential searches during the 2002-2003 report year: Calhoun Community College, Chattahoochee Valley Community College, Snead State Community College, and Wallace State Community College - Hanceville. The following individuals served as interim/acting presidents during the presidential searches at the respective colleges: Dr. Theresa Hamilton (a white female) served as Interim President at Calhoun Community College from August 1, 2002 to December 31, 2002; Dr. Laurel Blackwell (a white female) served as Acting President at Chattahoochee Valley Community College from July 1, 2002 to August 31, 2003; Dr. Devin Stephenson (a white male) served as Acting President at Snead State Community College from July 2002, to June 30, 2003; and Dr. Allen Champion (a white male) served as Acting President at Wallace State Community College – Hanceville from May 1, 2003 to August 31, 2003.

A search was conducted at the four (4) Alabama College System institutions pursuant to the State Board of Education policy 203.01. The Department of Postsecondary Education created a color brochure describing the college and announcing the vacancy at the institution. The vacancy announcement appeared in the following publications:

| | |
|---|---|
| Chronicle of Higher Education | Mobile Register |
| Affirmative Action Register | Huntsville Times |
| Community College Times | Black Issues in Higher Education |
| Alabama School Journal | Women in Higher Education |
| Birmingham News | Community College Week |
| Montgomery Advertiser | Hispanic Outlook |
| Higheredjobs.com | |

In addition, each vacancy announcement appeared in local newspapers.

During the presidential search for Calhoun Community College, the color brochure was mailed to 570 members of the National Institute for Leadership Development (predominantly female members), to 92 members of the Presidents' Roundtable, to 30 colleges, and to 20 other individuals requesting applications, and to 93 agencies of postsecondary education across the United States. A vacancy announcement was mailed to 255 Applicant Pool members. A total of 53 individuals submitted completed application packages. Of that number, sixteen (16) were members of the Applicant Pool. Dr. Marilyn Beck (a white female) was recommended by the Chancellor and appointed by the State Board of Education as President of Calhoun Community College, effective January 24, 2003.

During the presidential search for Chattahoochee Valley Community College, the color brochure was mailed to 28 colleges, and to 6 other individuals requesting applications, and to 93 agencies of postsecondary education across the United States. A vacancy announcement was mailed to 239 Applicant Pool members. A total of 55 individuals submitted completed application packages. Of that number, thirteen (13) were members of the Applicant Pool. Dr. Laurel Blackwell (a white female) was recommended by the Chancellor and appointed by the State Board of Education as President of Chattahoochee Valley Community College, effective September 1, 2003.

During the presidential search for Snead State Community College, the color brochure was mailed to 28 colleges, and to 7 other individuals requesting applications, and to 93 agencies of postsecondary education across the United States. A vacancy announcement was mailed to 239 Applicant Pool members. A total of 52 individuals submitted completed application packages. Of that number, thirteen (13) were members of the Applicant Pool. Dr. Devin

Stephenson (a white male) was recommended by the Chancellor and appointed by the State Board of Education as President of Snead State Community College, effective July 1, 2003.

During the presidential search for Wallace State Community College - Hanceville, the color brochure was mailed to 30 colleges, and to 4 other individuals requesting applications, and to 93 agencies of postsecondary education across the United States. A vacancy announcement was mailed to 249 Applicant Pool members. A total of 49 individuals submitted completed application packages. Of that number, nine (9) were members of the Applicant Pool. Dr. Vicki Hawsey (a white female) was recommended by the Chancellor and appointed by the State Board of Education as President of Calhoun Community College, effective September 1, 2003.

### Progress Toward Goals on Salary Schedules B, C, and D

Black Persons. The goals for appointment of black person on Salary Schedules B & C1, C2 & C3, and D are 25 percent by Fall 1999. Data as of September 15, 2003 shows that of 207 total employees on Salary Schedules B and C1, 51 (24.6 percent) are black. On Salary Schedules C2 and C3, 153 of 508 total employees (30.1 percent) are black. On Salary Schedule D 377 of 1884 total employees (20.0 percent) are black. Defendants continue to meet or exceed their goals on Salary Schedules C2 & C3. Defendants continue their extensive efforts in meeting the goals for Salary Schedules B, C1 and D.

Women. The goals for appointment of women on Salary Schedules B, C1, C2, C3 and D are 33 percent by Fall 1999 and 50 percent by Fall 2005. On Salary Schedule B, 47 of 101 employees (46.5 percent) are women. On Salary Schedule C1, 56 of 105 employees (53.0 percent) are women. On Salary Schedule C2, 23 of 71 employees (32.0 percent) are women. On Salary Schedule C3, 279 of 441 employees (63.0 percent) are women. On Salary Schedule D, 1050 of 1884 employees (56.0 percent) are women. On Salary Schedules B, C1, C2 and D, Defendants continue to meet and exceed the goals set for Fall 1999. On Salary Schedule C1, C3 and D, Defendants have exceeded the goals for women set for Fall 2005.

Black Women. The goals for appointment of black women on Salary Schedules B & C1, C2 & C3, and D are roughly one-half of the goals set for blacks, or 12.5 percent by Fall 1999. As of September 15, 2003, there were 206 employees on Salary Schedules B & C1, 512

employees on Salary Schedules C2 & C3, and 1884 employees on Salary Schedule D. There were 15 black women (15.0 percent) on Salary Schedule B & C1, 206 black women (19.3 percent) on Salary Schedules C2 & C3, and 237 black women (12.6 percent) on Salary Schedule D. Defendants continue to exceed the goal for black women on Salary Schedules B, C1, C2 and C3 and D.

## Conclusion

Defendants will continue their extensive efforts to recruit and hire qualified black persons, women, and black women. The Alabama State Board of Education, the Chancellor, the Alabama Department of Postsecondary Education, and the institutions of the Alabama College System remain committed to compliance with these decrees. That commitment is obviously reflected in the progress made and the goals attainment already achieved throughout the System.

Other required information for this report can be found herein, including information on progress made by the Alabama College System individual institutions in meeting the established goals for black persons, women, and black women, and narrative information received from individual colleges on their progress. This report also includes detailed information and analysis on Applicant Pool members; a sample letter sent to Applicant Pool members to update information; Applicant Pool information forms; Job Newsletters; advertisements and brochures announcing the presidential vacancies.

# NARRATIVE

## 2002-2003 ANNUAL REPORT
### Shuford et al. v. Alabama State Board of Education et al.

<u>George C. Wallace Community College-Dothan</u>
(Name of College)

The progress George C. Wallace Community College (WCC) has made toward achieving goals relative to the hiring and/or appointment of blacks and women is described as follows.  Goals reflect Service Area's Black Population for Wallace Community College.

(1)  <u>GOALS RELATING TO THE APPOINTMENT OF BLACK PERSONS:</u>

    a.  The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black persons employed at each college on B and C1 Salary Schedules combined shall equal at least that number which most closely represents 75% of the percentage of black persons in the general population of the primary service area of the respective college."

        Service Area Average Black Population: 28%
        Goal: 21% (28% x 75%)
        WCC Employees on B/C1: 13
        Black Employees on B/C1: 2 (15%)

    <u>WCC IS WITHIN 6% OF REACHING ITS GOAL FOR SALARY SCHEDULES B AND C1.</u>

    b.  The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black persons employed at each college on C2 and C3 Salary Schedules combined shall equal at least that number which most closely represents 75% of the percentage of black persons in the general population of the primary service area of the respective college."

        Service Area Average Black Population: 28%
        Goal: 21% (28% x 75%)
        WCC Employees on C2/C3: 30
        Black Employees on C2/C3: 9 (30%)

    <u>WCC HAS MET ITS GOAL OF 21% FOR SALARY SCHEDULES C2 AND C3.</u>

(Page 2 of 3)

c. The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black persons employed at each college on the D Salary Schedule shall equal at least that number which most closely represents 75% of the percentage of black persons in the general population of the primary service area of the respective college."

> Service Area Average Black Population: 28%
> Goal: 21% (28% x 75%)
> WCC Employees on D: 146
> Black Employees on D: 10 (7%)

<u>WCC HAS NOT MET ITS GOAL FOR SALARY SCHEDULE D.</u>

(2)  <u>GOALS RELATING TO THE APPOINTMENT OF WOMEN:</u>

a. The Shuford Consent Decrees require that "By the end of Fall Quarter 2005, the percentage of women employed at each college on each of the B, C1, C2, C3, and D Salary Schedules, respectively, shall equal at least that number which most closely represents 50% of the total number of persons employed at each of the respective colleges on the B, C1, C2, C3, and D Salary Schedules."

| Salary Schedule | Total Number At WCC | Total/(Percentage of Women Employed) | | +/- Goal Accomplished |
|---|---|---|---|---|
| B | 10 | 4 | (40%) | -10% |
| C1 | 3 | 1 | (33%) | -17% |
| C2 | 0 | 0 | (0%) | N/A |
| C3 | 30 | 22 | (73%) | +23% |
| D | 146 | 70 | (48%) | -2% |

<u>WCC HAS EXCEEDED ITS GOAL FOR SALARY SCHEDULE C3 BUT WILL NEED TO CONTINUE TRYING TO EMPLOY WOMEN WHO ARE QUALIFIED TO FILL POSITIONS ON B, C1, AND D SALARY SCHEDULES AS VACANCIES OCCUR.</u>

EMANUEL--0194--PLF DOX

(Page 3 of 3)

(3)  <u>GOALS RELATING TO THE APPOINTMENT OF BLACK WOMEN:</u>

    a.  The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black women employed at each college on B and C1 Salary Schedules combined shall equal at least that number which most closely represents 37.5% of the percentage of black persons in the general population of the primary service area of the respective college."

        Service Area Average Black Population:  28%
        Goal:  10.5% (28% x 37.5%)
        WCC Employees on B/C1:  13
        Black Women Employees on B/C1:  1 (7.69%)

    <u>WCC HAS NOT MET ITS GOAL FOR SALARY SCHEDULES B AND C1.</u>

    b.  The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black women employed at each college on the C2 and C3 Salary Schedules combined shall equal at least that number which most closely represents 37.5% of the percentage of black persons in the general population of the primary service area of the respective college."

        Service Area Average Black Population:  28%
        Goal:  10.5% (28% x 37.5%)
        WCC Employees on C2/C3:  30
        Black Women Employees on C2/C3:  6 (20%)

    <u>WCC HAS EXCEEDED ITS GOAL FOR SALARY SCHEDULES C2 AND C3.</u>

    c.  The Shuford Consent Decrees require that "By the end of Fall Quarter 1996, the percentage of black women employed at each college on the D Salary Schedule shall equal at least that number which most closely represents 37.5% of the percentage of black persons in the general population of the primary service area of the respective college."

        Service Area Average Black Population:  28%
        Goal:  10.5% (28% x 37.5%)
        WCC Employees on D:  146
        Black Women Employees on D:  5 (4%)

    <u>WCC  HAS  NOT  MET  ITS  GOAL  FOR  SALARY  SCHEDULE  D.</u>

# WALLACE COMMUNITY COLLEGE-DOTHAN

## PERSONNEL BY SALARY SCHEDULE (A, B, C, & D)
### As of September 15, 2003

| Salary Schedule** | White (Non-Hispanic) | | | | | Black (Non-Hispanic) | | | | | Other Minorities Total | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Men | % | Women | % | Total | Men | % | Women | % | Total | Men | % | Women | % | Total |
| A | | 100 | | | | 1 | 1 | | | 100 | | | | | |
| B | 3 | 1 | 6 | 1 | 60% | 6 | 60% | 4 | | 9 | | 10% | | 40% | 1 |
| | | | | | | | | | 30% | | | | | | 10 |
| C1 | 1 | | 1 | | 33% | 1 | 33% | 1 | 60% | 2 | 33% | | | | 3 |
| | | | | | | | 67% | | | | | | | | |
| C2 | | | | | | | | | | | | | | 20% | |
| C3 | 16 | | 5 | | 17% | 3 | 27% | 6 | 10% | 21 | 3% | | 9 | | |
| | | | | | | | | | | 8 | | | | | |
| D | 76 | 44% | 71 | | 64 | 146 | 48% | 5 | | 5 | 30 | | 10 | | |
| | | | 1 | | 49% | 135 | 52% | | | 6 | | | | | |
| | | | | | 1% | 22 | | | | 73% | | | | | |
| | | | | | | 70 | | | | | | | | | |

---

**Only presidential appointments are listed on Salary Schedule A. Those appointments such as Vice President and Provost, on neither Salary Schedule A nor B, are shown with a #.

2002-2003 Annual Report
*Shuford, et al., v. Alabama State Board of Education, et al.*
Civil Action No. 89-T-196-N

EMANUEL--0196--PLF DOX

| | | | | | | |
|---|---|---|---|---|---|---|
| Coordinator of Services, Student Support Services (Sparks Campus) | C-3 | Vickie A. Williams | B | F | No | LT |
| Dean of Instructional Support Services | B | Michael Babb | W | M | No | R |
| Dean of Instructional Affairs | B | John R. Fergus | W | M | No | R |

EMANUEL–0197–PLF DOX

| Position | Code | Name | | | | |
|---|---|---|---|---|---|---|
| Dean of Business Affairs | | H. Lynn Bell | W | M | No | R |
| Dean of Instructional Affairs | B | John R. Fergus | W | M | No | R |
| Executive Assistant to the President | B | Mackie H. Jordan | W | F | No | R |
| Dean of Institutional Effectiveness | B | Eva K. Sasser | W | F | No | R |
| Biology Instructor | D-1 | Vanessa H. Martz | W | F | No | R |
| Associate Degree Practical Nursing Instructor* | D-1 | Patricia C. Janasky | W | F | No | S |
| | | Candace N. Short | W | F | No | S |

\* Originally opened February '02

| Position | Code | Name | | | | |
|---|---|---|---|---|---|---|
| Coordinator of Program Services, Student Support Services (Aviation Campus) | C-3 | Lesia R. DuBose | W | F | No | S |
| Systems/Network Administrator | C-3 | Patrick L. Adkinson | W | M | No | S |
| Physical Therapist Assistant Instructor | D-1 | Niva N. Harrison | W | F | No | S |
| Welding Instructor | D-1 | Myles E. Albritton III | W | M | No | S |
| Computer Information Science Instructor | D-1 | Roelaux D. Black | W | M W | No | S |
| | | Dennis R. Pitts | | M | No | S |
| Instructor/Instructional Technology Specialist | D-1 | No one appointed | | | | |

EMANUEL–0198--PLF DOX

| | | | | | |
|---|---|---|---|---|---|
| Director, Student Support Services, Wallace Campus | C-3 | Lisa Adams-Horsley | B | F | No | S |
| Biology Instructor | D-1 | Cynthia P. Robison | W | F | No | S |
| Physical Therapist Assistant Instructor | D-1 | No one appointed | | | | |
| Associate Degree Practical Nursing Instructor | D-1 | Pending | | | | |
| Director of Accounting And Finance | C-2 | Pending | | | | |
| Computer Information Science Instructor | D-1 | No one appointed | | | | |
| Nursing Program Clinical Associate | D-1 | Kelley M. Leonard | W | F | No | T |

2002-2003 Annual Report
*Shuford, et al., v. Alabama state Board of Education, et al.*
Civil Action No. 89-T-196-N

EMANUEL–0199–PLF DOX

WALLACE COMMUNITY COLLEGE-DOTHAN

RECRUITING AND SELECTION COMMITTEES (Salary Schedules A, B, C, & D)
September 15, 2002 - September 15, 2003

| Date Committee Appointed | Committee Members Names | Race | Gender | Vacancy For Which Committee Appointed |
|---|---|---|---|---|
| August 15, 2002 | Mike Abbott | W | M | Coordinator of Program Services, Student Support Services, Aviation Campus |
| | Mickey Baker | B | M | |
| | Debbie McCollough | W | F | |
| | Vickie Williams | B | F | |
| September 18, 2002 | Quincey Banks | B | M | Systems/Network Administrator |
| | Frank Barefield | W | M | |
| | Brenda Barnes | W | F | |
| | Tangela Washington | B | F | |
| September 23, 2002 | Gregg Grimsley | W | M | Physical Therapist Assistant |
| | Keith Saulsberry | B | M | |
| | Denise Stanford-Bowers | B | F | |
| | Priscilla Tucker | W | F | |
| September 23, 2002 | Dwight Baker | B | M | Welding Instructor |
| | Dewey Lee | W | M | |
| | Teresa Salter | W | F | |
| | Shannon Thomas | B | F | |
| October 9, 2002 | Jim Kinney | W | M | Computer Information Science Instructor (2 positions) |
| | Gary LeFan | W | M | |
| | Denise Stanford-Bowers | B | F | |
| | Shannon Thomas | B | F | |
| November 6, 2002 | Locy Baker | B | M | *Instructor/Instructional Technology Specialist |
| | Rip Ellis | W | M | |
| | Tara Estes | W | F | |
| | Denise Stanford-Bowers | B | F | |
| March 19, 2003 | Mike Babb | W | M | Director, Student Support Services, Wallace |

EMANUEL-0200-PLF DOX

EMANUEL--0201--PLF DOX

| Date | Applicant | | | Campus | Position |
|---|---|---|---|---|---|
| March 20, 2003 | Jean Dagostin | W | F | | |
| | Shannon Thomas | B | F | | |
| | Vickie Williams | B | F | | |
| | Angie Livingston | W | F | F | Biology Instructor — F |
| | Vanessa Passler | W | F | W | |
| | Keith Saulsberry | B | M | M | |
| | Denise Stanford-Bowers | B | F | F | |
| April 25, 2003 | Joey Caffee | W | M | | Physical Therapist Assistant Instructor — M |
| | Keith Saulsberry | B | M | | |
| | Denise Stanford-Bowers | B | F | | |
| | Priscilla Tucker | W | F | | |
| May 19, 2003 | Fred Ortman | W | M | M | Associate Degree/Practical Nursing Instructor — M (2 positions) |
| | Keith Saulsberry | B | M | B | |
| | Jackie Spivey | W | F | F | |
| | Mary Wiggins | B | F | F | |
| June 17, 2003 | Quincey Banks | B | M | M | *Computer Information Science Instructor |
| | Erma Perry | B | F | F | |
| | Teresa Salter | W | F | F | |
| | Lisa Sanders | W | F | F | |
| July 17, 2003 | H. Lynn Bell | W | M | M | Director of Accounting and Finance |
| | Pat Byrne | W | F | F | |
| | Peggy Hill | B | F | F | |
| | Keith Saulsberry | B | M | M | |

\* No one was selected; search will be reopened at a later date

2002-2003 Annual Report
Shuford, et al., v. Alabama State Board of Education, et al.
Civil Action No. 89-T-196-N

**2003-2004 ANNUAL REPORT**
**KENNEDY (FORMERLY SHUFORD), ET AL., V. ALABAMA STATE**
**BOARD OF EDUCATION, ET AL.**
**CIVIL ACTION NUMBER 89-T-196-N**

### Introduction

This is the tenth annual report in the above matter, the ninth full year of operation under the *Kennedy (formerly known as Shuford)* Partial Consent Decree (approved in March of 1994) involving race based relief, and the eighth full year of operation under the *Johnson* Partial Consent Decree (approved in August of 1995) involving gender based relief. In accordance with the Uniform Guidelines established in April 2000, a training session was held on April 26 -28, 2004 for all college Human Resources professionals. The purpose of this training session was to reinforce the importance of following the guidelines and to discuss new ideas and strategies for recruitment. Also, pursuant to the Uniform Guidelines, the Monitor conducted audits of all colleges during the 2003-2004 report year. The Monitor also held quarterly meetings with representatives of Plaintiffs' counsel to discuss issues relating to the enforcement of the Partial Consent Decrees.

### Efforts of the Alabama Department of Postsecondary Education

The Department has the responsibility for implementation and monitoring of compliance with the requirements of both Partial Consent Decrees. The Department continues to provide services both to the Alabama College System institutions and to the members of the Applicant Pool in order to increase the number of individuals who receive notices of System vacancies and to provide a broad base of applicants for those vacancies. The Department engages in the following activities:

1. Operates a telephone information "Job Line" in the Division of Legal and Human Resources, providing callers with information on all vacancies within the Alabama College System;

2. Updates annually information on members of the Applicant pool, making necessary changes in addresses and credentials for the database;

EMANUEL--0202--PLF DOX

3. Provides pre-printed address labels of Applicant Pool members to colleges, so that pool members can receive vacancy announcements in a timely meaner;

4. Publishes and distributes a Job Newsletter, listing current vacancies within the System;

5. Places advertisements in national publications, seeking additions to the Applicant Pool;

6. Posts job vacancy notices on the Alabama College System web site at www.acs.cc.al.us; and

7. Allows individuals desiring to become members of the Applicant Pool to apply online at the web site.

Further, the Defendants have engaged in other activities that will have an effect on the number of applications from blacks and women. During the 2003-2004 report year, the Defendants engaged in the following activities:

1. Participated in the National Diversity Conference entitled *Diversity: "Different Gifts...One Goal"*, sponsored by the Alabama College System Human Resources Management Association on September 15-16, 2004 (see attachment);

2. Participated as a member in the Black Collegiate Services – IMDiversity Job Bank, which is dedicated to providing career, job, and self-development information to members of minority groups. It features the African-American village, the Asian-American village, the Hispanic-American village, the Native-American village, the Women's village, and the Minorities Global village. As a member, we post Alabama College System vacancies, have access to the Resume Database, have listing in the Director of Employers, and have an Employer Profile with the System logo and hyperlink to our Home page;

3. Participated in the Alabama Community College Leadership Academy hosted by the University of Alabama;

4. Encouraged a President or designee from each college to attend the National Conference of the National Multicultural Institute in June, 2004;

5. Placed Shuford advertisement in the AEA Journal.

As of September 15, 2004, the Applicant Pool contained a total of 1279 records, an increase of 6.5 percent from last year's total of 1201 records. During the 2003-2004 report year, the Department excluded white men from the Applicant Pool. Approximately 49.8 percent of Applicant Pool members are black; 25.4 percent are white; and the races of 20.6 percent of Applicant Pool members are unknown/other. Approximately 68.2 percent of Applicant Pool members are women. By race and gender, Applicant Pool members are as follows: 25.4 percent white women, 34.9 percent black women; and 14.9 percent black men. The races of 76 women and 168 men are unknown/other. Nineteen individuals declined to provide information on either race or gender. Approximately 75.9 percent of individuals in the Applicant Pool reside within the State of Alabama.

**Presidential Vacancies**

There was one (1) continuing presidential vacancies at Alabama College System institutions during the 2003-2004 report year: Southern Union State Community College. Dr. Joanne Jordan (a white female) continues to serve as acting president at Southern Union State Community College.

There was one (1) Alabama College System institutions that conducted a presidential search during the 2003-2004 report year: Northwest-Shoals Community College. The following individuals served as interim president during the presidential search at the respective college: Dr. James Lowe (a black male) served at Northwest-Shoals Community College from August 29, 2003 to January 4, 2004 and Dr. Humphrey Lee (an Asian male) served at Northwest-Shoals Community College from January 5, 2004 to March 24, 2004.

A search was conducted at the one (1) Alabama College System institutions pursuant to the State Board of Education policy 203.01. The Department of Postsecondary Education created a color brochure describing the college and announcing the vacancy at the institution. The vacancy announcement appeared in the following publications:

| | |
|---|---|
| Chronicle of Higher Education | Mobile Register |
| Affirmative Action Register | Huntsville Times |
| Community College Times | Black Issues in Higher Education |

EMANUEL--0204--PLF DOX

Alabama School Journal

Birmingham News

Montgomery Advertiser

Higheredjobs.com

Women in Higher Education

Community College Week

Hispanic Outlook

In addition, each vacancy announcement appeared in local newspapers.

During the presidential search for Northwest-Shoals Community College, the color brochure was mailed to 26 colleges, and to 4 other individuals requesting applications (the application is available for download now on the Alabama College System website), and to 93 agencies of postsecondary education across the United States. A vacancy announcement was mailed to 246 Applicant Pool members. A total of 43 individuals submitted completed application packages. Of that number, thirteen (13) were members of the Applicant Pool. Dr. Humphrey Lee (an Asian male) was recommended by the Chancellor and appointed by the State Board of Education as President of Northwest-Shoals Community College, effective March 24, 2004.

### Progress Toward Goals on Salary Schedules B, C, and D

Black Persons. The goals for appointment of black person on Salary Schedules B & C1, C2 & C3, and D are 25 percent by Fall 1999. Data as of September 15, 2004 shows that of 205 total employees on Salary Schedules B and C1, 53 (25.9 percent) are black. On Salary Schedules C2 and C3, 152 of 537 total employees (28.3 percent) are black. On Salary Schedule D, 374 of 1869 total employees (20.0 percent) are black. Defendants continue to meet or exceed their goals on Salary Schedules B & C1 and C2 & C3. Defendants continue their extensive efforts in meeting the goals for Salary Schedule D.

Women. The goals for appointment of women on Salary Schedules B, C1, C2, C3 and D are 33 percent by Fall 1999 and 50 percent by Fall 2005. On Salary Schedule B, 50 of 104 employees (48.1 percent) are women. On Salary Schedule C1, 53 of 101 employees (52.5 percent) are women. On Salary Schedule C2, 29 of 78 employees (37.2 percent) are women. On Salary Schedule C3, 289 of 459 employees (63.0 percent) are women. On Salary Schedule D, 1030 of 1869 employees (55.1 percent) are women. On Salary Schedules B, C1 and C2,

Defendants continue to meet and exceed the goals set for Fall 1999. On Salary Schedule C1, C3 and D, Defendants have exceeded the goals for women set for Fall 2005.

    <u>Black Women</u>. The goals for appointment of black women on Salary Schedules B & C1, C2 & C3, and D are roughly one-half of the goals set for blacks, or 12.5 percent by Fall 1999. As of September 15, 2002, there were 205 employees on Salary Schedules B & C1, 534 employees on Salary Schedules C2 & C3, and 1869 employees on Salary Schedule D. There were 30 black women (14.6 percent) on Salary Schedule B & C1, 97 black women (18.2 percent) on Salary Schedules C2 & C3, and 229 black women (12.3 percent) on Salary Schedule D. Defendants continue to exceed the goal for black women on Salary Schedules B, C1, C2 and C3 and are approximately one percentage point away from meeting the goals for black women on Salary Schedule D.

## Conclusion

    Defendants will continue their extensive efforts to recruit and hire qualified black persons, women, and black women. The Alabama State Board of Education, the Chancellor, the Alabama Department of Postsecondary Education, and the institutions of the Alabama College System remain committed to compliance with these decrees. That commitment is obviously reflected in the progress made and the goals attainment already achieved throughout the System.

    Other required information for this report can be found herein, including information on progress made by the Alabama College System individual institutions in meeting the established goals for black persons, women, and black women, and narrative information received from individual colleges on their progress. This report also includes detailed information and analysis on Applicant Pool members; a sample letter sent to Applicant Pool members to update information; Applicant Pool information forms; Job Newsletters; advertisements and brochures announcing the presidential vacancies.

EMANUEL--0206--PLF DOX

NARRATIVE

# 2003-2004 ANNUAL REPORT
# Shuford et al. v. Alabama State Board of Education et al.

George C. Wallace Community College-Dothan

The progress George C. Wallace Community College (WCC) has made toward achieving goals relative to the hiring and/or appointment of blacks and women is described as follows. Goals reflect Service Area's Black Population for Wallace Community College.

(1)    GOALS RELATING TO THE APPOINTMENT OF BLACK PERSONS:

a.    The Shuford Consent Decrees require that by the end of Fall Quarter    1996, the percentage of black persons employed at each college on    B and C1 Salary Schedules combined shall equal at least that    number which most closely represents 75% of the percentage of    black persons in the general population of the primary service area  of the respective college.

> Service Area Average Black Population: 28%
> Goal: 21% (28% x 75%)
> WCC Employees on B/C1: 9
> Black Employees on B/C1:1 (11%)

WCC IS WITHIN 10% OF REACHING ITS GOAL FOR SALARY    SCHEDULES B AND C1.

b.    The Shuford Consent Decrees require that by the end of Fall Quarter    1996, the percentage of black persons employed at each college on    C2 and C3 Salary Schedules combined shall equal at least that    number which most closely represents 75% of the percentage of    black persons in the general population of the primary service area  of the respective college.

> Service Area Average Black Population: 28%
> Goal: 21% (28% x 75%)
> WCC Employees on C2/C3: 24
> Black Employees on C2/C3: 7 (29%)

WCC HAS MET ITS GOAL OF 21% FOR SALARY SCHEDULES C2 AND    C3.

c.    The Shuford Consent Decrees require that by the end of Fall Quarter    1996, the percentage of black persons employed at each college on    the D Salary Schedule shall

equal at least that number which most   closely represents 75% of the percentage of black persons in the       general population of the primary service area of the respective college.

> Service Area Average Black Population:  28%
> Goal: 21% (28% x 75%)
> WCC Employees on D: 122
> Black Employees on D: 9 (7%)

WCC HAS NOT MET ITS GOAL FOR SALARY SCHEDULE D.

(2)    GOALS RELATING TO THE APPOINTMENT OF WOMEN:

a.    The Shuford Consent Decrees require that by the end of Fall Quarter      2005, the percentage of women employed at each college on each      of the B, C1, C2, C3, and D Salary Schedules respectively, shall      equal at least that number which most closely represents 50% of the       total number of persons employed at each of the respective colleges      on the B, C1, C2, C3, and D Salary Schedules.

| Number Schedule | Total Total (Percentage At WCC | +/- Goal of Women Employed) | | Salary Accomplished |
|---|---|---|---|---|
| B | 7 | 3 | (43%) | -7 |
| C1 | 2 | 1 | (50%) | +50 |
| C2 | 1 | 1 | (100%) | +50 |
| C3 | 23 | 17 | (74%) | +24 |
| D | 122 | 68 | (56%) | +6 |

*AND D!*

WCC HAS EXCEEDED ITS GOAL FOR SALARY SCHEDULE C1, C2 AND      C3, BUT WILL NEED TO CONTINUE TRYING TO EMPLOY WOMEN      WHO ARE QUALIFIED TO FILL POSITIONS ON THE B SALARY SCHEDULE AS VACANCIES OCCUR.

(3)    GOALS RELATING TO THE APPOINTMENT OF BLACK WOMEN:

a.    The Shuford Consent Decrees require that by the end of Fall Quarter      1996, the percentage of black women employed at each college on      B and C1 Salary Schedules combined shall equal at least that       number which most closely represents 37.5% of the

percentage of        black persons in the general population of the primary service area  of the respective college

>Service Area Average Black Population: 28%
>Goal: 10.5% (28% x 37.5%)
>WCC Employees on B/C1: 9
>Black Women Employees on B/C1: 1 (11%)

WCC HAS MET ITS GOAL FOR SALARY SCHEDULES B AND C1.

b.    The Shuford Consent Decrees require that by the end of Fall Quarter        1996, the percentage of black women employed at each college on                    the C2 and C3 Salary Schedules combined shall equal at least that                    number which most closely represents 37.5% of the percentage of            black persons in the general population of the primary service area            of the respective college.

>Service Area Average Black Population: 28%
>Goal: 10.5% (28% x 37.5 %)
>WCC Employees on C2/C3: 24
>Black Women Employees on C2/C3: 4 (17%)

WCC HAS EXCEEDED ITS GOAL FOR SALARY SCHEDULES C2 AND  C3.

c.    The Shuford Consent Decrees require that by the end of Fall Quarter        1996, the percentage of black women employed at each college on                    the D Salary Schedule shall equal at least that number which most            closely represents 37.5% of the percentage of black persons in the                    general population of the primary service area of the respective            college.

>Service Area Average Black Population: 28%
>Goal: 10.5% (28% x 37.5%)
>WCC Employees on D: 122
>Black Women Employees on D: 4 (3%)

WCC HAS NOT MET ITS GOAL FOR SALARY SCHEDULE D.

EMANUEL--0209--PLF DOX

EMANUEL--0210--PLF DOX

**PERSONNEL BY SALARY SCHEDULE (A, B, C1, C2, C3, D)**
As of September 15, 2004

| Salary Schedule** | White (non-hispanic) | | | | | Black (non-hispanic) | | | | | Other Minorities | | | | | Total | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Men | % | Women | % | Total | Men | % | Women | % | Total | Men | % | Women | % | Total | Men | % | Women | % | Total |
| A | 0 | 0% | 1 | 100% | 1 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 1 | 100% | 1 |
| B | 4 | 67% | 2 | 33% | 6 | 0 | 0% | 1 | 100% | 1 | 0 | 0% | 0 | 0% | 0 | 4 | 57% | 3 | 43% | 7 |
| C1 | 1 | 50% | 1 | 50% | 2 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 0 | 0% | 0 | 1 | 50% | 1 | 50% | 2 |
| C2 | 0 | 0% | 1 | 100% | 1 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 0 | 0% | 0 | 0 | 0% | 1 | 100% | 1 |
| C3 | 4 | 25% | 12 | 75% | 16 | 3 | 43% | 4 | 57% | 7 | 0 | 0% | 0 | 0% | 0 | 7 | 30% | 16 | 70% | 23 |
| D | 49 | 43% | 64 | 57% | 113 | 5 | 56% | 4 | 44% | 9 | 0 | 0% | 0 | 0% | 0 | 54 | 44% | 68 | 56% | 122 |

** Only presidential appointments are listed on Salary Schedule A  Those appointments such as Vice President and Provost.
on neither Salary Schedule A nor B are shown with a #

2003-2004 Annual Report
*Shuford, et al., Alabama State Board of Education*
Civil Action No. 89-T-196-N

**WALLACE COMMUNITY COLLEGE-DOTHAN**

VACANT POSITIONS FILLED (Salary Schedules A, B, C, & D)
September 15. 2003 - September 15, 2004

| Position Title | Salary Schedule | Name | Race | Gender | Search | Temporary Appt. | Reorganization | Lateral Transfer | Member of the Applicant Pool? Yes/No |
|---|---|---|---|---|---|---|---|---|---|
| Executive Assistant to the President | B | Sasser, Eva K | W | F | | | X | | No |
| Dean of Student Affairs and Sparks | B | Screws. Jacqueline B. | B | F | | | X | | No |
| Dean of Student Development and | B | Shope, Mark L. | W | M | | | X | | No |
| Director of Accounting and Finance | C-2 | McGowan, Gloria | W | F | X | | | | No |
| Director of Fort Rucker Center | C-3 | Davis, Kathleen L | W | F | | X | | | No |
| AS400 Programmer/Systems Admin | C-3 | Free, H. Gordon | W | M | X | | | | No |
| Director of Maintenance | C-3 | Sizemore, Lamar T. | W | M | X | | | | No |
| Counselor, Upward Bound (Sparks C | C-3 | Stokes. Nina H | W | F | X | | | | No |
| Associate Degree Nursing/Licensed | D-1 | Clifford-Robinson. Kathy | W | F | X | | | | No |
| Accounting Instructor | D-1 | Cook, Sharon F. | W | F | X | | | | No |
| English Instructor | D-1 | Dixon, Hope C | W | F | X | | | | No |
| Associate Degree Nursing/Licensed | D-1 | Hartzog, Glenna D. | W | F | X | | | | No |
| Computer Information Science Instr | D-1 | McCallister. Thomas A | W | M | X | | | | No |
| Business & Office Information Proce | D-1 | Mims. Paula C | W | F | X | | | | Yes |
| Associate Degree Nursing/Licensed | D-1 | Mitchell, Celia L | W | F | X | | | | No |
| Psychology Instructor | D-1 | Payne. David K. | W | M | X | | | | No |
| Psychology Instructor | D-1 | Reeder. Leslie S | W | F | X | | | | No |
| English Instructor | D-1 | Ross, Bradley W. | W | M | X | | | | No |
| Associate Degree Nursing/Licensed | D-1 | Salter. Gail W | W | F | X | | | | No |
| English Instructor | D-1 | Smith, Brandi C | W | F | X | | | | No |
| Welding Instructor | D-1 | Ward. Andre L | B | M | X | | | | No |
| Associate Degree Nursing/Licensed | D-1 | Williams, Carol M | W | F | X | | | | No |

2003-2004 Annual Report
*Shuford, et al , v  Alabama State Board of Education. et al.*

EMANUEL--0211--PLF DOX

*WALLACE COMMUNITY COLLEGE-DOTHAN*

**RECRUITING AND SELECTION COMMITTEES ( Salary Schedules A, B, C, & D)**
September 15, 2003 - September 15, 2004

| Date Appointed | Names | Race | Gender | Vacancy For Which Appointed |
|---|---|---|---|---|
| 2/23/2003 | Quincey Banks | B | M | English Instructor |
| | Denise Padgett | W | F | |
| | Erma Perry | B | F | |
| | Linda York | W | F | |
| 2/23/2003 | Vanessa Dickens | B | F | Computer Information Science Instructor |
| | Jim Kinney | W | M | |
| | Donna Petty | W | F | |
| | Keith Saulsberry | B | M | |
| 5/19/2003 | Fred Ortman | W | M | Associate Degree Nursing/Practical Nursing Instructors |
| | Keith Saulsberry | B | M | |
| | Jackie Spivey | W | F | |
| | Mary Wiggins | B | F | |
| 8/20/2003 | Jeanette Baxley | W | F | Counselor, Upward Bound |
| | Earl Bynum | B | M | |
| | Linda Watson | W | F | |
| | Vickie Williams | B | F | |
| 9/23/2003 | Wanda Austin | W | F | AS/400 Programmer/Systems Analyst |
| | Shaletha Barnes | B | F | |
| | Jim Kinney | W | M | |
| | Erma Perry | B | F | |
| | Bill Roberts | W | M | |
| 10/1/2003 | Vanessa Dickens | B | F | Physical Therapist Assistant Instructor |
| | Greg Grimsley | W | M | NO ONE APPOINTED |
| | Priscilla Tucker | W | F | |
| | Mary Wiggins | B | F | |
| 10/14/2003 | Vanessa Dickens | B | F | Biology Instructor |
| | Tony Holland | W | M | NO ONE APPOINTED |
| | Vanessa Passler | W | F | |
| | Keith Saulsberry | B | M | |
| 10/14/2003 | Frank Barefield | W | M | Distance Education Instructor |
| | Vanessa Dickens | B | F | NO ONE APPOINTED |
| | Angel Lynk | B | F | |
| | Robert Speed | W | M | |
| | Shannon Thomas | B | F | |
| 11/10/2003 | Quincey Banks | B | M | Business & Office Information Processing Instructor |
| | Peggy Hill | B | F | |
| | Earl Jernigan | W | M | |
| | Teresa Salter | W | F | |
| 11/13/2003 | Shaletha Barnes | B | F | Director of Plant Maintenance |
| | George Baxter | B | M | NO ONE APPOINTED |
| | H Lynn Bell | W | M | |
| | Mary Sue Ray | W | F | |
| 1/5/2004 | Gwyn Galloway | W | F | Director of Ft. Rucker Center |
| | Keith Saulsberry | B | M | NO ONE APPOINTED |
| | Shannon Thomas | B | F | |
| | Cornelia Turner | W | F | |
| 2/23/2004 | Earl Bynum | B | M | Accounting Instructor |
| | Earl Jernigan | W | M | |

EMANUEL--0212--PLF DOX

| Date | Name | | | Position |
|---|---|---|---|---|
| | Lisa Sanders | W | F | |
| | Vickie Williams | B | F | |
| 2/23/2004 | Bates Gilmore | W | M | Physical Therapist Assistant Instructor |
| | Keith Saulsberry | B | M | NO ONE APPOINTED |
| | Denise Standord-Bowers | B | F | |
| | Priscilla Tucker | W | F | |
| 3/17/2004 | H Lynn Bell | W | M | Director of Maintenance (Search Reopened) |
| | Tommie Gatewood | B | F | |
| | Elizabeth Livings | W | F | |
| | Denise Standford-Bowers | B | F | |
| 5/11/2004 | Bruce Adams | W | M | Coordinator for Non-Credit Training |
| | Evonne Bennett | B | F | NO ONE APPOINTED |
| | Janet Ormond | W | F | |
| | Shannon Thomas | B | F | |
| 5/19/2004 | Ralph Purvis | W | M | Psychology Instructors (2 Positions) |
| | Denise Standford-Bowers | B | F | |
| | Christie Suggs | W | F | |
| | Shannon Thomas | B | F | |
| 5/19/2004 | Drucie Brown | W | F | English Instructors (2 Positions) |
| | Denise Padgett | W | F | |
| | Quincey Banks | B | M | |
| | Dorothy Hawkins | B | F | |
| 6/3/2004 | Dwight Baker | B | M | Welding Instructor |
| | Quincey Banks | B | M | |
| | Billie Bush | W | F | |
| | Mary Morris | B | F | |
| 7/21/2004 | Gwyn Galloway | W | F | Associate Degree Nursing/Licensed Practical |
| | Fred Ortman | W | M | Nursing Instructors (3 Positions) |
| | Keith Saulsberry | B | M | |
| | Shannon Thomas | B | F | |

2003-2004 Annual Report
*Shuford, et al . v. Alabama State Board of Education, et al*
Civil Action No  89-T-196-N

EMANUEL--0213--PLF DOX

## 2004-2005 ANNUAL REPORT
## KENNEDY (FORMERLY SHUFORD), ET AL., V. ALABAMA STATE
## BOARD OF EDUCATION, ET AL.
## CIVIL ACTION NUMBER 89-T-196-N

### Introduction

This is the ~~ninth~~ eleventh annual report in the above matter, the tenth full year of operation under the *Kennedy (formerly known as Shuford)* Partial Consent Decree (approved in March of 1994) involving race based relief, and the ninth full year of operation under the *Johnson* Partial Consent Decree (approved in August of 1995) involving gender based relief. In accordance with the Uniform Guidelines established in April 2000, a training session was held on May 4 – 6, 2005 for all college Human Resources professionals. The purpose of this training session was to reinforce the importance of following the guidelines and to discuss new ideas and strategies for recruitment. Also, pursuant to the Uniform Guidelines, the Monitor conducted audits of all colleges during the 2004-2005 report year. The Monitor also held meetings with representatives of Plaintiffs' counsel to discuss issues relating to the enforcement of the Partial Consent Decrees.

### Efforts of the Alabama Department of Postsecondary Education

The Department has the responsibility for implementation and monitoring of compliance with the requirements of both Partial Consent Decrees. The Department continues to provide services both to the Alabama College System institutions and to the members of the Applicant Pool in order to increase the number of individuals who receive notices of System vacancies and to provide a broad base of applicants for those vacancies. The Department engages in the following activities:

1. Updates annually information on members of the Applicant pool, making necessary changes in addresses and credentials for the database;

2. Provides pre-printed address labels of Applicant Pool members to colleges, so that pool members can receive vacancy announcements in a timely meaner;

3. Publishes and distributes a Job Newsletter, listing current vacancies within the System;

4. Places advertisements in national publications, seeking additions to the Applicant Pool;

5. Posts job vacancy notices on the Alabama College System web site at www.acs.cc.al.us; and

6. Allows individuals desiring to become members of the Applicant Pool to apply online at the web site.

Further, the Defendants have engaged in other activities that will have an effect on the number of applications from blacks and women. During the 2004-2005 report year, the Defendants engaged in the following activities:

1. Participated in the National Diversity Conference entitled *Diversity – It's All About Respect "*, sponsored by the Alabama College System Human Resources Management Association on September 14-15, 2005 (see attachment);

2. Participated as a member in the Black Collegiate Services – IMDiversity Job Bank, which is dedicated to providing career, job, and self-development information to members of minority groups. It features the African-American village, the Asian-American village, the Hispanic-American village, the Native-American village, the Women's village, and the Minorities Global village. As a member, we post Alabama College System vacancies, have access to the Resume Database, have listing in the Director of Employers, and have an Employer Profile with the System logo and hyperlink to our Home page;

3. Participated in the Alabama Community College Leadership Academy hosted by the University of Alabama;

4. Encouraged a President or designee from each college to attend the National Conference of the National Multicultural Institute in June, 2005;

5. Placed Shuford advertisement in the AEA Journal.

As of September 15, 2005, the Applicant Pool contained a total of 805 records, a decrease of 58 percent from last year's total of 1279 records.[1] During the 2004-2005 report year, the

---

[1] During the 2004 – 2005 report year, an Applicant Pool survey was conducted. This survey resulted in address changes, deletion of Applicant Pool members who were no longer interested, and updating of Applicant Pool member information. A copy of the survey is provided. This is the reason that the number of Applicant Pool members decreased dramatically during this past year.

Department excluded white men from the Applicant Pool. Approximately 53.7 percent of Applicant Pool members are black; 37.5 percent are white; and the races of 8.8 percent of Applicant Pool members are unknown/other. Approximately 81.5 percent of Applicant Pool members are women. By race and gender, Applicant Pool members are as follows: 37.5 percent white women, 40.0 percent black women; and 13.7 percent black men. The races of 15 women and 11 men are unknown/other. Ten individuals declined to provide information on either race or gender. Approximately 91.3 percent of individuals in the Applicant Pool reside within the State of Alabama.

**Presidential Vacancies**

There was one (1) continuing presidential vacancy at Alabama College System institutions during the 2004-2005 report year: Southern Union State Community College. Dr. Joanne Jordan (a white female) continues to serve as acting president at Southern Union State Community College.

There were no Alabama College System institutions that conducted a presidential search during the 2004-2005 report year.

**Progress Toward Goals on Salary Schedules B, C, and D**

Black Persons. The goals for appointment of black person on Salary Schedules B & C1, C2 & C3, and D are 25 percent by Fall 1999. Data as of September 15, 2005 shows that of 218 total employees on Salary Schedules B and C1, 56 (25.7 percent) are black. On Salary Schedules C2 and C3, 162 of 562 total employees (28.8 percent) are black. On Salary Schedule D, 392 of 1887 total employees (20.8 percent) are black. Defendants continue to meet or exceed their goals on Salary Schedules B & C1 and C2 & C3. Defendants continue their extensive efforts in meeting the goals for Salary Schedule D.

Women. The goals for appointment of women on Salary Schedules B, C1, C2, C3 and D are 33 percent by Fall 1999 and 50 percent by Fall 2005. On Salary Schedule B, 55 of 112 employees (49.1 percent) are women. On Salary Schedule C1, 52 of 106 employees (49.1 percent) are women. On Salary Schedule C2, 36 of 84 employees (42.8 percent) are women. On Salary Schedule C3, 303 of 478 employees (63.4 percent) are women. On Salary Schedule D, 1087 of 1887 employees (57.6 percent) are women. On Salary Schedule C3 and D, Defendants

have exceeded the goals for women set for Fall 2005. Defendants are approximately one percentage point away from meeting the goals for women on Salary Schedule B, C1, and C2.

Black Women. The goals for appointment of black women on Salary Schedules B & C1, C2 & C3, and D are roughly one-half of the goals set for blacks, or 12.5 percent by Fall 1999. As of September 15, 2005, there were 218 employees on Salary Schedules B & C1, 562 employees on Salary Schedules C2 & C3, and 1887 employees on Salary Schedule D. There were 30 black women (13.8 percent) on Salary Schedule B & C1, 109 black women (19.4 percent) on Salary Schedules C2 & C3, and 252 black women (13.4 percent) on Salary Schedule D. Defendants continue to exceed the goal for black women on Salary Schedules B, C1, C2 and C3 and D.

## Conclusion

Defendants will continue their extensive efforts to recruit and hire qualified black persons, women, and black women. The Alabama State Board of Education, the Chancellor, the Alabama Department of Postsecondary Education, and the institutions of the Alabama College System remain committed to compliance with these decrees. That commitment is obviously reflected in the progress made and the goals attainment already achieved throughout the System.

Other required information for this report can be found herein, including information on progress made by the Alabama College System individual institutions in meeting the established goals for black persons, women, and black women, and narrative information received from individual colleges on their progress. This report also includes detailed information and analysis on Applicant Pool members; a sample letter sent to Applicant Pool members to update information; Applicant Pool information forms; Job Newsletters; advertisements and brochures announcing the presidential vacancies.

# SHUFORD GOALS FOR APPOINTMENT OF BLACKS

1) By end of FallQuarter 1999, B and C1 combined - 37.5% of the percentage of black persons in the general population of the primary service area of each college
2) By end of FallQuarter 1999, C2 and C3 combined - 37.5% of the percentage of black persons in the general population of the primary service area of each college
3) By end of FallQuarter 1999, D - 37.5% of the percentage of black persons in the general population of the primary service area of each college

## As of September 15, 2005

| College | Shuford % (37.5% of Black SVC Area) | ACTUAL % OF B & C1 COMBINED | ACTUAL # B & C1 COMBINED | TOTAL # OF STAFF ON B & C1 COMBINED | ACTUAL % OF C2 & C3 COMBINED | ACTUAL # C2 & C3 COMBINED | TOTAL # OF STAFF ON C2 & C3 COMBINED | ACTUAL % OF D | ACTUAL # OF D | TOTAL # OF STAFF ON D |
|---|---|---|---|---|---|---|---|---|---|---|
| Alabama Southern Community College | 17.6% | 25% | 2 | 8 | 45% | 14 | 31 | 31% | 17 | 55 |
| Bevill State Community College | 4.4% | 9% | 1 | 11 | 12% | 7 | 60 | 6% | 7 | 116 |
| Bishop State Community College | 11.6% | 89% | 8 | 9 | 81% | 13 | 16 | 59% | 67 | 113 |
| Calhoun Community College | 7.1% | 30% | 3 | 10 | 35% | 8 | 23 | 17% | 22 | 133 |
| Central Alabama Community College | 12.7% | 0% | 0 | 6 | 17% | 2 | 12 | 14% | 4 | 29 |
| Chattahoochee Valley Community College | 13.8% | 0% | 0 | 2 | 11% | 1 | 9 | 29% | 9 | 31 |
| Drake State Technical College | 6.0% | 60% | 3 | 5 | 57% | 4 | 7 | 55% | 14 | 25 |
| Enterprise-Ozark Community College | 8.5% | 10% | 1 | 10 | 25% | 4 | 16 | 10% | 6 | 62 |
| Faulkner State Community College | 4.9% | 30% | 1 | 3 | 33% | 2 | 6 | 16% | 10 | 64 |
| Gadsden State Community College | 6.2% | 23% | 6 | 26 | 23% | 7 | 31 | 8% | 13 | 164 |
| Ingram State Technical College | 9.5% | 33% | 2 | 6 | 38% | 3 | 8 | 30% | 13 | 44 |
| Jefferson Davis Community College | 15.4% | 17% | 1 | 6 | 43% | 3 | 7 | 17% | 8 | 46 |
| Jefferson State Community College | 12.0% | 21% | 3 | 14 | 22% | 16 | 72 | 17% | 22 | 127 |
| Lawson State Community College | 13.2% | 64% | 9 | 14 | 63% | 15 | 24 | 64% | 70 | 109 |
| Lurleen B. Wallace Community College | 9.0% | 0% | 0 | 8 | 5% | 1 | 22 | 15% | 8 | 53 |
| Northeast Alabama Community College | 1.1% | 0% | 0 | 5 | 0% | 0 | 12 | 3% | 1 | 36 |
| Northwest-Shoals Community College | 4.2% | 0% | 0 | 5 | 15% | 6 | 40 | 9% | 7 | 79 |
| Reid State Technical College | 15.3% | 40% | 2 | 5 | 50% | 6 | 12 | 39% | 9 | 23 |
| Shelton State Community College | 13.2% | 27% | 3 | 11 | 33% | 14 | 43 | 18% | 16 | 90 |
| Sneed State Community College | 0.75% | 0% | 0 | 6 | 7% | 1 | 14 | 0% | 0 | 32 |
| Southern Union State Community College | 10.5% | 13% | 1 | 8 | 17% | 3 | 18 | 7% | 6 | 84 |
| Trenholm State Technical College | 15.3% | 56% | 5 | 9 | 63% | 15 | 24 | 49% | 32 | 65 |
| Wallace Community College-Dothan | 8.2% | 11% | 1 | 9 | 28% | 8 | 28 | 8% | 10 | 127 |
| Wallace State Community College-Hanceville | 0.5% | 8% | 1 | 12 | 7% | 1 | 14 | 1% | 2 | 134 |
| Wallace State Community College-Selma | 13.7% | 33% | 1 | 3 | 4% | 8 | 12 | 41% | 19 | 46 |
| SYSTEM TOTAL | | 26% | 56 | 216 | 29% | 162 | 562 | 21% | 392 | 1887 |

EMANUEL--0218--PLF DOX

# SHUFORD GOALS FOR APPOINTMENT OF BLACK WOMEN

1) By end of FallQuarter 1999, B and C1 combined-37.5% of the percentage of black persons in the general population of the primary service area of each college
2) By end of FallQuarter 1999, C2 and C3 combined-37.5% of the percentage of black persons in the general population of the primary service area of each college
3) By end of FallQuarter 1999, D-37.5% of the percentage of black persons in the general population of the primary service area of each college

## As of September 15, 2005

| College | Shuford % (37.5% of Black SVC Area) | ACTUAL % OF B & C1 COMBINED | ACTUAL # B & C1 COMBINED | TOTAL # OF STAFF ON B & C1 COMBINED | ACTUAL % OF C2 & C3 COMBINED | ACTUAL # C2 & C3 COMBINED | TOTAL # OF STAFF ON C2 & C3 COMBINED | ACTUAL % OF D | ACTUAL # OF D | TOTAL # OF STAFF ON D |
|---|---|---|---|---|---|---|---|---|---|---|
| Alabama Southern Community College | 17.6% | 25% | 2 | 8 | 29% | 9 | 31 | 20% | 11 | 55 |
| Bevill State Community College | 4.4% | 9% | 1 | 11 | 8% | 5 | 60 | 5% | 6 | 116 |
| Bishop State Community College | 11.6% | 22% | 2 | 9 | 31% | 5 | 16 | 37% | 42 | 113 |
| Calhoun Community College | 7.1% | 0% | 0 | 10 | 26% | 6 | 23 | 11% | 14 | 133 |
| Central Alabama Community College | 12.7% | 0% | 0 | 6 | 8% | 1 | 12 | 14% | 4 | 29 |
| Chattahoochee Valley Community College | 13.8% | 0% | 0 | 2 | 11% | 1 | 9 | 13% | 4 | 31 |
| Drake State Technical College | 6.0% | 20% | 1 | 5 | 57% | 4 | 7 | 36% | 9 | 25 |
| Enterprise State Junior College | 8.5% | 10% | 1 | 10 | 25% | 4 | 16 | 6% | 4 | 62 |
| Faulkner State Community College | 4.9% | 20% | 2 | 10 | 17% | 1 | 6 | 9% | 6 | 64 |
| Gadsden State Community College | 6.2% | 19% | 5 | 26 | 19% | 6 | 31 | 5% | 8 | 164 |
| Ingram State Technical College | 9.5% | 0% | 0 | 6 | 0% | 0 | 8 | 18% | 8 | 44 |
| Jefferson Davis Community College | 15.4% | 17% | 1 | 6 | 29% | 2 | 7 | 7% | 3 | 46 |
| Jefferson State Community College | 12.0% | 7% | 1 | 14 | 18% | 13 | 72 | 12% | 15 | 127 |
| Lawson State Community College | 13.2% | 43% | 6 | 14 | 38% | 9 | 24 | 42% | 46 | 109 |
| Lurleen B. Wallace Junior College | 9.0% | 0% | 0 | 8 | 5% | 1 | 22 | 8% | 4 | 53 |
| Northeast Alabama Community College | 1.1% | 0% | 0 | 5 | 0% | 0 | 12 | 3% | 1 | 36 |
| Northwest-Shoals Community College | 4.2% | 0% | 0 | 5 | 13% | 5 | 40 | 3% | 2 | 79 |
| Reid State Technical College | 15.3% | 40% | 2 | 5 | 33% | 4 | 12 | 26% | 6 | 23 |
| Shelton State Community College | 13.2% | 9% | 1 | 11 | 21% | 9 | 43 | 13% | 12 | 90 |
| Snead State Community College | 0.75% | 0% | 0 | 6 | 0% | 0 | 14 | 0% | 0 | 32 |
| Southern Union State Community College | 10.5% | 0% | 0 | 8 | 0% | 0 | 18 | 4% | 3 | 84 |
| Trenholm State Technical College | 15.3% | 22% | 2 | 9 | 54% | 13 | 24 | 40% | 26 | 65 |
| Wallace Community College-Dothan | 6.2% | 11% | 1 | 9 | 17% | 5 | 29 | 4% | 5 | 127 |
| Wallace State Community College-Hanceville | 0.5% | 8% | 1 | 12 | 7% | 1 | 14 | 0% | 0 | 134 |
| Wallace State Community College-Selma | 13.7% | 33% | 1 | 3 | 0% | 5 | 12 | 28% | 13 | 46 |
| SYSTEM TOTAL | | 14% | 30 | 218 | 19% | 109 | 562 | 13% | 252 | 1887 |

EMANUEL--0219-PLF DOX

# SHUFORD GOALS FOR APPOINTMENT OF WOMEN

B, C1, C2, C3, AND D
By end of Fall Quarter 2005 - 50% of the total number employed at each college on each of the above salary schedules.

## As of September 15, 2005

| College | ACTUAL % OF B | ACUTAL # OF B | TOTAL # STAFF ON B | ACTUAL % OF C1 | ACTUAL # OF C1 | TOTAL # STAFF ON C1 | ACTUAL % OF C2 | ACTUAL # C2 | TOTAL # STAFF ON C2 | ACTUAL % OF C3 | ACTUAL # OF C3 | TOTAL # STAFF ON C3 | ACTUAL % OF D | ACTUAL # OF D | TOTAL # STAFF ON D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama Southern Community College | 80% | 4 | 5 | 67% | 2 | 3 | 0% | 0 | 0 | 74% | 23 | 31 | 58% | 32 | 55 |
| Bevill State Community College | 67% | 2 | 3 | 63% | 5 | 8 | 0% | 0 | 0 | 67% | 38 | 57 | 54% | 63 | 116 |
| Bishop State Community College | 25% | 1 | 4 | 20% | 1 | 5 | 50% | 2 | 4 | 50% | 6 | 12 | 53% | 60 | 113 |
| Calhoun Community College | 67% | 4 | 6 | 25% | 1 | 4 | 56% | 5 | 9 | 36% | 5 | 14 | 50% | 67 | 133 |
| Central Alabama Community College | 100% | 3 | 3 | 33% | 1 | 3 | 20% | 1 | 5 | 29% | 2 | 7 | 100% | 29 | 29 |
| Chattahoochee Valley Community College | 0% | 0 | 2 | 0% | 0 | 0 | 0% | 0 | 0 | 67% | 6 | 9 | 68% | 21 | 31 |
| Drake State Technical College | 67% | 2 | 3 | 0% | 0 | 2 | 60% | 3 | 5 | 50% | 1 | 2 | 60% | 15 | 25 |
| Enterprise-Ozark Community College | 40% | 2 | 5 | 40% | 2 | 5 | 50% | 1 | 2 | 71% | 10 | 14 | 44% | 27 | 62 |
| Faulkner State Community College | 40% | 2 | 5 | 100% | 1 | 1 | 0% | 0 | 5 | 50% | 3 | 6 | 55% | 35 | 64 |
| Gadsden State Community College | 38% | 3 | 8 | 56% | 10 | 18 | 57% | 4 | 7 | 71% | 17 | 24 | 60% | 99 | 164 |
| Ingram State Technical College | 33% | 1 | 3 | 0% | 0 | 3 | 25% | 1 | 4 | 75% | 3 | 4 | 34% | 15 | 44 |
| Jefferson Davis Community College | 33% | 1 | 3 | 100% | 3 | 3 | 60% | 3 | 5 | 100% | 2 | 2 | 54% | 25 | 46 |
| Jefferson State Community College | 50% | 4 | 8 | 67% | 4 | 6 | 17% | 1 | 6 | 67% | 44 | 66 | 65% | 84 | 127 |
| Lawson State Community College | 63% | 5 | 8 | 33% | 2 | 6 | 50% | 3 | 6 | 50% | 11 | 22 | 58% | 63 | 105 |
| Lurleen B. Wallace Community College | 50% | 2 | 4 | 75% | 3 | 4 | 50% | 2 | 4 | 55% | 11 | 20 | 64% | 34 | 53 |
| Northeast Alabama Community College | 0% | 0 | 2 | 33% | 1 | 3 | 50% | 1 | 2 | 60% | 6 | 10 | 58% | 21 | 36 |
| Northwest-Shoals Community College | 50% | 2 | 4 | 0% | 0 | 1 | 50% | 1 | 2 | 79% | 26 | 33 | 47% | 37 | 79 |
| Reid State Technical College | 33% | 1 | 3 | 100% | 2 | 2 | 14% | 1 | 7 | 56% | 5 | 9 | 61% | 14 | 23 |
| Shelton State Community College | 67% | 2 | 3 | 63% | 5 | 8 | 100% | 2 | 2 | 55% | 21 | 38 | 58% | 52 | 90 |
| Sneed State Community College | 0% | 0 | 3 | 33% | 1 | 3 | 20% | 1 | 5 | 57% | 8 | 14 | 63% | 20 | 32 |
| Southern Union State Community College | 50% | 3 | 6 | 50% | 1 | 2 | 0% | 0 | 3 | 56% | 9 | 16 | 58% | 49 | 84 |
| Trenholm State Technical College | 20% | 1 | 5 | 50% | 2 | 4 | 100% | 2 | 2 | 64% | 14 | 22 | 55% | 36 | 65 |
| Wallace Community College-Dothan | 43% | 3 | 7 | 50% | 1 | 2 | 0% | 0 | 2 | 70% | 19 | 27 | 57% | 72 | 127 |
| Wallace State Community College-Hanceville | 83% | 5 | 6 | 67% | 4 | 6 | 43% | 3 | 7 | 86% | 6 | 7 | 66% | 89 | 134 |
| Wallace State Community College-Selma | 67% | 2 | 3 | 0% | 0 | 0 | 0% | 0 | 0 | 58% | 7 | 12 | 61% | 28 | 46 |
| SYSTEM TOTAL | 49% | 55 | 112 | 49% | 52 | 106 | 43% | 36 | 84 | 63% | 303 | 478 | 58% | 1087 | 1867 |

EMANUEL--0220--PLF DOX

**Narrative**

2004-2005 ANNUAL REPORT
*Shuford, et al, v. Alabama State Board of Education, et al.*

### *WALLACE COMMUNITY COLLEGE-DOTHAN*

NARRATIVE

2004-2005 ANNUAL REPORT
Shuford et al. v. Alabama State Board of Education et al.

George C. Wallace Community College-Dothan

The progress George C. Wallace Community College (WCC) has made toward achieving goals relative to the hiring and/or appointment of blacks and women is described as follows. Goals reflect Service Area's Black Population for Wallace Community College.

(1) GOALS RELATING TO THE APPOINTMENT OF BLACK PERSONS:

a. The Shuford Consent Decrees require that by the end of Fall Quarter 1996, the percentage of black persons employed at each college on B and C1 Salary Schedules combined shall equal at least that number which most closely represents 75% of the percentage of black persons in the general population of the primary service area of the respective college.

   Service Area Average Black Population: 28%
   Goal: 21% (28% x 75%)
   WCC Employees on B/C1: 9
   Black Employees on B/C1:1 (11%)

WCC IS WITHIN 10% OF REACHING ITS GOAL FOR SALARY SCHEDULES B AND C1.

b. The Shuford Consent Decrees require that by the end of Fall Quarter 1996, the percentage of black persons employed at each college on C2 and C3 Salary Schedules combined shall equal at least that number which most closely represents 75% of the percentage of black persons in the general population of the primary service area of the respective college.

   Service Area Average Black Population: 28%
   Goal: 21% (28% x 75%)
   WCC Employees on C2/C3: 29
   Black Employees on C2/C3: 8 (28%)

WCC HAS MET ITS GOAL OF 21% FOR SALARY SCHEDULES C2 AND C3.

c. The Shuford Consent Decrees require that by the end of Fall Quarter 1996, the percentage of black persons employed at each college on the D Salary Schedule shall equal at least that

number which most closely represents 75% of the percentage of black persons in the general population of the primary service area of the respective college.

Service Area Average Black Population: 28%
Goal: 21% (28% x 75%)
WCC Employees on D: 127
Black Employees on D: 10 (8%)

WCC HAS NOT MET ITS GOAL FOR SALARY SCHEDULE D.

(2) GOALS RELATING TO THE APPOINTMENT OF WOMEN:

a. The Shuford Consent Decrees require that by the end of Fall Quarter 2005, the percentage of women employed at each college on each of the B, C1, C2, C3, and D Salary Schedules respectively, shall equal at least that number which most closely represents 50% of the total number of persons employed at each of the respective colleges on the B, C1, C2, C3, and D Salary Schedules.

Total      Salary Number Total (Percentage +/- Goal
Schedule At WCC of Women Employed) Accomplished

B   7   3 (43%)   -7
C1  2   1 (50%)   +50
C2  2   2 (100%)  +50
C3  27  19 (70%)  +20
D   127 71 (56%)  +6

WCC HAS EXCEEDED ITS GOAL FOR SALARY SCHEDULES C1, C2, C3, AND D, AND WILL CONTINUE TO STRIVE TO EMPLOY WOMEN WHO ARE QUALIFIED TO FILL POSITIONS ON THE B SALARY SCHEDULE AS VACANCIES OCCUR.

(3) GOALS RELATING TO THE APPOINTMENT OF BLACK WOMEN:

a. The Shuford Consent Decrees require that by the end of Fall Quarter 1996, the percentage of black women employed at each college on B and C1 Salary Schedules combined shall equal at least that number which most closely represents 37.5% of the percentage of black persons in the general population of the primary service area of the respective college

Service Area Average Black Population: 28%
Goal: 10.5% (28% x 37.5%)
WCC Employees on B/C1: 9
Black Women Employees on B/C1: 1 (11%)

WCC HAS MET ITS GOAL FOR SALARY SCHEDULES B AND C1.

b. The Shuford Consent Decrees require that by the end of Fall Quarter 1996, the percentage of black women employed at each college on the C2 and C3 Salary Schedules combined shall

EMANUEL--0222--PLF DOX

equal at least that    number which most closely represents 37.5% of the percentage of    black persons in the general population of the primary service area    of the respective college.

Service Area Average Black Population: 28%
Goal: 10.5% (28% x 37.5 %)
WCC Employees on C2/C3: 29
Black Women Employees on C2/C3: 8 (28%)

WCC HAS EXCEEDED ITS GOAL FOR SALARY SCHEDULES C2 AND  C3.

c. The Shuford Consent Decrees require that by the end of Fall Quarter   1996, the percentage of black women employed at each college on    the D Salary Schedule shall equal at least that number which most     closely represents 37.5% of the percentage of black persons in the general population of the primary service area of the respective   college.

Service Area Average Black Population: 28%
Goal: 10.5% (28% x 37.5%)
WCC Employees on D: 127
Black Women Employees on D: 5 (4%)

WCC HAS NOT MET ITS GOAL FOR SALARY SCHEDULE D.

EMANUEL--0223--PLF DOX

WALLACE COMMUNITY COLLEGE - DOTHAN

PERSONNEL BY SALARY SCHEDULE (A, B, C1, C2, C3, D)
As of September 15, 2005

| Salary Schedule* | White (non-hispanic) | | | | | Black (non-hispanic) | | | | | Other Minorities | | | | | Total | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Men | % | Women | % | Total | Men | % | Women | % | Total | Men | % | Women | % | Total | Men | % | Women | % | Total |
| A | 0 | 0% | 1 | 100% | 1 | 0 | #DIV/0! | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | #DIV/0! | 0 | 0 | 0% | 1 | 100% | 1 |
| B | 4 | 67% | 2 | 33% | 6 | 0 | 0% | 1 | 100% | 1 | 0 | #DIV/0! | 0 | #DIV/0! | 0 | 4 | 57% | 3 | 43% | 7 |
| C1 | 1 | 50% | 1 | 50% | 2 | 0 | #DIV/0! | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | #DIV/0! | 0 | 1 | 50% | 1 | 50% | 2 |
| C2 | 0 | 0% | 2 | 100% | 2 | 0 | #DIV/0! | 0 | #DIV/0! | 0 | 0 | #DIV/0! | 0 | #DIV/0! | 0 | 0 | 0% | 2 | 100% | 2 |
| C3 | 4 | 22% | 14 | 78% | 18 | 3 | 38% | 5 | 63% | 8 | 1 | 100% | 0 | 0% | 1 | 8 | 30% | 19 | 70% | 27 |
| D | 50 | 43% | 66 | 57% | 116 | 5 | 50% | 5 | 50% | 10 | 0 | 0% | 1 | 100% | 1 | 55 | 43% | 72 | 57% | 127 |

** Only presidential appointments are listed on Salary Schedule A. Those appointments such as Vice President and Provost, on neither Salary Schedule A nor B, are shown with a #.

2004-2005 Annual Report
Shuford, et al., Alabama State Board of Education
Civil Action No. 89-T-196-N

EMANUEL--0224--PLF DOX

## WALLACE COMMUNITY COLLEGE - DOTHAN

### VACANT POSITIONS FILLED (Salary Schedules A, B, C, & D)
### September 15, 2004 - September 15, 2005

| Position Title | Salary Schedule | Name | Race | Gender | Position Filled By: (Check one) | | | | Member of the Applicant Pool? Yes/No |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Search | Temporary Appt. | Reorganization | Lateral Transfer | |
| Dean, Career Technical Instruction | B | Michael Babb | W | M | | | X | | No |
| Dean, Academic Affairs and Health S | B | Fergus, John | W | M | | | X | | No |
| Dean, Student Affairs and Sparks Ca | B | Screws, Jacqueline | B | F | | | X | | No |
| Executive Assistant to the President | B | Sasser, Eva | W | F | | | X | | No |
| Coordinator, Instructional Services, S | C-3 | Anglin, Terri | B | F | | X | | | No |
| Recruiter | C-3 | Breedlove, Debra | W | F | | X | | | No |
| Distance Education Technology Spec | C-3 | Cruz-Wells, David | H | M | X | | | | No |
| Director, Planning and Research | C-3 | Gartlan, Shana | W | F | X | | | | No |
| Coordinator for Non-Credit Training | C-3 | Harris, Sharla | W | F | X | | | | No |
| Coordinator, Career Technical Progr | C-3 | Ormond, Janet | W | F | X | | | | No |
| Practical Nursing Clinical Associate | D-1 | Chesnut, Wanda | W | F | X | | | | No |
| Biology Instructor | D-1 | Conli, Sandra | W | F | X | | | | No |
| Practical Nursing Clinical Associate | D-1 | Duprey, Melissa | W | F | X | | | | No |
| Accounting Instructor | D-1 | Farrington, Woodrow | W | M | X | | | | No |
| Biology Instructor | D-1 | Fischer, Julie | W | F | X | | | | No |

EMANUEL--0225--PLF DOX

EMANUEL--0226-PLF DOX

WALLACE COMMUNITY COLLEGE - DOTHAN

VACANT POSITIONS FILLED (Salary Schedules A, B, C, & D)
September 15, 2004 - September 15, 2005

| Position Title | Salary Schedule | Name | Race | Gender | Position Filled By: (Check one) | | | | | Member of the Applicant Pool? Yes/No |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Search | Temporary Appt. | Reorganization | Lateral Transfer | | |
| Practical Nursing Clinical Associate | D-1 | Ford, Linda | B | F | X | | | | | No |
| Associate Degree Nursing Instructor | D-1 | McNease, Leigh | W | F | X | | | | | No |
| Medical Assisting Instructor | D-1 | Moodt, Grace | W | F | X | | | | | No |
| Associate Degree Nursing Instructor | D-1 | Owens, Anna | W | F | X | | | | | No |
| Practical Nursing Clinical Associate | D-1 | Radney, Monica | A | F | X | | | | | No |
| Practical Nursing Clinical Associate | D-1 | Stringfellow, JoAnn | W | F | X | | | | | No |
| Cosmetology Instructor | D-1 | Womack, Terra | B | F | X | | | | | No |
| Associate Degree Nursing Instructor | D-1 | York, Kimberly | W | F | X | | | | | No |

2004-2005 Annual Report
*Shuford, et al., v. Alabama State Board of Education, et al.*
Civil Action No. 89-T-196-N

*WALLLACE COMMUNITY COLLEGE - DOTHAN*

**RECRUITING AND SELECTION COMMITTEES ( Salary Schedules A, B, C, & D)**
September 15, 2004 - September 15, 2005

| Date Appointed | Names | Race | Gender | Vacancy For Which Appointed |
|---|---|---|---|---|
| 12-Jul-04 | John Fergus | W | M | Director, Fort Rucker Center (Temporary) |
| | Gwyn Galloway | W | F | |
| | Shannon Thomas | B | F | |
| 24-Aug-04 | Bruce Adams | W | M | Coordinator for Non-Credit Training (Reopened) |
| | Evonne Bennett | B | F | |
| | Janet Ormond | W | F | |
| | Shannon Thomas | B | F | |
| 27-Aug-04 | Lisa Adams-Horsley | B | F | Coordinator of Instructional Services, |
| | Mickey Baker | B | M | Student Support Services (Sparks Campus) |
| | Bilie Faye Bush | W | F | NO ONE APPOINTED |
| | Brandi Smith | W | F | |
| 3-Sep-04 | Lisa Adams-Horsley | B | F | Tech Prep Specialist |
| | Mike Babb | W | M | |
| | John Waters | W | M | |
| | Mary Wiggins | B | F | |
| 14-Sep-04 | Quincey Banks | B | M | Recruiter (Temporary) |
| | Eva Sasser | W | F | |
| | Jacqueline Screws | B | F | |
| | Mark Shope | W | M | |
| 30-Sep-04 | George Baxter | B | M | Nursing Program Clinical Associates (Three Positions) |
| | Gwyn Galloway | W | F | |
| | Gail Jones | W | F | |

EMANUEL--0227--PLF DOX

*WALLLACE COMMUNITY COLLEGE - DOTHAN*

**RECRUITING AND SELECTION COMMITTEES ( Salary Schedules A, B, C, & D)**
September 15, 2004 - September 15, 2005

| Date Appointed | Names | Race | Gender | Vacancy For Which Appointed |
|---|---|---|---|---|
| 7-Oct-04 | Shannon Thomas | B | F | Medical Assisting Program Instructor |
| | Debbie Brown | W | F | |
| | Larricia Craig | B | F | |
| | Jane Ann Shannon | W | F | |
| | Keith Saulsberry | B | M | |
| 9-Nov-04 | George Baxter | B | M | Distance Education Technology Specialist |
| | Gordon Free | W | M | NO ONE APPOINTED |
| | Christie Suggs | W | F | |
| | Lucile Youngblood | B | F | |
| 10-Jan-05 | Mike Babb | W | M | Tech Prep Specialist (Temporary) |
| | Amy Brabham | W | F | NO ONE APPOINTED |
| 10-Jan-05 | Lisa Adams-Horsley | B | F | Director, Planning and Research |
| | Mike Babb | W | M | |
| | Eva Sasser | W | F | |
| | Lucile Youngblood | B | F | |
| 24-Jan-05 | Lisa Adams-Horsley | B | F | Coordinator of Instructional Services, |
| | Mickey Baker | B | M | Student Support Services (Sparks Campus) |
| | Billie Faye Bush | W | F | Search Reopened |
| | Brandi Smith | W | F | NO ONE APPOINTED |
| 17-Jan-05 | Qunicey Banks | B | M | Accounting Instructor |
| | Earl Jernigan | W | M | |
| | Peggy Hill | B | F | |

EMANUEL--0228--PLF DOX

WALLLACE COMMUNITY COLLEGE - DOTHAN

RECRUITING AND SELECTION COMMITTEES ( Salary Schedules A, B, C, & D)
September 15, 2004 - September 15, 2005

| Date Appointed | Names | Race | Gender | Vacancy For Which Appointed |
|---|---|---|---|---|
| 17-Jan-05 | Teresa Salter | W | F | Associate Degree Nursing Instructors (Three Positions) |
| | Linda Ford | B | F | |
| | Jackie Spivey | W | F | |
| | Joy Whitlow | W | F | |
| | Lucile Youngblood | B | F | |
| 17-Jan-05 | Vanessa Dickens | B | F | Biology Instructors (Two Positions) |
| | Tony Holland | W | M | |
| | Vanessa Passler | W | F | |
| | Keith Saulsberry | B | M | |
| 31-Jan-05 | Qunicey Banks | B | M | Cosmetology Instructor |
| | Evonne Bennett | B | F | |
| | Ken Hester | W | M | |
| | Paula Mims | W | F | |
| 3-Mar-05 | Shaletha Barnes | B | F | Coordinator, Career Technical Programs |
| | Mike Babb | W | M | |
| | Chris Purvis | W | M | |
| | Tameka Williams | B | F | |
| 28-Mar-05 | Lori Logan | W | F | Director, Fort Rucker Center |
| | Connie Parrish | W | F | NO ONE APPOINTED |
| | Keith Saulsberry | B | M | |
| | Shannon Thomas | B | F | |
| 23-May-05 | Mickey Baker | B | M | Coordinator, Instructional Services, |

EMANUEL--0229--PLF DOX

EMANUEL--0230--PLF DOX

*WALLLACE COMMUNITY COLLEGE - DOTHAN*

**RECRUITING AND SELECTION COMMITTEES ( Salary Schedules A, B, C, & D)**
September 15, 2004 - September 15, 2005

| Date Appointed | Names | Race | Gender | Vacancy For Which Appointed |
|---|---|---|---|---|
| 15-Jun-05 | Jacqueline Screws | B | F | Student Support Services (Sparks Campus) (Temporary) |
| | Laricia Craig | B | F | Director, Student Activities |
| | Jean Dagostin | W | F | |
| | Suzanne Monday | W | F | |
| | Keith Saulsberry | B | M | |
| 15-Jun-05 | Lisa Adams-Horsley | B | F | Tech Prep Specialist |
| | Michael Babb | W | M | |
| | Janet Ormond | W | F | |
| | Mary Wiggins | B | F | |
| 24-Jun-05 | Quincey Banks | B | M | Speech Instructor |
| | Tammie Gregg | W | F | NO ONE APPOINTED |
| | Mary Pearl Morris | B | F | |
| | Lisa Sanders | W | F | |
| 24-Jun-05 | Earl Bynum | B | M | Child Development Instructor |
| | Vanessa Dickens | B | F | NO ONE APPOINTED |
| | Cindy Eller | W | F | |
| | Tameka Williams | B | F | |
| 15-Jun-05 | Linda Ford | B | F | Practical Nursing Instructors (Two Positions) |
| | Gwyn Galloway | W | F | NO ONE APPOINTED |
| | Fred Ortman | W | M | |
| | Lucile Youngblood | B | F | |
| 24-Jun-05 | George Baxter | B | M | Practical Nursing Clinical Associates (Two Positions) |

EMANUEL–0231–PLF DOX

WALLLACE COMMUNITY COLLEGE - DOTHAN

RECRUITING AND SELECTION COMMITTEES ( Salary Schedules A, B, C, & D)
September 15, 2004 - September 15, 2005

| Date Appointed | Names | Race | Gender | Vacancy For Which Appointed |
|---|---|---|---|---|
|  | Linda Ford | B | F |  |
|  | Gwyn Galloway | W | F |  |
|  | Celia Mitchell | W | F |  |
|  |  |  |  |  |
| 30-Jun-05 | Vanessa Dickens | B | F | Physical Therapist Assistant Instructor |
|  | Greg Grimsley | W | M | NO ONE APPOINTED |
|  | Priscilla Tucker | W | F |  |
|  | Mary Wiggins | B | F |  |
|  |  |  |  |  |
| 3-Aug-05 | Linda Ford | B | F | Director, Nursing Program Recruitment & Retention |
|  | Fred Ortman | W | M |  |
|  | Jackie Spivey | W | F |  |
|  | Shannon Thomas | B | F |  |
|  |  |  |  |  |
| 12-Aug-05 | Brenda Barnes | W | F | Director, Fort Rucker Center (Search Reopened) |
|  | Lori Logan | W | F |  |
|  | Keith Saulsberry | B | M |  |
|  | Shannon Thomas | B | F |  |
|  |  |  |  |  |
| 12-Aug-05 | Frank Barefield | W | M | Instructional Technologist |
|  | Denise Stanford-Bowers | B | F |  |
|  | Christie Suggs | W | F |  |
|  | Linda Weems | B | F |  |

2004-2005 Annual Report
Shuford, et al., v. Alabama State Board of Education, et al.
Civil Action No. 89-T-196-N

# Loss of income computations

.

EMANUEL--0232--PLF DOX

**A conservative estimate of income lost due to
not being hired by Wallace-Dothan in 2006**

| | 4 66% trend Current Employer | 4 43% trend Wallace-Dothan | Loss |
|---|---|---|---|
| 2006-2007 | $66,851 | $84,567 | $17,716 |
| 2007-2008 | $64,019 | $90,487 | $26,468 |
| 2008-2009 | $72,296 | $94,495 | $22,199 |
| 2009-2010 | $75,418 | $98,681 | $23,263 |
| 2010-2011 | $78,685 | $109,000 | $30,315 |
| 2011-2012 | $82,105 | $113,829 | $31,724 |
| 2012-2013 | $85,684 | $121,072 | $35,388 |
| 2013-2014 | $89,430 | $126,435 | $37,005 |
| 2014-2015 | $93,350 | $132,036 | $38,686 |
| 2015-2016 | $97,454 | $137,886 | $40,432 |
| Subtotal | $810,586 | $1,108,488 | $259,012 |
| 2016-2017 | $101,748 | $143,994 | $42,246 |
| 2017-2018 | $106,242 | $150,373 | $44,131 |
| 2018-2019 | $110,946 | $157,034 | $46,088 |
| 2018-2019 | $115,869 | $163,991 | $48,122 |
| 2018-2019 | $121,022 | $171,256 | $50,234 |
| | $1,366,413 | $1,895,136 | $489,833 |

DROP

Current employer salary trends are based on a 7-year salary history.
Wallace-Dothan salary trends are based on an 18-year salary history.

EMANUEL--0233--PLF DOX

## Loss of Income & Benefits

| Age | | | Wallace-Dothan | Current Employer | Difference | Insurance | Tuition Waiver | Compens. Damages | TOTAL | Sick leave | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 46 | 2006-2007 | step 20 | $84,567 | $66,851 | $17,716 | $4,157 | | $100,000 | $121,873 | 5 | 2006-2007 |
| 47 | 2007-2008 | step 20 | $90,487 | $64,019 | $26,468 | $4,157 | | Back Pay = | $30,624 | 10 | 2007-2008 |
| 48 | 2008-2009 | step 20 | $94,495 | $72,296 | $22,199 | $4,157 | $1,800 | | $28,156 | 5 | 2008-2009 |
| 49 | 2009-2010 | step 20 | $98,681 | $75,418 | $23,263 | $4,157 | $5,400 | | $32,820 | 5 | 2009-2010 |
| 50 | 2010-2011 | step 25 | $109,000 | $78,685 | $30,315 | $4,157 | $2,700 | | $37,172 | 5 | 2010-2011 |
| 51 | 2011-2012 | step 25 | $113,829 | $82,105 | $31,724 | $4,157 | | | $35,881 | 5 | 2011-2012 |
| 52 | 2012-2013 | step 27 | $121,072 | $85,684 | $35,388 | $4,157 | | | $39,544 | 5 | 2012-2013 |
| 53 | 2013-2014 | step 27 | $126,435 | $89,430 | $37,005 | $4,157 | | | $41,162 | 5 | 2013-2014 |
| 54 | 2014-2015 | step 27 | $132,036 | $93,350 | $38,686 | $4,157 | | | $42,843 | 5 | 2014-2015 |
| 55 | 2015-2016 | step 27 | $137,886 | $97,454 | $40,432 | $4,157 | | | $44,589 | 5 | 2015-2016 |
| 56 | 2016-2017 | D.R.O.P | $143,994 | $101,748 | $42,246 | $4,157 | | | $46,403 | 5 | 2016-2017 |
| 57 | 2017-2018 | D.R.O.P | $150,373 | $106,242 | $44,131 | $4,157 | | | $48,287 | 5 | 2017-2018 |
| 58 | 2018-2019 | D.R.O.P | $157,034 | $110,946 | $46,088 | $4,157 | | | $50,245 | 5 | 2018-2019 |
| 59 | 2019-2020 | D.R.O.P | $163,991 | $115,869 | $48,122 | $4,157 | | | $52,279 | 5 | 2019-2020 |
| 60 | 2020-2021 | D.R.O.P | $171,256 | $121,022 | $50,234 | $4,157 | | | $54,391 | 5 | 2020-2021 |
| | | | | | $489,833 | $54,038 | $9,900 | Front Pay = | $553,771 | 65 | |

GRAND TOTAL =    $534,016    $62,352    $9,900    $100,000    $709,268

EMANUEL_0234--PLF DOX
75

# Retirement and D.R.O.P. calculations

There are very few full-time college teaching positions in Alabama that pay as well as the two-year college system. Only professor salaries at larger universities in select academic disciplines (e.g. computer science and business) in Alabama would match those of the two-year college system. EMANUEL's doctoral degree is not in one of those select disciplines.

Because EMANUEL is vested in the Alabama Teachers' Retirement System, he would not seek employment outside of Alabama.

In the Alabama Teachers' Retirement System, a teacher's monthly retirement income and D.R.O.P. program benefits are both based on a formula which is, in large measure, determined by salary.

## RETIREMENT

The retirement formula for maximum monthly benefit is:

**Average Final Salary**   x   **Years+Months of Service**   x   .020125   **divided by 12.**
(average of the highest          (Sick leave accumulates
three years out of the last 10)      toward additional months
                                            of service)

So, the maximum monthly benefit is influenced by average salary and, to a lesser degree, by the accumulation of sick leave days. Based on salary projections for Wallace-Dothan versus EMANUEL's current employer prior to EMANUEL's anticipated participation in the D.R.O.P. program, the average of the highest three years at Wallace-Dothan would be $132,119. The average of the highest three years at EMANUEL's current place of employment would be $93,411. The maximum monthly benefit using the Wallace-Dothan figure would be **$5,761**; the benefit using the current place of employment would be **$4,073.** This represents a difference and, therefore, a potential loss of income of at least **$1,688 per month every month EMANUEL is retired.**

## D.R.O.P.

The formula for determining D.R.O.P. benefits is:

**(Maximum monthly benefit  x  Value factor)   +   (Average salary during DROP  x  Interest factor)**

where the Value factor and the Interest factor are both determined by the number of years from 1-5 of the D.R.O.P. program participation. For example, if EMANUEL participated in the program for 5 years, the Value factor would be 66.30 and the Interest factor would be 0.2762.

So, the **D.R.O.P.** value including interest would depend on the Maximum monthly benefit (excluding sick leave credit) which depends on the Average Final Salary. Using the Wallace-Dothan figure, EMANUEL's D.R.O.P. program value plus interest would be $410,714; for EMANUEL's current place of employment, the value plus interest would be $290,365 – a difference and potential **loss of income of at least $120,349.**

## Retirement

|  | Wallace-Dothan | Current Employer |  |
|---|---|---|---|
| 2013-2014 | $126,435 | $89,430 |  |
| 2014-2015 | $132,036 | $93,350 |  |
| 2015-2016 | $137,886 | $97,454 |  |
| Average | $132,119 | $93,411 |  |
|  |  |  |  |
| Years of service | 26 | 26 |  |
|  | 0.020125 | 0.020125 | **Difference per month** |
| Max. monthly benefit | **$5,761** | **$4,073** | **1,688** |
|  |  |  |  |
| Max. monthly benefit for <u>DROP</u> program | **$5,539** | **$3,916** |  |

## DROP

|  |  | Wallace-Dothan | Current Employer |
|---|---|---|---|
|  | 2016-2017 | $143,994 | $101,748 |
|  | 2017-2018 | $150,373 | $106,242 |
| **DROP** | 2018-2019 | $157,034 | $110,946 |
|  | 2019-2020 | $163,991 | $115,869 |
|  | 2020-2021 | $171,256 | $121,022 |
|  | **Average** | **$157,330** | **$111,165** |

| DROP | Value | Interest | Wallace-Dothan | Current Employer | Difference |
|---|---|---|---|---|---|
| 1 year | 12.24 | 0.051 | $75,826 | $53,607 | $22,219 |
| 2 years | 24.97 | 0.104 | $154,680 | $109,355 | $45,325 |
| 3 years | 38.21 | 0.159 | $236,706 | $167,346 | $69,360 |
| 4 years | 51.98 | 0.217 | $322,014 | $227,656 | $94,357 |
| 5 years | 66.30 | 0.276 | **$410,714** | **$290,365** | **$120,349** |

EMANUEL--0236--PLF DOX

# Monthly PEEHIP Cost for 2006 - 2007 Plan Year

| Group | Who is Covered | Total Monthly Cost | Paid Monthly by State | Paid Monthly by Retiree | What You Can Lose - Total Paid by State for the Year |
|---|---|---|---|---|---|
| | Retired Members | | | | |
| A | Retiree only, non-Medicare | $ 581.00 | $491.00 | $ 90.00 | $ 5,892.00 |
| B | Retiree & Family, non-Medicare | $1,094.00 | $872.00 | $222.00 | $10,464.00 |
| C | Retiree non-Medicare with Medicare- Eligible Family Coverage | $874.00 | $693.00 | $181.00 | $8,316.00 |
| D | Retiree only, Medicare Eligible | $299.00 | $297.86 | $1.14 | $3,574.32 |
| E | Retiree Medicare Eligible with family- not Medicare Eligible | $812.00 | $678.86 | $133.14 | $8,146.32 |
| F | Retiree & Spouse, Both Medicare Eligible | $592.00 | $499.86 | $92.14 | $5,998.32 |

**Each year, the Legislature determines how much the State will pay which determines how much is left for you to pay.**

EMANUEL--0237--PLF DOX

PEEHIP

## Based on 2007-08 Rates

### Retiree Sliding Scale

**Non-Medicare Eligible Retiree with Non-Medicare Family Coverage (B Rate)**

| Years of Service | % of State Share for Single Coverage | State Share | Retiree Share | Total Premium |
|---|---|---|---|---|
| 40 | 30% | 991.10 | 78.90 | 1070.00 |
| 39 | 28% | 981.56 | 88.44 | 1070.00 |
| 38 | 26% | 972.02 | 97.98 | 1070.00 |
| 37 | 24% | 962.48 | 107.52 | 1070.00 |
| 36 | 22% | 952.94 | 117.06 | 1070.00 |
| 35 | 20% | 943.40 | 126.60 | 1070.00 |
| 34 | 18% | 933.86 | 136.14 | 1070.00 |
| 33 | 16% | 924.32 | 145.68 | 1070.00 |
| 32 | 14% | 914.78 | 155.22 | 1070.00 |
| 31 | 12% | 905.24 | 164.76 | 1070.00 |
| 30 | 10% | 895.70 | 174.30 | 1070.00 |
| 29 | 8% | 886.16 | 183.84 | 1070.00 |
| 28 | 6% | 876.62 | 193.38 | 1070.00 |
| 27 | 4% | 867.08 | 202.92 | 1070.00 |
| 26 | 2% | 857.54 | 212.46 | 1070.00 |
| 25 | 0% | 848.00 | 222.00 | 1070.00 |
| 24 | -2% | 838.46 | 231.54 | 1070.00 |
| 23 | -4% | 828.92 | 241.08 | 1070.00 |
| 22 | -6% | 819.38 | 250.62 | 1070.00 |
| 21 | -8% | 809.84 | 260.16 | 1070.00 |
| 20 | -10% | 800.30 | 269.70 | 1070.00 |
| 19 | -12% | 790.76 | 279.24 | 1070.00 |
| 18 | -14% | 781.22 | 288.78 | 1070.00 |
| 17 | -16% | 771.68 | 298.32 | 1070.00 |
| 16 | -18% | 762.14 | 307.86 | 1070.00 |
| 15 | -20% | 752.60 | 317.40 | 1070.00 |
| 14 | -22% | 743.06 | 326.94 | 1070.00 |
| 13 | -24% | 733.52 | 336.48 | 1070.00 |
| 12 | -26% | 723.98 | 346.02 | 1070.00 |
| 11 | -28% | 714.44 | 355.56 | 1070.00 |
| 10 | -30% | 704.90 | 365.10 | 1070.00 |

| | 25 Year Base | 848.00 | 222.00 | 1070.00 |
|---|---|---|---|---|



# MEMBER HANDBOOK



## TEACHERS' RETIREMENT SYSTEM

### 2002

MANUEL-023 FEB-06-02

# TABLE OF MAXIMUM MONTHLY

| Average Final Salary | Years of Creditable Service | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 10 | 12 | 14 | 16 | 18 | 20 | 22 | 24 |
| $10,000 | 168 | 201 | 235 | 268 | 302 | 335 | 369 | 402 |
| 12,000 | 201 | 242 | 282 | 322 | 362 | 403 | 443 | 483 |
| 15,000 | 252 | 302 | 352 | 403 | 453 | 503 | 553 | 604 |
| 17,000 | 285 | 342 | 399 | 456 | 513 | 570 | 627 | 684 |
| 20,000 | 335 | 402 | 469 | 536 | 604 | 671 | 743 | 805 |
| 22,500 | 377 | 453 | 528 | 604 | 679 | 755 | 830 | 906 |
| 25,000 | 419 | 503 | 586 | 670 | 755 | 839 | 922 | 1006 |
| 27,500 | 461 | 553 | 646 | 738 | 830 | 922 | 1015 | 1107 |
| 30,000 | 503 | 603 | 704 | 806 | 906 | 1006 | 1106 | 1206 |
| 32,500 | 545 | 654 | 763 | 872 | 981 | 1090 | 1199 | 1308 |
| 35,000 | 587 | 704 | 822 | 939 | 1057 | 1174 | 1291 | 1409 |
| 37,500 | 629 | 755 | 880 | 1006 | 1132 | 1258 | 1384 | 1509 |
| 40,000 | 671 | 805 | 939 | 1073 | 1208 | 1342 | 1476 | 1610 |
| 45,000 | 755 | 906 | 1057 | 1208 | 1359 | 1509 | 1660 | 1811 |
| 50,000 | 839 | 1006 | 1174 | 1342 | 1509 | 1677 | 1845 | 2013 |
| 55,000 | 922 | 1107 | 1291 | 1476 | 1660 | 1845 | 2029 | 2214 |
| 60,000 | 1006 | 1208 | 1409 | 1610 | 1811 | 2013 | 2214 | 2415 |
| 65,000 | 1090 | 1308 | 1526 | 1744 | 1962 | 2160 | 2398 | 2616 |
| 70,000 | 1174 | 1409 | 1644 | 1878 | 2113 | 2348 | 2583 | 2818 |
| 75,000 | 1258 | 1509 | 1761 | 2012 | 2264 | 2516 | 2767 | 3019 |
| 80,000 | 1342 | 1610 | 1878 | 2147 | 2415 | 2683 | 2952 | 3220 |
| 85,000 | 1426 | 1711 | 1996 | 2281 | 2566 | 2851 | 3136 | 3421 |
| 90,000 | 1509 | 1811 | 2113 | 2415 | 2717 | 3019 | 3321 | 3923 |

Note: Average Final Salary is the average of the highest three years (July - June) out of the last 10 years the member made contributions. Partial years are included when calculating the average final salary if they bene-fit the member.

To compute the maximum monthly retiree benefit, the following formula is used:
Average Final Salary X Years and Months of Service x Benefit Factor (2.0125%) ÷ 12

# RETIREMENT BENEFIT

| Average Final Salary | Years of Creditable Service | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 25 | 26 | 28 | 30 | 32 | 34 | 36 | 38 |
| $10,000 | 419 | 436 | 470 | 503 | 537 | 570 | 604 | 637 |
| 12,000 | 503 | 523 | 564 | 604 | 644 | 684 | 725 | 765 |
| 15,000 | 629 | 654 | 704 | 755 | 805 | 855 | 906 | 956 |
| 17,000 | 713 | 741 | 788 | 855 | 912 | 969 | 1026 | 1083 |
| 20,000 | 839 | 872 | 939 | 1006 | 1073 | 1140 | 1208 | 1275 |
| 22,500 | 943 | 981 | 1057 | 1122 | 1208 | 1283 | 1358 | 1434 |
| 25,000 | 1048 | 1090 | 1174 | 1258 | 1342 | 1426 | 1509 | 1593 |
| 27,500 | 1153 | 1199 | 1291 | 1384 | 1476 | 1568 | 1660 | 1753 |
| 30,000 | 1258 | 1308 | 1408 | 1510 | 1610 | 1710 | 1812 | 1912 |
| 32,500 | 1365 | 1420 | 1529 | 1638 | 1748 | 1857 | 1966 | 2075 |
| 35,000 | 1467 | 1526 | 1644 | 1761 | 1878 | 1996 | 2113 | 2231 |
| 37,500 | 1572 | 1635 | 1761 | 1887 | 2012 | 2138 | 2264 | 2380 |
| 40,000 | 1677 | 1744 | 1878 | 2013 | 2147 | 2281 | 2415 | 2549 |
| 45,000 | 1887 | 1962 | 2113 | 2264 | 2415 | 2566 | 2717 | 2868 |
| 50,000 | 2096 | 2180 | 2348 | 2516 | 2683 | 2851 | 3019 | 3186 |
| 55,000 | 2305 | 2398 | 2583 | 2767 | 2952 | 3136 | 3321 | 3505 |
| 60,000 | 2516 | 2616 | 2817 | 3019 | 3220 | 3421 | 3623 | 3824 |
| 65,000 | 2725 | 2834 | 3052 | 3270 | 3488 | 3706 | 3924 | 4142 |
| 70,000 | 2935 | 3052 | 3287 | 3522 | 3757 | 3991 | 4226 | 4461 |
| 75,000 | 3145 | 3270 | 3522 | 3773 | 4025 | 4277 | 4528 | 4780 |
| 80,000 | 3354 | 3488 | 3757 | 4025 | 4293 | 4562 | 4830 | 5098 |
| 85,000 | 3564 | 3706 | 3991 | 4277 | 4562 | 4647 | 5132 | 5417 |
| 90,000 | 3774 | 3924 | 4226 | 4528 | 4830 | 5132 | 5404 | 5736 |

Note: Average Final Salary is the average of the highest three years (July - June) out of the last 10 years the member made contributions. Partial years are included when calculating the average final salary if they bene-fit the member.

To compute the maximum monthly retiree benefit, the following formula is used:
Average Final Salary X Years and Months of Service x Benefit Factor (2.0125%) ÷ 12

EMANUEL--0240--PLF DOX

employes to elect to participate in the DROP. This does not apply to regular payments for leave or contributions toward health insurance.

## Reemployment with the RSA after Withdrawal from Service

Any member who participated in DROP and withdrew from service may become reemployed with either the TRS or ERS. This additional service will be calculated based on Number 4 (page 31) under Continued Service After the DROP Participation Period.

## Calculating Your DROP Benefit

The following is a step-by-step method of calculating your DROP benefit. This is only an estimate. When you are ready to make a decision about entering DROP, contact the TRS for an estimate.

1. Determine your monthly retirement benefit at the DROP participation date.

Average Final Salary x Years and Months of Service x .020125 ÷ 12 = Monthly Retirement benefit

The Average Final Salary is the average of the highest three annual salaries in the member's last 10 years of creditable service for which the member made contributions.

2. This formula will only compute the Maximum monthly retirement benefit. For options 1, 2, or 3, use the benefit calculator on our Web site to determine the monthly retirement benefit.

Multiply the monthly retirement benefit times the factor associated with the number of years you elect to participate in DROP to give you the DROP contributions value including interest.

1 year  -  12.24
2 years  -  24.97
3 years  -  38.21
4 years  -  51.98
5 years  -  66.30

3. Determine the value of your contributions, plus interest, made during the drop participation period.

Multiply the average salary (estimated) during the drop participation period times the factor for the number of years you elect to participate in DROP.

1 year  -  .0510
2 years  -  .1040
3 years  -  .1592
4 years  -  .2166
5 years  -  .2762

4. Add the two amounts together to give you an estimated value of your DROP benefit at the end of the DROP participation period.

Example: At the DROP participation date the member had an average final salary of $41,000, 31 years of service and selects the maximum retirement benefit. The member elects a four-year DROP participation period and ...

1. Monthly retirement benefit:
$41,000 X 31 x .020125 ÷ 12 = $2,131.57

2. DROP contribution value including interest:
$2,131.57 x 51.98 = $110,799.00

3. Member contributions including interest:
$43,500 X .2166 = $9,422.10

4. Total DROP benefit:
$110,799.00 + $9,422.10 = $120,221.10

EMANUEL--0241--PLF DOX