

**U.S. Department of Justice**

Civil Rights Division
NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

*rec'd 7/3/07 Ap*

CERTIFIED MAIL
5057 3591

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB. Room 4239*
*Washington, DC 20530*

June 22, 2007

Mr. Rich Emanuel
c/o Adam M. Porter, Esquire
Law Offices of Adam M. Porter
Attorney at Law
2301 Morris Ave., Ste. 102
Birmingham, AL 35203

Re:  EEOC Charge Against Wallace State Community College, Dothan
     No. 420200700605

Dear Mr. Emanuel:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Wan J. Kim
Assistant Attorney General
Civil Rights Division

by  *Karen J. Ferguson*

Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc:  Birmingham District Office, EEOC
     Wallace State Community College, Dothan

DEFENDANT'S
EXHIBIT
21
PENGAD 800-631-6989

EMANUEL-0142--PLF DOX



Hasler

06HH601047

$06.2 10

Mailed From 20530
06/25/2007

US POSTAGE

U.S. OFFICIAL MAIL
$300 Penalty
for Private Use



U.S. Department of Justice

**CIVIL RIGHTS-EMP LIT**

*Washington, D.C. 20530*

Official Business
Penalty for Private Use $300

# Emanuel's 2006-2007 and 2007-2008 Income



DEFENDANT'S
EXHIBIT
22
PENGAD 800-631-6989

EMANUEL--0145--PLF DOX

FACULTY SALARY COMPUTATION WORKSHEET
2006-2007

NAME: Dr  Richard C. Emanuel
RANK/TITLE:  Associate Professor of Speech Communications
ASSIGNED UNIT: COLLEGE OF ARTS AND SCIENCES/Languages & Literature
ACCOUNT #: 2-11430-1110 OBJ/EEO CODE: 011/02   POSITION:
ACCOUNT #:   OBJ/EEO CODE:   POSITION:
ACCOUNT #:   OBJ/EEO CODE:   POSITION:
ACCOUNT #:   OBJ/EEO CODE:   POSITION:
ACCOUNT #:   OBJ/EEO CODE: 6 /   POSITION:
POSITION STATUS: Tenured
FUNDING UNIT: Languages & Literature

1.  **NINE-MONTH MINIMUM:**                    $41,889.00
         2005-2006 BASE SALARY                               $44,081.00
         **RANK ADJUSTMENT**                                  $11391.00
         PROMOTION:                                           $1,000.00
         COST OF LIVING ADJUSTMENT:
         2006-07 BASE SALARY:                                 $56,472.00
2. **SUPPLEMENTS:**
         TEACHING EXPERIENCE YEARS:        **21** :
         TEACHING EXPERIENCE PAY:                               4,398
         NON TEACH EXPERIENCE:
         TOTAL EXPERIENCE ALLOWANCE:
         GRADUATE STUDY ALLOWANCE:
         EARNED DOCTORATE:                                    $680.00
              INSTRUCTOR   ( ) $810
              ASST. PROF.    ( ) $680
              ASSOC. PROF.  ( ) $410
         MARKET ADJUSTMENT:
         CRITICAL NEED:

3. **TOTAL NINE MONTH SALARY:**                             $61,550.00

4. **DEPARTMENT CHAIR COMPUTATION:**
         DEPT. CHAIR/OTHER ADMIN.:
         FTE FACULTY: @$75.00

5. **HONORARIUM:**
     (FUNDED PROPOSAL; ADVISORSHIP;
     SPECIAL ASSIGNMENTS; VARSITY SPORTS)
6. **TOTAL COMPENSATION:**                                 **$61,550.00**
**PRORATED AMOUNT:**
**SPECIAL CONDITION:** None

EMANUEL--0146--PLF DOX

# SUMMER CONTRACT
# ALABAMA STATE UNIVERSITY
# MONTGOMERY, ALABAMA 36101-0271
# NOTICE OF EMPLOYMENT

**DATE:** 11 June 2007
**UNIT ASSIGNED:** COLLEGE OF ARTS AND SCIENCES/Languages & Literature

**RE:** Dr  Richard C. Emanuel

**TITLE/RANK:** Associate Professor of Speech Communications

**DEPARTMENT:** Academic Affairs      **HOURS TAUGHT:** 3

Effective **29 May 2007** to **30 July 2007**, the above referenced employee will be paid at the following rate:
## BUDGET INFORMATION
**TOTAL COMPENSATION:** $5,301.00

**ACCOUNT NUMBER:** 2-11980-1160    **Amount:**
**ACCOUNT NUMBER:**      **Amount:**
**ACCOUNT NUMBER:**      **Amount:**
**FUNDING UNIT:** Languages & Literature

**SPECIAL CONDITIONS:** None

### !!!NOTE!!!
**The employment and salary provided for in this contract are contingent upon the materialization of the assigned courses.**

*Beverly A. Rudolph   26 June 2007*
Personnel                  Date

# ALABAMA STATE UNIVERSITY
## FACULTY SALARY COMPUTATION WORKSHEET
### 2007-2008

NAME: Dr Richard C. Emanuel
RANK/TITLE: Associate Professor of Speech Communications
UNIT ASSIGNED: COLLEGE OF ARTS AND SCIENCES/Languages & Literature
ACCOUNT #1: 2-11430-1110 OBJ/EEO 1: 011/02 COST 1:
ACCOUNT #2:   OBJ/EEO 2:   COST 2:
ACCOUNT #3:   OBJ/EEO 3:   COST 3:
ACCOUNT #4:   OBJ/EEO 4:   COST 4:
ACCOUNT #5:   OBJ/EEO 5:   COST 5: 0
**POSITION STATUS**: Tenured
**FUNDING UNIT**: Languages & Literature

**1. NINE-MONTH MINIMUM**:          **41,889**
    LAST YEAR BASE:                                      56,472
    RANK ADJUSTMENT:
    PROMOTION:
    NEW DOCTORATE
    COST OF LIVING ADJUSTMENT:                2,259
    NEW BASE:                                              58,731
**2. SUPPLEMENTS**:
    TEACHING EXPERIENCE YEARS:**22**
    TEACHING EXPERIENCE PAY:                    4,608
    NON TEACHING EXPERIENCE PAY:
    TOTAL EXPERIENCE ALLOWANCE:
    GRADUATE STUDY ALLOWANCE:
    EARNED DOCTORATE:                                 680
        INSTRUCTOR  ( ) $810
        ASST. PROF.   ( ) $680
        ASSOC. PROF. ( ) $410
    MARKET ADJUSTMENT:
    CRITICAL NEED:

**3. TOTAL NINE MONTH SALARY**:              64,019

**4. DEPARTMENT CHAIR COMPUTATION**:
    DEPT. CHAIR/OTHER ADMIN:
    FTE FACULTY: @75.00

**5. HONORARIUM**:
    FUNDED PROPSAL; ADVISORSHIP;
    SPECIAL ASSIGNMENT; VARSITY SPORT:

**6. TOTAL COMPENSATION**:                      64,019
**PRORATED AMOUNT**:
**SPECIAL CONDITIONS**:  None

EMANUEL--0148--PLF DOX

Form **1040**

Department of the Treasury—Internal Revenue Service
**U.S. Individual Income Tax Return** **2006** (99) IRS Use Only—Do not write or staple in this space.

For the year Jan. 1–Dec. 31, 2006, or other tax year beginning , 2006, ending , 20 | OMB No. 1545-0074

| **Label** (See instructions on page 16.) Use the IRS label. Otherwise, please print or type. | Your first name and initial RICHARD C. | Last name EMANUEL | Your social security number 422 | 84 | 0323 |
| | If a joint return, spouse's first name and initial RENEE M. | Last name EMANUEL | Spouse's social security number |
| | Home address (number and street). If you have a P.O. box, see page 16. 1937 TARA DRIVE | Apt. no. | ▲ You must enter your SSN(s) above. ▲ |
| | City, town or post office, state, and ZIP code. If you have a foreign address, see page 16. PRATTVILLE, AL   36066 | | Checking a box below will not change your tax or refund. |

**Presidential Election Campaign** ▶ Check here if you, or your spouse if filing jointly, want $3 to go to this fund (see page 16) ▶ ☐ You ☐ Spouse

**Filing Status**
Check only one box.

1 ☐ Single
2 ☒ Married filing jointly (even if only one had income)
3 ☐ Married filing separately. Enter spouse's SSN above and full name here. ▶
4 ☐ Head of household (with qualifying person). (See page 17.) If the qualifying person is a child but not your dependent, enter this child's name here. ▶
5 ☐ Qualifying widow(er) with dependent child (see page 17)

**Exemptions**

6a ☒ Yourself. If someone can claim you as a dependent, do not check box 6a . . . . .
b ☒ Spouse . . . . . . . . . . . . . . . . . .

| c Dependents: | | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✔ if qualifying child for child tax credit (see page 19) |
| (1) First name | Last name | | | |
| James (ALEX) | EMANUEL | ⬤⬤⬤ ⬤⬤ ⬤⬤⬤⬤ | son | ☒ |
| Richard (MICHAEL) | EMANUEL | ⬤⬤⬤ ⬤⬤ ⬤⬤⬤⬤ | son | ☒ |
| | | | | ☐ |
| | | | | ☐ |

If more than four dependents, see page 19.

Boxes checked on 6a and 6b **2**
No. of children on 6c who:
• lived with you **2**
• did not live with you due to divorce or separation (see page 20)
Dependents on 6c not entered above

d Total number of exemptions claimed . . . . . . . . . . . . . Add numbers on lines above ▶ **4**

**Income**

Attach Form(s) W-2 here. Also attach Forms W-2G and 1099-R if tax was withheld.

If you did not get a W-2, see page 23.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 . . . . . . . . . | 7 | 61,177 |
| 8a | Taxable interest. Attach Schedule B if required . . . . . . . | 8a | 30 |
| b | Tax-exempt interest. Do not include on line 8a . . | 8b | | |
| 9a | Ordinary dividends. Attach Schedule B if required . . . . . . | 9a | |
| b | Qualified dividends (see page 23) . . . . . | 9b | | |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes (see page 24) | 10 | |
| 11 | Alimony received . . . . . . . . . . . . . . . | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ . . . . . | 12 | 9,162 |
| 13 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | 13 | |
| 14 | Other gains or (losses). Attach Form 4797 . . . . . . . . | 14 | |
| 15a | IRA distributions . . | 15a | | b Taxable amount (see page 25) | 15b | |
| 16a | Pensions and annuities | 16a | | b Taxable amount (see page 26) | 16b | |
| 17 | Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E | 17 | |
| 18 | Farm income or (loss). Attach Schedule F . . . . . . . . | 18 | |
| 19 | Unemployment compensation . . . . . . . . . . . | 19 | |
| 20a | Social security benefits . | 20a | | b Taxable amount (see page 27) | 20b | |
| 21 | Other income. List type and amount (see page 29) ----------------------- | 21 | |
| 22 | Add the amounts in the far right column for lines 7 through 21. This is your **total income** ▶ | 22 | 70,369 |

**Adjusted Gross Income**

| 23 | Archer MSA deduction. Attach Form 8853 . . E . . | 23 | 250 | |
| 24 | Certain business expenses of reservists, performing artists, and fee-basis government officials. Attach Form 2106 or 2106-EZ | 24 | | |
| 25 | Health savings account deduction. Attach Form 8889 . . . | 25 | | |
| 26 | Moving expenses. Attach Form 3903 . . . . . | 26 | | |
| 27 | One-half of self-employment tax. Attach Schedule SE . . | 27 | 647 | |
| 28 | Self-employed SEP, SIMPLE, and qualified plans . . . | 28 | | |
| 29 | Self-employed health insurance deduction (see page 29) | 29 | | |
| 30 | Penalty on early withdrawal of savings . . . . . . | 30 | | |
| 31a | Alimony paid   b Recipient's SSN ▶ | 31a | | |
| 32 | IRA deduction (see page 31) . . . . . . . | 32 | | |
| 33 | Student loan interest deduction (see page 33) . . . . | 33 | | |
| 34 | Jury duty pay you gave to your employer . . . . | 34 | | |
| 35 | Domestic production activities deduction. Attach Form 8903 | 35 | | |
| 36 | Add lines 23 through 31a and 32 through 35 . . . . . . . . . | 36 | 897 |
| 37 | Subtract line 36 from line 22. This is your **adjusted gross income** . . . . . ▶ | 37 | 69,472 |

For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see page 80.   Cat. No. 11320B   Form **1040** (2006)

EMANUEL--0149--PLF DOX

# Loss of income computations



DEFENDANT'S
EXHIBIT
23

PENGAD 800-631-6989

**A conservative estimate of income lost due to
not being hired by Wallace-Dothan in 2006**

| | 4.66% trend Current Employer | 4 43% trend Wallace-Dothan | Loss |
|---|---|---|---|
| **2006-2007** | **$66,851** | **$84,567** | **$17,716** |
| **2007-2008** | **$64,019** | **$90,487** | **$26,468** |
| 2008-2009 | $72,296 | $94,495 | $22,199 |
| 2009-2010 | $75,418 | $98,681 | $23,263 |
| 2010-2011 | $78,685 | $109,000 | $30,315 |
| 2011-2012 | $82,105 | $113,829 | $31,724 |
| 2012-2013 | $85,684 | $121,072 | $35,388 |
| 2013-2014 | $89,430 | $126,435 | $37,005 |
| 2014-2015 | $93,350 | $132,036 | $38,686 |
| 2015-2016 | $97,454 | $137,886 | $40,432 |
| **Subtotal** | **$810,586** | **$1,108,488** | **$259,012** |
| 2016-2017 | $101,748 | $143,994 | $42,246 |
| 2017-2018 | $106,242 | $150,373 | $44,131 |
| 2018-2019 | $110,946 | $157,034 | $46,088 |
| 2018-2019 | $115,869 | $163,991 | $48,122 |
| 2018-2019 | $121,022 | $171,256 | $50,234 |
| | $1,366,413 | $1,895,136 | **$489,833** |

DROP

Current employer salary trends are based on a 7-year salary history.
Wallace-Dothan salary trends are based on an 18-year salary history.

EMANUEL--0233--PLF DOX

## Loss of Income & Benefits

| Age | Year | Step | Wallace-Dothan | Current Employer | Difference | Insurance | Tuition Waiver | Compens. Damages | TOTAL | Sick leave | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 46 | 2006-2007 | step 20 | $84,567 | $66,851 | $17,716 | $4,157 | | $100,000 | $121,873 | 5 | 2006-2007 |
| 47 | 2007-2008 | step 20 | $90,487 | $64,019 | $26,468 | $4,157 | | | $30,624 | 5 | 2007-2008 |
| | | | | | | | | Back Pay = | $152,497 | 10 | |
| 48 | 2008-2009 | step 20 | $94,495 | $72,296 | $22,199 | $4,157 | $1,800 | | $28,156 | 5 | 2008-2009 |
| 49 | 2009-2010 | step 20 | $98,681 | $75,418 | $23,263 | $4,157 | $5,400 | | $32,820 | 5 | 2009-2010 |
| 50 | 2010-2011 | step 25 | $109,000 | $78,685 | $30,315 | $4,157 | $2,700 | | $37,172 | 5 | 2010-2011 |
| 51 | 2011-2012 | step 25 | $113,829 | $82,105 | $31,724 | $4,157 | | | $35,881 | 5 | 2011-2012 |
| 52 | 2012-2013 | step 27 | $121,072 | $85,684 | $35,388 | $4,157 | | | $39,544 | 5 | 2012-2013 |
| 53 | 2013-2014 | step 27 | $126,435 | $89,430 | $37,005 | $4,157 | | | $41,162 | 5 | 2013-2014 |
| 54 | 2014-2015 | step 27 | $132,036 | $93,350 | $38,686 | $4,157 | | | $42,843 | 5 | 2014-2015 |
| 55 | 2015-2016 | step 27 | $137,886 | $97,454 | $40,432 | $4,157 | | | $44,589 | 5 | 2015-2016 |
| 56 | 2016-2017 | D.R.O.P | $143,994 | $101,748 | $42,246 | $4,157 | | | $46,403 | 5 | 2016-2017 |
| 57 | 2017-2018 | D.R.O.P | $150,373 | $106,242 | $44,131 | $4,157 | | | $48,287 | 5 | 2017-2018 |
| 58 | 2018-2019 | D.R.O.P | $157,034 | $110,946 | $46,088 | $4,157 | | | $50,245 | 5 | 2018-2019 |
| 59 | 2019-2020 | D.R.O.P | $163,991 | $115,869 | $48,122 | $4,157 | | | $52,279 | 5 | 2019-2020 |
| 60 | 2020-2021 | D.R.O.P | $171,256 | $121,022 | $50,234 | $4,157 | | | $54,391 | 5 | 2020-2021 |
| | | | | | $489,833 | $54,038 | $9,900 | Front Pay = | $553,771 | 65 | |
| | | GRAND TOTAL = | | | $534,016 | $62,352 | $9,900 | $100,000 | $706,268 | | |

EMANUEL_0234--PLF DOX

# Retirement and D.R.O.P. calculations

There are very few full-time college teaching positions in Alabama that pay as well as the two-year college system. Only professor salaries at larger universities in select academic disciplines (e.g. computer science and business) in Alabama would match those of the two-year college system. EMANUEL's doctoral degree is not in one of those select disciplines.

Because EMANUEL is vested in the Alabama Teachers' Retirement System, he would not seek employment outside of Alabama.

In the Alabama Teachers' Retirement System, a teacher's monthly retirement income and D.R.O.P. program benefits are both based on a formula which is, in large measure, determined by salary.

## RETIREMENT

The retirement formula for maximum monthly benefit is:

**Average Final Salary**   x   **Years+Months of Service**   x   .020125   **divided by 12.**
(average of the highest     (Sick leave accumulates
three years out of the last 10)     toward additional months
                                     of service)

So, the maximum monthly benefit is influenced by average salary and, to a lesser degree, by the accumulation of sick leave days. Based on salary projections for Wallace-Dothan versus EMANUEL's current employer prior to EMANUEL's anticipated participation in the D.R.O.P. program, the average of the highest three years at Wallace-Dothan would be $132,119. The average of the highest three years at EMANUEL's current place of employment would be $93,411. The maximum monthly benefit using the Wallace-Dothan figure would be **$5,761**; the benefit using the current place of employment would be **$4,073.** This represents a difference and, therefore, a potential loss of income of at least **$1,688 per month every month EMANUEL is retired.**

## D.R.O.P.

The formula for determining D.R.O.P. benefits is:

**(Maximum monthly benefit x Value factor)   +   (Average salary during DROP x Interest factor)**

where the Value factor and the Interest factor are both determined by the number of years from 1-5 of the D.R.O.P. program participation. For example, if EMANUEL participated in the program for 5 years, the Value factor would be 66.30 and the Interest factor would be 0.2762.

So, the **D.R.O.P.** value including interest would depend on the Maximum monthly benefit (excluding sick leave credit) which depends on the Average Final Salary. Using the Wallace-Dothan figure, EMANUEL's D.R.O.P. program value plus interest would be $410,714; for EMANUEL's current place of employment, the value plus interest would be $290,365 – a difference and potential **loss of income of at least $120,349.**

## Retirement

|  | Wallace-Dothan | Current Employer |  |
|---|---|---|---|
| 2013-2014 | $126,435 | $89,430 |  |
| 2014-2015 | $132,036 | $93,350 |  |
| 2015-2016 | $137,886 | $97,454 |  |
| Average | $132,119 | $93,411 |  |
|  |  |  |  |
| Years of service | 26 | 26 |  |
|  | 0.020125 | 0.020125 | **Difference per month** |
| Max. monthly benefit | **$5,761** | **$4,073** | 1,688 |
|  |  |  |  |
| Max. monthly benefit for <u>DROP</u> program | **$5,539** | **$3,916** |  |

## DROP

|  |  | Wallace-Dothan | Current Employer |
|---|---|---|---|
|  | 2016-2017 | $143,994 | $101,748 |
|  | 2017-2018 | $150,373 | $106,242 |
| **DROP** | 2018-2019 | $157,034 | $110,946 |
|  | 2019-2020 | $163,991 | $115,869 |
|  | 2020-2021 | $171,256 | $121,022 |
|  | Average | **$157,330** | **$111,165** |

| DROP | Value | Interest | Wallace-Dothan | Current Employer | Difference |
|---|---|---|---|---|---|
| 1 year | 12.24 | 0.051 | $75,826 | $53,607 | $22,219 |
| 2 years | 24.97 | 0.104 | $154,680 | $109,355 | $45,325 |
| 3 years | 38.21 | 0.159 | $236,706 | $167,346 | $69,360 |
| 4 years | 51.98 | 0.217 | $322,014 | $227,656 | $94,357 |
| 5 years | 66.30 | 0.276 | **$410,714** | **$290,365** | **$120,349** |

EMANUEL--0236--PLF DOX

# Monthly PEEHIP Cost for 2006 - 2007 Plan Year

| Group | Retired Members<br>Who is Covered | Total Monthly Cost | Paid Monthly by State | Paid Monthly by Retiree | What You Can Lose - Total Paid by State for the Year |
|---|---|---|---|---|---|
| A | Retiree only, non-Medicare | $ 581.00 | $491.00 | $ 90.00 | $ 5,892.00 |
| B | Retiree & Family, non-Medicare | $1,094.00 | $872.00 | $222.00 | $10,464.00 |
| C | Retiree non-Medicare with Medicare- Eligible Family Coverage | $874.00 | $693.00 | $181.00 | $8,316.00 |
| D | Retiree only, Medicare Eligible | $299.00 | $297.86 | $1.14 | $3,574.32 |
| E | Retiree Medicare Eligible with  family- not Medicare Eligible | $812.00 | $678.86 | $133.14 | $8,146.32 |
| F | Retiree & Spouse, Both Medicare Eligible | $592.00 | $499.86 | $92.14 | $5,998.32 |

Each year, the Legislature determines how much the State will pay which determines how much is left for you to pay.

EMANUEL--0237--PLF DOX

PEEHIP

## Based on 2007-08 Rates

### Retiree Sliding Scale

**Non-Medicare Eligible Retiree with Non-Medicare Family Coverage (B Rate)**

| Years of Service | % of State Share for Single Coverage | State Share | Retiree Share | Total Premium |
|---|---|---|---|---|
| 40 | 30% | 991.10 | 78.90 | 1070.00 |
| 39 | 28% | 981.56 | 88.44 | 1070.00 |
| 38 | 26% | 972.02 | 97.98 | 1070.00 |
| 37 | 24% | 962.48 | 107.52 | 1070.00 |
| 36 | 22% | 952.94 | 117.06 | 1070.00 |
| 35 | 20% | 943.40 | 126.60 | 1070.00 |
| 34 | 18% | 933.86 | 136.14 | 1070.00 |
| 33 | 16% | 924.32 | 145.68 | 1070.00 |
| 32 | 14% | 914.78 | 155.22 | 1070.00 |
| 31 | 12% | 905.24 | 164.76 | 1070.00 |
| 30 | 10% | 895.70 | 174.30 | 1070.00 |
| 29 | 8% | 886.16 | 183.84 | 1070.00 |
| 28 | 6% | 876.62 | 193.38 | 1070.00 |
| 27 | 4% | 867.08 | 202.92 | 1070.00 |
| 26 | 2% | 857.54 | 212.46 | 1070.00 |
| 25 | 0% | 848.00 | 222.00 | 1070.00 |
| 24 | -2% | 838.46 | 231.54 | 1070.00 |
| 23 | -4% | 828.92 | 241.08 | 1070.00 |
| 22 | -6% | 819.38 | 250.62 | 1070.00 |
| 21 | -8% | 809.84 | 260.16 | 1070.00 |
| 20 | -10% | 800.30 | 269.70 | 1070.00 |
| 19 | -12% | 790.76 | 279.24 | 1070.00 |
| 18 | -14% | 781.22 | 288.78 | 1070.00 |
| 17 | -16% | 771.68 | 298.32 | 1070.00 |
| 16 | -18% | 762.14 | 307.86 | 1070.00 |
| 15 | -20% | 752.60 | 317.40 | 1070.00 |
| 14 | -22% | 743.06 | 326.94 | 1070.00 |
| 13 | -24% | 733.52 | 336.48 | 1070.00 |
| 12 | -26% | 723.98 | 346.02 | 1070.00 |
| 11 | -28% | 714.44 | 355.56 | 1070.00 |
| 10 | -30% | 704.90 | 365.10 | 1070.00 |

| | 25 Year Base | 848.00 | 222.00 | 1070.00 |
|---|---|---|---|---|

EMANUEL--0238--PLF DOX



# MEMBER HANDBOOK



## TEACHERS' RETIREMENT SYSTEM

### 2002

MANUEL-0299-PLTFRP

# TABLE OF MAXIMUM MONTHLY RETIREMENT BENEFIT

| Average Final Salary | Years of Creditable Service | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 10 | 12 | 14 | 16 | 18 | 20 | 22 | 24 |
| $10,000 | 168 | 201 | 235 | 269 | 302 | 335 | 369 | 402 |
| 12,000 | 201 | 242 | 282 | 322 | 362 | 403 | 443 | 483 |
| 15,000 | 252 | 302 | 352 | 403 | 453 | 503 | 554 | 604 |
| 17,000 | 285 | 342 | 399 | 456 | 513 | 570 | 627 | 684 |
| 20,000 | 335 | 402 | 469 | 536 | 604 | 671 | 743 | 805 |
| 22,500 | 377 | 453 | 528 | 604 | 679 | 755 | 830 | 906 |
| 25,000 | 419 | 503 | 586 | 670 | 755 | 839 | 922 | 1006 |
| 27,500 | 461 | 553 | 646 | 738 | 830 | 922 | 1015 | 1107 |
| 30,000 | 503 | 603 | 704 | 806 | 906 | 1006 | 1106 | 1208 |
| 32,500 | 545 | 654 | 763 | 872 | 981 | 1080 | 1199 | 1308 |
| 35,000 | 587 | 704 | 822 | 939 | 1057 | 1174 | 1291 | 1409 |
| 37,500 | 629 | 755 | 880 | 1006 | 1132 | 1258 | 1384 | 1509 |
| 40,000 | 671 | 805 | 939 | 1073 | 1208 | 1342 | 1476 | 1610 |
| 45,000 | 755 | 906 | 1057 | 1208 | 1359 | 1509 | 1660 | 1811 |
| 50,000 | 839 | 1006 | 1174 | 1342 | 1509 | 1677 | 1845 | 2013 |
| 55,000 | 922 | 1107 | 1291 | 1476 | 1660 | 1845 | 2029 | 2214 |
| 60,000 | 1006 | 1208 | 1409 | 1610 | 1811 | 2013 | 2214 | 2415 |
| 65,000 | 1090 | 1308 | 1526 | 1744 | 1962 | 2160 | 2398 | 2616 |
| 70,000 | 1174 | 1409 | 1644 | 1878 | 2113 | 2348 | 2583 | 2818 |
| 75,000 | 1258 | 1509 | 1761 | 2012 | 2264 | 2516 | 2767 | 3019 |
| 80,000 | 1342 | 1610 | 1878 | 2147 | 2415 | 2683 | 2952 | 3220 |
| 85,000 | 1426 | 1711 | 1996 | 2281 | 2566 | 2851 | 3136 | 3421 |
| 90,000 | 1509 | 1811 | 2113 | 2415 | 2717 | 3019 | 3321 | 3623 |

Note: Average Final Salary is the average of the highest three years (July - June) out of the last 10 years the member made contributions. Partial years are included when calculating the average final salary if they terminate mid-fiscal year.

To compute the maximum monthly retiree benefit, the following formula is used:
Average Final Salary X Years and Months of Service X Benefit Factor (2.0125%) ÷ 12

# RETIREMENT BENEFIT

| Average Final Salary | Years of Creditable Service | | | | | | |
|---|---|---|---|---|---|---|---|
| | 26 | 28 | 30 | 32 | 34 | 36 | 38 |
| $10,000 | 419 | 436 | 470 | 503 | 537 | 570 | 604 |
| 12,000 | 503 | 523 | 564 | 604 | 644 | 684 | 725 |
| 15,000 | 629 | 654 | 704 | 755 | 805 | 855 | 906 |
| 17,000 | 713 | 741 | 798 | 855 | 912 | 969 | 1026 |
| 20,000 | 839 | 872 | 939 | 1006 | 1073 | 1140 | 1208 |
| 22,500 | 943 | 981 | 1057 | 1132 | 1208 | 1283 | 1358 |
| 25,000 | 1048 | 1090 | 1174 | 1258 | 1342 | 1428 | 1509 |
| 27,500 | 1153 | 1199 | 1291 | 1384 | 1476 | 1568 | 1660 |
| 30,000 | 1258 | 1308 | 1408 | 1510 | 1610 | 1710 | 1812 |
| 32,500 | 1365 | 1420 | 1529 | 1638 | 1748 | 1857 | 1966 |
| 35,000 | 1467 | 1528 | 1644 | 1761 | 1878 | 1996 | 2113 |
| 37,500 | 1572 | 1635 | 1761 | 1887 | 2012 | 2138 | 2264 |
| 40,000 | 1677 | 1744 | 1878 | 2013 | 2147 | 2281 | 2415 |
| 45,000 | 1887 | 1962 | 2113 | 2264 | 2415 | 2566 | 2717 |
| 50,000 | 2096 | 2180 | 2348 | 2516 | 2683 | 2851 | 3019 |
| 55,000 | 2305 | 2398 | 2583 | 2767 | 2952 | 3138 | 3321 |
| 60,000 | 2516 | 2616 | 2817 | 3019 | 3220 | 3421 | 3623 |
| 65,000 | 2725 | 2834 | 3052 | 3270 | 3488 | 3706 | 3924 |
| 70,000 | 2935 | 3052 | 3287 | 3522 | 3757 | 3991 | 4226 |
| 75,000 | 3145 | 3270 | 3522 | 3773 | 4025 | 4277 | 4528 |
| 80,000 | 3354 | 3488 | 3757 | 4025 | 4283 | 4562 | 4830 |
| 85,000 | 3564 | 3706 | 3991 | 4277 | 4562 | 4847 | 5132 |
| 90,000 | 3774 | 3924 | 4226 | 4528 | 4830 | 5132 | 5434 |

Note: Average Final Salary is the average of the highest three years (July - June) out of the last 10 years the member made contributions. Partial years are included when calculating the average final salary if they terminate mid-fiscal year.

To compute the maximum monthly retiree benefit, the following formula is used:
Average Final Salary X Years and Months of Service X Benefit Factor (2.0125%) ÷ 12

EMANUEL--0240--PLF DOX

employees to elect to participate in DROP. This does not apply to regular payments for leave or continuous toward health insurance.

## Reemployment with the RSA after Withdrawal from Service

Any member who participated in DROP and withdrew from service may become reemployed with either the TRS or ERS. This additional service will be calculated based on Number 4 (page 31) under Continued Service After the DROP Participation Period.

## Calculating Your DROP Benefit

The following is a step-by-step method of calculating your DROP benefit. This is only an estimate. When you are ready to make a decision about entering DROP, contact the TRS for an estimate.

1. Determine your monthly retirement benefit at the DROP participation date.

Average Final Salary x Years and Months of Service x .020125 ÷ 12 = Monthly Retirement Benefit

The Average Final Salary is the average of the highest three annual salaries in the member's last 10 years of creditable service for which the member made contributions.

This formula will only compute the Maximum monthly retirement benefit. For options 1, 2, or 3, use the benefit calculator on our Web site to determine the monthly retirement benefit.

2. Multiply the monthly retirement benefit times the factor associated with the number of years you elect to participate in DROP to give you the DROP contributions value including interest.

   1 year   - 12.24
   2 years - 24.97
   3 years - 38.21
   4 years - 51.98
   5 years - 66.30

3. Determine the value of your contributions, plus interest, made during the DROP participation period.

   Multiply the average salary (estimated) during the drop participation period times the factor for the number of years you elect to participate in DROP.

   1 year   - .0510
   2 years - .1040
   3 years - .1592
   4 years - .2166
   5 years - .2762

4. Add the two amounts together to give you an estimated value of your DROP benefit at the end of the DROP participation period.

Example: At the DROP participation date the member had an average final salary of $41,000; 31 years of service; and selects the maximum retirement benefit. The member elects a four-year DROP participation period and

1. Monthly retirement benefit:
$41,000 X 31 x .020125 ÷ 12 = $2,131.57

2. DROP contribution value including interest: $2,131.57 x 51.98 = $110,799.00

3. Member contribution, including interest: $43,500 X .2166 = $9,422.10

4. Total DROP benefit:
$110,799.00 + $9,422.10 = $120,221.10

# Wallace-Dothan's
# Dependent tuition waiver
# Emanuel would have had
# in the absence of discrimination



EMANUEL--0269--PLF DOX

**Wallace-Dothan dependent tuition waiver**

| | | |
|---|---|---|
| 12 hours | $1,080 per semester | |
| | $2,160 per year | |
| | | |
| 15 hours | $1,350 per semester | |
| | **$2,700 per year** | |
| | | |
| 18 hours | $1,620 per semester | |
| | $3,240 per year | |

| | | |
|---|---|---|
| | 2006-07 1/3 waiver | |
| | 2007-08 2/3 waiver | |
| Alex Fr year | 2008-09 full waiver | $1,800 waiver |
| Alex SO year | 2009-2010 | $2,700 waiver |
| Michael FR year | | $2,700 waiver |
| Michael SO year | 2010-2011 | $2,700 |
| | | **$9,900** total waiver |

# Two-year college Salary Schedule D



DEFENDANT'S
EXHIBIT
25
PENGAD 800-631-6989

# Alabama Community and Technical Colleges

## Schedule D-1
## Full-time Instructors, Counselors and Librarians
## 2007-2008

| Rank | | Salary Step 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| IV | 9-Month | 50,437 | 51,771 | 53,105 | 54,439 | 55,774 | 57,108 | 58,442 | 59,777 | 61,_11 | |
| | Summer | 15,573 | 15,987 | 16,401 | 16,815 | 17,229 | 17,643 | 18,057 | 18,471 | 18,_86 | |
| | 12 Month | 66,009 | 67,758 | 69,506 | 71,255 | 73,003 | 74,751 | 76,500 | 78,248 | 79,_96 | |
| III | 9-Month | 45,404 | 46,739 | 48,073 | 49,407 | 50,742 | 52,076 | 53,410 | 54,744 | 56,0_9 | |
| | Summer | 14,016 | 14,430 | 14,844 | 15,258 | 15,672 | 16,086 | 16,500 | 16,915 | 17,329 | |
| | 12 Month | 59,420 | 61,169 | 62,917 | 64,665 | 66,414 | 68,162 | 69,911 | 71,659 | 73,407 | |
| II | 9-Month | 41,741 | 43,075 | 44,409 | 45,744 | 47,078 | 48,412 | 49,746 | 51,081 | 52,415 | |
| | Summer | 12,885 | 13,299 | 13,713 | 14,127 | 14,541 | 14,955 | 15,369 | 15,784 | 16,198 | |
| | 12 Month | 54,626 | 56,374 | 58,122 | 59,871 | 61,619 | 63,368 | 65,116 | 66,864 | 68,613 | |
| IA | 9-Month | 38,077 | 39,411 | 40,746 | 42,080 | 43,414 | 44,748 | 46,083 | 47,417 | 48,751 | |
| | Summer | 11,756 | 12,170 | 12,584 | 12,998 | 13,412 | 13,827 | 14,241 | 14,655 | 15,069 | |
| | 12 Month | 49,833 | 51,581 | 53,330 | 55,078 | 56,827 | 58,575 | 60,323 | 62,072 | 63,820 | |
| IB | 9-Month | 34,414 | 35,749 | 37,083 | 38,417 | 39,752 | 41,086 | 42,420 | 43,754 | 45,089 | |
| | Summer | 10,626 | 11,040 | 11,454 | 11,868 | 12,283 | 12,697 | 13,111 | 13,525 | 13,939 | |
| | 12 Month | 45,041 | 46,789 | 48,537 | 50,286 | 52,034 | 53,782 | 55,531 | 57,279 | 59,028 | |
| IC | 9-Month | 34,414 | 35,749 | 37,083 | 38,417 | 39,752 | 41,086 | 42,420 | 43,754 | 45,089 | |
| | Summer | 10,626 | 11,040 | 11,454 | 11,868 | 12,283 | 12,697 | 13,111 | 13,525 | 13,939 | |
| | 12 Month | 45,041 | 46,789 | 48,537 | 50,286 | 52,034 | 53,782 | 55,531 | 57,279 | 59,028 | |

Notes:

1. For instructors, librarians, and counselors in the State Community and Technical Colleges, initial step placement on t... schedule for prior full-time professional high-tech experience will be recommended by the president for approval by th... Chancellor. Prior full-time experience in teaching, counseling, or librarianship will be included in the qualificatio... initial step placement for new employees are determined by the president. Advancement in steps after placement will be... years completed in the respective position.

2. A department or division chairperson shall be paid an additional $400 per month provided that the department or divisi... a minimum of three full-time faculty members, with the Chairperson being counted as one of the three (see Policy Numbe...

3. A full-time head librarian shall be paid an additional $100 per month provided that only one person at each institutio... designated as head librarian (see Policy Number 606.05).

4. Schedule D-i is to be used to compensate full-time instructors at colleges using a 175/54 calendar.

ANUEE--0262--PLF DOX



| POLICY NAME: | **601.01: Equal Employment Opportunity** |
|---|---|
| EFFECTIVE: | 03-24-05 |
| SUPERSEDES: | 601.01 issued 12-08-94; 1979 |
| SOURCE: | *Civil Rights Act of 1964*, as amended in 1972 and 1991; Title VI; Title VII; Executive Order 11246, 1965, amended by Executive Order 11375; *Equal Opportunity Act of 1972*; Title VII *Education Amendments of 1972*; Title IX (P.L. 92-318) 45 CFR, Parts 81, 86 (Federal Register, June 4,1975, August 11, 1975); Section 504 of the *Rehabilitation Act of 1973* (Federal Register, May 4, 1997); *Pregnancy Discrimination Act of 1978*; *Americans With Disabilities Act of* 1990. (GAAA) |
| CROSS REFERENCE: | |

The State Board of Education and the entities under its direction and control are equal opportunity employers. It is their policy to provide equal opportunity for employment and advancement to all applicants and employees without regard to race, color, national origin, religion, age, disability, marital status, or gender, as provided in federal and state law.



Blumberg No. 5114

DEFENDANT'S
EXHIBIT
26

| POLICY NAME: | **601.02: Nondiscrimination** |
|---|---|
| EFFECTIVE: | 10-25-07 |
| SUPERSEDES: | 601.02 issued 12-08-94; 1982; 03-24-05 |
| SOURCE: | |
| CROSS REFERENCE: | |

No employee or applicant for employment or promotion, including applicants for presidential, full-time faculty, and other administrative and supervisory positions, shall be discriminated against on the basis of any impermissible criterion or characteristic including, without limitation, race, sex, age or any other protected class.

GWCC488

| POLICY NAME: | 601.04: Harassment |
|---|---|
| EFFECTIVE: | 10-25-07 |
| SUPERSEDES: | 601.04 issued 10-24-96; 12-08-94; 03-24-05 |
| SOURCE: | |
| CROSS REFERENCE: | |

1.   The State Board of Education is committed to providing both employment and educational environments free of harassment or discrimination related to an individual's race, color, gender, religion, national origin, age, disability, or any other protected class  Such harassment is a violation of State Board of Education policy. Any practice or behavior that constitutes harassment or discrimination shall not be tolerated on any campus or site, or in any division, or department by any employee, student, agent, or non-employee on any institution's property and while engaged in any institutionally sponsored activities.

It is within this commitment of providing a harassment-free environment and in keeping with the efforts to establish an employment and educational environment in which the dignity and worth of members of the community are respected, that harassment of students and employees is unacceptable conduct and shall not be tolerated at any of the institutions that comprise The Alabama College System

A nondiscriminatory environment is essential to the mission of The Alabama College System. An abusive environment inhibits, if not prevents, the harassed individual from performing responsibilities as student or employee and creates a hostile work environment. It is essential that institutions maintain an environment that affords equal protection against discrimination, including sexual harassment  The institutions of The Alabama College System shall take all the necessary steps to ensure that harassment, in any form, does not occur.  Employees and students who are found in violation of this policy shall be disciplined as deemed appropriate by the investigating authority as to the severity of the offense with final approval from the President

Employees and students of The Alabama College System shall strive to promote a environment that fosters personal integrity where the worth and dignity of each human being is realized, where democratic principles are promoted, and where efforts are made to assist colleagues and students to realize their full potential as worthy and effective members of society. Administrators, professional staff, faculty, and support staff shall adhere to the highest ethical standards to ensure professionally functioning institutions and to guarantee equal educational opportunities for all students

For these purposes, the term "harassment" includes, but is not necessarily limited to:

Slurs, jokes, or other verbal, graphic, or physical conduct relating to an individual's race, color, gender, religion, national origin, age, disability, or any other protected class  Harassment also includes unwelcome sexual advances, requests for sexual favors, and other verbal, graphic, or physical contact if perceived as such by the recipient.

Any contact solicited during non-traditional business hours may be perceived as

harassment by recipient unless it is specifically associated with work related duties.

2.    Harassment of employees or students by non-employees is also a violation of this policy. Any employee or student who becomes aware of any such harassment shall report the incident(s) to the appropriate institution official. Failure to act, which includes initial investigation, shall be deemed in direct violation of this policy.

3.    Sexual harassment is a form of sex discrimination which is illegal under Title VII of the *Civil Rights Act of 1964* for employees and under Title IX of the *Education Amendments of 1972* for students. Sexual harassment does not refer to occasional compliments; it refers to behavior of a sexual nature which interferes with the work or education of its victims and their co-workers or fellow students. Sexual harassment may involve the behavior of a person of either sex against a person of the opposite sex or the same sex, and occurs when such behavior constitutes unwelcome sexual advances, unwelcome requests for sexual favors, or other unwelcome verbal or physical conduct of a sexual nature, when perceived by the recipient that:

   3.1    Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or educational opportunities;

   3.2    Submission to or rejection of such conduct is used as the basis for employment or academic decisions affecting that individual;

   3.3    Such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance, or creates an intimidating, hostile, or offensive work or educational environment.

   Any incident of harassment shall be reported to the grievance officer as promptly as possible after the harassment occurs.

4.    The employees of the institutions within The Alabama College System determine the ethical and moral tone for these institutions through both their personal conduct and their job performance. Therefore, each employee must be dedicated to the ideals of honor and integrity in all public and personal relationships. Relationships between institution personnel of different ranks, including that of instructors and students, which involve partiality, preferential treatment, or the improper use of position shall be avoided. Further, such relationships may have the effect of undermining the atmosphere of trust on which the educational process depends. Implicit in the idea of professionalism is the recognition by those in positions of authority that in their relationships with students or employees there is always an element of power. It is incumbent on those with authority not to abuse the power with which they are entrusted.

   All personnel shall be aware that any romantic relationship (consensual or otherwise) or any otherwise inappropriate involvement with another employee or student makes them liable for formal action against them if a complaint is initiated by the aggrieved party in the relationship. Even when both parties have consented to the development of such a relationship, it is the supervisor in a supervisor-employee relationship, the faculty member in a faculty-student relationship, or the employee in an employee-student relationship who shall be held accountable for unprofessional behavior.

GWCC490

5   This policy encourages faculty, students, and employees who believe that they have been the victims of harassment to contact the grievance officer or other appropriate official at the institution where the alleged incident occurred. Any reprisals shall be reported immediately to the grievance officer or other appropriate official.

6.  This policy shall be distributed, communicated and implemented in a manner which provides all interested parties the opportunity to be informed of this policy. A system-wide educational program shall be utilized to assist all members of the community to understand, prevent and combat harassment.

7.  A harassment educational program may consist of seminars, workshops, videos, and/or printed materials. The educational elements of this policy seek to achieve the following goals through dissemination of this policy and providing a training program by: (1) ensuring that all administrators, faculty, students, and all employees are made aware of their rights concerning sexual harassment; (2) notifying individuals of conduct that is prohibited; (3) informing administrators and supervisors about the proper procedures in addressing complaints. This program must be administered annually and approved by Department of Postsecondary Education

8.  The Chancellor will issue guidelines to ensure the adherence to, implementation of, and enforcement of this policy

GWCC491

| POLICY NAME: | 602.01: Appointment and Assignment of Personnel |
|---|---|
| EFFECTIVE: | September 27, 2007 |
| SUPERSEDES: | 602.01 issued 01-22-04; 12-08-94 |
| SOURCE: | State Board of Education Resolution; *Code of Alabama* 16-60-111 4 and 16-60-111.7 |
| CROSS REFERENCE: | Policy 203.02 and 204-01 |

1.  The President of each institution shall appoint the faculty and staff of the institution according to qualifications approved by the State Board of Education and such other policies as may have been adopted by the State Board of Education. The President of each institution is authorized to make assignments of faculty and staff at the local level. The Chancellor has the authority to reverse any appointment or assignment of personnel determined to be contrary to any statute, and such policies as may have been adopted by the State Board of Education. The Presidents serve at the pleasure of the State Board of Education.

2.  A full-time consenting employee may be transferred from one college to another or from the Department of Postsecondary Education to a college, with the written agreement of both the transferring and receiving Presidents or Chancellor, and with the approval of the Chancellor Transfer requests will apply only to positions for lateral moves and will conform to the Alabama College System Uniform Guidelines

3.  The Chancellor shall notify the State Board of Education of any reversals of appointments or assignments resulting from this policy.

| POLICY NAME: | **602.02: Hiring Practices and Procedures** |
| --- | --- |
| EFFECTIVE: | 05-25-06 |
| SUPERSEDES: | 602.02 issued 03-24-05; 01-22-04; 12-08-94 |
| SOURCE: | State Board of Education Resolution; *Code of Alabama* 16-60-111.4 and 16-60-111.7 |
| CROSS REFERENCE: | Policy 203.02 and 204-01 |

Vacancies in presidential, full-time faculty, and other full-time administrative and supervisory positions, regardless of whether the position is shown on Salary Schedules A, B, C, or D, shall be filled according to the practices and procedures set out in The Alabama College System Uniform Guidelines

GWCC493

| POLICY NAME: | 605.01: Qualifications of Personnel |
|---|---|
| EFFECTIVE: | 03-24-05 |
| SUPERSEDES: | 605.01 issued 12-08-94; 1979 |
| SOURCE: | State Board of Education Resolution; Policies and Procedures |
| CROSS REFERENCE: | |

The President and other administrative officers directly responsible to the President must possess credentials, experience, and/or demonstrated competence appropriate to their areas of responsibility. The Chancellor shall issue guidelines on qualifications and experience required for the Presidents and administrative officers Appointments to such positions must be made in accordance with the guidelines.

GWCC494

| POLICY NAME: | **605.02: Postsecondary Faculty Credentials** |
|---|---|
| EFFECTIVE: | 03-24-05 |
| SUPERSEDES: | 605.02 issued 08-27-04; 12-08-94; 08-30-77 |
| SOURCE: | State Board of Education Resolution |
| CROSS REFERENCE: | |

1    The credentials are organized according to teaching areas. The following groups are presented:

    1.1.    Group A. This group of requirements shall be used for instructors teaching credit courses in the following areas: humanities/fine arts; social/behavioral sciences; natural sciences/mathematics; and in professional, occupational, and technical areas that are components of associate degree programs designed for college transfer. This group of requirements shall also be used for librarians and counselors.

    1.2.    Group B. This group of requirements shall be used for instructors teaching credit courses in professional, occupational, and technical areas that are components of associate degree programs not usually resulting in college transfer to senior institutions.

    1.3.    Group C. This group of requirements shall be used for instructors teaching credit courses in diploma or certificate occupational programs. The associate degree program may be authorized, but is not usually required. A doctoral degree is not available in these teaching areas or related areas.

2.    All instructors will be "grandfathered" in their current rank or level placements. For salary purposes, Ranks I/B, I/A, II, III, and IV shall be equivalent to Levels O, I, II, III, and IV, respectively.

    2.1.    Level IV-Group A

        2.1.1.    Degree Requirement: Earned Doctorate

        2.1.2.    In-field Requirement:

            Option (a)    Earned doctorate in-field

            Option (b)    Fifty-four (54) graduate semester hours of coursework in the teaching field.

            Option (c)    (Accepted only when fifty-four (54) graduate semester hours of coursework in the teaching field is unavailable at any accredited institution of higher education.)

                        Fifty-four (54) graduate semester hours of course-work in a combination of teaching field, related field, and/or education

Option (d)    (Acceptable only when an instructor has two teaching assignments)

Thirty-six (36) graduate semester hours in a major teaching field with eighteen (18) hours in a second teaching area

2.2.    Level IV-Group B

2.2.1.    Degree Requirement:

Option (a)    Specialist degree (minimum thirty (30) graduate semester hours beyond the master's degree in a planned program) plus thirty (30) additional graduate semester hours

Option (b)    Specialist degree (minimum of thirty (30) graduate semester hours beyond the master's degree in a planned program) plus the equivalent of thirty (30) additional graduate semester hours as stipulated in 2.2.2 (c) below

2.2.2.    In-field Requirement:

Option (a)    Thirty-six (36) graduate semester hours in teaching field.

Option (b)    (Acceptable only when thirty-six (36) graduate semester hours in the teaching field in unavailable at an accredited institution of higher education.) Thirty-six (36) graduate semester hours is a combination of the teaching field and/or related field; or, if unavailable, thirty-six (36) graduate semester hours in a combination of teaching field, related field, or education.

Option (c)    Twenty-four (24) graduate semester hours in accordance with Option (a) or (b) above plus the equivalent of thirty (30) graduate semester hours of corporate or other external formal training as determined below:

The (30) graduate semester hours equivalent will be determined for each program area by a program standards committee appointed by the Chancellor and composed of two technical Deans of Instruction and two instructors in each program area. The standards committee will revise the equivalent experience criteria on a three-year cycle.

2.2.3.    Work Requirement:

Three years of successful full-time experience as a practitioner in the vocational field and successful completion of an approved occupational examination (e.g., NOCTI) within the first year of employment.

2.3.    Level IV-Group C

   2.3.1.   Degree Requirement:

   Specialist degree (minimum of thirty (30) graduate semester hours beyond the master's degree in a planned program.)

   2.3.2.   In-field Requirement:

   Option (a)    Thirty-six (36) graduate semester hours in teaching field

   Option (b)    (Acceptable only when thirty-six (36) graduate semester hours in the teaching field are unavailable at any accredited institution of higher education.) Thirty-six (36) graduate semester hours in a combination of teaching field and/or related field; or, if unavailable, thirty-six (36) graduate semester hours in a combination of teaching field, related field, and/or education.

   Option (c)    Six (6) graduate semester hours in accordance with Options (a) or (b) above plus the equivalent of thirty (30) graduate semester hours of corporate or other external formal training as determined below:

   The thirty (30) graduate semester hours equivalent will be determined for each program area by a program standards committee appointed by the Chancellor. The standards committee will revise the equivalent experience criteria on a three-year cycle or as needed.

   2.3.3.   Work Requirement:

   Six (6) years of successful full-time experience as a master craftsman/ journeyman in the vocational field with competency demonstrated through successful completion of an approved occupational examination (e.g., NOCTI) within the first year of employment.

2.4    Level III-Group A

   2.4.1.   Degree Requirement:

   Specialist degree (minimum of thirty (30) graduate semester hours beyond the master's degree in a planned program) plus thirty (30) additional graduate semester hours.

   2.4.2.   In-field Requirement:

   Option (a)    Fifty-four (54) graduate semester hours in the teaching field.

   Option (b)    (Acceptable only when fifty-four (54) graduate semester hours in the teaching field is unavailable at any accredited institution of higher

education.) Fifty-four (54) graduate semester hours in a combination of the teaching field and/or related field; or, if unavailable, thirty-six (36) graduate semester hours in a combination of teaching field, related field, and/or education.

Option (c)   (Acceptable only when an instructor has two teaching assignments.) Thirty-six (36) graduate semester hours in a major teaching field with eighteen (18) graduate semester hours in a second teaching area.

2.5.   Level III–Group B

2.5.1   Degree Requirement:

Option (a)   Specialist degree (minimum of thirty (30) graduate semester hours beyond the master's degree in a planned program).

Option (b)   Master's degree plus the equivalent of thirty (30) graduate semester hours equivalent as stipulated in 2.5.2.(c) below.

2.5.2   In-field Requirements:

Option (a)   Thirty-six (36) graduate semester hours in teaching field.

Option (b)   (Acceptable only when thirty-six (36) graduate semester hours in the teaching field is unavailable at an accredited institution of higher education.) Thirty-six (36) graduate semester hours in a combination of the teaching field and/or related field; or, if unavailable, thirty-six (36) graduate semester hours in a combination of teaching field, related field, or education.

Option (c)   Fifteen (15) graduate semester hours in accordance with Options (a) or (b) above plus the equivalent of fifteen (15) graduate hours of corporate or other external formal training as determined below:

The fifteen (15) graduate semester hours equivalent will be determined for each program area by a program standards committee appointed by the Chancellor. The standards committee will revise the equivalent experience criteria on a three-year cycle.

2.5.3   Work Requirement:

Three years of successful full-time experience as a practitioner in the vocational field and successful completion of an approved occupational examination (e.g., NOCTI) within the first year of employment.

GWCC498

2.6    Level III-Group C

    2.6.1.    Degree Requirement:

        Option (a)    Master's Degree

        Option (b)    Baccalaureate degree plus the equivalent of thirty (30) additional graduate semester hours as stipulated in 2.6.2 (c) below

    2.6.2.    In-field Requirement:

        Option (a)    Eighteen (18) graduate semester hours in teaching field.

        Option (b)    (Acceptable only when eighteen (18) graduate semester hours in the teaching field are unavailable at an accredited institution of higher education.) Eighteen (18) graduate semester hours in a combination of teaching field and/or related field; or, if unavailable, eighteen (18) graduate semester hours in a combination of teaching field, related field, and/or education

        Option (c)    The equivalent of thirty (30) graduate semester hours of corporate or other external formal training will be determined for each program area by a program standards committee appointed by the Chancellor. The standards committee will revise the equivalent experience criteria on a three-year cycle.

    2.6.3.    Work Requirement:

        Six (6) years of successful full-time experience as a practitioner in the vocational field and successful completion of an approved occupational examination (e.g., NOCTI) within the first year of employment.

2.7.    Level II-Group A

    2.7.1.    Degree Requirement:

        Specialist degree (minimum of a master's degree plus thirty (30) additional graduate semester hours in a planned program.

    2.7.2    In-field Requirement:

        Option (a)    Thirty-six (36) graduate semester hours in the teaching field.

        Option (b)    (Acceptable only when thirty-six (36) graduate semester hours in the teaching field is unavailable at any accredited institution of higher education.) Thirty-six (36) graduate semester hours in a combination

GWCC499

of teaching field and/or related field; or, if unavailable, thirty-six (36) graduate semester hours in a combination of teaching field, related field, or education.

Option (c)    (Acceptable only when an instructor has two teaching assignments) Eighteen (18) graduate semester hours in a major teaching field with eighteen (18) graduate semester hours in a second teaching area.

2.8.    Level II-Group B

2.8.1.    Degree Requirement:

Option (a)    Master's Degree

Option (b)    Baccalaureate degree plus the equivalent of thirty (30) graduate semester hours as stipulated in 2.8.2 (c) below.

2.8.2    In-field Requirement:

Option (a)    Eighteen (18) graduate semester hours in the teaching field.

Option (b)    (Acceptable only when eighteen (18) semester hours in the teaching field is unavailable at an accredited institution of higher education) Eighteen (18) graduate semester hours in a combination of teaching field and/or related field; or, if unavailable, eighteen (18) graduate semester hours in a combination of teaching field, related field, or education.

Option (c)    The equivalent of thirty (30) graduate semester hours of corporate or other external formal training will be determined for each program area by a program standards committee appointed by the Chancellor. The standards committee will revise the equivalent experience criteria on a three-year cycle.

2.8.3    Work Requirement:

Three (3) years of successful full-time experience as a practitioner in the vocational field with competency demonstrated through successful completion of an approved occupational examination (e.g., NOCTI) within the first year of employment

2.9    Level II-Group C

2.9.1    Degree Requirement:

Baccalaureate Degree

2.9.2  In-field Requirement:

Twenty-seven (27) semester hours in the teaching field or related field

2.9.3.  Work Requirement:

Six (6) years of successful full-time experience as a practitioner in the vocational field with competency demonstrated through successful completion of an approved occupational examination (e.g., NOCTI) within the first year of employment.

2.10.  Level I-Group A

2.10.1  Degree Requirement:

Option (a)    Master's Degree

Option (b)    (Acceptable only for creative and applied arts and occupational programs.)  Baccalaureate degree plus in-field requirements in 2.10.2 (c) below

2.10.2.  In-field Requirement:

Option (a)    Eighteen graduate semester hours in the teaching field.

Option (b)    (Acceptable only when eighteen (18) graduate semester hours in the teaching field is unavailable at any accredited institution of higher education.) Eighteen (18) graduate semester hours in a combination of teaching field and/or related field; or, if unavailable, eighteen (18) graduate semester hours in a combination of teaching field, related field, or education.

Option (c)    (Acceptable only for 1(b) above.)  Bachelor's degree with twenty-seven (27) semester hours in the teaching field, documented professional competency, and three (3) years full-time experience in the occupational area.

2.11.  Level I-Group B

2.11.1  Degree Requirement:

Bachelor's Degree

2.11.2.  In-field Requirement:

Option (a)    Twenty-seven (27) semester hours in the teaching field

Option (b)     Specialized coursework equivalent to the community or technical college program

2.11.3  Work Requirement:

Three years of successful full-time experience as a practitioner in the occupational, technical, or vocational field.

2.12.  Level I-Group C

2.12.1.  Degree Requirement:

Associate degree or equivalent (at least sixty (60) semester hours in a planned program including associate degree core)

2.12.2  In-field Requirement:

Specialized coursework equivalent to the community or technical college program.

2.12.3  Work Requirement:

Six (6) years of successful full-time experience as a practitioner in the vocational field with competency demonstrated through successful completion of an approved occupational examination (e.g., NOCTI) within the first two years of employment.

2.13.  Level 0-Group A

(Instructors using these minimum requirements may only teach basic computation and communication skills in diploma or certificate programs or remedial courses.)

2.13.1.  Degree Requirement:

Bachelor's Degree

2.13.2.  In-field Requirement:

Twenty-seven (27) semester hours in the teaching field.

2.14.  Level 0-Group B

2.14.1.  Degree Requirement:

Associate Degree

GWCC502

2.14.2. In-field Requirement:

Major in assigned teaching area

2.14.3. Work Requirement:

Three (3) years successful full-time experience as a practitioner in the occupational or technical field.

2.15    Level 0-Group C

2.15.1. Degree Requirement:

Associate degree or equivalent (at least sixty (60) semester hours in a planned program including associate degree core.)

2.15.2. In-field Requirement:

Specialized coursework equivalent to the community or technical college program

2.15.3. Work Requirement:

Three (3) years successful full-time experience as a practitioner in the occupational or technical field.

(May 2005)

### GUIDELINES FOR POLICY
### 601.04: HARASSMENT

I    Definition of Sexual Harassment

Sexual harassment can be verbal, visual, or physical. It can be overt, as in the suggestions that a person could get a higher grade or a raise by submission to sexual advances. The suggestion or advance need not be direct or explicit; it can be implied from the conduct, circumstances, and relationship of the individuals involved. Sexual harassment can also consist of persistent, unwanted attempts to change a professional or educational relationship to a personal one. Sexual harassment is distinguished from consenting or welcome sexual relationships by the introduction of the elements of coercion; threat; unwelcome sexual advances; unwelcome requests for sexual favors; other unwelcome sexually explicit or suggestively written, verbal, or visual material; or unwelcome physical conduct of a sexual nature. Examples of verbal or physical conduct prohibited within the definition of sexual harassment include, but are not limited to:

A.    Physical assault;

B.    Direct or implied threats that submission to or rejection of requests for sexual favors will affect a term, condition, or privilege of employment or a student's academic status;

C.    Direct propositions of a sexual nature;

D.    Subtle pressure for sexual activity;

E.    Repeated conduct intended to cause discomfort or humiliation, or both, that includes one or more of the following: (i) comments of a sexual nature; or (ii) sexually explicit statements, questions, jokes, or anecdotes;

F.    Repeated conduct that would cause discomfort and/or humiliate a reasonable person at whom the conduct was directed that includes one or more of the following:

    1.    Touching, patting, pinching, hugging, or brushing against another's body;

    2.    Commentary of a sexual nature about an individual's body or clothing; or

    3.    Remarks about sexual activity or speculations about previous sexual experience(s);

G.    Intimidating or demeaning comments to persons of a particular sex, whether sexual or not;

(May 2005)

H.  Displaying objects or pictures which are sexual in nature that would create a hostile or offensive employment or educational environment, and serve no educational purpose related to the subject matter being addressed.

II.  Complaint Resolution

A.  Procedures for Reporting Complaints

1.  Any member of the institution community who believes that he or she has been the victim of sexual harassment, as defined in Section I, may bring the matter to the attention of any academic or administrative officer, Dean, Associate Dean, Director, supervisor, or advisor. When a complaint has been reported to any of these individuals, the recipient of the complaint will forward the complaint to the appropriate institution official, who shall be designated by the President to coordinate the investigation of such complaints. The President and the Vice Chancellor for Legal and Human Resources of the Department of Postsecondary Education shall be promptly notified of the complaint. The Vice Chancellor for Legal and Human Resources must be kept informed regarding the progress and results of the investigation of the complaint.

2.  The complainant should present the complaint as promptly as possible after the alleged sexual harassment occurs. The complainant should submit a written statement of the allegations. Retaliation against a student or employee for bringing a sexual harassment complaint is prohibited. Retaliation is itself a violation of this policy and may be grounds for disciplinary action.

3.  It is the intention of this policy to resolve complaints of sexual harassment as quickly as possible. Except in extraordinary cases, all complaints will be investigated and resolved within forty-five (45) days of receipt. Every possible effort shall be made to ensure confidentiality of information received as part of the investigation. Complaints will be handled on a "need to know" basis with a view toward protecting the interests of both parties.

4.  The investigation record shall consist of formal and informal statements from the alleged victim, the alleged offender, witnesses, and others deemed by the investigator to have pertinent knowledge of the facts involved in the complaint. The investigation will afford the accused a full opportunity to respond to the allegations. If the results of the investigation and informal resolution of the complaint are accepted by the alleged victim and he or she desires no further action against the alleged harasser, the complainant will sign a statement requesting that no further action be taken.

B.  Formal Action

(May 2005)

1. If the complaint cannot be resolved on an informal basis, the complainant may file a formal complaint. Each complainant has the right to proceed with or withdraw from the formal complaint procedure once it has been submitted. The issues involved in the complaint should not be changed once the charge has been made. However, administrative procedures may be revised to accommodate issues arising during the investigation which were not known to the complainant or the institution when the initial complaint was filed.

2. The appropriate institution official will notify the accused in writing of the decision to take formal action. Formal action will consist of the Title IX procedures set forth in State Board of Education Policy Number 620.01 for complaints against institution employees.

3. Complaints against students will be handled according to usual and customary student discipline procedures in effect at the institution.

4. It is the intent of the policy to provide for a prompt and thorough investigation of any complaints. The time limits set forth within these guidelines are subject to change as needed to ensure a satisfactory conclusion to the investigation.

C. Appeal

The accused or the complainant may, by written request, appeal the decision to the Chancellor within fifteen (15) calendar days of notification of a decision. The Chancellor shall use the appeal process for Title IX complaints set forth in State Board of Education Policy Number 620.01.

D. Remedial Action

Based on the findings of the hearing panel and the decision of the President of the institution and the Chancellor, disciplinary action will be imposed as appropriate depending on the severity of the findings.

III. Education

A sexual harassment educational program may consist of seminars, workshops, videos, and/or printed materials. The educational elements of this policy seek to achieve the following goals through dissemination of this policy and providing a training program by: (1) ensuring that all administrators, faculty, students, and all employees are made aware of their rights concerning sexual harassment; (2) notifying individuals of conduct that is prohibited; (3) informing administrators and supervisors about the proper procedures in addressing complaints.

(July 2006)

### GUIDELINES FOR POLICY
### 602.01: APPOINTMENT AND ASSIGNMENT OF PERSONNEL
### TRANSFER GUIDELINES

I.     A full-time institution employee must submit a written request for transfer to both the transferring and receiving Presidents. Upon the written agreement of both Presidents, the Chancellor must provide final approval of the transfer.

II.    A full-time Department of Postsecondary Education employee must submit a written request and receive written approval from the receiving President and Chancellor.

III.   A transfer request will only apply to a petition for a lateral move, i.e. movement between the same or similar job titles and pay grades.

IV.    All transfer requests will be effected in compliance with State Board of Education policy and applicable law and shall not be implemented to alter, abridge, or replace practices and procedures set out in the Uniform Guidelines.

V.     Any employee transferred will retain all benefits, rights, and status held at the time of transfer. No employee will lose non-probationary status as a result of transfer.

GWCC507

(July 2006)

## GUIDELINES FOR POLICY
## 602.02: HIRING PRACTICES AND PROCEDURES

I.    The President (or designee) of each institution shall post notices of all personnel vacancies, full-time and part-time, temporary and non-temporary, for all salary schedules. The vacancy notice shall be posted in an area in plain view at each institution's main campus and all instructional sites at least fourteen (14) calendar days before the position is to be filled. These posting requirements shall not be implemented to alter, abridge, or replace practices and procedures set out in the Uniform Guidelines.

II.   The vacancy notice shall include, but is not limited to, the following:

A.    Job description and title;

B.    Required qualifications;

C.    Salary schedule and amount;

D.    Information regarding the location for submitting applications;

E.    Information regarding any deadlines for receipt of applications;

F.    Any other relevant information.

III.  When a personnel vacancy occurs during an academic term and is not a supervisory, managerial, or newly created position, the vacancy notice may be posted not less than seven (7) calendar days before the position is to be filled.

IV.   Posting of personnel vacancies shall not be abridged or delayed except in circumstances of dire emergency. Under such emergency conditions, any delay in the posting of notices shall be only temporary in order to reasonably meet the emergency conditions that may arise. Any such emergency conditions and posting(s) must be documented in writing to the Chancellor no later than the end of each academic term.

(These guidelines are issued in compliance with the requirements of Act 98-147.)

GWCC508

I.A

COPY

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| HUMPHREY L. SHUFORD, individually and on behalf of a class of persons similarly situated, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| CONNIE JOHNSON, individually and on behalf of a class of persons similarly situated, | ) ) ) ) |
| Plaintiff-Intervenor, | ) ) CIVIL ACTION NO. 89-T-196-N |
| KAREN NEWTON, individually and on behalf of a class of persons similarly situated, | ) ) LEGAL NOTICE OF ) PROPOSED CONSENT ) DECREE AND HEARING |
| Plaintiff-Intervenor, | ) ) |
| vs. | ) ) |
| ALABAMA STATE BOARD OF EDUCATION, et al., | ) ) ) |
| Defendants. | ) ) |

TO:    (1) ALL PRESENT EMPLOYEES AND (2) BLACK PERSONS WHO ARE, HAVE BEEN, OR MAY BECOME CANDIDATES FOR EMPLOYMENT IN OR PROMOTION TO FULL-TIME FACULTY, ADMINISTRATIVE OR SUPERVISORY POSITIONS AT JUNIOR, COMMUNITY AND TECHNICAL COLLEGES OPERATED BY THE ALABAMA STATE BOARD OF EDUCATION

THIS LEGAL NOTICE IS TO INFORM YOU OF A PROPOSED PARTIAL SETTLEMENT OF A CLASS ACTION LAWSUIT WHICH MAY ALTER THE PROCEDURES BY WHICH CERTAIN EMPLOYEES ARE HIRED AND PROMOTED AT THE JUNIOR, COMMUNITY AND TECHNICAL COLLEGES OPERATED BY THE ALABAMA STATE BOARD OF EDUCATION, AND WHICH CONSEQUENTLY MAY AFFECT YOU. PERSONS WHO MAY BE AFFECTED, INCLUDING BLACK EMPLOYEES IN THE JUNIOR, COMMUNITY AND TECHNICAL COLLEGES AND BLACK PERSONS WHO ARE, HAVE BEEN, OR MAY BECOME CANDIDATES FOR EMPLOYMENT IN OR PROMOTION TO FULL-TIME FACULTY, ADMINISTRATIVE OR SUPERVISORY POSITIONS AT THE COLLEGES SHOULD READ THIS NOTICE CAREFULLY.

A proposed partial settlement has been reached in the above-captioned action and incorporated in a proposed partial consent decree which has been submitted to this Court for its consideration and approval.

I.    BACKGROUND OF THE PROPOSED PARTIAL CONSENT DECREE

A lawsuit is pending in the United States District Court for the Middle District of Alabama against the Alabama State Board of Education ("ASBE"), the members of the Board of Education, and Dr. Fred Gainous, the Chancellor of the



DEFENDANT'S
EXHIBIT
27

GWCC509

## Employment Practices and Procedures

After the effective date of the decree, all vacancies in full-time positions (35 or more hours per week) covered by the decree shall be filled using a standardized process which is designed to assure that Black applicants are identified and given fair consideration. Defendants will establish a centralized minority recruiting program. The program will include a state-wide bank of information regarding potential Black applicants, annual recruiting contacts with historically Black universities, regular contact with predominantly Black colleges in the Postsecondary System to solicit qualified Black applicants, annual recruiting contacts with historically Black universities, regular of Black applicants through professional journals and publications, and other efforts to identify Black applicants. The individual colleges will also take steps to identify potential Black applicants. Temporary or part-time employees are not specifically covered by the decree, but provisions are included to assure that such positions are not used to frustrate the purposes of the decree.

## The Application Process

Each college must develop job descriptions and advertise all vacancies to be filled. Each college must maintain records of how and by whom vacancies are filled, including but not limited to applications and written evaluations of applicants. Applicants meeting the minimum requirements shall be interviewed. Hiring and promotion decisions shall be based on merit and qualifications, but consideration shall also be given to the needs of the college for racial, ethnic and cultural diversity and to the employment goals of the decree.

## Recruitment and Selection Committee

Each college shall have one or more recruitment and selection committees, the membership of which shall be at least 40% Black, to screen and interview applicants and to make hiring recommendations to the president. The president must ordinarily make a hiring decision from among the persons recommended, and shall justify his or her decision in writing. The president will have discretion to reopen the application process or employ a qualified Black person without using the prescribed selection process, if necessary to comply with the decree's remedial objectives.

## Lateral Transfers and Reorganization

Before making a lateral transfer, the president must obtain the names of potential Black applicants for the position from the state-wide bank of information. If an incumbent Black employee applies for the position but is not hired, the president must document the reasons for the hiring decision. Should a college find it necessary to modify an existing position, such modification shall not be deemed to create a vacancy subject to the terms of the decree; provided, however, that any such modification must be educationally necessary, not based on race, and approved by the Chancellor.

## Reduction in Force Due to Merger or Consolidation

The Board's current policy is that no employee will be terminated or demoted due to a merger of colleges. Any reduction in force which might be necessitated by a merger or other material restructuring shall be done in a non-discriminatory manner using non-racial objective criteria set out in the decree. Employees who are displaced will be given special opportunities to interview with other colleges where vacancies are available. If a Black employee in good standing is displaced, the employee's name shall be placed in the state-wide bank of information, the employee shall be advised of available positions for which he or she may be qualified, and the colleges will be advised of the employee's availability. Displaced employees shall have priority for reemployment should a position for which the employee is qualified become available at the college from which the employee was displaced.

## Reporting Requirements

Each college shall annually file a report describing its efforts and progress in complying with the decree. Counsel for the plaintiff class shall have the right to inspect copies of the records maintained by the colleges.

3

GWCC510

Copies of the Proposed Consent Decree

A copy of the proposed partial consent decree is available for review in the office of the president of each of the junior, community and technical colleges covered by the decree and also at the following locations:

Clerk of the United States District Court
for the Middle District of Alabama
Frank M Johnson, Jr. Federal Courthouse
15 Lee Street
Montgomery, Alabama 36104

Chancellor's Office
Department of Postsecondary
Education
401 Adams Avenue
Montgomery, Alabama 36130-2130

Hearing - What You May Do

If you are satisfied with the proposed partial consent decree or if you have no objection, you need not do anything regarding the hearing scheduled by the Court. If you oppose the decree, you have an opportunity to appear at this hearing and to file a written statement explaining your objection(s). If you wish to object to the proposed partial consent decree you or your attorney must file your statement of objection in writing with the Clerk, United States District Court, Frank M Johnson, Jr Federal Courthouse, 15 Lee Street, Montgomery, Alabama 36104 so the Court may consider it when making its final decision whether to approve the decree. If you wish to present your views at the hearing, you should so inform the Clerk in writing at the same time you file your written statement of objection. If you wish, you may also file a statement and present your views in support of the proposed partial consent decree at the hearing. You may not present your views at the hearing unless you file a statement with the Court on or before December 15, 1993. At the top of each written statement should appear the words *Shuford v. Alabama State Board of Education, et al, Civil Action No. 89-T-196-N*

Copies of all objections, statements of support, and statements of intent to appear should be sent to the following persons at the time they are filed with the Clerk of the Court:

1  Terry G Davis, Esquire
   Kenneth L. Thomas
   Anita L Kelly
   Mark Englehart
   Post Office Box 230907
   Montgomery, Alabama 36123-0907

2  James U Blacksher, Esquire
   Fifth Floor Title Bldg.
   300 21st Street North
   Birmingham, Alabama 35203

3  Joe R Whatley, Esquire
   Cooper, Mitch, Crawford
   Kuykendall & Whatley
   505 20th Street, North
   1100 Financial Center
   Birmingham Alabama 35203-2605

4  Randall Morgan, Esquire
   Hill, Hill, Carter, Franco, Cole
   & Black
   Post Office Box 116
   Montgomery, Alabama 36101-0116

5  J Allen Schreiber Esquire
   Gerald A. Templeton Esquire
   Lloyd Schreiber & Gray P C
   2 Perimeter Park South, Suite 100
   Birmingham Alabama 35243

This notice has been approved by counsel for plaintiff and the plaintiff class, by counsel for the defendants, and by the Court

Dated: November 19, 1993

/s/ Thomas C. Caver
CLERK, UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA

5

GWCC511

1.B

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| HUMPHREY L. SHUFORD, individually and on behalf of a class of persons similarly situated, <br><br> Plaintiff, <br><br><br> CONNIE JOHNSON and KAREN NEWTON, individually and on behalf of a class of persons similarly situated, <br><br> Plaintiff-Intervenors, <br><br><br> MYRA P. DAVIS and SHERYL B. THREATT, individually and on behalf of a class of persons similarly situated, <br><br> Plaintiff-Intervenors, <br><br> vs. <br><br> ALABAMA STATE BOARD OF EDUCATION, et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) **CIVIL ACTION NO.** ) **89-T-196-N** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

### PARTIAL CONSENT DECREE

1.   This action was commenced on February 24, 1989, by Plaintiff HUMPHREY L. SHUFORD. On April 20, 1989, DR. CONNIE JOHNSON filed a motion to intervene. On June 21, 1991, the Court entered an order granting SHUFORD leave to file an amended complaint and granting JOHNSON'S motion to intervene and allowing her complaint in intervention. On September 21, 1993, KAREN NEWTON filed a motion to intervene and a complaint in intervention, which were allowed by the Court on October 19, 1993. On February 3, 1994, MYRA P. DAVIS and SHERYL B. THREATT filed a motion to intervene and a complaint in intervention, which were allowed by the Court on March 2, 1994. This partial consent decree deals only with the claims asserted by JOHNSON, NEWTON, THREATT, and DAVIS and not those asserted by SHUFORD. However, this partial consent decree shall be read in conjunction with and construed contemporaneously with the partial consent decree entered in this matter on March 15, 1994 regarding the claims raised by SHUFORD. (Hereafter called the Shuford partial consent decree).

2. Plaintiff JOHNSON, who is a white female, alleged she was denied a position as President of Muscle Shoals State Technical College and denied a position of dean of instruction at Muscle Shoals State Technical College because of her gender. JOHNSON alleged causes of action based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., on the Fourteenth Amendment, on 42 U.S.C. § 1983 and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).

3. Plaintiff NEWTON, who is a white female, alleged she had been denied promotion to a high administrative position at the Phil Campbell campus of Northwest Shoals Community College and denied a high administrative position at Bevill State Community College. She alleged that she did not receive the position because of her gender and also alleged that she was effectively demoted because of her gender. NEWTON alleged causes of action based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., on the Fourteenth Amendment, on 42 U.S.C. § 1983 and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).

4. Plaintiff DAVIS, who is a black female, alleged she was denied a position of Director of Admissions at Lawson State Community College because of her gender. DAVIS alleged causes of action based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., on the Fourteenth Amendment, on 42 U.S.C. § 1983 and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) and 42 U.S.C. § 1981.

5. Plaintiff THREATT, who is a black female, alleged she was denied a position of Director of Financial Aid at Lawson State Community College because of her gender. THREATT alleged causes of action based on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., on the Fourteenth Amendment, on 42 U.S.C. § 1983 and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) and 42 U.S.C. § 1981.

6. Plaintiffs JOHNSON and NEWTON sought to prosecute this case as a class action on behalf of female professional educators who have been or may be victims of gender discrimination in Alabama's community, junior, and technical colleges. Plaintiffs JOHNSON and NEWTON contended,

GWCC513

on behalf of themselves and the proposed putative class, that historical circumstances created systematic barriers to equal opportunity in employment for female professional educators throughout said community, junior, and technical colleges. JOHNSON and NEWTON sought appropriate declaratory and injunctive relief for themselves individually and for the respective putative class as a whole.

7. Plaintiffs THREATT and DAVIS sought to prosecute this case as a class action on behalf of black female professional educators who have been or may be victims of racial and gender discrimination in Alabama's community, junior, and technical colleges. Plaintiffs THREATT and DAVIS contended, on behalf of themselves and the proposed putative class, that historical circumstances created systematic barriers to equal opportunity in employment for black female professional educators throughout said community, junior, and technical colleges. THREATT and DAVIS sought appropriate declaratory and injunctive relief for themselves individually and for the respective putative class as a whole.

8. Defendants denied all the material allegations of the amended Shuford complaint, all complaints in intervention, challenged jurisdiction, and asserted various affirmative defenses, including but not limited to res judicata and collateral estoppel.

9. This decree is issued with the consent of the Alabama State Board of Education and Chancellor Fred Gainous, without a trial of any contested issues. The Plaintiff-Intervenors and Defendants have agreed to the entry of this decree to demonstrate their good faith and to avoid the risks, burdens and expense of continued litigation, and to promote full enforcement of federal civil rights laws. The parties have agreed to compromise their claims and defenses on the terms stated herein. It is expressly understood and agreed by the parties that by entering into this consent decree the Defendants are not, and shall not be construed as, in any manner admitting liability; nor do the Defendants admit the material allegations of the complaints in intervention as amended.

10. This Court has in personam and subject matter jurisdiction sufficient to enter this consent decree, and venue is proper.

3

11. The Court has fully examined the terms of this consent decree and finds them to be reasonable, just, and in accordance with the Fourteenth Amendment to the Constitution of the United States, Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. §s 1981 and 1983, and Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a). Plaintiffs agree to a dismissal with prejudice of the claims asserted under the Voting Rights Act, 42 U.S.C. §1973.

WHEREFORE, it is hereby ORDERED, ADJUDGED and DECREED, and Defendants Alabama State Board of Education and Chancellor Fred Gainous and their successors are hereby ENJOINED, as follows:

A.  Class Certification

1.  Plaintiffs JOHNSON and NEWTON represent a plaintiff class defined as follows: "A class of all female citizens who have been or will be denied employment in or promotion to presidential, full-time faculty and other administrative and supervisory positions covered by salary schedules A, B, C, and D at community, junior and technical colleges in the Alabama System of Postsecondary Education. If a college maintains a full-time administrative or supervisory position which is not covered or defined on the A, B, C, or D salary schedule, such position shall also be included within the scope of the plaintiff class and the coverage of this decree." The phrase "positions covered by this decree" as hereinafter used shall be construed accordingly.

2.  Plaintiffs DAVIS and THREATT represent a plaintiff sub-class defined as follows: "A sub-class of all black citizens represented by Humphrey Shuford and all women represented by Johnson and Newton, which is further and more specifically defined as a sub-class of all black female citizens who have been or will be denied employment in or promotion to presidential, full-time faculty and other administrative and supervisory positions covered by salary schedules A, B, C, and D at community, junior and technical colleges in the Alabama System of Postsecondary Education. If a college maintains a full-time administrative or supervisory position which is not covered or defined on the A, B, C, or D salary schedule, such position shall also be included within the scope of

4

the plaintiff sub-class and the coverage of this decree." The phrase "positions covered by this decree" as hereinafter used sha ll be construed accordingly.

B.   Nondiscrimin ation Policy and Goal of Decree

1.   It is the intent of the parties that all junior, technical and community colleges which are or which shall become a part of the Alabama System of Postsecondary Education (referred to hereinafter separately or collectively as the "college" or the "colleges") shall be subject to this decree.

2.   Defendants shall adopt the following as a written policy of the Alabama State Board of Education and the System of Postsecondary Education and shall ensure this policy is effectuated in a manner which advances the purpose and goals of the decree so:

a.   that no employee or applicant for employment or promotion, including applicants for presidential, full-time faculty and other administrative and supervisory positions, shall be discriminated against on the basis of any impermissible criterion or characteristic including without limitation of race or sex and,

b.   that all persons participating in selection procedures for professional employees shall take all action necessary to foster black persons and women, including black women, having equal and effective participation in the personnel decision-making process.

3.   Defendants shall adopt as a written policy of the State Board of Education that the employment goals stated hereafter shall be employment goals for the appointment of black persons and women, including black women, to positions covered by this decree at State community, junior, and technical colleges; and shall cause the colleges and the Department of Postsecondary Education to implement the Board's policy using their best good-faith efforts, recognizing the spirit and principles underlying the policy. Where particular salary schedules are indicated, the goals stated below shall apply to any equivalent successor salary schedule or schedules which may be established by the State Board of Education. As provided in Section A., it is the parties' intent that this decree include within its coverage all presidential, full-time faculty, and other full-time administrative and

5

GWCC516

supervisory positions regardless of whether the position is shown on the formal A,B,C, or D salary schedule. For purposes of this decree, "full-time" shall mean 35 or more duty hours per week.

Inasmuch as the respective colleges are currently being reviewed in terms of redefining their respective service areas, and inasmuch as their service areas are subject to being revised or eliminated should the State Board of Education deem such revision or elimination to be appropriate, then for the purposes of this consent decree the term "primary service area" shall mean such geographic area as the State Board of Education and Chancellor shall submit to this Court as each respective college's primary service area. The primary service areas designated for the purpose of this consent decree shall not be binding upon any college or the State Board of Education for any other purposes, unless expressly adopted for such other purpose(s) by the State Board of Education. The State Board and Chancellor shall submit such service area designations to the Court by no later than 120 days after the effective date of this decree. If Plaintiffs contend that the service areas so designated have the purpose or effect of materially thwarting achievement of the employment goals established in this decree, they may file appropriate objections with the Court.

The following employment goals are being established in good faith by the parties to this consent decree with the mutual understanding that the extent to which the respective goals are reasonably attainable shall depend on such factors as the nature and number of vacancies which shall occur during the term of this decree, the number and availability of black persons and women, including black women, who meet the job requirements of the positions in question, and the number of black persons and women, including black women, meeting the job requirements who shall be desirous of applying for the vacancies which shall become available. Therefore, in any instance where any of the following goals is not met, this Court shall reserve the authority to conduct a hearing on the matter of the degree to which the Defendants shall have exercised good faith efforts to reach each such goal. In the event of a finding of a lack of good faith effort on the part of any Defendant, this Court shall order such additional measures as shall be appropriate to ensure that a subsequent reasonable effort is made by the Defendants to reach the unmet goal.

6

GWCC517

In the event o f a finding by this Court with respect to any unmet goal that the Defendants have nevertheless made a reasonable good-faith effort to attain such goal, the Court shall reevaluate such goal to determine whether or not the Court should order that it and related subsequent goals should be modified by the State Board of Education so as to be more reasonably attainable.

## GOALS RELATING TO THE APPOINTMENT OF WOMEN

(1)  By the en d of Fall Quarter 1996, the total number of female college presidents shall be at least that number which most closely represents twenty-five percent (25%) of all college presidents. By the end of Fall Quarter 1999, the total number of female college presidents shall be at least that number which most closely represents thirty-three percent (33%) of all college presidents. By the end of Fall Quarter 2005, the total number of female college presidents shall be that number which most closely represents fifty percent (50%) of all college presidents.

(2)  By the en d of Fall Quarter 2005, the percentage of women employed at each college on each of the B, C1, C2, C3 and D Salary Schedules, respectively, shall equal at least that number which most closely represents fifty percent (50%) of the total number of persons employed at each of the respective colleges on the B, C1, C2, C3 and D Salary Schedules.

## GOALS RELATING TO THE APPOINTMENT OF BLACK WOMEN

These goals relating to the appointment of black women are to be construed contemporaneously and concurrently with the percentages for appointment of black persons approved in the companion Shuford partial consent decree. That is, the following goals and percentages for appointment of black women are roughly equal to one half of the goals and percentages for blacks as a class represented by Shuford. These goals do not increase the overall goals set for the class of blacks represented by the Shuford partial consent decree.

(1)  By the end of Fall Quarter 1996, the total number of black women college presidents shall be at least that number which most closely represents twelve and one half percent (12.5%) of all college presidents.

(2)  By the end of Fall Quarter 1996, the percentage of black women employed at each college on B and C1 Salary Schedules combined shall equal at least that number which most closely represents thirty-seven and one half percent (37.5%) of the percentage of black persons in the general population of the primary service area of the respective college.

7

GWCC518

(3)  By the end of Fall Quarter 1995, the percentage of black women employed on the B and C1 Salary Schedule at all colleges combined shall be at least ten and one half percent (10.5%) of the total of all persons employed at the colleges on the B and C1 Salary Schedules. By the end of Fall Quarter 1997, this percentage shall be eleven and one half percent (11.5%); and by the end of Fall Quarter 1999, it shall be twelve and one half percent (12.5%).

(4)  By the end of Fall Quarter 1996, the percentage of black women employed at each college on the C2 and C3 Salary Schedules combined shall equal at least that number which most closely represents thirty-seven and one half percent (37.5%) of the percentage of black persons in the general population of the primary service area of the respective college.

(5)  By the end of Fall Quarter 1995, the percentage of black women employed on the C2 and C3 Salary Schedules at all colleges combined shall be at least ten and one half percent (10.5%) of the total of all persons employed at the colleges on the C2 and C3 Salary Schedules.  By the end of Fall Quarter 1997, this percentage shall be eleven and one half percent (11.5%); and by the end of Fall Quarter 1999, it shall be twelve and one half percent (12.5%).

(6)  By the end of Fall Quarter 1996, the percentage of black women employed at each college on the D Salary Schedule shall equal at least that number which most closely represents thirty-seven and one half percent (37.5%) of the percentage of black persons in the general population of the primary service area of the respective college.

(7)  By the end of Fall Quarter 1995, the percentage of black women employed on the D Salary Schedule at all colleges combined shall be at least ten and one half percent (10.5%) of the total of all persons employed at the colleges on the D Salary Schedule.  By the end of Fall Quarter 1997 this percentage shall be eleven and one half percent (11.5%); and by the end of Fall Quarter 1999, it shall be twelve and one half percent (12.5%).

These goals shall not be deemed to be "quotas" as that term is generally applied, and the non-attainment or over attainment of any of the respective goals shall not be considered to be, per se, a violation of this consent decree.  In addition, this decree does not contemplate that any current employee will be terminated, or otherwise adversely affected in his or her employment, in order that progress toward these goals be made; and neither the Defendants nor the colleges shall be required to take such measures.  Further, this consent decree shall not be construed to require the Defendants or any of the colleges to hire or promote any person, regardless of race or gender, who is not qualified for the position in question, or to preclude them from hiring or promoting the best qualified applicant regardless of race or gender.

4.  The Chancellor, or each of the colleges under the coordination of the Chancellor, shall report to the Court and the parties on or about October 1, 1994 and annually thereafter on or about

8

GWCC519

the same date for the duration of this consent decree, regarding the progress made toward achieving the goals set out above. Any extenuating circumstances or conditions which may have affected a college's progress may be identified in the report, including but not limited to (1) the number and nature of the positions available to be filled during the preceding period, (2) the number of black persons and women, including black women applicants, for the available positions, and (3) an analysis of the college's progress relative to the racial and gender composition of the pool of potential employees who meet the job requirements of the available positions. In any proceedings to review the progress of any college, whether in connection with a motion for further relief or otherwise, nothing in this decree shall foreclose the Defendants or the college from advancing in their defense these or other relevant circumstances and conditions; provided, however, that it shall not be a defense for Defendants or the colleges to rely solely on such extenuating circumstances and conditions. Defendants and the college shall also be required to demonstrate they have taken affirmative measures and made good faith efforts to achieve the goals of this decree. A college which identifies or relies on such extenuating circumstances or conditions shall include in its annual report, in addition to those items required by Section E. of this decree, the following: (1) the names and addresses of all black persons and women, including black women, who applied for the positions available to be filled during the preceding period, (2) the names and addresses of potential black and female applicants, including black female applicants, for such positions which the college secured, or which were available, from the statewide bank of information maintained by the Chancellor and the Department of Postsecondary Education pursuant to Section C.2.b. of this decree, and (3) a description of Defendants and the colleges efforts to recruit black persons and women, including black women, who applied during the preceding period.

5.   In the event a college is (i) meeting or exceeding the goals for that college set out above, or (2) is determined by the Court to have engaged in a concerted good-faith effort to achieve those goals, but the system goals based on all colleges combined have not been met, Plaintiffs shall not apply for, and the Court shall not impose, any further or additional relief against, or which would affect,

9

the college whose goals have been met or pursued in good faith. Such college shall, however, remain subject to the provisions of this decree.

C.  Practices and Procedures

1.  With the exception of temporary appointments, as provided in Section C.9. below, all vacancies in positions covered by this decree at the colleges shall be filled according to the practices and procedures set out hereinafter.

2.  Recruitment

a.  All employment practices and procedures of the colleges shall be governed by policies promulgated by the State Board of Education, and by any applicable court orders and state and federal statutes.

b.  The Board, through the Chancellor of the Department of Postsecondary Education, shall establish and maintain during the term of this decree a centralized recruiting program designed to assist the colleges in making progress toward the employment goals set out above. This program shall include, but not necessarily be limited to, the following activities by the Department: (i) establishment and maintenance of a statewide bank of information regarding potential black applicants and female applicants, for vacancies which may occur at the various colleges; (ii) on a regular basis, but at least annually, recruiting contacts, via letters and/or campus visits, with historically black colleges or universities ("HBCUs"), including but not limited to Alabama A&M University, Alabama State University, Miles College, Stillman College, Talladega College, Tuskegee University, Atlanta University, Fisk University, Florida A&M University, Jackson State University, LeMoyne Owen University, Southern University, and Tennessee State University. These contacts shall advise students and/or existing faculty and staff at the institutions contacted of the availability of positions at the colleges and encourage them to apply for such positions. The Chancellor shall make reasonable efforts to include representatives of the respective colleges in such recruiting visits to the HBCUs, on a rotating or other basis designed to offer the respective HBCUs and the respective

10

GWCC521

colleges broad exposure to one another, and shall encourage the colleges to actively devote their recruiting visits and resources in a manner which fully includes the HBCUs; (iii) on a regular basis, but at least every three months, contacts with Bishop State Community College, Drake State Technical College, Lawson State Community College, and Trenholm State Technical College to obtain the name, address, educational background, previous experience, and area(s) of employment interest of each qualified black applicant, including qualified black women applicants, for employment who is not employed at the respective colleges because of an absence of vacancies in the applicant's area(s) of qualification and interest. The Chancellor shall thereafter cause each such qualified applicant to be contacted to ascertain the applicant's interest in applying for available faculty or staff positions at the various colleges which may have vacancies. If such interest is expressed, the Chancellor shall advise the presidents of colleges which may have vacancies in the potential applicant's area(s) of qualification and interest; and the president or his/her designee shall thereafter contact those qualified black applicants, including qualified black female applicants, in order to ascertain whether they wish to be considered for employment in an available position; (iv) review, at least bi-annually, of placement lists maintained by the Alabama State Department of Education, the Alabama Education Association, other relevant professional organizations and associations, and the public and private four-year colleges and universities in Alabama; and (v) on at least an annual basis, publication in appropriate professional journals, publications and newspapers, including but not limited to Black Issues in Higher Education, the Chronicle of Higher Education, and the Alabama Education Association and Alabama Department of Education journals, a statement that the Department and each of the colleges (identified by name and location) are equal opportunity employers and that they are seeking applications in particular from black persons and women, including black women, in order to increase the representation of blacks and women in all professional positions.

     c. The president of each college, or the president's designee, shall, in connection with every vacancy which occurs in a faculty or staff position, contact the Department of Postsecondary Education, advise the Department of the nature of the vacancy, and obtain all relevant information

11

available in the Department's information bank regarding potential black and female applicants, including black female applicants, for such vacancy. Accurate records as to the dates of the request for and receipt of such materials shall be maintained as required by Section C.4.b.

d.    Each college, on an annual basis and otherwise as vacancies occur, shall advertise all available vacant faculty and staff positions in at least one daily or weekly newspaper published in its service area and in at least one daily newspaper of regional or statewide coverage.    These advertisements shall state that the college is an equal opportunity employer and that it is seeking applications in particular from black persons and women, including black women. In addition, each such vacancy shall be reported to the Alabama State Employment Service, and, if feasible, shall be advertised in the Alabama Department of Education journal.

e.    One or more representatives of each college shall make annual employment recruiting visits to at least one conference sponsored by:    (1) predominantly black institutions of higher education, (2) predominantly black or women's professional associations, or (3) predominantly black or women's industrial organizations.

f.    The president of each predominantly white college shall meet on at least an annual basis with black and female community and educational leaders in and around the State of Alabama, and particularly in the college's service area, to discuss the recruitment of qualified black applicants and female applicants, including black female applicants. Accurate records of the date, location, and persons attending said meetings shall be maintained as required by Section C.4.b.

g.    In all the college's recruiting contacts required above, the president or the president's designee shall communicate to potential employment sources the policy of non-discrimination set out in Section B.2.a. above.

3.    Job Descriptions

a.    Prior to the announcement of any vacancy in a faculty or staff position, the college shall develop a complete and accurate job description for the position, which shall contain at least the following:

12

    (1)   duties and responsibilities of the job;

    (2)   required education and work experience;

    (3)   required license, certification or other credentials; and

    (4)   all other special qualifications or requirements of the job.

b.   Every job description shall be reviewed and appropriate revisions made at least annually by responsible supervisors.

4.   Application Process

a.   When a college has a faculty or staff vacancy, whether in a new position or an existing position, the college shall make every reasonable effort to procure applications from all interested, qualified persons. Each faculty and staff vacancy shall be advertised at the respective college, at the Department of Postsecondary Education, and at each of the other colleges. Vacancy announcements shall specify the salary range for the position to be filled. Vacancy announcements shall be published in time to give all interested persons a reasonable opportunity to respond to them, and they shall describe fully the duties, qualifications and selection criteria for the job. To facilitate distribution of vacancy notices among the colleges and to other interested parties, the Department shall publish and distribute on a regular and frequent basis a jobs newsletter or similar publication, listing job vacancies in a format suitable for posting and distribution at the respective colleges.

b.   The following records shall be kept on file at each college concerning each vacancy, vacancy announcement and application received with respect to a position covered by this decree:

    (1)   all applications for employment, whether solicited or not;

    (2)   records of all interviews and other contacts with applicants, including a copy of each relevant piece of correspondence with applicants;

    (3)   a written evaluation of each applicant who met the minimum qualifications for an announced position;

13

GWCC524

(4) a written record of the response to each announced vacancy, including a list of all qualified persons considered for the vacancy, the name of the person offered the position, and the reasons for the selection;

(5) a copy of each letter, memorandum, report or other communication between college officials regarding the establishment or modification of an employment position, the announcement of a position, the recruitment of personnel, the selection process and the evaluation of applicants.

The aforementioned records shall be maintained for the duration of this decree and thereafter for a period of one year. The records shall be kept in an orderly manner, organized by calendar year and by position.

c.   Upon the receipt of applications for a vacancy, applicants who meet the minimum requirements contained in the vacancy announcement shall have their education and experience verified.  If verification is obtained, the applicant shall be invited for an interview and, if interviewed, shall be considered for employment; provided, however, that in any situation where the respective college shall receive more than 10 applications from persons who fully meet the announced minimum requirements, the president, in conjunction with the selection committee, shall have the option of conducting a preliminary screening of these applicants in order to determine a reasonable number, but not fewer than 10, to be interviewed.  This determination shall be made by reference to Section C.5, below, and taking into consideration the goals and purposes of this decree.  All applications, however, shall be maintained as required by Section C.4.b.  The finalists, as determined by the pre-screening, shall then each be interviewed.  Where feasible, interviews shall be conducted in person.  The college, however, shall not be under any obligation to pay the travel expenses of any applicant who is invited for an interview.  If the college elects to pay such travel expenses, it shall do so in a manner which is non-discriminatory.

5.   Selection Criteria

14

a. Selections of applicants for faculty and staff vacancies shall be based on the following criteria, all of which shall be spelled out in the job description for the vacant position:

(1) minimum education, certification and experience requirements, or a combination thereof, for the position;

(2) additional education, certification and/or experience considered desirable for the position;

(3) evidence of past performance and/or occupational competency that is accompanied by reliable indicia that it is free of racial or gender-based bias;

(4) any particular needs of students or others who will work with or who may be served by the person selected; and

(5) the particular needs of the college and community it serves for racial, ethnic, cultural and/or gender diversity.

b. In addition, selection shall take into consideration the following criteria, which cannot be spelled out in the job description:

(1) any particular personal qualities and characteristics of any applicant that demonstrably enhance or detract from the applicant's ability to perform the job duties;

(2) the employment goals adopted by the State Board of Education pursuant to Section B.3. hereinabove; and

(3) the best interests of the college, its students, faculty and staff, and the public.

c. Except for the minimum education, experience and certification requirements, the preceding selection criteria shall be applied flexibly and in their totality and shall not be used to create rigid or mathematical measurements.

6. Recruitment and Selection Committee

a. Annually each college president shall appoint a recruitment and selection committee which shall make recommendations to the president. Nothing in this decree shall preclude the State Board of Education from adopting a policy regarding the appointment and composition of the

15

committee, provided that such policy is consistent with this decree. The size, composition and membership of the committee shall be determined by the president, but in any event shall include membership which is at least forty percent (40%) black and fifty percent (50%) female. The president in his or her discretion may appoint additional committees from time to time, as need arises, so as to account for different academic disciplines, administrative service areas, or vocational areas in which vacancies may exist, or to enable vacancies to be filled in an efficient and timely manner. Any additional committee so appointed shall have at least forty percent (40%) black and fifty percent (50%) female membership, but otherwise shall be constituted in a manner determined by the president. No committee shall be appointed or used for the purpose of frustrating the intent of this consent decree.

b.  Each member of the principal committee appointed pursuant to this section shall review all recruitment procedures of the college for compliance with the provisions of this decree, and the committee shall file with the president a written report of its findings prior to the expiration of the president's current term of office.

c.  Applications for all positions covered by this decree shall be screened by a committee. The committee shall interview the qualified applicants for each vacancy, as determined in accordance with Section C.4., above, and, using the criteria set out in Section C.5., above, shall recommend three applicants to the president (unless there are fewer than three qualified applicants, in which case all qualified applicants shall be submitted to the president). The committee's recommendations shall not be ranked but shall be listed in alphabetical order by last name.

7.  Selection by the President

a.  The president may select one of the applicants for the vacancy recommended by the committee. The president shall not select any person to fill the vacancy (except on a temporary basis, if necessary) except one of the applicants recommended by the committee; provided, however, that if the president deems it necessary to comply with the remedial objectives of this decree, the

16

GWCC527

president may at any time reopen the application and selection process. In filling a vacancy on a temporary basis, the president shall be subject to the requirements of Section C.9.b.

b. The selection by the president from among the candidates recommended by the committee shall be supported by a contemporaneous written explanation of the reasons for the president's choice, which shall be made a part of the permanent record of the selection process.

8    Lateral Internal Transfers and Reorganization of Existing Positions

a. Notwithstanding the above procedures for filling vacant positions, in the event there shall be one or more employees at the respective college on permanent status in positions which are at least equivalent to a vacant position in terms of salary schedule and level of responsibility, the president of the college shall have the discretion, in lieu of external solicitation of applicants, to offer all such equivalently positioned employees the opportunity to apply for a lateral transfer to said vacancy. If at least one equivalently positioned black person or woman, including a black woman, applies for the vacancy and the president selects a person who is not black and/or female, the president's decision shall be supported by a contemporaneous written explanation of the reasons for the president's choice, which shall be made a part of the permanent record of the selection process.

b. In no instance may the president make such a lateral transfer except where all equivalently positioned employees have been given the opportunity to apply for and to be considered for the lateral transfer without discrimination on the basis of race, color or gender. To enable the president to make a better informed decision consistent with the goals of this decree, no lateral transfer shall be made until the president shall have obtained from the Chancellor the names of potential black and female applicants, including black female applicants, for the position from the statewide bank of information to be established and maintained under this decree. The president of the respective college shall have the discretion, after reviewing all applications for such lateral transfer and any information obtained from the Chancellor, to make the lateral transfer or to open the application process and receive additional applications from all other interested, qualified applicants, with such process to be governed by any applicable provisions of this decree.

17

GWCC528

c.    Recognizing that there may occasionally be situations where, for legitimate reasons not related to race or gender, a college may find it necessary and appropriate to expand or otherwise modify an existing position, the college may do so without the position, as modified, being considered a vacancy subject to the provisions of this decree. Examples of such circumstances would include expanding the duties of an incumbent employee or reassigning duties among incumbent employees to avoid the necessity of hiring an additional employee; provided, however, that each proposed modification which involves a change of an existing employee's title, salary, placement, benefits, or level of supervisory responsibility shall be subject to the prior written approval of the Chancellor, who shall ensure and document to the Court and counsel for the respective plaintiff classes prior to implementation of the subject modification that the modification is not being made on the basis of race or gender and that the modification is necessary and appropriate given the college's circumstances. No action under this paragraph shall be taken for the purpose of frustrating the intent of this consent decree. Failure of Plaintiffs' counsel to object to a proposed modification under this paragraph at the time notice is given shall not be deemed a waiver of the right to contest said modification at a later date.

9.    Recruitment and Selection of Full-time Temporary Instructional, Administrative, or Professional Employees

a.    In certain limited instances, a college may employ a full-time employee on a "temporary" (as distinguished from "probationary") basis. A "temporary" position generally would be one which is either intended to last for one year or less or has been established for a trial period of one year or less to determine the feasibility of making the position permanent.

b.    A temporary position which, if permanent, would be a position covered by this decree may be filled by the president, without compliance with the solicitation, hiring and selection criteria and procedures mandated by this consent decree, including but not limited to use of a recruitment and selection committee, only when one or more of the following conditions exists:

18

(1)  The college is in need of filling such a position for a period of one year or less.

(2)  The college is the recipient of a non-renewable contract or grant which is for a period of twelve months or less, and the subject position is established or retained for the sole purpose of fulfilling the requirements of the contract or grant and will be eliminated upon the expiration of the contract or grant.

(3)  The college is in need of immediately filling an unanticipated vacancy and is making a temporary appointment for a period of time in order to properly advertise and accept applications for normal "probationary" appointment to the position. In such instance, the college shall act expeditiously to fill the position on a permanent basis. It is not contemplated that, except in extraordinary circumstances, a temporary employee hired under this provision would remain employed in that capacity beyond the commencement of the academic year next following his or her being hired on a temporary basis.

c.  In no instance will a person be allowed to hold a position which would otherwise be a position covered by this decree on a "temporary" basis for longer than twelve months. After that twelve month period, the position shall be filled, if at all, only by an employee selected in compliance with the solicitation, hiring and selection criteria and procedures mandated by this decree. No position shall be left unfilled for the purpose of frustrating the goals and purposes of this decree.

10.  Part-time Employees

Should a college determine that it is necessary to employ part-time employees, it shall hire and utilize such part-time employees in a manner consistent with, and not calculated to frustrate, the intent of this consent decree. A college shall not engage in the excessive use of part-time employees, and the totality of the circumstances will be considered relating to the college's action.

D.  Reduction in Force Due to Merger or Consolidation

1.  It is currently the position of the Defendants that no merger or consolidation within the System of Postsecondary Education will be accomplished in a manner which will result in the

19

GWCC530

termination or demotion of incumbent employees. In connection with any merger or consolidation which may occur, the Defendants presently intend for all incumbent employees at the affected colleges to retain all rights, privileges and benefits theretofore accruing to them, including but not limited to salary schedule placement, continuing service status (tenure), accrued leave, and date of initial employment.

2. If, in the event of a merger, consolidation or other material restructuring involving one or more of the colleges, it is nevertheless determined that a reduction in force and/or demotions are necessary with respect to employees in positions covered by this decree, the reduction in force or demotions shall be accomplished in a manner consistent with the policy of nondiscrimination and employment goals for black persons and women, including black women, embodied in this decree and the companion Shuford partial consent decree. For purposes of this provision, "demotion" shall mean (1) any material reduction in duties or responsibilities, or (2) any reduction in pay.

3. If it appears to Defendants that a reduction in force or demotions may become necessary as a result of a proposed merger, consolidation or other material restructuring, Defendants shall promptly advise counsel for the respective Plaintiff classes of this possibility. If a merger, consolidation or restructuring plan is to be implemented which actually includes a reduction in force or demotions, Defendants shall give notice of such plan to counsel for the respective Plaintiff classes and the employees to be terminated, laid off or demoted not later than 90 days prior to the date on which the reduction in force or demotions are to become effective; provided, however, that implementation of the plan shall not be delayed so long as Defendants give the required notice as timely as possible and in good faith.

4. Any employee in good standing who is designated to be terminated, laid off, or demoted as a result of a merger, consolidation or other material restructuring shall be provided information by the college, working through and with the Department and the Chancellor, regarding existing vacancies at the other colleges for which the employee may be qualified. In the event such a vacancy is identified and the employee desires to apply for it, Defendants and the colleges shall facilitate

20

submission and consideration of the application, and make their best efforts to afford an interview before the employee suffers economic loss with respect to the employee's prior employment. Nothing in this paragraph shall require any college to actually employ an employee who is terminated, laid off or demoted as a result of a merger, consolidation or other material restructuring, but any college may elect to employ such an employee.

5.    The name of any black or female employee in good standing who is terminated, laid off or demoted due to a merger, consolidation or other material restructuring, but who is not successful in relocating to another college under the provisions of the preceding paragraph, shall be provided forthwith by the college to the Chancellor. The Chancellor shall maintain the name and relevant information regarding such employee in the statewide bank of information to be established and maintained pursuant to Section C.3.b. of this decree, and shall advise the colleges of the potential availability of such employee in connection with the inquiries regarding potential black and female applicants, including black female applicants, which the colleges are required to make under Section C.3.c. of this decree. Consistent with Section C.3.b. of this decree, the Chancellor shall contact and advise each displaced black or female employee of the availability of positions at the respective colleges for which the employee may be qualified. Notwithstanding any other provision of this consent decree, any displaced black or female employee who meets the minimum qualifications for a vacant position at one of the colleges, shall, upon application for the position, be accorded an interview.

6.    In identifying incumbent employees to be terminated, laid off, or demoted as the result of a merger, consolidation or other material restructuring, the following non-racial, gender-neutral, objective criteria (where applicable) shall be employed:

    a.    Area or field of teaching or other employment expertise;

    b.    Degree(s) earned;

    c.    Other education achieved; certificates or diplomas earned;

    d.    Teaching experience:

21

GWCC532

    (i)    at the college(s) involved in the restructuring;

    (ii)   in the instructional field;

    (iii)  in other college(s) within the System of Postsecondary Education;

    (iv)  in other higher education; and

    (v)   in other schools.

e.  Employment experience:

    (i)    at the college(s) involved in the restructuring;

    (ii)   in other college(s) within the System of Postsecondary Education;

    (iii)  positions held;

    (iv)  duties performed;

    (v)   in other higher education;

    (vi)  in other schools; and

    (vii) in other comparable or relevant employment.

7.   Any employee who is terminated or laid off due to a merger, consolidation or other material restructuring shall be afforded the opportunity for reemployment at the college, or its successor institution, if a position for which the employee is qualified becomes available, and if the employee otherwise meets all requirements for employment at the college. Any employee demoted due to a merger, consolidation or other material restructuring shall be afforded the opportunity for promotion to the employee's former rank or status, if a position for which the employee is qualified becomes available and if the employee is otherwise in good standing at the time.

8.   To implement the provisions of the preceding paragraph, employees terminated, laid off or demoted shall be given priority for filling a vacancy for which they are qualified, and no such vacancy shall be filled until the displaced employee who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so within a reasonable period of time. An employee who fails to accept such an offer for a position which is equivalent or substantially

22

GWCC533

equivalent to the position held prior to the employee's displacement shall no longer be entitled to the protection of this and the preceding paragraph.

9. The provisions of this Section D. shall apply only with respect to employees who, at the time of a decision to terminate, lay off or demote, occupy a position covered by this decree.

E. Reporting Requirements

The Chancellor shall file with the Court, or cause to be filed by the presidents of the colleges, on or about October 1, 1994, and annually thereafter on or about the same date for the duration of this consent decree, a report describing fully Defendants' efforts to comply with the provisions of this decree, including without limitation the following information for each college and for the Postsecondary System as a whole:

1. The number and percentage of blacks, whites, and others by gender, salary schedule and by rank, employed in positions covered by this decree:

    (a) as of September 30, 1993;

    (b) as of the effective date of this decree; and

    (c) as of September 30 of the year of the report.

Reports after the first report shall also include all the above information which was contained in the next preceding annual report.

2. The name, race, gender and position filled of every person selected to fill a position covered by this decree during the period covered by the report, indicating whether each vacancy was filled permanently, by lateral transfer or as a full-time temporary position;

3. The name, race and gender of every member of the recruiting and selection committee(s) who was appointed or served during the period covered by the report;

4. The name, race and gender position held of any part-time employees during the period covered by the report.

23

GWCC534

F.    Right of Inspection

Upon submission to the Chancellor and the affected college of written advance notice of not less than 10 working days, counsel for the Plaintiff classes shall have the right to: (1) visit a representative college and inspect and copy the records required by Section C.4.b. above to be maintained at the various colleges; (2) inspect and copy records maintained at the Department of Postsecondary Education required to be maintained under the provisions of this decree, including but not limited to records compiled from appointments of presidential vacancies.

G.    Individual Relief

1.    Plaintiff-Intervenor Dr. Connie Johnson shall be paid compensatory damages in the amount of Forty-Five Thousand Dollars and 00/100 ($45,000.00). Upon payment of this amount to Plaintiff-Intervenor Johnson, all of her claims for individual relief against all of the Defendants, including but not limited to Defendants Larry W. McCoy and Northwest Shoals Community College (which includes the institution formally known as Muscle Shoals State Technical College) shall be dismissed with prejudice.

2.    Plaintiff-Intervenor Johnson shall assume individual responsibility for any tax, social security, or Teachers Retirement System report or contribution which may accrue to or be required from her as a result of this payment of compensatory damages.

3.    No Further relief is given for the claims for individual relief alleged by Plaintiff-Intervenors Dr. Karen Newton, Ms. Myra Davis and Ms Sheryl Threatt. These claims for individual relief will be further litigated in the U. S. District Court for the Middle District of Alabama.

H.    Release from Claims

Plaintiff-Intervenor JOHNSON agrees that upon the entry of this decree she shall consider the relief stated herein to resolve absolutely and completely any and all claims which she has filed or could have filed in this action as of the effective date of this decree against any of the Defendants

24

GWCC535

or against the State of Alabama, or any official or representative thereof, including but not limited to Larry McCoy, concerning the respective employment, or any application for employment or any term of condition of employment, at Northwest Shoals Community College (including the former Muscle Shoals State Technical College) or any other college which is among those institutions controlled and administered by the State of Alabama Board of Education.

Upon entry of this decree all Defendants shall be dismissed with prejudice with respect to these claims.

I.  Attorney's Fees

Although Defendants do not in any manner admit liability under the Shuford complaint, the Johnson complaint in intervention, the Newton complaint in intervention, the Davis complaint in intervention, the Threatt complaint in intervention, as amended, Defendants acknowledge that, for purposes of an award of attorney's fees pursuant to 42 U.S.C. § 1988, Plaintiff-Intervenors Johnson, Newton, Davis and Threatt, as class representatives, are the prevailing parties and also that Plaintiff-Intervenor Johnson is a prevailing party on her individual claims without any admission of liability by the Defendants.  Plaintiff-Intervenors Newton, Davis and Threatt are not prevailing parties on their individual claims and there is no acknowledgement or admission by Defendants of any liability. If the parties are unable to agree upon the amount of fees and expense to be paid to Plaintiff-Intervenors, Plaintiff-Intervenors shall file their request for attorney's fees and expenses not later than thirty (30) days after final approval of this decree.

J.  Term of Decree and Dismissal of Parties and Claim

Jurisdiction of this action for such other and further relief or enforcement proceedings as may be appropriate consistent with this decree is hereby retained until December 31, 2005, unless, upon the motion of one or more of the parties or upon the Court's own motion and for good cause shown, it is sooner modified, dissolved or extended by further order of this Court. This decree shall

25

GWCC536

be binding upon the State of Alabama Board of Education and/or any of its successors or assigns. The individual Defendants in their individual capacities are hereby DISMISSED with prejudice, and Plaintiff-Intervenor's claim under the Voting Rights Act, 42 U.S.C. §1973, is hereby DISMISSED with prejudice.

DONE this ___ day of _____, 1994.

_____
UNITED STATES DISTRICT JUDGE

_____
JAMES U. BLACKSHER
LESLIE M. PROLL
   Attorneys for Plaintiff-Intervenor
CONNIE JOHNSON, individually and on
behalf of a class of persons similarly situated


_____
JOE R. WHATLEY, JR.
REBECCA HUNT
   Attorneys for Plaintiff-Intervenor
KAREN NEWTON, individually and on
behalf of a class of persons similarly situated


_____
BEVERLY P. BAKER
RICHARD H. WALSTON
   Attorneys for Plaintiff-Intervenors
MYRA P. DAVIS AND SHERYL B. THREATT,
individually and on behalf of a class
of persons similarly situated


_____
J. ALLEN SCHREIBER
GERALD A. TEMPLETON
J. MASON DAVIS, JR.
   Attorneys for Defendants
ALABAMA STATE BOARD OF EDUCATION;
FRED GAINOUS, in his capacity as
Chancellor of Postsecondary Education
Services; JOHN M. TYSON,
STEADMAN SHEALY, BETTY FINE COLLINS,
ETHEL HALL, WILLIE PAUL,
TAZEWELL SHEPHERD, VICTOR POOLE
and DAN CLECKLER, in their official
capacities as members of the Alabama State
Board of Education, NORTHWEST SHOALS
COMMUNITY COLLEGE; LARRY McCOY,
in his capacity of President of Northwest
Shoals Community College; BEVILL STATE
COMMUNITY COLLEGE; HAROLD WADE,
in his capacity as President of
Bevill State Community College; LAWSON
STATE COMMUNITY COLLEGE; and
PERRY W. WARD, in his capacity as
President of Lawson State Community College

26

GWCC537

I.C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| HUMPHREY L. SHUFORD, individually and on behalf of a class of persons similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| CONNIE JOHNSON and KAREN NEWTON, individually and on behalf of a class of persons similarly situated, | ) ) ) ) ) | CIVIL ACTION NO. 89-T-196-N |
| Plaintiff-Intervenors, | ) ) | |
| MYRA P. DAVIS and SHERYL B. THREATT, individually and on behalf of a class of persons similarly situated, | ) ) ) ) ) | LEGAL NOTICE OF PROPOSED CONSENT DECREE AND HEARING |
| Plaintiff-Intervenors, | ) ) | |
| vs. | ) ) | |
| ALABAMA STATE BOARD OF EDUCATION, FRED GAINOUS, et al., | ) ) ) | |
| Defendants. | ) | |

TO:  ALL PRESENT EMPLOYEES AND TO BLACK PERSONS AND WOMEN, INCLUDING BLACK WOMEN, WHO ARE, HAVE BEEN, OR MAY BECOME CANDIDATES FOR EMPLOYMENT IN OR PROMOTION TO FULL-TIME FACULTY, ADMINISTRATIVE OR SUPERVISORY POSITIONS AT JUNIOR, COMMUNITY AND TECHNICAL COLLEGES OPERATED BY THE ALABAMA STATE BOARD OF EDUCATION

THIS LEGAL NOTICE IS TO INFORM YOU OF A PROPOSED PARTIAL SETTLEMENT OF A CLASS ACTION LAWSUIT WHICH MAY ALTER THE PROCEDURES BY WHICH CERTAIN EMPLOYEES ARE HIRED AND PROMOTED AT THE JUNIOR, COMMUNITY AND TECHNICAL COLLEGES OPERATED BY THE ALABAMA STATE BOARD OF EDUCATION, AND WHICH CONSEQUENTLY MAY AFFECT YOU. PERSONS WHO MAY BE AFFECTED, INCLUDING BLACK PERSONS AND WOMEN, INCLUDING BLACK WOMEN, EMPLOYEES IN THE JUNIOR, COMMUNITY AND TECHNICAL COLLEGES AND BLACK PERSONS WHO ARE, HAVE BEEN, OR MAY BECOME CANDIDATES FOR EMPLOYMENT IN OR PROMOTION TO FULL-TIME FACULTY, ADMINISTRATIVE OR SUPERVISORY POSITIONS AT THE COLLEGES SHOULD READ THIS NOTICE CAREFULLY.

A proposed partial settlement has been reached in the above-captioned action and incorporated in a proposed partial consent decree which has been submitted to this Court for its consideration and approval.

I.    BACKGROUND OF THE PROPOSED PARTIAL CONSENT DECREE

A lawsuit is pending in the United States District Court for the Middle District of Alabama against the Alabama State Board of Education ("ASBE"), the members of the Board of Education, and Dr. Fred Gainous, the Chancellor of the Department of Postsecondary Education. This lawsuit, initially filed in 1989, charged that Defendants discriminated on the basis of race against black persons in Defendants' employment practices. However, the parties have agreed, and the Court has approved and entered a partial consent decree which resolved all claims raised on behalf of a class of black persons represented by Humphrey Shuford. That decree was entered by the Court on March 15, 1994, after a fairness hearing and following notice of the settlement being given to the class members and general public. Additional class action claims have been alleged by certain intervenors into the lawsuit originally filed by Humphrey Shuford. The Plaintiff-Intervenors, Dr. Connie Johnson, Dr. Karen Newton, Ms. Myra Davis and Ms. Sheryl Threatt, charge that Defendants discriminated on the basis of gender against women in general, and against black women in a distinct way, different from discrimination experienced by black men and other women.

The remaining class action allegations of the suit seeks injunctive relief, attorney's fees, and costs from the Defendants. Dr. Connie Johnson and Dr. Karen Newton, filed individual claims and also claims on behalf of a class of female citizens who have been or may be affected by the Defendants' employment practices. Myra Davis and Sheryl Threatt, filed individual claims and claims on behalf of a sub-class of black female citizens who may have been or may be affected by the Defendants employment practices. Johnson, Newton, Davis and Threatt have engaged in extensive discovery with respect to the facts and law in this action. On the advice of legal counsel, Johnson, Newton, Davis and Threatt have concluded that settlement with the Defendants, according to the terms of the proposed partial consent decree (sometimes hereinafter "the decree"), is in the best interest of themselves and the class.

The decree deals only with the gender and racial discrimination claims asserted by Johnson, Newton, Davis and Threatt, and does not directly deal with certain racial discrimination claims asserted by Plaintiff Humphrey L. Shuford. However, the proposed decree, if approved by the Court will specifically set out that one half of the goals and percentages approved in the Shuford partial consent decree, would apply to black women. If the proposed decree is approved by the Court, the goals relating to black women will not increase the overall goals set for the class of black persons approved in the Shuford partial consent decree. By entering into this settlement, the Defendants do not in any manner admit liability, nor should this notice be understood as an expression of any opinion by the Court as to the merits of any of the claims or defenses asserted by the Plaintiffs, the plaintiff classes, or the Defendants.

II.    PURPOSE OF THIS NOTICE

The purpose of this notice is to give you a general outline of the substance of the decree, to inform you how you may review a complete copy of the decree, and make you aware of how you should present objections to the Court if you feel the decree is unfair. If you are satisfied with the decree or if you have no objection, you do not need to do anything regarding the hearing set by the Court. (See Section V. below.) The proposed partial consent decree is prospective in nature and does not include damages or other monetary relief to the class. The decree will not cut off or limit any individual claim you might have, and will not affect your individual right to bring a lawsuit should you believe you have been the victim of unlawful discrimination.

2

III.    CLASS ACTION RULING

By order dated May _____, 1994, the Court certified this part of the lawsuit as a class action and authorized Plaintiffs Dr. Connie Johnson and Dr. Karen Newton to proceed on behalf of a plaintiff class defined as follows:

> "A class of all female citizens who have been or will be denied employment in or promotion to presidential, full-time faculty and other administrative and supervisory positions covered by salary schedules A, B, C, and D at community, junior and technical colleges in the Alabama System of Postsecondary Education. If a college maintains a full-time administrative or supervisory position which is not covered or defined on the A, B, C, or D salary schedule, such position shall also be included within the scope of the plaintiff class and the coverage of this decree."

Further, in the same order, the Court certified a sub-class of black female citizens and authorized Myra Davis and Sheryl Threatt as class representatives to proceed on behalf of a plaintiff sub-class defined as follows:

> "A sub-class of all black citizens represented by Humphrey Shuford and all women represented by Johnson and Newton, which is further and more specifically defined as a sub-class of all black female citizens who have been or will be denied employment in or promotion to presidential, full-time faculty and other administrative and supervisory positions covered by salary schedules A, B, C, and D at community, junior and technical colleges in the Alabama System of Postsecondary Education. If a college maintains a full-time administrative or supervisory position which is not covered or defined on the A, B, C, or D salary schedule, such position shall also be included within the scope of the plaintiff sub-class and the coverage of this decree."

IV.    SUMMARY OF THE PROPOSED PARTIAL CONSENT DECREE

The following is a summary of the major terms of the proposed partial consent decree, however the only complete statement of these terms is contained in the decree itself.

### Non-Discrimination Policy and Goal of Decree

A written policy shall be adopted that no discrimination shall occur in the processes of employment or promotion within the System of Postsecondary Education, and that black persons and women, including black women, will have equal participation in the personnel hiring process. A reasonable good faith effort will be made to increase employment of black persons and women, including black women, within the System and at each junior, community, and technical college. In furtherance of that objective, certain hiring goals are established. The decree does not contemplate that any current employee will be terminated or otherwise adversely affected in order that progress toward these goals be made; and no such measure shall be required. The decree applies only to positions which may become available in the future. The goals established are not quotas and the colleges shall not be required to hire or promote unqualified persons. The decree requires the Defendants periodically to report to the Court on their progress in reaching the goals specified in the decree.

3

GWCC540

### Employment Practices and Procedures

After the effective date of the decree, all vacancies in full-time positions (35 or more hours per week) covered by the decree shall be filled using a standardized process which is designed to assure that black persons and women, including black women applicants are identified and given fair consideration. Defendants will establish a centralized gender and minority recruiting program. The program will include a state-wide bank of information regarding potential black or female applicants, including black female applicants, annual recruiting contacts with historically black colleges and universities, regular contact with predominantly black colleges in the Postsecondary System to solicit qualified black and female applicants, annual solicitation of black and female applicants through professional journals and publications, and other efforts to identify black and female applicants. The individual colleges will also take steps to identify black or female applicants. Temporary or part-time employees are not specifically covered by the decree, but provisions are included to assure that such positions are not used to frustrate the purposes of the decree.

### The Application Process

Each college must develop job descriptions and advertise all vacancies to be filled. Each college must maintain records of how and by whom vacancies are filled, including but not limited to applications and written evaluations of applicants. Applicants meeting the minimum requirements shall be interviewed. Hiring and promotion decisions shall be based on merit and qualifications, including the needs of the college for racial, gender, ethnic and cultural diversity and to the employment goals of the decree.

### Recruitment and Selection Committee

Each college shall have one or more recruitment and selection committees, the membership of which shall be at least 40% black and 50% female, to screen and interview applicants and to make hiring recommendations to the president.

The president must ordinarily make a hiring decision from among the persons recommended, and shall justify his or her decision in writing. The president will have discretion to reopen the application process, if necessary to comply with the decree's remedial objectives.

### Lateral Transfers and Reorganization

Before making a lateral transfer, the president must obtain the names of potential black or female applicants for the position from the state-wide bank of information. If an incumbent black or female employee applies for the position but is not hired, the president must document the reasons for the hiring decision. Should a college find it necessary to modify an existing position, such modification shall not be deemed to create a vacancy subject to the terms of the decree; provided, however, that any such modification must be educationally necessary, not based on race or gender, and must be approved by the Chancellor.

### Reduction in Force Due to Merger or Consolidation

The Board's current policy is that no employee will be terminated or demoted due to a merger of colleges. Any reduction in force which might be necessitated by a merger or other material

4

restructuring shall be done in a non-discriminatory manner using non-racial and gender-neutral objective criteria set out in the decree. Employees who are displaced will be given special opportunities to interview with other colleges where vacancies are available. If a black or female employee in good standing is displaced, the employee's name shall be placed in the state-wide bank of information, the employee shall be advised of available positions for which he or she may be qualified, and the colleges will be advised of the employee's availability. Displaced employees shall have priority for reemployment should a position for which the employee is qualified become available at the college from which the employee was displaced.

### Reporting Requirements

Each college shall annually file a report describing its efforts and progress in complying with the decree. Counsel for the plaintiff classes shall have the right to inspect copies of the records maintained by the colleges.

### Individual Relief

Plaintiff Johnson will individually receive $45,000.00 in compensatory damages in full satisfaction of all her personal claims against Defendants. No other individual relief claim has been agreed to between Plaintiffs Newton, Davis, Threatt and the Defendants, at this time. No damages or other monetary relief will be paid to any member of the plaintiff class.

### Attorney's Fees

Without admitting liability, Defendants agree that Plaintiff Johnson on her individual claim and Plaintiffs Johnson, Newton, Davis and Threatt, as class representatives, and the respective classes are entitled to payment of their reasonable attorney's fees and expenses by Defendants. If the parties cannot reach agreement on a reasonable amount, the issue will be decided by the Court.

### Term of Decree

The Court will retain jurisdiction over the decree until December 31, 2005, unless the Court determines for good cause to shorten or extend that period.

### Future Combination or Consolidation of Consent Decrees

On March 15, 1994, this Court entered an order and memorandum opinion approving the Shuford partial consent decree. The order approving that Decree was entered by the Court after a fairness hearing and notice being provided to the general public and the class represented by Humphrey Shuford. If the proposed partial consent decree on the gender-based claims raised by Plaintiffs Johnson, Newton, Threatt and Davis are approved by this Court, further efforts may be undertaken to combine the two partial decrees into a single document without any further notice to the respective classes represented by Humphrey Shuford, Connie Johnson, Karen Newton, Myra Davis and Sheryl Threatt or to the general public.

5

GWCC542

## V.   HEARING ON PROPOSED PARTIAL CONSENT DECREE

The Court has tentatively approved the settlement of this case on the basis explained above. However, because this lawsuit is a class action, the Court has the responsibility of assuring that the proposed settlement is fair, equitable and consistent with the interest of the plaintiff class before giving its final approval to the decree. After those persons who may be affected by the decree have had an opportunity to consider the proposed settlement and to make their views known to the Court, the Court will conduct a hearing to consider final approval of the decree. That hearing will be held on ____June 22_____, 1994, at ___1:30_____ o'clock _P__.m. at the Frank M. Johnson, Jr. Federal Courthouse, 15 Lee Street, Montgomery, Alabama, at which time the Court will consider all objections to the proposed settlement, whether made in writing or in person.

## VI.   WHAT TO DO IF YOU HAVE QUESTIONS OR OBJECTIONS

If you have any questions about this notice or the proposed partial consent decree you should contact your own lawyer or the lawyers representing the class of women and sub-class of black women, listed below:

Joe R. Whatley, Jr., Esq.
Rebecca Hunt, Esq.
Cooper, Mitch, Crawford,
   Kuykendall & Whatley
1100 Financial Center
505 North 20th Street
Birmingham, Alabama  35203-2605

Richard H. Walston, Esq.
Beverly P. Baker, Esq.
Haskel, Slaughter, Young
   & Johnston
1200 AmSouth/Harbert Plaza
19001 6th Avenue North
Birmingham, Alabama  35203

James U. Blacksher, Esq.
Leslie M. Proll, Esq.
Attorneys at Law
Title Building, Fifth Floor
300 21st Street North
Birmingham, Alabama  35203

You should not contact the Clerk of the Court or the Judge with any questions about this notice or the decree.

### Copies of the Proposed Consent Decree

A copy of the proposed partial consent decree is available for review in the office of the president of each of the junior, community and technical colleges covered by the decree and also at the following locations:

Clerk of the United States District Court
for the Middle District of Alabama
Frank M. Johnson, Jr. Federal Courthouse
15 Lee Street
Montgomery, Alabama 36104

Chancellor's Office
Department of Postsecondary
  Education
401 Adams Avenue
Montgomery, Alabama 36130-2130

6

## Hearing - What You May Do

If you are satisfied with the proposed partial consent decree or if you have no objection, you need not do anything regarding the hearing scheduled by the Court. If you oppose the decree, you have an opportunity to appear at this hearing and to file a written statement explaining your objection(s). If you wish to object to the proposed partial consent decree, you or your attorney must file your statement of objection in writing with the Clerk, United States District Court, Frank M. Johnson, Jr. Federal Courthouse, 15 Lee Street, Montgomery, Alabama 36104 so the Court may consider it when making its final decision whether to approve the decree. If you wish to present your views at the hearing, you should so inform the Clerk in writing at the same time you file your written statement of objection. If you wish, you may also file a statement and present your views in support of the proposed partial consent decree at the hearing. You may not present your views at the hearing unless you file a statement with the Court on or before _____June 10_____, 1994.

At the top of each written statement should appear the words *Shuford v. Alabama State Board of Education, et al., Civil Action No. 89-T-196-N.*

Copies of all objections, statements of support, and statement of intent to appear should be sent to the following persons at the time they are filed with the Clerk of the Court:

1.  Terry G. Davis, Esquire
    Kenneth L. Thomas
    Anita L. Kelly
    Mark Englehart
    Post Office Box 230907
    Montgomery, Alabama 36123-0907

2.  James U. Blacksher, Esquire
    Leslie M. Proll, Esquire
    Fifth Floor Title Bldg.
    300 21st Street, North
    Birmingham, Alabama 35203

3.  Joe R. Whatley, Esquire
    Rebecca H. Hunt, Esquire
    Cooper, Mitch, Crawford, Kuykendall
       & Whatley
    505 20th Street, North
    1100 Financial Center
    Birmingham, Alabama 35203-2605

4.  Beverly P. Baker, Esq.
    Richard H. Walston, Esq.
    Haskel, Slaughter, Young
       & Johnston
    1200 AmSouth/Harbert Plaza
    19001 6th Avenue North
    Birmingham, Alabama 35203

GWCC544

5.    J. Allen Schreiber, Esquire
        Gerald A. Templeton, Esquire
        Lloyd, Schreiber & Gray, P.C.
        2 Perimeter Park South, Suite 100
        Birmingham, Alabama 35243

6.    J. Mason Davis, Jr., Esquire
        Sirote & Permutt, P.C.
        2222 Arlington Avenue South
        Post Office Box 55727
        Birmingham, Alabama  35255-5727

This notice has been approved by counsel for plaintiff and the plaintiff class, by counsel for the defendants, and by the Court.

Dated: _MAY 3, 1994_        _Thomas C. Caver_
                         CLERK, UNITED STATES DISTRICT COURT FOR
                         THE MIDDLE DISTRICT OF ALABAMA

8

GWCC545

05/26/04   07:44   ☎205 242 0214        POSTSECONDARY      ___    ___ ___   ☐002
                                                                        1.D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION



| | | |
|---|---|---|
| HUMPHREY L. SHUFORD, individually, | ) | |
| DR. CONNIE JOHNSON, individually | ) | |
| et al., and on behalf of a class | ) | |
| of persons similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 89-T-196-N |
| ALABAMA STATE BOARD OF EDUCATION, | ) | |
| FRED GAINOUS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

NOTICE TO COURT OF COMPLIANCE WITH CONSENT DECREE
RELATIVE TO LATERAL INTERNAL TRANSFERS AND
REORGANIZATION OF EXISITING POSITIONS

Come now the Defendants, Alabama State Board of Education and its Chancellor, Dr. Fred

Gainous, and hereby give notice to the Court that the below-listed jobs, title changes, expansion

of job duties or realignment of job duties have been effected and that documentation of said

changes has been provided to the Counsel for Plantiff classes and, further, that said realignment

is not based upon race or gender and that the modification is necessary and appropriate given the

college's circumstances.

Documentation for the following referenced changes has been provided to attorneys for the

Plaintiffs' class:

05/26/94    07:44    ☎205 242 0214          POSTSECONDARY                    ☑003

(1)  Jefferson State Community College—Two employees were given more responsible positions in a temporary reorganization; subsequently, two others were appointed to fill vacancies created thereby.  The college seeks to remove the temporary status of the appointments.

(2)  Central Alabama Community College—One vice president is retiring from each of the two campuses; their positions are being eliminated and their tasks realigned and relegated to four newly created positions.

(3)  Wallace State Community College-Dothan—A reporting line is being changed.

Dr. Fred Gainous
Chancellor
Alabama Department of Postsecondary Education

Sworn to and subscribed before me
this _26th_ day of _MAY_, 1994.

NOTARY PUBLIC

My Commission expires:
_7/16/94_

RENEE D. CULVERHOUSE
Legal Counsel
Alabama Department of Postsecondary Education

OF COUNSEL:

ALABAMA DEPARTMENT OF
POSTSECONDARY EDUCATION
401 Adams Avenue, Suite 710
Montgomery, Alabama 36130-2130
(205) 242-2982

05/26/94   07:45   ☎205 242 0214         POSTSECONDARY         ___   ___ ___         ☑004

## CERTIFICATE OF SERVICE

I hereby certify that on this the _26_ day of _May_____, 1994, I have mailed a copy of the foregoing pleading to the following attorneys of record:

James U. Blacksher, Esquire
Leslie M. Proll, Esquire
Attorneys at Law
Title Building, Fifth Floor
300 21st Street North
Birmingham, Alabama  35203
(205) 322-1100

Joe R. Whatley, Jr., Esquire
Rebecca Hunt, Esquire
Cooper, Mitch, Crawford,
        Kuykendall & Whatley
1100 Financial Center
505 North 20th Street
Birmingham, Alabama  35203-2605
(205) 328-9576

Kenneth L. Thomas, Esquire
Anita L. Kelly, Esquire
Thomas, Means & Gillis, P.C.
Post Office Drawer 5058
Montgomery, Alabama 36103-5058
(205) 270-1033

Terry G. Davis, Esquire
Terry G. Davis, P.C.
Post Office Box 230907
Montgomery, AL  36123
(205) 270-0592

Beverly P. Baker, Esquire
Richard H. Walston, Esquire
Haskel, Slaughter, Young &
        Johnston
1200 AmSouth/Harbert Plaza
19001 6th Avenue North
Birmingham, Alabama  35203
(205) 251-1000

OF COUNSEL

GWCC548

i.E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

HUMPHREY L. SHUFORD, individu-      )
ually and on behalf of a class of     )
persons similarly situated,           )
                                      )
     Plaintiff,                    )
                                      )
CONNIE JOHNSON and KAREN          )
NEWTON, individually and on          )
behalf of a class of persons simi-    )
larly situated,                       )
                                      )
     Plaintiff-Intervenors,        )
                                      )    CIVIL ACTION NO. 89-T-196-N
MYRA P. DAVIS and SHERYL B.       )
THREATT, individually and on         )
behalf of a class of persons simi-    )
larly situated,                       )
                                      )
     Plaintiff-Intervenors,        )
                                      )
v.                                    )
                                      )
ALABAMA STATE BOARD OF           )
EDUCATION, et al.,                   )
                                      )
     Defendants.                   )

STIPULATION OF THE PARTIES

It is hereby stipulated by and among the parties to the gender-related Partial Consent

Decree (the "Johnson Decree") and Intervenors Moncrief and Davis that as a clarification of

the Johnson Decree the parties agree that the Court should interpret the provisions of the

Johnson Decree as follows:

1.    The Johnson Decree requires only that women, including black women, receive

equal and non-discriminatory treatment by the Defendants in making employment decisions.

The Johnson Decree does not require or permit any preferences for women, including black women, in the decision-making process

2    In considering qualified persons for vacancies, the Defendants shall use valid job-related selection procedures, and all candidates should be fully considered and evaluated. No jobs should be set aside or reserved on the basis of race or gender. The Johnson Decree should not be interpreted as requiring or as permitting the hiring or promotion of less qualified persons on account of their gender or race in order to meet the goals of the Johnson Decree.

3.    Plaintiffs will not contend that the long-range goals for salary levels C3 and D are relevant evidence for assessing compliance with the terms of the Johnson Decree, except to the extent that representation of women, including black women, in salary levels C3 and D bear on their representation in the post-secondary system work force as a whole

4.    The stipulations herein stated do not affect any rights of blacks, including black women, under the race-related Partial Consent Decree (the "Shuford Decree")

5.    These stipulations resolve the objections of Intervenors Moncrief and Davis to the Johnson Decree.

_James U Blacksher_ R 174 w/
permission
James U Blacksher
One of the Attorneys for
Plaintiff-Intervenor Connie Johnson,
individually and on behalf of a class
of persons similarly situated

OF COUNSEL:
Title Building - Fifth Floor
300 21st Street North
Birmingham, Alabama 35203

2

_____
Joe R. Whatley, Jr.
One of the Attorneys for
Plaintiff-Intervenor Karen Newton,
individually and on behalf of a class
of persons similarly situated

OF COUNSEL:
COOPER, MITCH, CRAWFORD,
  KUYKENDALL & WHATLEY
1100 The Financial Center
505 North 20th Street
Birmingham, Alabama  35203

_____
Richard H. Walston
One of the Attorneys for
Plaintiff-Intervenors Myra P. Davis
and Sheryl B. Threatt, individually
and on behalf of all persons
similarly situated

OF COUNSEL:
HASKELL SLAUGHTER YOUNG & JOHNSTON
  Professional Association
1200 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama  35203
(205) 251-1000

_____
Gerald A. Templeton
One of the Attorneys for
All Defendants

OF COUNSEL:
LLOYD, SCHREIBER & GRAY
Two Perimeter Park - Suite 100
Birmingham, Alabama  35243

3

_____
Raymond P. Fitzpatrick, Jr
Attorney for Plaintiff-Intervenors
Jamie C Moncrief and Thomas L Davis

OF COUNSEL:
WHITESIDE & FITZPATRICK
1929 3rd Avenue North
6th Floor
Birmingham, Alabama  35203

130266 1

4

1F
APR 1 4 2000



# ALABAMA
# DEPARTMENT OF
# POSTSECONDARY EDUCATION

## *Representing Alabama's Public Two-Year College System*

| STATE BOARD OF EDUCATION | Governor Don Siegelman President | Bradley Byrne District 1 | G J Higginbotham District 2 | Stephanie Bell District 3 | Ethel Hall Vice President District 4 | Willie J Paul District 5 | David F. Byers, Jr. District 6 | Sandra Ray District 7 | Mary Jane Caylor District 8 |
|---|---|---|---|---|---|---|---|---|---|

## M E M O R A N D U M   #2000-LGL-122

DATE:   April 13, 2000

TO:     Members, State Board of Education
        Presidents, The Alabama College System

FROM:   Fred Gainous, Chancellor

RE:     *Kennedy (formerly Shuford) v. Alabama State Board of Education, et al.*
        Civil Action No. 89-T-196-N
        In the U. S. District Court for the Middle District of Alabama

I am enclosing for your information a copy of an Order in the above matter, signed by Judge Myron H. Thompson on April 12, 2000, approving and adopting the attached Uniform Guidelines for Compliance and Monitoring of Consent Decrees. The procedures and requirements contained in the Uniform Guidelines are effective immediately Presidents should read carefully the contents of the Uniform Guidelines and distribute them to appropriate college employees who will be responsible for various portions of the search processes

We will advertise and hire a Monitor within sixty (60) days of April 12, 2000, and within ninety (90) days, we will develop and distribute to you standard procedures of record keeping and reporting to be used by each college for search processes, annual reports, and documentation.  We will also conduct training seminars for presidents and selected college employees before the end of the Summer Term of 2000.

Based on the requirements of the Uniform Guidelines, presidents are reminded of the following deadlines:

(1)   Within 90 days, the Chancellor must submit to class counsel a detailed report on how presidents will meaningfully and fully fulfill the requirement of the Partial Consent Decrees, requiring a contemporaneous written explanation of the reasons for selections made through the search process.

---

4-14-00  Dr Jordan

GWCC553

Memorandum #2000-LGL-122
Page Two
April 13, 2000

(2)    Within 90 days, with the exception of current searches already in progress, the Recruitment and Selection Committee(s) at each college must be reestablished and reappointed  Each president must prominently publicize and notify individuals that the college is seeking persons to serve on the committee(s) required by the Partial Consent Decrees.

(3)    Within 90 days, all presidents, with the exception of interim presidents, will begin search processes to fill positions currently held by individuals who have been serving in temporary appointments for more than twelve (12) months for positions covered by the Partial Consent Decrees.

We will be communicating with you frequently as we implement these new guidelines. Presidents should keep in mind that it is always preferable to ask advice before taking any action covered by the Partial Consent Decrees. Please refer any questions or concerns to Ms. Culverhouse.  We appreciate your understanding and assistance in this transition period.

FG:RDC:vs

Enclosures

REC'D APR 1 4 2000

FILED

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

APR 1 2 2000

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

BRENDA J. KENNEDY, et al.,        )
                                  )
      Plaintiffs,                 )
                                  )
      v.                          )    CIVIL ACTION NO. 89-T-196-N
                                  )
ALABAMA STATE BOARD OF            )
EDUCATION, et al.,                )
                                  )
      Defendants.                 )

ORDER

Based upon the representations made at a hearing on April 11,
2000, it is ORDERED as follows:

(1)    The motion for court approval and adoption, etc., filed
       by plaintiffs on April 7, 2000 (Doc. no. 989), is
       granted.

(2)    The uniform guidelines for compliance and monitoring of
       consent decrees are approved and adopted by the court.

DONE, this the 12ᵗ day of April, 2000.

MYRON H. THOMPSON
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

BRENDA J. KENNEDY, et al.,        )
                                  )
        Plaintiffs,               )
                                  )
                                  )    CIVIL ACTION NO 89-T-196-N
                                  )
ALABAMA STATE BOARD               )
OF EDUCATION, et al.,             )
                                  )
        Defendants.               )

FILED

APR 12 2000

CLERK
U S DISTRICT COURT
MIDDLE DIST. OF ALA

## UNIFORM GUIDELINES FOR COMPLIANCE AND MONITORING OF CONSENT DECREES

### SECTION ONE: PROCEDURES FOR MAINTENANCE OF STATEWIDE INFORMATION BANK.

1. The Chancellor will modify membership in the Bank so that it complies with the requirements of the Consent Decrees

2. Mailing labels to colleges for System vacancies will include a printout from the database that reflects the race and gender of all pool members listed on the labels.

3. In an effort to increase the numbers of individual members in the Bank from outside of The Alabama College System:

   (A)  The Chancellor will enhance and improve the Bank and its use by building into the Bank the names of class members who may be interested in and qualified for the vacancies in positions covered by the Partial Consent decrees.

   (B)  At the conclusion of searches for vacancies in positions covered by the Partial Consent Decrees, the names and resumes of class members who met the

minimum qualifications for the positions but who were not selected for the positions will be provided to the Chancellor by the Presidents, and the Chancellor will send a letter to those individuals, stating that unless the individual notifies the Chancellor otherwise, their information will be included in the applicant pool, and they will be given notice of future job vacancies.

(C)   The Alabama College System will purchase a general ad in the *AEA Journal* each quarter, inviting membership in the Bank;

(D)   In each Annual Report, the Chancellor shall report, by class, the numbers of class members hired from the Bank for positions covered by the Partial Consent Decrees. Each college shall also maintain the names of class members secured through the college's recruitment efforts, including visitations to predominantly black institutions of higher learning, professional associations, and industrial organizations, and meetings with community and educational leaders, and shall forward them to the Chancellor for inclusion in the Bank.

SECTION TWO: RECRUITING AND SELECTION.

1.   The Chancellor will direct each president (or designee) to attend (on an annual basis) the meeting of the National Association of African American Studies (or a similar national conference), which meets in concert with the National Association of Hispanic and Latino Studies, the National Association of Native American Studies, and the International Association of Asian Studies at a national conference.

2.    The Chancellor will direct each college president to make a concerted effort to contact historically black colleges and universities. The Chancellor will further direct each college to make at least two HBCU visits annually, coordinated through the Career Counseling and Placement Centers at each college or university Confirmation of these efforts will be reflected in a Recruiting Form to be completed and signed by the Center Director at the time of the visit, with a copy forwarded to the Division of Legal and Human Resources and reflected in the colleges' annual reports.

3      The Alabama College System will participate on an Internet site that will assist in recruiting under represented minority groups. The Alabama College System will also join the Minorities Job Bank as a Corporate Member  The Minorities Job Bank is dedicated to providing career, job, and self development information to members of minority groups. In addition, all System vacancy announcements will be posted on the web site. This will also provide unlimited access to the Resume Database, which will be periodically reviewed as a means of identifying potential applicants. Members of the Resume Database will be contacted to determine their interest in being added to the Bank.

4.    The Department of Postsecondary Education will purchase the database from the National Institute for Leadership Development that will encompass all female participants in the Leaders and Next Step programs. This database will be updated annually and will provide a vehicle for searches for presidential and upper level administrative vacancies in the System.

5.  For positions covered by the Partial Consent Decrees, all vacancy notices will be sent to the Alabama Employment Service.

6.  Presidents will report to the Chancellor the names and affiliations of all members of the Recruiting and Selection Committees for each vacancy covered by the Partial Consent Decrees.

7.  The president of each college is responsible for compliance with the provisions of the Partial Consent Decrees relating to selections made through the search process. No president may delegate such responsibility and will meaningfully and fully fulfill the requirement of the Partial Consent Decrees requiring a contemporaneous written explanation of the reasons for such selections. The Chancellor will submit to class counsel within ninety (90) days a detailed report on how the presidents have accomplished these requirements. The Chancellor will specifically and contemporaneously report to class counsel instances where a president reopens an application and search process in order to comply with the remedial objectives of the Partial Consent Decrees and will further report to class counsel whether the reopening of the search resulted in the hiring of a class member covered by these Partial Consent Decrees.

8.  With the exception of current searches already in progress, the Chancellor will direct the presidents that the Recruitment and Selection Committee(s) at each college must, within ninety (90) days be reestablished and reappointed, and that as a part of this process the president will prominently publicize that he or she is seeking persons to serve on the committee(s) pursuant to the requirements of the Partial Consent Decrees.

## SECTION THREE: TEMPORARY APPOINTMENTS

1.  Within ninety (90) days, all college presidents, except interim presidents, will begin
    search processes to fill positions currently held by persons who have been serving in
    temporary appointments for more than twelve (12) months for positions covered by
    the Partial Consent Decrees. All applicants will be given equal consideration.

2.  Subsequent to the making of temporary appointments for positions covered by the
    Partial Consent Decrees, Presidents will notify the Chancellor of those appointments
    and their estimated duration.

3.  No person who is appointed to a temporary position will be given preference for a
    permanent appointment by virtue of serving in the temporary position.

4.  For each temporary appointment made for positions reasonably expected to become
    permanent, the president shall contemporaneously begin a full search process in the
    year of the temporary appointment to fill the position on a permanent basis

5.  A person appointed on a temporary basis shall serve only until the position is filled
    by search on a permanent basis.

SECTION FOUR: <u>LATERAL TRANSFERS AND REORGANIZATIONS</u>

1. Lateral transfers will be limited to the conditions of the Partial Consent Decrees, will be limited to actual vacancies in previously existing positions, and will not be used for promotions or increases in pay, or creating a new position or new title

2. For reorganizations and lateral transfers, a form will be used that will provide detailed information, including race, gender, title, salary schedule, narrative description, and justification. If in any instance a person receives more than one appointment by lateral transfer or reorganization, the reports to class counsel will include a narrative statement, citing the former appointment by lateral transfer or reorganization, and shall state why second appointment is justified.

3. Reorganizations will be limited to expansion or modification of existing positions

4. The Chancellor will collect information from Presidents on all previous appointments for positions covered by the Partial Consent Decrees and made by lateral transfer or reorganization. Said information shall be provided to the Monitor.

5. The Chancellor shall direct each President to prepare an Annual Institutional Management Plan of each two-year college, to be submitted to the Chancellor during the Spring Term of each year, that will include plans for reorganizations, lateral transfers and use of part-time and temporary employees

6. If a reorganization occurs which is not contained in a college's Institutional Management Plan, a full and detailed explanation as to the need for the reorganization will be submitted by the Chancellor as part of the narrative description of the reorganization provided to class counsel.

GWCC561

SECTION FIVE: <u>TRAINING</u>.

Prior to the end of the Summer Term of 1999-2000, the Chancellor will conduct at least one workshop to be attended by each college president and college employees designated by the presidents to orient and instruct them with regard to the requirements of the Partial Consent Decrees and the new procedures established by the Chancellor pursuant to this document. The workshop will include dissemination of ideas and strategies used by those colleges which have been successful in hiring class members. Each president shall be required to attend at least one workshop.

SECTION SIX: <u>RECORD-KEEPING AND REPORTING</u>.

1. Within ninety (90) days, the Chancellor will develop and promulgate standard procedures of record keeping and reporting to meet the requirements of the Partial Consent Decrees. Such procedures will include a standard record-keeping and reporting format to be used by each college for its search processes, annual reports, and documentation of temporary appointments, and appointments made by lateral transfer and reorganization.

2. The Chancellor will create a public web site to make available to class counsel, to class members, to Alabama College System employees, and to members of the public all annual reports and notices of reorganizations, beginning with the annual report due on or about October 1, 2000.

3. The reporting provisions under the Partial Consent Decrees shall continue throughout the terms of the decrees.

GWCC562

SECTION SEVEN: MONITOR:

1.  Within sixty (60) days, the Chancellor will designate an individual to serve as Monitor, responsible for effecting compliance with the Partial Consent Decrees. The Chancellor will notify class counsel of the identity and qualifications of the Monitor. The Monitor will schedule quarterly meetings with class counsel to discuss any perceived problems or concerns raised by class members with regard to compliance issues, including efforts to enhance and improve the statewide bank of information and its use. The Monitor will not serve as an advocate for any party.

2.  The Monitor will develop a systematic and periodic schedule of random audits that will examine the compliance of each institution with the provisions of the Partial Consent Decrees.

3.  The Monitor will conduct annual training seminars designed to review the progress of the institutions in reaching their goals and to reconfirm the requirements of the Partial Consent Decrees.

4.  Within ninety (90) days, the Monitor will distribute to Presidents standard procedures for record keeping and reporting of activities under the Partial Consent Decrees, including search processes, annual reports, temporary appointments, lateral transfers, reorganizations, and maintenance and use of the Bank.

5.  The Monitor will examine data from the colleges, including information on race and gender, and will review the use of part-time employees by each institution. The Monitor will make recommendations to the Chancellor concerning the representation of class members as part-time employees and will discuss such representation with class counsel during quarterly meetings.

GWCC563

6. The Monitor will collect from each college for each vacancy advertised the name, address, race, and gender of each applicant who applied unsuccessfully for vacancies covered by the Partial Consent Decrees.

7. Class counsel may have *ex parte* communications with the Monitor. Each class shall appoint a representative through whom contact with the Monitor will be made for purposes of addressing issues relating to the Consent Decrees.

## SECTION EIGHT: CONTINUING OBLIGATIONS UNDER THE CONSENT DECREES.

Nothing in these Uniform Guidelines and Procedures is intended to relieve the parties of any obligation or requirement under the Consent Decrees.

## SECTION NINE: OBJECTIONS AND HEARINGS:

For any objection filed with the Monitor by the class representative to actions of Defendants, the Defendants shall file a detailed response including documentation within 14 days thereof. If the Defendants' response resolves the objection, Plaintiffs shall notify the Monitor that the objection is resolved. If the objection is not resolved, Plaintiffs shall, within 7 days of receipt of Defendants' response, request that the Monitor set a hearing date to resolve said objection. The Monitor shall set said hearing within 30 days of the request. The presentation of evidence shall be limited to no more than one day. The Monitor shall issue a ruling overruling or sustaining the objection within 10 days of the hearing, unless the parties agree to extend the time for receipt of Monitor's ruling. The Monitor's ruling shall include facts supporting his/her decision. Within 21 days of the Monitor's ruling, Plaintiffs may petition the court for a review of the Monitor's decision, or utilize any judicial proceeding currently available to them relating to enforcement of the Consent

Decrees. Nothing herein, including the filing of an objection, shall prohibit the parties from resolving any objection prior to a ruling by the Monitor or the Court.

## SECTION TEN: <u>SERVICE AREAS AND GOALS</u>.

The service areas and goals of each Alabama College System institution will be examined subsequent to the receipt of data from the 2000 United States Census, and goals will be adjusted accordingly. The term "primary service area" means such geographic area as the State Board of Education and the Chancellor shall submit to the Court as each respective college's primary service area. The primary service areas designated for the purpose of this Agreement shall not be binding upon any college of the State Board of Education for any other purposes, unless expressly adopted for such other purpose(s) by the State Board of Education. The State Board of Education and the Chancellor shall submit any changes in service area designations and goals to the Court no later than 120 days after receipt of data from the 2000 United States Census. If class members contend that the service areas so designated have the purpose or effect of materially thwarting achievement of the employment goals established by the Partial Consent Decree, they may file appropriate objections with the Court.

## SECTION ELEVEN: <u>ATTORNEY FEES</u>.

Although Defendants do not in any manner admit liability under any of the pleadings filed in this matter, they acknowledge that, for purposes of an award of attorney fees pursuant to 42 U.S.C.§ 1988, Plaintiff Kennedy, as class representative, is the prevailing party with respect to the Motion to Show cause and the Amended Motion to Show Cause. Defendants do not agree or concede that Plaintiff Kennedy, as an individual, is the prevailing party in her individual Complaint and Amended Complaint against Defendants. If the parties are unable to agree upon the amount of

fees and expenses to be paid by Defendants regarding the class claims, Plaintiff shall file her request for attorney fees and expenses not later than thirty (30) days after approval of this Agreement.

Approved on the the ___12th___ day of ___April___, 2000.

_____
United States District Judge

::

Anthony Joseph, Esq.
William D. Jones, Esq.
S. Christopher Collier, Esq.
Johnston, Barton, Procter,
& Powell, LLP
1901 6<sup>th</sup> Avenue North, Suite 2900
Birmingham, AL 35203
(205) 458-9400


Counsel for Defendants

Terry G. Davis (DAV040)
Post Office Box 230907
Montgomery, AL 36123
Telephone: (334) 270-0592
Fax: (334) 279-0362

Gregory B. Stein (STE055)
Angelique M. Cooper (COO068)
Stein and Brewster
Post Office Box 1051
Mobile, AL 36633-1051
Telephone: (334) 433-2002
Fax: (334) 432-7756

George L. Beck, Jr. (BEC011)
David B. Byrne, III (BYR013)
Beck & Byrne, P.C.
Post Office Box 5019
Montgomery, Alabama 36103
Telephone: (334) 832-4878
Fax: (334) 832-4704

C:\A E A\FINAL EDITS\FINAL PROPOSED UNIFORM GUIDLINES2.KENNEDY.RTF

GWCC567

Henry H. Caddell (CAD006)
Thiry & Caddell
1911 Government Street
Mobile, Alabama 36606
Telephone: (334) 478-8880
Fax: (334) 478-8885

Kenneth L. Thomas (THO043)
John W. Adams (AD045)
Thomas, Means & Gillis
Post Office Drawer 5058
Montgomery, AL 36103-5058
Telephone: (334) 270-1033
Fax: (334) 360-9396

Counsel for Plaintiff Brenda J. Kennedy
and the Plaintiff Class

C:\A E A\FINAL EDITS\FINAL PROPOSED UNIFORM GUIDLINES2.KENNEDY.RTF

GWCC568

1.G

ALABAMA STATE BOARD OF EDUCATION
THE ALABAMA COLLEGE SYSTEM

RECOMMENDATION FOR ACTION

| | |
|---|---|
| | Action Item Number _____ VIII.A.6. |
| December 11, 2003 | Chancellor's Office |
| Date of Board Meeting Action | Source |

## ACTION ITEM TITLE

THE ALABAMA COLLEGE SYSTEM
Addendum to the Uniform Guidelines for Compliance and Monitoring

### RECOMMENDATION

It is recommended "That the Alabama State Board of Education approve the Addendum to the Uniform Guidelines as attached, and authorize the Chancellor to effect the payment of negotiated attorney fees in the matter of *Kennedy, et al. v. Alabama State Board of Education*."

### FISCAL CONSIDERATION

Fiscal considerations will include the costs associated with notice requirements, third-party mediation costs, and negotiated attorney fees which will be prorated among the individual colleges.

### RATIONALE

In 1994 and 1995, U. S. District Judge Myron Thompson issued orders approving the implementation of two Partial Consent Decrees in settlement of class claims against the Alabama State Board of Education and The Alabama College System. The decrees require specific actions on behalf of the Board, the Chancellor, and Alabama College System Presidents with respect to maintenance of a statewide information bank, recruiting and selection, and goals for positions on Salary Schedules B, C, and D. In 2000, the State Board of Education approved Uniform Guidelines to implement certain record keeping and reporting requirements, including the appointment of a Monitor, to document compliance with the provisions of the Decrees. As a result of Plaintiff's Motion for Contempt filed in November of 2002, additional notice requirements have been implemented to assure compliance. The pending Motion for Contempt and related litigation will be dismissed upon approval of the Addendum to the Uniform Guidelines

| | | | |
|---|---|---|---|
| Code/Statute | COA  13A-14-2 | | / / |
| Policy | | Director | Date |
| | | | 12/9/03 |
| | | Legal Counsel | Date |

**Action by Board:**
_____ Tabled
12-11-03 Approved
_____ Disapproved
_____ Amended (describe)
_____ Additional action required

| | |
|---|---|
| | / / |
| Vice Chancellor/ Asst to Chancellor | Date |
| | 12/9/03 |
| Chancellor | Date |

In support of their joint motion, the parties would respectfully represent to this Court that the proposed Addendum to Uniform Guidelines does not alter or amend any requirements of the *Johnson* Consent Decree and, therefore, may be adopted without further notice or hearing. Rule 23(e), Fed. R. Civ. P provides:

> A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs

The parties respectfully submit that formal approval and notice to the class is not required here, because the action is not to be dismissed and the merits are not being compromised. Rather, the parties propose to resolve the pending motions by institution and use of the proposed Addendum to Uniform Guidelines and dismissal of the pending motions with prejudice. The parties do not seek, and do not believe it is necessary, to amend the *Johnson* Consent Decree previously entered in this action

The purpose of Rule 23(e) "is to protect the nonparty members of the class from unjust or unfair settlements affecting their rights when the representatives become faint-hearted before the action is adjudicated or are able to secure satisfaction of their individual claims by compromise." Rule 7B Fed. Prac. & Proc. Civ. 2d § 1797. The proposed resolution of the pending motions is not an adjudication or final settlement of the rights of the class members. Moreover, the proposed Addendum to Uniform Guidelines does not in any way alter the substantive rights of any class member under the *Johnson* Consent Decree.

Under these circumstances, the parties submit that notice to the class and a hearing and determination by the Court regarding the adequacy and fairness of the proposed resolution of the

2

## CERTIFICATE OF SERVICE

I hereby certify the above and foregoing Joint Motion for Court Approval and Adoption of Addendum to Uniform Guidelines for Compliance and Monitoring of Consent Decrees has been served on the following counsel of record, by placing a copy of the same in the United States Mail, first class postage prepaid and properly addressed:

George L. Beck, Jr., Esq.
Terri Biggs, Esq
George L. Beck, Jr., P.C
P.O. Box 5019
Montgomery, AL 36103-5019

Ernestine S. Sapp, Esq.
Gray, Langford, Sapp, McGowan
 Gray & Nathanson
108 Eastside Street
Tuskegee, Alabama 36083

Joe R. Whatley Jr., Esq.
Whatley Drake
P.O. Box 10647
Birmingham, Alabama 35203-0647

This the _____ day of December, 2003.


_____
Of Counsel

W0439182 VPD

4

If a hearing takes place before a third party, the plaintiffs and defendants will follow procedures established by the third party for the hearing. The third party shall set the hearing within 30 calendar days of his/her appointment. The decision of the third party shall include facts supporting his/her decision

Within 21 calendar days of the decision of the Monitor or the third party, either plaintiffs or defendants may petition the Chancellor for a review of the decision. The Chancellor shall examine documentary evidence and written testimony and shall issue a written decision within 10 working days.

Within 21 calendar days of the Chancellor's written decision, either party may petition the Court for a review of the decision or may utilize any judicial proceeding currently available to them relating to enforcement of the *Johnson* Consent Decree or the Uniform Guidelines  Nothing herein, including the filing of any objection, shall prohibit the parties from resolving any objection prior to a ruling by the Monitor, by the third party, by the Chancellor, or by the Court

Approved on this the _____ day of December, 2003.


_____
Myron H. Thompson
United States District Judge

W0439241.WPD

4

*agree not an all except attorney fees.*

*• Tuesday - Ray only testimony. Sue below - David Jones.*

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| BRENDA J. KENNEDY et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 89-T-196-N |
| | ) | |
| ALABAMA STATE BOARD OF | ) | |
| EDUCATION et al., | ) | |
| | ) | |
| Defendants. | ) | |

JOINT MOTION FOR COURT APPROVAL AND ADOPTION OF
ADDENDUM TO UNIFORM GUIDELINES

In settlement of all issues raised or which could have been raised in the Kennedy class

plaintiffs' Motion for Contempt (dated November 27, 2002), Appeal from Monitor's Order (dated

October 14, 2003), Motion to Modify Johnson Consent Decree (dated October 20, 2003),

Supplemental Motion to Modify Johnson Consent Decree (dated October 21, 2003), and Amended

Supplemental Motion to Modify Johnson Consent Decree (dated November 19, 2003) (such motions

referred to collectively as the "pending motions"), the parties hereby jointly move the Court to

approve and adopt the ADDENDUM TO UNIFORM GUIDELINES FOR COMPLIANCE AND

MONITORING OF CONSENT DECREES attached to the present joint motion.

In support of their joint motion, the parties would respectfully represent to this Court that the

proposed Addendum to Uniform Guidelines does not alter or amend any requirements of the

*from meeting on*
*12-5-03*

*Mark*

*C Sasser*

*Johnson* Consent Decree and, therefore, may be adopted without further notice or hearing   Rule

23(e), Fed. R. Civ. P. provides:

> A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

The parties respectfully submit that formal approval and notice to the class is not required here,

because the action is not to be dismissed and the merits are not being compromised.  Rather, the

parties propose to resolve the pending motions by institution and use of the proposed Addendum to

Uniform Guidelines and dismissal of the pending motions with prejudice.  The parties do not seek,

and do not believe it is necessary, to amend the *Johnson* Consent Decree previously entered in this

action.

The purpose of Rule 23(e) "is to protect the nonparty members of the class from unjust or

unfair settlements affecting their rights when the representatives become faint-hearted before the

action is adjudicated or are able to secure satisfaction of their individual claims by compromise "

Rule 7B Fed. Prac. & Proc. Civ, 2d § 1797.  The proposed resolution of the pending motions is not

an adjudication or final settlement of the rights of the class members.  Moreover, the proposed

Addendum to Uniform Guidelines does not in any way alter the substantive rights of any class

member under the *Johnson* Consent Decree.

Under these circumstances, the parties submit that notice to the class and a hearing and

determination by the Court regarding the adequacy and fairness of the proposed resolution of the

pending motions are not required.  Accordingly, the parties move the Court to adopt the attached

Addendum to Uniform Guidelines and to dismiss with prejudice plaintiffs' pending motions.

2

As a final matter, the parties represent to the Court that the plaintiffs are seeking an award of attorneys' fees and expenses to be paid by the defendants. The parties have not settled or reached agreement on this issue, although they are engaged in ongoing discussions  In the event the parties are unable to reach agreement, the plaintiffs will file with the Court a request for attorneys' fees and costs within 30 days after the Court's ruling on the foregoing joint motion

Respectfully submitted this _____ day of December, 2003.


_____
Terry G. Davis (DAV040)
One of the Attorneys for Plaintiff

DAVIS & HATCHER, LLC
P. O. Box 230907
Montgomery, Alabama 36123
(334) 270-0592


_____
Anthony A. Joseph (JOS002)
One of the Attorneys for Defendants

JOHNSTON BARTON PROCTOR & POWELL LLP
2900 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618
(205) 458-9400

3

GWCC575

## CERTIFICATE OF SERVICE

I hereby certify the above and foregoing Joint Motion for Court Approval and Adoption of Addendum to Uniform Guidelines for Compliance and Monitoring of Consent Decrees has been served on the following counsel of record, by placing a copy of the same in the United States Mail, first class postage prepaid and properly addressed:

George L. Beck, Jr., Esq.
Terri Biggs, Esq.
George L. Beck, Jr., P.C.
P.O. Box 5019
Montgomery, AL 36103-5019

Ernestine S. Sapp, Esq.
Gray, Langford, Sapp, McGowan
 Gray & Nathanson
108 Eastside Street
Tuskegee, Alabama 36083

Joe R. Whatley Jr., Esq.
Whatley Drake
P, O. Box 10647
Birmingham, Alabama 35203-0647

This the _____ day of December, 2003.

_____
Of Counsel

W0439182 WPD

4

GWCC576

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

BRENDA J. KENNEDY et al.,          )
                                   )
        Plaintiffs,                )
                                   )
v.                                 )    CIVIL ACTION NO. 89-T-196-N
                                   )
ALABAMA STATE BOARD OF             )
EDUCATION et al.,                  )
                                   )
        Defendants.                )

ADDENDUM TO UNIFORM GUIDELINES
FOR COMPLIANCE AND MONITORING OF CONSENT DECREES

The Uniform Guidelines for Compliance and Monitoring of Consent Decrees, which were

adopted and approved by the Court on April 12, 2000, are hereby amended as follows:


SECTION TWO:  RECRUITING AND SELECTION

The following paragraph is added to Section Two:

9.      On each occasion that a position covered by the *Johnson* Consent Decree is

to be filled through the search process, the Chancellor will send class counsel

a copy of the same applicant pool list that is forwarded to the respective

college.


SECTION THREE:  TEMPORARY APPOINTMENTS

The following paragraph is added to Section Three:

6.      The parties recognize that there may be extenuating circumstances or other

emergencies where a temporary appointment exceeds twelve months.  For

GWCC577

each temporary appointment that is expected to exceed a twelve-month period, the Chancellor will provide 10 working days' notice to plaintiffs' counsel of the extension. The notice will provide the reason for the extension, the expected duration of the extension, and the date the position will be advertised, if any. If the extension exceeds 10 working days, plaintiffs' counsel may object and proceed in accordance with Section Nine of the Uniform Guidelines. This provision is not intended to extend the twelve-month period for temporary appointments.

## SECTION FOUR: LATERAL TRANSFERS AND REORGANIZATIONS

The following sentence is added to the end of paragraph 5 of Section Four:

The section of the annual Institutional Management Plan of each two-year college regarding plans for reorganizations, lateral transfers, and use of part-time and temporary employees shall be provided to class counsel by May 1 of each year.

The following paragraph is added to Section Four:

7. The Chancellor will provide to class counsel 30 calendar days' notice prior to the effective date of any reorganization. If class counsel timely files an objection to a reorganization, any portion of the reorganization that is implemented shall be deemed temporary pending the decision of the Monitor or third party. This provision is not intended to limit or alter any rights and obligations of the parties under provision 8c of the *Johnson* Consent Decree and the Uniform Guidelines adopted on April 12, 2000.

2

## SECTION NINE: OBJECTIONS AND HEARINGS

The previous Section Nine is hereby replaced and superseded by the following:

*re-written -*
*they can choose*
*to go to*
*Monitor or*
*3rd party -*
*their choice*

In the event plaintiffs file an objection, notice of such objection must be filed with the Monitor prior to the effective date of the employment action.

For any objection, the defendants shall file a detailed response, including documentation, within 14 calendar days thereof. If the defendants' response resolves the objection, plaintiffs shall notify the Monitor that the objection is resolved. If the objection is not resolved, plaintiffs shall, within 7 calendar days of receipt of defendants' response, notify defendants of their request for a hearing before the Monitor or before a third party.

*we must*
*agree on 3rd*
*party or*
*Court decides*

In the event plaintiffs elect a hearing before a third party, costs will be divided equally between plaintiffs and defendants. plaintiffs and defendants will endeavor to agree upon the third party. In the event the parties are unable to do so within 7 calendar days of plaintiffs' notice to defendants, the parties agree to allow the Court to appoint the third party

If a hearing takes place before the Monitor, the Monitor shall set said hearing within 30 calendar days of the request. The presentation of evidence shall be limited to no more than one day. The Monitor shall issue a ruling overruling or sustaining the objection within 10 calendar days of the hearing, unless the parties agree to extend the time for receipt of Monitor's ruling. The Monitor's ruling shall include facts supporting his/her decision.

If a hearing takes place before a third party, the plaintiffs and defendants will follow procedures established by the third party for the hearing. The third party shall set the hearing within 30 calendar days of his/her appointment. The decision of the third party shall include facts supporting his/her decision.

3

GWCC579

Within 21 calendar days of the decision of the Monitor or the third party, either plaintiffs or defendants may petition the Chancellor for a review of the decision. The Chancellor shall examine documentary evidence and written testimony and shall issue a written decision within 10 working days.

Within 21 calendar days of the Chancellor's written decision, either party may petition the Court for a review of the decision or may utilize any judicial proceeding currently available to them relating to enforcement of the *Johnson* Consent Decree or the Uniform Guidelines. Nothing herein, including the filing of any objection, shall prohibit the parties from resolving any objection prior to a ruling by the Monitor, by the third party, by the Chancellor, or by the Court.

Approved on this the _____ day of December, 2003.

_____
Myron H. Thompson
United States District Judge

W0439241.WPD

4

12/12/03  FRI 12:39 FAX                           →→→ WALLACE DOTHAN        ☒001



# ALABAMA
# DEPARTMENT OF
# POSTSECONDARY EDUCATION

## *Representing Alabama's Public Two-Year College System*

| STATE BOARD OF EDUCATION | Governor Bob Riley President | Randy McKinney District 1 | Betty Peters District 2 | Stephanie Bell District 3 | Ethel Hall Vice President District 4 | Ella B. Bell District 5 | David F. Byers, Jr. District 6 | Sandra Ray District 7 | Mary Jane C. Tyler District 3 |
|---|---|---|---|---|---|---|---|---|---|

## M E M O R A N D U M  #2003-LGL-282

DATE:     December 12, 2003

TO:       Presidents, The Alabama College System

FROM:     Roy W. Johnson, Chancellor

RE:       December Board Actions

At its meeting on December 11, 2003, the Alabama State Board of Education took the following actions of system-wide interest.

> ➢ Adopted the 2004 Department of Postsecondary Education Meeting Dates and Locations schedule. A copy of Action Item VIII.A.2. and the schedule are attached.

> ➢ Accepted the resignation of Dr. James Wade effective no later than February 1, 2004. A copy of Action Item VII.A.5. is attached.

> ➢ Approved the Addendum to the Uniform Guidelines relating to *Kennedy, et. al. v. Alabama State Board of Education*. A copy of Action Item VIII.A.6, the Joint Motion, and the Addendum are attached.

vs

Attachments

12-15-03
1 c. routed Adm Council

c. Sasser
c. Personnel

Roy W. Johnson, Chancellor   Post Office Box 302130   Montgomery, Alabama 36130-2130   (334) 242-2900   Fax (334) 242-2888

401 Adams Avenue  Montgomery, Alabama 36104-4340    Internet Address: http://www.acs.cc.al.us

GWCC581

12/12/03  FRI 12:39 FAX                                    →→→ WALLACE DOTHAN        @002

ALABAMA STATE BOARD OF EDUCATION
THE ALABAMA COLLEGE SYSTEM

RECOMMENDATION FOR ACTION

Action Item Number  VIII.A.2.

December 11, 2003                              Chancellor's Recommendation
Date of Board Meeting Action                  Source

### ACTION ITEM TITLE

ALABAMA STATE BOARD OF EDUCATION
2004 Work Session and Meeting Schedule

### RECOMMENDATION

It is recommended "That the Alabama State Board of Education adopt the attached 2004 Department of
Postsecondary Education Meeting Dates and Locations schedule."

### FISCAL CONSIDERATION

None

### RATIONALE

The State Board of Education is required by law to publish advance notice of its meetings. This will give the
opportunity to publish the meetings in a timely manner.

Code/Statute  COA  13A-14-2                    _____  / /
Policy                                         Director                     Date

                                               _____  / /
                                               Legal Counsel                Date

Action by Board:
_____ Tabled
12-11-03 Approved                              Vice Chancellor/ Asst to Chancellor    Date
_____ Disapproved
_____ Amended (describe)
_____ Additional action required            Chancellor                   Date

GWCC582

12/12/03  FRI 12:39 FAX                                    +++ WALLACE DOTHAN    ⌐001

DPE/LGL/10-08-03

## ALABAMA STATE BOARD OF EDUCATION
## DEPARTMENT OF POSTSECONDARY EDUCATION
## MEETING DATES AND LOCATIONS

### 2004

| Work Sessions | | Board Meetings | |
|---|---|---|---|
| January 8 | Alabama Center for Commerce | January 22 | Gordon Persons Building |
| February 12 | Alabama Center for Commerce | February 26 | Gordon Persons Building |
| March 11 | Alabama Center for Commerce | March 25 | Gordon Persons Building |
| April 8 | Alabama Center for Commerce | April 22 | Drake State Technical College |
| May 13 | Alabama Center for Commerce | May 27 | Gordon Persons Building |
| June 10 | Alabama Center for Commerce | June 24 | Gordon Persons Building |
| June 24 | Gordon Persons Building | July 13 | Gordon Persons Building* |
| August 12 | Alabama Center for Commerce | August 26 | Gordon Persons Building |
| September 9 | Alabama Center for Commerce | September 23 | Snead State Community College |
| October 14 | Alabama Center for Commerce | October 28 | Gordon Persons Building |
| October 28 | Gordon Persons Building | November 18 | Gordon Persons Building* |
| November 18 | Alabama Center for Commerce | December 9 | Gordon Persons Building* |

*Joint meeting for K-12 and Postsecondary

GWCC583

## ALABAMA STATE BOARD OF EDUCATION
### THE ALABAMA COLLEGE SYSTEM

### RECOMMENDATION FOR ACTION

December 11, 2003
_____
**Date of Board Meeting Action**

Action Item Number _____ VIII.A.5. _____
Chancellor's Office _____
**Source**

### ACTION ITEM TITLE

NORTHWEST-SHOALS COMMUNITY COLLEGE
Resignation of President

### RECOMMENDATION

It is recommended "That the Alabama State Board of Education accept the resignation of Dr. James Wade as President of Northwest-Shoals Community College effective no later than February 1, 2004."

### FISCAL CONSIDERATION

None

### RATIONALE

Dr. James Wade has served as President of Northwest-Shoals Community College since September 1, 2000. Dr. Wade notified Chancellor Johnson by letter, dated December 2, 2003, of his resignation from the College, to be effective February 1, 2004. Chancellor Johnson acknowledged the resignation in a letter dated December 3, 2003. By statute and Board policy, the resignation of a president must be presented to the Board for its consideration.

Code/Statute  COA 16-60-111.4
Policy        203.02 and 203.03

Director _____  / / Date
Legal Counsel _____  12/9/03 Date

Action by Board:
_____ Tabled
12-11-03 Approved
_____ Disapproved
_____ Amended (describe)
_____ Additional action required

Vice Chancellor/ Asst to Chancellor ____ / / Date
Chancellor _____  12/9/03 Date

GWCC584

12/12/03  FRI 12:40 FAX                                    →→ WALLACE FO  L       ☐001

# ALABAMA STATE BOARD OF EDUCATION
## THE ALABAMA COLLEGE SYSTEM

### RECOMMENDATION FOR ACTION

December 11, 2003                          Action Item Number _____ VIII.A.6. __
_____                      Chancellor's Office
**Date of Board Meeting Action**           _____
                                           Source

### ACTION ITEM TITLE

THE ALABAMA COLLEGE SYSTEM
Addendum to the Uniform Guidelines for Compliance and Monitoring

### RECOMMENDATION

It is recommended "That the Alabama State Board of Education approve the Addendum to the Uniform Guidelines as attached, and authorize the Chancellor to effect the payment of negotiated attorney fees in the matter of *Kennedy, et al. v. Alabama State Board of Education.*"

### FISCAL CONSIDERATION

Fiscal considerations will include the costs associated with notice requirements, third party mediation costs, and negotiated attorney fees which will be prorated among the individual colleges.

### RATIONALE

In 1994 and 1995, U. S. District Judge Myron Thompson issued orders approving the implementation of two Partial Consent Decrees in settlement of class claims against the Alabama State Board of Education and The Alabama College System. The decrees require specific actions on behalf of the Board, the Chancellor, and Alabama College System Presidents with respect to maintenance of a statewide information bank, recruiting and selection, and goals for positions on Salary Schedules B, C, and D. In 2000, the State Board of Education approved Uniform Guidelines to implement certain record keeping and reporting requirements, including the appointment of a Monitor, to document compliance with the provisions of the Decrees. As a result of Plaintiff's Motion for Contempt filed in November of 2002, additional notice requirements have been implemented to assure compliance. The pending Motion for Contempt and related litigation will be dismissed upon approval of the Addendum to the Uniform Guidelines.

Code/Statute    COA  13A-14-2                    Director _____    /  /
Policy          _____                                                   Date
                                                Legal Counsel _____   12/9/03
                                                                                      Date

_____
| Action by Board:                    |
|        _____ Tabled                |         Vice Chancellor/ Asst to Chancellor    /  /
| 12-11-03 ___ Approved               |         _____             Date
|        _____ Disapproved           |         _____            12/9/03
|        _____ Amended (describe)    |         Chancellor                            Date
|        _____ Additional action required |
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

GWCC585

12/12/03 FRI 12:40 FAX                                    +++ WALLACE DOTHAN    [002]

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| BRENDA J. KENNEDY et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 89-T-196-N |
| | ) | |
| ALABAMA STATE BOARD OF | ) | |
| EDUCATION et al., | ) | |
| | ) | |
| Defendants | ) | |

## JOINT MOTION FOR COURT APPROVAL AND ADOPTION OF ADDENDUM TO UNIFORM GUIDELINES

In settlement of all issues raised or which could have been raised in the Kennedy class plaintiffs' Motion for Contempt (dated November 27, 2002), Appeal from Monitor's Order (dated October 14, 2003), Motion to Modify Johnson Consent Decree (dated October 20, 2003), Supplemental Motion to Modify Johnson Consent Decree (dated October 21, 2003), and Amended Supplemental Motion to Modify Johnson Consent Decree (dated November 19, 2003) (such motions referred to collectively as the "pending motions"), the parties hereby jointly move the Court to approve and adopt the ADDENDUM TO UNIFORM GUIDELINES FOR COMPLIANCE AND MONITORING OF CONSENT DECREES attached to the present joint motion.

In support of their joint motion, the parties would respectfully represent to this Court that the proposed Addendum to Uniform Guidelines does not alter or amend any requirements of the *Johnson* Consent Decree and, therefore, may be adopted without further notice or hearing. Rule 23(e), Fed. R. Civ. P. provides:

> A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

The parties respectfully submit that formal approval and notice to the class is not required here, because the action is not to be dismissed and the merits are not being compromised. Rather, the parties propose to resolve the pending motions by institution and use of the proposed Addendum to Uniform Guidelines and dismissal of the pending motions with prejudice. The parties do not seek, and do not believe it is necessary, to amend the *Johnson* Consent Decree previously entered in this action.

The purpose of Rule 23(e) "is to protect the nonparty members of the class from unjust or unfair settlements affecting their rights when the representatives become faint-hearted before the action is adjudicated or are able to secure satisfaction of their individual claims by compromise." Rule 7B Fed. Prac & Proc. Civ. 2d § 1797. The proposed resolution of the pending motions is not an adjudication or final settlement of the rights of the class members. Moreover, the proposed Addendum to Uniform Guidelines does not in any way alter the substantive rights of any class member under the *Johnson* Consent Decree.

Under these circumstances, the parties submit that notice to the class and a hearing and determination by the Court regarding the adequacy and fairness of the proposed resolution of the

2

12/12/03 FRI 12:41 FAX                              +++ WALLACE DOTHAN    ☒008

pending motions are not required. Accordingly, the parties move the Court to adopt the attached

Addendum to Uniform Guidelines and to dismiss with prejudice plaintiffs' pending motions.

As a final matter, the parties represent to the Court that the plaintiffs are seeking an award of

attorneys' fees and expenses to be paid by the defendants. If necessary, the plaintiffs will petition the

Court for such an award within 30 days after the Court's ruling on the foregoing joint motion

Respectfully submitted this _____ day of December, 2003.


_____
Terry G. Davis (DAV040)
One of the Attorneys for Plaintiffs

DAVIS & HATCHER, LLC
P. O. Box 230907
Montgomery, Alabama 36123
(334) 270-0592


_____
Anthony A. Joseph (JOS002)
One of the Attorneys for Defendants

JOHNSTON BARTON PROCTOR & POWELL, LLP
2900 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618
(205) 458-9400


3

GWCC588

12/12/03  FRI 12:41 FAX                          →→→ WALLACE DOTHAN        ⓦ009

## CERTIFICATE OF SERVICE

I hereby certify the above and foregoing Joint Motion for Court Approval and Adoption of Addendum to Uniform Guidelines for Compliance and Monitoring of Consent Decrees has been served on the following counsel of record, by placing a copy of the same in the United States Mail, first class postage prepaid and properly addressed:

George L. Beck, Jr., Esq.
Terri Biggs, Esq.
George L. Beck, Jr., P C.
P.O. Box 50 19
Montgomery, AL 36103-5019

Ernestine S. Sapp, Esq.
Gray, Langford, Sapp, McGowan
 Gray & Nathanson
108 Eastside Street
Tuskegee, Alabama 36083

Joe R. Whatley Jr., Esq.
Whatley Drake
P. O. Box 10647
Birmingham, Alabama 35203-0647

This the _____ day of December, 2003.


_____
Of Counsel

WGJ39183.WPD

GWCC589

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

BRENDA J. KENNEDY et al.,                    )
                                             )
        Plaintiffs,                          )
                                             )
v.                                           )    CIVIL ACTION NO. 89-T-196-N
                                             )
ALABAMA STATE BOARD OF                       )
EDUCATION et al.,                            )
                                             )
        Defendants.                          )

ADDENDUM TO UNIFORM GUIDELINES
FOR COMPLIANCE AND MONITORING OF CONSENT DECREES

The Uniform Guidelines for Compliance and Monitoring of Consent Decrees, which were

adopted and approved by the Court on April 12, 2000, are hereby amended as follows:

## SECTION TWO:  RECRUITING AND SELECTION

The following paragraph is added to Section Two:

9.    On each occasion that a position covered by the *Johnson* Consent Decree is to

be filled through the search process, the Chancellor will send class counsel a

copy of the same applicant pool list that is forwarded to the respective

college.

## SECTION THREE: TEMPORARY APPOINTMENTS

The following paragraph is added to Section Three:

6.    The parties recognize that there may be extenuating circumstances or other emergencies where a temporary appointment exceeds twelve months. For each temporary appointment that is expected to exceed a twelve-month period, the Chancellor will provide 10 working days' notice to plaintiffs' counsel of the extension. The notice will provide the reason for the extension, the expected duration of the extension, and the date the position will be advertised, if any. If the extension exceeds 10 working days, plaintiffs' counsel may object and proceed in accordance with Section Nine of the Uniform Guidelines. This provision is not intended to extend the twelve-month period for temporary appointments.

## SECTION FOUR: LATERAL TRANSFERS AND REORGANIZATIONS

The following sentence is added to the end of paragraph 5 of Section Four:

The section of the annual Institutional Management Plan of each two-year college regarding plans for reorganizations, lateral transfers, and use of part-time and temporary employees shall be provided to class counsel by May 1 of each year.

The following paragraph is added to Section Four:

7.    The Chancellor will provide to class counsel 30 calendar days' notice prior to the effective date of any reorganization. If class counsel timely files an objection to a reorganization, any portion of the reorganization that is implemented shall be deemed temporary pending the decision of the Monitor

2

12/12/03  FRI 12:42 FAX                                    →→→ F LAKE DOTHAN    ☒012

or third party. This provision is not intended to limit or alter any rights and obligations of the parties under provision 8c of the *Johnson* Consent Decree and the Uniform Guidelines adopted on April 12, 2000.

## SECTION NINE:  OBJECTIONS AND HEARINGS

The previous Section Nine is hereby replaced and superseded by the following:

In the event plaintiffs file an objection, notice of such objection must be filed with the Monitor prior to the effective date of the employment action.

For any objection, the defendants shall file a detailed response, including documentation, within 14 calendar days thereof. If the defendants' response resolves the objection, plaintiffs shall notify the Monitor that the objection is resolved. If the objection is not resolved, plaintiffs shall, within 7 calendar days of receipt of defendants' response notify defendants of their request for a hearing before the Monitor or before a third party. In the event plaintiffs elect a hearing before a third party, costs will be divided equally between plaintiffs and defendants. Plaintiffs and defendants will endeavor to agree upon the third party. In the event the parties are unable to do so within 7 calendar days of plaintiffs' notice to defendants, the parties agree to allow the Court to appoint the third party.

If a hearing takes place before the Monitor, the Monitor shall set said hearing within 30 calendar days of the request. The presentation of evidence shall be limited to no more than one day. The Monitor shall issue a ruling overruling or sustaining the objection within 10 calendar days of the hearing, unless the parties agree to extend the time for receipt of Monitor's ruling. The Monitor's ruling shall include facts supporting his/her decision.

3

GWCC592

If a hearing takes place before a third party, the plaintiffs and defendants will follow procedures established by the third party for the hearing. The third party shall set the hearing within 30 calendar days of his/her appointment. The decision of the third party shall include facts supporting his/her decision.

Within 21 calendar days of the decision of the Monitor or the third party, either plaintiffs or defendants may petition the Chancellor for a review of the decision. The Chancellor shall examine documentary evidence and written testimony and shall issue a written decision within 10 working days.

Within 21 calendar days of the Chancellor's written decision, either party may petition the Court for a review of the decision or may utilize any judicial proceeding currently available to them relating to enforcement of the *Johnson* Consent Decree or the Uniform Guidelines. Nothing herein, including the filing of any objection, shall prohibit the parties from resolving any objection prior to a ruling by the Monitor, by the third party, by the Chancellor, or by the Court.

Approved on this the _____ day of December, 2003.


_____
Myron H. Thompson
United States District Judge

W0439241.WPD

4

GWCC593

COPY

# SEARCH COMMITTEE/

# HIRING PROCEDURES

# MANUAL

# 2005-06



Blumberg No. 5114
DEFENDANT'S
EXHIBIT
30

GWCC600

## SECTION II

### PROCEDURES FOR APPOINTING FULL-TIME
### SALARY SCHEDULE B, C, AND D-1 PERSONNEL

1   To initiate the request to hire a new employee, the appropriate dean must complete the
    following forms and documents and submit them to the Administrative Council for
    approval:

    • *Request to Fill Position* form (Exhibit 6)

    • Memorandum appointing the Search Committee (obtain President's signature) (See
      Exhibit 7, *Sample Memorandum Notifying Search Committee Members* )

    • Job description (See Exhibit 16, *Sample Job Description/ Reasonable Accommodations
      Statement* )

    • *The Alabama College System Request to Fill Position* form (Exhibit 8) (obtain
      President's signature)  No vacancy can be filled without first obtaining the
      Chancellor's approval.  This form must include an explanation for filling the vacancy

2   If approved, the Dean, Business Affairs will review the request (for funding approval) and
    respond by (1) denying the request or (2) approving and forwarding the approved *Request to
    Fill Position* form and attachments to the Executive Assistant to the President for approval

3   The Executive Assistant to the President will review the request and attachments and route
    them to the President   The President will deny or approve the *Request to Fill Position* and
    attachments and return them to the dean originating the request

4.  If the request is approved by the President, the dean originating the request will submit the
    *Request to Fill Position* form and attachments to the Director of Personnel   (The dean will
    retain a copy and route a copy to the appropriate Campus Dean )

5   The Director of Personnel will submit to the dean originating the request and to the
    Executive Assistant to the President a draft *Vacancy Announcement* (Exhibit 9), draft
    *Newspaper Advertisement* (Exhibit 10), and a *Memorandum Requesting Approval of
    Vacancy Announcement and Classified Ad* (Exhibit 11`

6   The approved *Vacancy Announcement* and *Newspaper Advertisement* will be returned to the
    Director of Personnel who will fax the *Vacancy Announcement* and *The Alabama College
    System Request to Fill Position* form to the Chancellor for approval   After the Chancellor
    has approved the position, the Office of Personnel will receive names from the statewide
    Applicant Pool and mail the *Vacancy Announcement* to Applicant Pool members at least
    seven (7) days prior to advertising the position elsewhere (at least 21 days prior to the
    application deadline)   Other dissemination procedures are outlined in Steps 9-14   Copies
    are maintained for the search file.

### FROM WALLACE COMMUNITY COLLEGE
### SEARCH COMMITTEE/HIRING
### PROCEDURES MANUAL 2005-06

GWCC601

7   For any disabled person making an inquiry, the Director of Personnel will prepare an appropriate *Vacancy Announcement*, ensuring that accessible formats or alternative services are provided throughout the application and interviewing process

8   Search Committees are appointed by the President for a one-year term. The Director of Personnel ensures that race and gender guidelines required by the Uniform Guidelines (50% female and 40% black) are followed in appointing Search Committee members.

The Search Committee will consist of the following:

- Appropriate professional staff member or dean (will serve as Chair)

- Representatives from the faculty and staff and possibly business and/or industry representatives

9   The Director of Personnel will disseminate the memo from the President notifying the Search Committee [attach *Vacancy Announcement*] and will complete the *Recruitment and Selection Committee Appointment Form* (Exhibit 12) and submit it to Ms Jackie Sexson, Monitor for the Department of Postsecondary Education (DPE)   Copies are maintained for the search file.

10  The Director of Personnel will conduct an orientation session for Search Committee members and the Committee secretary and will provide the Committee Chair with a copy of the *WCC Search Committee/Hiring Procedures manual, Vacancy Announcement, and Job Description* containing reasonable accommodations statement

11  The Dean, Academic Affairs and Health Sciences (or designee) or Dean, Career Technical Instruction (or designee) will participate in orientation sessions for all faculty searches in which evaluation of academic credentials is necessary

12  To ensure that accurate documentation is maintained for each job search, the Personnel Coordinator will do the following:

- Assign a *Vacancy Announcement* number and maintain a vacancy announcement log book

- Prepare requisitions for publishing approved classified ads in appropriate publications; place the approved ads in at least one daily or weekly newspaper published in the College service area and at least one daily newspaper with regional or statewide coverage; and obtain copies of ads from actual newspapers.  Copies are maintained for the search file. Specific newspapers to be used will be determined by Office of Personnel staff in conjunction with the dean originating the request

- Post the approved *Vacancy Announcement* in the Administration Building on the Wallace Campus, and send a copy to the President  each Campus Dean, and Director, Fort Rucker Center for posting in a public place at each College location  The Wallace Campus Dean

FROM WALLACE COMMUNITY COLLEGE
SEARCH COMMITTEE/HIRING
PROCEDURES MANUAL 2005-06

GWCC602

6
11/05

will ensure that the *Vacancy Announcement* is posted in a public place on the Wallace Campus  The Sparks Campus Dean will ensure that the *Vacancy Announcement* is posted in a public place on the Sparks Campus and at the Ventress and Easterling sites. The Director, Fort Rucker Center will ensure that the *Vacancy Announcement* is posted in a public place at the Fort Rucker Center.

13  The Personnel Coordinator will ensure that the *Vacancy Announcement* is posted on College bulletin boards during the application period (a minimum of 3 weeks [or 14 days if the vacancy occurs during an academic term and is not a supervisory, managerial, or newly created position])

14. The Director of Personnel will ensure that the *Vacancy Announcement* is disseminated to or posted at the following:

   - Alabama Department of Postsecondary Education

   - Qualified applicants provided through the Department of Postsecondary Education's applicant pool

   - Local State Employment Service Office(s) (Dothan, Eufaula, etc.)

   - Equal Employment Opportunity Commission

   - All persons requesting an application in response to the *Vacancy Announcement*  (All copies are dated and a log sheet is maintained, detailing mailing and picking up  Copies are maintained for the search file.

   - All institutions listed in the Uniform Guidelines  (See Exhibit 13, *Uniform Guidelines Addresses* )

   - IMDiversity com Web site

   - Wallace Community College Web site

15  Applicants will be required to submit *The Alabama College System Application for Employment* (Exhibit 14), a personal resume, verification of experience/certification as necessary, and photocopies of individual transcript(s) from all colleges attended

16  Applications will be received for a minimum of 3 weeks, with exceptions as noted in #13 above

17  The Search Committee will review all application packets to (1) identify applicants who meet the minimum requirements specified and (2) verify education and prior work experience of applicants who meet minimum qualifications. (See Exhibit 5  *Sample Applicant Qualifications/Verification Form* )  The Search Committee Chair will provide the Director of Personnel with the names and application files of all applicants who do <u>not</u> meet minimum requirements or did not submit all required application materials, including

<div align="center">
FROM WALLACE COMMUNITY COLLEGE<br>
SEARCH COMMITTEE/HIRING<br>
PROCEDURES MANUAL 2005-06
</div>

GWCC603

documentation of minimum work experience. [Tips: (1) Minimum education/certification standards must be met by the deadline for application, not by the date the job is scheduled to begin at WCC and (2) it is often helpful to have a committee member with the greatest subject-area expertise serve as the initial reviewer ]

18   The Personnel Coordinator will prepare, for the Search Committee Chair's signature, letters to all applicants who do not meet minimum requirements, did not submit all required application materials, or did not submit the application by the required deadline. The Personnel Coordinator will indicate in each letter which criterion or criteria precluded the applicant's being interviewed. The Personnel Coordinator will mail signed letters to applicants. Copies are maintained for the search file. (See Exhibit 15, *Sample Letter to Applicants Who Did Not Meet Minimum Requirements or Submit Required Application Materials* )

19   The Search Committee Chair will establish a time frame and a location for the interviews

20   The Search Committee Secretary will schedule interviews for applicants meeting minimum requirements and will provide the interview schedule to Switchboard Operators on both campuses. A copy of the interview schedule is maintained for the search file.

21   The Search Committee will do the following:

- Develop an applicant interview questionnaire and other interview materials. Copies maintained for search file. (See Section I, *General Guidelines for Search Committee* )

- Obtain information/materials necessary for answering interviewees' potential questions regarding WCC and specific locations—e g , prisons.

- Interview applicants who meet minimum requirements.

22   The Search Committee Chair will obtain each applicant's signature on the job description Copies are maintained for the search file as part of the interview process. (See Exhibit 16, *Sample Job Description/Reasonable Accommodations Statement.*)

23   The Search Committee will recommend to the President three finalists for the position, and the Search Committee Chair will do the following:

- Prepare the memorandum from the Search Committee to the President recommending three finalists for the position, listed in alphabetical order by last name  A copy is maintained for the search file. (See Exhibit 17, *Sample Memorandum to the President Recommending Applicants for Final Interview* )

- Route a copy of the preceding memorandum to the Executive Assistant to the President, to the dean who supervises the functional area for which the search is being conducted, and to the Office of Personnel

GWCC604

8
11/05

- Route a copy of the preceding memorandum, <u>along with application packets/job search materials for all applicants interviewed, to the Director of Personnel</u> so that reference checks can be conducted for finalists and results submitted to the President for conducting final interviews  (See Exhibit 18, *Reference Check Form* )

24. The Personnel Coordinator (assisted by the Search Committee members, if necessary) will complete reference checks on finalists recommended by the Search Committee and route the completed reference check forms and interview packets for each person participating in final interviews to the <u>President and Executive Assistant to the President for conducting final interviews</u>. Reference check forms are maintained for the search file. The final interview packet should contain the following:
   - Copy of WCC Catalog (in <u>one</u> packet only)
   - Employment application and other application materials for each finalist
   - Copy of *Vacancy Announcement*
   - Questionnaire used in initial interview
   - Benefits sheet (Exhibit 3) (in <u>one</u> packet only)
   - Appropriate Salary Schedule (Exhibit 19)

   (The final interview packet will <u>not</u> include ratings/opinions from initial interview.)

25. The President and appropriate dean(s)/supervisor(s) will develop final interview questions and interview recommended finalists  Copies of final interview questions and interviewers' ratings and comments are maintained for the search file. The President may interview finalists by telephone following finalists' interviews with appropriate dean and final interview committee  The Administrative Assistant to the President will schedule telephone interviews

26  The Administrative Assistant to the President (or designee) will schedule final interviews and provide the interview schedule to the appropriate Switchboard Operator  The Administrative Assistant (or designee) will inform the interviewee of expectations for any teaching demonstrations—lecture, presentation, etc  (The Administrative Assistant to the President or the President's designee will ensure that final interview questions and a teaching demonstration topic are prepared by the President or designee.)

27  The President reserves the right to reopen the search if none of the recommended finalists meets the needs of the institution

28  The President will select the person to be employed.

29  The appropriate dean or supervisor will draft a *Statement of Justification* for the President's signature. The President will return the signed *Statement of Justification* to the Office of Personnel  A copy is maintained for the search file  (See Exhibit 20, *Sample Statement of Justification* )

30  The appropriate dean and the Executive Assistant to the President will verify education and experience of the selected applicant to determine the proper salary schedule, pay grade  and step placement and make a tentative offer of employment

FROM WALLACE COMMUNITY COLLEGE
SEARCH COMMITTEE/HIRING
PROCEDURES MANUAL 2005-06

9
11/05

31  After the offer of employment has been accepted, the appropriate dean will submit to the Director of Personnel a completed *Credit Faculty Credentials Verification Form* (if applicable) (Exhibit 21), a *Verification of Employment Experience Form* (Exhibit 22); and an *Authorization of Employment/Personnel Request* (Exhibit 23), along with all finalists' application files and any remaining job search materials

32  The Director of Personnel will prepare the appropriate letter to the Chancellor for the President's signature and route it to the Executive Assistant to the President for approval  A copy is maintained for the search file. For personnel on Salary Schedules C-3 and D-1, the Chancellor is to be informed of the employment. (See Exhibit 24, *Sample Letter Informing the Chancellor about New Employee*.) For personnel on Schedules B, C-1, or C-2, the Chancellor's approval of employment placement must be requested.  (See Exhibit 25, *Sample Letter to the Chancellor Requesting Approval of Employee Placement*)  In the event that placement at a higher step level is granted for prior "high tech" experience for personnel on Salary Schedule D-1, the Chancellor's approval must also be requested.  (See Exhibit 26, *Sample Letter to the Chancellor Requesting Approval of Placement for Prior High Tech Experience*)

33  After ensuring that the *Authorization of Employment/Personnel Request* has been signed by the President, the Director of Personnel will prepare a *Contract* or *Letter of Appointment* (Exhibits 27 and 28), attaching the signed *Authorization of Employment/Personnel Request*. The *Contract* or *Letter of Appointment* (and attached *Authorization of Employment/ Personnel Request*) will be routed to the Executive Assistant to the President for approval and on to the President for signature  The President will return the signed *Contract* or *Letter of Appointment* and the *Authorization of Employment/Personnel Request* to the Director of Personnel, who will secure the employee's signature on the *Contract* or *Letter of Appointment* and issue a copy to him/her

34  The Personnel Coordinator will initiate the *Employee Orientation Checklist* for new employees and will ensure that the new full- or part-time employee completes the necessary paperwork for the personnel file  The Secretary to the Dean, Student Affairs and Sparks Campus will initiate the necessary paperwork for work-study students, tutors, etc and will assist with new full- or part-time employee orientation as needed. After completing the *Employee Orientation Checklist* with the Personnel Coordinator, the new employee will be given the checklist to take to other appropriate personnel for completion. After all sections of the *Employee Orientation Checklist* have been completed, the employee must return the checklist to the Personnel Coordinator to ensure that his/her paycheck will not be delayed Personnel with responsibilities as reflected on the *Employee Orientation Checklist* must complete their section(s) immediately to ensure that the new employee does not experience any delays in being paid.

35  The Personnel Coordinator will prepare, for the Search Committee Chair's signature, letters to all applicants who were interviewed but not selected for employment  [Letters will not be sent to applicants who withdraw ]  Copies are maintained for the search file.  (See Exhibit 29, *Sample Letter to Applicants Interviewed But Not Selected*)

36  The Director of Personnel will prepare an announcement and submit it for publication in *FYI*, informing all WCC personnel about employment of the selected applicant, when he/she will begin work, etc

ID
11/05

37   For positions covered by the Uniform Guidelines (B, C, and D), the Director of Personnel will submit to the DPE Monitor all required information (name, address, race, gender, etc.) of each black, female, or black female applicant who applied unsuccessfully (attaching each applicant's resume) for each vacancy   (See Exhibit 30, *Applicant Reporting Form* )

38   The Director of Personnel will maintain the information listed in #36 as part of WCC's job search files and will use it in preparing the annual *Report of Compliance re: Shuford v State Board of Education*

39   The Director of Personnel will ensure that the following Affirmative Action information (including that for the applicant who is ultimately selected for the position) is maintained in the search files and computerized database for each job search:

   • Applications
   • Transcripts
   • Documentation of work experience
   • Copy of memo appointing search committee, verifying race and gender of committee members (Search Committee names, race, gender, and affiliation will be maintained in a computerized database.)
   • Vacancy announcement and newspaper advertisements (from actual newspapers)
   • Signed job description/reasonable accommodations statement
   • List of applicants who were interviewed, who withdrew, and who did not meet minimum requirements by (1) race and (2) gender (applicant information will be maintained in a computerized database.)
   • Copy of committee's interview schedule, questions, and members' ratings/comments
   • Copy of <u>final</u> interview schedule, questions, and ratings/comments from President (or designee) and <u>all</u> others participating in final interviews
   • Copy of all committee correspondence to applicants and others
   • Summary of each applicant's evaluation by the Committee, including writing samples, teaching demonstrations, or other skills exercises
   • Copy of all recommendations/reference checks
   • President's *Justification for Employment*
   • Copy of the *Alabama College System Request to Fill Position* form
   • Copy of names from Department of Postsecondary Education applicant pool (Exhibit 13)
   • Copy of applicant pool printout provided by Department of Postsecondary Education
   • Names of all persons from DPE applicant pool employed through the job search
   • Copy of forms submitted to DPE Monitor (Exhibits 12 and 30)
   • Copy of letters to Chancellor regarding person employed (Exhibits 25, 26, or 27)
   • Copies of materials from the job search pertaining to the selected applicant for personnel file

40   After completion of the job search, the Director of Personnel and the Personnel Coordinator will use the *Job Search Materials Checklist* to ensure that all job search materials for all applicants have been returned to the Office of Personnel and are filed in the appropriate job search files. and that job search materials pertaining to the selected applicant are photocopied and placed in his/her personnel file  (This checklist is an internal document in the Office of Personnel )

FROM WALLACE COMMUNITY COLLEGE
SEARCH COMMITTEE/HIRING
PROCEDURES MANUAL 2005-06

GWCC607

22
11/05
Exhibit 1

GEORGE C. WALLACE COMMUNITY COLLEGE
SUGGESTED INTERVIEW GUIDELINES

1. <u>Introduce the Search Committee by Names and Titles</u>

   Sample:    Ms  Gwyn Galloway—Division Director, Practical Nursing
              Ms Linda Ford—Practical Nursing Instructor
              Mr. Drayton Odom—Program Director, Respiratory Therapist
              Ms. Terra Womack—Cosmetology Instructor

2. Discuss the <u>Interview Process</u>

   a.  You were given the Job Description for the position of _____ (Fill in name) _____
       when you arrived today

       Have you had time to read it?

       Will you be able to perform the essential job functions with or without reasonable
       accommodations? (Take the signed Job Description from the applicant and place it in
       his/her file ) (See Exhibit 16 )

   b   The Search Committee will interview all qualified candidates   (If the number of qualified
       candidates is so many as to be prohibitive, the Committee Chair should refer to and abide
       by guidelines listed in the Uniform Guidelines ) (See Section I, *Guidelines for Search
       Committee* #6 )

   c   This interview will have two parts.  We will begin by asking you a series of questions
       The committee will record your answers to help us in making our recommendations

       We will ask all of the applicants the same questions

       After we have completed these questions, you may have some questions you would like
       to ask us

       Following those questions, we have some questions we want you to complete in writing
       You will move to another part of the building to complete your written answers

   d.  The job of this Search Committee is to recommend to the President 3 applicants who best
       match the requirements for the job and the needs of the institution

       We are looking at your education and experience and matching them to the needs of the
       College as far as this position is concerned

       Three applicants will be recommended to our President, Dr  Young, for a second
       interview.  She will make the final decision.

GWCC608

e.  Applicants who are selected for a second interview will be notified by telephone

All non-selected applicants will be notified by letter.

We hope this process will be completed within the next (Fill in the blank) weeks.

### 3. Discuss Information Relative to the Job

a.  Hours/month/days:  Monday-Friday (_____ a m  -  _____ p m )

b.  The salary range ($_____ - _____) was printed in the vacancy announcement;
do you have any questions about the salary?

The President will make the final determination about the salary based on the applicant's
education and experience.

c.  Pay period: once per month; last working day of the month.

d.  Everyone is expected to recruit students for Wallace College.

e.  We anticipate this job to begin on _____.

### 4. Explain Employee Benefits

a.  Of your income, 5% goes to Teacher's Retirement; the state matches that amount with
8 17%  (Effective October 1, 2005)  (See Exhibit 3 )

b.  An employee is vested for retirement after 10 years.

c.  If an employee leaves the education field before retirement, he/she may withdraw the
amount he/she has contributed to the fund

d.  Health Insurance (Blue Cross/Blue Shield):
- Family plan costs the employee $134 per month
- Single plan costs the employee $2 per month
Supplemental Coverages:
- Dental, Vision, Cancer, or Hospital Indemnity costs the employee $38 each per month

e.  LEAVE/HOLIDAYS (This information varies by position   See Exhibit 3 )

### 5. Conduct Interview Using Questionnaire Developed by Search Committee

### 6. Finalize the Interview

a.  Ask the applicant if he/she has any questions

b.  Assign written questions and tell the applicant what to do with them when completed
Take applicant to another room to complete the written questions   Thank him/her for
coming

GWCC609

24
11/05
Exhibit 2

## GEORGE C. WALLACE COMMUNITY COLLEGE
### SAMPLE INTERVIEW FORM

*bold*

NOTE: The following questions are (examples only.) Each Search Committee will develop
questions specifically for the position to be filled.

APPLICANT'S NAME_____

DATE _____

### PROFESSIONAL SKILLS

Rating Scale (1 = lowest, 3 = highest)

1  2  3    1.  Describe your general professional background and experience, emphasizing
              particularly your experience in education

1  2  3    2.  What are your employment goals?  How are you preparing yourself to
              achieve them?

1  2  3    3.  Rate yourself from 1-5 (with 5 being the highest) on:

              Punctuality            ____        Accuracy   ____
              Dependability          ____        Loyalty    ____
              Organizational Skills  ____        Initiative ____
              Cooperation/People Skills ____

1  2  3    4   Tell us what you know about George C. Wallace Community College

1  2  3    5   Why do you want to work at George C. Wallace Community College?

1  2  3    6   Tell us about your experience in working with disadvantaged students

GWCC610

25
11/05
Exhibit 2 (cont.)

1   2   3       7.    Describe your experience and skills in computer operations/data exchange.

1   2   3       8     What experience have you had in administering federal programs?

1   2   3       9.    Describe something you have done that demonstrates your organizational or administrative skills

1   2   3       10    Tell us why you would be the best person we could hire as the _____ (Convince us that you are the right person for this job.)

_____    Total Points

GWCC611

26
11/05
Exhibit 2 (cont.)

## PERSONAL PROFILE

1   2   3       1.   Oral communication: grammar usage appropriate, clearly understood, does
                     not ramble.

1   2   3       2.   Displays professional and self-confident manner; appropriate dress for
                     interview.

1   2   3       3    Makes eye contact during conversation

1   2   3       4.   Demonstrates warmth and enthusiasm; clearly interested.

1   2   3       5    Written communication: neat, legible, well-organized, informative, clearly
                     understood, not wordy

Clarification of questions on application:

                 Professional Skills        30 points _____

                 Personal Profile           15 points _____

                                    Total _____

Evaluator: _____    _____
                          Signature                                Date

GWCC612

## BENEFITS FOR GEORGE C. WALLACE COMMUNITY COLLEGE

| BENEFIT | INSTRUCTOR | NON-INSTRUCTOR |
|---|---|---|
| Sick Leave | 8 hours per month<br>May accumulate an unlimited number of sick leave days | 8 hours per month<br>May accumulate an unlimited number of sick leave days |
| Annual Leave | N/A (off between terms) | (Based on a 40-hour work week)<br>1 - 4 years    8 hours per month<br>5 - 9 years    10 hours per month<br>10 - 14 years  12 hours per month<br>15 - 19 years  14 hours per month<br>20+          16 hours per month.  May accumulate up to 60 days (480 hours). |
| Personal Leave | 40 hours per year (converts to sick leave if not used) | 16 hours per year (converts to sick leave if not used) |
| Emergency Leave | N/A | President may approve up to a maximum of 3 days (24 hours) per year (or prorated) when all annual and sick leave have been exhausted (see *Personnel Handbook*) |
| Holidays | 15 (4 locally assigned) | 15 (4 locally assigned) |
| Number of Contracted Work Days | 175 fall and spring terms<br>54 summer term | 260 |
| Retirement | Pays 5% monthly.  State matches 8.17% (effective 10/1/05) | Same |
| Health Insurance | Pays $134.00 monthly for family coverage. Pays $2.00 monthly for single coverage.  If desired, employee may elect four options rather than health insurance options to include hospital indemnity, cancer, dental, and vision.  Institution matches $668.00 monthly | Same |
| Duty Hours | 7:30 a.m.-3:30 p.m. Monday-Friday (hours vary by campus) | 7:30 a.m.-4:30 p.m. Monday-Thursday<br>7:30 a.m.-2:00 p.m. Friday (hours vary by campus) |
| Free Tuition at Two-Year Colleges (Employees/Dependents) | Yes  1/3 off after 1st year<br>      2/3 off after 2nd year<br>      Free after 3 years | Yes  1/3 off after 1st year<br>      2/3 off after 2nd year<br>      Free after 3 years |

Note: Employee is vested after 10 years in Retirement System.  Employee may retire after 25 years of service or upon reaching age 60 with at least 10 years of service.  After the employee is eligible for retirement, he/she may apply unused sick leave toward retirement.  If employee leaves the system before becoming vested, he/she may withdraw all deposits.  If employee dies while covered by Retirement System, his/her beneficiary receives $15,000 life insurance, one year's salary, and all interest earned and payments made to the Retirement System.

GWCC613

28
11/05
Exhibit 4

## LEGAL AREAS OF INQUIRY IN INTERVIEWING AND EMPLOYMENT APPLICATIONS

| AREA OF INQUIRY | LEGAL | ILLEGAL | LEGISLATION |
|---|---|---|---|
| 1. Name | a. For access purposes, inquiry into whether the applicant's work records are under another name. | a. To ask if a woman is a Miss, Mrs., or Ms.<br>b. To request to give maiden name, or any other previous name he/she has used. | Title VII as amended by Equal Employment Opportunity Title IV (Higher Education Act) |
| 2. Address/Housing | a. To request place and length of current and previous addresses.<br>b. To ask for applicant's phone number or how he/she can be reached if a number is not available. | a. To ask applicants if they own their own home, rent, or live in an apartment or house. | Title VII |
| 3. Age | a. Require proof of age by birth certificate after hiring. | a. To ask age or age group of applicant.<br>b. To request birth certificate or baptismal record before hiring. | Age Discrimination Act of 1967 |
| 4. Birthplace/National Origin | | a. To ask birthplace of applicant or that of his/her parents, grandparents, or spouse.<br>b. Any other inquiry into national origin. | Title III |
| 5. Race/Color | a. To indicate that the institution is an equal opportunity employer.<br>b. To ask race for affirmative action plan statistics, after hiring. | a. Any inquiry that would indicate race or color. | Title VII |
| 6. Sex | a. Indicate that the institution is an equal opportunity employer. | a. To ask applicant any inquiry that would indicate sex, unless job related. (Only such jobs in education would be a full-time locker room or restroom attendant.) | Title VII and Title IX |
| 7. Religion/Creed | | a. To ask an applicant's religion or religious customs and holidays.<br>b. To request recommendations from church officials | Title VII |

FROM WALLACE COMMUNITY COLLEGE
SEARCH COMMITTEE/HIRING
PROCEDURES MANUAL 2005-06

GWCC614

| AREA OF INQUIRY | LEGAL | ILLEGAL | LEGISLATION |
|---|---|---|---|
| 8. Citizenship | a. Whether a U.S. citizen.<br>b. If not, whether intends to become one.<br>c. If U.S. resident is legal.<br>c. If spouse is a citizen.<br>d. Require proof of citizenship, after hiring. | a. If native-born or naturalized<br>b. Proof of citizenship before hiring.<br>c. Whether parents or spouse are (is) native-born or naturalized.<br>d. Date of citizenship. | Title VII |
| 9. Marital/Parental Status | a. Status (only married or single) after hiring for insurance purposes.<br>b. Number and ages of dependents and/or spouse after hiring for insurance purposes. | a. To ask marital status before hiring<br>b. To ask the number and age of children, who cares for them, and if applicant plans to have more children. | Title VII and Title IX |
| 10. Relatives | a. To ask name, relationship, and address of person to be notified in case of emergency, after hiring. | a. Names of relatives working for the institution or in a district (nepotism policies that impact disparately on one sex are illegal under Title IX.) | Title IX |
| 11. Military Service | a. Inquiry into service in the U.S. armed forces.<br>b. Rank attained.<br>c. Branch of service.<br>d. Any job-related experience.<br>d. Require military discharge certificate after hiring. | a. To ask type of discharge.<br>b. To request military service records.<br>c. To ask about military service in armed service of any country but U.S. | |
| 12. Education | a. To ask what academic, professional, or vocational schools attended.<br>b. To ask about language skills, such as reading and writing foreign languages. | a. Specifically ask the nationality, racial, or religious affiliation of schools attended.<br>b. To ask how foreign language ability was acquired. | Title VII |
| 13. Criminal Record | a. To request listing of convictions and other misdemeanors. | a. To inquire about arrests. | Title VII |
| 14. References | a. To request general work references not relating to race, color, religion, sex, national origin, or ancestry. | a. To request references specifically from clergy or any other persons who might reflect race, color, religion, sex, national origin, or ancestry. | Title VII |

FROM WALLACE COMMUNITY COLLEGE
SEARCH COMMITTEE/HIRING
PROCEDURES MANUAL 2005-06

GWCC615

30
11/05
Exhibit 4 (cont.)

| AREA OF INQUIRY | LEGAL | ILLEGAL | LEGISLATION |
|---|---|---|---|
| 15. Organizations | a. To ask organizational membership (professional, social, etc.) so long as affiliation is not used to discriminate on the basis of race, sex, national origin, or ancestry. b. Offices held, if any. | a. To request listing of (all) clubs applicant belongs to or has belonged to. | Title VII |
| 16. Photographs | May be required after hiring for identification purposes. | a. Request photographs before hiring. b. To take pictures of applicants during interviews. | Title VII |
| 17. Work Schedule | a. To ask willingness to work required work schedule. b. To ask if applicant has military reservist obligations. | a. To ask willingness to work any particular religious holiday. | Title VII |
| 18. Physical Data | a. To require applicant to prove ability to do manual labor, lifting, and other physical requirements of the job, if any. b. Require a physical examination. | a. To ask height and weight, impairment, or other unspecified job-related physical data. | Title VII |
| 19. Handicap | a. To inquire for the purpose of determining applicant's capability to perform the job. (Burden of proof for non-discrimination lies with the employer.) | a. To exclude handicapped applicants as a class on the basis of their type of handicap. (Each case must be determined on an individual basis by law.) | Handicap Discrimination Guidelines of the Revised Code, Chapter 4112. |
| 20. Other Qualifications | a. To inquire about any area that has a direct reflection on the job applied for. | a. Any non-job-related inquiry that may present information permitting unlawful discrimination. | |

Note:    From material developed by T. Payuiter, Kent State University, Kent, Ohio. 44342.  Reprinted with permission.

FROM WALLACE COMMUNITY COLLEGE
SEARCH COMMITTEE/HIRING
PROCEDURES MANUAL 2005-06

GWCC616

## PRE-EMPLOYMENT INQUIRY GUIDE

| | SUBJECT | PERMISSIBLE INQUIRIES | INQUIRIES THAT MUST BE AVOIDED |
|---|---|---|---|
| 1. | Name | "Have you worked for this company under a different name?" "Is any additional information relative to change of name, use of an assumed name or nickname necessary to enable a check on your work and educational record? If yes, explain." | Inquires about the name that would indicate applicant's lineage, ancestry, national origin, or descent. Inquiry into previous name of applicant where it has been changed by court order or otherwise. "Indicate: Miss, Mrs., Ms." |
| 2. | Marital and Family Status | Whether applicant can meet specified work schedules or has activities, commitments, or responsibilities that may hinder the meeting of work attendance requirements. Inquiries made to males and females alike, as to duration of stay on job or anticipated absences. | Any inquiry indicating whether an applicant is married, single, divorced, engaged, etc. Number and age of children. Any question concerning pregnancy. Any similar question that directly or indirectly results in limitation of job opportunity in any way. |
| 3. | Age | If a minor, require proof of age in the form of a work permit or a certificate of age. Require proof of age by birth certificate after being hired. Inquiry as to whether the applicant meets the minimum age requirements as set by law and indication that, on hiring, proof of age must be submitted in the form of a birth certificate or other forms of proof of age. If age is a legal requirement: "If hired, can you furnish proof of age?" or statement that hire is subject to verification of age. Inquiry as to whether an applicant is younger than the employer's regular retirement age. | Requirement that applicant state age or date of birth. Requirement that applicant produce proof of age in the form of a birth certificate or baptismal record. (The Age Discrimination in Employment Act of 1967 forbids discrimination against persons between the ages of 40 and 70.) |
| 4. | Handicap | For employers subject to the provisions of the Rehabilitation Act of 1973, applicants may be "invited" to indicate how and to what extent they are handicapped. The employer must indicate to applicants that: (1) compliance with the invitation is voluntary, (2) the information is being sought solely to remedy discrimination or provide opportunities for the handicapped, (3) the information will be kept confidential, and (4) refusing to provide the information will not result in adverse treatment. All applicants can be asked whether they are able to carry out all necessary job assignments and perform them in a safe manner. | The Rehabilitation Act of 1973 forbids employers from asking job applicants general questions about whether they are handicapped or asking them about the nature and severity of their handicaps. An employer must be prepared to prove that any physical and mental requirements for a job are due to "business necessity" and the safe performance of the job. Except in cases where undue hardship can be proven, employers must make "reasonable accommodations" for the physical and mental limitations of an employee or applicant. "Reasonable accommodations" include alteration of physical setting and provision of aids. |

FROM WALLACE COMMUNITY COLLEGE
SEARCH COMMITTEE/HIRING
PROCEDURES MANUAL 2005-06

GWCC617

32
11/05
Exhibit 4 (cont.)

| | SUBJECT | PERMISSIBLE INQUIRIES | INQUIRIES THAT MUST BE AVOIDED |
|---|---|---|---|
| 5. | Sex | Inquiry as to sex or restriction of employment to one sex is permissible only where a bona fide occupational qualification (BFOQ) exists. (This BFOQ exception is interpreted very narrowly by the courts and EEOC.) The burden of proof rests on the employer to prove that the BFOQ does exist and that all members of the affected class are incapable of performing the job. | Sex of applicant. Any other inquiry that would indicate sex. Sex is not a BFOQ because a job involves physical labor (such as heavy lifting) beyond the capacity of some women, nor can employment be restricted just because the job is traditionally labeled "men's work" or "women's work." Sex cannot be used as a factor for determining whether an applicant will be satisfied in a particular job. Avoid questions concerning applicant's height or weight unless you can prove they are necessary requirements for the job to be performed. |
| 6. | Race or Color | General distinguishing physical characteristics, such as scars. | Applicant's race. Color of applicant's skin, eyes, hair, or other questions directly indicating race or color. |
| 7. | Address or Duration or Residence | Applicant's address. Inquiry into place and length of current and previous addresses, e.g., "How long a resident of this state or city?" | Specific inquiry into foreign addresses that would indicate national origin. Names or relationship of persons with whom applicant resides. Whether applicant owns or rents house. |
| 8. | Birthplace | "After employment (if employed by this institution) can you submit a birth certificate or other proof of U.S. citizenship?" | Birthplace of applicant. Birthplace of applicant's parents, spouse, or other relatives. Requirement that applicant submit a birth certificate or naturalization or baptismal record before employment. Any other inquiry into national origin. |
| 9. | Religion | An applicant may be advised concerning normal hours and days of work required by the job to avoid possible conflict with religious or other personal convictions. | Applicant's religious denomination or affiliation, church, parish, pastor, or religious holidays observed. Applicants may not be told that any particular religious groups are required to work on their religious holidays. Any inquiry to indicate or identify religious denomination or customs. |
| 10. | Military Record | Type of education and experience in service as it relates to a particular job. | Type of discharge. |
| 11. | Photograph | Indicate that this may be required after hiring for identification. | Requirement that applicant affix a photograph to his or her application. Request that applicant, at his or her option, submit photograph. Requirement of photograph |

FROM WALLACE COMMUNITY COLLEGE
SEARCH COMMITTEE/HIRING
PROCEDURES MANUAL 2005-06

GWCC618

33
11/05
Exhibit 4 (cont.)

| | SUBJECT | PERMISSIBLE INQUIRIES | INQUIRIES THAT MUST BE AVOIDED |
|---|---|---|---|
| | | | after interview but before hiring. |
| 12. | Citizenship | "Are you a citizen of the United States?" "If you are not a U.S. citizen, have you the legal right to remain permanently in the U.S.?" "If not a citizen, are you prevented from lawfully becoming employed because of visa or immigration status?" Statement that, if hired, applicant may be required to submit proof of citizenship. | "Of what country are you a citizen?" Whether applicant or his or her parents or spouse are naturalized or native-born U.S. citizens. Date when applicant or parents or spouse acquired U.S. citizenship. Requirement that applicant produce his or her naturalization papers. Whether applicant's parents or spouse are citizens of the U.S. |
| 13. | Ancestry or National Origin | Languages applicant reads, speaks, or writes fluently. (If another language is necessary to perform the job.) | Inquiries into applicant's lineage, ancestry, national origin, descent, birthplace, or mother tongue. National origin of applicant's parents or spouse. |
| 14. | Education | Applicant's academic, vocational, or professional education, school attended. Inquiry into language skills such as reading, speaking, and writing foreign languages. | Any inquiry asking specifically the nationality, racial affiliations, or religious affiliation or a school. Inquiry as to how foreign language ability was acquired. |
| 15. | Experience | Applicant's work experience, including names and addresses of previous employers, dates of employment, reasons for leaving, salary history. Other countries visited. | |
| 16. | Conviction, Arrest, and Court Record | Inquiry into actual convictions that relate reasonably to fitness to perform a particular job. (A conviction is a court ruling where the party is found guilty as charged. An arrest is merely the apprehending or detaining of the person to answer the alleged crime.) | Any inquiry relating to arrests. Ask or check into a person's arrest, court, or conviction record if not substantially related to functions and responsibilities of the particular job in question. |
| 17. | Relatives | Names of applicant's relatives already employed by this company. Name and address of parents or guardian of minor applicant. | Name and address of any relative of adult applicant, other than those employed by this company. |
| 18. | Notice in Case of Emergency | Name and address of persons to be notified in case of accident or emergency. | Name and address of relatives to be notified in case of accident or emergency. |
| 19. | Organizations | Inquiry into the organizations of which an applicant is a member providing the name or character of the organization does not reveal the race, religion, color, or ancestry of the membership. "List all professional organizations to which you belong. What offices are held?" | "List all organizations, clubs, societies, and lodges to which you belong." The names of organizations to which the applicant belongs if such information would indicate through character or name the race, religion, color, or ancestry of the membership. |

FROM WALLACE COMMUNITY COLLEGE
SEARCH COMMITTEE/HIRING
PROCEDURES MANUAL 2005-06

GWCC619

34
11/05
Exhibit 4 (cont.)

| SUBJECT | PERMISSIBLE INQUIRIES | INQUIRIES THAT MUST BE AVOIDED |
|---|---|---|
| 20. References | Who referred you for a position here? Names of persons willing to provide professional and/or character references for applicant. | Require the submission of a religious reference. Request reference from applicant's pastor. |
| 21. Miscellaneous | Notice to applicants that any misstatements or omissions of material facts in the application may be cause for dismissal. | |

Any inquiry should be avoided that, although not specifically listed among the above, is designed to elicit information as to race, color, ancestry, age, sex, religion, handicap, or arrest and court record unless upon a bona fide occupational qualification.

Reprinted from *Personnel Practices for Small Colleges* by permission of the National Association of Colleges and University Business Officers.

FROM WALLACE COMMUNITY COLLEGE
SEARCH COMMITTEE/HIRING
PROCEDURES MANUAL 2005-06

GWCC620

35
11/05
Exhibit 5

# SAMPLE

### WALLACE COMMUNITY COLLEGE
### APPLICANT QUALIFICATIONS/VERIFICATION FORM

POSITION TITLE: _____ Financial Aid Coordinator _____

NAME OF APPLICANT: _____

Qualification:

1. _____  Master's degree in Education

   _____  Bachelor's degree in Accounting

   _____  Bachelor's degree in Business Administration

2. _____  One year's experience with student financial aid programs preferred.

3. _____  Application

4. _____  Resume

5. _____  References (3)

6. _____  Verification of Education (all transcripts)

7. _____  Verification of Experience (documentation from employers/former employers)

8. _____  Verification of Certification (if applicable)


_____ Meets minimum requirements

_____ Does not meet minimum requirements

Additional items needed to meet requirements: _____

_____

_____

_____          _____
Committee Chair                            Committee Member

_____          _____
Committee Member                           Committee Member

GWCC621

36
11/05
Exhibit 6

# WALLACE COMMUNITY COLLEGE
## REQUEST TO FILL POSITION

Dean originating request: _____    Date: _____

Approval of Administrative Council: _____    Date: _____

Department requesting this position: _____

Title of position: _____

Date position is to be filled (allow 6 weeks): _____

Full account number to which position is to be charged: _____

Salary schedule and range to be used for position: _____

Minimum qualifications for position (education and work experience)  Include any required license,

certification, or other credentials: _____

_____

Preferred qualifications for position (education and work experience): _____

_____

Justification for position: _____

_____

_____

Signature, Dean Originating Request

Recommended Search Committee:

_____        _____

(Dean or Supervisor - Chair)

_____        _____

Secretary: _____

\*    ATTACH A CURRENT JOB DESCRIPTION TO THIS FORM AND A MEMO APPOINTING
THE SEARCH COMMITTEE (FOR PRESIDENT'S SIGNATURE).

_____

Approved:    _____
             Appropriate Dean                                    Date

Approved:    _____
             Executive Assistant to the President                Date

Approved:    _____
             President                                           Date

Distribution:  Dean Originating Request
               Personnel Office
               Campus Dean

GWCC622

37
11/05
Exhibit 7

# SAMPLE

WALLACE COMMUNITY COLLEGE
MEMORANDUM NOTIFYING SEARCH COMMITTEE MEMBERS

MEMORANDUM

TO:        MR. RANDY BRYSON
           MS. HOLLY BYRD (SECRETARIAL SUPPORT)
           MS. DENISE STANFORD-BOWERS (CHAIR)
           MS. CHRISTI WHITFIELD
           MS. TAMEKA WILLIAMS

FROM:      LINDA C. YOUNG

SUBJECT:   SEARCH COMMITTEE, COMPUTER INFORMATION SCIENCE
           INSTRUCTOR

DATE:      JUNE 17, 2005

As you can see from the attached vacancy announcement, we will be conducting an employment search for a Computer Information Science Instructor. I am asking that you serve on the Search Committee for filling this position and that Ms Stanford-Bowers serve as Chair Ms Byrd will provide secretarial support

Ms Stanford-Bowers will provide you with additional information at a later date. Thank you for your cooperation

cb

Attachment

c   Ms Baxley
    Mr Fergus
    Mr Jernigan
    Dr Kinney
    Ms Roberts
    Dr Sasser

GWCC623

3B
11/05
Exhibit 8

## THE ALABAMA COLLEGE SYSTEM
## REQUEST TO FILL POSITION
(Use one form for each position)

Name of Institution_____ George C. Wallace Community College, Dothan, Alabama _____

Position to Be Filled_____
(Attach copy of vacancy/position announcement.)

Salary Schedule_____    Full-time_____    Part-time_____    Effective Date_____

Justification (Place a check mark by each item as it applies to this position )
___ Resignation      ___ Effective Management of Institution   ___ Student Services
___ Retirement       ___ Effective Management of              ___ Accreditation Requirements
___ New Position     ___ Instructional Program                ___ Other

Explanation_____
_____
_____
_____
_____

By signing below, the President of the institution affirms that funds are available for the position,
and that the position will not create financial hardships for the institution.

Requested by:

_____
President's Signature (Required)                              Date

THIS SECTION IS TO BE COMPLETED BY DEPARTMENT OF POSTSECONDARY
EDUCATION.

It is recommended that the Chancellor (approve/not approve) this position based on the
information provided.

_____
Department Staff Member                                      Date

| APPROVED: | NOT APPROVED: (See below ) |
| --- | --- |
| | |
| Roy W. Johnson, Chancellor        Date | Roy W. Johnson, Chancellor        Date |

Your request to fill this position is not approved at this time for the following reasons:
_____
_____
_____
_____
_____
_____

GWCC624

39
11/05
Exhibit 9

# SAMPLE

## WALLACE COMMUNITY COLLEGE
## VACANCY ANNOUNCEMENT

### INSTRUCTIONAL TECHNOLOGIST

Start Date:  October 24, 2005

The Technologist will be based at the Wallace Campus in Dothan

QUALIFICATIONS:  Required: Bachelor's degree in educational or instructional technology, media, computer or management information sciences, media communications, visual arts, or library science. Preferred: Experience in teaching online, Web-based, or Web-enhanced courses at the college level; training others to teach online, Web-based, or Web-enhanced courses; designing, developing, and publishing Web pages in instructional settings; using Blackboard of WebCT software in teaching; integrating technological innovations into curriculum; teaching others to use various instructional technologies; assessing electronic-based instructional offerings

DUTIES:  In addition to adhering to guidelines as specified by the Wallace Community College Personnel Handbook, the Alabama State Board of Education, and the College President, duties will include the following: reviews, assesses, and identifies possible instructional technologies for use; trains faculty members in the use of selected technologies; develops and implements a mentoring program to train qualified faculty members to assist others; assists faculty members in preparing coursework for delivery via the Internet; assists faculty members in applying various media and computer technologies to their instruction; directs the review and implementation of mediated and/or Web-based coursework; coordinates with MIS personnel on hardware and software support for instructional activities; and assists students who are registered in courses delivered via the Internet and/or with heavy mediation.

SALARY:  Twelve-month position based on education and experience commensurate with Salary Schedule C-3 (range: $34,081 - $62,069)

SCREENING COMMITTEE: The President will appoint a Screening and Interview Committee to include representatives of the College faculty and staff  This committee will employ appropriate procedures, including the review of application packets, interview, and demonstration of competency, to determine which applicants are to be recommended to the President for further consideration  Applicants must travel at their own expense  If you have a disability and require accommodation, please notify us at (334) 556-2425.

APPLICATION DEADLINE/PROCEDURE: A complete application file must be received in the Office of Personnel no later than 1:00 p.m. on Friday, October 7, 2005.  A complete application file consists of the Wallace Community College employment application with three work references; resume; documentation (from current and/or former employers) verifying employment experience to meet preferred qualifications (if applicable); a letter describing specifically how your experience and qualifications meet the qualifications outlined for the position; and individual transcripts from each college attended (photocopies of transcripts will suffice until employed).  Must meet eligibility requirements to work in the U.S. at time of appointment  All application materials should be submitted as a complete package. Applicants who fail to submit all required information will be disqualified.  Only applications received during the period of this announcement will be considered  Applications are available from and should be submitted to:

GWCC625

40
11/05

Office of Personnel
ATTN: 2004-05:36
Wallace Community College
1141 Wallace Drive
Dothan, AL 36303-0943
(334) 556-2425

Wallace Community College is an Equal Opportunity Employer and complies with the Americans with Disabilities Act. As required by the Uniform Guidelines, Wallace Community College is seeking applications in particular from black persons and women, including black women.

GWCC626

41
11/05
Exhibit 10

# SAMPLE

## WALLACE COMMUNITY COLLEGE
## NEWSPAPER ADVERTISEMENT

### INSTRUCTIONAL TECHNOLOGIST

Start Date: October 24, 2005

The Technologist will be based at the Wallace Campus in Dothan

QUALIFICATIONS: Required: Bachelor's degree in educational or instructional technology, media, computer or management information sciences, media communications, visual arts, or library science. Preferred: Experience in teaching online, Web-based, or Web-enhanced courses at the college level; training others to teach online, Web-based, or Web-enhanced courses; designing, developing, and publishing Web pages in instructional settings; using Blackboard of WebCT software in teaching; integrating technological innovations into curriculum; teaching others to use various instructional technologies; assessing electronic-based instructional offerings

SALARY: Twelve-month position based on education and experience commensurate with Salary Schedule C-3 (range: $34,081 - $62,069)

APPLICATION DEADLINE/PROCEDURE: A complete application file must be received in the Office of Personnel no later than 1:00 p.m. on Friday, October 7, 2005. A complete application file consists of the Wallace Community College employment application with three work references; resume; documentation (from current and/or former employers) verifying employment experience to meet preferred qualifications (if applicable); a letter describing specifically how your experience and qualifications meet the qualifications outlined for the position; and individual transcripts from each college attended (photocopies of transcripts will suffice until employed). Must meet eligibility requirements to work in the U.S. at time of appointment. All application materials should be submitted as a complete package. Applicants who fail to submit all required information will be disqualified. Only applications received during the period of this announcement will be considered. Applications are available from and should be submitted to: Office of Personnel, ATTN: 2004-05:36, Wallace Community College, 1141 Wallace Drive, Dothan, AL 36303-0943, (334) 556-2425.

Wallace Community College is an Equal Opportunity Employer and complies with the Americans with Disabilities Act. As required by the Uniform Guidelines, Wallace Community College is seeking applications in particular from black persons and women, including black women.

GWCC627

42
11/05
Exhibit 11

# SAMPLE

## MEMORANDUM REQUESTING APPROVAL OF VACANCY ANNOUNCEMENT AND CLASSIFIED AD

MEMORANDUM

TO:        MR. JOHN FERGUS (DEAN ORIGINATING REQUEST)
DR. EVA K. SASSER, EXECUTIVE ASSISTANT TO THE PRESIDENT
AND DEAN, INSTITUTIONAL EFFECTIVENESS

FROM:    BETTY ROBERTS

SUBJECT:  APPROVAL OF DRAFT VACANCY ANNOUNCEMENT AND
CLASSIFIED AD FOR INSTRUCTIONAL TECHNOLOGIST

DATE:     SEPTEMBER 6, 2005

Attached for your review are the draft vacancy announcement and classified ad for Instructional Technologist on the Wallace Campus. Please review and return to me with any revisions clearly marked  Thank you for your prompt attention to this matter.

al

Attachments (2)

Approved ( ) yes  ( ) no      Dean: _____

Date: _____

Approved ( ) yes  ( ) no      Executive Assistant: _____

Date: _____

GWCC628

43
11/05
Exhibit 12

## RECRUITMENT AND SELECTION COMMITTEE
## APPOINTMENT FORM

Name of College

Date _____

Position to be filled _____

| NAME | TITLE | Check One Category Per Person | | | Check All Applicable Categories | | | | |
|------|-------|---------|-------|-------|------|--------|-------|-------|-------|
|      |       | Faculty | Staff | Admin | Male | Female | Black | White | Other |
|      |       |         |       |       |      |        |       |       |       |
|      |       |         |       |       |      |        |       |       |       |
|      |       |         |       |       |      |        |       |       |       |
|      |       |         |       |       |      |        |       |       |       |
|      |       |         |       |       |      |        |       |       |       |
|      |       |         |       |       |      |        |       |       |       |
|      |       |         |       |       |      |        |       |       |       |
|      |       |         |       |       |      |        |       |       |       |

GWCC629

44
11/05
Exhibit 13

# UNIFORM GUIDELINES ADDRESSES

AL COMMISSION ON HIGHER ED
HUMAN RESOURCE MGR
100 N UNION ST
MONTGOMERY AL  36130-2000

AL A&M UNIVERSITY
PLACEMENT OFFICE
PO BOX 998
NORMAL AL  35762

ATLANTA UNIVERSITY
DIRECTOR OF PLACEMENT
223 CHESTNUT ST
ATLANTA GA  30314

EEOC (ATTN F THOMAS)
BIRMINGHAM DIST OFFICE
1900 3RD AVE NORTH
BIRMINGHAM AL  35203

NW SHOALS COMM COLL
PO BOX 2545
MUSCLE SHOALS  AL  35622

FLORIDA STATE UNIVERSITY
DEPT OF HUMAN RESOURCES
301 WESCOTT BLDG R-11
TALLAHASSEE FL  32306-1049

MILES COLLEGE
PERSONNEL OFFICE
PO BOX 3800
BIRMINGHAM AL  35208

TENNESSEE STATE UNIV
CAREER DEVELOPMENT
3500 JOHN A MERRETT BLVD
NASHVILLE TN  37209

KENTUCKY STATE UNIV
DIRECTOR OF PLACEMENT
FRANKFORT KY  40601

TALLADEGA COLLEGE
PERSONNEL DEPARTMENT
627 WEST BATTLE ST
TALLADEGA AL  35160

AL STATE UNIVERSITY
PLACEMENT OFFICE
915 SOUTH JACKSON ST
MONTGOMERY, AL  36195

ATHENS STATE COLLEGE
300 NORTH BEATY ST
ATHENS AL  35611

DEPT OF POSTSECONDARY EDUC
PO BOX J02130
MONTGOMERY AL  36130-2130

CLARK-ATLANTA UNIVERSITY
DEPT OF HUMAN RESOURCES
223 JAMES P BRAWLEY
ATLANTA GA  30314

UNIVERSITY OF SOUTH AL
PERSONNEL RELATIONS
286 ADMINISTRATION BLDG
MOBILE AL  36608-0002

AL EDUCATION ASSOC
EXECUTIVE DIRECTOR
PO BOX 4177
MONTGOMERY AL  36101

FLORIDA A&M UNIVERSITY
PERSONNEL RELATIONS
ROOM 211-FHAC
TALLAHASSEE FL  32307

SOUTHERN UNIVERSITY
DIRECTOR OF PLACEMENT
S BRANCH POST OFFICE
BATON ROUGE LA  70813

STILLMAN COLLEGE
PLACEMENT OFFICE
PO BOX 1430
TUSCALOOSA AL  35403

AL INDUST DEV TRNG INST
1 TECHNOLOGY CT
MONTGOMERY AL  36116-3200

ALCORN STATE UNIVERSITY
DIRECTOR OF PLACEMENT
LORMAN MS  39096

AUBURN UNIVERSITY
DEPT OF UNIV PERSONNEL
LANGDON HALL
AUBURN AL  36849

STATE OF ALABAMA PERSONNEL
64 NORTH UNION ST
MONTGOMERY AL  36130-2301

UNIVERSITY OF AL
DEPT OF HUMAN RESOURCES
PO BOX 870126
TUSCALOOSA AL  35487-0126

UNIVERSITY OF FLORIDA
DEPT OF AFFIRM ACTION
ROOM 352-TIGER HALL
GAINESVILLE AL  32611

JACKSON STATE UNIVERSITY
PERSONNEL OFFICE
PO BOX 17028
JACKSON MS  39217

FISK UNIVERSITY
PLACEMENT OFFICE
17TH AVE NORTH
NASHVILLE TN  37208

TUSKEGEE UNIVERSITY
PERSONNEL DEPARTMENT
TUSKEGEE AL  36088

UNIVERSITY OF NORTH AL
DEPT OF HUMAN RESOURCES
CAMPUS BOX 5043
FLORENCE AL  35632

BIRMINGHAM SOUTHERN
PERSONNEL DIRECTOR
BOX 549008
BIRMINGHAM AL  35254

MS DEBBIE GAYDOS
SOLDIER SRVC CTR
BLDG 5700 ROOM 380
FORT RUCKER AL 36362

RUSSELL CO BRD OF EDUC
PO BOX 400
PHENIX CITY AL 36868

PLACEMENT OFFICE
TROY UNIVERSITY DOTHAN
PO BOX 8368
DOTHAN AL 36304-8368

CONCORDIA COLLEGE
1804 GREEN ST
SELMA AL 36703

SO UNION ST COMM COLL
PO BOX 1000
WADLEY AL 36276

CENTRAL AL COMM COLL
PO BOX 699
CHILDERSBURG AL 35044

UNIV OF WEST ALABAMA
PLACEMENT OFFICE
HWY 11 NORTH
LIVINGSTON AL 35470

TROY UNIVERSITY
DEPT OF COUNSELING SRVCS
PO BOX 8368
TROY AL 36304

ALABAMA'S CAREER CTR SYS
ATTN PAM CUTCHENS MGR
1950 REEVES ST
DOTHAN AL 36303

PHENIX CITY BRD OF EDUC
PO BOX 460
PHENIX CITY AL 36868

PLACEMENT OFFICE
TROY STATE UNIV-MONTG
PO BOX 4419
MONTGOMERY AL 36103-4419

UNIV OF ALABAMA-BHAM
HILL UNIV CENTER RM 540
BIRMINGHAM AL 35294

BEVILL STATE COMM COLL
PO BOX 800
SUMITON AL 35148

CHATTAHOOCHEE VLY C C
2602 COLLEGE DR
PHENIX CITY AL 36869

UNIV OF AL-HUNTSVILLE
PERSONNEL SERVICES
MADISON HALL 135
HUNTSVILLE AL 35899

AUBURN UNIV-MONTGOMERY
PERSONNEL OFFICE
7300 UNIVERSITY DR
MONTGOMERY AL 36117

AL STATE DEPT OF EDUC
GORDON PERSONS BLDG
50 N RIPLEY ST
MONTGOMERY AL 36130-3901

LEE COUNTY BRD OF EDUC
COURTHOUSE
PO BOX 120
OPELIKA AL 36803-0120

UNIV OF MONTEVALLO
STUDENT SUPPORT SERVICES
MONTEVALLO AL 35115

AL SOUTHERN COMM COLL
PO BOX 2000
MONROEVILLE AL 36461

BISHOP STATE COMM COLL
351 NORTH BROAD ST
MOBILE AL 36603-5898

CALHOUN COMM COLL
PO BOX 2216
DECATUR AL 35609-2216

JEFFERSON DAVIS COMM COLL
PO BOX 958
BREWTON AL 36427-0958

DRAKE STATE TECH COLL
PO BOX 17439
HUNTSVILLE AL 35811

LAWSON STATE COMM COLL
3060 WILSON RD SW
BIRMINGHAM AL 35221

SNEAD STATE COMM COLL
PO BOX 734
BOAZ AL 35957

WALLACE STATE COMM COLL
PO BOX 2530
SELMA AL 36702-2530

COOSA VALLEY TECH
785 CEDAR AVE
ROME GA 30161

ENTERPRISE-OZARK COMM COLL
PO BOX 1300
ENTERPRISE AL 36331

INGRAM STATE TECH COLL
PO BOX 220350
DEATSVILLE AL 36022-0350

REID STATE TECH COLL
PO BOX 588
EVERGREEN AL 36401

AL DEPT INDUS RELATIONS
EMPLOYMENT SRVC DIV
ATTN-CARL WHITE MGR
122 PAUL LEE PKWY
EUFAULA AL 36027-3328

LURLEEN B WALLACE C C
PO BOX 1418
ANDALUSIA AL 36420

FAULKNER STATE COMM COLL
1900 HWY 31 SOUTH
BAY MINETTE AL 36507

SHELTON STATE COMM COLL
9500 OLD GREENSBORO RD
TUSCALOOSA AL 35405

TRENHOLM STATE TECH COLL
1225 AIR BASE BLVD
MONTGOMERY AL 36108

46
11/05
Exhibit 13 (cont)

WALLACE STATE COMM COLL
PO BOX 2000
HANCEVILLE AL 35077-2000

MS ANGELINA HERBERT
WIREGRASS TIMES
PO DRAWER 1885
DOTHAN AL 36302

MR DAVID E DUKE
ALFRED SALIBA FAM SRVCS CTR
301 W LAFAYETTE ST STE 2B
DOTHAN AL 36301

GADSDEN STATE COMM COLL
PO BOX 227
GADSDEN AL 35902-0227

MS MERRY BRAZZELLE
FAMILY GUIDE CTR OF AL INC
2431 W MAIN ST STE 1102
DOTHAN AL 36301

ACAP
FOLGERS SRVC CTR
BLDG 5700 RM 280
FORT RUCKER AL 36362

MS ELAMAREE GORDON
PO BOX 620577
FORT RUCKER AL 36362-0577

ALABAMA TECH NETWORK
500 BEACON PKY W
BIRMINGHAM AL 35209

JEFFERSON STATE COMM COLL
2601 CARSON RD
BIRMINGHAM AL 35215-3080

NORTHEAST AL COMM COLL
PO BOX 159
RAINSVILLE AL 35986-015

GWCC632

47
11/05
Exhibit 14



ALABAMA COLLEGE SYSTEM                          APPLICATION NO. _____

# APPLICATION FOR EMPLOYMENT
## WALLACE COMMUNITY COLLEGE-DOTHAN

| | |
|---|---|
| Title of position for which you are applying: _____ | Date of Application |

| Last Name | First Name | Middle Initial | Social Security Number |
|---|---|---|---|

| Address | | City | State | ZIP |
|---|---|---|---|---|

*Contact Information*

| Phone | Home | Work | Cell | E-mail Address |
|---|---|---|---|---|

| | School/College | Dates Attended From/To | Major | Minor | Degree(s) Earned |
|---|---|---|---|---|---|
| High School/ GED | | | | | |
| College | | | | | |
| College | | | | | |
| College | | | | | |
| Other (Specify) | | | | | |

Please list most recent employment experience first

| Employer | Telephone Number | Job Duties |
|---|---|---|
| Address | Dates of Employment | |
| Title    ☐Full-time    ☐Part-time | Hourly Rate/Salary | |
| Reason for Leaving | Supervisor | |

48
11/05
Exhibit 14 (cont)

| | | |
|---|---|---|
| Employer | Telephone Number | Job Duties |
| Address | Dates of Employment | |
| Title ☐Full-time ☐Part-time | Hourly Rate/Salary | |
| Reason for Leaving | Supervisor | |
| Employer | Telephone Number | Job Duties |
| Address | Dates of Employment | |
| Title ☐Full-time ☐Part-time | Hourly Rate/Salary | |
| Reason for Leaving | Supervisor | |
| Employer | Telephone Number | Job Duties |
| Address | Dates of Employment | |
| Title ☐Full-time ☐Part-time | Hourly Rate/Salary | |
| Reason for Leaving | Supervisor | |
| Employer | Telephone Number | Job Duties |
| Address | Dates of Employment | |
| Title ☐Full-time ☐Part-time | Hourly Rate/Salary | |
| Reason for Leaving | Supervisor | |
| Attach additional page if needed | | |

**Employment History (Continued)**

May we contact your current employer?     ☐ Yes     ☐ No

**Skills, Certifications, Awards or Professional Activities**

GWCC634

49
11/05
Exhibit 14 (cont )

**References**

Please list three reliable references, other than relatives, who can provide information verifying qualifications, character, or work experience

| Name and Title | Address | Phone Number |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**Felony Conviction(s)**

Have you ever been convicted of or pled no contest or guilty to any felony or any crime involving theft, dishonesty, violence, or sexual misconduct?   ☐ Yes     ☐ No

If yes, explain below:

_____

_____

_____

**Consent & Agreement**

I represent and warrant that the information I have given on this application is full and true to the best of my knowledge and belief  I further acknowledge that I understand that I must provide documented verification of education, experience, and required certifications and/or licensures  And further, I represent and warrant that I have answered fully and truthfully all questions regarding criminal convictions/records  I hereby expressly request, and give permission to, former employers and any persons who may have pertinent information concerning this application to furnish such information to college officials  I agree to hold such persons harmless, and I do hereby release them from any and all liability for damage of any nature whatsoever for furnishing such information  I understand that failure to provide full and true information on this application may result in disqualification or dismissal

_____         _____
Signature of Applicant                                      Date

Return to:     Wallace Community College
Attention:  Office of Personnel
1141 Wallace Drive
Dothan, Alabama  36303
334-556-2425

It is the policy of the Alabama Department of Postsecondary Education including all postsecondary institutions under the control of the Alabama State Board of Education, that no person shall, on the grounds of race, color, disability, sex  religion  creed, national origin, or age  be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, activity, or employment  (Each institution will make reasonable accommodations for qualified disabled applicants or employees )

GWCC635

50
11/05
Exhibit 14 (cont.)

## EQUAL EMPLOYMENT OPPORTUNITY INFORMATION

The following information is gathered solely for reporting purposes and will not be used to evaluate the applicant's qualifications, suitability, or desirability for employment.

Name _____ _____ _____
     Last       First       Middle

Date of Birth _____

Ethnic Background (check one):    Gender (check one):

( ) Native American     ( ) Male
( ) White, not of Hispanic origin ( ) Female
( ) Hispanic
( ) Black, not of Hispanic origin
( ) Asian/Pacific Islander
( ) Multi-racial
( ) Other

### MISCELLANEOUS INFORMATION

Have you ever been employed by the College?  ( )  Yes    ( )  No

Position: _____  Employed from _____to _____

Name(s), relationship, and department of relative(s) presently employed by the College:

_____ _____ _____

GWCC636

51
11/05
Exhibit 15

# SAMPLE

### LETTER TO APPLICANTS WHO DID NOT
### MEET MINIMUM REQUIREMENTS OR
### SUBMIT REQUIRED APPLICATION MATERIALS

July 29, 2005

Ms Jane Doe
1234 Anywhere Street
Ozark, Alabama 36360

Dear Ms Doe:

Thank you for your interest in the _____ position at Wallace Community College. We regret that the Search Committee was unable to consider your application for the following reason(s):

\_\_\_    You do not appear to meet minimum qualifications for the position.

\_\_\_    Your application package and/or required documentation was incomplete

\_\_\_    Your application was not submitted by the required deadline.

\_\_\_    Other (_____)

The other members of the Search Committee and I wish you success in finding a position that meets your professional and personal interests

Sincerely,

(Name), Chair
Search Committee

cb

Distribution:  Director of Personnel

GWCC637

52
11/05
Exhibit 16

# SAMPLE
## JOB DESCRIPTION/REASONABLE ACCOMMODATIONS STATEMENT

WALLACE COMMUNITY COLLEGE

IDENTIFICATION

Job Title: Instructor
Department: Academic Affairs and Health Sciences; Career Technical Programs
Salary Schedule: D-1

RELATIONSHIPS

Reports to: Program director, division director, appropriate instructional coordinator, and/or appropriate instructional dean

Subordinate Staff: None

Other Internal Contacts: Deans, instructional coordinators, division directors, program directors, and students

External Contacts: As appropriate for specific field of study, colleagues in similar discipline from other institutions; potential students; potential employers of graduates; alumni; regional accrediting agency staff; staff of external regulating bodies

JOB SUMMARY

Under the supervision of the Program Director, Division Director, instructional coordinator, and/or instructional dean, employee instructs students according to established policies and procedures.

JOB DOMAINS/ESSENTIAL FUNCTIONS

A. Instruction. Demonstrates mastery of subject matter assigned. Employs appropriate teaching strategies in the instructional setting. Demonstrates proficiency in the use of a variety of teaching strategies and instructional technologies. Demonstrates effective use of the College's course management system. Demonstrates use of principles of teaching and learning in meeting course objectives. Uses instructional time wisely to meet course objectives. Evaluates student progress at frequent intervals by means of examinations, papers, and other methods as appropriate. Grades and returns examinations and papers within a reasonable time. Evaluates procedures to ensure that students meet stated course objectives. Seeks feedback from appropriate sources to evaluate and improve quality and relevance of instruction. Explains safety precautions prior to lab or shop activities as appropriate. Evaluates College inventory of instructional materials, including library-media and computer resources, pertinent to own area of responsibility. Requests additional materials as needed.

B. Advising. Serves as advisor in the institutional advisement program by effectively using the College's automated enrollment management system. Demonstrates concern for student progress and willingness to assist as needed. Demonstrates proficiency in the use of STARS in advising students planning to transfer. Maintains scheduled office hours and counsels students regarding their academic progress and career goals as needed.

GWCC638

53
11/05
Exhibit 16 (cont.)

## JOB DOMAINS/ESSENTIAL FUNCTIONS (cont.)

Promotes leadership and enrichment experiences through student organizations and/or other activities. Assists, when appropriate, graduates in finding positions/ occupations

C. <u>Administrative Duties</u>. Plans, develops, implements and evaluates classroom policies and procedures consistent with College policies. Uses e-mail, telephone, memo, and other forms of communication appropriately. Develops and posts work schedule that is consistent with College policy and that encourages student conferences and individualized instruction. Maintains up-to-date syllabi according to College policy. Collects, maintains, and submits course documentation and student information to appropriate College offices as required. Reads and, when appropriate, communicates appropriate information to students and others. Follows directives from administrators with regard to campus rules, submission of requested information, participation in college activities, and similar instructions. Reports to work promptly, meets instructional obligations, and keeps office hours. Participates in curriculum development, evaluation, and revision. Keeps administrative officials advised of curriculum or instructional changes, problems with students, and own professional development undertakings by following appropriate organizational structure. Keeps records of inventory and maintains equipment as appropriate. Keeps office area, assigned laboratory areas, and classrooms neat and orderly to reflect a quality learning environment. Maintains current licensure and certification as required.

D. <u>Liaison Activities</u>. Interacts, when appropriate, with representatives from service area businesses, industries, educational organizations, and other agencies to promote positive, productive relationships with own department and the college. Participates in faculty, discipline, and division meetings and in-service activities, consistent with instructional schedule. Serves on assigned committees and actively contributes toward meeting committee objectives. Assists, as assigned, in discipline, division, and college-level student activities. Assists in planning, developing, and evaluating special discipline, division, and college-level programs and activities. Supports College mission, including the institution's commitment to providing opportunities to students without regard to race, sex, age, income, religion, disability, or occupation.

E. <u>Discipline Chair</u>. When assigned, serves as chair of the appropriate discipline committee. Provides a focal point for other full- and part-time faculty members assigned in that discipline, regardless of location. Duties include developing and administering the budget for the assigned discipline, preparing the coming term's course schedule for the discipline, determining and submitting book orders to support instruction in the discipline, and recruiting part-time faculty members to teach in discipline courses. As discipline committee chair for a career/technical program discipline, forms, maintains, schedules, and documents meetings of the program advisory committee.

F. <u>Professional Development</u>. Updates knowledge and skills in subject matter field and/or instructional abilities. Remains current in teaching discipline by one or more of the following methods: (1) attending workshops, continuing education programs, practicums, and academic courses; (2) engaging in individual self-study; (3) actively participating in professional organizations. Sets professional development goals for each rating period

GWCC639

52
11/05
Exhibit 16

# SAMPLE
## JOB DESCRIPTION/REASONABLE ACCOMMODATIONS STATEMENT

### WALLACE COMMUNITY COLLEGE

#### IDENTIFICATION

Job Title:  Instructor
Department:  Academic Affairs and Health Sciences; Career Technical Programs
Salary Schedule:  D-1

#### RELATIONSHIPS

Reports to:  Program director, division director, appropriate instructional coordinator, and/or appropriate instructional dean

Subordinate Staff:  None

Other Internal Contacts:  Deans, instructional coordinators, division directors, program directors, and students

External Contacts:  As appropriate for specific field of study, colleagues in similar discipline from other institutions; potential students; potential employers of graduates; alumni; regional accrediting agency staff; staff of external regulating bodies

#### JOB SUMMARY

Under the supervision of the Program Director, Division Director, instructional coordinator, and/or instructional dean, employee instructs students according to established policies and procedures.

#### JOB DOMAINS/ESSENTIAL FUNCTIONS

A.  Instruction  Demonstrates mastery of subject matter assigned.  Employs appropriate teaching strategies in the instructional setting.  Demonstrates proficiency in the use of a variety of teaching strategies and instructional technologies.  Demonstrates effective use of the College's course management system.  Demonstrates use of principles of teaching and learning in meeting course objectives.  Uses instructional time wisely to meet course objectives.  Evaluates student progress at frequent intervals by means of examinations, papers, and other methods as appropriate.  Grades and returns examinations and papers within a reasonable time.  Evaluates procedures to ensure that students meet stated course objectives.  Seeks feedback from appropriate sources to evaluate and improve quality and relevance of instruction.  Explains safety precautions prior to lab or shop activities as appropriate.  Evaluates College inventory of instructional materials, including library-media and computer resources, pertinent to own area of responsibility.  Requests additional materials as needed.

B.  Advising  Serves as advisor in the institutional advisement program by effectively using the College's automated enrollment management system.  Demonstrates concern for student progress and willingness to assist as needed.  Demonstrates proficiency in the use of STARS in advising students planning to transfer.  Maintains scheduled office hours and counsels students regarding their academic progress and career goals as needed.

53
11/05
Exhibit 16 (cont.)

JOB DOMAINS/ESSENTIAL FUNCTIONS (cont.)

Promotes leadership and enrichment experiences through student organizations and/or other activities  Assists, when appropriate, graduates in finding positions/ occupations

C.  Administrative Duties.  Plans, develops, implements and evaluates classroom policies and procedures consistent with College policies  Uses e-mail, telephone, memo, and other forms of communication appropriately  Develops and posts work schedule that is consistent with College policy and that encourages student conferences and individualized instruction  Maintains up-to-date syllabi according to College policy.  Collects, maintains, and submits course documentation and student information to appropriate College offices as required.  Reads and, when appropriate, communicates appropriate information to students and others  Follows directives from administrators with regard to campus rules, submission of requested information, participation in college activities, and similar instructions  Reports to work promptly, meets instructional obligations, and keeps office hours  Participates in curriculum development, evaluation, and revision.  Keeps administrative officials advised of curriculum or instructional changes, problems with students, and own professional development undertakings by following appropriate organizational structure.  Keeps records of inventory and maintains equipment as appropriate  Keeps office area, assigned laboratory areas, and classrooms neat and orderly to reflect a quality learning environment  Maintains current licensure and certification as required.

D.  Liaison Activities.  Interacts, when appropriate, with representatives from service area businesses, industries, educational organizations, and other agencies to promote positive, productive relationships with own department and the college  Participates in faculty, discipline, and division meetings and in-service activities, consistent with instructional schedule.  Serves on assigned committees and actively contributes toward meeting committee objectives  Assists, as assigned, in discipline, division, and college-level student activities.  Assists in planning, developing, and evaluating special discipline, division, and college-level programs and activities.  Supports College mission, including the institution's commitment to providing opportunities to students without regard to race, sex, age, income, religion, disability, or occupation

E.  Discipline Chair  When assigned, serves as chair of the appropriate discipline committee  Provides a focal point for other full- and part-time faculty members assigned in that discipline, regardless of location.  Duties include developing and administering the budget for the assigned discipline, preparing the coming term's course schedule for the discipline, determining and submitting book orders to support instruction in the discipline, and recruiting part-time faculty members to teach in discipline courses.  As discipline committee chair for a career/technical program discipline, forms, maintains, schedules, and documents meetings of the program advisory committee

F  Professional Development.  Updates knowledge and skills in subject matter field and/or instructional abilities  Remains current in teaching discipline by one or more of the following methods: (1) attending workshops, continuing education programs, practicums, and academic courses; (2) engaging in individual self-study; (3) actively participating in professional organizations  Sets professional development goals for each rating period

GWCC641

54
11/05
Exhibit 16 (cont)

## JOB SPECIFICATIONS

**Education/Certification**

Group A:    Academic and Academically-Oriented Professional, Vocational, and Technical
Faculty
- Requires Master's Degree
- Requires 18 graduate semester hours in the teaching field

Group B:    Professional, Vocational, and Technical Faculty Teaching in Degree Programs
- Requires a Bachelor's Degree
- Requires 27 semester hours in the teaching field
- Requires three years' full-time field experience

Group C:    Professional, Vocational, and Technical Faculty Teaching in Non-degree
Programs
- Requires an Associate's Degree or equivalent
- Requires specialized course work equivalent to the junior or technical
college program
- Requires six years' full-time field experience

**Knowledge, Skills, and Abilities**.  Specific technical/academic/computer skills as required by assigned discipline   Knowledge of effective instruction methods in classroom and lab setting Skill in academic advising of incoming and continuing students   Verbal skills to communicate knowledge of subject matter and related skills to students of varying backgrounds; ability to communicate instructional and instructional support needs to colleagues and division director; ability to communicate with College officials; ability to communicate with others within the College and with external constituents.  Writing skills to keep records, maintain course syllabi, develop curricula proposals, perform committee assignments, and provide reports as needed. Math skills to manage assigned budgetary responsibilities and to compute grades.  Reading skills to understand reference and course materials, College communications, and other published materials   Ability to teach basic information in discipline area

**Physical Characteristics**   Ability to understand and respond to student comments and questions; ability to take and apply guidance from supervisor; ability to operate equipment and training aids relevant to teaching assignment; ability to demonstrate the physical skills and tasks assigned within a discipline

**Other Characteristics**   Ability to deal with students and encourage successful performance; ability to work with discipline and division colleagues to represent their interests to others in the College community.  Ability to meet credential standards established by Department of Postsecondary Education

Physical characteristics indicate standard functions for essential job tasks but are not intended to limit the applicant pool.

GWCC642

55
11/05
Exhibit 16 (cont )

NOTE

> Statements included in this description are intended to be representative of the duties and responsibilities of this job and are not to be interpreted as being all inclusive   The employee may be assigned other duties that are not specifically included.

I have carefully read the job description, and I indicate by my signature that I can perform these duties with or without reasonable accommodations.

_____        _____
Applicant's Signature                               Date

9/28/05

GWCC643

56
11/05
Exhibit 17

## SAMPLE

### MEMORANDUM TO THE PRESIDENT
### RECOMMENDING APPLICANTS FOR FINAL INTERVIEW

## MEMORANDUM

TO:          DR. LINDA C. YOUNG

FROM:        FINANCIAL AID COORDINATOR SEARCH COMMITTEE
             MICKEY BAKER
             ANGEL LYNK
             ERMA PERRY

SUBJECT:     COMMITTEE RECOMMENDATION

DATE:        JULY 1, 2005


Listed below are our recommended applicants for a final interview for the Financial Aid
Coordinator position

    Ms  Jane Doe
    Mr  John Smith
    Ms. Mary Taylor

al

c   Dr  Sasser
    Ms  Screws
    Ms  Roberts

GWCC644

57
11/05
Exhibit 18

## GEORGE C. WALLACE COMMUNITY COLLEGE
### REFERENCE CHECK FORM

Name of Applicant_____

Name of Reference_____ Company/Agency_____

Phone Number(s)_____

Relationship of Reference to Applicant:  _____ Present Employer _____ Former Employer

_____ Co-Worker _____ Friend _____ Other (Specify)_____

1   Can you tell me briefly about this person's skills and abilities?

2.  What are this person's greatest strengths?

3   What are this person's greatest weaknesses, if any?

4.  Any problems with this person regarding work habits, cooperation, or work quality?

5   On a scale of 1-10 (10 being the highest), how would you rate this person on the following:

     punctuality         _____
     attendance         _____
     dependability    _____
     loyalty           _____
     initiative          _____

6   Did you have or know of any problems with this person as an employee?

7.  Would you hire this person again?

_____      _____
        DATE                 SIGNATURE OF EMPLOYEE

Distribution:  President (or designee)
              Director of Personnel

GWCC645

58
11/05
Exhibit 19

## Alabama Community and Technical and Junior Colleges

### Schedule B
### Deans and Business Managers
### For Fiscal Year 2005-2006

Action Item

7/12/2005

Page 2 of 11

**Salary Step**

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 |
|---|---|---|---|---|---|---|---|----|----|----|----|
| 73,426 | 74,980 | 76,534 | 78,088 | 79,642 | 81,196 | 82,750 | 84,304 | 85,858 | 90,520 | 95,182 | 99,844 |

Notes:

1. Initial placement on the schedule for prior experience will be determined by the Chancellor's Office. Advancement in steps after this initial placement will be based on years completed in the position.
2. If a person holds an earned doctorate, add $1,000 to salary.
3. If the president has designated a person paid from this schedule as being in charge in the president's absence, that person shall be paid an additional $1,000 annually.
4. The president of a community or technical college may place dean-level personnel and the chief financial officer on this schedule.
5. Colleges authorized to employ a Vice-President may pay a salary not to exceed 110% of the appropriate step on Salary Schedule D upon approval of the Chancellor.
6. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2005-2006 year only and may not be awarded in subsequent years.

Printed at 7/12/2005 3.33 PM

GWCC646

59
11/05
Exhibit 19 (cont)

Alabama Community and Technical Colleges

Schedule C

Professional Personnel

For Fiscal Year 2005-2006

Action Item _____
7/12/2005
Page 3 of 11

Salary Step

| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 64,402 | 65,956 | 67,510 | 69,064 | 70,618 | 72,172 | 73,726 | 75,260 | 76,834 | 81,496 | 86,158 | 90,020 |
| 2 | 56,458 | 58,012 | 59,566 | 61,120 | 62,674 | 64,228 | 65,782 | 67,336 | 68,890 | 73,552 | 78,214 | 82,876 |

3 Maximum Salary    71,796

Notes:
1. Initial step placement on the appropriate schedule for prior experience will be determined by the Chancellor's Office. Advancement in steps after this initial placement will be based on years completed in the position.
2. Individuals will be placed on the appropriate schedule based upon their level of administrative responsibility at the institution.
3. If a person holds an earned doctorate, add $1,000 to salary.
4. Placement on Schedule C-3 presumes negotiation between the individual and the president for salary determination.
5. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2005-2006 year only and may not be awarded in subsequent years.

Printed at 7/12/2005 3:33 PM

GWCC647

6D
11/05
Exhibit 19 (cont )

# GEORGE C. WALLACE COMMUNITY COLLEGE

### Salary Schedule C-3
### Effective September 1, 2005
### (8/5/05)

| Step | B.S. Degree | M.A./M.S. Degree |
|---|---|---|
| 0 | $34,081 | $37,157 |
| 1 | 35,634 | 38,710 |
| 2 | 37,187 | 40,261 |
| 3 | 38,739 | 41,814 |
| 4 | 40,291 | 43,367 |
| 5 | 41,844 | 44,918 |
| 6 | 43,395 | 46,470 |
| 8 | 44,947 | 48,023 |
| 10 | 46,500 | 49,574 |
| 15 | 51,158 | 54,232 |
| 20 | 59,113 | 62,667 |
| 25 | 62,069 | 65,800 |

GWCC648

61
11/05
Exhibit 19 (cont.)

# Alabama Community College System — Technical Colleges

## Schedule D-1
### Full-time Instructors, Counselors and Librarians
### For Fiscal Year 2005-2006

Action Item
7/12/2005
Page 4 of 11

Salary Step

| Rank | | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 |
|------|----------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| IV   | 9-Month  | 44,892 | 46,079 | 47,266 | 48,453 | 49,640 | 50,827 | 52,014 | 53,201 | 54,388 | 57,949 | 61,510 | 65,071 |
|      | Summer   | 13,861 | 14,229 | 14,597 | 14,965 | 15,333 | 15,701 | 16,069 | 16,437 | 16,805 | 17,909 | 19,013 | 20,117 |
|      | 12 Month | 58,753 | 60,308 | 61,863 | 63,418 | 64,973 | 66,528 | 68,083 | 69,638 | 71,193 | 75,058 | 80,523 | 85,188 |
| III  | 9-Month  | 40,413 | 41,600 | 42,787 | 43,974 | 45,161 | 46,348 | 47,535 | 48,722 | 49,909 | 52,995 | 56,081 | 59,168 |
|      | Summer   | 12,475 | 12,843 | 13,211 | 13,579 | 13,947 | 14,315 | 14,683 | 15,051 | 15,419 | 16,376 | 17,333 | 18,289 |
|      | 12 Month | 52,888 | 54,443 | 55,998 | 57,553 | 59,108 | 60,663 | 62,218 | 63,773 | 65,328 | 69,371 | 73,414 | 77,457 |
| II   | 9-Month  | 37,152 | 38,339 | 39,526 | 40,713 | 41,900 | 43,087 | 44,274 | 45,461 | 46,648 | 49,022 | 51,396 | 53,770 |
|      | Summer   | 11,469 | 11,837 | 12,205 | 12,573 | 12,941 | 13,309 | 13,677 | 14,045 | 14,413 | 15,149 | 15,885 | 16,621 |
|      | 12 Month | 48,621 | 50,176 | 51,731 | 53,286 | 54,841 | 56,396 | 57,951 | 59,506 | 61,061 | 64,171 | 67,281 | 70,391 |
| IA   | 9-Month  | 33,891 | 35,078 | 36,265 | 37,452 | 38,639 | 39,826 | 41,013 | 42,200 | 43,387 | 45,761 | 48,135 | 50,509 |
|      | Summer   | 10,464 | 10,832 | 11,200 | 11,568 | 11,936 | 12,304 | 12,672 | 13,040 | 13,408 | 14,144 | 14,880 | 15,616 |
|      | 12 Month | 44,355 | 45,910 | 47,465 | 49,020 | 50,575 | 52,130 | 53,685 | 55,240 | 56,795 | 59,905 | 63,015 | 66,125 |
| IB   | 9-Month  | 30,631 | 31,818 | 33,005 | 34,192 | 35,379 | 36,566 | 37,753 | 38,940 | 40,127 | 42,501 | 44,875 | 47,249 |
|      | Summer   | 9,458  | 9,826  | 10,194 | 10,562 | 10,930 | 11,298 | 11,666 | 12,034 | 12,402 | 13,138 | 13,874 | 14,610 |
|      | 12 Month | 40,089 | 41,644 | 43,199 | 44,754 | 46,309 | 47,864 | 49,419 | 50,974 | 52,529 | 55,639 | 58,749 | 61,859 |
| IC   | 9-Month  | 30,631 | 31,818 | 33,005 | 34,192 | 35,379 | 36,566 | 37,753 | 38,940 | 40,127 | 42,501 | 44,875 | 47,249 |
|      | Summer   | 9,458  | 9,826  | 10,194 | 10,562 | 10,930 | 11,298 | 11,666 | 12,034 | 12,402 | 13,138 | 13,874 | 14,610 |
|      | 12 Month | 40,089 | 41,644 | 43,199 | 44,754 | 46,309 | 47,864 | 49,419 | 50,974 | 52,529 | 55,639 | 58,749 | 61,859 |

Notes:

1. For instructors, librarians, and counselors in the State Community and Technical Colleges, initial step placement on the salary schedule for prior full-time professional high-tech experience will be recommended by the president for approval by the Chancellor. Prior full-time experience in teaching, counseling, or librarianship will be included in the qualification for initial step placement for new employees as determined by the president. Advancement in steps after placement will be based on years completed in the respective position.
2. A department or division chairperson shall be paid an additional $200 per month provided that the department or division includes a minimum of three full-time faculty members, with the Chairperson being counted as one of the three (see Policy Number 606.05)
3. A full-time librarian shall be paid an additional $200 per month provided that only one person at each institution is designated as head librarian (see Policy Number 606.05)
4. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2005-2006 year only and may not be awarded in subsequent years.
5. Schedule D-1 is to be used to compensate full-time instructors at colleges using a 175/54 calendar.

Printed at 7/12/2005 3:33 PM

62
11/05
Exhibit 19 (cont.)

**Alabama Community & Technical Colleges**

Schedule D-2

Full-time Instructors, Counselors and Librarians

For Fiscal Year 2005-2006

Action Item

7/12/2005

Page 5 of 11

| Rank | | Salary Step 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IV | 9-Month | 42,327 | 43,446 | 44,565 | 45,684 | 46,803 | 47,922 | 49,041 | 50,160 | 51,279 | 54,636 | 57,993 | 61,350 |
| | Summer | 16,424 | 16,860 | 17,296 | 17,732 | 18,168 | 18,604 | 19,040 | 19,476 | 19,912 | 21,220 | 22,528 | 23,836 |
| | 12 Month | 58,751 | 60,306 | 61,861 | 63,416 | 64,971 | 66,526 | 68,081 | 69,636 | 71,191 | 75,856 | 80,521 | 85,186 |
| III | 9-Month | 38,103 | 39,222 | 40,341 | 41,460 | 42,579 | 43,698 | 44,817 | 45,936 | 47,055 | 49,964 | 52,074 | 55,783 |
| | Summer | 14,785 | 15,221 | 15,657 | 16,093 | 16,529 | 16,965 | 17,401 | 17,837 | 18,273 | 19,407 | 20,540 | 21,674 |
| | 12 Month | 52,888 | 54,443 | 55,998 | 57,553 | 59,108 | 60,663 | 62,218 | 63,773 | 65,328 | 69,371 | 73,414 | 77,457 |
| II | 9-Month | 35,030 | 36,149 | 37,268 | 38,387 | 39,506 | 40,625 | 41,744 | 42,863 | 43,982 | 46,220 | 48,458 | 50,696 |
| | Summer | 13,591 | 14,027 | 14,463 | 14,899 | 15,335 | 15,771 | 16,207 | 16,643 | 17,079 | 17,951 | 18,823 | 19,695 |
| | 12 Month | 48,621 | 50,176 | 51,731 | 53,286 | 54,841 | 56,396 | 57,951 | 59,506 | 61,061 | 64,171 | 67,281 | 70,391 |
| IA | 9-Month | 31,956 | 33,075 | 34,194 | 35,313 | 36,432 | 37,551 | 38,670 | 39,789 | 40,908 | 43,146 | 45,384 | 47,622 |
| | Summer | 12,400 | 12,836 | 13,272 | 13,708 | 14,144 | 14,580 | 15,016 | 15,452 | 15,888 | 16,760 | 17,632 | 18,504 |
| | 12 Month | 44,356 | 45,911 | 47,466 | 49,021 | 50,576 | 52,131 | 53,686 | 55,241 | 56,796 | 59,906 | 63,016 | 66,126 |
| IB | 9-Month | 28,881 | 30,000 | 31,119 | 32,238 | 33,357 | 34,476 | 35,595 | 36,714 | 37,833 | 40,071 | 42,309 | 44,547 |
| | Summer | 11,208 | 11,644 | 12,080 | 12,516 | 12,952 | 13,388 | 13,824 | 14,260 | 14,696 | 15,560 | 16,440 | 17,312 |
| | 12 Month | 40,089 | 41,644 | 43,199 | 44,754 | 46,309 | 47,864 | 49,419 | 50,974 | 52,529 | 55,639 | 58,749 | 61,859 |
| IC | 9-Month | 28,881 | 30,000 | 31,119 | 32,238 | 33,357 | 34,476 | 35,595 | 36,714 | 37,033 | 40,071 | 42,309 | 44,547 |
| | Summer | 11,200 | 11,644 | 12,000 | 12,516 | 12,952 | 13,388 | 13,824 | 14,260 | 14,696 | 15,560 | 16,440 | 17,312 |
| | 12 Month | 40,089 | 41,644 | 43,199 | 44,754 | 46,309 | 47,864 | 49,419 | 50,974 | 52,529 | 55,639 | 58,749 | 61,859 |

Notes:

1. For instructors, librarians, and counselors in the State Community and Technical Colleges, initial step placement on the salary schedule for prior full-time professional high-tech experience will be recommended by the president for approval by the Chancellor. Prior full-time experience in teaching, counseling, or librarianship will be included in the qualification for initial step placement for new employees as determined by the president. Advancement in steps after placement will be based on years completed in the respective position.

2. A department or division chairperson shall be paid an additional $200 per month provided that the department or division includes a minimum of three full-time faculty members, with the chairperson being counted as one of the three (see Policy Number 606.05)

3. A full-time head librarian shall be paid an additional $200 per month provided that only one person at each institution is designated as head librarian (see Policy Number 606.05)

4. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in three salary schedules are awarded for the 2005-2006 year only and may not be awarded in subsequent years.

5. Schedule D-1 is to be used to compensate full-time instructors at colleges using a 165/64 calendar.

Printed at 7/12/2005 3:33 PM

63
11/05
Exhibit 19 (cont.)

Alabama Community / Technical Colleges

Action Item _____
7/12/2005
Page 6 of 11

Schedule D-3
Adult Education Teachers
For Fiscal Year 2005-2006
and
Program Year 2005-2006 AEFLA Maximum Reimbursement Schedule

Years of Experience

| Rank | | 0 | 3 | 6 | 9 | 12 | 15 | 18 | 21 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|
| Level 2 | Salary | 47,404 | 52,228 | 54,510 | 55,243 | 56,268 | 57,533 | 50,281 | 59,021 | 60,669 |
| | Monthly | 3,957 | 4,352 | 4,543 | 4,604 | 4,687 | 4,794 | 4,857 | 4,918 | 5,056 |
| | Hourly | 22.83 | 25.11 | 26.21 | 26.56 | 27.04 | 27.66 | 28.02 | 28.38 | 29.17 |
| Level 1 | Salary | 41,289 | 45,423 | 47,407 | 48,043 | 48,908 | 50,028 | 50,678 | 51,325 | 52,759 |
| | Monthly | 3,441 | 3,785 | 3,951 | 4,004 | 4,076 | 4,169 | 4,223 | 4,277 | 4,397 |
| | Hourly | 19.85 | 21.84 | 22.79 | 23.10 | 23.51 | 24.05 | 24.36 | 24.68 | 25.36 |

Notes:

1. The salary amount in the above table represents the twelve-month salary for full-time teachers. Full-time teachers are assigned a 260-day contract. The hourly rate is to be used to compensate teachers working less than 40 hours/week.

2. Teachers shall meet the employment criteria established by State Board of Education policy and guidelines of the Chancellor.

3. "Years of experience" is defined as the number of years (12-month) the employee has in documented full-time teaching, supervising, or a combination of the two in and Adult Education Program as defined in the Alabama Adult Education and Family Literacy Plan or Adult Education Plan previously published by the Department of Postsecondary Education.

4. Non-degreed teachers (those with less than a baccalaureate degree) may be reimbursed a maximum of $13.75 per hour. Non-degreed teachers may be employed only under extenuating circumstances and with prior approval of the Chancellor.

5. Increases are awarded at the sole discretion of the Alabama State Board of Education. Increases appearing in these salary schedules are awarded for the 2005-2006 year only and may not be awarded in subsequent years.

6. All figures herein represent maximum reimbursement which can be made from Adult Education Program funds upon placement and are not mandatory salary increments. Any additional amount above those reflected must be furnished by the local provider from other fund sources.

7. Adult Education teachers are entitled to the 15 paid holidays defined by the college as days during which the college will be closed.

8. Adult Education teachers are entitled to 5 personal leave days per year.

9. Adult Education teachers are entitled to 1 day of sick leave per month to a maximum of 12 days per year. Any unused balance of sick leave accumulated at the end of the year will be carried forward to the next succeeding year until a maximum allowable days of sick leave is accumulated.

10. Level 1 is the salary structure normally used by those holding the Bachelor's degree, while Level 2 is the salary structure normally used for those holding the Master's degree.

Printed at 7/13/2005 3:33 PM

**Alabama Community (Technical Colleges)**

Schedule E1 to E5
Full-Time Support Personnel 40 Hours Per Week
For Fiscal Year 2005-2006

Action Item
7/12/2005
Page 7 of 11

| Salary Schedule | Grade | Salary Step 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| E1 | 01 | 40,839 | 41,634 | 42,429 | 43,224 | 44,019 | 44,814 | 45,609 | 46,404 | 47,199 | 48,709 | 50,379 | 51,969 |
| E1 | 02 | 36,867 | 37,662 | 38,457 | 39,252 | 40,047 | 40,842 | 41,637 | 42,432 | 43,227 | 44,817 | 46,407 | 47,997 |
| E2 | 02 | 36,867 | 37,662 | 38,457 | 39,252 | 40,047 | 40,842 | 41,637 | 42,432 | 43,227 | 44,817 | 46,407 | 47,997 |
| E2 | 03 | 32,895 | 33,690 | 34,485 | 35,280 | 36,075 | 36,870 | 37,665 | 38,460 | 39,255 | 40,845 | 42,435 | 44,025 |
| E3 | 03 | 32,895 | 33,690 | 34,485 | 35,280 | 36,075 | 36,870 | 37,665 | 38,460 | 39,255 | 40,845 | 42,435 | 44,025 |
| E3 | 04 | 28,922 | 29,717 | 30,512 | 31,307 | 32,102 | 32,897 | 33,692 | 34,487 | 35,282 | 36,872 | 38,462 | 40,052 |
| E3 | 05 | 24,950 | 25,745 | 26,540 | 27,335 | 28,130 | 28,925 | 29,720 | 30,515 | 31,310 | 32,900 | 34,490 | 36,080 |
| E4 | 05 | 24,950 | 25,745 | 26,540 | 27,335 | 28,130 | 28,925 | 29,720 | 30,515 | 31,310 | 32,900 | 34,490 | 36,080 |
| E4 | 06 | 20,977 | 21,772 | 22,567 | 23,362 | 24,157 | 24,952 | 25,747 | 26,542 | 27,337 | 28,927 | 30,517 | 32,107 |
| E5 | 06 | 20,977 | 21,772 | 22,567 | 23,362 | 24,157 | 24,952 | 25,747 | 26,542 | 27,337 | 28,927 | 30,517 | 32,107 |
| E5 | 07 | 20,185 | 20,980 | 21,775 | 22,570 | 23,365 | 24,160 | 24,955 | 25,750 | 26,545 | 28,135 | 29,725 | 31,315 |

Notes:

1. Grade placement of positions on the above salary schedule shall be based on the DPE Uniform Job Title (Personnel File) Handbook.
2. Initial step placement of an employee of an appropriate schedule for prior postsecondary education experience and equivalent experience in business or industry will be determined by the president. Advancement within a level is based on uniform guidelines issued by the Chancellor. Advancement in steps after the initial placement will be based on years completed in the respective position.
3. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in those salary schedules are awarded for the 2005-2006 year only and may not be awarded in subsequent years.

Printed at 7/12/2005 3:33 PM

GWCC652

65
11/05
Exhibit 19 (cont.)

Alabama Community and ... Junior Colleges

Schedule H20

Part-Time Support Personnel 20-24 Hours Per Week

For Fiscal Year 2005-2006

Action Item

7/12/2005

Page 8 of 11

## Salary Salary Step

| Rank | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 16,464 | 16,666 | 16,868 | 17,070 | 17,272 | 17,474 | 17,676 | 17,878 | 18,080 | 18,484 | 18,888 | 19,292 |
| 02 | 16,069 | 16,271 | 16,473 | 16,675 | 16,877 | 17,079 | 17,281 | 17,483 | 17,685 | 18,089 | 18,493 | 18,897 |
| 03 | 15,671 | 15,873 | 16,075 | 16,277 | 16,479 | 16,681 | 16,883 | 17,085 | 17,287 | 17,691 | 18,095 | 18,499 |
| 04 | 15,274 | 15,476 | 15,678 | 15,880 | 16,082 | 16,284 | 16,486 | 16,688 | 16,890 | 17,294 | 17,698 | 18,102 |
| 05 | 14,876 | 15,078 | 15,280 | 15,482 | 15,684 | 15,886 | 16,088 | 16,290 | 16,492 | 16,896 | 17,300 | 17,704 |
| 06 | 14,479 | 14,681 | 14,883 | 15,085 | 15,287 | 15,489 | 15,691 | 15,893 | 16,095 | 16,499 | 16,903 | 17,307 |
| 07 | 14,082 | 14,284 | 14,486 | 14,688 | 14,890 | 15,092 | 15,294 | 15,496 | 15,698 | 16,102 | 16,506 | 16,910 |
| 08 | 13,685 | 13,887 | 14,089 | 14,291 | 14,493 | 14,695 | 14,897 | 15,099 | 15,301 | 15,705 | 16,109 | 16,513 |
| 09 | 13,287 | 13,489 | 13,691 | 13,893 | 14,095 | 14,297 | 14,499 | 14,701 | 14,903 | 15,307 | 15,711 | 16,115 |
| 10 | 12,890 | 13,092 | 13,294 | 13,496 | 13,698 | 13,900 | 14,102 | 14,304 | 14,506 | 14,910 | 15,314 | 15,718 |
| 11 | 12,492 | 12,694 | 12,896 | 13,098 | 13,300 | 13,502 | 13,704 | 13,906 | 14,108 | 14,512 | 14,916 | 15,320 |
| 12 | 12,096 | 12,298 | 12,500 | 12,702 | 12,904 | 13,106 | 13,308 | 13,510 | 13,712 | 14,116 | 14,520 | 14,924 |
| 13 | 11,698 | 11,900 | 12,102 | 12,304 | 12,506 | 12,708 | 12,910 | 13,112 | 13,314 | 13,718 | 14,122 | 14,526 |
| 14 | 11,302 | 11,504 | 11,706 | 11,908 | 12,110 | 12,312 | 12,514 | 12,716 | 12,918 | 13,322 | 13,726 | 14,130 |
| 15 | 10,904 | 11,106 | 11,308 | 11,510 | 11,712 | 11,914 | 12,116 | 12,318 | 12,520 | 12,924 | 13,328 | 13,732 |
| 16 | 10,507 | 10,709 | 10,911 | 11,113 | 11,315 | 11,517 | 11,719 | 11,921 | 12,123 | 12,527 | 12,931 | 13,335 |
| 17 | 10,110 | 10,312 | 10,514 | 10,716 | 10,918 | 11,120 | 11,322 | 11,524 | 11,726 | 12,130 | 12,534 | 12,938 |
| 18 | 9,713 | 9,915 | 10,117 | 10,319 | 10,521 | 10,723 | 10,925 | 11,127 | 11,329 | 11,733 | 12,137 | 12,541 |
| 19 | 9,315 | 9,517 | 9,719 | 9,921 | 10,123 | 10,325 | 10,527 | 10,729 | 10,931 | 11,335 | 11,739 | 12,143 |
| 20 | 8,918 | 9,120 | 9,322 | 9,524 | 9,726 | 9,928 | 10,130 | 10,332 | 10,534 | 10,938 | 11,342 | 11,746 |
| 21 | 8,520 | 8,722 | 8,924 | 9,126 | 9,328 | 9,530 | 9,732 | 9,934 | 10,136 | 10,540 | 10,944 | 11,348 |
| 22 | 8,123 | 8,325 | 8,527 | 8,729 | 8,931 | 9,133 | 9,335 | 9,537 | 9,739 | 10,143 | 10,547 | 10,951 |
| 23 | 7,726 | 7,928 | 8,130 | 8,332 | 8,534 | 8,736 | 8,938 | 9,140 | 9,342 | 9,746 | 10,150 | 10,554 |
| 24 | 7,329 | 7,531 | 7,733 | 7,935 | 8,137 | 8,339 | 8,541 | 8,743 | 8,945 | 9,349 | 9,753 | 10,157 |
| 25 | 6,931 | 7,133 | 7,335 | 7,537 | 7,739 | 7,941 | 8,143 | 8,345 | 8,547 | 8,951 | 9,355 | 9,759 |
| 26 | 6,734 | 6,936 | 7,138 | 7,340 | 7,542 | 7,744 | 7,946 | 8,148 | 8,350 | 8,754 | 9,158 | 9,562 |

Notes:

1. Grade placement of positions on the above salary schedule shall be based on level of required training, level and extent of duties and responsibilities, and prevailing salaries for similar positions in the geographic area.

2. Initial step placement on the appropriate schedule, taking into consideration prior postsecondary education experience and equivalent experience in business or industry will be determined by the president. Advancement in step after the initial placement will be based on years completed in the position.

3. Salaries shown on this schedule are base salaries for a 20-hour work week. Compensation for hours worked above 20 hours per week shall be computed from hourly rates shown on Supplemental Salary Schedule H22.

4. For purposes of the Fair Labor Standards Act, the "normal" work week is forty (40) hours per week. Any employee, regardless of hours worked, who is covered by the Fair Labor Standards Act may become eligible for overtime benefits mandated by the act only for hours worked beyond forty (40) hours per week.

5. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2005-2006 year only and may not be awarded in subsequent years.

Printed at 7/12/2005 3:33 PM

66
11/05
Exhibit 19 (cont.)

**Alabama Community College System**

**Alabama Colleges**

Action Item

7/12/2005

Page 9 of 11

## Schedule H25
## Part-Time Support Personnel 25-29 Hours Per Week
### For Fiscal Year 2005-2006

Salary Step

| Rank | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 20,584 | 20,834 | 21,084 | 21,334 | 21,584 | 21,834 | 22,084 | 22,334 | 22,584 | 23,084 | 23,584 | 24,084 |
| 02 | 20,088 | 20,338 | 20,588 | 20,838 | 21,088 | 21,338 | 21,588 | 21,838 | 22,088 | 22,588 | 23,088 | 23,588 |
| 03 | 19,590 | 19,840 | 20,090 | 20,340 | 20,590 | 20,840 | 21,090 | 21,340 | 21,590 | 22,090 | 22,590 | 23,090 |
| 04 | 19,094 | 19,344 | 19,594 | 19,844 | 20,094 | 20,344 | 20,594 | 20,844 | 21,094 | 21,594 | 22,094 | 22,594 |
| 05 | 18,596 | 18,846 | 19,096 | 19,346 | 19,596 | 19,846 | 20,096 | 20,346 | 20,596 | 21,096 | 21,596 | 22,096 |
| 06 | 18,098 | 18,348 | 18,598 | 18,848 | 19,098 | 19,348 | 19,598 | 19,848 | 20,098 | 20,598 | 21,098 | 21,598 |
| 07 | 17,601 | 17,851 | 18,101 | 18,351 | 18,601 | 18,851 | 19,101 | 19,351 | 19,601 | 20,101 | 20,601 | 21,101 |
| 08 | 17,104 | 17,354 | 17,604 | 17,854 | 18,104 | 18,354 | 18,604 | 18,854 | 19,104 | 19,604 | 20,104 | 20,604 |
| 09 | 16,607 | 16,857 | 17,107 | 17,357 | 17,607 | 17,857 | 18,107 | 18,357 | 18,607 | 19,107 | 19,607 | 20,107 |
| 10 | 16,109 | 16,359 | 16,609 | 16,859 | 17,109 | 17,359 | 17,609 | 17,859 | 18,109 | 18,609 | 19,109 | 19,609 |
| 11 | 15,613 | 15,863 | 16,113 | 16,363 | 16,613 | 16,863 | 17,113 | 17,363 | 17,613 | 18,113 | 18,613 | 19,113 |
| 12 | 15,115 | 15,365 | 15,615 | 15,865 | 16,115 | 16,365 | 16,615 | 16,865 | 17,115 | 17,615 | 18,115 | 18,615 |
| 13 | 14,620 | 14,870 | 15,120 | 15,370 | 15,620 | 15,870 | 16,120 | 16,370 | 16,620 | 17,120 | 17,620 | 18,120 |
| 14 | 14,124 | 14,374 | 14,624 | 14,874 | 15,124 | 15,374 | 15,624 | 15,874 | 16,124 | 16,624 | 17,124 | 17,624 |
| 15 | 13,624 | 13,874 | 14,124 | 14,374 | 14,624 | 14,874 | 15,124 | 15,374 | 15,624 | 16,124 | 16,624 | 17,124 |
| 16 | 13,127 | 13,377 | 13,627 | 13,877 | 14,127 | 14,377 | 14,627 | 14,877 | 15,127 | 15,627 | 16,127 | 16,627 |
| 17 | 12,630 | 12,880 | 13,130 | 13,380 | 13,630 | 13,880 | 14,130 | 14,380 | 14,630 | 15,130 | 15,630 | 16,130 |
| 18 | 12,132 | 12,382 | 12,632 | 12,882 | 13,132 | 13,382 | 13,632 | 13,882 | 14,132 | 14,632 | 15,132 | 15,632 |
| 19 | 11,637 | 11,887 | 12,137 | 12,387 | 12,637 | 12,887 | 13,137 | 13,387 | 13,637 | 14,137 | 14,637 | 15,137 |
| 20 | 11,137 | 11,387 | 11,637 | 11,887 | 12,137 | 12,387 | 12,637 | 12,887 | 13,137 | 13,637 | 14,137 | 14,637 |
| 21 | 10,641 | 10,891 | 11,141 | 11,391 | 11,641 | 11,891 | 12,141 | 12,391 | 12,641 | 13,141 | 13,641 | 14,141 |
| 22 | 10,144 | 10,394 | 10,644 | 10,894 | 11,144 | 11,394 | 11,644 | 11,894 | 12,144 | 12,644 | 13,144 | 13,644 |
| 23 | 9,648 | 9,898 | 10,148 | 10,398 | 10,648 | 10,898 | 11,148 | 11,398 | 11,648 | 12,148 | 12,648 | 13,148 |
| 24 | 9,149 | 9,399 | 9,649 | 9,899 | 10,149 | 10,399 | 10,649 | 10,899 | 11,149 | 11,649 | 12,149 | 12,649 |
| 25 | 8,654 | 8,904 | 9,154 | 9,404 | 9,654 | 9,904 | 10,154 | 10,404 | 10,654 | 11,154 | 11,654 | 12,154 |
| 26 | 8,405 | 8,655 | 8,905 | 9,155 | 9,405 | 9,655 | 9,905 | 10,155 | 10,405 | 10,905 | 11,405 | 11,905 |

Notes:

1. Grade placement of positions on the above salary schedule shall be based on level of required training, level and extent of duties and responsibilities, and prevailing salaries for similar positions in the geographic area.

2. Initial step placement on the appropriate schedule, taking into consideration prior postsecondary education experience and equivalent experience in business or industry will be determined by the president. Advancement in steps after the initial placement will be based on years completed in the position.

3. Salaries shown on this schedule are base salaries for a 25-hour work week. Compensation for hours worked above 25 hours per week shall be computed from hourly rates shown on Supplemental H.

4. For purposes of the Fair Labor Standards Act, the "normal" work week is forty (40) hours per week. Any employee, regardless of hours worked, who is covered by the Fair Labor Standards Act may become eligible for overtime benefits mandated by the act only for hours worked beyond forty (40) hours per week.

5. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in those salary schedules are awarded for the 2005-2006 year only and may not be awarded in subsequent years.

Printed at 7/12/2005 3:33 PM

67
11/05
Exhibit 19 (cont.)

Alabama Community College System

## Schedule H30
### Part-Time Support Personnel 30-34 Hours Per Week
### For Fiscal Year 2005-2006

Action Item
7/12/2005
Page 10 of 11

| Salary Rank | Salary Step 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 24,717 | 25,018 | 25,319 | 25,620 | 25,921 | 26,222 | 26,523 | 26,824 | 27,125 | 27,727 | 28,329 | 28,931 |
| 02 | 24,120 | 24,421 | 24,722 | 25,023 | 25,324 | 25,625 | 25,926 | 26,227 | 26,528 | 27,130 | 27,732 | 28,334 |
| 03 | 23,522 | 23,823 | 24,124 | 24,425 | 24,726 | 25,027 | 25,328 | 25,629 | 25,930 | 26,532 | 27,134 | 27,736 |
| 04 | 22,927 | 23,228 | 23,529 | 23,830 | 24,131 | 24,432 | 24,733 | 25,034 | 25,335 | 25,937 | 26,539 | 27,141 |
| 05 | 22,330 | 22,631 | 22,932 | 23,233 | 23,534 | 23,835 | 24,136 | 24,437 | 24,738 | 25,340 | 25,942 | 26,544 |
| 06 | 21,731 | 22,032 | 22,333 | 22,634 | 22,935 | 23,236 | 23,537 | 23,838 | 24,139 | 24,741 | 25,343 | 25,945 |
| 07 | 21,135 | 21,436 | 21,737 | 22,038 | 22,339 | 22,640 | 22,941 | 23,242 | 23,543 | 24,145 | 24,747 | 25,349 |
| 08 | 20,536 | 20,837 | 21,138 | 21,439 | 21,740 | 22,041 | 22,342 | 22,643 | 22,944 | 23,546 | 24,148 | 24,750 |
| 09 | 19,941 | 20,242 | 20,543 | 20,844 | 21,145 | 21,446 | 21,747 | 22,048 | 22,349 | 22,951 | 23,553 | 24,155 |
| 10 | 19,344 | 19,645 | 19,946 | 20,247 | 20,548 | 20,849 | 21,150 | 21,451 | 21,752 | 22,354 | 22,956 | 23,558 |
| 11 | 18,745 | 19,046 | 19,347 | 19,648 | 19,949 | 20,250 | 20,551 | 20,852 | 21,153 | 21,755 | 22,357 | 22,959 |
| 12 | 18,149 | 18,450 | 18,751 | 19,052 | 19,353 | 19,654 | 19,955 | 20,256 | 20,557 | 21,159 | 21,761 | 22,363 |
| 13 | 17,551 | 17,852 | 18,153 | 18,454 | 18,755 | 19,056 | 19,357 | 19,658 | 19,959 | 20,561 | 21,163 | 21,765 |
| 14 | 16,955 | 17,256 | 17,557 | 17,858 | 18,159 | 18,460 | 18,761 | 19,062 | 19,363 | 19,965 | 20,567 | 21,169 |
| 15 | 16,358 | 16,659 | 16,960 | 17,261 | 17,562 | 17,863 | 18,164 | 18,465 | 18,766 | 19,368 | 19,970 | 20,572 |
| 16 | 15,760 | 16,061 | 16,362 | 16,663 | 16,964 | 17,265 | 17,566 | 17,867 | 18,168 | 18,770 | 19,372 | 19,974 |
| 17 | 15,163 | 15,464 | 15,765 | 16,066 | 16,367 | 16,668 | 16,969 | 17,270 | 17,571 | 18,173 | 18,775 | 19,377 |
| 18 | 14,567 | 14,868 | 15,169 | 15,470 | 15,771 | 16,072 | 16,373 | 16,674 | 16,975 | 17,577 | 18,179 | 18,781 |
| 19 | 13,970 | 14,271 | 14,572 | 14,873 | 15,174 | 15,475 | 15,776 | 16,077 | 16,378 | 16,980 | 17,582 | 18,184 |
| 20 | 13,372 | 13,673 | 13,974 | 14,275 | 14,576 | 14,877 | 15,178 | 15,479 | 15,780 | 16,382 | 16,984 | 17,586 |
| 21 | 12,775 | 13,076 | 13,377 | 13,678 | 13,979 | 14,280 | 14,581 | 14,882 | 15,183 | 15,785 | 16,387 | 16,989 |
| 22 | 12,178 | 12,479 | 12,780 | 13,081 | 13,382 | 13,683 | 13,984 | 14,285 | 14,586 | 15,188 | 15,790 | 16,392 |
| 23 | 11,582 | 11,883 | 12,184 | 12,485 | 12,786 | 13,087 | 13,388 | 13,689 | 13,990 | 14,592 | 15,194 | 15,796 |
| 24 | 10,985 | 11,286 | 11,587 | 11,888 | 12,189 | 12,490 | 12,791 | 13,092 | 13,393 | 13,995 | 14,597 | 15,199 |
| 25 | 10,387 | 10,688 | 10,989 | 11,290 | 11,591 | 11,892 | 12,193 | 12,494 | 12,795 | 13,397 | 13,999 | 14,601 |
| 26 | 10,089 | 10,390 | 10,691 | 10,992 | 11,293 | 11,594 | 11,895 | 12,196 | 12,497 | 13,099 | 13,701 | 14,303 |

Notes:

1. Grade placement of positions on the above salary schedule shall be based on level of required training, level and extent of duties and responsibilities, and prevailing salaries for similar positions in the geographic area.

2. Initial step placement on the appropriate schedule, taking into consideration prior postsecondary education experience and equivalent experience in business or industry will be determined by the president. Advancement in steps after the initial placement will be based on years completed in the position.

3. Salaries shown on this schedule are base salaries for a 30-hour work week. Compensation for hours worked above 30 hours per week shall be computed from hourly rates shown on Supplemental H.

4. For purposes of the Fair Labor Standards Act, the "normal" work week is forty (40) hours per week. Any employee, regardless of hours worked, who is covered by the Fair Labor Standards Act may become eligible for overtime benefits mandated by the act only for hours worked beyond forty (40) hours per week.

5. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2005-2006 year only and may not be awarded in subsequent years.

Printed at 7/12/2005 3:33 PM

68
11/05
Exhibit 19 (cont.)

Alabama Community and Technical Colleges

Schedule H35

Part-Time Support Personnel 35-39 Hours Per Week

For Fiscal Year 2005-2006

Action Item
7/12/2005
Page 11 of 11

| Salary Rank | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 8 | 10 | 15 | 20 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 28,946 | 29,198 | 29,550 | 29,902 | 30,254 | 30,606 | 30,958 | 31,310 | 31,662 | 32,366 | 33,070 | 33,774 |
| 02 | 28,148 | 28,500 | 28,852 | 29,204 | 29,556 | 29,908 | 30,260 | 30,612 | 30,964 | 31,668 | 32,372 | 33,076 |
| 03 | 27,451 | 27,803 | 28,155 | 28,507 | 28,859 | 29,211 | 29,563 | 29,915 | 30,267 | 30,971 | 31,675 | 32,379 |
| 04 | 26,753 | 27,105 | 27,457 | 27,809 | 28,161 | 28,513 | 28,865 | 29,217 | 29,569 | 30,273 | 30,977 | 31,681 |
| 05 | 26,057 | 26,409 | 26,761 | 27,113 | 27,465 | 27,817 | 28,169 | 28,521 | 28,873 | 29,577 | 30,281 | 30,985 |
| 06 | 25,361 | 25,713 | 26,065 | 26,417 | 26,769 | 27,121 | 27,473 | 27,825 | 28,177 | 28,881 | 29,585 | 30,289 |
| 07 | 24,664 | 25,016 | 25,368 | 25,720 | 26,072 | 26,424 | 26,776 | 27,128 | 27,480 | 28,184 | 28,888 | 29,592 |
| 08 | 23,967 | 24,319 | 24,671 | 25,023 | 25,375 | 25,727 | 26,079 | 26,431 | 26,783 | 27,487 | 28,191 | 28,895 |
| 09 | 23,268 | 23,620 | 23,972 | 24,324 | 24,676 | 25,028 | 25,380 | 25,732 | 26,084 | 26,788 | 27,492 | 28,196 |
| 10 | 22,572 | 22,924 | 23,276 | 23,628 | 23,980 | 24,332 | 24,684 | 25,036 | 25,388 | 26,092 | 26,796 | 27,500 |
| 11 | 21,875 | 22,227 | 22,579 | 22,931 | 23,283 | 23,635 | 23,987 | 24,339 | 24,691 | 25,395 | 26,099 | 26,803 |
| 12 | 21,178 | 21,530 | 21,882 | 22,234 | 22,586 | 22,938 | 23,290 | 23,642 | 23,994 | 24,698 | 25,402 | 26,106 |
| 13 | 20,480 | 20,832 | 21,184 | 21,536 | 21,888 | 22,240 | 22,592 | 22,944 | 23,296 | 24,000 | 24,704 | 25,408 |
| 14 | 19,785 | 20,137 | 20,489 | 20,841 | 21,193 | 21,545 | 21,897 | 22,249 | 22,601 | 23,305 | 24,009 | 24,713 |
| 15 | 19,086 | 19,438 | 19,790 | 20,142 | 20,494 | 20,846 | 21,198 | 21,550 | 21,902 | 22,606 | 23,310 | 24,014 |
| 16 | 18,390 | 18,742 | 19,094 | 19,446 | 19,798 | 20,150 | 20,502 | 20,854 | 21,206 | 21,910 | 22,614 | 23,318 |
| 17 | 17,692 | 18,044 | 18,396 | 18,748 | 19,100 | 19,452 | 19,804 | 20,156 | 20,508 | 21,212 | 21,916 | 22,620 |
| 18 | 16,997 | 17,349 | 17,701 | 18,053 | 18,405 | 18,757 | 19,109 | 19,461 | 19,813 | 20,517 | 21,221 | 21,925 |
| 19 | 16,300 | 16,652 | 17,004 | 17,356 | 17,708 | 18,060 | 18,412 | 18,764 | 19,116 | 19,820 | 20,524 | 21,228 |
| 20 | 15,602 | 15,954 | 16,306 | 16,658 | 17,010 | 17,362 | 17,714 | 18,066 | 18,418 | 19,122 | 19,826 | 20,530 |
| 21 | 14,905 | 15,257 | 15,609 | 15,961 | 16,313 | 16,665 | 17,017 | 17,369 | 17,721 | 18,425 | 19,129 | 19,833 |
| 22 | 14,208 | 14,560 | 14,912 | 15,264 | 15,616 | 15,968 | 16,320 | 16,672 | 17,024 | 17,728 | 18,432 | 19,136 |
| 23 | 13,511 | 13,863 | 14,215 | 14,567 | 14,919 | 15,271 | 15,623 | 15,975 | 16,327 | 17,031 | 17,735 | 18,439 |
| 24 | 12,813 | 13,165 | 13,517 | 13,869 | 14,221 | 14,573 | 14,925 | 15,277 | 15,629 | 16,333 | 17,037 | 17,741 |
| 25 | 12,117 | 12,469 | 12,821 | 13,173 | 13,525 | 13,877 | 14,229 | 14,581 | 14,933 | 15,637 | 16,341 | 17,045 |
| 26 | 11,771 | 12,123 | 12,475 | 12,827 | 13,179 | 13,531 | 13,883 | 14,235 | 14,587 | 15,291 | 15,995 | 16,699 |

Notes:

1. Grade placement of positions on the above salary schedule shall be based on level of required training, level and extent of duties and responsibilities, and prevailing salaries for similar positions in the geographic area.

2. Initial step placement on the appropriate schedule, taking into consideration prior postsecondary education experience and equivalent will be based on years completed in the position. Advancement in steps after the initial placement will be based on years completed in the position.

3. Salaries shown on this schedule are base salaries for a 35-hour work week. Compensation for hours worked above 35 hours per week shall be computed from hourly rates shown on Supplemental H.

4. For purposes of the Fair Labor Standards Act, the "normal" work week is forty (40) hours per week. Any employer, regardless of hours worked, who is covered by the Fair Labor Standards Act may become eligible for overtime benefits mandated by the act only for hours worked beyond forty (40) hours per week.

5. Step increases are awarded within the sole discretion of the Alabama State Board of Education. Step increases appearing in these salary schedules are awarded for the 2005-2006 year only and may not be awarded in subsequent years.

Printed at 7/12/2005 3:33 PM

69
11/05
Exhibit 20

## SAMPLE

### STATEMENT OF JUSTIFICATION
(Prepared by Appropriate Dean or Supervisor for President's Signature and Approval)

### STATEMENT TO THE SEARCH FILE FOR
### COORDINATOR OF SPECIAL ACTIVITIES

On June 17, 2004, Mr. Mark Shope and I interviewed the following three finalists recommended by the Search Committee for Coordinator of Special Activities:

Ms  Mary Johnson (white female)
Ms  Sue Jones (black female)
Mr  John Smith (white male)

I selected Ms  Jones as the top candidate for the following reasons:

- She has broad-based community college experience.
- She has extensive experience as a college recruiter
- She has experience as special projects coordinator at a two-year college.
- She has experience in budget planning and management as grants coordinator at a two-year college
- Ms. Jones' qualifications seemed to be the best match for the needs of the institution

_____

Linda C  Young, President
June 18, 2005

Distribution:  Director of Personnel

GWCC657

70
11/05
Exhibit 21

## CREDIT FACULTY CREDENTIALS VERIFICATION FORM

Name _____ SSN _____

Division _____ Date of Employment _____

Full-Time Rank or Part-Time: _____

Assigned course(s): As appropriate, list specific courses or broader range of eligibility such as "all Math" or "ILT courses"

_____

_____

| Degree | Discipline | Institution | Date |
|--------|-----------|-------------|------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Accreditation   Are the degree/credit granting institutions regionally accredited?          YES     NO
Note: International institutions require additional verification procedures
Communication Skills  Has written and oral command of English been verified?          YES     NO
Note: Applicant's writing sample must be attached
Exception.  Is review based on experience and professional contributions?          YES     NO
Note: Requires additional verification procedures
As appropriate for English, Reading, and Mathematics Developmental courses only
          Is there graduate training in remedial education?          YES     NO
          Is there teaching experience in a discipline related to their assignment?          YES     NO

CREDENTIAL STATUS (Check appropriate category)

____ Credentialed for humanities/fine arts, social/behavioral sciences, and natural sciences/mathematics (Minimum of master's degree in discipline or master's degree with 18 hours in discipline )

____ Credentialed for professional, occupational, and technical areas other than physical activity courses that are components of associate degree programs designed for college transfer or from which substantial numbers of students transfer to senior institutions (Minimum of master's degree in discipline or master's degree with 18 hours in discipline )

For above credentials list applicable graduate courses taken with semester or quarter hours for each   Example: ENG621 5Q; ENG573 1S.

| | |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

| Quarter Hours | | Plus | Semester Hours | | Equal Total Equivalent Semester Hours | |
|---|---|---|---|---|---|---|

GWCC658

71
11/05
Exhibit 21 (cont)

___ Credentialed for professional, occupational, and technical areas that are components of associate degree programs not usually resulting in college transfer. (Appropriate academic preparation or academic preparation coupled with work experience (minimum academic degree must be an associate degree ) NOTE: WCC requires a minimum of a bachelor's degree for some programs and a master's degree for others  Consult ADPE guidelines

___ Credentialed for non-degree diploma or certificate occupational courses. (Some college or specialized training, but with an emphasis on competence gained through work experience  NOTE: WCC requires a minimum of an associate degree or at least 60 semester hours in a planned program including an associate degree core)

___ Credentialed for basic computation and communication skills in non-degree occupational programs. (Baccalaureate degree and, ideally, work or other experience that helps relate these skills to the occupational field)

___ Credentialed for adult basic education courses below the collegiate level. (Baccalaureate degree and attributes or experiences that help them relate to the particular needs of the adults they teach)

___ Credentialed for remedial (developmental) programs. (Baccalaureate degree in a discipline related to the teaching assignment and either teaching experience in discipline related to the teaching assignment or graduate training in remedial education).

___ Credentialed as an exception  (Status based on documented outstanding professional experience and demonstrated contributions to the teaching discipline ) [Prior approval of the Dean, Academic Affairs and Health Sciences or Dean, Career Technical Programs is required]

DOCUMENTATION

Official transcripts:

| Degree | Institution | Verified by | Date |
|--------|-------------|-------------|------|
|        |             |             |      |
|        |             |             |      |
|        |             |             |      |
|        |             |             |      |

Other supporting materials:

| Item Required | Verified by | Date |
|---------------|-------------|------|
|               |             |      |
|               |             |      |
|               |             |      |
|               |             |      |

Credentials approved by:

Division Director _____Date_____

Instructional Coordinator _____Date_____

Dean, Academic Affairs and Health Sciences_____Date_____

Dean, Career Technical Instruction_____Date_____

The Division Director should circle the degree title and completion date on the accompanying transcripts and all relevant graduate courses should be highlighted

GWCC659

72
11/05
Exhibit 22

# WALLACE COMMUNITY COLLEGE
## VERIFICATION OF EMPLOYMENT EXPERIENCE

Name: _____    Date: _____

Position Held or Applied for: _____

This Verification of Employment Experience form is to confirm that the applicant or employee named above and the President of Wallace Community College-Dothan (WCC), and/or an authorized representative of the President of WCC, have mutually reviewed all documentation provided to WCC with regard to determining the appropriate number of years of relevant work experience with which to credit the applicant or employee with respect to step placement on the salary schedule and range designated for the position of employment titled above, and that it has been mutually agreed on by the applicant or employee and WCC that the appropriate number of years of credit for relevant work experience is _____.

This determination entitles the applicant or employee to be placed at:

| | |
|---|---|
| Salary Schedule | _____ |
| Rank | _____ |
| Step | _____ |
| Range | _____ |

effective _____ for the position titled above

_____          _____
* Dean                                                    Date

_____          _____
Executive Assistant to the President                      Date

_____          _____
Applicant/Employee                          Date

SSN: _____

* Submit to Personnel Office with completed Authorization of Employment.

7/29/04

73
11/05
Exhibit 23

## GEORGE C. WALLACE COMMUNITY COLLEGE
### AUTHORIZATION OF EMPLOYMENT/PERSONNEL REQUEST

CHANGE OF STATUS ☐                NEW HIRE ☐                REHIRE ☐

| College Location | Documentation Required for Prior Experience Credit | Employee Status | Job Classification |
|---|---|---|---|
| Wallace Campus ___ | In-State ___ | Full-Time ___ | Faculty ___ |
| Sparks Campus ___ | Out-of-State ___ | Part-Time ___ | Administrative Staff ___ |
| Other _____ | | Temporary ___ | Support Staff ___ |
| | | | Other _____ |

Name:_____
           Last            First            Middle              Social Security Number

Account Number _____   Position _____

Contract Beginning Date _____   Contract Ending Date _____

Rate of Pay:  $_____ per _____

Salary Schedule _____   Rank/Grade _____   Step _____ = $_____

If change of status, specify change and justification:_____

_____

Will applicant work more than 19 hours per week in this position? Yes _____ No _____

Is applicant currently working in another department at the College? Yes _____ No _____

If yes, indicate department _____ and hours worked per week _____

### COMPLETE THIS SECTION FOR NEW HIRE OR REHIRE

_____
        Address              City/State              Zip Code         Home Phone Number

Ethnic Origin_____   Sex: M_____ F_____ Date of Birth_____
                                                                      Month/Day/Year
Disability_____   Highest Degree_____

Former Employee:  Wallace Community College _____   Sparks State Technical College _____

Does applicant have an active Teachers Retirement System account through other employment? Yes _____ No _____

If yes, where?_____

### APPROVAL FOR CHANGE OF STATUS, NEW HIRE, OR REHIRE
(Signature below indicates that funds are budgeted and available for this position.)

Signed: _____   Date: _____
           Immediate Supervisor              Title

Approval_____   Date_____
           Appropriate Dean

Approval_____   Date_____
           Dean of Business Affairs (for funding approval)

Approval_____   Date_____
           Executive Assistant to the President

Approval_____   Date_____
           President

Benefits (To Be Completed by Personnel Office):
  Is employee eligible to earn leave? Yes _____ No _____
  Is employee eligible to receive health insurance? Yes _____ No _____
  Is employee currently a member of Teachers Retirement System? Yes _____ No _____
  Is employee eligible to become a member of Teachers Retirement System? Yes _____ No _____

Distribution:   WHITE - Personnel Office     YELLOW - Supervisor     PINK - Campus Dean     GOLDENROD – Employee

GWCC661

74
11/05
Exhibit 24

# SAMPLE

LETTER INFORMING THE CHANCELLOR
ABOUT NEW EMPLOYEE
(SALARY SCHEDULES C-3 OR D-1)

July 16, 2005

Dr. Roy Johnson
Chancellor
Department of Postsecondary Education
Post Office Box 302130
Montgomery, Alabama 36130-2130

Dear Dr. Johnson:

George C. Wallace Community College recently advertised for a Physics Instructor. The initial and final interviews have been conducted.

I plan to employ Ms. Jane Doe (white female), Social Security number XXX-XX-XXXX, in the position of Physics Instructor on Salary Schedule D-1, Rank XXX, Step X at *(an annual) (a nine-month) salary of $XX,XXX.XX.

This position will be filled effective August 18, 2005. Please let me know if you need additional information.

Sincerely,

Linda C. Young
President

al

c    Ms. Joan Davis

* (Use "annual" for C-3 personnel; use "nine-month" for D-1 personnel.)

Distribution:  Director of Personnel

GWCC662

75
11/05
Exhibit 25

# SAMPLE

## LETTER TO THE CHANCELLOR
## REQUESTING APPROVAL OF EMPLOYEE PLACEMENT
## (SALARY SCHEDULES B, C-1, OR C-2)

July 15, 2005

Dr. Roy Johnson
Chancellor
Department of Postsecondary Education
Post Office Box 302130
Montgomery, Alabama  36130-2130

Dear Dr. Johnson:

Wallace Community College recently advertised for a Director of Public Relations and Marketing, and the initial and final interviews have been conducted.

I plan to employ Mr. Joe Blow (black male) in this position and am requesting your approval to place him on Salary Schedule C-2, Step 0 at an annual salary of $56,458, effective September 2, 2005.  Mr. Blow's Social Security number is 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

Your consideration is appreciated.

Sincerely,

Linda C. Young
President

al

Approved _____
          Chancellor, Department of Postsecondary Education

c  Ms. Joan Davis

Distribution:  Director of Personnel

GWCC663

76
11/05
Exhibit 26

# SAMPLE

### LETTER TO THE CHANCELLOR
### REQUESTING APPROVAL OF PLACEMENT FOR
### PRIOR HIGH TECH EXPERIENCE
### (SALARY SCHEDULE D-1, ONLY IN SPECIAL CIRCUMSTANCES)

July 15, 2005

Dr. Roy Johnson
Chancellor
Department of Postsecondary Education
Post Office Box 302130
Montgomery, Alabama  36130-2130

Dear Dr  Johnson:

Wallace Community College recently advertised for a Computer Information Science
Instructor, and the initial and final interviews have been conducted

I plan to employ Mr  John Doe (white male) in this position effective August 15, 2005
Based on Mr  Doe's qualifications and his 10 years of high technology experience as a systems
analyst with Synovus, I am requesting your permission to employ him on Salary Schedule D-1,
Rank IA, Step 10 at an annual salary of $56,795  Mr  Doe's Social Security number is 111-20-
3000.  A copy of his resume is enclosed

I will appreciate your favorable consideration of this request

Sincerely,

Linda C  Young
President

al

Approved _____
               Chancellor, Department of Postsecondary Education

Enclosure

c   Ms  Joan Davis

Distribution:  Director of Personnel

GWCC664

77
11/05
Exhibit 27

# SAMPLE

### GEORGE C. WALLACE COMMUNITY COLLEGE
1141 WALLACE DRIVE • DOTHAN, ALABAMA  36303-0943
### CONTRACT OF EMPLOYMENT
(Date Contract Begins)

(Social Security Number)
(Name)

This Employment Agreement is made on (Date), between George C. Wallace Community College, the employer, and (Name), the employee, and conditional upon acceptance hereof by the employee, will confirm the employee's appointment as (Title) at George C. Wallace Community College beginning (Date) and ending (Date)  This written Contract, including those terms specifically included by reference herein, constitutes the entire agreement between the College and Employee.  As determined from your credentials, and in accordance with the current (Salary Schedule, Rank, Step) the total 9-month salary will be ($Amount).

Special terms of appointment:  Rules and regulations of George C. Wallace Community College and the Alabama State Board of Education as they now exist or may hereafter be modified are hereby incorporated into this contract of employment as additional terms and conditions of such employment

This salary will be subject to withholding for (1) state and federal income tax, (2) FICA, (3) Teacher's Retirement, and (4) other authorized optional payroll deductions

Duties and responsibilities of this position, which may be performed on the main campus at Dothan or any location that George C Wallace Community College may now or at any future date offer classes, are subject to applicable rules of the State Board of Education and/or directives of the Chancellor

In the event that this Contract is terminated prior to its stated expiration date, the Employee's salary shall be calculated on a daily rate from the beginning of this respective Contract period, such calculation to be in accordance with applicable rules of the State Board of Education and/or directives of the Chancellor  In the event that an appropriate calculation of the compensation due to the Employee indicates that the Employee has received an overpayment of salary and/or other compensation, the Employee agrees to reimburse the College for such overpayment within thirty (30) calendar days after the actual termination date of this Contract or not later than September 30

Acceptance of this offer of employment and the provisions of this Contract of Employment should be indicated by signing in the space provided and returning the original copy of this Contract to the  Personnel Office within five calendar days of receipt hereof.

BY _____     _____
President, George C  Wallace Community College                              Date

I acknowledge that I have read and understand all provisions of the Contract, and I accept this offer of employment and the provision of the Contract of Employment.

_____     _____
Signature                                                               Date

Budgeted Salary Account # _____

Divide my 9-month contract over 9 or 12 months (Circle one)

Distribution: (1) Employee   (2) Personnel

GWCC665

78
11/05
Exhibit 28

# SAMPLE

**GEORGE C. WALLACE COMMUNITY COLLEGE**
**1141 WALLACE DRIVE • DOTHAN, ALABAMA  36303**
**LETTER OF APPOINTMENT**
(Date Letter of Appointment Begins)

(Social Security Number)
(Name)

It is my pleasure to offer you a probationary appointment to the position of (<u>Title</u>) at George C Wallace Community College

This offer of probationary appointment is made pursuant to the Policies, Procedures, and Regulations Governing Alabama State Community, Junior, and Technical Colleges

By your acceptance of this Letter of Appointment, you agree to perform your duties beginning (<u>Date</u>), unless you are removed from appointment in accordance with the policies of the State Board of Education  As determined from your credentials and in accordance with the current (<u>Salary Schedule, Rank, Step</u>), the annual salary will be (<u>$Amount</u>)

Special terms of appointment: Rules and regulations of George C  Wallace Community College and the Alabama State Board of Education as they now exist or may hereafter be modified are hereby incorporated into this Letter of Appointment as additional terms and conditions of such employment

This salary will be subject to withholding for (1) state and federal income tax, (2) FICA, and (3) Teacher's Retirement, and (4) other authorized optional payroll deductions.

Duties and responsibilities of this position, which may be performed on the Wallace Campus in Dothan or any location that George C  Wallace Community College may now or at any future date offer classes, are subject to applicable rules of the State Board of Education and/or directives of the Chancellor

In the event that this Appointment is terminated prior to its stated expiration date, the Employee's salary shall be calculated on a daily rate from the beginning of this respective period, such calculation to be in accordance with applicable rules of the State Board of Education and/or directives of the Chancellor  In the event that an appropriate calculation of the compensation due to the Employee indicates that the Employee has received an overpayment of salary and/or other compensation, the Employee agrees to reimburse the College for such overpayment within thirty (30) calendar days after the actual termination date or not later than September 30

Acceptance of this offer of employment and the provisions of this Letter of Appointment should be indicated by signing in the space provided and returning the original copy of this letter to the Personnel Office within five calendar days of receipt thereof

BY _____     _____
    President, George C  Wallace Community College         Date

I acknowledge that I have read and understand all provisions of the Letter of Appointment, and I accept this offer of employment and the provisions of the Letter of Appointment

_____     _____
        Signature                  Date

Budgeted Salary Account # _____

Distribution:  (1) Employee (2) Personnel

GWCC666

79
11/05
Exhibit 29

# SAMPLE

### LETTER TO
### APPLICANTS INTERVIEWED BUT NOT SELECTED

July 29, 2005

Ms  Jane Doe
1234 Anywhere Street
Ozark, Alabama  36360

Dear Ms  Doe:

Thank you for the interest you have shown in Wallace Community College by submitting your application for the position of _____.
We realize this search process was very lengthy, and we appreciate your patience

Although another applicant has been selected for the position, we invite you to apply for any future vacancies.  Again, thank you for your interest in Wallace Community College

Sincerely,

(Name), Chair
Search Committee

cb

Distribution:  Director of Personnel

GWCC667

BD
11/05
Exhibit 30

## APPLICANT REPORTING FORM

Name of Position

| LAST NAME | FIRST NAME | RACE | SEX | DATE APPLICATION RECEIVED | COMPLETE APPLICATION PACKET RECEIVED | NO INTERVIEW | INTERVIEW | FINALIST | EMPLOYED |
|-----------|-----------|------|-----|---------------------------|--------------------------------------|--------------|-----------|----------|----------|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Human Resources Officer

Date

GWCC668

B1
11/05

# SECTION VII

# ADDENDUM

GWCC669

82
11/05

# SAMPLE

## LETTER TO REQUEST REORGANIZATION OF POSITIONS

(NOTE: The effective date on the Reorganization of Positions or Lateral Internal Transfer
form will be 30 days from the date it was sent to class counsel.)

Date

Dr Roy Johnson
Chancellor
Alabama Department of
    Postsecondary Education
Post Office Box 302130
Montgomery, Alabama 36130-2130

Dear Dr Johnson:

    I am writing to request your approval of a personnel reorganization at Wallace Community College
(WCC), effective _____(DATE)_____. Currently, _____(NAME), (RACE/GENDER)_____
_____, _____(TITLE)_____ at
WCC is employed on Salary Schedule __(    )__, _____(RANK, GRADE, etc. if applicable)_____,
Step ___(    )__. I am requesting approval to _____(Describe Action)_____

_____    _____
(Salary Schedule, Rank, Step, etc. if applicable) to reflect recent changes in _____(NAME'S)____ job
description and to better meet the needs of WCC.

    My rationale for this request is outlined below, and the required form for REORGANIZATION
OF POSITIONS OR LATERAL INTERNAL TRANSFER and WCC's Organizational Chart are attached

        •
        •
        •
        o

    Dr Johnson, I will appreciate your prompt attention to this request

                    Sincerely,


                    Linda C Young
                    President

pm

Attachments:    Job Description—Current Position and Proposed Position
                Reorganization of Positions or Lateral Internal Transfer
                WCC Organizational Chart

c   Ms Joan Davis

GWCC670

83
11/05

# SAMPLE

## LETTER TO REQUEST LATERAL INTERNAL TRANSFER

Date

Dr. Roy Johnson
Chancellor
Alabama Department of
    Postsecondary Education
Post Office Box 302130
Montgomery, Alabama  36130-2130

Dear Dr Johnson:

    I am writing to request your approval of a lateral internal transfer at Wallace Community College (WCC) to fill the position of_____(TITLE OF POSITION)_____.
Effective _____(DATE)_____, I want to appoint __(NAME), (RACE/GENDER)__
_____ to this position, which will be paid on
Salary Schedule __(  )__, Step __(  )__  All personnel at Wallace Community College on Salary
Schedule __(  )__ were notified of this vacancy and were offered the opportunity to apply, as reflected in
the attached memorandum.  Moreover, WCC obtained the names of potential black and female applicants
from the Department of Postsecondary Education's statewide applicant pool

    The required form for REORGANIZATION OF POSITIONS OR LATERAL INTERNAL
TRANSFER which summarizes my reasons for choosing _____(NAME)_____
and a job description for this position are attached

               Sincerely,


               Linda C  Young
               President

pm

Attachments:  Memorandum
              Reorganization of Positions or Lateral Internal Transfer
              Job Description

c   Ms  Joan Davis

GWCC671

B4
11/05

# REORGANIZATION OF POSITIONS
## OR
## LATERAL INTERNAL TRANSFER

Type of Assignment:    ☐  Lateral Internal Transfer      ☐  Reorganization

Name of Institution_____

Name of Appointee_____

Current Title_____ Race_____ Gender_____

Proposed Title_____

Salary Schedule:   Prior Position_____      Proposed Position_____

Salary:           Prior Position_____      Proposed Position_____

Narrative Description of Proposed Position (List additional duties/responsibilities):

_____
_____
_____
_____

If Appointee has previously been appointed to position(s) as a result of a
Reorganization or Lateral Transfer, describe such appointment(s).

_____
_____
_____

## DOCUMENTATION

### Reorganization

Letter to Chancellor     Date_____    (Exhibit 1)
Approval from Chancellor  Date_____    (Exhibit 2)
Reorganization Effective   Date_____

Summary of Justification for Request:

_____
_____
_____

### Lateral Internal Transfer

Position Posted          Date_____    (Exhibit 3)
Proposal to Chancellor's Office  Date_____    (Exhibit 4)
Appointment Effective     Date_____

Summary of Reasons for President's Choice

_____
_____
_____

Revised 04/30/02

GWCC672

B5
11/05

## NOTIFICATION OF TEMPORARY APPOINTMENT

NAME OF INSTITUTION: _____

POSITION TO BE FILLED: _____

NAME OF PERSON TO BE APPOINTED: _____

RACE: _____    GENDER: _____

EFFECTIVE DATE OF APPOINTMENT: _____

SALARY SCHEDULE: _____    SALARY: _____

JUSTIFICATION FOR TEMPORARY APPOINTMENT:

_____

_____

_____

_____

_____        _____

Signature of President                                        Date

REMINDER:

TEMPORARY APPOINTMENTS MAY NOT EXCEED ONE YEAR IN DURATION.
SHOULD AN EMERGENCY SITUATION ARISE REQUIRING AN EXTENSION OF A
TEMPORARY APPOINTMENT, APPROVAL BY THE CHANCELLOR MUST BE
REQUESTED IN WRITING PRIOR TO THE EXTENSION.

This form is to be submitted prior to the effective date of
the temporary appointment.

Send to:
Division of Legal and Human Resources
Department of Postsecondary Education
Post Office Box 302130
Montgomery, Alabama  36130-2130
or fax to:
334-242-0246

09/01/05

GWCC673

Response No. 11

**EXHIBIT D**

STATE OF ALABAMA)
DALE COUNTY)

### A-F-F-I-D-A-V-I-T

BEFORE ME, the undersigned Notary Public for the State of Alabama at Large, comes Terry L. Schembera, who is known to me, and who being by me first duly sworn, states under oath as follows:

1. My name is Terry L. Schembera. I am a resident of the State of Alabama, am over twenty-one years of age, and am making this statement voluntarily of my own free will and based on my personal knowledge.

2. I hold the position of Speech and Theater Instructor at George C. Wallace Community College in Dothan, Alabama.

3. In my capacity as the Speech and Theater Instructor, I served as the Committee Chair on the Search Committee for this job position and state that neither race nor sex was a consideration in making the recommendations to Dr. Linda C. Young, President for this position.

Further, the Affiant sayeth not.

_____
Affiant

### ACKNOWLEDGEMENT

THE ABOVE AFFIDAVIT was sworn to and subscribed before the undersigned Notary Public on the _13th_ day of _December_, 2006.

_____
Notary Public
State of Alabama at Large
My commission expires: _9-22-07_

DEFENDANT'S
EXHIBIT
31

IN THE UNITED STATED DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DR. RICH EMANUEL,                )
                                 )
    Plaintiff,               )
                                 )
v.                               )    CV-07-819-WKW
                                 )
GEORGE C. WALLACE                )
COMMUNITY COLLEGE,               )
                                 )
    Defendant.               )

### <u>AFFIDAVIT OF TERRY SCHEMBERA</u>

Before me, the undersigned notary public, appeared Terry Schembera and upon

being duly sworn on oath deposed and said as follows:

    My name is Terry Schembera. I am currently a speech and theater
instructor at George Wallace Community College (GWCC) in Dothan,
Alabama. I served on the selection committee that filled a speech instructor
position in 2006. It is the job of the search committee to interview all
minimally qualified applicants and select the top three applicants for a final
interview with the president and her designees. With respect to this
particular position, the only qualified applicants for the position were Jill
Coons, Shatangi Ware, and Richard Emanuel. Since there were only three
qualified applicants, the committee simply passed all three names onto the
next committee and the president. Those names were passed on in
alphabetical order and not ranked in terms of performance. At no time did I
take race or gender into consideration as a participant of the selection
committee. Similarly, I am aware of no instance in which any of the
committee members with which I served took race or gender into
consideration.



Terry Schembera



DEFENDANT'S
EXHIBIT
32

STATE OF ALABAMA )
_Houston_ COUNTY )

I, the undersigned authority, a Notary Public in and for said State and County, hereby certify that Terry Schembera, whose name is signed to the foregoing document and who is known to me, acknowledged before me on this day that being informed of the contents of the foregoing document, he signed the same voluntarily on the day the same bears date.

Given under my hand and official seal this _7th_ day of _July_, 2008.

_Pam Mallory_
Notary Public

IN THE UNITED STATED DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DR. RICH EMANUEL,                        )
                                         )
    Plaintiff,                           )
                                         )
v.                                       )    CV-07-819-WKW
                                         )
GEORGE C. WALLACE                        )
COMMUNITY COLLEGE,                       )
                                         )
    Defendant.                           )

### AFFIDAVIT OF DR. LINDA C. YOUNG

Before me, the undersigned notary public, appeared Dr. Linda C. Young and upon

being duly sworn on oath deposed and said as follows:

My name is Dr. Linda C. Young. I currently serve as the President of
George C. Wallace Community College (GCWCC) in Dothan, Alabama. I
have held that position for 9 years. This affidavit is based upon my own
personal knowledge and in support of our Motion for Summary Judgment.

As President of the college, I have the final decision-making authority
with regard to hiring and firing decisions. I was personally involved in the
decision to hire Shatangi Ware for the speech instructor position advertised
and filled in 2006.

The State Board of Education serves as the board of control for
GCWCC, as well as the other community and technical colleges in the
Alabama Community College System; and the Chancellor of the Alabama
Department of Postsecondary Education serves as the Chief Executive
Officer for the System. All statewide policies that apply to GCWCC are
adopted by the State Board at the recommendation of the Chancellor. The
College's President also has the authority to adopt institutional policies that
are consistent with State Board of Education policies.

The Uniform Guidelines that must be followed by GCWCC were not
issued by GCWCC. It is my understanding that the Guidelines were
adopted by the State Board of Education upon the recommendation of the
Chancellor of the Department of Postsecondary Education.



DEFENDANT'S
EXHIBIT
33
Blumberg No. 5114

In my judgment, Ms. Ware was the best suited candidate for the speech instructor position. I selected Ms. Ware for a number of reasons including her enthusiasm for the subject matter, her obvious concern for students, her record of successful teaching as a part-time instructor at Jeff State Community College, her strong record of involvement in professional development activities, her strong understanding and support for the community college philosophy, her experience with technology, and her overall fit for the institution and position available.

When filling positions at GCWCC, I take into account the entire picture of suitability of a particular candidate for a particular job. There is no one qualification or set of qualifications that necessarily dictates my decision. While certain candidates may have higher qualifications in terms of education or experience than others, sometimes those candidates are not the best suited for the particular position for other reasons.

It is my understanding that Richard Emanuel has accused the college of discriminating against him based upon his race and gender by filling the speech communication instructor position with a black female, Shatangi Ware, instead of Dr. Emanuel, a white male. There were a number of reasons that Ms. Ware was selected over Dr. Emanuel, none of which had anything to do with his race or gender. I was generally more impressed with Ms. Ware's performance in the telephone interview in that she seemed to be the most enthusiastic and appropriate candidate for the job. Her experience as a community college student as well as her recent experience in teaching part time at a community college indicated to me that she would identify well with the student body at the Sparks campus. The position available at GCWCC was a teaching position at the Eufaula-Sparks campus. This is a smaller and more rural campus where a strong connection and identification with the students would greatly increase the effectiveness of the instructor. Dr. Emanuel, while having a Ph.D and extensive experience in the four year and two year college setting, as well as having numerous publications, did not seem to be as good a fit as Ms. Ware in this particular setting. The position did not call for a Ph.D or publication experience.

Moreover, I estimated that employing Dr. Emanuel for this position would have cost approximately $33,000 more than employing Ms. Ware in light of his higher educational attainment and years of experience. Since Ms. Ware seemed to be the more appropriate fit for the position available and much more cost effective for the college in terms of salary, she was, to me, the obvious choice.

Moreover, I also received a phone call from the president of Enterprise-Ozark Community College warning me about employing Dr. Emanuel. Dr. Stafford Thompson, President of Enterprise-Ozark Community College,

telephoned me one day when I was in my office and indicated that employing Dr. Emanuel could be a potential problem for me and the college. This was an interesting phone call to me in that Dr. Thompson and I do not regularly socialize or communicate with one another. Dr. Thompson and I have had some disagreements in the past but have maintained a cordial and professional working relationship. I certainly would not have expected Dr. Thompson to telephone me with a warning about an applicant for a position at GCWCC. The fact that Dr. Thompson called at all alarmed me as to the gravity of the potential problem Dr. Emanuel may pose to the college if hired. Although Dr. Thompson did not elaborate as to the particular nature of the problem, I knew that Dr. Emanuel no longer worked for Enterprise-Ozark Community College. I inferred from Dr. Thompson's comments that Dr. Emanuel had been a problem while working at Enterprise and would likewise be a problem if employed at GCWCC. I certainly do not inherit or hire problems knowingly. It was my judgment, based on my conversation with Dr. Thompson, that hiring Dr. Emanuel would be a mistake and would cause problems for the institution.

Although I do not recall exactly when Dr. Thompson's call came in, it would have been sometime before I made the decision to hire Ms. Ware. My decision not to hire Dr. Emanuel was based on Dr. Thompson's warning that Dr. Emanuel would be a problem, Ms. Ware's overall suitability for the position, and the unnecessary increase in cost Dr. Emanuel's contract would have represented in comparison to Ms. Ware's. My decision to hire Ms. Ware had nothing to do with Dr. Emanuel's race or gender.

Although Dr. Emanuel alleges that some employment practice of the college affected a disparate impact upon him (and white males in general), he has not clearly articulated exactly what employment practice has caused him harm. At all times associated with the filling of the position at issue in this case, I expressly followed the provisions of the Uniform Guidelines and applicable procedures of the two year college system. The procedures for appointing fulltime salary B, C, and D-1 personnel were followed. Those guidelines are attached hereto as Exhibit A. The advertisement for the position was posted in accordance with the procedures. Further, a search committee was appointed in accordance with the Uniform Guidelines requiring 50% female and 40% black composition on the committee. In addition to the initial search committee, I also utilized a final interview committee comprised of two males and one female. Finally, I conducted a final interview of all of the applicants by telephone.

It is my understanding that Dr. Emanuel claims that the college's adherence to the Uniform Guidelines has caused a disparate impact on both him and white males in general. He claims that white males are underrepresented on the salary D scale in comparison to the appropriate applicant pool. It is my understanding that Dr. Emanuel claims that the

appropriate applicant pool is derived from the United States Census Bureau. The applicant pool urged by Dr. Emanuel is constrained to only those individuals who have attained a master's degree or higher. Dr. Emanuel seems to be under the impression that the applicant pool on the salary D schedule is limited to only individuals with a master's degree or higher. That is incorrect. There are positions on the salary D schedule filled by technical instructors who are not required to have a master's degree. Therefore, the applicant pool urged by Dr. Emanuel is flawed in that it fails to take into account individuals who have not attained a master's degree but are still eligible to be employed on the salary D schedule as technical or vocational instructors. Since GCWCC is a community college, the technical division routinely hires instructors without master's degrees.

Additionally, Dr. Emanuel assumes that the relevant labor pool is based upon the national census. The college is not required to advertise its positions nationally. In fact, in the present case, the college advertised in accordance with procedures for appointing fulltime salary schedule D personnel in a daily or weekly newspaper in the college service area, a daily newspaper with regional or statewide coverage, and in the other required media that may or may not have national circulation or attention. Therefore, Dr. Emanuel's assumption that the relevant labor pool is national in its scope, rather than regional or statewide, is also incorrect.

Although the Uniform Guidelines have adopted many provisions of the Shuford/Johnson/Kennedy Consent decrees, the guidelines do not require "quota" hiring. In other words, there is no firm requirement that the college employ a particular number or percentage of blacks or females. Instead, the decree expressly states that it, "shall not be construed to require the defendants or any of the colleges to hire or promote any person, regardless of race, who is not qualified for the position in question, or to preclude them from hiring or promoting the best qualified applicant regardless of race." (Shuford Decree, p. 8). It is both my practice and the practice of the faculty and staff serving under me never to take race or gender into consideration in the hiring process. Guidelines 601.01, 601.02, and 601.04 also prohibit discrimination based on race and sex. All individuals participating in the selection committees are provided with "Legal Areas of Inquiry in Interviewing and Reviewing Employment Applications." (See Exhibit B). That document specifically provides that the committee is not to make any inquiry indicating race or color or to ask any applicant any inquiry that would indicate sex, unless specifically job related. The only appropriate statement to be made by the committee with regard to race and sex is to indicate to the applicant that the institution is an equal opportunity employer. (See Exhibit B).

Although the Shuford/Johnson/Kennedy Consent decrees provided certain goals for the two year college system with respect to the employment

of blacks, females, and black females, those goals were never mandatory. There has never been any sanction against me or GCWCC for failing to attain any of the goals in the Shuford decrees. It is my understanding that the college has never achieved its goals with respect to the hiring of black females. (See Exhibit C—Shuford Reports). The college has never been sanctioned, disciplined, or penalized in any way for the failure to meet the goals. I have been under no pressure and felt no obligation to take race or gender into consideration in the hiring process. It is not my understanding that the Shuford decrees or the uniform guidelines require that I take race or gender into consideration during the hiring process. I did not take race or gender into consideration when hiring Ms. Ware.

Dr. Linda C. Young
President George C. Wallace
Community College

STATE OF ALABAMA     )
                     )
_Houston_ COUNTY     )

    I, the undersigned authority, a Notary Public in and for said State and County, hereby certify that <u>Dr. Linda C. Young</u>, whose name is signed to the foregoing document and who is known to me, acknowledged before me on this day that being informed of the contents of the foregoing document, has signed the same voluntarily on the day the same bears date.

    Given under my hand and official seal this _7th_ day of ___July___, 2008.

_____
Notary Public

Sunday, April 23, 2006

## 27 Drivers

**Circle City Transports**
Dothan, AL
wers, in today's mar
ret, you can have a
choice with our new
bonus program. More
money, within our bene
fit program. You can
save BC/BS ins., or
more per miles - you
choose. Time on road
14 days or 18 days-
your choice.
Call 800-219-8678
ext. 238 or 240

**DRIVERS**
$2,000 Sign-on
for Student Drivers
after 6 wks O/T
start at .29 cpm
Tuition assistance
Need help finding a
job?
Call
800-569-9232

**Drivers**
$3500 MONTHLY
Independent
Contractors Needed
For Auto Parts
Delivery out of
Dothan, Al. Must
trucks needed,
Home daily.
334-685-1170.

Drivers About the Money
$4000 Sign-On
Bonus
Home most weekends
HOGAN VAN
EOE CDL A 800-444-6042

Drivers:
**Offering Every
Weekend Home
High $$$ Pay**
Call for program details
today!

800-247-2862 ext. 1
No CDL? We can Help!
Call 800-247-2862, ext. 3
www.tmctrans.com

**DRIVER TRAINEES
NEEDED NOW! No
experience required.**
Werner Enterprises has
immediate openings
for entry-level semi
drivers. Our avg. driv-
ers earn more than
$35K first year, 60% of
our drivers get home
monthly/weekly. 15-day
CDL training available
in your area.
Call today
1-866-280-5309

Driver
**VAN & FLATBED
OWNER OPERATORS!**
Dedicated O/R
Orientation
Reimbursement &
100% Fuel Surcharge
3x weekly settlements
Trailers Available
Lease Purchase
Available
800-715-2778
www.driveforcrst.com

## 227 Drivers

Drivers

**Here's Your Chance-
Own a Truck with
No Money Down**

After purchasing hun-
dreds of new trucks for
our fleet, J.B. Hunt now
has late-model, fully
inspected Freightliner
conventionals avail-
able for our lease-pur-
chase program. These
by your name - not a
number.
GIVE US A TRY!!

## 228 Education

Teachers and Tutors
Needed. $17.50-25/hr.
PT, your own schedule,
Must be cert./licensed
teacher, or hold 4-year
degree. Apply online
www.a1ortutoring.com

## 228 Education

**Henry County
BOARD OF
EDUCATION**
VACANCY
ANNOUNCEMENT
FOR THE 2006-2007
SCHOOL YEAR

1. A. Description of
Positions Available:
Secondary Math
Teachers
(multiple locations)
Certapplication Contacts
678-6262,
e-mail dothang-
wallstaff.net
apply on-line
www.wallstaff.net

**CABINET MAKER**
Busy shop needs
exp. Cabinet Maker
Competitive pay
& benefits.
Call 334-794-6297.

---

**STAFF ACCOUNTANT**
SunSouth Bank - Dothan has an outstanding
career opportunity for an Accountant
Qualifications include a 4 year degree
with a major in Accounting or
Finance. Bank experience preferred. We offer
a competitive salary and an excellent
benefit package.

Please send resume to:
SunSouth Bank
Human Resources
108 Jamestown Blvd.
Dothan, AL 36301

---



**NOW HIRING
At Cracker Barrel**

**Waiters & Waitresses
Full & Part Time**

**Night & Weekend
Shifts Available**

Paid Vacations • 401(k) Plan

Advancement Opportunities

**Please Apply In Person**


Cracker Barrel
Old Country Store
3431 Ross Clark Circle
Dothan, AL

WHT2 RMW 371813-032206

---



**CAPPS COLLEGE**
"The Medical Career Training Specialists"
In less than a year, you can train for an exciting,
rewarding medical career:

**Medical
Assistant**
• 4-Day School Week
• Day or Evening Classes
• Hands On Training
• Job Placement & Financial Assistance

**Be In Demand!**

www.medcareers.net
Call Today!
1-888-461-6179
200 Vulcan Way • Dothan, AL

## 236 General Help Wanted

**ASSISTANT
MANAGER & CSR**
The Dothan branch of
World Finance
has an immediate
opening for the
position of
Assistant Manager
Manager Trainee &
CSR. This is an entry
level position that
does not require any
experience. We will
train. Possible
promotion to Manager
within 12-18 months.
including product knowledge and sales skills
and the ability to relate professionally with
clients and colleagues alike. Series 7 and 63
securities licenses, resident life and health
insurance licenses, and a commitment to
succeed through the successes of
others are required.

Your resume and cover letter will start
the dialogue.

Contact:
D. Jeffrey Bentley
PrimeVest Financial Services Inc
1000 Hwy. 231
Troy, AL 36081
334-807-5139
800-433-4087
Fax: 334-807-5200

## 236 General Help Wanted

Comfort Systems,
USA - Southeast
now hiring
HVAC Service
Technicians!

What we offer:
• Competitive Pay
• Profit Sharing
• 401K w/ matching
• Medical & Dental
• Other Insurance
• Vacation & Holidays
• Salary-Oriented
Company

If you possess skills
and experience, send
your resume now!

---

**WALLACE
COMMUNITY COLLEGE**

**SPEECH INSTRUCTOR**

Start Date:
August 14, 2006

The instructor position will be
based initially at the
Sparks Campus in Eufaula.

**QUALIFICATIONS:** Required: Master's
degree from a regionally accredited in-
stitution with 18 graduate semester
hours or 27 graduate quarter hours in
speech, speech communication, com-
munication studies, communication
arts, or communication management.
Preferred: Additional 18 graduate se-
mester hours or 27 graduate quarter
hours in another discipline taught at
the College. Teaching experience in a
community college. Demonstrated ex-
perience in integrating technological
innovations into the curriculum, includ-
ing, but not limited to, web-based
teaching. Experience in producing and
directing student drama activities.
Experience in coaching student teams
for speech and/or debate competition.

**SALARY:** Based on education and expe-
rience commensurate with Salary
Schedule D-1 for 9 months (range:
$33,891 - $65,071) or 12 months (range:
$44,855 - $85,188). Summer term is
customary but not guaranteed.

**APPLICATION DEADLINE/PROCEDURE:**
A complete application file must be re-
ceived in the Office of Personnel no lat-
er than 1:00 p.m. on Friday, June 9,
2006. A complete application file con-
sists of a Wallace Community College
employment application with three
work references; resume; documenta-
tion (from current and/or former em-
ployers) verifying employment experi-
ence (if applicable); a letter describing
specifically how your experience and
qualifications meet the qualifications
outlined for the position; and individual
transcripts from each college attended
(photocopies of transcripts will suffice
until employed). Must meet eligibility
requirements to work in the U.S. at the
time of appointment. All application
materials should be submitted as a
complete package. Applicants who fail
to submit all required information will
be disqualified. Only applications
received during the period of this an-
nouncement will be considered.
Applications are available from and
should be submitted to:

Office of Personnel
ATTN:2005-D6:13
Wallace Community College
1141 Wallace Drive
Dothan, AL 36303-0943
(334) 556-2425

Wallace Community College is an Equal Opportu-
nity Employer and complies with the Americans
with Disabilities Act. As required by the uni-
form Guidelines, Wallace Community College is
seeking applications in particular from black
persons and women, including black women.

DEFENDANT'S
EXHIBIT
35
Blumberg No. 5114

APR 2 5 2006

## STATEMENT TO THE SEARCH FILE FOR
## SPEECH INSTRUCTOR

On June 22, 2006, Mr. Woodrow Farrington, Ms. Paula Mims, and Mr. John Fergus interviewed the three finalists recommended by the Search Committee for Speech Instructor. I interviewed these candidates on June 30, 2006:

Ms. Jill Coons (white female)
Dr. Richard Emanuel (white male)
Ms. Shatangi Ware (black female)

I selected Ms. Ware as the top candidate for the following reasons:

➢ She has an obvious enthusiasm for her discipline.
➢ She has an obvious concern for students and the teaching and learning process.
➢ She has a record of successful teaching in the courses to be taught.
➢ She has a strong record of involvement in professional development activities in her discipline, including presentations to the Southern States Communication Association.
➢ She demonstrates strong understanding of and support for the community college philosophy.
➢ She has experience with technology in her discipline, including the use of WebCT and the Internet.
➢ Ms. Ware's qualifications seemed to be the best match for the needs of the institution.

Linda C. Young, President
July 17, 2006

DEFENDANT'S
EXHIBIT
34
Blumberg No. 5114

1

```
1        IN THE UNITED STATES DISTRICT COURT
2         FOR THE MIDDLE DISTRICT OF ALABAMA
3                SOUTHERN DIVISION
4
5    DR. RICH EMANUEL,         )
6           PLAINTIFF,         )
7    V                         ) CIVIL ACTION NO
8    GEORGE C. WALLACE         ) 2:07-cv-00819-WKW
9    COMMUNITY COLLEGE,        )
10           DEFENDANT         )
11
12          S T I P U L A T I O N
13       IT IS STIPULATED AND AGREED, by
14   and between the parties, through their
15   respective counsel, that the deposition of
16   DR. LINDA C YOUNG, may be taken before
17   Deborah Pudles Schaffer, Commissioner and
18   Notary Public, at the law offices of
19   Gidiere, Hinton, Herndon & Christman,
20   Montgomery, Alabama, on the 13th day
21   of June, 2008, commencing at 9:55 a.m.
22       IT IS FURTHER STIPULATED AND AGREED
23   that the signature to and reading of the
```

3

```
1
2                I N D E X
3    EXAMINATION BY              PAGE NO
4    Mr. Porter                  6 - 216
5
6
7              INDEX OF EXHIBITS
8    PX-1                        40
9    PX-2                        43
10   PX-3                        51
11   PX-4                        58
12   PX-5                        62
13   PX-6                        65
14   PX-7                        67
15   PX-8                        69
16   PX-9                        81
17   PX-10 and PX-11             87
18   PX-12                       88
19   PX-13                       90
20   PX-14                       106
21   PX-15                       144
22   PX-16                       165
23       INDEX OF EXHIBITS CONTINUED
```

2

```
1    deposition by the witness is waived, the
2    deposition to have the same force and effect
3    as if full compliance had been had with all
4    laws and rules of Court relating to the
5    taking of depositions.
6        IT IS FURTHER STIPULATED AND AGREED
7    that it shall not be necessary for any
8    objections to be made by counsel to any
9    questions, except as to form or leading
10   questions, and that counsel for the parties
11   may make objections and assign grounds at
12   the time of trial or at the time said
13   deposition is offered in evidence, or prior
14   thereto
15       IT IS FURTHER STIPULATED AND AGREED
16   that notice of filing of the deposition by
17   the Commissioner is waived
18
19
20
21
22
23
```

4

```
1                              PAGE NO.
2    PX-17                     184
3    PX-18                     188
4    PX-19                     209
5    PX-20                     212
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

5

```
 1
 2    BEFORE:
 3         Deborah Pudles Schaffer,
 4    Commissioner.
 5
 6    APPEARANCES:
 7         Adam M. Porter, Esquire, 2301 Morris
 8    Avenue, Suite 102, Birmingham, Alabama,
 9    35203, appearing on behalf of the Plaintiff.
10         Andrew W. Christman, Esquire, of the
11    firm Gidiere, Hinton, Herndon & Christman,
12    60 Commerce Street, Suite 904, Montgomery,
13    Alabama, 36104, appearing on behalf of the
14    Defendant.
15         Also present:  Dr. Rich Emanuel
16
17
18
19
20
21
22
23
```

6

```
 1         I, Deborah Pudles Schaffer, a court
 2    reporter acting as Notary Public, State of
 3    Alabama at Large, certify that on this date,
 4    as provided by Rule 30 of the Alabama Rules
 5    of Civil Procedure, and the foregoing
 6    stipulation of counsel, there came before
 7    me at the law offices of Gidiere, Hinton,
 8    Herndon & Christman, 60 Commerce Street,
 9    Suite 904, Montgomery, Alabama, beginning at
10    9:55 a.m., DR. LINDA C. YOUNG, witness in
11    the above cause, for oral examination,
12    whereupon the following proceedings were
13    had:
14
15         THE COURT REPORTER:  Usual
16    stipulations?
17         MR. CHRISTMAN:  Yes.
18
19              LINDA C. YOUNG,
20    being first duly sworn, was examined and
21    testified as follows:
22
23    EXAMINATION BY MR. PORTER:
```

7

```
 1    Q         Good morning, Dr. Young.  My name is
 2    Adam Porter.  I represent Dr. Emanuel in his
 3    lawsuit against the George Wallace Community
 4    College.
 5              Have you ever given a deposition
 6    before?
 7    A         I have on the phone.
 8    Q         On the phone?  Okay.  Well, let me
 9    give you some ground rules we'll have today.
10    First is that you need to verbalize all your
11    answers and try not to say uh-huh or huh-uh,
12    stick with yes or no.
13              If you would, let me completely
14    finish my question before you begin your
15    answer so that we don't talk over each other
16    and I'll try to do the same.
17              If you don't understand a question
18    that I ask, please let me know and I will
19    repeat it or try to rephrase it.  If you
20    answer my question, I'll assume that you
21    understood it; is that fair?
22    A         Yes.
23    Q         Okay.  Are you on any medication
```

8

```
 1    today that might prevent you from
 2    understanding my questions or giving
 3    accurate answers to my questions?
 4    A         No.
 5    Q         Okay.  If you need to take a break at
 6    any time, let me know and we'll do that,
 7    we'll probably be here a few hours, but if
 8    there's a question on the table, I would ask
 9    that you answer that before we take the
10    break, okay?
11    A         Okay.
12    Q         Can I have your home address, please?
13    A         204 Partridge Lane, Dothan, Alabama,
14    36303.
15    Q         And are you married?
16    A         No.
17    Q         Are you from the Dothan area?
18    A         From Elba originally.
19    Q         Where is Elba?  I've heard of it, but
20    what county is that in?
21    A         Coffee.
22    Q         Okay.  That's southeast?
23    A         Southeast, Alabama.
```

9

```
1    Q     Yeah.  Do you have much family in
2    Alabama?
3    A     I have a brother, a niece. and her
4    husband
5    Q     What's your brother's name?
6    A     J. W. Coon.
7    Q     C-o-o-n?
8    A     Yes.
9    Q     Your niece?
10   A     Cindy Cobb
11   Q     And did you say a cousin?
12   A     Well, her husband. Allen Cobb.
13   Q     Okay.  Is that it?
14   A     Yes.
15   Q     Those are the, those are the only
16   adult relatives that you have in Alabama?
17   A     Well, when you say relatives, what do
18   you mean?
19   Q     Cousins?
20   A     No. I have other cousins.
21   Q     How many?
22   A     Um --
23   Q     Well, just tell me -- what are their
```

11

```
1    A     Wallace Community College and Sparks
2    Technical College were merged in 1999 to
3    become Wallace Community College
4    Q     Okay.  I've noticed. I've seen in
5    different places you have like Wallace
6    Community College, dash, Dothan or Wallace
7    Community College. dash, Hanceville, are
8    those separate entities?
9    A     They are
10   Q     Okay   Well, in the lawsuit we've
11   named the defendant as George C. Wallace
12   Community College, is that an accurate name
13   for your employer?
14   A     Yes. but the official name has
15   Dothan.
16   Q     Okay.
17   A     Because there are three Wallace
18   Community Colleges in the state.
19   Q     Dothan and Hanceville?
20   A     And Selma and then Lurleen Wallace
21   Community College which is in Andalusia is
22   its base.
23   Q     Okay.  I'm not that familiar with the
```

10

```
1    last names?
2    A     Daugherty
3    Q     Is D-a-u-g-h-e-r-t-y?
4    A     Yes.
5    Q     Okay.  Anybody else?
6    A     No.
7    Q     Okay   And tell me your present
8    position?
9    A     President. Wallace Community College,
10   Dothan.
11   Q     How long have you been in that
12   position?
13   A     I've been in the position of the
14   merged institution Wallace Community College
15   for nine years.
16   Q     Okay.
17   A     Prior to that. I was president of
18   Sparks Technical College which became a part
19   of Wallace Community College for eleven
20   years, so a total of twenty years together.
21   Q     You said the college merged?
22   A     Yes.
23   Q     With whom?
```

12

```
1    two-year structure.  Do you have like a
2    board of trustees for your college?
3    A     The board of trustees for Wallace
4    Community College, Dothan, is the State
5    Board of Education --
6    Q     Okay
7    A     -- and that is the board for all of
8    the community colleges.
9    Q     For everybody?
10   A     Right.
11   Q     So the different institutions don't
12   have their own boards?
13   A     No.  They may have foundation boards
14   but they're not governing boards.
15   Q     So you're governed by the Department
16   of Education?
17   A     No.  I'm governed by the Department
18   of Postsecondary Education.
19   Q     Right. I'm sorry.  And how many
20   different campuses does Wallace Community
21   College. Dothan, have?
22   A     We have two campuses we call it and
23   one center and then two sites.
```

13

```
1    Q       Is Dothan one of the campuses?
2    A       I have Dothan.  We have Eufaula.  We
3    have a center at Fort Rucker and then we do
4    training in the two prisons in Barbour
5    County.
6    Q       Are those the two sites?
7    A       Yes.  One is in Clayton and one is
8    Clio.
9    Q       Now, the center at Fort Rucker, I
10   assume that's a lesser facility than the
11   campuses?
12   A       Well, it has fewer programs.
13   Q       Okay.  Does the Dothan campus have
14   the same programs as the Eufaula campus?
15   A       It has some of the same programs, but
16   not all of them are the same.
17   Q       And the position that we're here
18   about today, that was for the Eufaula
19   campus?
20   A       Yes.
21   Q       Okay.  About how many students are at
22   that campus?
23   A       About 30 percent of our enrollment is
```

14

```
1    at the Eufaula campus.  Usually, it runs
2    around 400 to 500 students, that's an
3    estimate.
4    Q       And are there faculty working or
5    teaching classes at the Eufaula campuses
6    expected to also teach at the Dothan campus?
7    A       They can.  They are expected to teach
8    there if they're needed to teach.
9    Q       Okay.  What is your educational
10   background?
11   A       I have an associates in arts degree
12   from Enterprise Junior College, a bachelor's
13   degree from Troy University.
14   Q       In what?
15   A       Business education.
16   Q       Okay.
17   A       I have a master's from Troy.
18   Q       In what?
19   A       Foundations of education.
20   Q       What does that mean?
21   A       It's basically an education degree.
22   Q       Okay.
23   A       And then a doctorate in vocational
```

15

```
1    and adult education from Auburn with a minor
2    work in education administration.
3    Q       So that's vocational and adult?
4    A       And adult.
5    Q       Those are two components?
6    A       Right.  Together.  I mean, vocational
7    and adult, it's together.
8    Q       Okay.  It's not vocational education
9    and then adult education is something
10   different?
11   A       No.  It's together, vocational and
12   adult education.
13   Q       And when did you get your Ph.D.?
14   A       1982 and it's Ed.D.
15   Q       What's that?
16   A       Doctorate of education.
17   Q       Oh, it's not a Ph.D.?
18   A       No.
19   Q       But it's a doctoral degree, though,
20   right?
21   A       It is.
22   Q       And what was your first job after you
23   got that Ed.D?
```

16

```
1    A       I was working while I got the
2    doctorate at Enterprise Junior College.
3    Q       Who was the president there?
4    A       When I got my doctorate or while I
5    was working here?
6    Q       While you were working there.
7    A       I, when I was employed there, Mr. B.
8    A. Forrester was the president.
9    Q       Okay.
10   A       And then Dr. Joe Talmage became
11   president.  I worked there thirteen years.
12   Q       At Enterprise?
13   A       At Enterprise.
14   Q       In what capacity?
15   A       Several things.  I taught business.
16   I was director of the career programs.  The,
17   Enterprise does not have technical programs,
18   but they have short-term or when I say
19   short-term, that's not the correct term,
20   they have one-year programs like child
21   development, insurance, real estate, or they
22   did at that time, I'm not sure what they
23   have now, but they're not technical in
```

17

1    nature but they're more vocational in nature
2    and so I worked with those programs.
3        I set up the career development
4    center, so I was director of that center
5    which is still there, I assume, and then I
6    was dean of development at the end of my
7    time there.
8    Q    What is dean of development?
9    A    Working on, set up a foundation,
10   worked on resource development, fundraising.
11   Q    Okay. And so what did you do when
12   you left there?
13   A    I worked in a chancellor's office in
14   Montgomery on a leave of absence from
15   Enterprise for three years.
16   Q    And what did you do there?
17   A    I was executive assistant to the
18   chancellor.
19   Q    Who was the chancellor then?
20   A    Charles Payne.
21   Q    Okay. And what did you do after
22   that?
23   A    Went to Lurleen B. Wallace Junior

18

1    College at the time as dean of academic
2    affairs.
3    Q    Where is that located?
4    A    Andalusia.
5    Q    And how long were you in that
6    position?
7    A    About six months.
8    Q    And then what did you do?
9    A    Went to Sparks State Technical
10   College as president.
11   Q    And that's the Eufaula campus now?
12   A    Yes.
13   Q    How long were you the president at
14   Sparks State?
15   A    Eleven years before the merger.
16   Q    Okay. And then you also became the
17   president at Wallace?
18   A    In 1999 when the institutions were
19   merged, Sparks and Wallace were merged in
20   1999, so I became the president of the
21   merged institution.
22   Q    And that's Wallace Community College,
23   Dothan?

19

1    A    Wallace Community College, Dothan.
2    which encompasses Eufaula and Dothan.
3    Q    Now. tell me about the decrees that
4    were in place that affected hiring
5    decisions. Let's start with the beginning
6    in 1999. Was there anything in effect at
7    that time?
8    A    Not, not in 1999.
9    Q    When did the first decree come in
10   play?
11   A    I believe it was in 2000, Shuford was
12   the first one and I believe it was in 2002.
13   I may not have the year right, but in the
14   early 2000s.
15   Q    And, and when, what were the --
16   generally speaking, the dictates of that
17   decree?
18   A    The dictates were that we had a, the
19   requirements were that we had a committee
20   composed of 50 percent black -- excuse me,
21   50 percent female and 40 percent black who
22   would interview the applicants who met
23   minimum qualification. The committee was

20

1    appointed by the president and --
2    Q    The president of what?
3    A    The president of the college, and the
4    committee would, would interview those who
5    met minimum qualification and they would go
6    through the -- first of all, let me back
7    up.
8        The, when, when there's a position,
9    the position is advertised and it has to be
10   advertised, it had to be advertised in at
11   least one regional newspaper and one daily
12   paper for a minimum, I believe, of fourteen
13   days and also. I don't remember in the
14   beginning if there was the applicant pool, I
15   believe that came about at a later time, but
16   also the president and/or a designee had to
17   attend, had to visit a historically black
18   college or university.
19       The position announcement had to be
20   mailed to the historically black colleges
21   and universities when you had a vacancy.
22       In other words, it had to be widely
23   disseminated, the announcement, by a variety

21

```
 1   of means
 2   Q      And did this involve all positions,
 3   faculty, maintenance, you know, the gamut?
 4   A      The full-time position.
 5   Q      All full-time positions?
 6   A      Yes.  Okay.  Then the president
 7   appointed the committee which had to be 50
 8   percent female and 40 percent black.
 9   Q      Let me interrupt you there.  You say
10   the president, you mean the president for
11   each college?
12   A      Yes.
13   Q      Okay.  How many are there?
14   A      You mean at present?
15   Q      Yeah.
16   A      Or at that time?
17   Q      At present.
18   A      At present I believe there are 25 --
19   Q      How many were there --
20   A      -- or 26.
21   Q      How many were there at that time?
22   A      I couldn't tell you because it's
23   varied from year to year because mergers
```

22

```
 1   have occurred during each period of time so
 2   it's varied from one year to the next
 3   because when there's a merger, see, you put
 4   them together which decreases the number.
 5   At one time there were 42.
 6   Q      Okay.  And you said the president had
 7   to, to get a group of, what, you said 40
 8   people?  You said some number of people that
 9   had to be --
10   A      A president, president appoints a
11   committee to interview the applicant.
12   Q      Okay.
13   A      That committee must be composed of 50
14   percent female and 40 percent black.
15   Q      How many people are on that
16   committee?
17   A      You can -- the number is not
18   determined.  It can be up to the president,
19   but ever how many people you have on the
20   committee, it has to be, the number has to
21   be 50 percent female and 40 percent black.
22   Q      And I understand first there's a
23   larger group that screens people; is that
```

23

```
 1   right?
 2   A      No.
 3   Q      Okay.  Well -- okay.  Go ahead.
 4   We'll get into that later.
 5   A      Okay.  So they go through --
 6          MR. CHRISTMAN:  What's the question
 7   at this point?
 8          MR. PORTER:  She was telling me about
 9   the dictates of the Shuford decree.
10          MR. CHRISTMAN:  Okay.
11          THE WITNESS:  So the committee
12   inter -- reviews the applications.  They
13   interview those who meet minimum
14   qualification and then they recommend three
15   in alphabetical order to the president and
16   the president and a designee, and/or
17   designees would inter-, do the final
18   interviews and the president makes the
19   selection.
20   Q      (BY MR. PORTER:)  Did the -- so the
21   committee would submit a list of three to
22   the president; is that right?
23   A      Yes.
```

24

```
 1   Q      Did the committee rank the
 2   candidates?
 3   A      No.  They must be submitted in
 4   Alphabetical order.
 5   Q      Okay.  Did race or gender play any
 6   role in committee's decision?
 7   A      Should not.
 8   Q      Okay.
 9   A      No.
10   Q      So the only way that, what I've heard
11   so far, that race or gender has any role in
12   this is that you've got to have -- what did
13   you say, 50 percent female and 40 percent
14   African-American on the committee?
15   A      Yes.
16   Q      So the makeup of the committee has
17   some requirements with regard to who can be
18   on there, but you're saying there is no
19   racial or gender consideration to give to
20   the applicants?
21   A      No.
22   Q      Okay.  So it's not an affirmative
23   action type situation?
```

25

```
1   A       No.
2   Q       Okay.  All right.  Go ahead.  How
3   does it go after that?
4   A       Then the president justifies in
5   writing his or her choice as to why that
6   choice was made.
7   Q       Now -- and we'll look at some
8   documents a little bit later. but I've seen
9   goals for your college and I assume all the
10  other colleges have goals of certain
11  representation by minorities. are you saying
12  that Shuford had a requirement as to who
13  serves on the section committee with regard
14  to race and gender and goals of selection of
15  minority candidates. but those are the only
16  two areas where race or gender was a
17  criteria?
18  A       In the Shuford -- I'm not sure I
19  understand the question.
20  Q       Well. let me ask you this.  Were you
21  ever told or given any information as to how
22  you were supposed to bring up the
23  representation of minorities in the hiring
```

26

```
1   process?
2   A       No.  We were given the goals and we
3   were given the Shuford consent decree.
4   Q       Okay.   But there was nothing in the
5   Shuford consent decree that said to give any
6   consideration to the applicants' race or
7   gender in assessing him or her for the job?
8   A       No.
9   Q       Was there any ramification to the
10  college if the goals were not met regarding
11  representation of hiring of
12  African-Americans and females?
13  A       No.  We were monitored.  A monitor
14  was sent to the college and I can only
15  remember and find two times that we were
16  monitored in which a person came and looked
17  at the files and I can only find a letter or
18  two from Dr. Gainous who was chancellor at
19  the time who said your goals for these
20  different salary schedules are thus and such
21  and you have achieved thus and such
22  percentages toward these goals.  We
23  recommend that you continue to work toward
```

27

```
1   these goals, that was the extent of it.
2           There was a statement urging us to
3   work toward the goals, that was the extent
4   of it.  There was nothing, there were never
5   any ramifications or any punishment or any.
6   anything that was, I guess, anything done to
7   us for lack of a better word if we didn't
8   meet the goals.
9   Q       Was there any, any reward for making
10  the goals?
11  A       No.
12  Q       Did you feel that it was your
13  obligation to try to reach the goals?
14  A       I felt that we were under the Shuford
15  consent decree and we needed to follow the
16  consent decree, but I did not employ anyone
17  based on race or gender ever.
18          I followed the process and I have
19  never instructed anyone to employ anyone
20  based on race or gender. we follow the
21  process.
22  Q       Did the, did the decree provide for
23  the goals or do the goals come from
```

28

```
1   somewhere else?
2   A       The goals were a part of the decree.
3   Q       Okay.  And so did you think it was
4   your job to try to implement the decree in
5   reaching the goal set forth in the decree?
6   A       Well, we were under the decree, but,
7   and we had these goals, but I was. I've
8   never employed anyone based on race or
9   gender to meet those goals.
10  Q       I'm not --
11  A       I mean, I knew we were under a
12  decree, but I was going to follow the
13  process and have a fair process.
14  Q       I'm not asking about that.  I'm
15  asking you generally speaking is if you felt
16  that it was your job to reach those goals
17  for your school?
18  A       I felt it was my job to follow a fair
19  process in the employment process to be fair
20  to everyone who applied.
21  Q       Okay.
22  A       And if we reached the goals. that was
23  great.
```

29

```
1   Q     So are you saying that you felt no
2   obligation to try to reach the goals?
3   A     Not, not -- I was going to follow the
4   fair process and if we reached the goals
5   that was great, but I would not, I would not
6   try to reach the goals and have an unfair
7   process in the employment process
8   Q     Since the decree was issued, how many
9   hiring decisions have you made?
10  A     I don't know
11  Q     More than twenty?
12  A     Yes.
13  Q     Have you ever had a situation where
14  you came down -- is it always three
15  candidates that are given to you?
16  A     Yes.
17  Q     Have you ever had --
18  A     Well, excuse me, that's not correct.
19  Q     Okay.
20  A     If there are not three qualified
21  candidates, you can receive two
22  Q     Have you ever had a situation where
23  you had two candidates whose qualifications
```

31

```
1         MR. CHRISTMAN:  Well, I'm going to
2   object to that question, in fact, in that I
3   don't think it's a fair question to be
4   answered with a yes or no answer.  She's
5   already told you that she would meet the
6   goals if she could but not violate the
7   process
8         MR. PORTER:  And I think I said
9   assume that I'm not asking you to violate
10  any process or violate any other regulations
11  or rules.
12  Q     (BY MR. PORTER:)  In other words, I'm
13  not asking you did you think that you should
14  meet, meet the goals at any cost and, you
15  know, through any means, I'm not asking you
16  that, I'm just asking you generally did you
17  think that it was your obligation to try to
18  see the goals met consistent with what, the
19  way you think the rules and regulations
20  should be applied?
21  A     I thought it was an obligation
22  because we were under a consent decree.
23  Q     Okay
```

30

```
1   and general skills and abilities left you
2   with the feeling that it was a tie, that you
3   couldn't decide which one was better?
4   A     I don't remember that
5   Q     That's never happened to you?
6   A     No.
7   Q     Okay.  Now, I'm not, I want you to
8   assume, I'm going to go ask you this
9   question again and assume that I'm not
10  asking you to violate any other policy, I'm
11  just asking you generally did you feel it
12  was your responsibility to try to see the
13  goals met?
14        MR. CHRISTMAN:  Object to form.  You
15  can answer if you can.
16        THE WITNESS:  I knew we were under
17  the consent decree, but I was going to
18  follow the process in a fair --
19  Q     (BY MR. PORTER:)  I'm going to have
20  to interrupt you, that's not my question
21  It's a simple question.  Did you think that
22  it was your responsibility to see the goals
23  were met or not?  Yes or no
```

32

```
1   A     But I'm going, I am not going to say
2   yes or no to that question because I'm going
3   to tell you that I followed the process
4   fairly and I did not consider race and
5   gender in making a decision.
6   Q     Never?
7   A     Never.
8   Q     Did, did anybody, other than in this
9   case, allege that you discriminated against
10  somebody on the basis of race in an
11  employment setting?
12        MR. CHRISTMAN:  Object to form.
13        THE WITNESS:  I cannot remember off
14  the top of my head, but I'm sure we've had a
15  case or two in twenty years.
16  Q     (BY MR. PORTER:)  What about sex,
17  can you recall anybody making an allegation
18  of discrimination on the basis of sex
19  against you?
20  A     Probably, but I can't remember off
21  the top of my head.
22  Q     Can you recall --
23  A     We have, we have not had many, I will
```

33

1    say that.
2    Q       Have any of them gone to trial?
3    A       No.
4    Q       Okay    Have any of them gone to
5    litigation, that is, a lawsuit was filed?
6    A       I do not believe so.
7    Q       Okay. And you can't recall the
8    specifics of any of them?
9    A       No.
10   Q       Okay   And have you told me
11   everything. to the best of your knowledge,
12   about the dictates of the Shuford decree?
13           MR  CHRISTMAN:   From what she's told
14   you?
15           MR. PORTER:  Yeah.
16   Q       (BY MR. PORTER:)   Just the best of
17   your memory.
18   A       There is a stipulation in the process
19   where if there are so many applicants for a
20   particular job that the committee, again
21   composed of the composition of the committee
22   that's appointed by the president. if they
23   determine that there are so many applicants

35

1    Q       Okay   Anything else that you can
2    think of?
3    A       I can't right now.
4    Q       When did the Shuford decree end?
5    A       I believe it was '05
6    Q       Okay   And did. did that change
7    anything with regard to the hiring process?
8    A       Not really.
9    Q       Okay   And did the board adopt
10   regulations to essentially carry forward the
11   Shuford requirements?
12           MR. CHRISTMAN:  Object to form.  If
13   you know what the board did.
14           THE WITNESS:  Well, the board adopted
15   uniform guidelines
16   Q       (BY MR. PORTER:)  Right. And, again,
17   this is just to the best of your knowledge,
18   did those guidelines pretty much mirror the
19   dictates of Shuford?
20   A       Yes, except they allowed us to remove
21   that statement from the position
22   announcement that called for the. that we
23   were seeking blacks and females and black

34

1    that it would be unmanageable to interview
2    that many, there is a stipulation in the
3    decree where the president can sit with the
4    committee -- and it must be the president,
5    it cannot be a designee -- can sit with the
6    committee and can narrow the field of
7    qualified applicants to ten to be
8    interviewed, that can be done in that
9    decree.
10          I have never wanted to do that
11   because I think it's good to have interviews
12   because interviews always tell you a lot
13   more about the qualifications of the person,
14   the fit of the person for an institution and
15   so forth than not having an interview, just
16   looking at paper
17          I've never done that except one time
18   and I believe it was an English opening when
19   we had I believe about eighty applications.
20   Q       A lot of people looking for English
21   jobs. huh?
22   A       Yeah, but that can be done within the
23   decree

36

1    females in particular in the advertisement
2    and that also allowed for the president
3    and/or a designee to not have to visit a
4    historically black college or university.
5    Q       Now, at the time of this hiring
6    decision in the spring-summer of '06. the
7    Shuford decree had expired; is that right?
8    A       Yes.
9    Q       Had the guidelines that you're
10   referring to been adopted?
11   A       No. but we had not been told nor
12   allowed to remove that wording from the
13   announcement.
14   Q       That was my question because that
15   wording was on that announcement, was it
16   not?
17   A       Yes. but we had not been allowed or
18   told that we could remove it.
19   Q       Okay.
20   A       We were only told that the month
21   after this job was advertised.
22   Q       Okay   And so, what, did you just
23   assume that Shuford still provided that that

37

1  language be put in the posting?
2  A     Yes
3  Q     Okay   Were there any other decrees
4  that had any effect on hiring processes
5  after the merger of the two colleges?
6      MR. CHRISTMAN: You're talking about
7  anything other than Shuford, Kennedy?
8      MR. PORTER: We hadn't gone into
9  Kennedy
10  Q     (BY MR PORIER:) Kennedy, was there.
11  is there a separate one?  Are these all
12  melded together?
13  A     Well, there was Shuford and then
14  along came Kennedy which was for black
15  females -- well, excuse me.  Kennedy --
16  Shuford and then Johnson which was for
17  females --
18  Q     (BY MR. PORIER:) Okay.
19  A     And then Kennedy was for black
20  females.
21  Q     Okay.  And did those decrees change
22  anything, the procedure from what we've
23  talked about?

39

1  A     To my knowledge it was
2  Q     Okay.  So did the only way that race
3  or gender played any role in the selection
4  process was that there was a requirement of
5  a certain percentage of African-American
6  females on the hiring committees --
7      MR. CHRISTMAN:  Form
8  Q     (BY MR. PORTER:)  -- is that right?
9      MR. CHRISTMAN:  Form
10      THE WITNESS:  That's the only, the
11  only way that race entered into it and
12  gender is the composition of the committee.
13  Q     (BY MR. PORTER:)  Okay.  And under
14  the guidelines, did you still have those
15  requirements for the representation of
16  African-Americans, the females on the
17  committees?
18  A     Yes
19  Q     So that stayed the same?
20  A     Stayed the same.
21  Q     Okay   Okay   Let's talk about the
22  position at issue.  What job was that for?
23  A     Speech instructor.

38

1  A     No.
2  Q     Okay
3  A     Basically it was the same
4  Q     Was Shuford gender?
5  A     Shuford was black
6  Q     Okay   Shuford was race?
7  A     Was black and -- well, Shuford was
8  race, yes.
9  Q     Okay.  And then, and then Kennedy was
10  gender and race?
11  A     Yes.
12  Q     Okay   So under Shuford, did you just
13  have to have a certain percentage of
14  African-Americans on the committees?
15  A     No.  You had to have the race and
16  the gender in Shuford.
17  Q     Okay.  So the other, the other
18  decrees didn't change anything from what
19  we've talked about in the hiring process?
20  A     No. it remained basically the same
21  Q     Okay.  Were those all the decrees
22  that had any effect on the hiring process
23  during the period we've discussed?

40

1  Q     Were there particular courses that
2  there was a need for?
3  A     Yes, speech courses.
4  Q     Okay   And there was also some
5  component of theater?
6  A     I believe that was the preferred
7  qualification on the announcement.
8  Q     Okay.  So was it preferred that you
9  have somebody that could also teach theater
10  courses?
11  A     It was a preferred qualification, not
12  a required qualification because we have a
13  person who is employed to teach theater.
14  Q     Let me show you what I'm marking as
15  Exhibit 1 to your deposition.  Are you
16  familiar with this document?
17  A     Yes
18  Q     Is that your signature about midway
19  through there?
20  A     No, it's Eva Sasser signed for me.
21  Q     Okay.
22  A     She's executive assistant.
23  Q     And this is sort of like the document

41

1    where you're asking for permission to fill
2    the position and justifying it, right?
3    A    Yes
4    Q    Where. under the explanation where it
5    says, "The college has only two full-time
6    faculty members in this discipline," is that
7    for the Dothan and Eufaula campus or just
8    the Eufaula campus?
9    A    Dothan and Eufaula.
10   Q    Okay  Down there it says that, "The
11   college advertised a full-time member in
12   summer of 2005 but no suitable candidate
13   emerged;" is that right?
14   A    We did not employ anyone at that
15   time.
16   Q    But you announced for it?
17   A    We did.
18   Q    Did you receive applications?
19   A    We did.
20   Q    Do you know how many?
21   A    No.
22   Q    But none of the ones that you
23   received passed the initial screening?

43

1    A    I don't remember at the time.
2    Apparently, they were. there was no suitable
3    candidate.  I don't remember the reason.  It
4    could have been a budget issue.  I don't
5    remember the reason
6    Q    Okay.  Up there you say, "One of
7    these leads the college's theatrical
8    productions," who is that?
9    A    Terry Schembera.
10   Q    Terry?
11   A    Terry with a I.
12   Q    Is that a man or woman?
13   A    A man.
14   Q    Does he still do that?
15   A    Yes.
16   Q    Does Ms  Ware teach any theater?
17   A    No.
18   Q    Okay.  And so it appears that the
19   chancellor approved that request; is that
20   right?
21   A    Yes.
22   Q    Okay.  So let me show you what I'm
23   marking as Exhibit 2.  Take a look at that

42

1    A    There were three applicants referred
2    to me and two deans interviewed them and
3    made a recommendation to me that, and I
4    cannot remember if I did a phone interview
5    or not, but they recommended that we close
6    the search which we have that option of
7    doing
8    Q    Do you remember how many applied?
9    A    No.
10   Q    So they went through the committee
11   process; is that right?
12   A    Yes
13   Q    Whatever number they were. and three
14   ended up with you?
15   A    Yes
16   Q    And these two deans interviewed the
17   three candidates?
18   A    Yes.
19   Q    And both deans thought none of them
20   were suitable?
21   A    They recommended that we close the
22   search.
23   Q    Why?

44

1    and tell me what it is
2    A    Okay.  You're asking me what this
3    document is, correct?
4    Q    Yes, ma'am.
5    A    When there is a position needed at
6    the college, the appropriate dean will
7    request that that position be filled, with
8    proper documentation as to the need and so
9    forth, and they'll submit that and that is
10   this document for that speech instructor
11   position and recommends a search committee
12   with a secretary to handle the secretarial
13   work surrounding the search, attaches a job
14   description to the form. a memo appointing
15   the search committee for my signature.  Of
16   course, you don't have to go with a search
17   committee it's only a recommendation.
18   Q    Wait a minute.  You don't have to go
19   with a search committee?
20   A    No.  I can, I can change the search
21   committee.  This is just to recommend a
22   search committee.
23   Q    Oh, okay.

45

1    A        I mean. I can change the membership
2    Q        Okay.  You have to have the search
3    committee but you can change the membership?
4    A        Yes.
5    Q        Okay.
6    A        And then it goes through the
7    different signatures.
8    Q        Who --
9    A        For approval.
10   Q        I'm sorry?
11   A        For approval.
12   Q        And this was approved?
13   A        Yes.
14   Q        Who comes up with the minimum
15   qualifications?
16   A        Usually, it's the appropriate dean.
17   Q        Would that be Dean Fergus here?
18   A        Yes.
19   Q        All right.  Under the minimum
20   qualifications you have to have a master's
21   degree from a reasonably accredited
22   institution and it says, "With eighteen
23   graduate semester hours or twenty-seven

46

1    graduate quarter hours in speech. speech
2    communication, communication studies,
3    communication arts. or communication
4    management."
5            That's talking about classes attended
6    as a student, not taught; is that right?
7    That doesn't mean you have to have taught
8    these courses.  You have to have taken them
9    as a student; is that right?
10   A        Yes.
11   Q        And these are all the minimum
12   qualifications there are; is that right?
13   A        For this?
14   Q        For this position?
15   A        I believe so.  I mean, that's what's
16   listed here.
17   Q        Okay.  Who has come up with the
18   preferred qualifications?
19   A        He would have, based on the needs of
20   the college.
21   Q        Okay.  When he says that, "Additional
22   eighteen graduate semester hours or
23   twenty-seven graduate quarter hours in

47

1    another discipline taught at the college."
2    what does that mean?
3    A        That means that this person might
4    could be used in another area.
5    Q        Like what?
6    A        Just another teaching area sometimes.
7    Q        Anything like English or biology or
8    something?
9    A        Yes.
10   Q        Okay.  And it says, "Teaching
11   experience in a community college is a
12   preferred qualification;" is that right?
13   A        Yes.
14   Q        And, "Demonstrated experience in
15   integrated technological innovations into
16   the curriculum including, but not limited to
17   web-based teaching," what is that?
18   A        I don't understand the question.
19   What is that?  What?
20   Q        What is, what is integrated
21   technological innovations into the
22   curriculum?  We'll begin with that.
23   A        Well. I guess it means using

48

1    technology in the teaching.  It's not just
2    teaching with the old chalk and blackboard.
3    it's using up-to-date technology.
4    Q        Computers and stuff like that?
5    A        Computers. SMART board web-based
6    teaching.  We do a lot of distance
7    learnings.
8    Q        What is web-based teaching?
9    A        You're asking, you're going to get
10   into something I can't answer a lot about,
11   but it's teaching online.
12   Q        Somebody else teaches it from a
13   different location?
14   A        This instructor teaches it to
15   students online.  The instructor we're
16   employing in this position can teach online
17   to students.
18   Q        Who are different places?
19   A        They may be at home.
20   Q        Okay.  "Experience in producing and
21   directing student drama activities."  Do you
22   know what y'all were looking for with regard
23   to that?

49

```
1    A       I don't understand the question.
2    Q       What were you looking. I mean. what
3    were you looking for the teacher to do, put
4    on plays or what?
5    A       Well. we have a theatrical program.
6    so --
7    Q       Right
8    A       It could be that in the future --
9    Terry Schembera is near retirement -- so it
10   could be that we were looking for someone
11   that could possibly, when he retires, move
12   into that, that particular position.
13   Q       Did the. did the college offer a
14   degree in theater?
15   A       No
16   Q       Okay   What, what school was that
17   theater course a part of?
18   A       Well --
19           MR. CHRISTMAN:  Object   You can
20   answer if you can.
21           THE WITNESS:  Well, we just, we have
22   a drama program with some supporting courses
23   in that, but it really relates to speech.
```

51

```
1    so --
2    Q       Cats?
3    A       No, it was not Cats
4    Q       Rent?
5    A       But we have very good plays, I can
6    tell you.
7    Q       Okay   And it also says, "Experience
8    in coaching student teams for speech and/or
9    debate competition." What was the thought
10   there?
11   A       I can't answer that because I don't
12   know what John Fergus had in mind on that
13   because we don't have a debate team.
14   Q       Okay   Do you have a speech team?
15   A       No.
16   Q       Is there a speech competition?
17   A       There are speech competitions, we
18   don't participate.
19   Q       Did y'all participate back then?
20   A       No.
21   Q       Okay   Okay   Let me show you what
22   I'm marking as Exhibit 3.  What is, what is
23   this?
```

50

```
1    Q       (BY MR PORTER:)  Okay.  That's in --
2    A       Fine arts.  Fine arts.
3    Q       Okay   And the students. they have
4    theater class?
5    A       Yes
6    Q       And that's, what, they put on a play
7    every semester or something like that?
8    A       Yes   Well, not every semester.
9    but --
10   Q       Did they put one on this semester?
11           MR. CHRISTMAN:  Form   What semester?
12           MR. PORTER:  Spring.
13   Q       (BY MR PORTER:)  This past semester.
14   A       I believe so.  I couldn't attend.  I
15   was out of town on this one, but --
16   Q       Do you know what the play was?
17   A       No.  I can't remember.
18   Q       Did they have one last fall?
19   A       I believe so.
20   Q       Do you remember what it was?
21   A       No.
22   Q       South Pacific?
23   A       I can't remember yesterday usually,
```

52

```
1    A       A vacancy announcement for speech
2    instructor.
3    Q       Okay.  Is this what you post?
4    A       Yes.
5    Q       There at the school?
6    A       At the college and a variety of other
7    places.
8    Q       Okay.  And look at the last. the
9    second page of that paragraph at the bottom,
10   that's the language we talked about that you
11   thought that you still had to have; is that
12   right?
13   A       We had not been, yes.  We had not
14   been told to remove it.
15   Q       Okay.  Tell me from your best memory
16   in this hire process take me through your
17   involvement with it. what you know about
18   it.
19   A       A committee -- well, we advertised
20   the position.  I'm sure that we advertised
21   in a regional paper and a daily paper.  I
22   don't know which ones without going to look
23   back at the records. but we advertised in
```

53

1    the paper.
2            I feel like it was advertised on our
3    web site, we've been doing that for some
4    time now.  It was advertised, it was sent to
5    postsecondary to put in the applicant pool.
6    It was put with the Alabama Employment
7    Service, that's done as a general rule.
8    It's sent to people who may have sent in
9    resumes to be put on file for different
10   positions,  an announcement could have been
11   sent to them.
12           All of our usual sources where we
13   send announcements which is on file in our
14   handbook that we follow for the search
15   process, so it was announced and
16   applications were collected in the personnel
17   office.  A search committee was appointed,
18   which this committee, I'm assuming --
19           MR. CHRISTMAN:  You're pointing to
20   Exhibit 2?
21           THE WITNESS:  I'm assuming this was
22   the search committee.  Without verifying
23   that, I don't know, but a search committee

54

1    was appointed and they would have done the
2    interviews and they submitted three names to
3    me and, John Fergus, as a general rule, I
4    involve the dean in that particular area for
5    a particular position, the dean that's over
6    that particular area.  If it's a technical
7    instructor job, I'll involve the dean of the
8    technical division.
9    Q    (BY MR. PORTER:)  Okay.  Let me back
10   up.  First, there are five people listed on
11   this committee with the secretary, is that
12   typically the number?
13           MR. CHRISTMAN:  You're referring to
14   Exhibit 2?
15           MR. PORTER:  Yeah.
16           THE WITNESS:  Usually it's five.
17   Q    (BY MR. PORTER:)  Okay.  And what is
18   the role of this committee?
19   A    The role of this committee is to
20   review all the applications that are
21   submitted to the personnel office and to
22   determine those that meet minimum
23   qualifications and then to conduct the

55

1    interviews of those that meet minimal
2    qualifications.
3    Q    Okay.
4    A    And to select, of those that are
5    interviewed that met minimum qualifications,
6    to select three that they feel would be
7    suitable for this position and to send those
8    three names ranked in alphabetical order to
9    me.
10   Q    Is there not another round of
11   interviews before it gets to you?
12   A    No.
13   Q    Okay.
14   A    Well, let me back up.  There, they
15   are sent to me and then I ask Dean Fergus
16   and any people he might like to involve to
17   do some interviewing.  I could not
18   participate in that interview, so I did a
19   phone interview.  Normally, I would have
20   participated with them, but if we have
21   several job searches going on at the same
22   time or if I am out of town or, for whatever
23   reason, I can't do some of the final job

56

1    interviews.
2    Q    Is that what happened here?
3    A    Probably, I can't remember exactly,
4    but that's probably what it was.
5    Q    Okay.  Let me show you something that
6    might help with that.
7    A    I know I did a phone interview on
8    this one.
9    Q    Okay.  So not an in-person interview?
10   A    No.
11   Q    Okay.
12   A    And -- but they did.
13   Q    Right.
14   A    John Fergus and some other people
15   members.
16   Q    Do you know who else did?
17   A    I know Woodrow Farrington and I
18   believe there were two other people.  I
19   can't call their name.
20   Q    What was Woodrow Farrington's
21   position?
22   A    Accounting instructor.
23   Q    Why do you think he would have been a

57

1    good choice?
2    A       He's based on the Sparks campus and
3    we try to include instructors from both
4    campuses for a good mix
5    Q       Okay.
6    A       That's probably why he was on there.
7    Q       The  the committee has a preset list
8    of questions to ask the candidates; is that
9    correct?
10   A       Yes.
11   Q       Now, these interviews that you're
12   talking about with Dean Fergus and  Woodrow
13   Farrington and the others, do they have a
14   preset list of questions to ask as well?
15   A       Yes.
16   Q       Okay  And are they the same
17   questions for, regardless of position?
18   A       No.
19   Q       Okay.  They're tailored to the
20   position?
21   A       Yes.
22   Q       Okay.  So, what, they come up with
23   the questions and agree that they're proper

58

1    questions before the interviews are done?
2    A       Yes
3    Q       Okay.  So the committee in this
4    occasion sent three names to you and then
5    you asked Dean Fergus and the others to
6    interview; is that right?
7    A       Yes.
8    Q       Now, I heard something in Dr.
9    Emanuel's deposition that the three that
10   were sent on were the only three that met
11   the minimum qualifications, do you know if
12   that's right or not?
13   A       No. I don't know if that's correct or
14   not.
15   Q       Okay.  Let me show you what I'm
16   marking as Exhibit 4  What is this
17   document?
18   A       I'm not familiar with it.
19   Q       It appears to be sort of like a
20   checklist for the hiring process, would you
21   agree?
22   A       I would agree
23   Q       Okay.  Where in there does it discuss

59

1    the committee's interview of the applicants?
2    A       Which, are you talking about the --
3    which committee?
4    Q       These five people that are on Exhibit
5    2  What's the other committee you're
6    talking about?
7    A       Well, I'm just asking you.  I didn't
8    know which committee you were talking about.
9    but --
10   Q       Well. how many committees would be
11   involved?
12   A       Well, I didn't know if you were
13   asking me about the final interview or the
14   committee, the first one, the first group
15   that interviews.
16   Q       The first group.
17   A       Uh-huh.
18   Q       These five people listed on Exhibit
19   2 --
20   A       Right.
21   Q       -- that's the first group, right?
22   A       Correct. but this apparently came
23   from the HR department, human resources. and

60

1    number 24 says, "Meet with search committee
2    chair and deliver all application packets."
3    so apparently she met with the search
4    committee chair on June 19th and did that
5    and gave them the search committee hiring
6    procedures manual including vacancy
7    announcement and job description with
8    accommodations statement and so forth.
9    oriented the committee chair. restated the
10   responsibilities of the committee and the
11   committee chair, scheduled and coordinated
12   any testing of applicants "  I don't know if
13   that was applicable.
14           And then number 25, "Prepare for
15   search committee chair letters to applicants
16   who do not meet minimal requirements, did
17   not submit all required application
18   materials."
19           And then it shows a copy. "Receive a
20   copy of the memo recommending three
21   finalists from search committee to the
22   president," so one would surmise that the
23   search committee did its work.

61

1    Q    Where on here does it say when the
2    search committee meets with the applicants?
3    A    I think this document is a checklist
4    for the human resources department.  The
5    search committee, meeting schedule, and that
6    type thing is handled more or less by the
7    search committee chair.
8    Q    I'm not suggesting the absence of
9    that is some sort of a big deal.  I'm just
10   trying to figure out where that fits in the
11   time line of when things are done.  Do you
12   know?
13   A    I can't tell you for certain, but
14   it's normally done shortly after the
15   deadline for the vacancy.
16   Q    Okay.
17   A    Once the applications are in and
18   they're all in, then the search committee
19   would start its work.
20   Q    Okay.  Down there on number 27 it
21   discusses reference checks, who does those?
22   A    Human resources department.
23   Q    And do you know what they're supposed

62

1    to do with regard to that?
2    A    Call the references, there's a form.
3    Q    Okay.  I may have some of those.  Let
4    me show you what I'm marking as Exhibit 5.
5    Are these the forms you're talking about?
6    A    Yes.
7    Q    Do you ever review these in the
8    hiring process?
9    A    Yes.
10   Q    Okay.  So you review them with the
11   packet of information that you get?
12   A    Yes.
13   Q    Now, is there any requirement that HR
14   is supposed to contact all of the previous
15   employers listed on an applicant's
16   application?
17   A    It's not a requirement.
18   Q    How many are these supposed to
19   contact?
20   A    There's not a set number.
21   Q    There's no rule about the number of
22   references to check?
23   A    Sometimes they cannot reach all the

63

1    references.
2    Q    All right.  Is there any rule about
3    the number of attempts to make?
4    A    No.
5    Q    Okay.  It appears in Exhibit 5, these
6    are the reference checks for Ms. Ware,
7    would you agree?
8    A    Yes.
9    Q    And it appears that they were, she
10   was, whoever did this only got a reference
11   check from Jeff State, would you agree with
12   that?
13   A    It appears.
14   Q    And for whatever reason they did not
15   get a reference from Oakland University or
16   the University of Alabama, do you agree with
17   that?
18   A    I called Jeff State and got a
19   reference check on her myself though.
20   Q    Are these your notes?
21   A    I didn't take any notes on it.
22   Q    Okay.  You called Jeff State?
23   A    Yes, the president.

64

1    Q    Okay.  Did you call Oakland
2    University?
3    A    No.
4    Q    Did you call the University of
5    Alabama?
6    A    No.
7    Q    Okay.  Why did you call Jeff State?
8    A    Because that's a college in our
9    system and that, I know those people
10   involved and have a great deal of respect
11   for those programs at Jeff State.
12   Q    Is the fact that that's the only
13   place that she ever taught, does that have
14   anything to do with it?
15   A    No.
16   Q    What did they tell you about her?
17   A    That she was very good and very
18   effective in the classroom.
19   Q    Did you keep notes of that?
20   A    No.
21   Q    Did you call anybody else about her?
22   A    No.
23   Q    Did you call anybody about Dr.

65

1   Emanuel?
2   A    No.
3   Q    Why not?
4   A    I got a call about Dr. Emanuel.
5   Q    That's not, that's not my question.
6   Why didn't you call anybody about him?
7   A    Because I got a call about him and
8   didn't need to call anybody else.
9   Q    Okay.  We'll get to that.  Let me
10  show you what I'm marking as Exhibit 6.  Do
11  these appear to be the reference forms for
12  Dr. Emanuel?
13  A    I'm sorry.  Did you ask me a
14  question?
15  Q    Yes.  Do these appears to be the
16  reference forms for Dr. Emanuel?
17  A    They do.
18  Q    Okay.  And it appears that whoever
19  was doing these reference checks were able
20  to get responses from all three.  Auburn,
21  Montgomery, Trenhom Tech and Troy; is that
22  right?
23  A    It appears so.

66

1   Q    And did you have these documents in
2   your information?
3   A    To the best of my knowledge, I did.
4   Q    Okay.  These, these reference checks
5   appear to have been done on June 22, June
6   27, and June 26.  When did you get this
7   phone call you're speaking of?
8   A    I don't remember the date.
9   Q    Did you keep any notes about it?
10  A    No.
11  Q    Did you tell anybody about it?
12  A    I don't remember.
13  Q    Where were you when you had this
14  phone call?
15  A    In my office.
16  Q    Well, let's see here.  You're looking
17  at the -- here it is.  Before I mark this,
18  is this your interview list?
19  A    I don't believe so.  No, it would not
20  be because I would only have received three
21  names and apparently one of these people,
22  there are four names listed and one
23  withdrew, so that would not be my list.

67

1   Q    Okay.  Would this perhaps be the list
2   for Dean, what's his name, Fergus?
3   A    Fergus.  It would not be his list
4   either because he would have received the
5   three names that I received.  See, I
6   received the names and then I involved him
7   with me in the final interview.
8   Apparently -- I'm guessing now -- but that
9   apparently might have been for the search
10  committee.
11  Q    Okay.  Let me go ahead and mark this.
12  Let me show you what I'm marking as Exhibit
13  7 which is what I think to be the notes
14  regarding Dr. Emanuel by the search
15  committee and perhaps some of the interviews
16  with Dean Fergus, et al, and your notes.
17  What I'd like for you to do is look through
18  these and see if you think I'm right.
19       MR. CHRISTMAN:  Look through those.
20  I'll be right back.  Hold your next question
21  until I get back.
22                 (Whereupon, a short recess
23                 was had.)

68

1   Q    (BY MR. PORTER:)  We were looking at
2   Exhibit 7.  What is your understanding of
3   what Exhibit 7 is?
4   A    The first part appears to be
5   documentation and rating of the speech
6   instructor demonstration.  Normally with an
7   instructor position we have them do a 10- to
8   15-minute demonstration of a, a teaching.
9   teaching on some topic that they're given
10  prior to the interview, and then there's an
11  interview form with the listing of the
12  questions that apparently was used in the,
13  by the search committee.
14  Q    Okay.  So, so far the documents
15  we've been talking about are search
16  committee documents, right?
17  A    I believe so.
18  Q    Okay.  And then you have a personal
19  profile; is that right?
20       MR. CHRISTMAN:  I don't know where we
21  are, Adam.
22       MR. PORTER:  Bates page 149.
23  Q    (BY MR. PORTER:)  Down there on the

69

1    bottom right you'll see the letters GWCC and
2    then some numbers. 149.
3    A    Well, that's a part of what's filled
4    out by each search committee member.
5    Q    Okay. And these are all scores; is
6    that right?
7    A    Right.
8    Q    And do you have these documents at
9    your disposal when you're making a decision?
10   A    No, I do not look at these documents
11   until after the interview.
12   Q    After, oh, but before you make the
13   decision?
14   A    Uh-huh.
15   Q    That's a yes?
16   A    Yes.
17   Q    Okay.
18   A    I'm sorry
19   Q    Let me ask you what this is real
20   quick. Let me show you what I'm marking as
21   Exhibit 8. Do you know what this is?
22   A    I'm not familiar with it, but
23   apparently it would be the scoring of the

70

1    applicant by the search committee.
2    Q    And would you have this document at
3    your disposal before you make the decision?
4    A    I could get it. I don't normally
5    Q    Do you recall if you got it in this
6    situation?
7    A    No.
8    Q    You don't know one way or another?
9    A    I do not recall looking at it.
10   Q    Okay.
11   A    And I do not recall looking at it in
12   other applicants as well.
13   Q    Okay. Then what's the purpose of the
14   search committee to do this?
15   A    It's probably just for their use
16   Q    Okay. Do you read this that Dr.
17   Emanuel was ranked the highest by them?
18   A    Apparently, he was.
19   Q    Did anybody ever tell you that?
20   A    No.
21   Q    Okay. Okay. Going back to Exhibit
22   7, the last two pages -- I'm sorry, let's
23   back up. Did we go through the rest of

71

1    what, what these are? All right. We got to
2    the --
3         MR. CHRISMAN: We are at Bates 149.
4    Q    (BY MR. PORTER:) Personal profile.
5    and this is something that each of the
6    committee members does?
7    A    Yes.
8    Q    Okay. And then 150 is the
9    demonstration and the interview form, so you
10   basically got three documents from the
11   search committee, the interview form, the
12   personal profile, and the document regarding
13   the speech demonstration; is that right?
14   A    Yes
15   Q    Okay.
16   A    That's what this search committee
17   apparently chose to do. Each search
18   committee can choose what they do --
19   Q    Okay.
20   A    -- to evaluate the applicant.
21   Q    Okay. And then if you would, look at
22   Bates 155. There appears to be a different
23   type of document. It says, "Final interview

72

1    questions," and do you see those?
2    A    I do
3    Q    155 through 157? These appear to
4    have been done by Paula Mims. Would she
5    have been one of the participants in the
6    interview that Dean Fergus did?
7    A    Yes.
8    Q    So these would be notes regarding
9    that round of interviews?
10   A    Yes.
11   Q    Okay. Got them from Mims. Look at
12   page 160, is that John Fergus?
13   A    Yes.
14   Q    Mims. Fergus. And on 163 it appears
15   to be Woodrow Farrington's signature, does
16   it not?
17   A    Yes.
18   Q    Okay. So they may have been the only
19   three; is that right?
20   A    I believe so.
21   Q    Okay. Would these be all of the
22   notes of the people that interviewed Dr.
23   Emanuel?

73

```
1    A    I believe so.
2    Q    Okay.  And the last two relate to
3    your interview with him?
4    A    Yes.
5    Q    Okay.  And it says that you
6    interviewed him on June 29th, would that be
7    the date that you interviewed him?
8    A    It should have been, yes.
9    Q    Okay.  And that was over the phone?
10   A    Yes.
11   Q    And looking at the previous round of
12   interviews from Farrington, Fergus and Mims,
13   they did their interviews on June 22, a week
14   before you, does that sound right?
15   A    I don't remember the time period.
16   Q    Okay.  Did, did they meet with you
17   and talk about their interview with Dr.
18   Emanuel before you interviewed Dr. Emanuel?
19   A    No.
20   Q    Okay.  Is that against the rules?
21   A    We don't do that that way.
22   Q    Now, did you have -- I think you said
23   that you did not have the screening
```

74

```
1    committee's documents prior to the time you
2    interviewed Dr. Emanuel; is that right?
3    A    No.  I -- that is correct, I did not.
4    Q    Did you have the, for lack of a
5    better term, second committee's documents
6    prior to your interview with Dr. Emanuel?
7    A    No.
8    Q    Okay.  And by second committee, I
9    mean the one with Fergus, Mims and
10   Farrington.
11   A    If I don't participate with the
12   interview with the finalist with another
13   group, in other words, if I do phone
14   interviews, I don't discuss, before my phone
15   interview, I don't discuss any of the
16   applicants with that dean or any of the,
17   that committee, with any of the others until
18   after I do my interview on the phone because
19   I don't want to cloud my thinking with their
20   perceptions, so I wait until I've done my
21   interview and then the dean and I and
22   possibly some of the other members, but if I
23   just, I may just get with the dean and talk
```

75

```
1    about the applicant.
2    Q    When you say the other members, are
3    you talking about only Farrington and Mims
4    or do you --
5    A    Usually those.
6    Q    Would it include the screening
7    committee members?
8    A    Not normally.
9    Q    All right.  But, anyway, it looks
10   like your interview with Dr. Emanuel was on
11   June 29, do you have any reason to believe
12   that's not the date that you interviewed
13   him?
14   A    No, I do not.
15   Q    Well, let me ask you, hold on a
16   second.  I'm not going to mark this at the
17   moment, but this is your statement regarding
18   why you made your selection.  It says that
19   you did the interviews on June 30.
20   A    Okay.  There must be an error.
21   Q    You don't know whether it was the
22   29th or the 30th?
23   A    No, I do not.  This says on June 22nd
```

76

```
1    Farrington, Mims and Fergus interviewed
2    them.
3    Q    Right.
4    A    And I interviewed them on the 30th.
5    Q    Okay.
6    A    All right.  What could have happened,
7    see, my, Pam Mallory my assistant makes the
8    calls and schedules the interviews and she
9    could have inadvertently used the wrong
10   date.  She probably called on the 29th, I
11   don't know --
12   Q    Okay.
13   A    -- so I cannot tell you what date.
14   Q    Maybe y'all couldn't get together on
15   the 29th or whatever?
16   A    I don't know.
17   Q    Okay.  But anyway, you would have
18   talked to Dr. Emanuel on the 29th or the
19   30th of June; is that right?
20   A    But I signed it on the 29th on my
21   signature, so I would think that I probably
22   interviewed him on the 29th.
23   Q    Okay.  Now, this phone conversation
```

77

1  that you say that you received, did you
2  receive it before you interviewed Dr.
3  Emanuel?
4  A    I think it was after, but I can't
5  tell you for sure. I really can't.
6  Q    At the time that you interviewed Dr.
7  Emanuel, did you know him from before that
8  other than his application?
9  A    No.
10 Q    Had no knowledge of him?
11 A    You mean did I know him personally?
12 Q    Yes, ma'am.
13 A    No.
14 Q    Had you ever heard of him?
15 A    I had heard his name.
16 Q    Do you recall in what context?
17 A    I had heard that he taught speech at
18 Enterprise, that he was a speech instructor
19 at Enterprise.
20 Q    Do you remember who told you that?
21 A    No.
22 Q    Do you remember if it was a favorable
23 comment or a neutral or negative?

78

1  A    It was pretty neutral.
2  Q    Okay. Who did you have this phone
3  conversation with we've been talking about?
4  A    Dr. Stafford Thompson.
5  Q    Who is he?
6  A    President at Enterprise Community
7  College.
8  Q    Okay. And you knew him?
9  A    I know him.
10 Q    How long have you known him?
11 A    Well, he works in the department of
12 postsecondary education so I've known him
13 probably since the mid '80s.
14 Q    Are you friends with him?
15 A    Not close at all.
16 Q    Are you unfriendly with him?
17 A    Not unfriendly.
18 Q    Do you think he's a credible person?
19 A    Yes.
20 Q    Do you, is there, do you have some
21 sort of a problem with him?
22 A    No. We're just not really close
23 friends like I am close friends with some of

79

1  the other presidents. We've had, you know,
2  a couple of little problems with service
3  area boundaries and, you know, little, just
4  little disagreements on some technical
5  matters regarding the colleges. We're just
6  not close friends that communicate a whole
7  lot like I do with some of the other
8  presidents, but we're not enemies at all.
9  Q    What do you mean when you talk about
10 service area boundaries?
11 A    Each college has a service area that
12 you recruit in and you're supposed to stay
13 in your respective, your particular service
14 area to recruit and sometimes I have
15 maintained that he encroaches on Wallace's
16 service area and sometimes he's maintained
17 that Wallace encroaches on Enterprise's
18 service area and we've, you know, said you
19 don't need to do this and, but it's been
20 just matter of fact.
21 Q    Do y'all go to the board with these
22 complaints?
23 A    No.

80

1  Q    You just call each other up?
2  A    Yeah, pretty much.
3  Q    Had one or the other of you ever made
4  a complaint to the board about the other?
5  A    I think I called a state board member
6  about him one time.
7  Q    What had he done?
8  A    I think they had some billboards in
9  our area.
10 Q    That would be a pretty clear
11 violation, wouldn't it?
12 A    It, it's really unclear as to what
13 you can do in recruiting and especially with
14 Enterprise with the aviation college because
15 the aviation college has a statewide
16 mission.
17 Q    Statewide mission?
18 A    Mission, yes.
19 Q    Okay. So is he a doctor?
20 A    Yes.
21 Q    Do you call him doctor, Dr. Thompson?
22 So you're sitting in your office one day and
23 Dr. Thompson calls you?

81

1   A     Yes.
2   Q     And correct me if I am wrong, you
3   think that you had already interviewed Dr.
4   Emanuel but you're not sure?
5   A     I don't remember.
6   Q     Okay. Hand me this right here.
7   A     (Witness complies.)
8   Q     Well. I'll go ahead and mark it. I'll
9   show you what I'm marking as Exhibit 9.
10  You signed it July 17. why did you sign it
11  on that date?
12  A     Because that's the day I signed it,
13  I guess. I mean. I really can't --
14  Q     Do you know if you made the decision
15  on that date?
16  A     No. I probably made the decision
17  before that date and this happened to be the
18  date I signed the statement as to the
19  justification for the decision.
20  Q     Okay. If you would. look at Exhibit
21  4 at the third page, paragraph number 28.
22        MR. CHRISTMAN: For the record. we're
23  looking at Bates number 200, GWCC200.

82

1   Q     (BY MR. PORTER:) Okay. Do you see
2   number 28 there?
3   A     Yes.
4   Q     It says "After president or designee
5   interviews three finalists, makes a
6   tentative offer, and tentative offer is
7   accepted.." et cetera. et cetera, and
8   that's dated July 12. Do I take this to
9   mean that you had made your decision and
10  extended an offer on July 12?
11  A     Apparently.
12  Q     Okay. Did you receive this phone
13  call, do you recall, if you received the
14  phone call before July 12th?
15  A     I would have, I received it before I
16  made the decision.
17  Q     Okay. What was said in that
18  conversation?
19  A     Basically he said that he understood
20  that Dr. Emanuel had made application for
21  instructor position with us and he just
22  needed to let us. let me know that there was
23  a potential problem.

83

1   Q     Okay. He called you, right?
2   A     He called me, which is out of the
3   ordinary.
4   Q     You had not contacted him earlier?
5   A     No.
6   Q     Or you had not done anything to
7   solicit his call?
8   A     No.
9   Q     Okay.
10  A     And he did not elaborate on what the
11  problems was. but just said it was a
12  problem.
13  Q     Did he put an adjective on problem,
14  big problem, ugly problem?
15  A     I don't remember that. but a problem
16  of. I knew from the phone call from him
17  because he does not normally call me. that
18  was out of the ordinary for him to call me,
19  and for him to indicate to me that this was
20  a problem employee and for him to make that
21  call to me -- he had never made a call to me
22  in all my years, 20 years as a president of
23  knowing him -- he had never made a call to

84

1   me about an application. I knew that it was
2   something major, and for him not to be
3   employed at Enterprise anymore, I knew that
4   there was something major, but he did not
5   elaborate as to what the problem was and I
6   didn't ask him because I felt like he
7   needed, that he wouldn't go there.
8   Q     So he said I understand that you're
9   interviewing Rich Emanuel for --
10  A     That he's applied or something to
11  that effect.
12  Q     And you said yes or whatever?
13  A     Yes.
14  Q     And, and he said -- well, what did he
15  say as best you can recall?
16  A     As best as I can recall that this is
17  a potential problem and I just needed to let
18  you know that.
19  Q     Did he say anything about Dr. Emanuel
20  having been a problem at Enterprise State?
21  A     Well, he didn't have to say that
22  because I knew that he had been employed
23  over there.

85

1    Q    So he made no reference to, to Dr
2    Emanuel having been a problem at Enterprise
3    State?
4    A    Well, that was, I mean, that was, I
5    knew that from the call.
6    Q    I know, it may have been implied --
7    A    It was implied.
8    Q    -- inferred, but I'm just asking did
9    he make any reference to Dr. Emanuel having
10   been a problem at Enterprise State?
11   A    He didn't make that statement, but I,
12   I inferred it.
13   Q    Okay.  He just said he is a potential
14   problem; is that right?
15   A    Yes.
16   Q    Can you recall anything else he said?
17   A    I just needed to let you know that.  I
18   wanted you to know that.
19   Q    Okay.
20   A    "You do not need this problem," or
21   something to that effect.
22   Q    And you didn't ask him what he meant?
23   A    No, because I just felt like that it

86

1    was something of a legal nature that he
2    didn't need to discuss.
3    Q    What made you think that?
4    A    Just the way he phrased it.  I just
5    said, "I appreciate your calling."
6    Q    So he was calling from Enterprise and
7    you were in Dothan?
8    A    I don't know where he was when he
9    made the phone call, but --
10   Q    Okay.
11   A    -- he called me.
12   Q    Can you recall anything else from
13   that conversation?
14   A    No.  He might have discussed some
15   other matters, I don't know, but I don't
16   recall.
17   Q    Okay.  Let's back up.  So your first
18   direct involvement in the process was the
19   interview of the final three candidates; is
20   that right?
21   A    My first involvement would have been
22   approving the position.
23   Q    Okay.  I mean, just -- okay.  All

87

1    right.  But as far as dealing with the
2    candidates themselves or assessing the
3    candidates?
4    A    Yes, the phone call.
5    Q    And what documents did you have
6    available to you that you reviewed before
7    your interviews?
8    A    The applications.
9    Q    Okay.  We'll mark those.  Okay.  Are
10   these the applications of Dr. Emanuel and
11   Ms. Ware that you had?
12   A    They are, but they're not, I had much
13   more information on them.  I had their
14   transcripts.  I had letters of
15   recommendation.  I had resumes.  They had, I
16   mean, I had much different documents and a
17   lot more information to review on each one
18   of them than this.
19   Q    Okay.  You had resumes?
20   A    I think so.
21   Q    Did you have --
22   A    I know I had more information.  I had
23   transcripts and --

88

1    Q    Did you have Dr. Emanuel's CV?
2    A    I would think so, yes.
3    Q    Okay.  Let me mark that.  All right.
4    So what I'm marking as Exhibit 12 is his CV
5    and you think you had a copy of that as
6    well?
7    A    I believe so.
8    Q    And did you study all the documents
9    you had before the interviews?
10   A    I did.
11   Q    And I assume that you had the
12   position description which had the minimum
13   requirements and the preferred requirements
14   and the duties and that sort of thing; is
15   that right?
16   A    I did.
17   Q    And did you compare the documents
18   from these two candidates or three
19   candidates with the description?
20   A    I did.
21   Q    And you did that before you
22   interviewed them?
23   A    Yes.

89

1    Q      Did you have any conclusions from
2    reading the paperwork?
3    A      You mean conclusions as to who I was
4    going to employ?
5    Q      I don't mean as a final decision.
6    Did one or two stick out as this one looks
7    really good or what were your thoughts after
8    reading the paperwork at your disposal
9    before you interviewed them?
10   A      I don't remember.
11   Q      You don't have a recollection?
12   A      No.
13   Q      Do you have a recollection of your
14   impression of Dr. Emanuel's background?
15   A      No.
16   Q      Okay. So before you interviewed the
17   three candidates, you don't have any
18   recollection of your thought processes of
19   who looks good, who may not look as good as
20   the others, that sort of thing?
21   A      I think I remember that all, all, we
22   had three good candidates because it's
23   fairly rare that you have three good ones in

91

1    Exhibit 13  It appears that you interviewed
2    Ms. Ware at eight-fifty a.m.; is that right
3    or that's when it was scheduled for at
4    least?
5           MR. CHRISTMAN:  Which page is that
6    again?
7           MR. PORTER:  110 in Exhibit 13.
8           THE WITNESS:  Yes.
9    Q      (BY MR. PORTER:)  And then you
10   interviewed Dr. Emanuel at nine-fifteen and
11   that's at Bates page 164 in Exhibit 7; is
12   that right?
13   A      That's what is indicated on my notes.
14   Q      Okay. And both of these are phone
15   interviews; is that right?
16   A      Yes.
17   Q      Do you recall how long your interview
18   with Ms. Ware was?
19   A      No, I don't recall.
20   Q      And are these your notes here on
21   pages 110 and 111 of Exhibit 7?
22   A      Yes.
23          MR. CHRISTMAN:  I think it's Exhibit

90

1    a search.
2           Many times you'll have one good one
3    and the others are not as strong and you may
4    have two good ones and. I mean, it's rare
5    that you have three candidates that are,
6    that are good candidates
7    Q      Okay. If we could go back and look
8    at Exhibit -- well, let me go ahead and mark
9    this. I've given you the Exhibit 7 which
10   was the various notes regarding Dr. Emanuel,
11   look at Exhibit 13 and let me know if those
12   are the notes regarding Ms. Ware.
13          MR. CHRISTMAN:  If you know what
14   these are
15          THE WITNESS:  These appear to be the
16   notes from the committee like the notes I
17   reviewed earlier from the committee who
18   interviewed Dr. Emanuel.
19   Q      (BY MR. PORTER:)  Right. the same
20   thing for Emanuel?
21   A      For, for Ms. Ware.
22   Q      Okay. I just wanted to put those in
23   there. You're looking at Exhibit 7 and

92

1    13 for Ms. Ware.
2           MR. PORTER:  I'm sorry. Yeah,
3    Exhibit 13. yeah.
4    Q      (BY MR. PORTER:)  All right  Down
5    there under number 1. it looks like she got
6    a bachelor's degree at Alabama, a master's
7    at Alabama; is that right?
8    A      Yes.
9    Q      What does that say next, adjunct
10   faculty; is that what that is?
11   A      Yes.
12   Q      JSCC, what is that.
13   A      Jeff State Community College.
14   Q      Okay  For the last year, and got an
15   associate degree from Jeff State. Do you
16   know if she was full-time or part-time
17   faculty?
18   A      Part-time.
19   Q      How many classes was she teaching?
20   A      I don't remember.
21   Q      Typically how many classes does a
22   part-time instructor teach?
23   A      It varies.

93

```
1   Q      From what to what?
2   A      From one to -- it could be, it was
3   usually from one to three
4   Q      Okay   How many does a full-time
5   instructor teach?
6   A      Five, usually
7   Q      And under the question, "Why do you
8   want to work for Wallace Community College?"
9          She says that she was originally from
10  Dothan; is that right?
11  A      That's how she responded
12  Q      Okay   And she said, "I love
13  community college atmosphere," is that what
14  she was saying?
15  A      Yes
16  Q      Okay   Were you, did you write down
17  pretty much everything she said?
18  A      No
19  Q      Okay
20  A      These are sketchy notes on both Dr
21  Emanuel and Ms  Ware
22  Q      Okay   Down there under number 3
23  where you ask her, "Tell me why you're the
```

94

```
1   best person for the job."
2          You write, "Highly motivated,
3   punctual, proven instructor, received
4   excellent evaluations from students."
5          Now, are those her words?
6   A      Yes
7   Q      Okay   And then the next page, she
8   had never worked there before, so down at
9   number 5 you asked her if she had any
10  questions; is that right?
11  A      Yes
12  Q      Do you like to get questions back or
13  do you care?
14  A      I don't care
15  Q      Some people say you didn't interview
16  well because you didn't ask questions, you,
17  it doesn't matter to you?
18  A      Well, usually, they've been through
19  so many interviews at that point --
20  Q      Uh-huh
21  A      -- that they've gotten all their
22  questions answered.
23  Q      Okay
```

95

```
1   A      Because they've been interviewed
2   quite a bit by the time they get to my
3   interview
4   Q      Okay   Can you recall what your
5   impression was of her after you interviewed
6   her?
7   A      Very favorable
8   Q      And why was that?
9   A      She seemed to be very enthusiastic.
10  She was very articulate   Seemed to be very
11  knowledgeable of the institution and Jeff
12  State in comparison to Wallace   I remember
13  We talked a little bit about her experience
14  as a student   She graduated from Jeff
15  State, which I think is a good experience
16  for an instructor   It was favorable   I
17  can't remember everything about why I
18  thought it was favorable except that she was
19  very articulate and impressive on the
20  phone
21  Q      You said that she was enthusiastic,
22  what did, what did she do to lead you to
23  that conclusion?
```

96

```
1   A      Exuberant in her voice
2   Q      What do you mean by that?
3   A      Excited   A lot of inflection in her
4   voice
5   Q      She didn't have a whole lot of
6   experience, did she?
7   A      What do you mean by a whole lot?
8   Q      I mean, she hadn't even taught a full
9   year of school then, had she?
10  A      She had taught part-time for a year.
11  Q      That's all, right?
12  A      I believe so   She was a graduate
13  teaching assistant also
14  Q      Well, I'm talking about as an
15  instructor, she wasn't very experienced, was
16  she?
17  A      She had taught part-time for a year.
18  Q      Would you call that experienced?
19  A      I thought she had enough.
20  Q      I said would you call that
21  experienced?
22  A      She had experience, so I would call
23  it experience
```

97

1   Q       You would?

2   A       Uh-huh.

3   Q       Okay.  You said she was articulate.

4   what do you mean by that?

5   A       She speaks well.

6   Q       Clearly?

7   A       Clearly

8   Q       Enunciates well?

9   A       Enunciates well.

10  Q       Okay.  You said that she was

11  knowledgeable of the institution. now are

12  you referring to Wallace State or Jeff

13  State?

14  A       Jeff State in comparison to Wallace

15  as a part of our system of two-year

16  colleges

17  Q       And what did she say to demonstrate

18  that knowledge?

19  A       She talked a little bit about

20  students and, you know, the students we

21  serve.

22  Q       The students at Wallace or at Jeff

23  State?

98

1   A       Jeff State and Wallace because she's

2   from Dothan.

3   Q       What did she say about the students?

4   A       The ages, you know, that we serve

5   younger students. we serve older students.

6   all ages. many of them go to work.  I. I

7   can't remember the specifics, just that she

8   seemed to identify with our students.

9   Q       How did she seem to identify with

10  them?

11  A       Well, just like I said, that she knew

12  about our students, their ages, where. the

13  you know, the type students we serve.

14  Q       When you say "type" you're referring

15  to age?

16  A       Age. backgrounds, that type thing.

17  Q       What did she say about their

18  background?

19  A       I can't remember all the specifics of

20  the conversation.  I just remember that we

21  had a very brief conversation about students

22  that we served  Just that the two-year

23  college students at Jeff State would

99

1   probably be very similar to those at

2   Wallace. that type thing

3   Q       Would they not be similar to other

4   two-year colleges?

5   A       Probably.

6   Q       Okay.  And based on what you told me,

7   you inferred that she was knowledgeable of

8   the institution?

9   A       Yeah. she grew up in Dothan

10  Q       And you said she was impressive.

11  What did she do to lead you to that

12  conclusion?

13  A       Well. like I said. she was articulate

14  on the phone, seemed enthusiastic. We had a

15  good conversation and she was impressive.

16  Q       Let me, let me, what did she do that

17  impressed you?

18  A       She was articulate on the phone.  She

19  was enthusiastic  I thought she answered

20  the questions well, that impressed me.

21  Q       Did you have the authority to ask any

22  questions that aren't on here?

23  A       I don't do that.  I ask the same

100

1   questions of all the applicants

2   Q       So you can't do that?

3   A       I could.  I guess. but it would be

4   illegal in my opinion.

5   Q       Okay.  Can you recall anything else

6   from her interview?

7   A       Not really because it was a long time

8   ago.

9   Q       Okay.  And then you interviewed Dr.

10  Emanuel at nine-fifteen?

11  A       Yes.

12  Q       Okay.  Do you recall how long you

13  talked to him?

14  A       No

15  Q       Okay.  Now, I'm looking at his

16  notes.  In your conversation with Ms. Ware

17  about her education and experience, did you

18  ask her about her experience with drama or

19  theater?

20  A       I don't think so.

21  Q       Why not?

22  A       My interview was very broad.  I

23  didn't get into a lot of specifics about the

101

1    courses because I felt like that was done
2    probably with Dean Fergus and his, his
3    questioning.
4    Q    Wasn't that a preferred
5    qualification?
6    A    It probably was and they probably
7    covered it in that interview.
8    Q    Well, you're making the decision,
9    right?
10   A    He and I together.
11   Q    Oh, you -- who is "he" you're talking
12   about?
13   A    Dean Fergus.
14   Q    Oh, both of you made the decision?
15   A    I ultimately made it, but I have a
16   discussion.  I just don't make a phone
17   interview and then make a decision.
18   Q    I understand that, but it's your
19   decision to make, right?
20   A    Ultimately, I make a decision.
21   Q    And it's your job to get the best
22   person for the job, right?
23   A    Exactly.

103

1    student drama activities, right?  You can
2    look back at Exhibit 2, if you like.
3    A    I remember.
4    Q    That's right, isn't it?
5    A    That's correct.
6    Q    Did you ask her about her having any
7    experience with that?
8    A    I asked her these questions that are
9    on this sheet.
10   Q    So that's a no?
11   A    It's a no because I asked her these
12   four questions on this sheet.
13   Q    She didn't have that experience, did
14   she?
15   A    I don't believe so.
16   Q    Okay.  And experience in coaching
17   student teams for speech and/or debate
18   competitions, did you ask her if she had
19   experience with that?
20   A    I asked her only those four questions
21   on this sheet.  That question is not on the
22   sheet.
23   Q    So that's a no, right?

102

1    Q    Okay.  And would it not be trying to
2    get the best person for the job if you get
3    somebody who had the preferred
4    qualifications?
5    A    That would possibly be correct.
6    Q    Okay.  And under the preferred
7    qualifications it says there should be
8    teaching experience in a community college,
9    and, and I believe you've testified you
10   thought that her having done that for one
11   year part-time was experienced; is that
12   right?
13   A    She has experience.
14   Q    And demonstrated experience in
15   integrated technological innovations, did
16   you, did you look into that, ask her about
17   that?
18   A    I don't remember.  I asked her these
19   questions that are on this sheet because she
20   had already been asked questions by Dean
21   Fergus and the other committee members.
22   Q    And a preferred qualification is
23   experience in producing and directing

104

1    A    That's a no.
2    Q    And she didn't have that experience
3    either, did she?
4    A    I don't believe so.
5    Q    Okay.  Were you aware of that at the
6    time?
7    A    Yes.  I had looked at her
8    application.
9    Q    Okay.  And you were aware that she
10   didn't have the experience in producing and
11   directing student dramas?
12   A    Yes.
13   Q    Okay.  Looking at Dr. Emanuel's notes
14   or your notes with Dr. Emanuel, you wrote he
15   had a BS from Montevallo, speech and
16   theater, then the next is MS, what is that?
17   A    Master's in speech communications
18   probably.
19   Q    From Auburn.  And a Ph.D. from FSU?
20   A    Let me get his application.
21   Q    Is that right?
22   A    Yes.
23        MR. CHRISTMAN:  I think he's looking

105

1    at this page right here.
2         THE WITNESS:  I know. but I was just
3    verifying --
4         MR. CHRISTMAN:  Okay.
5         THE WITNESS:  Yeah, he had -- that's
6    okay.  He has a doctorate, a Ph.D. from FSU.
7    Q     (BY MR. PORTER:)  Are you familiar
8    with SACS?
9    A     Yes.
10   Q     The Southern Association of Colleges
11   and Schools?
12   A     Yes.
13   Q     What is that organization?
14   A     It's the accrediting body for eleven
15   southern states.
16   Q     Okay.
17   A     And they, it's the crediting body for
18   elementary, secondary and higher ed in those
19   eleven states.
20   Q     And is it the entity that accredits
21   your school?
22   A     Yes.
23   Q     Okay.  Can they impose any rules on

106

1    you. regulations?
2    A     Absolutely.
3    Q     And are you supposed to follow those
4    rules?
5    A     Absolutely.
6    Q     Let me show you what I'm marking as
7    Exhibit 14.
8    A     Yes.
9    Q     Have you ever seen this?
10   A     Yes, sir.
11   Q     Now, it says it's dated December '06,
12   do you know if there was any previous
13   version of this that was different from
14   this?
15   A     I don't know if it was different or
16   not.  I know that SACS has undergone quite a
17   bit of change.
18   Q     Do you see where it says that in the
19   second sentence "When determining acceptable
20   qualifications for its faculty, an
21   institution gives primary consideration to
22   the highest earned degree in the
23   discipline?"

107

1    A     Yes.
2    Q     What do you take that to mean?
3    A     I take this to mean that it has
4    nothing to do with the hiring process.  SACS
5    has nothing to do with the degree when you
6    hire someone.  What this is talking about is
7    when SACS comes to visit the institution and
8    looks at the credentials of your faculty and
9    they go through the files and the highest
10   degree earned is what SACS looks at in
11   determining the credentials of the faculty.
12   They have nothing to do whatsoever in the
13   hiring of the people as long as the faculty
14   members and all staff are qualified to
15   accomplish the mission and goals of the
16   institution as in the first sentence.
17   Q     The first sentence says what?
18   A     "The institution employs competent
19   faculty members qualified to accomplish the
20   mission and goals for the institution."
21   Q     Right.  And then it goes on to say,
22   "When determining acceptable qualifications.
23   the institution gives primary consideration

108

1    of highest degree earned," right?
2    A     Uh-huh.
3    Q     You're saying that has nothing to do
4    with the employment process?
5    A     Well. you've got to employ people who
6    have qualifications which normally for
7    faculty, academic faculty is eighteen
8    semester hours in field or twenty-seven
9    quarter hours in field. that's normal, but
10   they don't tell you to hire the highest
11   degree earned in any position.  They don't
12   tell you to do that --
13   Q     So --
14   A     -- but when they come to the
15   institution and they check faculty
16   credentials, which they go through every
17   file on every faculty member. the credential
18   they check is the highest degree earned and
19   that is what this says.
20   Q     I don't understand what that means.
21   So they're coming to the school to check
22   peoples' credentials?
23   A     Yes.

109

1    Q      And so what are they doing?
2    A      That's on the accreditation visit
3    when they check faculty credentials.
4    Q      They are looking to see who is the
5    highest, who has the highest degree?
6    A      They are checking to see, they are
7    checking to see if the faculty member meets
8    the qualifications of the job and that those
9    qualifications are, the minimal
10   qualifications are to teach and academic
11   faculty eighteen graduate semester hours or
12   twenty-seven graduate quarter hours to teach
13   in an academic area, that's the minimum
14   qualification.
15         All right.  When they go in the file
16   of that faculty member, they're checking to
17   see that that faculty member has those
18   minimum qualifications, but if that faculty
19   member has a higher credential, then they're
20   going to look at that higher credential to
21   review that credential.
22         If the faculty member has a
23   doctorate, they're going to review that

110

1    doctorate as the higher credential, but SACS
2    does not tell you to employ --
3    Q      Excuse me --
4    A      -- a person with a higher degree.
5    Q      When it says they're going to review
6    that higher credential, what are you talking
7    about?
8    A      They review it to ensure that you
9    have the proper credentialed faculty to
10   teach at your institution.
11   Q      You mean if it says somebody has a
12   Ph.D. somewhere, they contact that
13   university to make sure that they issued a
14   Ph.D. to that person?
15   A      No, they look at the transcript.
16   Q      Okay.  So they're verifying that the
17   person has that Ph.D.; is that what you're
18   saying?
19   A      Yes.
20   Q      So you're saying that all this
21   document here that says, this comprehensive
22   standard 3.7.1 is saying that if somebody
23   has a higher degree that SACS should

111

1    corroborate that?
2    A      Yes.
3    Q      That's all it says?
4    A      Yes.
5    Q      Who told you that?
6    A      I just know it.  I mean, we all know
7    it at our institution.  You can call SACS
8    and they'll tell you.  If not, you would
9    have to employ anybody in your search that
10   has a doctorate degree over anybody else any
11   time you have a search if that were the
12   case.
13   Q      Well, I'll grant you primary
14   consideration doesn't mean that you have to
15   do it 100 percent of the time, but it does
16   says primary consideration, right?
17   A      I'm telling you what it means and it
18   means that you don't have to hire a person
19   because they have a doctorate.  SACS has
20   nothing to do with who you hire.  They're
21   just ensuring that whoever you hire has the
22   proper credentials.
23   Q      What if you hired people with no

112

1    college degree at all?
2    A      Then they wouldn't have the proper
3    credential if that job called for a degree.
4    Q      So SACS does have some influence on
5    that?
6    A      On, on, once they're hired, they have
7    to have the proper credentials for that
8    particular job.
9    Q      From SACS?
10   A      Yes.
11   Q      So SACS does have some control over
12   credentials of the faculty, right?
13   A      Sure.
14   Q      And so, and so you're saying --
15   A      But there was -- I'm sorry.
16   Q      So you're saying that when it says,
17   where it says, "When determining acceptable
18   qualifications of its faculty, an
19   institution gives primary consideration to
20   the highest earned degree in the
21   discipline."  You're saying what that means
22   is if SACS goes on a school site visit and
23   they see somebody who purports to have a

113

```
1     Ph D , SACS looks to the transcript to make
2     sure that they have a Ph.D ?
3     A      Yes.
4     Q      And that that's all that sentence
5     means?
6     A      That's all it means.
7     Q      Okay.  Well. let me ask you this.
8     Just generally. would you rather have
9     somebody with an advanced degree over
10    somebody with a lesser degree?
11    A      No, not, I mean, it doesn't, it
12    depends on the person and the needs of the
13    institution.
14    Q      Well. doesn't an institution always
15    need the best qualified faculty?
16    A      Having a doctorate doesn't mean
17    you're the best qualified.
18    Q      Why did you get a doctorate?
19    A      Because I wanted one and because I
20    needed one to be a president, but I don't
21    think a doctorate makes you the best
22    qualified.
23    Q      So you've got to be, have a doctorate
```

114

```
1     to be president, right?
2     A      Well. you need one.
3     Q      You don't have to have one?
4     A      You need one to be, to get in the
5     door. I guess I'll say.
6     Q      But it's not an absolute requirement?
7     A      No, the master's degree is the, is
8     the minimal qualification. but I wanted the
9     doctorate is why I got one.
10    Q      Why did you want one?
11    A      Because I just wanted one.
12    Q      Why?
13    A      Well. why did you get a law degree?
14    Q      To practice law.
15    A      Well, I got a doctorate to be better
16    in education at my job as a president.
17    Q      Well, didn't you learn more getting
18    the doctorate?
19    A      Not necessarily.
20    Q      You didn't learn anything when you
21    got a doctorate?
22    A      Not much. but, no. I don't think that
23    necessarily having a doctorate makes you a
```

115

```
1     better teacher.
2     Q      As a general rule?
3     A      As a general rule not necessarily
4     does it make you better teacher.
5     Q      So if you had a family member and
6     said I'm thinking about getting a doctorate.
7     would you tell them that's a waste of time?
8     A      No, I wouldn't tell them that.
9     Q      Well. it doesn't make a better
10    teacher, does it?
11    A      Your question to me was, are you a
12    better teacher if you have a doctorate, and
13    I'm telling you in my opinion. not
14    necessarily, it depends on the person
15    Q      Okay.  Let's see.  Going back to Dr.
16    Emanuel's interview.  I believe your notes
17    say that he taught at FSU after getting his
18    Ph.D., right?
19           MR. CHRISTMAN:  We're back on --
20           MR. PORTER:  164.
21           MR. CHRISTMAN:  -- Exhibit 7?
22           MR. PORTER:  Yeah
23           MR. CHRISTMAN:  Page 164.
```

116

```
1            THE WITNESS:  My notes say he called
2     it FSU. I don't know if it was after he got
3     his Ph.D.. I would have to look back at the
4     application to know for sure.
5     Q      (BY MR. PORTER:)  And in Montevallo
6     and ASU and he's now at ASU, and that's
7     Alabama State, right?
8     A      Yes.
9     Q      Okay.  And number 2. can you read
10    that for me?
11    A      "Prefers two-year college setting to
12    four-year. Liked intro to communication,
13    two-year respond to the community..."
14    Q      Okay
15    A      -- and I would imagine and the way I
16    read what I wrote is that the two-year
17    college responds to the community much more
18    than a four-year. it's more responsive to
19    the community.
20    Q      To your average citizen?
21    A      I'm sorry.
22    Q      You mean to your average citizen?
23    A      The two-year is more responsive to
```

117

1    the average citizen?
2    Q    Yes.
3    A    Well, I, of course, I think that, but
4    probably what the discussion was, and I
5    think I remember our discussing how the
6    two-year is responsive through the different
7    types of programs and services that are
8    offered in the community.
9    Q    Okay.  And number 3 down there, can
10   you read that for me?
11   A    "Do understand mission of the
12   community college having taught in community
13   college.  Experience..."  Now, this is what
14   he's telling me --
15   Q    Right.
16   A    -- you know, when I ask the question,
17   I'm jotting down just words as, as he is
18   talking.  "Taught diverse populations."
19   Q    Okay.  Did he expand on that?
20   A    I can't, I don't recall.
21   Q    Okay.  What were your --
22   A    But he mentioned it or I wouldn't
23   have written it down.

118

1    Q    Okay.  And what were your impressions
2    of Dr. Emanuel from your interview with him?
3    A    That he was articulate and he was
4    very nice on the phone.  I thought we had a
5    good discussion on the phone, talked about
6    Enterprise a little bit.  I think I might
7    have mentioned to him that I worked there
8    for a long time.  He's articulate.
9    Q    Did he seem enthusiastic about it?
10   A    He's not as enthusiastic on the phone
11   as Ms. Ware is in my opinion, but he's
12   articulate and a very nice
13   conversationalist.
14   Q    He had a lot more experience than she
15   did in teaching, would you agree with that?
16   A    I would.
17   Q    And would you chalk up Ms. Ware's
18   enthusiasm to lack of experience?
19   A    No.
20   Q    Okay.  So you say he was not
21   enthusiastic?
22   A    I didn't say that.
23   Q    He was enthusiastic?

119

1    A    I didn't say that either.
2    Q    Was he?
3    A    I don't remember that he was
4    enthusiastic on the phone.
5    Q    Do you recall him appearing or
6    seeming disinterested?
7    A    No.
8    Q    Okay.  Did he seem interested in the
9    job?
10   A    Yes.
11   Q    Okay.  Did he demonstrate a knowledge
12   of the institution?
13   A    To the best of my memory.
14   Q    Did you find him impressive?
15   A    I thought he did a good job in the
16   phone interview.
17   Q    Is that a yes?
18   A    Yes.
19   Q    Okay.  Do you recall anything else
20   from your interview with him?
21   A    No.
22   Q    Okay.  And after you did the
23   interviews, did you sit down again with all

120

1    the documents and go over things?
2    A    I did.
3    Q    Okay.  Did you make any notes of
4    doing that?
5    A    No.
6    Q    So you don't have any notes of your
7    hiring decision, related to your hiring
8    decision?
9    A    The statement to the file.
10   Q    And that's it?
11   A    Yes.
12   Q    Okay.  After the three interviews,
13   did you have a favorite in mind?
14   A    Yes.
15   Q    Who was that?
16   A    Ms. Ware.
17   Q    And why was that?
18   A    Well, as I said in the, in my
19   statement, I think I listed my preferences,
20   but I believe that first of all she had
21   graduated from a community college and I
22   thought that gave her an identity with our
23   students.

121

```
1          Secondly, she has a master's degree,
2    so she met the qualifications for the job
3    having a master's degree.  She's taught at a
4    community college, she has experience and
5    she was impressive on the phone.  She
6    impressed the committee and John Fergus.
7    They were supportive of her appointment and
8    while Dr. Emanuel has a doctorate, in my
9    opinion we, the needs of the institution
10   could be best met with someone with a
11   master's.
12   Q      Why is that?
13   A      I think that at the
14   freshman/sophomore level a person with a
15   master's can do well teaching at that level
16   when they're a good instructor.
17   Q      At what level?
18   A      Freshman/sophomore courses.  I think
19   that she's doing a good job and I felt at
20   the time she could do a good job and to be
21   quite honest at $33,000 a year savings that
22   we could save at the institution, that
23   played a role in it.
```

122

```
1          He has published quite a bit, we're
2    not a teaching institution -- I mean, excuse
3    me, we're not a research institution, we're
4    a teaching institution, so there's not
5    really a need for that background, although
6    that is a good background.
7    Q      Wouldn't it be an added bonus?
8    A      We don't need that.
9    Q      I know.  I'm not saying he had to do
10   it, but he had done it, isn't that an added
11   bonus, don't you want to have faculty that
12   look good and have good credentials?
13   A      Of course we want people that, that
14   look good and all that, but I didn't need,
15   we don't need that particular qualification,
16   so as I said, I did not see the need in
17   paying $33,000 a year more --
18   Q      Okay.
19   A      -- to employ that person, but on top
20   of all that, I didn't want a problem.
21   Q      Okay.
22   A      So --
23   Q      But we haven't gotten to that yet,
```

123

```
1    though, have we?
2    A      Well, I'm getting to it, though.
3    Q      Well, we'll get to that.
4    A      Okay.
5    Q      I'm just asking about your
6    impressions after the interviews.
7    A      Okay.
8    Q      These are things that you thought of
9    after the interviews, right?
10   A      Yeah.
11   Q      Would you agree with me that when you
12   look at the required qualifications for the
13   position and the preferred qualifications
14   for the position, Dr. Emanuel is clearly
15   more qualified than Ms. Ware?
16   A      I'm, I'm not going to say that
17   because I think that she is clearly
18   qualified and when I reviewed everything and
19   looked at everything, I think that she best
20   met the needs of the institution.
21   Q      I'm not asking --
22   A      And that's my, that's my opinion.
23   Q      I'm not asking you about meeting the
```

124

```
1    needs of the institution.  I'm talking about
2    the qualifications as stated in the
3    announcement.  She had at least two
4    preferred qualifications that were, at least
5    two preferred qualifications that she did
6    not meet; is that correct?
7    A      But you don't have to meet preferred
8    qualifications.
9    Q      Is that not correct?
10   A      Yes.  She did not have some of those,
11   but they're preferred.
12   Q      Now, is preferred in this context
13   used differently than in general?
14          MR. CHRISTMAN:  Object to form.
15          THE WITNESS:  I don't understand the
16   question.
17   Q      (BY MR. PORTER:)  Well, to me when
18   you say you prefer it, that means you'd
19   rather have it, is that what that means
20   here?
21   A      I think it means nice to have, yes.
22   Q      Nice to have or you would rather have
23   it, right?
```

125

```
1    A      Yes.
2    Q      Okay.  And there are two
3  qualifications that you would rather have
4  that she does not have?
5    A      Yes, but I'm telling you that I
6  looked at the total picture in making a
7  decision --
8    Q      Okay.
9    A      -- not just one particular thing.
10   Q      Do you think that Ms. Ware was more
11 qualified than Dr. Emanuel?
12   A      I think that she was best suited to
13 meet the needs of the institution.
14   Q      That's a different question.  I'm not
15 asking you to, to look at the financial
16 impact on the school.  I'm talking, I'm
17 asking you to look at the qualifications as
18 listed, the minimum qualifications and the
19 preferred qualifications.
20   A      Well, he had a doctorate, she had a
21 master's, he had more experience than she
22 did, so if you want to look at that, yes,
23 but I looked at the total package, the total
```

126

```
1  picture in making my decision.
2    Q      Okay.  I'm not talking about the
3  total picture right now, I'm just talking
4  about the qualifications as stated.  Do you
5  agree with me that he was more qualified?
6    A      I just said he had, he had a
7  doctorate and she had a master's.  He had
8  more experience than she did, so if, I guess
9  you could say, if you want to look at only
10 those as aspects, he would be, but I look at
11 the total picture.
12   Q      Okay.  We'll get to the total picture
13 in a minute.
14          MR. PORTER:  Let's go off the record.
15          (Whereupon, a short pause
16              was had.)
17   Q      (BY MR. PORTER:)  Okay.  Again, I'm
18 not talking about the total big picture, I'm
19 just talking about I'm looking at the job
20 description and what it states as the
21 minimum requirements and the preferred
22 requirements.  Based on those, you would
23 agree with me that Dr. Emanuel was more
```

127

```
1  qualified than Ms. Ware?
2    A      I will agree he has a higher degree
3  and more experience, but I won't, I'm not
4  going to say he's more qualified because I'm
5  looking at the total picture.
6    Q      I'm not asking you about the total
7  picture.  I'm looking at the job description
8  and where it says these are required minimum
9  qualifications and these are the preferred
10 qualifications, that's all I'm asking about.
11   A      Then my answer is no.
12   Q      Your answer is no about what?
13   A      That he's not more qualified.
14   Q      Okay.  Explain that.
15   A      Well, I'm just telling you that I
16 look at everything about the candidates.
17   Q      Dr. Young, I'm not asking you about
18 that and I'm not asking you, I'm not saying
19 that you shouldn't consider other things,
20 all I'm asking you about, is about the
21 confines of this job description and you can
22 look at it if you like.  We'll start off
23 this way.  Would you agree with me that Dr.
```

128

```
1  Emanuel met and exceeded all minimum and
2  preferred qualifications?
3    A      The minimum he exceeds because he has
4  a master's.
5    Q      Doctorate.
6    A      Excuse me, a doctorate, she has a
7  master's, and they both have teaching
8  experience in a community college.
9    Q      Now -- okay.  When you say they both
10 have teaching experience, she hadn't --
11   A      Let me, can I, I want to answer my --
12   Q      All right.
13   A      -- please.  And then they both have
14 technological experience in the classroom
15 and I believe he has experience in the
16 student drama area and she's had some
17 experience with the speech debate, he has,
18 so he has some advantages and experience
19 over her.
20   Q      Okay.  You should have a copy of
21 that --
22   A      I know.
23   Q      All right.  Let's go through this.
```

                                                                    129

```
1    They both meet the minimum requirements,
2    right?
3    A      Yes.
4    Q      He exceeds them, right?
5    A      Yes
6    Q      They do not both meet the preferred
7    qualifications; is that right?
8    A      Yes.
9    Q      And Dr. Emanuel meets and exceeds all
10   the preferred qualifications, does he not?
11   A      I believe so   I'll have to go back.
12   I'm pretty sure he does on speech and debate
13   but I would have to look back at his
14   application
15   Q      Well, you can look at his CV, if you
16   want to, it's Exhibit 12.
17          MR. CHRISTMAN:  Is there a page you
18   can direct her to where she can see it?
19          MR. PORTER:  It's Bates page 247
20   Q      (BY MR. PORTER:)  Forensics team
21   member, do you see that?
22   A      Yes  Okay.
23   Q      Well, let me ask you this, you
```

                                                                    131

```
1    Q      (BY MR. PORTER:)  Okay.  And thank
2    you, and we'll go -- and that's Exhibit 2.
3    right?
4    A      Exhibit 2
5    Q      Okay  And we'll get to the big
6    picture.  When you got the phone call
7    from -- is it Dr. Thompson or has he got a
8    MA?
9    A      Dr. Thompson?
10   Q      -- from Dr. Thompson, had you already
11   met with Dean Fergus and the others?
12   A      No.
13   Q      Okay.  So it was some time after the
14   interviews and before you met with them; is
15   that right?
16          MR CHRISTMAN:  If you recall  Don't
17   guess
18          THE WITNESS:  I really don't recall
19   on the phone call.  It was sometime during
20   the application/interview process, but I do
21   not recall at what point the call came in
22   Q      (BY MR. PORTER:)  All right.  You do
23   remember meeting with Dean Fergus, right?
```

                                                                    130

```
1    studied his CV --
2    A      Yes
3    Q      -- during the time?
4    A      Yes.
5    Q      And you were familiar with it then?
6    A      Yes.
7    Q      Okay.  Would you agree with me that
8    Dr Emanuel meets all the preferred
9    qualifications?
10   A      Yes.
11   Q      Would you agree with me that Ms  Ware
12   does not?
13   A      Yes.
14   Q      And are you still saying that based
15   on the parameters of the question which is
16   these minimum and preferred qualifications
17   that Dr Emanuel nevertheless was not more
18   qualified?
19          MR. CHRISTMAN:  With respect to only
20   what's listed in Exhibit 2?
21          MR. PORTER:  Right
22          THE WITNESS:  He appears to be better
23   qualified as listed here on this page.
```

                                                                    132

```
1    A      Sure.  Yeah.
2    Q      Were Mims and Farrington present?
3    A      No.
4    Q      Okay.  It was just him?
5    A      Yes.
6    Q      But you, but you had all of their
7    notes?
8    A      Yes.
9    Q      Okay.  And you had the screening
10   committee's notes at that time?
11   A      Yes.
12   Q      And do you know if you had the
13   screening committee's scores at that time?
14   A      I don't remember seeing the scores.
15   Q      Okay.  Were you aware of the
16   screening committee's rankings?
17          MR CHRISTMAN:  You're talking about
18   the scores
19          MR. PORTER:  Yes.  On Exhibit 8.
20          THE WITNESS:  I don't remember.  I
21   don't remember about that.
22   Q      (BY MR. PORTER:)  All right.  I'm
23   sorry.  Did you say that you think that you
```

133

1  did have your conversation with Dr. Thompson
2  before you met with Dean Fergus?
3     A     Well, I would have had the
4  conversation before I met with Fergus
5  because at that point is when we made a
6  decision as to who we wanted to go with.
7     Q     So you think you met with Dean Fergus
8  on the day that you made the decision?
9     A     Yes.
10    Q     Which I believe was, that was July
11 12?
12    A     Well, I don't know the exact date,
13 but --
14    Q     Well --
15    A     -- around the time we made the
16 decision.
17    Q     If Exhibit 4 here says that, on the
18 third page, paragraph number 28 where it
19 talks about, you know, on July 12 the
20 president or designee interviews finalists,
21 makes a tentative offer and tentative offer
22 is accepted, do you see that?
23          MR. CHRISTMAN:  I'm sorry?

134

1     Q     (BY MR. PORTER:)  My question was,
2  did you make the decision on July 12 or can
3  you tell?
4     A     What page are you on?
5          MR. CHRISTMAN:  GWCC200.
6          THE WITNESS:  200.  Number 28?
7          MR. CHRISTMAN:  Paragraph 28.
8          MR. PORTER:  Yes, ma'am.
9          THE WITNESS:  I cannot tell you that
10 I met with him on July 12th because I do not
11 know.  That is the date that apparently
12 human resources put in on this sheet, so I
13 don't know what day I met with him.
14         MR. PORTER:  Do y'all want to take a
15 break?
16         MR. CHRISTMAN:  Sure.
17              (Whereupon, a luncheon
18              recess was had.)
19    Q     (BY MR. PORTER:)  Dr. Young, during
20 the break Dr. Emanuel and I looked and we
21 saw and I can show it to you a letter to Dr.
22 Emanuel and Jill Coons dated July 12 saying,
23 you know, essentially thank you for your

135

1  application but we've hired somebody else,
2  do you think that you would have sent a
3  similar letter like that to Ms. Ware on that
4  same date telling her that she was offered
5  the job?
6     A     Normally what we do is to call the
7  successful applicant and offer them the job
8  and then if, you know, if they accept them
9  shortly thereafter there's a contract    I
10 don't know of any letter that goes to --
11    Q     Oh, okay.  So you usually don't send
12 a letter to the winner?
13    A     I don't believe so.
14    Q     Okay.  Well, the contract was signed
15 in August, so that would, they would sign
16 it, I guess, shortly before the school year
17 starts?
18    A     Yes.
19    Q     Okay.
20    A     There may be some type letter, I
21 don't know.
22    Q     Okay.  Well, if you sent letters to
23 the two candidates who were not selected on

136

1  July 12, does that tell you anything as to
2  when you would have made the selection?
3     A     I don't understand what you're
4  asking.
5          MR. CHRISTMAN:  Object to form.
6     Q     (BY MR. PORTER:)  Well, did you
7  typically have a habit of sending the
8  candidates who are not selected a letter
9  notifying them of that on the same day you
10 make the decision -- well, let me -- strike
11 that.
12         Do you send the candidates who don't,
13 who aren't selected a letter informing them
14 of that on the same day that you have a
15 phone conversation with the selectee and are
16 sure the selectee is accepting, does that
17 make sense?
18    A     Do we normally send a letter to the
19 people we're not selecting on the same day
20 that we have a conversation with the person
21 that we do select?
22    Q     Yes.
23    A     And they select the job?

137

1  Q      Yes
2  A      I don't know if we do it normally,
3  but it's possible
4  Q      Is, is there anything, any document
5  that you know of that we could look to that
6  would tell us the date that you offered Ms
7  Ware the job?
8  A      I'm not aware of that document.  Now,
9  Dean Fergus was the one who would have made
10 that call.
11 Q      Oh, he did?
12 A      Yeah, I didn't make the call
13 Q      Okay.  Let me ask you about your
14 meeting with -- it was just him, right?
15 A      To the best of my knowledge
16 Q      Okay.  You had everybody else's
17 notes, right?
18 A      Yes.
19 Q      What can you recall being said in
20 that meeting?
21 A      I can't recall a whole lot about it
22 except --
23        MR. CHRISTMAN:  This is the meeting

138

1  with Fergus, is that what you're talking
2  about?
3        MR. PORTER:  Fergus.  Yeah, Dean
4  Fergus
5        THE WITNESS:  Except we usually, with
6  as in any job search, discuss the applicants
7  and reach a consensus and I can't tell you
8  the specifics of the discussion.  I don't
9  remember exactly what was said.  I can just
10 tell you that basically I remember the
11 reasons why I wanted to choose Ms. Ware.
12 Q      (BY MR. PORTER:)  You remember
13 discussing those with him?
14 A      I believe we did.  I can't remember
15 the exact conversation.
16 Q      Did he have, did he have somebody
17 that he had picked out as his favorite?
18 A      I don't think so.
19 Q      Did y'all discuss the different
20 qualifications of the position and how
21 candidates stood up with regard to those
22 qualifications?
23 A      I believe so.

139

1  Q      Can you recall what was said?
2  A      No.
3  Q      Do y'all -- can you recall discussing
4  the fact that Ms. Ware didn't have some of
5  the preferred qualifications?
6  A      I don't remember.
7  Q      Okay  Can you recall anything else
8  about your conversation with him?
9  A      No.
10 Q      Do you recall any conversation about
11 the monetary aspect of it?
12 A      Well, I'm sure we had a discussion
13 about what the salary would be
14 Q      Okay  So why did you select Ms
15 Ware?
16 A      I selected her, Ms  Ware because I
17 believed that she was the best suited for
18 this particular job because she had
19 graduated from a community college, she was
20 from the Dothan area. she had the
21 qualifications of a master's degree that I
22 felt was suitable for teaching this level of
23 courses in speech communication and that we

140

1  could employ her at $33,000 a year less than
2  Dr. Emanuel and that I had gotten the call
3  from Dr. Stafford Thompson indicating
4  there's was a problem with him at Enterprise
5  and I did not want to inherit a problem and
6  pay $33,000 more a year and have a problem
7  Q      Anything else?
8  A      I was impressed with her, with her
9  qualifications.
10 Q      More so than Dr. Emanuel's?
11 A      I think he has good qualifications
12 it's just that I, I think she was a good
13 candidate and I was very pleased with her
14 qualifications and her entire package.
15 Q      With regard to her qualifications,
16 you say you were impressed with them. were
17 you more impressed with her qualifications
18 than Dr. Emanuel's?
19 A      I think he has good qualifications
20 but I looked at the total picture in making
21 my decision.
22 Q      I'm not asking you again about the
23 total, you said you were impressed with her

141

1  qualifications so my question is simply were
2  you more impressed with her qualifications
3  than Dr. Emanuel?
4        MR. CHRISTMAN:  Form.
5        THE WITNESS:  I made the decision to
6  employ her so I looked at everything about
7  her.  When I say qualifications, I'm talking
8  about the total picture.
9  Q     (BY MR. PORTER:)  So essentially
10  you're saying you were impressed with her?
11  A     I was impressed with her, yes.
12  Q     Okay.  And is that based on the
13  things you've already told me about your
14  conversation with her where she had
15  knowledge of the school and all of that sort
16  of thing?
17  A     I was impressed with everything with
18  her, about her and, and those other factors
19  that I mentioned earlier.
20  Q     Okay.  I want to go over the things
21  that you've listed.  I've got the fact that
22  she was a community college graduate, she
23  was from the Dothan area, she had a master's

142

1  degree, she cost $33,000 a year less than
2  Dr. Emanuel, your telephone conversation
3  with Dr. Thompson and you were impressed
4  with her, have I covered it all?
5        MR. CHRISTMAN:  Take your time and
6  think about it if this is going to be an
7  exclusive list.
8        THE WITNESS:  Well, I felt she had an
9  obvious enthusiasm for her discipline.  I
10  felt she had an obvious concern for her
11  students in the teacher-learning process.
12  Q     (BY MR. PORTER:)  And for the record,
13  you're reading from exhibit -- what number
14  is that?
15  A     Exhibit -- is that 9?
16        MR. CHRISTMAN:  That looks like an
17  attempt at a 9 except the 9 looks like a G.
18        MR. PORTER:  9.
19        MR. CHRISTMAN:  That's old school 9.
20        THE WITNESS:  She had a record of
21  successful teaching at the community college
22  level.  She had been involved in
23  professional development activities in the

143

1  speech area including presentations to the
2  Southern State Communication Association.
3  She supported the community college
4  philosophy.  She had experience with
5  technology and her discipline, use of WebCT
6  and Internet.  I felt she was the best match
7  for the needs of the institution
8  Q     (BY MR. PORTER:)  So the institution
9  needed somebody cheap?
10        MR. CHRISTMAN:  Form.
11        THE WITNESS:  I didn't say that.
12  Q     (BY MR. PORTER:)  That WebCT, so she
13  had, that was a strength of hers, her
14  experience with that?
15  A     Yeah.  Yes.
16  Q     Did that turn out to be an accurate
17  representation on her part?
18  A     She uses it in her teaching.
19  Q     Oh, so you're familiar with what
20  she's been doing with it?
21  A     According to every indication, she
22  uses it.  I don't go sit in her class
23  though.

144

1  Q     Right.  I mean, have you gotten
2  reports from her supervisors about that how
3  she's doing with that?
4  A     I've gotten reports from faculty in
5  that area.
6  Q     Evaluating her, her performance in
7  that area?
8  A     No, I haven't gotten reports that
9  specifically designate her, but I've gotten
10  reports of faculty in all of those areas
11  that are doing well with the use of WebCT.
12  Q     So you're hearing that she's been
13  doing well with WebCT?
14  A     Yes.
15  Q     Who told you that?
16  A     The dean.
17  Q     What's his name?
18  A     Fergus.
19  Q     Let me show you what I've marked as
20  Exhibit 15.  Do you recognize this form?
21  A     This is an instructor's evaluation.
22        MR. CHRISTMAN:  Do you recognize it
23  I believe was his question?

145

1        THE WITNESS: Yes.
2    Q    (BY MR. PORTER:) So is this her
3    evaluation for the fall semester of '06?
4    A    That's what it indicates.
5    Q    So that would be the first semester
6    she taught?
7    A    I don't think she taught summer of
8    '06. Let's see. This employment was -- I'm
9    not sure if she taught the first summer, I
10   don't think so, so this would be the first
11   term.
12   Q    Look on the third page.
13   A    (Witness complies.)
14   Q    Down there under, "Major weak points
15   of this instructor."
16   A    (Witness complies.)
17   Q    Do you see those entries?
18   A    Yes.
19   Q    It looks like she was struggling
20   pretty badly with WebCT, doesn't it?
21        MR. CHRISTMAN: Form. It says what
22   it says.
23   Q    (BY MR. PORTER:) Would you agree

146

1    with that assessment?
2    A    It's what Mr. Fergus has indicated
3    that she, she is. We've done a lot of
4    in-service with instructors in technology.
5    Q    With her?
6    A    I'm assuming her. We've done a lot
7    of in-service with instructors. I don't
8    know that she herself has been in them, but
9    we've done a lot of work with instructors.
10   Q    Do you think that his evaluation of
11   her ability with WebCT is inconsistent with
12   the representations that she gave about her
13   abilities in that area?
14   A    I don't. I can't tell you that. I
15   don't know.
16   Q    Well, she claimed to be proficient at
17   it, didn't she?
18        MR. CHRISTMAN: Form.
19        THE WITNESS: She claimed to.
20   Q    (BY MR. PORTER:) And it doesn't
21   appear from this evaluation that she was,
22   does it?
23        MR. CHRISTMAN: Form.

147

1        THE WITNESS: That's Mr. Fergus'
2    evaluation.
3    Q    (BY MR. PORTER:) Right. Well, do
4    you know if, if he was in a bad position to
5    evaluate her or not?
6    A    I don't know that.
7    Q    What does Mr. Fergus do?
8    A    He teaches music. he did, he's
9    retired now.
10   Q    Why was he evaluating her
11   performance?
12   A    Because he was chair of the division
13   of fine arts.
14   Q    So he is the person who should be
15   evaluating her?
16   A    Yes.
17   Q    Okay. Well, why was it important for
18   you to have somebody who was a community
19   college graduate?
20   A    I just think that it's a good thing.
21   It's, it's not that important it just adds
22   to a person to have come from that
23   background in my opinion.

148

1    Q    Why is --
2    A    It's not, it's not necessary for the
3    position.
4    Q    Okay.
5    A    I just think it adds to and
6    complements.
7    Q    It's important to you?
8    A    I, I don't say that it's important to
9    me. I just thing it adds to a person's
10   qualifications.
11   Q    Okay. And why is that?
12   A    I think it gives them an
13   understanding of our students and their
14   backgrounds and the type students we serve.
15   Q    Okay. And what if you had taught in
16   community colleges for many years, would you
17   not get that same experience?
18   A    I think that you would know those
19   type students, yes.
20   Q    And so if Dr. Emanuel taught for many
21   years in community colleges, wouldn't he
22   have that same experience?
23   A    No, it's a different experience in my

149

1  opinion, teaching and having been a student,
2  but you would still know those students you
3  taught, but teaching, yes, but there's a
4  difference in being a student and teaching.
5  Q    So you, all things equal, you would
6  rather have somebody who went to community
7  college as opposed to a four-year college?
8  A    To teach.
9  Q    Yeah.
10 A    Absolutely.
11 Q    Okay. And that's because, what,
12 they're sort of kindred spirits with the
13 students or something?
14 A    I think they understand our students.
15 Q    Now why is that?
16 A    Because they've been one.
17 Q    And what's different about being a
18 student at a two-year institution versus
19 another type of institution?
20 A    What is the difference in being a
21 student in a two-year college and being one
22 at a four-year?
23 Q    Yeah.

150

1  A    I think there are a lot of
2  differences. You understand how instructors
3  relate to students and how they should
4  relate to students because you get a lot of,
5  in my opinion, a lot more of one-on-one
6  attention and you understand the role of the
7  instructor and it's because of the way
8  instructors teach you.
9         At most universities or at least my
10 experience was you're simply a number, you
11 don't get a lot of one-on-one attention, but
12 you do at a community college --
13 Q    What about --
14 A    -- so as a student you learn that
15 that's how, as an instructor, you should
16 relate to students because you were related
17 to that way as a student, so I think you,
18 you begin to fit that mold by having
19 attended one as a student.
20 Q    And you don't think that you would
21 get that feeling or that sense of the way
22 things are done by teaching for numerous
23 years at a community college?

151

1  A    I think you would, that would be
2  helpful, but I think having been a student
3  is very, very good to learn that.
4  Q    So --
5  A    Having taught and been a student
6  would be even better, like Ms. Ware did.
7  Q    You mean part-time for one year?
8  A    Yeah.
9  Q    So that part-time for one year and
10 having been a student for two years, would
11 trump having taught for 20 years.
12      MR. CHRISTMAN:  Form.
13      THE WITNESS:  In my opinion, having
14 been a student and taught was a very, very
15 good qualification. That's my opinion.
16 Q    (BY MR. PORTER:)  Well, now there are
17 four-year schools that are small, aren't
18 they?
19 A    I'm sorry?
20 Q    There are four-year schools that are
21 small?
22 A    Small?
23 Q    Yes. Where you have a low

152

1  student-teacher ratio?
2  A    I wasn't addressing student-teacher
3  ratio.
4  Q    Well, you said in four-year colleges
5  you're more like a number, I thought you
6  were talking about just a number of
7  students?
8  A    I'm talking about the way instructors
9  deal with students and, and assist them day
10 to day.
11 Q    It's more on a personal level --
12 A    Advise them maybe is the correct
13 term.
14 Q    It's more of a personal level?
15 A    Yes.
16 Q    And you don't think Dr. Emanuel would
17 have gotten that from all of his years in
18 teaching at community colleges?
19 A    I didn't say whether he's -- I don't
20 know whether he's gotten it or not.
21 Q    Okay. Why was it important for you
22 to have somebody who was from the Dothan
23 area?

153

```
 1    A      I just think that she knows the
 2    Dothan area, knows the people in the area,
 3    and would know a lot of the students who
 4    would attend there, it would help in
 5    recruiting by knowing the people in the
 6    area.
 7    Q      Does she do any recruiting?
 8    A      I can't say.  I think we're all
 9    recruiters.  All the people at the college
10    are recruiters, so by knowing people in the
11    community, you naturally see them in the
12    grocery store, speak to them, see them at
13    the gas station, say hello, they know you,
14    you know them, they tend to gravitate to
15    where you are.
16    Q      Yeah.  That might work if she was
17    teaching in Dothan, but she was teaching in
18    Eufaula, wasn't she?
19    A      She was probably, she probably, I
20    believe, teaches both places or could teach
21    both places.
22    Q      Where does she teach now?
23    A      Eufaula.
```

154

```
 1    Q      Has she taught at any campus other
 2    than Eufaula?
 3    A      I don't know.  I can't tell you that.
 4    Q      But even though she was teaching in
 5    Eufaula you thought it was good that she was
 6    from Dothan?
 7    A      Yeah.
 8    Q      Okay.
 9    A      There's a lot of carryover in Dothan
10    and Eufaula.
11    Q      The third reason that you listed was
12    she has a master's degree, that was a
13    minimum qualification; is that right?
14    A      Yes.
15    Q      Are you saying that in this situation
16    that was preferable to a doctorate to you?
17    A      I think that it was, that we did not
18    need someone with a doctorate.  I think a
19    master's degree was very acceptable for this
20    position.
21    Q      That's not my question.  Was it
22    preferable to have someone with a master's
23    to you?
```

155

```
 1    A      It was preferable for me to employ
 2    Ms. Ware.
 3    Q      Why?
 4    A      For all of those reasons I gave you
 5    earlier.
 6    Q      Okay.  And that's what am I trying to
 7    ask you about those reasons.  I'm just
 8    asking to you was it preferable to have
 9    somebody with a master's as opposed to a
10    Ph.D.?
11    A      It depends on the person.
12    Q      Okay.
13    A      Does everybody have a master's or a
14    doctorate, it depends on the person.
15    Q      You gave me a list of reasons why you
16    selected Ms. Ware and one of the reasons is
17    you said is that she had a master's degree,
18    so why is that a reason?
19    A      Well, for one reason is that I
20    thought that that, that reason she was, she
21    was sufficiently prepared to teach these
22    courses.
23    Q      So she met the minimum requirements?
```

156

```
 1    A      Right.
 2    Q      Okay.  And that was a feather in her
 3    cap that she met the minimum requirements?
 4    A      Along with all the other
 5    considerations I made about her.
 6    Q      Is there any other reason why her
 7    having a master's degree was important to
 8    you?
 9    A      No.
10    Q      Okay.  But you're not saying that you
11    found the master's degree to be preferable
12    to a Ph.D. in this particular situation?
13    A      No.
14    Q      Okay.  All right.  And number 4, it
15    would cost less money, $33,000; is that
16    right?
17    A      Yes.
18    Q      Now, let me ask you this, how much
19    would that shave your overall budget for the
20    faculty?
21          MR. CHRISTMAN:  Form.
22          THE WITNESS:  I don't understand the
23    question.
```

157

Q (BY MR. PORTER:) Well, how much do you budget for the whole faculty?
A I can't tell you that. I don't know for the whole faculty.
Q You don't know?
A We have a $22,000,000 budget.
Q You have a $22,000,000 budget?
A Yeah.
Q Do you know how much of that goes to salary or what do you call it class D, is that faculty?
A I can't tell you off the top of my head. 60 percent of it is instructional.
Q What does that mean salaries or what?
A Yes, salaries, everything, supplies, whatever.
Q So about $12,000,000 for the salaries?
A Or less, yeah -- no, not just salaries, but that would be everything, but without looking at figures, I can't tell you that off the top of my head, no.
Q You don't know your budget? How many

158

years have you been president there, and you don't know? Have you got any relatives that work there?
A No, I don't, nor legislators.
Q But by saving $33,000 was not a, I know it's $33,000, but it's not a very big part of your budget, is it?
A No, but it all adds up.
Q It does all add up, it does, but on one hand, don't you always want to try to get the best teacher you can for your students?
A Absolutely.
Q Okay. Number 5, we got the phone call from Thompson, we've been through that, right?
A I believe so.
Q Okay. And you're certain that that phone call took place before you made the hiring decision?
A Yes.
Q Okay. And had you never gotten that phone call, would you have made the same

159

decision?
A I believe so.
Q Okay. Let me ask you this. If you take all of these other factors out and all you had was the phone call, just hypothetically, assume that you felt that Ms. Ware and Dr. Emanuel were equal and you got the phone call, would that have swung the deal for you?
MR. CHRISTMAN: Object to that question. If you can answer that hypothetical question truthfully, I'd like for you to do it but don't speculate.
THE WITNESS: I don't even understand the question now.
Q (BY MR. PORTER:) It's a hypothetical one.
A I know, but take what out of whom and --
Q All these things that we talked about and we'll continue to talk about all of these other reasons --
A Uh-huh.

160

Q -- if you just, let's say Dr. Emanuel had the exact same thing, so all the other reasons are just even.
A You mean -- I'm sorry.
Q Yeah. All the other --
A If he had a master's, if he had exactly what she had.
Q All the reasons that you listed why you liked her, if he had the same thing, was dead even and the only difference is the phone call?
A About him, the phone call?
Q Yeah. From Dr. Thompson?
MR. CHRISTMAN: What's the question.
Q (BY MR. PORTER:) What decision would you have made then?
MR. CHRISTMAN: Object to the form of the question. Answer if you can.
THE WITNESS: If he and she were equal in everything but yet I got the phone call I got about him, well, I really don't like to answer hypotheticals, you know, I'm not in that situation, I'm in this

161

1    situation.
2    Q    (BY MR. PORTER:)  I know, it's okay
3    to ask a hypothetical situation, you know,
4    just answer the best you can
5    A    Well. I would think.
6    Q    If you don't know, that's fine. then
7    if you don't know
8    A    I don't want to answer it because I
9    don't know  I'm not in that situation.
10   Q    Well, if you have an answer, you have
11   to give it to me.
12   A    I don't have an answer
13   Q    Do you know?  So in other words, the
14   phone call didn't mean that much to you?
15   A    The phone call did mean a lot to me.
16   Q    Okay  Well, then would you have
17   made the same decision you made under the
18   scenario I gave you?
19   A    So if everything were the same, he
20   had a master's degree --
21   Q    He was enthusiastic, he was from
22   Dothan, yeah, all up and down the line.
23   A    And I got a phone call from Dr

162

1    Thompson saying --
2    Q    Just exactly like the one you told me
3    about.
4    A    About him?
5    Q    Right
6    A    Then I would still employ Ms. Ware.
7    Q    Okay.  All right.  You also said you
8    were impressed with her and we had an
9    earlier conversation about that where you
10   talked about her knowledge of the school and
11   that sort of thing, is that what you're
12   talking about, her enthusiasm on the phone,
13   is there anything else to that that we
14   haven't talked about that led to your
15   conclusion that you were impressed with her?
16   A    I think I've covered it.
17   Q    Okay.  You also listed her
18   enthusiasm -- I've got enthusiasm for
19   discipline, did you mean discipline like
20   disciplinary things.
21         MR. CHRISTMAN:  For the discipline.
22   She said the discipline
23   Q    (BY MR. PORTER:)  The discipline like

163

1    a school, the subject matter?
2    A    The subject matter.
3    Q    Okay.  And how did she demonstrate
4    that?
5    A    I don't remember.  It's written on
6    that sheet, but probably --
7    Q    You mean that exhibit?
8    A    My notes on, in the exhibit from the
9    conversation.
10   Q    Are you talking about your notes from
11   your interview with her?
12   A    On the phone. yes.
13   Q    Okay.  Where it says highly
14   motivated. punctual, proven instruction --
15         MR. CHRISTMAN:  I don't think that's
16   what she's talking about.  I think she's
17   talking about --
18         THE WITNESS:  Oh. from my statement.
19         MR. CHRISTMAN:  The justification
20   statement
21         THE WITNESS:  Oh, I'm sorry.  Yeah.
22         MR. PORTER:  You just had it right
23   there  Isn't that it right there?  You just

164

1    had it a minute ago.
2          MR. CHRISTMAN:  It's Exhibit 9.
3          THE WITNESS:  Yes. that's would be my
4    impression of her from the phone, her
5    enthusiasm for her discipline and her
6    enthusiasm for teaching students
7    Q    (BY MR. PORTER:)  And did you get
8    that from the inflections in her voice that
9    we talked about?
10   A    Yes, and from what I picked up from
11   the discussion with John Fergus.
12   Q    About what?
13   A    About her love for teaching, her
14   enjoyment for teaching
15   Q    How much she wanted the job?
16   A    Perhaps, I don't remember exactly.
17   Q    Okay  Did you have any involvement
18   in the drafting or the creation of her
19   contract with the school?
20   A    The drafting of her contract?
21   Q    Yeah  You were talking earlier about
22   how she signed the contract?
23   A    Well. the contracts are generated in

165

```
1    the human resources department.
2    Q    Did you sign it?
3    A    I did or either Eva Sasser would, she
4    has the designation that she can sign for
5    me.
6    Q    Okay. I don't have one to mark, but
7    let me show you what is Bates page GWCC167
8    and ask you if that's her contract?
9         MR. PORTER: Let's go off the record.
10        (Whereupon, an off-the-
11        record and short recess
12        was had.)
13   Q    (BY MR. PORTER:) Dr. Young, let me
14   show you what I've marked as Exhibit 16 to
15   your deposition. Have you ever seen that
16   before?
17   A    I don't believe so.
18   Q    Does it appear to be Ms. Ware's
19   contract?
20   A    No, sir.
21   Q    Okay. Excuse me. Verification of
22   employment experience; is that right?
23   A    Yes.
```

166

```
1    Q    Do you know who would have filled
2    this out?
3    A    Yes, personnel.
4    Q    Okay. And it's signed by, what, is
5    that Dean Fergus, Dr. Sasser; is that right?
6    A    Yes.
7    Q    And Ms. Ware?
8    A    Yes.
9         MR. PORTER: Oh, does anybody got a
10   black pen real quick? I want to mark out
11   her Social Security number.
12        (Whereupon, an off-the-
13        record discussion was had.)
14   Q    (BY MR. PORTER:) Do you know who
15   would have completed this top information?
16   A    What top information? You mean up
17   where it says D-1?
18   Q    Yeah. Where it says work
19   experience. 0, D-1, all of that?
20   A    Probably personnel.
21   Q    What is step 0?
22   A    That is the first step on the salary
23   schedule.
```

167

```
1    Q    So 1 is not the first step?
2    A    No.
3    Q    Do you know why it has 0 for relevant
4    work experience?
5    A    Yes.
6    Q    Why is that?
7    A    Because you get no credit for
8    part-time work experience on the salary
9    schedule.
10   Q    Well, then if you don't get credit
11   for it there, why, why does it help you meet
12   the minimum requirements for the job?
13   A    You still have the work experience,
14   you just don't get credit for it on the
15   salary schedule.
16   Q    Where does it say that?
17   A    In State board policy.
18   Q    Is that in the State board policy
19   somewhere?
20   A    On the salary schedule, yes.
21   Q    I thought there was a case where a
22   guy had some full-time and part-time work
23   and the issue was whether or not the
```

168

```
1    part-time, do you remember that? I think
2    you were actually in that case and the issue
3    was whether the part-time should count
4    toward tenure?
5    A    It, that was a John McCloud case,
6    that was before I became president, but it
7    lingered on --
8    Q    Yeah, it went on forever.
9    A    -- until after, and the college lost
10   the case, but it had to do with tenure, but
11   it did not have to do with salary schedule,
12   but you cannot get credit on the salary
13   schedule for part-time teaching experience.
14   Q    Why not?
15   A    Because State board policy won't
16   allow it.
17   Q    But if you have a requirement for a
18   position that you have teaching experience,
19   you can use part-time for that?
20        MR. CHRISTMAN: As a qualification
21   you mean?
22        MR. PORTER: Yeah. Yeah. Uh-huh.
23   Q    (BY MR. PORTER:) As a minimum
```

169

1    qualification?
2    A     I'm not sure.  I would have to check
3    on that. but I know you can't on the salary
4    schedule.
5    Q     Well, did you check on that before
6    you hired Ms. Ware?
7    A     I didn't, the committee should have
8    Q     Did you ask them about the results of
9    that?
10   A     No
11   Q     So if you can't count part-time
12   toward teaching experience as far as the
13   minimum qualifications. she didn't meet the
14   minimum qualifications. did she?
15   A     Where is the announcement?
16   Q     I think it's number 2 -- yeah, here's
17   a copy of it.
18   A     Well. it's not a minimum
19   qualification that she have teaching
20   experience, or he or the applicant
21   Q     Okay.  You're right.
22   A     Minimum qualifications is just a
23   master's degree.

170

1    Q     Just a master's, okay.  You're right
2    I'm sorry
3    A     It's the preferred qualification.
4    Q     Preferred.  So that would be another
5    preferred qualification that she did not
6    have?
7    A     No, it just says teaching experience
8    in a community college.  She has teaching
9    experience in a community college.
10   Q     But part-time. right?
11   A     Yeah, but it doesn't say full-time or
12   part-time.
13   Q     Well, does it say full-time in the
14   schedule that you're talking about?
15   A     This has nothing to do with salary
16   schedules.
17   Q     I'm talking about the salary
18   schedule.  It does. it does say it has to be
19   full-time there?
20   A     On the salary schedule, and she was
21   not granted that experience
22   Q     Okay
23   A     But this. she had this preferred

171

1    minimum qualification.  She has teaching
2    experience in a community college and she
3    met the minimum qualification which was only
4    the master's degree
5    Q     The next, the next item we have on
6    our list was enthusiasm, the discipline and
7    we've talked about that. right. we've
8    covered that completely?
9    A     I have
10   Q     Yeah, I mean you --
11   A     I mean, I believe I've said all I
12   know to say about it.
13   Q     Okay.  The next item is concern for
14   the students, what did you base that
15   impression on?
16   A     My conversation with her and what,
17   from the notes I read on the answers.
18   Q     From what?
19   A     Those notes that were taken during
20   the interview, John Fergus
21   Q     John Fergus' notes?
22   A     All of those notes, I had access to
23   all of those notes. remember

172

1    Q     You're talking about the screening
2    committee notes?
3    A     Uh-huh.
4    Q     That's a yes?
5    A     Yes
6    Q     Did you think that she had more of a
7    concern then Dr. Emanuel did?
8    A     I didn't say that now.  I just wrote
9    down why I chose her for the job.
10   Q     All right.
11   A     And that was an obvious concern for
12   the studentss.
13   Q     Okay.  Did you get the impression
14   from talking to Dr. Emanuel and reading the
15   documents related to him that he had concern
16   for the students as well?
17   A     I believe he had concern for student
18   Q     What, do you think he had enthusiasm
19   for the discipline as well?
20   A     Probably.  I just know I felt that
21   she was very enthusiastic from the
22   conversation on the phone, I remember that.
23   Q     You say she had. the next item I see

173

```
 1   is you say she had a record of successful
 2   teaching.  Now, is that the one-year
 3   part-time teaching she did at Jeff State?
 4   A    Yes.
 5   Q    And what do you base the successful
 6   aspect on?
 7   A    My call to Jeff State.
 8   Q    Okay.  And why did you call them?
 9   A    Because I wanted to know myself about
10   her.
11   Q    Why?
12   A    Because I was interested in employing
13   her.
14   Q    Did you call anybody that employed
15   Dr. Emanuel?
16   A    No.
17   Q    Why?
18   A    One reason is that I got that phone
19   call and I was not interested in him any
20   more.
21   Q    So you called Jeff State before you
22   had your conversation with Dr. Thompson?
23        MR. CHRISTMAN:  Object to the form.
```

174

```
 1   she did not say that.
 2   Q    (BY MR PORTER:)  Well, that has to
 3   be true, doesn't it?
 4   A    No.  I don't think so.  I called when
 5   I became very interested in employing her
 6   before we hired her to ensure that she was a
 7   candidate that I felt very comfortable about
 8   her for the college.  I called my friend at
 9   Jeff State and she checked with the dean to
10   ensure that she was a good instructor.
11   Q    Let's see.  You said that she had
12   professional development in the activities
13   in the area of speech, what is that about?
14   A    That's what I read on the resume, I
15   can't expand anymore on that.
16   Q    On her application?
17   A    Yes.
18   Q    Okay.  Show me where that is.  That
19   is Exhibit 10.
20   A    Do I have her complete application?
21   Q    I don't know.
22   A    I have his.  I don't know if hers has
23   been entered in as an exhibit.
```

175

```
 1   Q    Yeah.
 2        MR. CHRISTMAN:  10.  It's in the
 3   middle somewhere.
 4        THE WITNESS:  Yeah, but it's not
 5   complete.  It's not all her resume and --
 6        MR. CHRISTMAN:  She's asking about,
 7   she's saying this doesn't necessarily --
 8        MR. PORTER:  This is all I have on
 9   the application.
10        THE WITNESS:  Well, there is more
11   that I looked at.  As I told you in his -- I
12   had more information, and I thought, and I
13   know I had more on him also because I had
14   transcripts.
15   Q    (BY MR. PORTER:)  And what do you
16   recall that being?
17   A    What being?
18   Q    The activities, professional
19   development activities and speech?
20   A    Like I say, I don't know without
21   looking at the complete packet.
22   Q    Well, would it be at Jeff State where
23   it says, "Prepare and deliver lectures on
```

176

```
 1   topics such as public speaking?
 2   A    I would assume so.
 3   Q    That's what it is?
 4   A    Probably.
 5        MR. CHRISTMAN:  Form.
 6   Q    (BY MR PORTER:)  Okay.  And the next
 7   item it has that she supported the committee
 8   college philosophy, what do you base that
 9   on?
10   A    I would base it on my discussion with
11   her on the phone about community colleges.
12   Q    And did Dr. Emanuel not also talk
13   about his philosophy on community colleges
14   and how he preferred them?
15   A    He did.
16   Q    Do you think he supported the
17   community college philosophy as well as she
18   did?
19   A    I believe he supported the community
20   college philosophy.
21   Q    To the same degree that she did?
22   A    Probably.  I hadn't really thought
23   about the comparison.
```

177

1    Q    And her experience with WebCT, let's
2    see, that's based on what she said in the
3    interview?  I think you got some notes about
4    that?
5    A    I don't know if I have notes or not,
6    but it's --
7    Q    Well, it's in your notes --
8    A    I think the committee had covered
9    some of that and it's in her packet.
10   Q    What is WebCT?
11   A    I don't know a whole lot about it,
12   but it's the way we deliver instruction
13   online.
14   Q    You teach and there's a camera on
15   you --
16   A    Yeah.
17   Q    -- and people at home, or whatever,
18   can do it; is that right?
19   A    Uh-huh.
20   Q    And then the last item I have is that
21   she was the best match for the institution,
22   what did you base that on?
23   A    Everything in the statement, just how

178

1    she relates to the needs of the institution
2    overall.
3    Q    Okay.  Looking at Exhibit 9.  What is
4    the purpose of Exhibit 9?
5    A    The purpose of Exhibit 9 is that we
6    make a statement to the file as to why we
7    select a certain candidate for the job and
8    that's put on file and that's a requirement
9    under the consent decree and we just, it's
10   for the record.
11   Q    The, these arrows like bullet point
12   type things, have we covered all of those,
13   and if you would, read through those and
14   tell me if there are some that we have not
15   covered?
16   A    We've covered them all.
17   Q    You don't mention anything in there
18   about the phone call from Dr. Thompson, do
19   you?
20   A    No.
21   Q    Why not?
22        MR. CHRISTMAN:  Anything in Exhibit
23   9 about why she hired Ms. Ware?

179

1         MR. PORTER:  About the phone call
2    with Dr. Thompson.
3         MR. CHRISTMAN:  You're asking if she
4    mentioned it in Exhibit 9?
5         MR. PORTER:  Yes.
6         THE WITNESS:  I did not mention it
7    because I thought it pertained to him, not
8    to her and I think these are substanial
9    reasons for her employment.
10   Q    (BY MR. PORTER:)  You say, "I
11   selected Ms. Ware as the top candidate for
12   the following reasons," and you list your
13   reasons, right?
14   A    Yes.
15   Q    So your phone conversation with Dr.
16   Thompson was not a reason why you selected
17   Ms. Ware over Dr. Emanuel?
18        MR. CHRISTMAN:  Object to form.
19        THE WITNESS:  It was a reason.
20   Q    (BY MR. PORTER:)  Do you recall
21   consciously deciding not to mention that in
22   Exhibit 9?
23   A    No.

180

1    Q    And is the purpose of this Exhibit 9
2    to document the reasons for your decision?
3    A    Basically, that's the reason.
4    Q    Isn't it to address the very
5    situation we're in now, where somebody is
6    questioning those reasons?
7         MR. CHRISTMAN:  Object to form.  If
8    you know why the two-year college system
9    implemented that requirement or it was
10   implemented under Shuford, you can answer,
11   but don't speculate.
12        MR. PORTER:  Let's not coach, okay.
13        MR. CHRISTMAN:  I'm not coaching.
14   I don't want you to speculate.
15        THE WITNESS:  This, this process,
16   this requirement was implemented under
17   Shuford that we provide this information.
18   Q    (BY MR. PORTER:)  Did you learn that
19   from when your lawyer just told you?
20   A    No.  I've known this was a
21   requirement under Shuford.  I think I said
22   that earlier.
23   Q    And do you know the purpose of it?

161

1   A   Yeah.
2   Q   Isn't it to have a have clear record
3   of the reasonings for the decision?
4   A   Yes.
5   Q   Okay.  And that phone conversation
6   was an important part of your decision.  I
7   think you said; is that right?
8   A   It was a part of it, yes.
9   Q   Yeah.  But why didn't you include it
10  then?
11  A   Because I didn't want to put that
12  down if I listed the reason I employed her,
13  but I did not want to list that I did not
14  refer, I don't ever refer to the other
15  candidates in my listing, I do not make
16  comparisons in my listing, in any listing.
17  You will never look at a listing or a
18  statement in which I make comparisons to
19  other candidates.
20  Q   Well, this isn't a comparison,
21  though.  Dr. Thompson wasn't comparing Ms
22  Ware and Dr. Emanuel, it was just a comment
23  about Dr. Emanuel that was important to your

182

1   decision?
2   A   But I don't ever refer to other
3   candidates in my statement.  I just discuss
4   their strengths.
5   Q   But you state yourself that you
6   selected her for the following reasons?
7   A   That's correct.
8   Q   And that was one of your reasons?
9   A   But I didn't say that I listed all of
10  reasons.
11  Q   Oh.
12  A   I just said I selected her for these
13  reasons, but I don't say that these are the
14  only reasons.
15  Q   Where does it say they're not the
16  only reasons?
17  A   Well, it doesn't, but it doesn't say
18  that they are the only reasons.
19  Q   Oh, so when you think when you wrote
20  I selected Ms. Ware as the top candidate for
21  the following reasons, you think a
22  reasonable interpretation of that is that
23  this isn't all the reasons, there are more

183

1   reasons?
2   A   I think you can interpret it however
3   you want to, but it does not say that these
4   are the only reasons that I selected her.
5   Q   Okay.  Do you recall getting an EEOC
6   charge regarding this situation from Dr.
7   Emanuel?
8   A   Yes.
9   Q   And did you participate in providing
10  a response to that?
11  A   I did.  I signed the documents that
12  were prepared and so forth.
13  Q   Have you been through the EEOC
14  process before?
15  A   I believe we've gotten one other
16  complaint.
17  Q   And were you involved in responding
18  to that charge?
19  A   I believe so.
20  Q   I don't want you to tell me about any
21  conversations with lawyers, but did you work
22  with lawyers in responding to the charge?
23  A   The other one or this one?

184

1   Q   This one.
2   A   Primarily Dr. Sasser worked with
3   them, my executive assistant.
4   Q   Worked with the lawyers?
5   A   Yes.
6   Q   Who were the lawyers?
7   A   Ed George.
8   Q   Where is he?
9   A   Montgomery.
10  Q   Okay.  Again, I don't want you to
11  tell me about any conversations with the
12  lawyer, but did you meet with the lawyer to,
13  you know, provide factual information to
14  respond to the charge?
15  A   I think we talked on the phone.
16  Q   Okay.  Let me show you what am I
17  marking as Exhibit 17.  Have you seen that
18  before?
19  A   Yes.
20  Q   Is that your signature on the last
21  page?
22  A   Yes.
23  Q   Did you draft this?

185

```
 1    A      No.
 2    Q      Did you provide factual information
 3    in the drafting of it?
 4    A      I believe so. yes.
 5    Q      Do you know who did draft it?
 6    A      Dr. Sasser with Ed George I assume
 7    together.
 8    Q      And did you read this document before
 9    you signed it?
10    A      I believe so   I normally read them
11    Q      Do you recall if there were any
12    earlier drafts than this one?
13    A      No. I don't.
14    Q      Okay   Did you read this to make sure
15    it was accurate before you signed it?
16    A      As far as I know, I did.
17    Q      It states that at the bottom of page
18    2, "Neither race nor gender considered by
19    the search committee in recommending the
20    three finalists."  Do you see that?
21    A      Yes.
22    Q      Is that the same, is that also true
23    for you that race and gender played no role
```

186

```
 1    in your decision?
 2    A      About selection of the candidates?
 3    Q      Yes.
 4    A      Ms. Ware?
 5    Q      Yes.
 6    A      Absolutely.
 7    Q      Okay   You state down on, under the
 8    qualifications of selected candidate you
 9    describe her meeting the qualifications and
10    you state that. "My decision to appoint Ms.
11    Ware was based strictly on my determination
12    of her overall suitability for the
13    position," but that's not quite accurate, is
14    it?
15    A      "Strictly on my determination of her
16    overall suitability for the position."  The
17    phone call became a part of it.
18    Q      So that statement that you have there
19    is not accurate, is it?
20    A      Possibly not.
21    Q      Right.  Because it was also based on
22    your determination, in your words, of Dr.
23    Emanuel's unsuitability based on what Dr.
```

187

```
 1    Thompson told you; is that right?
 2    A      That entered into it, but I would
 3    still have selected her.
 4    Q      Even if you had not gotten that phone
 5    call?
 6    A      Yes.
 7    Q      Okay.  Why don't you mention the
 8    phone call or refer to it in any way here in
 9    this response?
10    A      Because I just did not want to get
11    into that subject.
12    Q      So you made a conscious decision not
13    to mention it?
14    A      Right.
15    Q      And why didn't you --
16    A      I didn't know the nature of the
17    problem over there.  I just knew there was
18    one.
19    Q      When you say, "over there" --
20    A      Over there, Enterprise.
21    Q      Okay.  And you assumed it was work
22    related?
23    A      Yes.  I knew that he had left the
```

188

```
 1    institution.
 2    Q      Right.  Did you, did you ever have
 3    another conversation with Dr  Thompson about
 4    that subject?
 5    A      No.
 6    Q      Have you talked to him at all since
 7    then?
 8    A      I told him that he would, he would
 9    get a call from Drew Christman regarding
10    this case.
11    Q      When was that?
12    A      Probably sometime, a few months ago,
13    I don't remember exactly, several months ago
14    I believe.
15    Q      Let me show you what I'm marking as
16    Exhibit 18.  I thought I had another copy,
17    but I don't.  It's the affidavit.  Have you
18    ever seen that before?
19    A      No
20    Q      Is there anything in it that is false
21    in your opinion?
22    A      I don't remember our discussion
23    exactly.  I just remember that, my memory of
```

189

1    it, I know that he called me, that's my
2    memory of it and I was in my office and my
3    memory was that he indicated that there was
4    a problem with Dr. Emanuel and I, but we
5    didn't have a discussion about what the
6    problem was or any of that, and I, I cannot
7    remember at what point we were in the
8    process, so I absolutely don't know.  I know
9    I had not made a decision to employ.
10   Q     His last sentence is, "From our
11   conversation, I was left with the impression
12   that she had concluded that Dr. Emanuel
13   would have been a problem if hired."
14   A     Yeah.  I don't, I don't think that, I
15   don't think that we were in, I think it
16   was before we had, had made a decision, but
17   like I say, I can't remember when it was.
18   Q     So it may have been after you made
19   the decision?
20   A     I don't think so.
21   Q     But you're not sure?
22   A     I'm not sure.
23   Q     Well, then if you had the

190

1    conversation with him after the decision was
2    made, it couldn't have had any effect on
3    your decision, could it?
4    A     No.
5    Q     And it's possible that you didn't
6    have the conversation before the decision
7    was made, right?
8    A     I believe the conversation was before
9    the decision was made.
10   Q     But you don't know for sure?
11   A     I don't know for sure.
12   Q     Well, when he says that he was left
13   with the impression that you concluded that
14   Dr. Emanuel would have been a problem if
15   hired, what did you say to him, do you
16   think, that would have given him that
17   impression?
18   A     I have no idea.
19   Q     Did you say anything to him that
20   would have given him that impression?
21   A     I don't think so, but I don't know.
22   Q     Okay.  Have you ever seen this
23   before?

191

1    A     No.
2    Q     Okay.  It's dated April 1, 2008.  Did
3    you have your conversation with him wherein
4    you told him that Drew will be calling him
5    before April 1 of 2008?
6    A     I believe so.
7    Q     And I was asking you about why you
8    didn't say anything to the EEOC about this
9    phone call.  Do you realize what the purpose
10   of this, the letter to the EEOC, was,
11   Exhibit 17?
12   A     Do I realize what the purpose was?
13   Q     What it is, yeah.
14   A     Basically to explain our position.
15   Q     Right.  Do you see where it says,
16   "Respondent's position statement?"
17   A     Uh-huh.
18   Q     Is that a yes?
19   A     Yes.  I'm sorry.
20   Q     And you say that you consciously made
21   a decision not to make any reference to the
22   phone conversation with Dr. Thompson because
23   you didn't want to, quote, go there, right?

192

1    A     Exactly.
2    Q     And why didn't you want to go there?
3    A     Because I didn't know exactly what
4    the problem was.
5    Q     I'm not following you.
6    A     The problem that was expressed in the
7    call from Dr. Thompson.
8    Q     Were you concerned about getting Dr.
9    Thompson in trouble?
10   A     I just didn't want to elaborate on
11   the problem.  I didn't know what the problem
12   was.  I just knew I didn't want the problem.
13   Q     My question was, were you concerned
14   about getting Dr. Thompson in trouble?
15   A     I didn't want to get him in trouble
16   either, but that was not my greatest
17   concern.  My greatest concern is that we did
18   not get a problem.  "We" at Wallace.
19   Q     As far as hiring him?
20   A     Yes.
21   Q     Well, that's got nothing to do with
22   why you wouldn't list it in a letter a year
23   later, does it?

193

```
1   A      Probably not
2   Q      Okay.  So one reason why you decided
3   not to mention the letter, or the phone
4   conversation, in this EEOC letter is you did
5   not want to get Dr. Thompson in trouble; is
6   that right?
7   A      I didn't say that, no.  No.
8   Q      Okay.  That's not a reason?
9   A      No, that's not a reason.
10  Q      Okay.  So your concern about Dr.
11  Thompson had nothing to do with your
12  decision about not mentioning that phone
13  conversation in this letter?
14  A      No.
15  Q      That's false?
16  A      I did not have a concern about
17  that --
18  Q      Okay.
19  A      -- is the reason for not listing it
20  in the letter.
21  Q      Okay.  Well, then explain to me why
22  you didn't want to, quote, go there?
23  A      I did not know the nature of the
```

195

```
1   offered a contract for the following year?
2   A      I don't remember that now.
3   Q      You didn't ask them that?
4   A      I don't remember the conversation
5   about that, but she left in good stead.  I
6   mean, she wasn't, she wasn't fired or
7   terminated.
8   Q      Well, that's not how it works, isn't
9   it like you get a contract for a year and
10  then they offer you another contract for the
11  next year?
12  A      Yeah.  Yeah.
13  Q      When do those contracts --
14  A      But they were satisfied with her job
15  performance.
16  Q      When are those contracts usually
17  offered?
18  A      It depends on the needs of the
19  institution.
20  Q      Typically?
21         MR. CHRISTMAN:  I didn't know -- what
22  did you say?
23         MR. PORTER:  When are those contracts
```

194

```
1   problem that existed between Dr. Emanuel and
2   Enterprise --
3   Q      And -- okay.  Go ahead.
4   A      I just knew that a colleague that was
5   not very close to me and would normally not
6   go out of his way to help me made a phone
7   call to me so I knew it was of a serious
8   nature that he called --
9   Q      Uh-huh.
10  A      -- to tell me that there was a
11  problem with an employee, so I knew that it
12  was something major and I knew that employee
13  had left the college.  Normally employees
14  don't leave unless there's something really
15  wrong.
16  Q      Why did Ms. Ware leave Jeff State?
17  A      Well, I think she left because she
18  relocated to Dothan is what she told me.
19  Q      Is that what they told you when you
20  called over there?
21  A      They told me she was a very good
22  employee.
23  Q      Had she been offered, had she been
```

196

```
1   usually offered.
2          MR. CHRISTMAN:  When?
3          MR. PORTER:  Yeah.
4   Q      (BY MR. PORTER:)  In the spring?
5   A      Yeah, if it's a nine-month contract.
6   Q      Uh-huh.  And so this was in June and
7   July when she was interviewing, right?
8   A      The announcement was in May I
9   believe.
10  Q      Yeah.  And you interviewed her in
11  June -- no, excuse me, July?
12  A      I believe so.
13  Q      And you don't know whether or not
14  she had been offered another contract with
15  Jeff State?
16  A      I don't remember.  I just know that
17  they were very satisfied with her job
18  performance.
19  Q      If they had not offered her a
20  contract, would that have been something of
21  importance to you?
22  A      Yeah, but they knew that they were
23  satisfied with her job performance.
```

197

1   Q      What would you infer from the fact if
2   they had not offered her a contract for the
3   following year?
4        MR. CHRISTMAN:  Form
5        THE WITNESS:  That they probably
6   didn't need part-time instructors
7   Q      (BY MR. PORTER:)  Okay  So you're
8   saying that your lack of knowledge of the
9   circumstances of what Dr. Thompson told you
10  made you decide that you didn't want to
11  mention this, right?
12  A      Yes.
13  Q      And then why is it would your lack of
14  knowledge prevent you from saying anything
15  about it?
16  A      Because I don't want to speculate on
17  something I don't know what the problem is
18  Q      Couldn't you have just said, I got a
19  bad reference from a colleague?
20  A      I guess I could have, but I just
21  didn't want to, I did not want to make that
22  statement.
23  Q      Why?

198

1   A      I just didn't want to get involved in
2   that  I just wanted to make my decision.  I
3   had a good candidate here, a good candidate
4   with qualifications and I thought it would
5   meet the needs of the college. we could save
6   $33,000 a year
7   Q      Oh, by the way. where do you mention
8   that in here in your EEOC --
9   A      I didn't
10  Q      You didn't mention that there either,
11  did you?
12  A      I don't have to mention everything
13  about a decision
14  Q      Well, I thought you said that the
15  purpose of the letter to the EEOC was to
16  explain the basis of your decision?
17  A      Well, I think I explained the race
18  and gender charge of which he was charging
19  us with
20  Q      Well, and the saving the money was an
21  important factor to you, was it not?
22  A      Yeah.
23  Q      You don't tell that to EEOC, do you?

199

1   A      No
2   Q      Did you make a conscious decision not
3   to do that?
4   A      Yeah, I guess so.
5   Q      Why?
6   A      I didn't feel like it was important.
7   He was concerned about the race and gender.
8   Q      Yeah, but wouldn't saving money prove
9   that it was something other than race and
10  gender?
11  A      I guess so.  We should have put it in
12  there I guess.
13  Q      But you still made the conscious
14  decision not to put it in there?
15  A      Didn't really think about it, I
16  guess, at the time
17  Q      I thought you said you did think
18  about it?
19  A      I did.  I guess our attorney didn't
20  and I failed to tell him that.
21  Q      Oh, you didn't mention it to anybody
22  when this was being drafted?
23  A      I guess not.

200

1   Q      And you didn't put it in, you didn't
2   mention anything about that in Exhibit 9,
3   did you?
4   A      No, and I should have.
5   Q      Why didn't you?
6   A      I just didn't.
7   Q      Wouldn't it show some fiscal
8   responsibility to show everybody that you're
9   saving money for the school?
10  A      Absolutely.
11  Q      And yet you didn't put it in here,
12  did you?
13  A      No.
14  Q      Okay.  I'm still not quite clear on
15  why your lack of knowledge about the
16  underlying facts regarding Dr. Thompson's
17  phone call caused you not to want to list
18  it.  Were you concerned with some sort of
19  slander suit or something?
20  A      I didn't want to get involved in
21  another college's problem.  All I knew is
22  there was a problem, therefore I didn't want
23  to employ that person.

201

```
1   Q      I'm not asking you about why you
2   didn't want to employ the person, I'm asking
3   why you didn't put it in this letter?
4   A      Because I didn't want to talk about a
5   problem I didn't know what the problem was
6   Q      And why is that?
7   A      Because I don't normally talk about
8   something I don't know what I'm talking
9   about.
10  Q      What's your concern?
11  A      I didn't want a problem employee
12  Q      Ma'am. the decision had already been
13  made. This is in December of 2006 and when
14  you're responding to the EEOC so the
15  question of your having a problem employee
16  is water under the bridge, now you're
17  answering to the EEOC. right?
18  A      Yes
19  Q      Stay with me on that
20  A      Yes.
21  Q      Why didn't you want to tell the EEOC
22  about this phone call from Dr. Thompson?
23  A      Because I felt like we were
```

203

```
1   A      I do
2   Q      Okay   Going back to this letter.
3   you felt that it was true. right, and.
4   again, why didn't you put some generic
5   statement like I got a bad reference from
6   not only a colleague. but a colleague that
7   I'm not big buddies with and it must have
8   been a pretty big deal for him to have
9   called, picked up the phone and told me
10  about this?
11         MR. CHRISTMAN: Before you answer.
12  I'm going to object to the form of the
13  question and ask. I'm going to let the
14  witness answer this question maybe one more
15  time and then we're not going to answer it
16  any more
17         MR. PORTER: Now, I have not gotten
18  an answer to this now.
19         MR. CHRISTMAN: I don't agree   I
20  feel like you've been over this -- I want to
21  give, listen. I want to give you plenty of
22  latitude to ask what you need to ask.   I'm
23  not trying to control your deposition, but I
```

202

```
1   addressing the race and gender charges in
2   that letter and I didn't want to get into a
3   phone call that I didn't have a basis for
4   discussing with EEOC about the problem. so I
5   didn't want to put it in the letter
6   Q      Did you have some suspicion that what
7   Dr. Thompson said was false?
8   A      No.
9   Q      Then why didn't you put it in the
10  letter?
11  A      Because I. I felt like that it was
12  true   I knew he left the institution
13  Q      Yeah   So what does that mean?
14  A      What does what mean?
15  Q      The fact that he left there.
16  A      I don't know, but it's enough of a
17  signal to me to know I don't want that
18  employee
19  Q      Oh, have you worked in the same place
20  your whole career?
21  A      No, but I just know that I, just know
22  how it works, let's just say that.
23  Q      Oh, you do?
```

204

```
1   feel like we're kind of churning the water
2   now
3          MR. PORTER: I agree with you 100
4   percent. The only thing that I've gotten
5   from her is that she didn't want to mention
6   it because she didn't want to go there to
7   something that she didn't know what it was,
8   but she has not said why she didn't want to
9   go there
10         MR. CHRISTMAN: Well, you keep asking
11  her and she keeps trying to tell you and you
12  keep asking.
13         MR. PORTER: And she keeps giving me
14  that same answer which is not an answer.
15         MR. CHRISTMAN: Well, then you're
16  just going to have to move on and --
17         MR. PORTER: No.  No. I'm not.
18         MR. CHRISTMAN: -- and take the
19  answer. All right. Well, what I'm telling
20  you is, I'm going to let you go through this
21  maybe one more time and then we're not going
22  to answer anymore
23         MR. PORTER: Okay
```

205

1    Q      (BY MR. PORTER:)  You answer the
2    question.
3    A      I didn't put it in the letter because
4    I didn't know the nature of the problem and
5    when I didn't know the nature of the
6    problem, I didn't want to elaborate or
7    indicate anything about it because I didn't
8    know what it was.
9    Q      And, again, why did your lack of
10   knowledge prevent you from mentioning the
11   bad reference?
12   A      Because I didn't know enough about
13   the problem and I did not want to raise a
14   red flag about something that I did not know
15   the details about the problem.
16          MR. PORTER:  It's, that's the same
17   answer, you know.
18          MR. CHRISTMAN:  Yeah.
19   Q      (BY MR. PORTER:)  I'm sorry, but
20   you're not answering my question.  The
21   question is simply, why would your lack of
22   knowledge about the underlying facts prevent
23   you from telling the EEOC about it?

206

1    A      I think my answer is the lack of
2    knowledge about the problem.
3    Q      I'm asking you why your lack of
4    knowledge was such a problem?  I understand
5    that your lack of knowledge about it, the
6    underlying facts was the problem, why was
7    that a problem to you?
8    A      Why was it a problem that I had the
9    lack of knowledge?
10   Q      Yeah -- no.  Why was your lack of
11   knowledge something that prevented you from
12   telling the EEOC about it?  Why was it a
13   concern to you?  You know, I'm thinking of
14   possibilities.  Were you concerned about a
15   possible blowback from a slander suit?  Were
16   you worried about, I don't know, you know,
17   why was it a concern to you?
18   A      You can't answer the question either,
19   see.
20   Q      I'm not you.  You know the answer.
21   A      I know.  I know.  But I don't want to
22   put anything in that letter that I don't
23   have information about.  I don't know what

207

1    the problem was.  I didn't know about it
2    until I heard the deposition the other day,
3    the details of his problem or their problem
4    there or whatever, but I knew there was a
5    problem of some significance for him to call
6    me, but I didn't know what it was and I'm
7    not going to put something in a letter, I
8    would sound like a fool to put something in
9    a letter about something I don't know
10   anything about.
11   Q      But yet you can deny a man a job over
12   it?
13   A      I didn't deny him a job over that one
14   reason.
15   Q      It was pretty important to you,
16   wasn't it?
17   A      I had a person that I felt was a good
18   candidate for this job based on the reasons
19   I gave you two or three times today.
20   Q      Even though you admit he's more
21   qualified --
22   A      I -- let me finish my answer, please.
23   I -- no I didn't say I felt like he was more

208

1    qualified.  I felt I had a good qualified
2    person for all the reason I've stated here
3    today.  I had a good candidate for this job
4    and I could save a lot of money and I didn't
5    inherit a problem, those are the reasons.
6    Q      Well, my question was why didn't you
7    tell EEOC about it actually?
8    A      Because I didn't know enough about
9    the problem and I didn't want to get into
10   something that I didn't know about with
11   EEOC.
12   Q      Okay.  Why didn't you tell EEOC
13   anything about these other issues that
14   you've talked about like the fact that she
15   was a community college graduate or that she
16   was from the Dothan area, why didn't you
17   mention those things?
18   A      I think that in the letter that we
19   mentioned the pertinent qualifications of
20   Ms. Ware and why she was selected without
21   going into every minute detail and I felt
22   like that we answered the charges
23   sufficiently and apparently they did also

209

1    since they ruled in our favor.
2    Q    Okay. Well. here's the other copy of
3    that if you want it. Let me show you what
4    I'm marking as Exhibit 19 to your deposition
5    and ask you to take a look at that. Are you
6    familiar with this document?
7    A    Yes.
8    Q    And what is this?
9    A    This shows the progress we've made
10   toward the goals set forth in the
11   appointments of blacks and females in our
12   service area. blacks and females under
13   Shuford.
14   Q    And which area of this deals with the
15   job position we've been talking about?
16   A    It would be salary schedule D.
17   Q    Okay. And it says on the bottom of
18   page 183. Bates number, that the college had
19   exceeded its goal there?
20   A    On 183?
21   Q    Uh-huh. Under salary schedule D.
22   A    Well, it's talking about salary
23   schedule C1. C2 and C3 and D all combined.

211

1    the gender of the instructors.
2    Q    Before I mark this let me ask you
3    what this is.
4         MR. PORTER: Here, I've got one for
5    you.
6         THE WITNESS: You're asking me what
7    this is?
8    Q    (BY MR. PORTER:) Yeah. Do you know
9    what it is?
10   A    Yes.
11   Q    Is that just a general instructor's
12   job description?
13   A    It is.
14   Q    Okay. It's not for this particular
15   position, is it?
16   A    No.
17   Q    Okay. You see where it, on the third
18   page it talks about job specifications,
19   education, slash, certification it's. got
20   group A. B and C?
21   A    Yes.
22   Q    Do you see that? This particular
23   position was a group A position: is that

210

1    Q    Okay. Well, do you know if the
2    college had met its goal for schedule D?
3    A    If you pull D out, I do not believe
4    it has, but I cannot. I don't know off the
5    top of my head, but with health programs in
6    there, it possibly could because we have 43
7    percent of our total enrollment is health
8    care programs and therefore we have many,
9    many, many instructors who are health care
10   instructors and as you know nursing
11   instructors are predominantly female, so the
12   nature of the programs many times dictate
13   the sex of the instructors just because
14   certain programs are traditionally taught by
15   females and then certain programs are
16   traditionally taught by males, you know,
17   it's hard to find a female auto body
18   instructor. for example, and it's very
19   difficult to find a male nursing instructor.
20   There are male nurses, of course, but it's
21   very difficult to find male nursing
22   instructors, so it's the, the type programs
23   you offer really dictate to a large degree

212

1    right?
2    A    Correct.
3    Q    Okay. I just wanted to make sure
4    about that. Y'all can keep those if you
5    want the, if you don't, just give them
6    back. All right. Let me show you what I'm
7    marking as Exhibit 20. Do you need to take
8    a break?
9    A    No, I'm fine.
10   Q    Are you familiar with these policies?
11   A    Yes.
12   Q    Whose policies are these?
13   A    These are state board of education
14   policies, Alabama State Board of Education.
15   Q    Were they in effect during this
16   hiring decision that we're talking about?
17   A    The first one is effective March 24th
18   of '05, that's Exhibit 20. page. I'm sorry,
19   page 487. And then the second. page 488
20   says this, I guess, is the latest version is
21   effective October of '07.
22   Q    Do you know if there was a. on that
23   second page there. do you know if there was

213

1    an earlier version of that that was any
2    different?
3    A    Well, apparently there were earlier
4    versions because this one supersedes, but I
5    don't know the differences.
6    Q    Okay.  Do you recall the third
7    candidate Ms. Coons?
8    A    Vaguely.
9    Q    Did you contact any of her prior
10   employers?
11   A    No.
12   Q    Do you recall why?
13   A    No.
14   Q    Do you recall anything --
15   A    Excuse me.  Probably because I was
16   giving more consideration to Dr. Emanuel and
17   Ms. Ware, but her references were checked, I
18   believe I remember seeing.
19   Q    Did you ever consider asking Dr.
20   Emanuel about what Dr. Thompson said?
21   A    No.
22   Q    Why not?
23   A    I just would never ask an applicant a

214

1    question like that.
2    Q    When did you -- did you review the
3    documents that Enterprise State produced
4    from the subpoena?
5    A    The documents that were here at his
6    deposition?
7    Q    Yes.
8    A    I have not reviewed them, no.
9    Q    Okay.  You have not looked at them?
10   A    No.
11   Q    Have, have you heard what, about what
12   they involve?
13   A    I heard only.  I know only what I
14   heard at the deposition.
15   Q    Okay.
16        MR. PORTER:  Let me take a break
17   here.
18             (Whereupon, a short recess
19             was had.)
20   Q    (BY MR. PORTER:)  Dr. Young, did you
21   know Ms. Ware before the selection process?
22   A    I did not.
23   Q    Okay.  Have you talked to her since?

215

1    A    Yes.
2    Q    Okay.  About this?
3    A    No.
4        MR. CHRISTMAN:  About this, being the
5    lawsuit?
6        MR. PORTER:  Yeah, about the lawsuit.
7        THE WITNESS:  No.
8    Q    (BY MR. PORTER:)  Where does the
9    college stand now on the guidelines goals?
10       MR. CHRISTMAN:  Form.
11       THE WITNESS:  We haven't met them.  I
12   can't tell you by each salary schedule the
13   percentages and all that, but I can tell you
14   we haven't met them.
15   Q    (BY MR. PORTER:)  Since you made the
16   decision, employment decision here back in,
17   was it July of '06, have you learned
18   anything else that you didn't know then that
19   would have caused you to make the same
20   decision you made had you known it back at
21   the time of the employment decision?
22   A    About this particular decision?
23   Q    Yeah.

216

1    A    Have I learned anything else that
2    would have caused me to --
3    Q    Make the same decision.
4    A    Have I learned anything else that
5    would cause me to make the same decision?
6    Q    If you had known it back when you
7    made the decision?
8    A    What I learned in the deposition the
9    other day would have caused me to make the
10   same decision.
11   Q    What's that?
12   A    What I heard that came up about his
13   problems at Enterprise would have confirmed
14   that there was a problem there.  I don't
15   know the details.  Again, I just know more
16   about it than I did in the beginning, but --
17   Q    Okay.  And would you have given him
18   the opportunity to respond to those problems
19   as you call them?
20   A    In the interview process?
21   Q    Yes.
22   A    No.
23       MR. PORTER:  Okay.  That's all I

217

1    have.  Thank you.
2
3        FURTHER THE DEPONENT SAITH NOT.
4        (EXHIBITS ATTACHED AND ENCLOSED.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

218

1
2            C E R T I F I C A T E
3
4    STATE OF ALABAMA )
5    JEFFERSON COUNTY )
6
7        I hereby certify that the above and
8    foregoing deposition was taken down by me in
9    stenotype and the questions and answers
10   thereto were reduced to writing under my
11   supervision, and that the foregoing
12   represents a true and correct transcript of
13   the testimony given by said witness on said
14   occasion.
15       I further certify that I am neither
16   of counsel nor of kin to the parties to the
17   action, not am I in anywise interested in
18   the result of said cause.
19
20   _____
21                COMMISSIONER
22                CCR ACCR# 136
23

<S>
$12,000,000: 157;17
$22,000,000: 157;6, 157;7
$33,000: 121;21, 122;17, 140;1, 140;6, 142;1, 156;15, 158;5, 158;6,
 198;6

<'>
'05: 35;5, 212;18
'06: 36;6, 106;11, 145;3, 145;8, 215;17
'07: 212;21
'80s: 78;13

<0>
0: 166;19, 166;21, 167;3

<1>
1: 92;5, 167;1
10: 68;7, 175;2
100: 111;15, 204;3
102: 5;8
106: 3;20
110: 91;7, 91;21
111: 91;21
136: 218;22
13th: 1;20
144: 3;21
149: 68;22, 69;2, 71;3
15-minute: 68;8
150: 71;8
155: 71;22, 72;3
157: 72;3
160: 72;12
163: 72;14
164: 91;11, 115;20, 115;23
165: 3;22
183: 209;18, 209;20
184: 4;2
188: 4;3
1982: 15;14

1999: 11;2, 18;18, 18;20, 19;6, 19;8

<2>
2: 116;9, 169;16, 185;18
2:07-cv-00819-WKW: 1;8
20: 83;22, 151;11
200: 81;23, 134;6
2000: 19;11
2000s: 19;14
2002: 19;12
2005: 41;12
2006: 201;13
2008: 191;5
204: 8;13
209: 4;4
212: 4;5
216: 3;4
2301: 5;7
24: 60;1
247: 129;19
25: 21;18, 60;14
26: 21;20
27: 61;20
28: 81;21, 82;2, 133;18, 134;6, 134;7
29th: 75;22, 76;10, 76;15, 76;18, 76;20, 76;22

<3>
3: 93;22, 117;9
3.7.1: 110;22
30: 6;4, 13;23
30th: 75;22, 76;4, 76;19
35203: 5;9
36104: 5;13
36303: 8;14

<4>
4: 156;14
40: 3;8, 19;21, 21;8, 22;7, 22;14, 22;21, 24;13
400: 14;2
42: 22;5

43: 3;9, 210;6
487: 212;19
488: 212;19

<5>
5: 94;9, 158;14
50: 19;20, 19;21, 21;7, 22;13, 22;21, 24;13
500: 14;2
51: 3;10
58: 3;11

<6>
6: 3;4
60: 5;12, 6;8, 157;13
62: 3;12
65: 3;13
67: 3;14
69: 3;15

<8>
81: 3;16
87: 3;17
88: 3;18

<9>
9: 142;15, 142;17, 142;17, 142;18, 142;19
9:55 a.m.: 1;21, 6;10
90: 3;19
904: 5;12, 6;9

<A>
a.m.: 91;2
abilities: 30;1, 146;13
ability: 146;11
able: 65;19
above: 6;11, 218;7
absence: 17;14, 61;8
absolute: 114;6
Absolutely: 106;2, 106;5, 149;10, 158;13, 186;6, 189;8, 200;10
academic: 18;1, 108;7, 109;10, 109;13

accept: 135;8
acceptable: 106;19, 107;22, 112;17, 154;19
accepted: 133;22
accepted..: 82;7
accepting: 135;16
access: 171;22
accommodations: 60;8
accomplish: 107;15, 107;19
According: 143;21
Accounting: 56;22
ACCR#: 218;22
accreditation: 109;2
accredited: 45;21
accrediting: 105;14
accredits: 105;20
accurate: 8;3, 11;12, 143;16, 185;15, 186;13, 186;19
achieved: 26;21
acting: 6;2
ACTION: 1;7, 24;23, 218;17
activities: 48;21, 103;1, 142;23, 174;12, 175;18, 175;19
actually: 168;2, 208;7
Adam: 5;7, 7;2, 68;21
add: 158;9
added: 122;7, 122;10
Additional: 46;21
address: 8;12, 180;4
addressing: 152;2, 202;1
adds: 147;21, 148;5, 148;9, 158;8
adjective: 83;13
adjunct: 92;9
administration: 15;2
admit: 207;20
adopt: 35;9
adopted: 35;14, 36;10
adult: 9;16, 15;1, 15;3, 15;4, 15;7, 15;9, 15;12
advanced: 113;9
advantages: 128;18
advertised: 20;9, 20;10, 20;10, 36;21, 41;11, 52;19, 52;20, 52;23,
 53;2, 53;4
advertisement: 36;1

Advise: 152;12
affairs: 18;2
affected: 19;4
affidavit: 188;17
affirmative: 24;22
African-American: 24;14, 39;5
African-Americans: 26;12. 38;14. 39;16
Age: 98;15. 98;16
ages: 98;4, 98;6, 98;12
ago: 100;8, 164;1, 188;12, 188;13
agree: 57;23, 58;21, 58;22, 63;7, 63;11, 63;16, 118;15, 123;11,
    126;5, 126;23, 127;2, 127;23. 130;7. 130;11. 145;23, 203;19. 204;3
AGREED: 1;13, 1;22. 2;6, 2;15
ahead: 23;3. 25;2, 67;11. 81;8. 90;8. 194;3
al: 67;16
ALABAMA: 1;2. 1;20, 5;8, 5;13, 6;3, 6;4, 6;9, 8;13, 8;23. 9;2. 9;16.
    53;6, 63;16, 64;5, 92;6. 92;7, 116;7. 212;14. 218;4
allegation: 32;17
allege: 32;9
Allen: 9;12
allow: 168;16
allowed: 35;20, 36;2, 36;12. 36;17
Alphabetical: 23;15. 24;4, 55;8
already: 31;5, 81;3. 102;20. 131;10, 141;13. 201;12
although: 122;5
and/or: 20;16, 23;16, 36;3, 51;8. 103;17
Andalusia: 11;21. 18;4
Andrew: 5;10
announced: 41;16, 53;15
announcement: 20;19, 20;23. 35;22, 36;13. 36;15, 40;7, 52;1. 53;10.
    60;7, 124;3, 169;15. 196;8
announcements: 53;13
Answer: 7;15, 7;20. 8;9, 30;15, 31;4. 48;10, 49;20, 51;11, 127;11,
    127;12, 128;11. 159;11, 160;18, 160;22. 161;4, 161;8, 161;10,
    161;12, 180;10, 203;11, 203;14, 203;15, 203;18, 204;14, 204;14.
    204;19, 204;22, 205;1, 205;17, 206;1, 206;18. 206;20, 207;22
answered: 31;4, 94;22, 99;19. 208;22
answering: 201;17, 205;20
answers: 7;11, 8;3, 171;17, 218;9
Anybody: 10;5. 32;8. 32;17. 64;21. 64;23, 65;6, 65;8. 66;11. 70;19,

around: 14;2, 133;15
arrows: 178;11
articulate: 95;10. 95;19, 97;3. 99;13, 99;18. 118;3. 118;8. 118;12
arts: 14;11, 46;3, 50;2. 50;2. 147;13
aspect: 139;11, 173;6
aspects: 126;10
assessing: 26;7, 87;2
assessment: 146;1
assign: 2;11
assist: 152;9
assistant: 17;17, 40;22. 76;7, 96;13. 184;3
associate: 92;15
associates: 14;11
Association: 105;10, 143;2
assume: 7;20, 13;10, 17;5, 25;9. 30;8, 30;9, 31;9. 36;23, 88;11,
    159;6. 176;2, 185;6
assumed: 187;21
assuming: 53;18, 53;21. 146;6
ASU: 116;6, 116;6
atmosphere: 93;13
ATTACHED: 217;4
attaches: 44;13
attempt: 142;17
attempts: 63;3
attend: 20;17, 50;14, 153;4
attended: 46;5, 150;19
attention: 150;6, 150;11
attorney: 199;19
Auburn: 15;1, 65;20. 104;19
August: 135;15
authority: 99;21
auto: 210;17
available: 87;6
Avenue: 5;8
average: 116;20, 116;22. 117;1
aviation: 80;14, 80;15
aware: 104;5. 104;9, 132;15. 137;8

<B>
bachelor's: 14;12. 92;6

111;9, 111;10, 166;9, 173;14. 199;21
anyway: 75;9, 76;17
anywise: 218;17
Apparently: 43;2, 59;22. 60;3, 66;21, 67;8, 67;9, 68;12. 69;23,
    70;18, 71;17, 82;11. 134;11, 208;23. 213;3
appear: 65;11, 66;5, 72;3. 90;15, 146;21. 165;18
APPEARANCES: 5;6
appearing: 5;9, 5;13, 119;5
appears: 43;18. 58;19. 63;5. 63;9. 63;13. 65;15, 65;18. 65;23. 68;4,
    71;22, 72;14, 91;1. 130;22
applicable: 60;13
applicant: 20;14. 22;11, 53;5. 70;1, 71;20. 75;1. 135;7, 169;20.
    213;23
applicant's: 62;15
applicants: 19;22, 24;20, 33;19, 33;23, 34;7. 42;1. 59;1, 60;12,
    60;15, 61;2, 70;12. 74;16, 100;1. 138;6
applicants': 26;6
application: 60;2, 60;17, 62;16, 77;8, 82;20, 84;1, 104;8. 104;20,
    116;4, 129;14, 135;1, 174;16. 174;20, 175;9
application/interview: 131;20
applications: 23;12, 34;19, 41;18, 53;16, 54;20, 61;17. 87;8. 87;10
applied: 28;20, 31;20. 42;8, 84;10
appoint: 186;10
appointed: 20;1. 21;7. 33;22, 53;17. 54;1
appointing: 44;14
appointment: 121;7
appointments: 209;11
appoints: 22;10
appreciate: 86;5
appropriate: 44;6, 45;16
approval: 45;9, 45;11
approved: 43;19, 45;12
approving: 86;22
April 1: 191;5
April 1, 2008: 191;2
area: 8;17, 47;4. 47;6, 54;4, 54;6. 79;3, 79;10, 79;11, 79;14, 79;16,
    79;18, 80;9, 109;13, 128;16, 139;20, 141;23. 143;1, 144;5, 144;7.
    146;13, 152;23. 153;2. 153;2, 153;6, 174;13, 208;16, 209;12,
    209;14
areas: 25;16. 144;10

back: 20;6. 51;19, 52;23. 54;9, 55;14, 67;20, 67;21, 70;21, 70;23,
    86;17. 90;7, 94;12, 103;2, 115;15, 115;19, 116;3, 129;11, 129;13,
    203;2, 212;6, 215;16, 215;20. 216;6
background: 14;10, 89;14, 98;18. 122;5. 122;6. 147;23
backgrounds: 98;16, 148;14
bad: 147;4, 197;19, 203;5, 205;11
badly: 145;20
Barbour: 13;4
base: 11;22, 171;14, 173;5, 176;8, 176;10, 177;22
Based: 27;17, 27;20, 28;6, 46;19, 57;2, 99;6, 126;22, 130;14, 141;12.
    177;2. 186;11, 186;21, 188;23, 207;18
Basically: 14;21, 38;3, 38;20, 71;10, 82;19, 138;10, 180;3, 191;14
basis: 32;10, 32;18, 198;16, 202;3
Bates: 68;22, 71;3, 71;22, 81;23, 91;11, 129;19, 165;7, 209;18
became: 10;18. 16;10. 18;16. 18;20, 168;6. 174;5. 186;17
become: 11;3
begin: 7;14, 47;22, 150;18
beginning: 6;9, 19;5. 20;14, 216;16
behalf: 5;9, 5;13
believe: 19;11, 19;12, 20;12, 20;15, 21;18, 33;6, 34;18, 34;19, 35;5.
    40;6, 46;15, 50;14, 50;19, 56;18, 66;19, 68;17, 72;20, 73;1,
    75;11, 88;7, 96;12, 102;9, 103;15, 104;4. 115;16, 120;20, 128;15,
    129;11, 133;10, 135;13, 138;14, 138;23, 144;23, 153;20, 158;17.
    159;2, 165;17, 171;11, 172;17, 176;19, 183;15, 183;19, 185;4.
    185;10, 188;14, 190;8, 191;6, 195;9, 196;12, 210;3, 213;18
believed: 139;17
best: 33;11, 33;16, 35;17, 52;15, 66;3, 84;15, 84;16, 94;1, 101;21,
    102;2, 113;15, 113;17, 113;21, 119;13, 121;10, 123;19, 125;12,
    137;15, 139;17, 143;6. 158;11, 161;4, 177;21
better: 27;7, 30;3, 74;5. 114;15. 115;1. 115;4, 115;9. 115;12.
    130;22, 151;8
big: 61;9, 83;14, 126;18, 131;5. 158;6. 203;7. 203;8
billboards: 80;8
biology: 47;7
Birmingham: 5;8
bit: 25;6, 95;2, 95;13, 97;19, 106;17, 118;6, 122;1
black: 19;20, 19;21, 20;17, 20;20, 21;8. 22;14, 22;21. 35;23. 36;4.
    37;14, 37;19, 38;5, 38;7, 166;10
blackboard: 48;2
blacks: 35;23, 209;11. 209;12

blowback: 206;15
Board: 12;2, 12;3, 12;5, 12;7, 35;9, 35;13, 35;14, 48;5, 79;21, 80;4,
    80;5, 167;17, 167;18, 168;15, 212;13, 212;14
boards: 12;12, 12;13, 12;14
body: 105;14, 105;17, 210;17
bonus: 122;7, 122;11
bottom: 52;9, 69;1, 185;17, 209;17
boundaries: 79;3, 79;10
break: 8;5, 8;10, 134;15, 134;20, 212;8, 214;16
bridge: 201;16
brief: 98;21
bring: 25;22
broad: 100;22
brother: 9;3
brother's: 9;5
BS: 104;15
buddies: 203;7
budget: 43;4, 156;19, 157;2, 157;6, 157;7, 157;23, 158;7
bullet: 178;11
Business: 14;15, 16;15

<C>
C-o-o-n: 9;7
C1: 209;23
C2: 209;23
C3: 209;23
Call: 12;22, 56;19, 62;2, 64;1, 64;4, 64;7, 64;21, 64;23, 65;4, 65;6,
    65;7, 65;8, 66;7, 66;14, 80;1, 80;21, 82;13, 82;14, 83;7, 83;16,
    83;17, 83;18, 83;21, 83;21, 83;23, 85;5, 86;9, 87;4, 98;18, 96;20,
    96;22, 111;7, 131;6, 131;19, 131;21, 135;6, 137;10, 137;12, 140;2,
    157;10, 158;15, 158;19, 158;23, 159;5, 159;8, 160;11, 160;12,
    160;21, 161;14, 161;15, 161;23, 173;7, 173;8, 173;14, 173;19,
    178;18, 179;1, 186;17, 187;5, 187;8, 188;9, 191;9, 192;7, 194;7,
    200;17, 201;22, 202;3, 207;5, 216;19
called: 35;22, 63;18, 63;22, 76;10, 80;5, 83;1, 83;2, 86;11, 112;3,
    116;1, 173;21, 174;4, 174;8, 189;1, 194;8, 194;20, 203;9
calling: 86;5, 86;6, 191;4
calls: 76;8, 80;23
camera: 177;14
campus: 13;13, 13;14, 13;19, 13;22, 14;1, 14;6, 18;11, 41;7, 41;8,

57;2, 154;1
campuses: 12;20, 12;22, 13;1, 13;11, 14;5, 57;4
candidate: 41;12, 43;3, 140;13, 174;7, 178;7, 179;11, 182;20, 186;8,
    198;3, 198;3, 207;18, 208;3, 213;7
candidates: 24;2, 25;15, 29;15, 29;21, 29;23, 42;17, 57;8, 86;19,
    87;2, 87;3, 88;18, 88;19, 89;17, 89;22, 90;5, 90;6, 127;16,
    135;23, 136;8, 136;12, 138;21, 181;15, 181;19, 182;3, 186;2
cap: 156;3
capacity: 16;14
care: 94;13, 94;14, 210;8, 210;9
career: 16;16, 17;3, 202;20
carry: 35;10
carryover: 154;9
case: 32;9, 32;15, 111;12, 167;21, 168;2, 168;5, 168;10, 188;10
Cats: 51;2, 51;3
cause: 6;11, 216;5, 218;18
caused: 200;17, 215;19, 216;2, 216;9
CCR: 218;22
center: 12;23, 13;3, 13;9, 17;4, 17;4
certain: 25;10, 38;13, 39;5, 61;13, 158;18, 178;7, 210;14, 210;15
certification: 211;19
certify: 6;3, 218;7, 218;15
cetera: 82;7, 82;7
chair: 60;2, 60;4, 60;9, 60;11, 60;15, 61;7, 147;12
chalk: 48;2, 118;17
chancellor: 17;18, 17;19, 26;18, 43;19
chancellor's: 17;13
change: 35;6, 37;21, 38;18, 44;20, 45;1, 45;3, 106;17
charge: 183;6, 183;18, 183;22, 184;14, 198;18
charges: 202;1, 208;22
charging: 198;18
Charles: 17;20
cheap: 143;9
check: 62;22, 63;11, 63;19, 108;15, 108;18, 108;21, 109;3, 169;2,
    169;5
checked: 174;9, 213;17
checking: 109;6, 109;7, 109;16
checklist: 58;20, 61;3
checks: 61;21, 63;6, 65;19, 66;4
child: 16;20

choice: 25;5, 25;6, 57;1
choose: 71;18, 138;11
chose: 71;17, 172;9
CHRISTMAN: 1;19, 5;10, 5;11, 6;8, 6;17, 23;6, 23;10, 30;14, 31;1,
    32;12, 33;13, 35;12, 37;6, 39;7, 39;9, 49;19, 50;11, 53;19, 54;13,
    67;19, 68;20, 71;3, 81;22, 90;13, 91;5, 91;23, 104;23, 105;4,
    115;19, 115;21, 115;23, 124;14, 129;17, 130;19, 131;16, 132;17,
    133;23, 134;5, 134;7, 134;16, 136;5, 137;23, 141;4, 142;5, 142;16,
    142;19, 143;10, 144;22, 145;21, 146;18, 146;23, 151;12, 156;21,
    159;10, 160;14, 160;17, 162;21, 163;15, 163;19, 164;2, 168;20,
    173;23, 175;2, 175;6, 176;5, 178;22, 179;3, 179;18, 180;7, 180;13,
    188;9, 195;21, 198;2, 197;4, 203;11, 203;19, 204;10, 204;15,
    204;18, 205;18, 215;4, 215;10
churning: 204;1
Cindy: 9;10
circumstances: 197;9
citizen: 116;20, 116;22, 117;1
CIVIL: 1;7, 6;5
claimed: 146;16, 146;19
class: 50;4, 143;22, 157;10
classes: 14;5, 46;5, 92;19, 92;21
classroom: 64;18, 128;14
Clayton: 13;7
clear: 80;10, 181;2, 200;14
Clearly: 97;6, 97;7, 123;14, 123;17
Clio: 13;9
close: 42;5, 42;21, 78;15, 78;22, 78;23, 79;6, 194;5
cloud: 74;19
coach: 180;12
coaching: 51;8, 103;16, 180;13
Cobb: 9;10, 9;12
Coffee: 8;21
colleague: 194;4, 197;19, 203;6, 203;6
collected: 53;16
COLLEGE: 1;9, 7;4, 10;9, 10;14, 10;18, 10;19, 10;21, 11;1, 11;2,
    11;3, 11;6, 11;7, 11;12, 11;21, 12;2, 12;4, 12;21, 14;12, 16;2,
    18;1, 18;10, 18;22, 19;1, 20;3, 20;18, 21;11, 25;9, 26;10, 26;14,
    36;4, 41;5, 41;11, 44;6, 46;20, 47;1, 47;11, 49;13, 52;6, 64;8,
    78;7, 79;11, 80;14, 80;15, 92;13, 93;8, 93;13, 98;23, 102;8,
    112;1, 116;11, 116;17, 117;12, 117;13, 120;21, 121;4, 128;8,

139;19, 141;22, 142;21, 143;3, 147;19, 149;7, 149;7, 149;21,
150;12, 150;23, 153;9, 168;9, 170;8, 170;9, 171;2, 174;8, 176;8,
176;17, 176;20, 180;8, 194;13, 198;5, 208;15, 209;18, 210;2, 215;9
college's: 43;7, 200;21
Colleges: 11;18, 12;8, 20;20, 25;10, 37;5, 79;5, 97;16, 99;4, 105;10,
    148;16, 148;21, 152;4, 152;18, 176;11, 176;13
combined: 209;23
comes: 45;14, 107;7
comfortable: 174;7
coming: 108;21
commencing: 1;21
comment: 77;23, 181;22
Commerce: 5;12, 6;8
COMMISSIONER: 1;17, 2;17, 5;4, 218;21
committee: 19;19, 19;23, 20;4, 21;7, 22;11, 22;13, 22;16, 22;20,
    23;11, 23;21, 24;1, 24;14, 24;16, 25;13, 33;20, 33;21, 34;4, 34;6,
    39;12, 42;10, 44;11, 44;15, 44;17, 44;19, 44;21, 44;22, 45;3,
    52;19, 53;17, 53;18, 53;22, 53;23, 54;11, 54;18, 54;19, 57;7,
    58;3, 59;3, 59;5, 59;8, 59;14, 60;1, 60;4, 60;5, 60;9, 60;10,
    60;11, 60;15, 60;21, 60;23, 61;2, 61;5, 61;7, 61;18, 67;10, 67;15,
    68;13, 68;16, 69;4, 70;1, 70;14, 71;6, 71;11, 71;16, 71;18, 74;8,
    74;17, 75;7, 90;16, 90;17, 102;21, 121;6, 169;7, 172;2, 176;7,
    177;8, 185;19
committee's: 24;6, 59;1, 74;1, 74;5, 132;10, 132;13, 132;16
committees: 38;14, 39;6, 39;17, 59;10
communicate: 79;6
Communication: 46;2, 46;2, 46;3, 46;3, 116;12, 139;23, 143;2
communications: 104;17
COMMUNITY: 1;9, 7;3, 10;9, 10;14, 10;19, 11;1, 11;3, 11;6, 11;7,
    11;12, 11;18, 11;21, 12;4, 12;8, 12;20, 18;22, 19;1, 47;11, 78;6,
    92;13, 93;8, 93;13, 102;8, 116;17, 116;19, 117;8, 117;12, 117;12,
    120;21, 121;4, 128;8, 139;19, 141;22, 142;21, 143;3, 147;18,
    148;16, 148;21, 149;6, 150;12, 150;23, 152;18, 153;11, 170;8,
    170;9, 171;2, 176;11, 176;13, 176;17, 176;19, 208;15
community..: 116;13
compare: 88;17
comparing: 181;21
comparison: 95;12, 97;14, 176;23, 181;20
comparisons: 181;16, 181;18
competent: 107;18

competition: 51;9, 51;16
competitions: 51;17, 103;18
complaint: 80;4, 183;16
complaints: 79;22
complements: 148;6
complete: 174;20, 175;5. 175;21
completed: 166;15
completely: 7;13. 171;8
compliance: 2;3
complies: 81;7, 145;13. 145;16
component: 40;5
components: 15;5
composed: 19;20, 22;13, 33;21
composition: 33;21, 39;12
comprehensive: 110;21
Computers: 48;4, 48;5
concern: 142;10, 171;13, 172;7, 172;11, 172;15, 172;17. 192;17,
    192;17. 193;10, 193;16, 201;10, 206;13, 206;17
concerned: 192;8, 192;13, 199;7. 200;18, 206;14
concluded: 189;12, 190;13
conclusion: 95;23. 99;12. 162;15
conclusions: 89;1. 89;3
conduct: 54;23
confines: 127;21
confirmed: 216;13
conscious: 187;12, 199;2, 199;13
consciously: 179;21. 191;20
consensus: 138;7
consent: 26;3, 26;5, 27;15, 27;16. 30;17. 31;22, 178;9
consider: 32;4, 127;19, 213;19
consideration: 24;19. 26;6, 106;21. 107;23. 111;14, 111;16. 112;19.
    213;16
considerations: 156;5
considered: 185;18
consistent: 31;18
contact: 62;14, 62;19. 110;12. 213;9
contacted: 83;4
context: 77;16, 124;12
continue: 26;23, 159;21
CONTINUED: 3;23

contract: 135;9, 135;14, 164;19, 164;20. 164;22, 165;8, 165;19,
    195;1, 195;9, 195;10, 196;5, 196;14, 196;20, 197;2
contracts: 164;23, 195;13, 195;16, 195;23
control: 112;11, 203;23
conversation: 76;23, 78;3, 82;18, 86;13, 98;20, 98;21, 99;15, 100;16.
    131;3, 133;4, 136;15, 136;20, 138;15, 139;8, 139;10. 141;14,
    142;2, 162;9, 163;9, 171;16. 172;22, 173;22, 179;15, 181;5, 188;3.
    189;11, 190;1, 190;6. 190;8. 191;3, 191;22. 193;4, 193;13. 195;4
conversationalist: 118;13
conversations: 183;21. 184;11
Coon: 9;6
Coons: 134;22, 213;7
coordinated: 60;11
copy: 60;19, 60;20. 88;5, 128;20, 169;17, 188;16, 209;2
Correct: 16;19, 29;18. 44;3, 57;9, 58;13. 59;22, 74;3. 81;2. 102;5.
    103;5, 124;6, 124;9, 152;12, 182;7. 212;2, 218;12
corroborate: 111;1
cost: 31;14, 142;1. 156;15
counsel: 1;15, 2;8, 2;10, 6;6. 218;16
count: 168;3. 169;11
COUNTY: 8;20. 13;5. 218;5
couple: 79;2
course: 44;16. 49;17, 117;3, 122;13, 210;20
courses: 40;1, 40;3. 40;10. 46;8, 49;22. 101;1, 121;18. 139;23,
    155;22
COURT: 1;1, 2;4. 6;1. 6;15
cousin: 9;11
Cousins: 9;19, 9;20
covered: 101;7, 142;4. 162;16, 171;8. 177;8, 178;12, 178;15. 178;16
creation: 164;18
credential: 108;17, 109;19. 109;20, 109;21, 110;1. 110;6, 112;3
credentialed: 110;9
credentials: 107;8, 107;11. 108;16. 108;22, 109;3. 111;22, 112;7.
    112;12, 122;12
credible: 78;18
credit: 167;7, 167;10. 167;14. 168;12
crediting: 105;17
criteria: 25;17
curriculum: 47;16, 47;22
CV: 88;1. 88;4. 129;15. 130;1

<D>
D-1: 166;17, 166;19
D-a-u-g-h-e-r-t-y: 10;3
daily: 20;11. 52;21
dash: 11;6, 11;7
date: 6;3, 66;8, 73;7. 75;12. 76;10. 76;13, 81;11, 81;15. 81;17,
    81;18, 133;12. 134;11, 135;4. 137;6
dated: 82;8, 106;11. 134;22. 191;2
Daugherty: 10;2
day: 1;20, 80;22, 81;12. 133;8. 134;13, 136;9, 136;14. 136;19, 152;9,
    152;10, 207;2, 216;9
days: 20;13
dead: 160;10
deadline: 61;15
deal: 61;8, 64;10. 152;9, 159;9. 203;8
dealing: 87;1
deals: 209;14
Dean: 17;6, 17;8, 18;1, 44;6. 45;16, 45;17, 54;4. 54;5, 54;7, 55;15,
    57;12, 58;5, 67;2, 67;16. 72;6, 74;16, 74;21, 74;23, 101;2,
    101;13. 102;20, 131;11. 131;23. 133;2. 133;7. 137;9. 138;3.
    144;16, 166;5, 174;9
deans: 42;2, 42;16, 42;19
debate: 51;9. 51;13. 103;17, 128;17. 129;12
Deborah: 1;17, 5;3. 6;1
December: 106;11. 201;13
decide: 30;3, 197;10
decided: 193;2
deciding: 179;21
decision: 24;6, 32;5, 36;6, 69;9, 69;13, 70;3, 81;14, 81;16, 81;19,
    82;9, 82;16, 89;5, 101;8, 101;14, 101;17, 101;19. 101;20, 120;7,
    120;8, 125;7, 126;1, 133;6, 133;8, 133;16, 134;2. 136;10, 140;21.
    141;5. 158;20, 159;1, 160;15. 161;17, 180;2, 181;3, 181;6, 182;1,
    186;1. 186;10. 187;12, 189;9, 189;16. 189;19, 190;1, 190;3, 190;6.
    190;9, 191;21, 193;12, 198;2, 198;13, 198;16, 199;2, 199;14,
    201;12, 212;16, 215;16, 215;16. 215;20. 215;21, 215;22, 216;3.
    216;5. 216;7, 216;10
decisions: 19;5, 29;9
decreases: 22;4
decree: 19;9, 19;17. 23;9. 26;3, 26;5, 27;15. 27;16. 27;22. 28;2,

28;4, 28;5, 28;6, 28;12, 29;8, 30;17, 31;22. 33;12. 34;3. 34;9,
    34;23, 35;4, 38;7, 178;9
decrees: 19;3. 37;3. 37;21, 38;18, 38;21
DEFENDANT: 1;10, 5;14, 11;11
degree: 14;11, 14;13, 14;21, 15;19, 45;21. 49;14, 92;6, 92;15,
    106;22, 107;5, 107;10. 108;1, 108;11, 108;18, 109;5. 110;4,
    110;23, 111;10. 112;1, 112;3, 112;20, 113;9, 113;10. 114;7,
    114;13, 121;1, 121;3, 127;2, 139;21, 142;1, 154;12, 154;19,
    155;17, 156;7, 156;11, 161;20. 169;23. 171;4, 176;21. 210;23
deliver: 60;2. 175;23, 177;12
demonstrate: 97;17, 119;11, 163;3
Demonstrated: 47;14, 102;14
demonstration: 68;6, 68;8, 71;9. 71;13
deny: 207;11, 207;13
Department: 12;15, 12;17. 59;23, 61;4, 61;22, 78;11. 165;1
depends: 113;12, 115;14. 155;11, 155;14. 195;18
DEPONENT: 217;3
deposition: 1;15, 2;1, 2;2. 2;13, 2;16, 7;5. 40;15. 58;9, 165;15,
    203;23, 207;2. 209;4. 214;6, 214;14, 216;8. 218;8
depositions: 2;9
describe: 189;9
description: 44;14. 60;7. 88;12, 88;19. 126;20. 127;7. 127;21, 211;12
designate: 144;9
designation: 165;4
designee: 20;16, 23;16, 34;5. 36;3. 82;4, 133;20
designees: 23;17
detail: 208;21
details: 205;15, 207;3, 216;15
determination: 185;11, 186;15, 186;22
determine: 33;23, 54;22
determined: 22;18
determining: 106;19, 107;11, 107;22, 112;17
development: 16;21, 17;3. 17;6, 17;8, 17;10, 142;23, 174;12. 175;19
dictate: 210;12, 210;23
dictates: 19;16, 19;18, 23;9, 33;12, 35;19
difference: 149;4, 149;20. 160;10
differences: 150;2. 213;5
different: 11;5, 12;11, 12;20, 15;10, 26;20, 45;7, 48;13, 48;18,
    53;9, 71;22, 87;16, 106;13, 106;15, 117;6, 125;14, 138;19. 148;23,
    149;17. 213;2

differently: 124;13
difficult: 210;19, 210;21
direct: 86;18, 129;18
directing: 48;21, 102;23, 104;11
director: 16;16, 17;4
disagreements: 79;4
disciplinary: 162;20
discipline: 41;6, 47;1, 106;23, 112;21, 142;9, 143;5, 162;19,
   162;21, 162;22, 162;23, 164;5, 171;6, 172;19
discriminated: 32;9
discrimination: 32;18
discuss: 58;23, 74;14, 74;15, 86;2, 138;6, 138;19, 182;3
discussed: 38;23, 86;14
discusses: 61;21
discussing: 117;5, 138;13, 139;3, 202;4
discussion: 101;16, 117;4, 118;5, 138;8, 139;12, 164;11, 166;13,
   176;10, 188;22, 189;5
disinterested: 119;6
disposal: 69;9, 70;3, 89;8
disseminated: 20;23
distance: 48;6
DISTRICT: 1;1, 1;2
diverse: 117;18
DIVISION: 1;3, 54;8, 147;12
doctor: 80;19, 80;21
doctoral: 15;19
Doctorate: 14;23, 15;16, 16;2, 16;4, 105;6, 109;23, 110;1, 111;10,
   111;19, 113;16, 113;18, 113;21, 113;23, 114;9, 114;15, 114;18,
   114;21, 114;23, 115;6, 115;12, 121;8, 125;20, 126;7, 128;5, 128;6,
   154;16, 154;18, 155;14
document: 40;16, 40;23, 44;3, 44;10, 58;17, 61;3, 70;2, 71;12, 71;23,
   110;21, 137;4, 137;8, 180;2, 185;8, 209;6
documentation: 44;8, 68;5
documents: 25;8, 66;1, 68;14, 68;16, 69;8, 69;10, 71;10, 74;1, 74;5,
   87;5, 87;16, 88;8, 88;17, 120;1, 172;15, 183;11, 214;3, 214;5
doing: 42;7, 53;3, 65;19, 109;1, 120;4, 121;19, 143;20, 144;3,
   144;11, 144;13
done: 27;6, 34;8, 34;17, 34;22, 53;7, 54;1, 58;1, 61;11, 61;14, 66;5,
   72;4, 74;20, 80;7, 83;6, 101;1, 102;10, 122;10, 146;3, 146;6,
   146;9, 150;22

door: 114;5
Dothan: 8;13, 8;17, 10;10, 11;6, 11;15, 11;19, 12;4, 12;21, 13;1,
   13;2, 13;13, 14;6, 18;23, 19;1, 19;2, 41;7, 41;9, 86;7, 93;10,
   98;2, 99;9, 139;20, 141;23, 152;22, 153;2, 153;17, 154;6, 154;9,
   161;22, 194;18, 208;16
Down: 29;14, 41;10, 61;20, 68;23, 92;4, 93;16, 93;22, 94;8, 117;9,
   117;17, 117;23, 119;23, 145;14, 161;22, 172;9, 181;12, 186;7,
   218;8
draft: 184;23, 185;5
drafted: 199;22
drafting: 164;18, 164;20, 185;3
drafts: 185;12
drama: 48;21, 49;22, 100;18, 103;1, 128;16
dramas: 104;11
Drew: 188;9, 191;4
duly: 6;20
during: 22;1, 38;23, 130;3, 131;19, 134;19, 171;19, 212;15
duties: 88;14

<E>
earlier: 83;4, 90;17, 141;19, 155;5, 162;9, 164;21, 180;22, 185;12,
   213;1, 213;3
early: 19;14
earned: 106;22, 107;10, 108;1, 108;11, 108;18, 112;20
Ed: 105;18, 184;7, 185;6
Ed D: 15;23
Ed.D.: 15;14
Education: 12;5, 12;16, 12;18, 14;15, 14;19, 14;21, 15;1, 15;2, 15;8,
   15;9, 15;12, 15;16, 78;12, 100;17, 114;16, 211;19, 212;13, 212;14
educational: 14;9
EEOC: 183;5, 183;13, 191;8, 191;10, 193;4, 198;8, 198;15, 198;23,
   201;14, 201;17, 201;21, 202;4, 205;23, 206;12, 208;7, 208;11,
   208;12
effect: 2;2, 19;6, 37;4, 38;22, 84;11, 85;21, 190;2, 212;15
effective: 64;18, 212;17, 212;21
eight-fifty: 91;2
eighteen: 45;22, 46;22, 108;7, 109;11
eighty: 34;19
either: 67;4, 104;3, 119;1, 165;3, 192;16, 198;10, 206;18
elaborate: 83;10, 84;5, 192;10, 205;6

Elba: 8;18, 8;19
elementary: 105;18
Eleven: 10;19, 18;15, 105;14, 105;19
else's: 137;16
EMANUEL: 1;5, 5;15, 7;2, 65;1, 65;4, 65;12, 65;16, 67;14, 70;17,
   72;23, 73;18, 73;18, 74;2, 74;6, 75;10, 76;18, 77;3, 77;7, 81;4,
   82;20, 84;9, 84;19, 85;2, 85;9, 87;10, 90;10, 90;18, 90;20, 91;10,
   93;21, 100;10, 104;14, 118;2, 121;8, 123;14, 125;11, 126;23,
   128;1, 129;9, 130;8, 130;17, 134;20, 134;22, 140;2, 141;3, 142;2,
   148;20, 152;16, 159;7, 160;1, 172;7, 172;14, 173;15, 176;12,
   179;17, 181;22, 181;23, 183;7, 189;4, 189;12, 190;14, 194;1,
   213;16, 213;20
Emanuel's: 58;9, 88;1, 89;14, 104;13, 115;16, 140;10, 140;18, 186;23
amarged: 41;13
employ: 27;16, 27;19, 41;14, 89;4, 108;5, 110;2, 111;9, 122;19,
   140;1, 141;6, 155;1, 162;6, 189;9, 200;23, 201;2
employed: 16;7, 28;8, 40;13, 84;3, 84;22, 173;14, 181;12
employee: 83;20, 194;11, 194;12, 194;22, 201;11, 201;15, 202;18
employees: 194;13
employer: 11;13
employers: 62;15, 213;10
employing: 48;16, 173;12, 174;5
Employment: 28;19, 29;7, 32;11, 53;6, 108;4, 145;8, 165;22, 179;9,
   215;16, 215;21
employs: 107;18
ENCLOSED: 217;4
encompasses: 19;2
encroaches: 79;15, 79;17
end: 17;6, 35;4
ended: 42;14
enemies: 79;8
English: 34;18, 34;20, 47;7
enjoyment: 164;14
enough: 96;19, 202;16, 205;12, 208;8
enrollment: 13;23, 210;7
ensure: 110;8, 174;6, 174;10
ensuring: 111;21
entered: 39;11, 174;23, 187;2
Enterprise: 14;12, 16;2, 16;12, 16;13, 16;17, 17;15, 77;18, 77;19,
   78;6, 80;14, 84;3, 84;20, 85;2, 85;10, 86;6, 118;6, 140;4, 187;20,

194;2, 214;3, 216;13
Enterprise's: 79;17
enthusiasm: 118;18, 142;9, 162;12, 162;18, 162;18, 164;5, 164;6,
   171;6, 172;16
enthusiastic: 95;9, 95;21, 99;14, 99;19, 118;9, 118;10, 118;21,
   118;23, 119;4, 161;21, 172;21
entire: 140;14
entities: 11;8
entity: 105;20
entries: 145;17
Enunciates: 97;8, 97;9
equal: 149;5, 159;7, 160;20
error: 75;20
especially: 80;13
Esquire: 5;7, 5;10
essentially: 35;10, 134;23, 141;9
estate: 16;21
estimate: 14;3
et: 67;16, 82;7, 82;7
Eufaula: 13;2, 13;14, 13;18, 14;1, 14;5, 18;11, 19;2, 41;7, 41;8,
   41;9, 153;18, 153;23, 154;2, 154;5, 154;10
Eva: 40;20, 165;3
evaluate: 71;20, 147;5
Evaluating: 144;6, 147;10, 147;15
evaluation: 144;21, 145;3, 146;10, 146;21, 147;2
evaluations: 94;4
everybody: 17;3, 137;16, 155;13, 200;8
everyone: 28;20
Everything: 33;11, 93;17, 95;17, 123;18, 123;19, 127;16, 141;6,
   141;17, 157;15, 157;20, 160;20, 161;19, 177;23, 198;12
evidence: 2;13
exact: 133;12, 138;15, 160;2
Exactly: 56;3, 101;23, 138;9, 160;7, 162;2, 164;16, 188;13, 188;23,
   192;1, 192;3
EXAMINATION: 3;3, 6;11, 6;23
examined: 6;20
example: 210;18
exceeded: 128;1, 209;19
exceeds: 128;3, 129;4, 129;9
excellent: 94;4

Except: 2;9, 34;17. 35;20. 95;18, 137;22. 138;5. 142;17
Excited: 96;3
exclusive: 142;7
Excuse: 19;20, 29;18. 37;15, 110;3. 122;2. 128;6, 165;21. 196;11, 213;15
executive: 17;17, 40;22. 184;3
Exhibit 1: 40;15
Exhibit 10: 174;19
Exhibit 12: 88;4, 129;16
Exhibit 13: 90;11, 91;1. 91;7. 91;23. 92;3
Exhibit 14: 106;7
Exhibit 15: 144;20
Exhibit 16: 165;14
Exhibit 17: 164;17, 191;11
Exhibit 18: 188;16
Exhibit 19: 209;4
Exhibit 2: 43;23, 53;20. 54;14, 59;4. 59;18. 103;2, 130;20. 131;2. 131;4
Exhibit 20: 212;7. 212;18
Exhibit 3: 51;22
Exhibit 4: 58;16, 81;20. 133;17
Exhibit 5: 62;4, 63;5
Exhibit 6: 65;10
Exhibit 7: 67;12, 68;2. 68;3, 70;21. 90;9, 90;23, 91;11. 91;21, 115;21
Exhibit 8: 69;21, 132;19
Exhibit 9: 81;9, 164;2. 178;3. 178;4. 178;5. 178;22. 179;4. 179;22. 180;1. 200;2
exhibit A: 163;7
exhibit Q: 174;23
Exhibit: 90;8, 142;13. 142;15. 163;8
EXHIBITS: 3;7. 3;23. 217;4
existed: 194;1
expand: 117;19. 174;15
expected: 14;6. 14;7
Experience: 47;11. 47;14, 48;20, 51;7. 95;13, 95;15, 96;6, 96;22, 96;23, 100;17, 100;18, 102;8, 102;13, 102;14, 102;23, 103;7, 103;13. 103;16, 103;19, 104;2, 104;10, 118;14, 118;18, 121;4, 125;21. 126;8, 127;3, 128;8, 128;10, 128;14, 128;15, 128;17, 128;18. 143;4. 143;14. 148;17, 148;22. 148;23, 150;10. 165;22,

feeling: 30;2, 150;21
felt: 27;14, 28;15, 28;18, 29;1, 84;6, 85;23. 101;1, 121;19, 139;22, 142;8, 142;10, 143;6, 159;6, 172;20, 174;7, 201;23. 202;11. 203;3. 207;17, 207;23, 208;1, 208;21
female: 19;21, 21;8, 22;14, 22;21, 24;13, 210;11, 210;17
females: 26;12, 35;23, 36;1, 37;15, 37;17, 37;20, 39;6, 39;16. 209;11, 209;12, 210;15
Fergus: 45;17, 51;12, 54;3, 55;15, 56;14, 57;12, 58;5, 67;2, 67;3. 67;16, 72;6, 72;12, 72;14, 73;12, 74;9, 76;1, 101;2, 101;13. 102;21, 121;6, 131;11, 131;23, 133;2, 133;4, 133;7, 137;9, 138;1. 138;3, 138;4, 144;18, 146;2, 147;7, 164;11, 166;5, 171;20
Fergus': 147;1, 171;21
few: 8;7, 188;12
field: 34;6, 108;8, 108;9
figure: 61;16
figures: 157;21
file: 53;9, 53;13, 108;17, 109;15, 120;9, 178;6, 178;8
filed: 33;5
files: 26;17, 107;9
filing: 2;16
fill: 41;1
filled: 44;7, 69;3. 166;1
Final: 23;17, 55;23. 59;13. 67;7. 71;23. 86;19. 89;5
finalist: 74;12
finalists: 60;21, 82;5, 133;20. 185;20
financial: 125;15
find: 26;15, 26;17, 119;14, 210;17, 210;19. 210;21
Fine: 50;2, 50;2, 147;13, 161;6, 212;9
finish: 7;14, 207;22
fired: 195;6
firm: 5;11
First: 6;20. 7;10, 15;22, 19;9, 19;12, 20;6, 22;22, 54;10, 59;14, 59;14. 59;16. 59;21, 68;4, 86;17, 86;21, 107;16, 107;17, 120;20, 145;5, 145;9. 145;10. 166;22. 167;1. 212;17
fiscal: 200;7
fit: 34;14, 150;18
fits: 61;10
Five: 54;10, 54;16. 59;4. 59;18. 93;6
flag: 205;14

166;19, 167;4, 167;8. 167;13, 168;13. 168;18, 169;12. 169;20. 170;7, 170;9. 170;21. 171;2, 177;1
Experience. : 117;13
experienced: 96;15. 96;18. 96;21, 102;11
expired: 36;7
Explain: 127;14, 191;14, 193;21. 198;16
explained: 198;17
explanation: 41;4
expressed: 192;6
extended: 82;10
extent: 27;1, 27;3
Exuberant: 96;1

<F>
facility: 13;10
fact: 31;2, 64;12. 79;20, 139;4. 141;21, 197;1. 202;15, 208;14
factor: 198;21
factors: 141;18, 159;4
facts: 200;16, 205;22, 206;6
factual: 184;13, 185;2
faculty: 14;4, 21;3, 41;6, 92;10, 92;17, 106;20, 107;8, 107;11, 107;13, 107;19. 108;7, 108;7, 108;15, 108;17, 109;3, 109;7, 109;11, 109;16. 109;17, 109;18, 109;22, 110;9, 112;12, 112;18. 113;15, 122;11. 144;4, 144;10. 156;20, 157;2. 157;4, 157;11
failed: 199;20
fair: 7;21, 28;13, 28;18, 28;19. 29;4, 30;18, 31;3
fairly: 32;4, 89;23
fall: 50;18, 145;3
false: 188;20, 193;15. 202;7
familiar: 11;23, 40;16, 58;18. 69;22, 105;7, 130;5. 143;19, 209;6, 212;10
family: 9;1, 115;5
far: 24;11, 68;14, 87;1, 169;12, 185;16, 192;19
Farrington: 56;17, 57;13. 73;12. 74;10, 75;3, 76;1. 132;2
Farrington's: 56;20. 72;15
favor: 209;1
favorable: 77;22, 95;7, 95;16, 95;18
favorite: 120;13, 138;17
feather: 156;2
feel: 27;12, 30;11. 53;2. 55;6. 199;6, 203;20, 204;1

follow: 27;15, 27;20, 28;12. 28;18. 29;3. 30;18, 53;14, 106;3
followed: 27;18. 32;3
following: 6;12, 179;12. 182;6. 182;21. 192;5. 195;1. 197;3
follows: 6;21
fool: 207;8
force: 2;2
foregoing: 6;5, 218;8, 218;11
Forensics: 129;20
forever: 168;6
Form: 2;9, 30;14, 32;12, 35;12. 39;7, 39;9, 44;14, 50;11, 62;2, 68;11, 71;9, 71;11, 124;14, 136;5, 141;4. 143;10, 144;20, 145;21. 146;18, 146;23, 151;12, 156;21. 160;17. 173;23. 176;5, 179;18, 180;7. 197;4, 203;12, 215;10
forms: 62;5, 65;11, 65;16
Forrester: 16;8
Fort: 13;3, 13;9
forth: 28;5, 34;15, 44;9, 60;8, 183;12. 209;10
forward: 35;10
found: 156;11
foundation: 12;13, 17;9
Foundations: 14;19
four: 66;22, 103;12, 103;20
four-year: 116;12, 116;18, 149;7, 149;22, 151;17, 151;20, 152;4
fourteen: 20;12
Freshman/sophomore: 121;14, 121;18
friend: 174;8
friends: 78;14. 78;23. 78;23, 79;6
FSU: 104;19, 105;6. 115;17, 116;2
full: 2;3, 96;8
full-time: 21;4, 21;5. 41;5, 41;11. 92;16, 93;4, 167;22, 170;11, 170;13, 170;19
fundraising: 17;10
future: 49;8

<G>
Galnous: 26;18
gamut: 21;3
gas: 153;13
gave: 60;5. 120;22, 146;12. 155;4. 155;15, 161;18. 207;19
gender: 24;5. 24;11. 24;19. 25;14. 25;16. 26;7. 27;17, 27;20, 28;9,

32:5, 38:4, 38:10, 38:16, 39:3, 39:12, 185:18, 185:23, 198:18,
199:7, 199:10, 202:1, 211:1
general: 30:1, 53:7, 54:3, 115:2, 115:3, 124:13, 211:11
generally: 19:16, 28:15, 30:11, 31:16, 113:8
generated: 164:23
generic: 203:4
GEORGE: 1:8, 7:3, 11:11, 184:7, 185:6
gets: 55:11
getting: 114:17, 115:6, 115:17, 123:2, 183:5, 192:8, 192:14
Gidiere: 1:19, 5:11, 6:7
give: 7:9, 24:19, 26:5, 161:11, 203:21, 203:21, 212:5
given: 7:5, 25:21, 26:2, 26:3, 29:15, 68:9, 90:9, 190:16, 190:20,
216:17, 218:13
gives: 106:21, 107:23, 112:19, 148:12
giving: 6:2, 204:13, 213:16
goal: 28:5, 209:19, 210:2
goals: 25:9, 25:10, 25:14, 26:2, 26:10, 26:19, 26:22, 27:1, 27:3,
27:8, 27:10, 27:13, 27:23, 27:23, 28:2, 28:7, 28:9, 28:16, 28:22,
29:2, 29:4, 29:6, 30:13, 30:22, 31:6, 31:14, 31:18, 107:15,
107:20, 209:10, 215:9
gotten: 94:21, 122:23, 140:2, 144:1, 144:4, 144:8, 144:9, 152:17,
152:20, 158:22, 183:15, 187:4, 203:17, 204:4
governed: 12:15, 12:17
governing: 12:14
graduate: 45:23, 46:1, 46:22, 46:23, 96:12, 109:11, 109:12, 141:22,
147:19, 208:15
graduated: 95:14, 120:21, 139:19
grant: 111:13
granted: 170:21
gravitate: 153:14
great: 28:23, 29:5, 64:10
greatest: 192:16, 192:17
grew: 99:9
grocery: 153:12
ground: 7:9
grounds: 2:11
group: 22:7, 22:23, 59:14, 59:16, 59:21, 74:13, 211:20, 211:23
guess: 27:8, 47:23, 81:13, 100:3, 114:5, 126:8, 131:17, 135:16,
197:20, 199:4, 199:11, 199:12, 199:16, 199:19, 199:23, 212:20
guessing: 67:8

hours: 8:7, 45:23, 46:1, 46:22, 46:23, 108:8, 108:9, 109:11, 109:12
HR: 59:23, 62:13
huh-uh: 7:11
Human: 59:23, 61:4, 61:22, 134:12, 165:1
husband: 9:4, 9:12
hypothetical: 159:12, 159:16, 161:3
hypothetically: 159:6
hypotheticals: 160:22

<I>
idea: 190:18
identify: 98:8, 98:9
identity: 120:22
illegal: 100:4
imagine: 116:15
impact: 125:16
implement: 28:4
implemented: 180:9, 180:10, 180:16
implied: 85:6, 85:7
importance: 196:21
important: 147:17, 147:21, 148:7, 148:8, 152:21, 156:7, 181:6,
181:23, 198:21, 199:6, 207:15
impose: 105:23
impressed: 99:17, 99:20, 121:6, 140:8, 140:16, 140:17, 140:23, 141:2,
141:10, 141:11, 141:17, 142:3, 162:8, 162:15
impression: 89:14, 95:5, 164:4, 171:15, 172:13, 189:11, 190:13,
190:17, 190:20
impressions: 118:1, 123:6
impressive: 95:19, 99:10, 99:15, 119:14, 121:5
in-person: 56:9
in-service: 146:4, 146:7
inadvertently: 76:9
include: 57:3, 75:6, 181:9
including: 47:16, 60:8, 143:1
inconsistent: 146:11
INDEX: 3:7, 3:23
indicate: 83:19, 205:7
indicated: 91:13, 146:2, 189:3
indicates: 145:4
indicating: 140:3

guidelines: 35:15, 35:18, 36:9, 39:14, 215:9
guy: 167:22
GWCC: 69:1
GWCC167: 165:7
GWCC200: 81:23, 134:5

<H>
habit: 136:7
Hanceville: 11:7, 11:19
Hand: 81:8, 158:10
handbook: 53:14
handle: 44:12
handled: 61:6
happened: 30:5, 56:2, 76:6, 81:17
hard: 210:17
head: 32:14, 32:21, 157:13, 157:22, 210:5
health: 210:5, 210:7, 210:9
heard: 8:19, 24:10, 58:8, 77:14, 77:15, 77:17, 207:2, 214:11, 214:13,
214:14, 216:12
hearing: 144:12
hello: 153:13
help: 56:6, 153:4, 167:11, 194:6
helpful: 151:2
hereby: 218:7
Herndon: 1:19, 5:11, 6:8
herself: 146:8
higher: 105:18, 109:19, 109:20, 110:1, 110:4, 110:6, 110:23, 127:2
highest: 70:17, 106:22, 107:9, 108:1, 108:10, 108:18, 109:5, 109:5,
112:20
Highly: 94:2, 163:13
Hinton: 1:19, 5:11, 6:7
hire: 52:16, 107:6, 108:10, 111:18, 111:20, 111:21
hired: 111:23, 112:6, 135:1, 169:6, 174:6, 178:23, 189:13, 190:15
hiring: 19:4, 25:23, 26:11, 29:9, 35:7, 36:5, 37:4, 38:19, 38:22,
39:6, 58:20, 60:5, 62:8, 107:4, 107:13, 120:7, 120:7, 158:20,
192:19, 212:16
historically: 20:17, 20:20, 36:4
Hold: 67:20, 75:15
home: 8:12, 48:19, 177:17
honest: 121:21

indication: 143:21
infer: 197:1
inferred: 85:8, 85:12, 99:7
inflection: 98:3
inflections: 164:8
influence: 112:4
information: 25:21, 62:11, 66:2, 87:13, 87:17, 87:22, 166:15, 166:16,
175:12, 180:17, 184:13, 185:2, 208:23
informing: 136:13
inherit: 140:5, 208:5
initial: 41:23
innovations: 47:15, 47:21, 102:15
institution: 10:14, 18:21, 34:14, 45:22, 95:11, 97:11, 99:8, 106:21,
107:7, 107:16, 107:18, 107:20, 107:23, 108:15, 110:10, 111:7,
112:19, 113:13, 113:14, 119:12, 121:9, 121:22, 122:2, 122:3,
122:4, 123:20, 124:1, 125:13, 143:7, 143:8, 149:18, 149:19,
177:21, 178:1, 188:1, 195:19, 202:12
institutions: 12:11, 18:18
instructed: 27:19
instruction: 163:14, 177:12
instructional: 157:13
instructor: 39:23, 44:10, 48:14, 48:15, 52:2, 54:7, 56:22, 68:6,
68:7, 77:18, 82:21, 92:22, 93:5, 94:3, 95:18, 96:15, 121:16,
145:15, 150:7, 150:15, 174:10, 210:18, 210:19
instructor's: 144:21, 211:11
instructors: 57:3, 146:4, 146:7, 146:9, 150:2, 150:8, 152:8, 197:6,
210:9, 210:10, 210:11, 210:13, 210:22, 211:1
insurance: 16:21
integrated: 47:15, 47:20, 102:15
inter: 23:12, 23:17
interested: 119:8, 173:12, 173:19, 174:5, 218:17
Internet: 143:6
interpret: 183:2
interpretation: 182:22
interrupt: 21:9, 30:20
interview: 19:22, 20:4, 22:11, 23:13, 34:1, 34:15, 42:4, 55:18,
55:19, 56:7, 56:9, 58:6, 59:1, 59:13, 66:18, 67:7, 68:10, 68:11,
69:11, 71:9, 71:11, 71:23, 72:6, 73:3, 73:17, 74:6, 74:12, 74:15,
74:18, 74:21, 75:10, 86:19, 91:17, 94:15, 95:3, 100:6, 100:22,
101:7, 101:17, 115:16, 118:2, 119:16, 119:20, 163:11, 171:20,

177;3, 216;20
interviewed: 34;8, 42;2, 42;16, 55;5, 72;22, 73;6, 73;7, 73;18, 74;2.
75;12. 76;1, 76;4, 76;22, 77;2. 77;6, 81;3, 88;22, 89;9, 89;16,
90;18, 91;1. 91;10, 95;1, 95;5. 100;9. 196;10
interviewing: 55;17, 84;9, 196;7
interviews: 23;18, 34;11, 34;12, 54;2, 55;1. 55;11. 56;1, 57;11,
58;1. 59;15, 67;15, 72;9, 73;12, 73;13, 74;14, 75;19, 76;8, 82;5,
87;7, 88;9. 91;15. 94;19, 119;23. 120;12. 123;6. 123;9, 131;14,
133;20
intro: 116;12
involve: 21;2, 54;4, 54;7, 55;16, 214;12
involved: 59;11, 64;10, 67;6, 142;22, 183;17. 198;1. 200;20
involvement: 52;17. 86;18. 86;21, 164;17
issue: 39;22, 43;4, 167;23. 168;2
issued: 29;8, 110;13
issues: 208;13
item: 171;5. 171;13, 172;23. 176;7. 177;20

<J>
Jeff: 63;11. 63;18, 63;22, 64;7, 64;11. 92;13. 92;15, 95;11, 95;14,
97;12, 97;14, 97;22, 98;1, 98;23, 173;3. 173;7. 173;21. 174;9,
175;22, 194;16, 196;15
JEFFERSON: 218;5
Jill: 134;22
job: 15;22, 26;7, 28;4, 28;16. 28;18, 33;20, 36;21, 39;22, 44;13,
54;7, 55;21, 55;23, 60;7. 94;1, 101;21, 101;22, 102;2. 109;8,
112;3, 112;8, 114;16, 119;9, 119;15. 121;2, 121;19. 121;20,
126;19, 127;7, 127;21. 135;5, 135;7, 136;23, 137;7, 138;6, 139;18,
164;15, 167;12. 172;9. 178;7, 195;14, 196;17, 196;23. 207;11,
207;13. 207;18. 208;3, 209;15. 211;12. 211;18
jobs: 34;21
Joe: 16;10
John: 51;12, 54;3. 56;14. 72;12, 121;6. 164;11. 168;5. 171;20, 171;21
Johnson: 37;16
jotting: 117;17
JSCC: 92;12
July 12: 133;19. 134;2, 134;22
July 12.: 136;1
July 12.: 82;8
July 12?: 82;10. 133;10

July 12th: 134;10
July 12th?: 82;14
July 17,: 81;10
July: 196;7, 196;11, 215;17
June 19th: 60;4
June 2008.: 1;21
June 22,: 66;5, 73;13
June 22nd: 75;23
June 26: 66;6
June 27.: 66;5
June 29,: 75;11
June 29th,: 73;6
June 30.: 75;19
June: 76;19, 196;6, 196;11
Junior: 14;12, 16;2, 17;23
justification: 81;19, 163;19
justifies: 25;4
justifying: 41;2

<K>
keep: 64;19, 66;9, 204;10. 204;12, 212;4
keeps: 204;11, 204;13
Kennedy: 37;7, 37;9. 37;10. 37;14, 37;15. 37;19. 38;9
kin: 218;16
kind: 204;1
kindred: 149;12
knowing: 83;23, 153;5, 153;10
knowledge: 33;11, 35;17, 39;1, 66;3, 77;10, 97;18, 119;11, 137;15,
141;15, 162;10, 197;8, 197;14, 200;15. 205;10. 205;22. 206;2,
208;4, 206;5, 206;9, 206;11
knowledgeable: 95;11, 97;11. 99;7
known: 78;10. 78;12, 180;20. 215;20. 216;6
knows: 153;1. 153;2

<L>
lack: 27;7. 74;4, 118;18, 197;8. 197;13. 200;15, 205;9, 205;21.
206;1, 206;3, 206;5. 206;9. 206;10
Lane: 8;13
language: 37;1, 52;10
Large: 6;3. 210;23

larger: 22;23
last: 10;1, 50;18, 52;8, 70;22, 73;2. 92;14, 177;20. 184;20, 189;10
later: 20;15, 23;4. 25;8. 192;23
latest: 212;20
latitude: 203;22
law: 1;18, 6;7. 114;13, 114;14
laws: 2;4
lawsuit: 7;3, 11;10. 33;5, 215;5, 215;6
lawyer: 180;19, 184;12, 184;12
lawyers: 183;21, 183;22, 184;4, 184;6
lead: 95;22, 99;11
leading: 2;9
leads: 43;7
learn: 114;17, 114;20, 150;14. 151;3. 180;18
learned: 216;17, 216;1. 216;4. 216;8
learnings: 48;7
least: 20;11, 91;4, 124;3, 124;4. 150;9
leave: 17;14, 194;14. 194;16
lectures: 175;23
led: 162;14
left: 17;12, 30;1, 187;23, 189;11, 190;12, 194;13. 194;17. 195;5.
202;12, 202;15
legal: 86;1
legislators: 158;4
less: 61;6, 140;1, 142;1. 156;15, 157;19
lesser: 13;10, 113;10
letter: 26;17, 134;21. 135;3, 135;10, 135;12, 135;20, 136;8. 136;13.
136;18, 191;10, 192;22, 193;3, 193;4, 193;13, 193;20, 198;15,
201;3, 202;2, 202;5, 202;10, 203;2, 205;3. 206;22. 207;7. 207;9.
208;18
letters: 60;15. 69;1, 87;14. 135;22
level: 121;14, 121;15. 121;17. 139;22, 142;22, 152;11, 152;14
limited: 47;16
LINDA: 1;16, 6;10, 6;19
line: 61;11, 161;22
lingered: 168;7
list: 23;21, 57;7, 57;14, 66;18, 66;23, 67;1, 67;3, 142;7. 155;15.
171;6, 179;12, 181;13, 192;22, 200;17
listed: 46;16, 54;10, 59;18, 62;15, 66;22, 120;19, 125;18. 130;20.
130;23. 141;21. 154;11. 160;8. 162;17. 182;9

listen: 203;21
listing: 68;11, 181;15. 181;16. 181;16, 181;17, 193;19
litigation: 33;5
little: 25;8, 79;2, 79;3, 79;4, 95;13, 97;19, 118;6
located: 18;3
location: 48;13
long: 10;11, 18;5, 18;13, 78;10, 91;17, 100;7. 100;12, 107;13, 118;8
Look: 25;7, 43;23, 52;8, 52;22, 67;17, 67;19, 69;10, 71;21, 72;11,
81;20, 89;19, 90;7, 90;11, 102;16, 103;2. 109;20. 110;15. 116;3.
122;12, 122;14. 123;12. 125;15. 125;17, 125;22, 128;9. 126;10,
127;16, 127;22, 129;13, 129;15. 137;5, 145;12, 181;17, 209;5
looked: 26;16, 104;7, 123;19, 125;6, 125;23, 134;20, 140;20, 141;6,
175;11, 214;9
Looking: 34;16, 34;20, 48;22, 49;2, 49;3, 49;10. 66;16, 68;1, 70;9,
70;11, 73;11, 81;23, 90;23, 100;15, 104;13. 104;23. 109;4. 126;19.
127;5, 127;7, 157;21, 175;21, 178;3
looks: 75;9, 89;6, 89;19, 92;5, 107;8, 107;10. 113;1. 142;16. 142;17.
145;19
lost: 166;9
lot: 34;12, 34;20, 48;6, 48;10, 79;7, 87;17, 96;3, 96;5, 96;7,
100;23, 118;14, 137;21, 146;3, 146;6, 146;9, 150;1, 150;4, 150;5.
150;11, 153;3, 154;9, 161;15, 177;11, 208;4
love: 93;12, 164;13
low: 151;23
luncheon: 134;17
Lurleen: 11;20, 17;23

<M>
MA: 131;8
Ma'am: 44;4, 77;12, 134;8, 201;12
malled: 20;20
maintained: 79;15, 79;16
maintenance: 21;3
Major: 84;2, 84;4. 145;14. 194;12
makeup: 24;16
male: 210;19, 210;20. 210;21
males: 210;16
Mallory: 76;7
man: 43;12, 43;13, 207;11
management: 46;4

manual: 60;6
March 24th: 212;17
mark: 66;17, 67;11, 75;16, 81;8, 87;9, 88;3, 90;8, 165;6, 166;10,
    211;2
marked: 144;19, 165;14
marking: 40;14, 43;23, 51;22, 58;16, 62;4, 65;10, 67;12, 69;20, 81;9,
    88;4, 106;6, 184;17, 188;15, 209;4, 212;7
married: 8;15
Master's: 14;17, 45;20, 92;6, 104;17, 114;7, 121;1, 121;3, 121;11,
    121;15, 125;21, 126;7, 128;4, 128;7, 139;21, 141;23, 154;12,
    154;19, 154;22, 155;9, 155;13, 155;17, 156;7, 156;11, 160;6,
    161;20, 169;23, 170;1, 171;4
match: 143;6, 177;21
materials: 60;18
matter: 79;20, 94;17, 163;1, 163;2
matters: 79;5, 86;15
McCloud: 168;5
mean: 9;18, 14;20, 15;6, 21;10, 21;14, 28;11, 45;1, 46;7, 46;15,
    47;2, 49;2, 74;9, 77;11, 79;9, 81;13, 82;9, 85;4, 88;23, 87;16,
    89;3, 89;5, 90;4, 96;2, 96;7, 98;8, 97;4, 107;2, 107;3, 110;11,
    111;6, 111;14, 113;11, 113;16, 116;22, 122;2, 144;1, 151;7,
    157;14, 160;4, 161;14, 161;15, 162;19, 163;7, 166;16, 168;21,
    171;10, 171;11, 195;6, 202;13, 202;14
means: 21;1, 31;15, 47;3, 47;23, 108;20, 111;17, 111;18, 112;21,
    113;5, 113;6, 124;18, 124;19, 124;21
meant: 85;22
medication: 7;23
Meet: 23;13, 27;8, 28;9, 31;5, 31;14, 31;14, 54;22, 55;1, 60;1,
    60;16, 73;16, 124;6, 124;7, 125;13, 129;1, 129;6, 167;11, 169;13,
    184;12, 198;5
meeting: 61;5, 123;23, 131;23, 137;14, 137;20, 137;23, 186;9
meets: 61;2, 109;7, 129;9, 130;8
melded: 37;12
member: 41;11, 69;4, 80;5, 108;17, 109;7, 109;16, 109;17, 109;19,
    109;22, 115;5, 129;21
members: 41;6, 56;15, 71;6, 74;22, 75;2, 75;7, 102;21, 107;14, 107;19
membership: 45;1, 45;3
memo: 44;14, 60;20
memory: 33;17, 52;15, 119;13, 188;23, 189;2, 189;3
mention: 178;17, 179;6, 179;21, 187;7, 187;13, 193;3, 197;11, 198;7,

198;10, 198;12, 199;21, 200;2, 204;5, 208;17
mentioned: 117;22, 118;7, 141;19, 179;4, 208;19
mentioning: 193;12, 205;10
merged: 10;14, 10;21, 11;2, 18;19, 18;19, 18;21
merger: 15;15, 22;3, 37;5
mergers: 21;23
met: 19;22, 20;5, 26;10, 30;13, 30;23, 31;18, 55;5, 58;10, 60;3,
    121;2, 121;10, 123;20, 128;1, 131;11, 131;14, 133;2, 133;4, 133;7,
    134;10, 134;13, 155;23, 156;3, 171;3, 210;2, 215;11, 215;14
mid: 78;13
MIDDLE: 1;2, 175;3
midway: 40;18
Mims: 72;4, 72;11, 72;14, 73;12, 74;9, 75;3, 76;1, 132;2
mind: 51;12, 120;13
minimal: 55;1, 60;16, 109;9, 114;8
Minimum: 19;23, 20;5, 20;12, 23;13, 45;14, 45;19, 46;11, 54;22, 55;5,
    58;11, 88;12, 109;13, 109;18, 125;18, 126;21, 127;8, 128;1, 128;3,
    129;1, 130;16, 154;13, 155;23, 156;3, 167;12, 168;23, 169;13,
    169;14, 169;18, 169;22, 171;1, 171;3
minor: 15;1
minorities: 25;11, 25;23
minority: 25;15
minute: 44;18, 126;13, 164;1, 208;21
mirror: 35;18
Mission: 80;16, 80;17, 80;18, 107;15, 107;20, 117;11
mix: 57;4
mold: 150;18
moment: 75;17
monetary: 139;11
money: 156;15, 198;20, 199;8, 200;9, 208;4
monitor: 26;13
monitored: 26;13, 26;16
Montevallo: 104;15, 116;5
Montgomery: 1;20, 5;12, 6;9, 17;14, 65;21, 184;9
month: 36;20
months: 18;7, 188;12, 188;13
morning: 7;1
Morris: 5;7
motivated: 94;2, 163;14
move: 49;11, 204;16

MS: 43;16, 63;6, 87;11, 90;12, 90;21, 91;2, 91;18, 92;1, 93;21,
    100;16, 104;16, 118;11, 118;17, 120;16, 123;15, 125;10, 127;1,
    130;11, 135;3, 137;6, 138;11, 139;4, 139;14, 139;16, 151;8, 155;2,
    155;16, 159;7, 162;6, 165;18, 166;7, 169;6, 178;23, 179;11,
    179;17, 181;21, 182;20, 186;4, 186;10, 194;16, 208;20, 213;7,
    213;17, 214;21
music: 147;8
myself: 63;19, 173;9

<N>
name: 7;1, 9;5, 11;12, 11;14, 56;19, 67;2, 77;15, 144;17
named: 11;11
names: 10;1, 54;2, 55;8, 58;4, 66;21, 66;22, 67;5, 67;6
narrow: 34;6
naturally: 153;11
nature: 17;1, 17;1, 86;1, 187;16, 193;23, 194;8, 205;4, 205;5, 210;12
near: 49;9
necessarily: 114;19, 114;23, 115;3, 115;14, 175;7
necessary: 2;7, 148;2
need: 7;10, 8;5, 40;2, 44;8, 65;8, 79;19, 85;20, 86;2, 113;15, 114;2,
    114;4, 122;5, 122;8, 122;14, 122;15, 122;16, 154;18, 197;8,
    203;22, 212;7
needed: 14;8, 27;15, 44;5, 82;22, 84;7, 84;17, 85;17, 113;20, 143;9
needs: 46;19, 113;12, 121;9, 123;20, 124;1, 125;13, 143;7, 178;1,
    195;18, 198;5
negative: 77;23
Neither: 185;18, 218;15
neutral: 77;23, 78;1
nevertheless: 130;17
newspaper: 20;11
next: 22;2, 67;20, 92;9, 94;7, 104;16, 171;5, 171;5, 171;13, 172;23,
    176;6, 195;11
Nice: 118;4, 118;12, 124;21, 124;22
niece: 9;3, 9;9
nine: 10;15
nine-fifteen: 91;10, 100;10
nine-month: 195;5
none: 41;22, 42;19
nor: 36;11, 158;4, 185;18, 218;16
normal: 108;9

Normally: 55;19, 61;14, 68;6, 70;4, 75;8, 83;17, 108;6, 135;6,
    136;18, 137;2, 185;10, 194;5, 194;13, 201;7
Notary: 1;18, 6;2
notes: 63;20, 63;21, 64;19, 66;9, 67;13, 67;16, 72;8, 72;22, 90;10,
    90;12, 90;16, 90;16, 91;13, 91;20, 93;20, 100;16, 104;13, 104;14,
    115;16, 116;1, 120;3, 120;6, 132;7, 132;10, 137;17, 163;8, 163;10,
    171;17, 171;19, 171;21, 171;22, 171;23, 172;2, 177;3, 177;5, 177;7
nothing: 26;4, 27;4, 107;4, 107;5, 107;12, 108;3, 111;20, 170;15,
    192;21, 193;11
notice: 2;16
noticed: 11;4
notifying: 136;9
Number: 22;4, 22;8, 22;17, 22;20, 42;13, 54;12, 60;1, 60;14, 61;20,
    62;20, 62;21, 63;3, 81;21, 81;23, 82;2, 92;5, 93;22, 94;9, 116;9,
    117;9, 133;18, 134;6, 142;13, 150;10, 152;5, 152;6, 156;14,
    158;14, 166;11, 169;16, 209;18
numbers: 69;2
numerous: 150;22
nurses: 210;20
nursing: 210;10, 210;19, 210;21

<O>
Oakland: 63;15, 64;1
Object: 30;14, 31;2, 32;12, 35;12, 49;19, 124;14, 136;5, 159;10,
    160;17, 173;23, 179;18, 180;7, 203;12
objections: 2;8, 2;11
obligation: 27;13, 29;2, 31;17, 31;21
obvious: 142;9, 142;10, 172;11
occasion: 58;4, 218;14
occurred: 22;1
October: 212;21
off-the: 165;10, 166;12
offer: 49;13, 82;6, 82;6, 82;10, 133;21, 133;21, 135;7, 195;10,
    210;23
offered: 2;13, 117;8, 135;4, 137;6, 194;23, 195;1, 195;17, 196;1,
    196;14, 196;19, 197;2
office: 17;13, 53;17, 54;21, 66;15, 80;22, 189;2
offices: 1;18, 6;7
official: 11;14
Okay: 7;8, 7;23, 8;5, 8;10, 8;11, 8;22, 9;13, 10;5, 10;7, 10;16,

11;4. 11;10, 11;16, 11;23, 12;6. 13;13, 13;21, 14;9, 14;16, 14;22.
15;8. 16;9. 17;11, 17;21, 18;16, 21;6, 21;13, 22;6, 22;12, 23;3.
23;3, 23;5, 23;10, 24;5, 24;8, 24;22, 25;2, 26;4, 28;3, 28;21,
29;19. 30;7. 31;23, 33;4, 33;7, 33;10. 35;1, 35;6, 35;9, 36;19,
36;22, 37;3. 37;16, 37;21, 38;2. 38;6. 38;9, 38;12, 38;17. 38;21.
39;2, 39;13. 39;21, 39;21, 40;4, 40;8. 40;21, 41;10. 43;6, 43;18,
43;22, 44;2, 44;23, 45;2, 45;5. 46;17, 46;21, 47;10, 48;20, 49;16.
50;1, 50;3, 51;7, 51;14, 51;21. 51;21. 52;3, 52;8, 52;15, 54;9,
54;17, 55;3, 55;13. 56;5, 56;9, 56;11, 57;5, 57;16, 57;19, 57;22,
58;3. 58;15, 58;23, 61;16, 61;20, 62;3, 62;10, 63;5, 63;20, 63;22,
64;1, 64;7, 65;9, 65;18, 66;4, 67;1, 67;11, 68;14, 68;18, 69;5.
69;17, 70;10. 70;13, 70;16. 70;21, 70;21, 71;8, 71;15, 71;19,
71;21, 72;11, 72;18, 72;21, 73;2, 73;5, 73;9, 73;16. 73;20, 74;8.
75;20, 76;5. 76;12, 76;17, 76;23, 78;2, 78;8, 80;19. 81;5, 81;20,
82;1, 82;12. 82;17, 83;1, 83;9, 85;13, 65;19, 86;10, 86;17, 86;23.
88;23, 87;9. 87;9, 87;19, 88;3, 89;16, 90;7, 90;22, 91;14. 92;14.
93;4. 93;12. 93;16, 93;19, 93;22, 94;7, 94;23, 95;4, 97;3, 97;10,
99;6, 100;5, 100;9, 100;12, 100;15, 102;1, 102;6, 103;16, 104;5.
104;9, 104;13. 105;4, 105;6, 105;16, 105;23, 110;16, 113;7,
115;15, 116;9. 116;14, 117;9, 117;19. 117;21, 118;1, 118;20,
119;8, 119;11, 119;19, 119;22, 120;3, 120;12, 122;18, 122;21,
123;4, 123;7, 125;2, 125;8, 126;2. 126;12, 126;17, 127;14, 128;9,
128;20. 129;22. 130;7, 131;1, 131;5, 131;13, 132;4, 132;9, 132;15.
135;11. 135;14. 135;19. 135;22, 137;13, 137;16, 139;7. 139;14,
141;12, 141;20, 147;17, 148;4, 148;11, 148;15, 149;11, 152;21.
154;8, 155;6, 155;12. 156;2, 156;10. 156;14, 158;14, 158;18.
158;22. 159;3. 161;2, 161;16. 162;7, 162;17, 163;3, 163;13,
164;17, 165;6. 165;21. 166;4. 169;21, 170;1, 170;22, 171;13,
172;13. 173;8, 174;18. 176;6, 178;3, 180;12, 181;5, 183;5, 184;10,
184;16. 185;14, 186;7, 187;7, 187;21, 190;22. 191;2, 193;2, 193;8,
193;10. 193;18, 193;21, 194;3, 197;7, 200;14. 203;2. 204;23,
208;12. 209;2, 209;17. 210;1, 211;14, 211;17. 212;3. 213;6. 214;9.
214;15. 214;23. 215;2. 216;17. 216;23
old: 48;2, 142;19
older: 98;5
Once: 61;17, 112;6
One: 12;23, 13;1. 13;7, 13;7, 19;12, 20;11, 20;11, 22;2, 22;5, 30;3.
34;17. 37;11. 43;6, 50;10, 50;15, 50;18, 56;8, 59;14, 60;22,
66;21, 66;22, 70;8, 72;5, 74;9, 80;3. 80;6, 80;22, 87;17. 89;6.
89;6. 90;2. 90;2, 93;2. 93;3. 102;10, 113;19, 113;20. 114;2.

Part-time: 92;16, 92;18, 92;22, 96;10, 96;17, 102;11, 151;7, 151;9.
167;8, 167;22. 168;1. 168;3. 168;13. 168;19. 169;11. 170;10.
170;12, 173;3, 197;6
participants: 72;5
participate: 51;18, 51;19. 55;18. 74;11. 183;9
participated: 55;20
particular: 33;20, 36;1, 40;1, 49;12, 54;4, 54;5. 54;6. 79;13, 112;8.
122;15, 125;9. 139;18. 156;12. 211;14. 211;22. 215;22
parties: 1;14, 2;10. 218;16
Partridge: 8;13
passed: 41;23
past: 50;13
Paula: 72;4
pause: 125;15
pay: 140;6
paying: 122;17
Payne: 17;20
pen: 166;10
people: 22;8, 22;8, 22;15, 22;19, 22;23, 34;20. 53;8, 54;10, 55;16.
56;14. 58;18, 59;4, 59;18, 64;9. 66;21. 72;22, 94;15, 107;13,
108;5. 111;23. 122;13, 136;19, 153;2, 153;5, 153;9, 153;10, 177;17
peoples': 108;22
percent: 13;23, 19;20, 19;21, 19;21, 21;8, 21;8. 22;14, 22;14. 22;21.
22;21, 24;13, 24;13, 111;15, 157;13, 204;4. 210;7
percentage: 38;13, 39;5
percentages: 26;22, 215;13
perceptions: 74;20
performance: 144;6, 147;11, 195;15. 196;18. 196;23
Perhaps: 67;1. 67;15. 164;16
period: 22;1, 38;23, 73;15
permission: 41;1
person: 26;16, 34;13, 34;14, 40;13. 47;3, 78;18. 94;1. 101;22. 102;2.
110;4, 110;14, 110;17, 111;18, 113;12, 115;14, 121;14. 122;19.
136;20, 147;14, 147;22, 155;11. 155;14. 200;23. 201;2. 207;17.
208;2
person's: 148;9
Personal: 68;18, 71;4, 71;12, 152;11, 152;14
personally: 77;11
personnel: 53;16, 54;21, 166;3. 166;20
pertained: 179;7

114;3, 114;4, 114;9, 114;10, 114;11, 125;9, 137;9, 149;16, 149;21,
150;19, 151;7, 151;9. 155;16, 155;19, 158;10. 159;17, 162;2,
165;6, 173;18, 182;8, 183;15, 183;23, 183;23. 184;1, 185;12,
187;18, 193;2, 203;14. 204;21, 207;13. 211;4. 212;17, 213;4
one-on-one: 150;5, 150;11
one-year: 16;20. 173;2
ones: 41;22, 52;22, 89;23, 90;4
online: 48;11, 48;15, 48;16. 177;13
opening: 34;18
opinion: 100;4, 115;13, 118;11. 121;9, 123;22. 147;23. 149;1. 150;5,
151;13. 151;15. 188;21
opportunity: 216;18
opposed: 149;7. 155;9
option: 42;6
oral: 8;11
order: 23;15, 24;4. 55;8
ordinary: 83;3, 83;18
organization: 105;13
oriented: 60;9
originally: 8;18, 93;9
others: 57;13, 58;5, 74;17, 89;20, 90;3. 131;11
overall: 156;19, 178;2. 186;12, 186;16
own: 12;12

<P>
Pacific: 50;22
package: 125;23, 140;14
packet: 62;11. 175;21, 177;9
packets: 60;2
PAGE: 3;3, 4;1, 52;9, 68;22. 72;12, 81;21, 91;5. 91;11, 94;7, 105;1,
115;23, 129;17. 129;19. 130;23, 133;18. 134;4, 145;12, 165;7,
184;21, 185;17, 209;18. 211;18, 212;18. 212;19. 212;19. 212;23
pages: 70;22. 91;21
Pam: 76;7
paper: 20;12. 34;16, 52;21. 52;21. 53;1
paperwork: 89;2, 89;8
Paragraph: 52;9, 81;21. 133;18, 134;7
parameters: 130;15
part: 10;18. 28;2, 49;17. 68;4. 69;3. 97;15. 143;17, 158;7, 181;6,
181;8. 186;17

pertinent: 208;19
Ph.D.: 15;13, 15;17, 104;19, 105;6, 110;12. 110;14, 110;17, 113;1.
113;2, 115;18. 116;3. 155;10, 156;12
philosophy: 143;4, 176;8. 176;13, 176;17, 176;20
phone: 7;7, 7;8, 42;4. 55;19. 56;7, 66;7, 66;14, 73;9, 74;13, 74;14,
74;18, 76;23. 78;2, 82;12, 82;14, 83;16, 86;9, 87;4, 91;14, 95;20,
99;14. 99;18, 101;16, 118;4, 118;5, 118;10, 119;4, 119;16, 121;5,
131;6, 131;19, 136;15, 158;14, 158;19, 158;23, 159;5, 159;8,
160;11, 160;12, 160;20, 161;14, 161;15, 161;23, 162;12, 163;12,
164;4, 172;22, 173;18, 178;11, 178;18, 179;1, 179;15, 181;5,
184;15, 186;17, 187;4, 187;8, 191;9, 191;22, 193;3. 193;12. 194;6.
200;17, 201;22, 202;3. 203;9
phrased: 86;4
picture: 125;6, 126;1, 126;3. 126;11. 126;12, 126;18, 127;5. 127;7,
131;8, 140;20, 141;8
place: 19;4, 64;13, 158;19, 202;19
places: 11;5. 48;18, 52;7. 153;20. 153;21
PLAINTIFF: 1;6, 5;9
play: 18;10, 24;5. 50;6. 50;16
played: 39;3, 121;23. 185;23
plays: 49;4, 51;5
please: 7;18, 8;12, 128;13, 207;22
pleased: 140;13
plenty: 203;21
point: 23;7, 94;19, 131;21, 133;5, 178;11, 189;7
pointing: 53;19
points: 145;14
policies: 212;10, 212;12, 212;14
policy: 32;10, 167;17, 167;18, 168;15
pool: 20;14, 53;5
populations: 117;18
PORTER: 3;4, 5;7, 6;23, 7;2, 23;8, 23;20, 30;19, 31;8, 31;12, 32;16,
33;15, 33;16, 35;16, 37;8. 37;10, 37;18, 39;8, 39;13, 50;1, 50;12,
50;13, 54;9, 54;15, 54;17, 68;1, 68;22, 68;23, 71;4, 82;1, 90;19.
91;7, 91;9, 92;2, 92;4, 105;7, 115;20, 115;22, 116;5, 124;17,
126;14, 126;17, 129;19, 129;20, 130;21, 131;1, 131;22, 132;19,
132;22, 134;1, 134;8, 134;14, 134;19, 136;6, 138;3, 138;12, 141;9.
142;12. 142;18, 143;8. 143;12, 145;2, 145;23, 146;20, 147;3,
151;16. 157;1. 159;16, 160;15. 161;2, 162;23, 163;22. 164;7.

165;9, 165;13, 166;9, 166;14, 168;22, 168;23, 174;2, 175;8,
175;15, 176;6, 179;1, 179;5, 179;10, 179;20, 180;12, 180;18,
195;23, 196;3, 196;14, 197;7, 203;17, 204;3, 204;13, 204;17,
204;23, 205;1, 205;16, 205;19, 211;4, 211;8, 214;16, 214;20,
215;6, 215;8, 215;15, 216;23
position: 10;8, 10;12, 10;13, 13;17, 18;6, 20;8, 20;9, 20;19, 21;4,
35;21, 39;22, 41;2, 44;5, 44;7, 44;11, 46;14, 48;16, 49;12, 52;20,
54;5, 55;7, 56;21, 57;17, 57;20, 68;7, 82;21, 86;22, 88;12,
108;11, 123;13, 123;14, 138;20, 147;4, 148;3, 154;20, 168;18,
188;13, 186;16, 191;14, 191;16, 209;15, 211;15, 211;23, 211;23
positions: 21;2, 21;5, 53;10
possibilities: 206;14
possible: 137;3, 190;5, 206;15
Possibly: 49;11, 74;22, 102;5, 186;20, 210;6
post: 52;3
posting: 37;1
Postsecondary: 12;18, 53;5, 78;12
potential: 82;23, 84;17, 85;13
practice: 114;14
predominantly: 210;11
prefer: 124;18
preferable: 154;16, 154;22, 155;1, 155;8, 156;11
preferences: 120;19
Preferred: 40;6, 40;8, 40;11, 46;18, 47;12, 88;13, 101;4, 102;3,
102;6, 102;22, 123;13, 124;4, 124;5, 124;7, 124;11, 124;12,
125;19, 126;21, 127;9, 128;2, 129;6, 129;10, 130;8, 130;16, 139;5,
170;3, 170;4, 170;5, 170;23, 176;14
Prefers: 116;11
Prepare: 60;14, 175;23
prepared: 155;21, 183;12
present: 5;15, 10;7, 21;14, 21;17, 21;18, 132;2
presentations: 143;1
preset: 57;7, 57;14
President: 10;9, 10;17, 16;3, 16;8, 16;11, 18;10, 18;13, 18;17,
18;20, 20;1, 20;2, 20;3, 20;16, 21;6, 21;10, 21;10, 22;6, 22;10,
22;10, 22;18, 23;15, 23;16, 23;18, 23;22, 25;4, 33;22, 34;3, 34;4,
36;2, 60;22, 63;23, 78;6, 82;4, 83;22, 113;20, 114;1, 114;16,
133;20, 158;1, 168;6
presidents: 79;1, 79;8
pretty: 35;18, 78;1, 80;2, 80;10, 93;17, 129;12, 145;20, 203;8,

proven: 94;3, 163;14
provide: 27;22, 180;17, 184;13, 185;2
provided: 6;4, 36;23
providing: 183;9
Public: 1;18, 6;2, 176;1
published: 122;1
Pudles: 1;17, 5;3, 6;1
pull: 210;3
punctual: 94;3, 163;14
punishment: 27;5
purports: 112;23
purpose: 70;13, 178;4, 178;5, 180;1, 180;23, 191;9, 191;12, 198;15
put: 22;3, 37;1, 49;3, 50;6, 50;10, 53;5, 53;6, 53;9, 83;13, 90;22,
134;12, 178;8, 181;11, 199;11, 199;14, 200;1, 200;11, 201;3,
202;5, 202;9, 203;4, 205;3, 206;22, 207;7, 207;8
PX-1: 3;8
PX-10: 3;17
PX-11: 3;17
PX-12: 3;18
PX-13: 3;19
PX-14: 3;20
PX-15: 3;21
PX-16: 3;22
PX-17: 4;2
PX-18: 4;3
PX-19: 4;4
PX-2: 3;9
PX-20: 4;5
PX-3: 3;10
PX-4: 3;11
PX-5: 3;12
PX-6: 3;13
PX-7: 3;14
PX-8: 3;15
PX-9: 3;16

<Q>
qualification: 19;23, 20;5, 23;14, 40;7, 40;11, 40;12, 47;12, 101;5,
102;22, 109;14, 114;8, 122;15, 151;15, 154;13, 168;20, 169;1,
169;19, 170;3, 170;5, 171;1, 171;3

207;15
prevent: 8;1, 197;14, 205;10, 205;22
prevented: 206;11
previous: 62;14, 73;11, 106;12
Primarily: 184;2
primary: 106;21, 107;23, 111;13, 111;16, 112;19
Prior: 2;13, 10;17, 68;10, 74;1, 74;6, 213;9
prisons: 13;4
Probably: 8;7, 32;20, 56;3, 56;4, 57;6, 70;15, 76;10, 76;21, 78;13,
81;16, 99;1, 99;5, 101;2, 101;6, 101;6, 104;18, 117;4, 153;19,
153;19, 163;6, 166;20, 172;20, 176;4, 176;22, 188;12, 193;1,
197;5, 213;15
problem: 78;21, 82;23, 83;12, 83;13, 83;14, 83;14, 83;15, 83;20,
84;5, 84;17, 84;20, 85;2, 85;10, 85;14, 85;20, 122;20, 140;4,
140;5, 140;6, 187;17, 189;4, 189;6, 189;13, 190;14, 192;4, 192;6,
192;11, 192;11, 192;12, 192;18, 194;1, 194;11, 197;17, 200;21,
200;22, 201;5, 201;5, 201;11, 201;15, 202;4, 205;4, 205;6, 205;13,
205;15, 206;2, 206;4, 206;6, 206;7, 206;8, 207;1, 207;3, 207;3,
207;5, 208;5, 208;9, 216;14
problems: 79;2, 83;11, 216;13, 216;18
Procedure: 6;5, 37;22
procedures: 60;6
proceedings: 6;12
process: 26;1, 27;18, 27;21, 28;13, 28;13, 28;19, 28;19, 29;4, 29;7,
29;7, 30;18, 31;7, 31;10, 32;3, 33;18, 35;7, 38;19, 38;22, 39;4,
42;11, 52;16, 53;15, 58;20, 62;8, 86;18, 107;4, 108;4, 131;20,
142;11, 180;15, 183;14, 189;8, 214;21, 216;20
processes: 37;4, 89;18
produced: 214;3
producing: 48;20, 102;23, 104;10
productions: 43;8
professional: 142;23, 174;12, 175;18
proficient: 146;16
profile: 68;19, 71;4, 71;12
program: 49;5, 49;22
programs: 13;12, 13;14, 13;15, 16;16, 16;17, 16;20, 17;2, 64;11,
117;7, 210;5, 210;8, 210;12, 210;14, 210;15, 210;22
progress: 209;9
proper: 44;8, 57;23, 110;9, 111;22, 112;2, 112;7
prove: 199;8

qualifications: 29;23, 34;13, 45;15, 45;20, 46;12, 46;18, 54;23,
55;2, 55;5, 58;11, 102;4, 102;7, 106;20, 107;22, 108;6, 109;8,
109;9, 109;10, 109;18, 112;18, 121;2, 123;12, 123;13, 124;2,
124;4, 124;5, 124;8, 125;3, 125;17, 125;18, 125;19, 126;4, 127;9,
127;10, 128;2, 129;7, 129;10, 130;9, 130;16, 138;20, 138;22,
139;5, 139;21, 140;9, 140;11, 140;14, 140;15, 140;17, 140;19,
141;1, 141;2, 141;7, 148;10, 169;13, 169;14, 169;22, 186;8, 186;9,
198;4, 208;19
qualified: 29;20, 34;7, 107;14, 107;19, 113;15, 113;17, 113;22,
123;15, 123;18, 125;11, 126;5, 127;1, 127;4, 127;13, 130;18,
130;23, 207;21, 208;1, 208;1
quarter: 46;1, 46;23, 108;9, 109;12
question: 7;14, 7;17, 7;20, 8;8, 23;6, 25;19, 30;9, 30;20, 30;21,
31;2, 31;3, 32;2, 36;14, 47;18, 49;1, 65;5, 65;14, 67;20, 93;7,
103;21, 115;11, 117;16, 124;16, 125;14, 130;15, 134;1, 141;1,
144;23, 154;21, 156;23, 159;11, 159;12, 159;15, 160;14, 160;18,
192;13, 201;15, 203;13, 203;14, 205;2, 205;20, 205;21, 206;18,
208;6, 214;1
questioning: 101;3, 180;6
questions: 2;9, 2;10, 8;2, 8;3, 57;8, 57;14, 57;17, 57;23, 58;1,
68;12, 72;1, 94;10, 94;12, 94;16, 94;22, 99;20, 99;22, 100;1,
102;19, 102;20, 103;8, 103;12, 103;20, 218;9
quick: 69;20, 166;10
quite: 95;2, 106;18, 121;21, 122;1, 166;13, 200;14
quote: 191;23, 193;22

<R>
race: 24;5, 24;11, 25;14, 25;16, 26;6, 27;17, 27;20, 28;8, 32;4,
32;10, 38;6, 38;8, 38;10, 38;15, 39;2, 39;11, 185;18, 185;23,
198;17, 199;7, 199;9, 202;1
racial: 24;19
raise: 205;13
ramification: 26;9
ramifications: 27;5
rank: 24;1
ranked: 55;8, 70;17
rankings: 132;16
rare: 89;23, 90;4
rather: 113;8, 124;19, 124;22, 125;3, 149;6
rating: 68;5

ratio: 152;1, 152;3
reach: 27;13, 28;16, 29;2, 29;6. 62;23. 138;7
reached: 28;22, 29;4
reaching: 28;5
read: 70;16. 116;9, 116;16, 117;10. 171;17. 174;14. 178;13. 185;8, 185;10, 185;14
reading: 1;23, 89;2, 89;8, 142;13. 172;14
real: 16;21, 69;19, 166;10
realize: 191;9, 191;12
really: 35;8. 49;23, 77;5, 78;22, 80;12. 81;13. 89;7, 100;7, 122;5, 131;18. 160;21, 176;22, 194;14. 199;15. 210;23
reason: 43;3, 43;5. 55;23, 63;14, 75;11, 154;11. 155;18, 155;19, 155;20, 156;6, 173;18, 179;16, 179;19. 180;3. 181;12. 193;2. 193;8, 193;9, 193;19, 207;14, 208;2
reasonable: 182;22
reasonably: 45;21
reasonings: 181;3
reasons: 138;11. 155;4, 155;7, 155;15, 155;16, 159;22. 160;3, 160;8. 179;9, 179;12, 179;13, 180;2, 180;6, 182;6, 182;8, 182;10, 182;13. 182;14, 182;16. 182;18. 182;21. 182;23, 183;1, 183;4. 207;18. 208;5
recall: 32;17, 32;22, 33;7, 70;5. 70;9, 70;11, 77;16, 82;13, 84;15, 84;16, 85;16, 86;12, 86;16. 91;17, 91;19, 95;4, 100;5, 100;12, 117;20, 119;5, 119;19, 131;16, 131;18, 131;21, 137;19, 137;21, 139;1, 139;3, 139;7, 139;10. 175;16. 179;20. 183;5, 185;11, 213;6, 213;12, 213;14
Receive: 29;21, 41;18, 60;19. 77;2. 82;12
received: 41;23. 66;20. 67;4, 67;5, 67;6. 77;1. 82;13. 82;15. 94;3
recess: 67;22, 134;18, 165;11, 214;18
recognize: 144;20. 144;22
recollection: 89;11. 89;13, 89;18
recommend: 23;14. 26;23, 44;21
recommendation: 42;3, 44;17. 87;15
recommended: 42;5, 42;21
recommending: 60;20. 185;19
recommends: 44;11
record: 81;22, 126;14. 142;12. 142;20. 165;9. 165;11, 166;13, 173;1, 178;10, 181;2
records: 52;23
recruit: 79;12, 79;14

recruiters: 153;9. 153;10
recruiting: 80;13. 153;5. 153;7
red: 205;14
reduced: 218;10
refer: 181;14. 181;14, 182;2, 187;8
reference: 61;21, 63;6, 63;10, 63;15, 63;19. 65;11, 65;16. 65;19. 66;4, 85;1, 85;9, 191;21, 197;19, 203;5. 205;11
references: 62;2. 62;22, 63;1, 213;17
referred: 42;1
referring: 36;10, 54;13, 97;12, 98;14
regard: 24;17, 25;13, 35;7, 48;22, 62;1, 138;21, 140;15
regarding: 26;10. 67;14, 71;12, 72;8, 75;17. 79;5, 90;10. 90;12. 183;6, 188;9, 200;16
regardless: 57;17
regional: 20;11, 52;21
regulations: 31;10. 31;19. 35;10, 106;1
relate: 73;2, 150;3, 150;4, 150;16
related: 120;7, 150;16. 172;15, 187;22
relates: 49;23, 178;1
relating: 2;4
relatives: 9;16, 9;17. 158;2
relevant: 167;3
relocated: 194;18
remained: 38;20
remember: 20;13, 26;15, 30;4. 32;13, 32;20, 42;4, 42;8, 43;1, 43;3, 43;5, 50;17, 50;20. 50;23. 56;3, 66;8, 66;12, 73;15, 77;20, 77;22, 81;5, 83;15, 89;10, 89;21, 92;20, 95;12, 95;17, 98;7, 98;19, 98;20, 102;18. 103;3, 117;5, 119;3, 131;23, 132;14, 132;20, 132;21, 138;9. 138;10. 138;12, 138;14, 138;9, 163;5, 164;16, 168;1, 171;23, 172;22, 188;13. 188;22, 188;23, 189;7, 189;17, 195;2, 195;4, 196;16. 213;18
remove: 35;20. 36;12, 36;18. 52;14
Rent: 51;4
repeat: 7;19
rephrase: 7;19
REPORTER: 6;2, 6;15
reports: 144;2. 144;4. 144;8. 144;10
represent: 7;2
representation: 25;11, 25;23. 26;11, 39;15, 143;17
representations: 146;12

represents: 218;12
request: 43;19, 44;7
required: 40;12, 60;17, 123;12, 127;8
requirement: 25;12. 39;4. 62;13. 62;17, 114;6, 168;17. 178;8. 180;9. 180;16, 180;21
requirements: 19;19. 24;17. 35;11, 39;15, 60;16. 88;13. 88;13. 126;21, 126;22. 129;1. 155;23, 156;3, 167;12
research: 122;3
resource: 17;10
resources: 59;23, 61;4. 61;22. 134;12, 165;1
respect: 64;10. 130;19
respective: 1;15. 79;13
respond: 116;13, 184;14. 216;18
responded: 93;11
Respondent's: 191;16
responding: 183;17. 183;22. 201;14
responds: 116;17
response: 163;10. 187;9
responses: 65;20
responsibilities: 60;10
responsibility: 30;12, 30;22, 200;8
responsive: 116;18, 116;23, 117;6
rest: 70;23
restated: 60;9
result: 218;18
results: 169;8
resume: 174;14, 175;5
resumes: 53;9. 87;15. 87;19
retired: 147;9
retirement: 49;9
retires: 49;11
review: 54;20, 62;7, 62;10. 87;17. 109;21. 109;23, 110;5, 110;8, 214;2
reviewed: 87;6, 90;17. 123;18. 214;8
reviews: 23;12
reward: 27;9
RICH: 1;5, 5;15, 84;9
role: 24;6, 24;11, 39;3, 54;18. 54;19. 121;23, 150;6, 185;23
round: 55;10. 72;9. 73;11
Rucker: 13;3. 13;9

Rule: 6;4, 53;7. 54;3, 62;21. 63;2, 115;2, 115;3
ruled: 209;1
Rules: 2;4, 6;4, 7;9, 31;11. 31;19. 73;20. 105;23. 106;4
runs: 14;1

<S>
SACS: 105;8. 106;16. 107;4. 107;7, 107;10. 110;1. 110;23. 111;7. 111;19, 112;4. 112;9. 112;11, 112;22, 113;1
SAITH: 217;3
salaries: 157;14, 157;15, 157;18, 157;20
salary: 26;20. 139;13, 157;10, 166;22, 167;8, 167;15, 167;20, 168;11, 168;12. 169;3. 170;15, 170;17, 170;20. 209;16. 209;21. 209;22. 215;12
Sasser: 40;20, 165;3, 166;5, 184;2, 185;6
satisfied: 195;14, 196;17, 196;23
save: 121;22, 198;5, 208;4
saving: 158;5, 198;20, 199;8, 200;9
savings: 121;21
saw: 134;21
saying: 24;18, 25;11, 29;1, 93;14, 108;3, 110;18, 110;20, 110;22, 112;14, 112;16, 112;21, 122;9, 127;18, 130;14, 134;22, 141;10. 154;15, 156;10, 162;1, 175;7, 197;8, 197;14
says: 41;5, 41;10. 45;22, 46;21, 47;10, 51;7, 60;1, 71;23, 73;5, 75;18, 75;23, 82;4, 93;9, 102;7, 106;11, 106;18, 107;17, 108;19. 110;5, 110;11, 110;21, 111;3, 111;16, 112;16, 112;17, 127;8, 133;17, 145;21. 145;22, 163;13, 166;17, 166;18. 170;7. 175;23, 190;12, 191;15. 209;17. 212;20
scenario: 161;18
Schaffer: 1;17, 5;3, 6;1
schedule: 61;5, 166;23, 167;9, 167;15, 167;20, 168;11, 168;13, 169;4, 170;14. 170;18, 170;20, 209;16, 209;21, 209;23, 210;2. 215;12
scheduled: 60;11, 91;3
schedules: 26;20, 76;8, 170;16
Schembera: 43;9, 49;9
school: 28;17, 49;16, 52;5, 96;9, 105;21, 108;21, 112;22, 125;16. 135;16, 141;15, 142;19, 162;10. 163;1, 164;19, 200;9
Schools: 105;11, 151;17, 151;20
scores: 69;5, 132;13. 132;14. 132;18
scoring: 69;23
screening: 41;23. 73;23. 75;6. 132;9, 132;13, 132;16. 172;1

screens: 22;23
search: 42;6, 42;22, 44;11, 44;13, 44;15, 44;16, 44;19, 44;20, 44;22,
   45;2, 53;14, 53;17, 53;22, 53;23, 60;1, 60;3, 60;5, 60;15, 60;21,
   60;23, 61;2, 61;5, 61;7, 61;18, 67;9, 67;14, 68;13, 68;15, 69;4,
   70;1, 70;14, 71;11, 71;16, 71;17, 90;1, 111;9, 111;11, 138;6,
   185;19
searches: 55;21
second: 52;9, 74;5, 74;8, 75;16, 106;19, 212;19, 212;23
secondary: 105;18
Secondly: 121;1
secretarial: 44;12
secretary: 44;12, 54;11
section: 25;13
Security: 166;11
seeing: 132;14, 213;18
seeking: 35;23
seem: 98;9, 118;9, 119;8
Seemed: 95;9, 95;10, 98;8, 99;14
seeming: 119;6
seen: 11;4, 25;8, 106;9, 165;15, 184;17, 188;18, 190;22
select: 55;4, 55;6, 136;21, 136;23, 139;14, 178;7
selected: 135;23, 136;8, 136;13, 139;16, 155;16, 179;11, 179;16,
   182;6, 182;12, 182;20, 183;4, 186;8, 187;3, 208;20
selectee: 136;15, 136;16
selecting: 136;19
selection: 23;19, 25;14, 39;3, 75;18, 136;2, 186;2, 214;21
Selma: 11;20
semester: 45;23, 46;22, 50;7, 50;8, 50;10, 50;11, 50;13, 108;8,
   109;11, 145;3, 145;5
send: 53;13, 55;7, 135;11, 136;12, 136;18
sending: 136;7
sense: 136;17, 150;21
sent: 26;14, 53;4, 53;8, 53;8, 53;11, 55;15, 58;4, 58;10, 135;2,
   135;22
sentence: 106;19, 107;16, 107;17, 113;4, 189;10
separate: 11;8, 37;11
serious: 194;7
serve: 97;21, 98;4, 98;5, 98;13, 148;14
served: 98;22
serves: 25;13

sketchy: 93;20
skills: 30;1
slander: 200;19, 206;15
slash: 211;19
Small: 151;17, 151;21, 151;22
SMART: 48;5
Social: 168;11
solicit: 83;7
Somebody: 32;10, 40;9, 48;12, 102;3, 110;11, 110;22, 112;23, 113;9,
   113;10, 135;1, 138;16, 143;9, 147;18, 149;6, 152;22, 155;9, 180;5
someone: 49;10, 107;6, 121;10, 154;18, 154;22
sometime: 131;19, 188;12
Sometimes: 47;6, 62;23, 79;14, 79;16
somewhere: 28;1, 110;12, 167;19, 175;3
sorry: 12;19, 45;10, 65;13, 69;18, 70;22, 92;2, 112;15, 116;21,
   132;23, 133;23, 151;19, 160;4, 163;21, 170;2, 191;19, 205;19,
   212;18
sort: 40;23, 58;19, 61;9, 78;21, 88;14, 89;20, 141;15, 149;12,
   162;11, 200;18
sound: 73;14, 207;8
sources: 53;12
South: 50;22
Southeast: 8;22, 8;23
SOUTHERN: 1;3, 105;10, 105;15, 143;2
Sparks: 10;18, 11;1, 18;9, 18;14, 18;19, 57;2
speaking: 19;16, 28;15, 66;7, 176;1
speaks: 97;5
specifically: 144;9
specifications: 211;16
specifics: 33;8, 98;7, 98;19, 100;23, 138;8
speculate: 159;13, 180;11, 180;14, 197;16
Speech: 39;23, 40;3, 44;10, 46;1, 46;1, 49;23, 51;8, 51;14, 51;16,
   51;17, 52;1, 68;5, 71;13, 77;17, 77;18, 103;17, 104;15, 104;17,
   128;17, 129;12, 139;23, 143;1, 174;13, 175;19
spirits: 149;12
Spring: 50;12, 196;4
spring-summer: 36;6
staff: 107;14
Stafford: 78;4, 140;3
stand: 215;9

Service: 53;7, 79;2, 79;10, 79;11, 79;13, 79;16, 79;18, 209;12
services: 117;7
set: 17;3, 17;9, 28;5, 62;20, 209;10
setting: 32;11, 116;11
Several: 16;15, 55;21, 188;13
sex: 32;16, 32;18, 210;13
shall: 2;7
shave: 156;19
She's: 31;4, 33;13, 40;22, 98;1, 121;3, 121;19, 128;16, 143;20,
   144;3, 144;12, 163;16, 163;16, 175;6, 175;7
sheet: 102;19, 103;9, 103;12, 103;21, 103;22, 134;12, 163;6
short: 67;22, 126;15, 165;11, 214;18
short-term: 16;18, 16;19
shortly: 61;14, 135;9, 135;16
shouldn't: 127;19
Show: 40;14, 43;22, 51;21, 56;5, 58;15, 62;4, 65;10, 67;12, 69;20,
   81;3, 106;6, 134;21, 144;19, 165;7, 165;14, 174;18, 184;16,
   188;15, 200;7, 200;8, 209;3, 212;6
shows: 60;19, 209;9
Shuford: 19;11, 23;9, 25;12, 25;18, 26;3, 26;5, 27;14, 33;12, 35;4,
   35;11, 35;19, 36;7, 36;23, 37;7, 37;13, 37;16, 38;4, 38;5, 38;6,
   38;7, 38;12, 38;16, 180;10, 180;17, 180;21, 209;13
sign: 81;10, 135;15, 165;2, 165;4
signal: 202;17
signature: 1;23, 40;18, 44;15, 72;15, 76;21, 184;20
signatures: 45;7
signed: 40;20, 76;20, 81;10, 81;12, 81;18, 135;14, 164;22, 166;4,
   183;11, 185;9, 185;15
significance: 207;5
similar: 99;1, 99;3, 135;3
simple: 30;21
simply: 141;1, 150;10, 205;21
sir: 106;10, 165;20
sit: 34;3, 34;5, 119;23, 143;22
site: 53;3, 112;22
sites: 12;23, 13;6
sitting: 80;22
situation: 24;23, 29;13, 29;22, 70;6, 154;15, 156;12, 160;23, 161;1,
   161;3, 161;9, 180;5, 183;6
six: 18;7

standard: 110;22
start: 19;5, 61;19, 127;22
starts: 135;17
STATE: 6;2, 11;18, 12;4, 18;9, 18;14, 63;11, 63;18, 63;22, 64;7,
   64;11, 80;5, 84;20, 85;3, 85;10, 92;13, 92;15, 95;12, 95;15,
   97;12, 97;13, 97;14, 97;23, 98;1, 98;23, 116;7, 143;2, 167;17,
   167;18, 168;15, 173;3, 173;7, 173;21, 174;9, 175;22, 182;5, 186;7,
   186;10, 194;16, 196;15, 212;13, 212;14, 214;3, 218;4
stated: 124;2, 126;4, 208;2
statement: 27;2, 35;21, 60;8, 75;17, 81;18, 85;11, 120;9, 120;19,
   163;18, 163;20, 177;23, 178;6, 181;18, 182;3, 186;18, 191;16,
   197;22, 203;5
STATES: 1;1, 105;19, 105;19, 126;20, 185;17
Statewide: 80;15, 80;17
station: 153;13
Stay: 79;12, 201;19
Stayed: 39;19, 39;20
stead: 195;5
stenotype: 218;9
step: 166;21, 166;22, 167;1
stick: 7;12, 89;6
STIPULATED: 1;13, 1;22, 2;6, 2;15
stipulation: 6;6, 33;18, 34;2
stipulations: 6;16
stood: 138;21
store: 153;12
Street: 5;12, 6;8
strength: 143;13
strengths: 182;4
Strictly: 186;11, 186;15
strike: 136;10
strong: 90;3
structure: 12;2
struggling: 145;19
student: 46;6, 46;9, 48;21, 51;8, 95;14, 103;1, 103;17, 104;11,
   128;16, 149;1, 149;4, 149;18, 149;21, 150;14, 150;17, 150;19,
   151;2, 151;5, 151;10, 151;14, 172;17
student-teacher: 152;1, 152;2
students: 13;21, 14;2, 48;15, 48;17, 50;3, 94;4, 97;20, 97;20, 97;22,
   98;3, 98;5, 98;5, 98;8, 98;12, 98;13, 98;21, 98;23, 120;23,

142;11, 148;13, 148;14, 148;19, 149;2, 149;13, 149;14, 150;3, 150;4. 150;16. 152;7, 152;9. 153;3. 158;12. 164;6. 171;14. 172;16
studentss: 172;12
studied: 130;1
studies: 46;2
study: 88;8
stuff: 48;4
subject: 163;1. 163;2, 187;11. 188;4
submit: 23;21, 44;9, 60;17
submitted: 24;3, 54;2. 54;21
subpoena: 214;4
substanial: 179;8
successful: 135;7, 142;21, 173;1. 173;5
sufficiently: 155;21, 208;23
suggesting: 61;8
suit: 200;19, 206;15
suitability: 186;12, 186;16
suitable: 41;12, 42;20. 43;2. 55;7, 139;22
Suite: 5;8, 5;12, 6;9
suited: 125;12, 139;17
summer: 41;12, 145;7. 145;9
supersedes: 213;4
supervision: 218;11
supervisors: 144;2
supplies: 157;15
supported: 143;3, 176;7. 176;16. 176;19
supporting: 49;22
supportive: 121;7
supposed: 25;22, 61;23. 62;14, 62;18. 79;12. 106;3
surmise: 60;22
surrounding: 44;13
suspicion: 202;6
sworn: 6;20
swung: 159;8
system: 64;9. 97;15. 180;8

&lt;T&gt;
table: 8;8
tailored: 57;19
talked: 37;23. 38;19. 52;10. 76;18, 95;13, 97;19, 100;13. 118;5.

thereafter: 135;9
thereto: 2;14, 218;10
they'll: 44;9. 111;8
they've: 94;18, 94;21, 95;1, 149;16
thinking: 74;19, 115;6. 206;13
third: 81;21, 133;18. 145;12. 154;11. 211;17, 213;6
thirteen: 16;11
Thompson: 78;4, 80;21. 80;23, 131;7, 131;9, 131;10, 133;1, 140;3. 142;3, 158;15. 160;13, 162;1, 173;22, 178;18, 179;2, 179;16, 181;21, 187;1, 188;3, 191;22, 192;7. 192;9. 192;14, 193;5, 193;11, 197;9, 201;22, 202;7, 213;20
Thompson's: 200;16
though: 15;19, 63;19, 123;1. 123;2. 143;23, 154;4, 181;21, 207;20
thoughts: 89;7
three: 11;17. 17;15, 23;14. 23;21, 29;14, 29;20, 42;1. 42;13. 42;17. 54;2, 55;6, 55;8, 58;4, 58;9, 58;10, 60;20, 65;20, 66;20, 67;5, 71;10, 72;19, 82;5, 86;19, 88;18. 89;17. 89;22, 89;23, 90;5, 93;3, 120;12. 185;20. 207;19
tie: 30;2
today: 7;9. 8;1, 13;18, 207;19, 208;3
Together: 10;20, 15;6, 15;7, 15;11. 22;4. 37;12, 76;14. 101;10, 185;7
took: 158;19
top: 32;14, 32;21, 122;19. 157;12. 157;22. 166;15, 166;16. 179;11. 182;20, 210;5
topic: 68;9
topics: 176;1
tolal: 10;20, 125;6, 125;23, 125;23, 126;3, 126;11, 126;12, 126;18. 127;5, 127;6, 140;20, 140;23. 141;8, 210;7
toward: 62;12, 26;23. 27;3, 168;4. 169;12. 209;10
town: 50;15, 55;22
traditionally: 210;14, 210;16
training: 13;4
transcript: 110;15. 113;1. 218;12
transcripts: 87;14. 87;23. 175;14
Trenhom: 65;21
trial: 2;12, 33;2
trouble: 192;9, 192;14, 192;15, 193;5
Troy: 14;13. 14;17, 65;21
true: 174;3, 185;22. 202;12. 203;3. 218;12
trump: 151;11

159;20. 162;10, 162;14. 164;9. 171;7. 184;15, 188;6, 208;14, 214;23
talks: 133;19. 211;18
Talmage: 16;10
Taught: 16;15, 46;6. 46;7, 47;1, 64;13, 77;17, 96;8. 96;10. 96;17. 115;17. 117;12, 117;18, 121;3, 145;6, 145;7, 145;9, 148;15, 148;20, 149;3. 151;5, 151;11, 151;14, 154;1, 210;14, 210;16
teach: 14;6, 14;7, 14;8. 40;9. 40;13. 43;16, 48;16, 92;22, 93;5, 109;10, 109;12. 110;10. 149;8. 150;8, 153;20, 153;22, 155;21, 177;14
teacher: 49;3, 115;1, 115;4. 115;10. 115;12. 158;11
teacher-learning: 142;11
teaches: 48;12. 48;14, 147;8, 153;20
Teaching: 14;5. 47;6, 47;10, 47;17, 48;1, 48;2, 48;6. 48;8, 48;11, 68;8, 68;9, 92;19, 96;13, 102;8, 118;15. 121;15, 122;2, 122;4. 128;7, 128;10, 139;22, 142;21, 143;18. 149;1. 149;3, 149;4, 150;22, 152;18, 153;17. 153;17. 154;4. 164;6. 164;13, 164;14, 168;13, 168;18. 169;12. 169;19. 170;7, 170;8. 171;1, 173;2, 173;3
team: 51;13, 51;14, 129;20
teams: 51;8. 103;17
Tech: 65;21
Technical: 10;18, 11;2. 16;17. 16;23. 18;9, 54;6, 54;8, 79;4
technological: 47;15, 47;21, 102;15, 128;14
technology: 48;1, 48;3. 143;5. 146;4
telephone: 142;2
ten: 34;7
tend: 153;14
tentative: 82;6, 82;6. 133;21. 133;21
tenure: 168;4, 168;10
term: 16;19, 74;5, 145;11, 152;13
terminated: 195;7
Terry: 43;9, 43;10, 43;11. 49;9
testified: 6;21, 102;9
testimony: 218;13
testing: 60;12
theater: 40;5. 40;9, 40;13. 43;18, 49;14, 49;17, 50;4, 100;19, 104;16
theatrical: 43;7, 49;5
themselves: 87;2
There's: 8;8. 20;8. 22;3, 22;22, 62;2, 62;20, 62;21. 68;10, 122;4. 135;9. 140;4. 149;3, 154;9. 177;14. 194;14

trustees: 12;2, 12;3
truthfully: 159;12
try: 7;11. 7;16. 7;19. 27;13, 28;4. 29;2. 29;6. 30;12. 31;17, 57;3, 158;10
trying: 61;10, 102;1, 155;6. 203;23. 204;11
turn: 143;16
twenty: 10;20, 29;11. 32;15
twenty-seven: 45;23, 46;23, 108;8, 109;12
two: 12;22, 12;23, 13;4. 13;6, 15;5, 25;16, 26;15. 26;18, 29;21, 29;23, 32;15, 37;5, 41;5, 42;2, 42;16, 56;18, 70;22, 73;2, 88;18, 89;6. 90;4. 124;3, 124;5, 125;2. 135;23. 151;10, 207;19
two-year: 12;1, 97;15, 98;22. 99;4. 116;11. 116;13, 116;16. 116;23. 117;6, 149;18, 149;21, 180;8
type: 24;23. 61;6, 71;23, 98;13. 98;14. 98;16, 99;2, 135;20. 148;14. 148;19, 149;19, 178;12. 210;22
types: 117;7
Typically: 54;12. 92;21, 136;7, 195;20

&lt;U&gt;
ugly: 83;14
Ultimately: 101;15, 101;20
unclear: 80;12
undergone: 106;16
underlying: 200;16, 205;22, 206;6
understand: 7;17, 22;22, 25;19, 47;18, 49;1, 84;8, 101;18, 108;20. 117;11, 124;15, 136;3, 149;14. 150;2, 150;6, 156;22, 159;14. 206;4
understanding: 8;2, 68;2, 148;13
understood: 7;21, 82;19
unfair: 29;6
unfriendly: 78;16, 78;17
uniform: 35;15
UNITED: 1;1
universities: 20;21, 150;9
University: 14;13, 20;18, 36;4. 63;15. 63;16, 64;2. 64;4. 110;13
unless: 194;14
unmanageable: 34;1
unsuitability: 186;23
unsuitable: 44;8
until: 87;21. 69;11. 74;17, 74;20, 168;9. 207;2
up-to-date: 48;3
urging: 27;2

uses: 143;18, 143;22
using: 47;23, 48;3
Usual: 6;15, 53;12

**<V>**
vacancy: 20;21, 52;1, 60;6, 61;15
Vaguely: 213;8
varied: 21;23, 22;2
varies: 92;23
variety: 20;23, 52;6
various: 90;10
verbalize: 7;10
Verification: 165;21
verifying: 53;22, 105;3, 110;16
version: 106;13, 212;20, 213;1
versions: 213;4
versus: 149;18
violate: 30;10, 31;6, 31;9, 31;10
violation: 80;11
visit: 20;17, 36;3, 107;7, 109;2, 112;22
vocational: 14;23, 15;3, 15;6, 15;8, 15;11, 17;1
voice: 96;1, 96;4, 164;8

**<W>**
Wait: 44;18, 74;20
waived: 2;1, 2;17
WALLACE: 1;8, 7;3, 10;9, 10;14, 10;19, 11;1, 11;3, 11;5, 11;6, 11;11,
    11;17, 11;20, 12;3, 12;20, 17;23, 18;17, 18;19, 18;22, 19;1,
    79;17, 93;8, 95;12, 97;12, 97;14, 97;22, 98;1, 99;2, 192;18
Wallace's: 79;15
wanted: 34;10, 85;18, 90;22, 113;19, 114;8, 114;11, 133;6, 138;11,
    164;15, 173;9, 198;2, 212;3
Ware: 43;16, 63;6, 87;11, 90;12, 90;21, 91;2, 91;18, 92;1, 93;21,
    100;16, 118;11, 120;16, 123;15, 125;10, 127;1, 130;11, 135;3,
    137;7, 138;11, 139;4, 139;15, 139;16, 151;6, 155;2, 155;16, 159;7,
    162;6, 166;7, 169;6, 178;23, 179;11, 179;17, 181;22, 182;20,
    186;4, 186;11, 194;16, 208;20, 213;17, 214;21
Ware's: 118;17, 165;18
waste: 115;7
water: 201;16, 204;1

weak: 145;14
web: 53;3
web-based: 47;17, 48;5, 48;8
WebCT: 143;5, 143;12, 144;11, 144;13, 145;20, 146;11, 177;1, 177;10
week: 73;13
Whatever: 42;13, 55;22, 63;14, 76;15, 84;12, 157;16, 177;17, 207;4
whatsoever: 107;12
wherein: 191;3
Whereupon: 6;12, 67;22, 126;15, 134;17, 165;10, 166;12, 214;18
whether: 75;21, 152;19, 152;20, 167;23, 168;3, 196;13
whoever: 63;10, 65;18, 111;21
whole: 79;6, 96;5, 96;7, 137;21, 157;2, 157;4, 177;11, 202;20
whom: 10;23, 159;18
widely: 20;22
will: 7;18, 32;23, 44;6, 127;2, 181;17, 191;4
winner: 135;12
withdrew: 66;23
within: 34;22
Without: 52;22, 53;22, 157;21, 175;20, 208;20
WITNESS: 2;1, 6;10, 23;11, 30;16, 32;13, 35;14, 39;10, 49;21, 53;21,
    54;16, 81;7, 90;15, 91;8, 105;2, 105;5, 116;1, 124;15, 130;22,
    131;18, 132;20, 134;6, 134;9, 138;5, 141;5, 142;8, 142;20, 143;11,
    145;1, 145;13, 145;16, 146;19, 147;1, 151;13, 156;22, 159;14,
    160;19, 163;18, 163;21, 164;3, 175;4, 175;10, 179;6, 179;19,
    180;15, 197;5, 203;14, 211;6, 215;7, 215;11, 218;13
woman: 43;12
Woodrow: 56;17, 56;20, 57;12, 72;15
word: 27;7
wording: 36;12, 36;15
words: 20;22, 31;12, 74;13, 94;5, 117;17, 161;13, 186;22
work: 15;2, 26;23, 27;3, 44;13, 60;23, 61;19, 93;8, 98;6, 146;9,
    153;16, 158;3, 166;18, 167;4, 167;8, 167;13, 167;22, 183;21,
    187;21
Worked: 16;11, 17;2, 17;10, 17;13, 94;8, 118;7, 184;2, 184;4, 202;19
Working: 14;4, 16;1, 16;5, 16;6, 17;9
works: 78;11, 195;8, 202;22
worried: 206;16
write: 93;16, 94;2
writing: 25;5, 218;10
written: 117;23, 163;5

wrote: 104;14, 116;16, 172;8, 182;19

**<Y>**
Y'all: 48;22, 51;19, 76;14, 79;21, 134;14, 138;19, 139;3, 212;4
year: 19;13, 21;23, 21;23, 22;2, 92;14, 96;9, 96;10, 96;17, 102;11,
    121;21, 122;17, 135;16, 140;1, 140;6, 142;1, 151;7, 151;9, 192;22,
    195;1, 195;9, 195;11, 197;3, 198;6
years: 10;15, 10;20, 10;20, 16;11, 17;15, 18;15, 32;15, 83;22, 83;22,
    148;16, 148;21, 150;23, 151;10, 151;11, 152;17, 158;1
yesterday: 50;23
YOUNG: 1;16, 6;10, 6;19, 7;1, 127;17, 134;19, 165;13, 214;20
younger: 98;5
yourself: 182;5

DEPOSITION OF RICHARD EMANUEL

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


RICHARD EMANUEL,

     Plaintiff,

vs.              CASE NO. 07-819-WKW

GEORGE C. WALLACE
COMMUNITY COLLEGE,

     Defendant.




* * * * * * * * * *

DEPOSITION OF RICHARD CECIL EMANUEL,

Ph.D., taken pursuant to stipulation and

agreement before Wendy Lewis, Certified Court

Reporter and Commissioner for the State of

Alabama at Large, in the Law Offices of Gidiere,

Hinton, Herndon & Christman, 904 Regions Bank

Building, 60 Commerce Street, Montgomery,

Alabama, on Friday, May 30, 2008, commencing at

9:45 a.m.

* * * * * * * * * *

DEPOSITION OF RICHARD EMANUEL

## Page 2

1          APPEARANCES
2  FOR THE PLAINTIFF:
3  Mr. Adam Porter
   LAW OFFICE OF ADAM PORTER
4  Attorney at Law
   2301 Morris Avenue, Suite 102
5  Birmingham, Alabama 35203
6  FOR THE DEFENDANT:
7  Mr. Andrew Christman
   GIDIERE, HINTON, HERNDON & CHRISTMAN
8  Attorneys at Law
   904 Regions Bank Building
9  60 Commerce Street
   Montgomery, Alabama 36104
10
   ALSO PRESENT:
11
   Ms Linda Young
12 Ms Eva Sasser
   Mr Matt Griffith
13
        * * * * * * * * * * *
14

15          EXAMINATION INDEX

RICHARD CECIL EMANUEL, Ph.D
16   DIRECT BY MR CHRISTMAN       4
     CROSS BY MR PORTER         225
17   REDIRECT BY MR. CHRISTMAN  226
18       * * * * * * * * * * *
19       STIPULATIONS
20       It is hereby stipulated and agreed by
21 and between counsel representing the parties that
22 the deposition of RICHARD CECIL EMANUEL, Ph D
23 is taken pursuant to the Federal Rules of Civil

## Page 3

1  Procedure, and that said deposition may be taken
2  before Wendy Lewis, Certified Court Reporter and
3  Commissioner for the State of Alabama at Large,
4  without the formality of a commission; that
5  objections to questions other than objections as
6  to the form of the questions need not be made at
7  this time but may be reserved for a ruling at
8  such time as the deposition may be offered in
9  evidence or used for any other purpose as
10 provided for by the Federal Rules of Civil
11 Procedure.
12      It is further stipulated and agreed by
13 and between counsel representing the parties in
14 this case that said deposition may be introduced
15 at the trial of this case or used in any manner
16 by either party hereto provided for by the
17 Federal Rules of Civil Procedure.
18      * * * * * * * * * * *
19      MR. PORTER:  He's going to read and
20         sign.  Can he just come to your
21         office to do that?
22      THE REPORTER:  Sure.  We'll just notify
23         him when the transcript is ready.

## Page 4

1          RICHARD CECIL EMANUEL, Ph.D.
2      The witness, having first been duly
3  sworn to speak the truth, the whole truth and
4  nothing but the truth, testified as follows:
5          DIRECT EXAMINATION
6  BY MR. CHRISTMAN:
7  Q.  Dr. Emanuel, we're going to take your
8      deposition today.  Have you ever given a
9      deposition?
10 A.  I never have.
11 Q.  Let me tell you what we're going to do.  I'm
12     sure your lawyer has explained to you some of
13     the process, but I'm going to be asking you
14     questions about your lawsuit against Wallace
15     Community College today.  You are under oath;
16     you know what that means?
17 A.  Yes.
18 Q.  If I ask any questions that aren't clear to
19     you, if they don't make sense, if they're
20     confusing in any way, you let me know.  I
21     want to clear that up for you before you
22     answer so that we're clearly communicating,
23     okay?  And anytime I ask you a question,

## Page 5

1  you'll have to answer out loud.  If you nod
2  your head, she can't take it down.
3  A.  Okay.
4  Q.  So I'll ask -- I'll try to remind you.  Your
5      lawyer may try to remind you.  Sometimes I'll
6      forget.  Also, yes or no's are more helpful
7      than like uh-huh and unh-unh and that kind of
8      thing, if you can remember.  I'll try to
9      remind you throughout the day.  If you answer
10     any of my questions, I'll assume you
11     understood it, is that okay?
12 A.  Yes.
13 Q.  We're going to start with your education.
14     Now, I have a copy of your CV which I'm going
15     to attach as an exhibit.  And I'll try to
16     save some time by not going over everything
17     in painful detail that's in your CV, but I do
18     need to cover a fair amount of it.
19         I'll mark this as Defendant's #1, and
20     you can refer to that if you need to.  You
21     didn't have in here where you graduated from
22     high school.  Where did you go to high
23     school?

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 6

1  A. Sparkman High School.
2  Q. I'm sorry. What's your -- tell me your full
3     name for the record, please.
4  A. Richard Cecil Emanuel.
5  Q. Where do you currently live?
6  A. In Prattville.
7  Q. What's your address?
8  A. 1937 Tara Drive.
9  Q. And your date of birth?
10 A. 9/11/1960.
11 Q. And the first thing I'm going to talk about
12    is your educational background. You went to
13    high school where?
14 A. Sparkman High School.
15 Q. And where is that?
16 A. Madison County near Huntsville.
17 Q. You graduated when?
18 A. From high school?
19 Q. Yes.
20 A. 1978.
21 Q. All right. And what did you do after high
22    school?
23 A. I attended the University of Montevallo.

Page 7

1  Q. All right. Graduated from there in 1982?
2  A. Yes.
3  Q. With a bachelor of science degree?
4  A. Yes.
5  Q. In what field?
6  A. In speech and theatre.
7  Q. And I see a listing here of some awards that
8     you won while you were receiving your BS
9     degree; is that right?
10 A. Yes.
11 Q. Tell me what these are.
12 A. Is there one particular one that you're
13    interested in?
14 Q. Well, let's just walk through them here. The
15    Algernon Sydney Sullivan Award; what is that?
16 A. That is the award that is given to the most
17    outstanding graduate. They give two each
18    year, one to a male and one to a female; and
19    it has to do with not so much academics but
20    for leadership and other qualities that are
21    characteristic of a leader in an outstanding
22    graduate in an institution. It's a fairly
23    prestigious award.

Page 8

1  Q. It's not a like a valedictorian or a --
2  A. It is not.
3  Q. -- Magna Cum Laude?
4  A. It is not the same thing.
5  Q. And, then, you're the student advisor to the
6     University president; is that right?
7  A. Yes.
8  Q. What is this Omicron Delta Kappa National
9     Leadership Honor Society?
10 A. It is a national leadership honor society
11    that you have to be tapped or inducted into
12    based on your leadership activities on
13    campus.
14 Q. And then you had Lambda Pi Eta National
15    Communications Studies Honor Society. That's
16    particularly with respect to communication?
17 A. Correct.
18 Q. The field, I mean?
19 A. Yes.
20 Q. Sigma Tau Delta, the English honor society;
21    is that right?
22 A. That's correct.
23 Q. Alpha Psi Omega, the theater honor society?

Page 9

1  A. Yes.
2  Q. And you were members of these societies; is
3     that what it is?
4  A. I was at that time. I'm not sure if you ever
5     lose your membership or if there are annual
6     dues. I have not kept up with them.
7  Q. All right. And then after you graduated in
8     1982 from the University of Montevallo, what
9     did you do then?
10 A. I went to the George Washington University in
11    Washington, D.C.
12 Q. To do what?
13 A. To begin a program in information systems
14    technology.
15 Q. All right. What is information systems
16    technology?
17 A. Computers, data bases, things like that.
18 Q. You began it there and did you finish it?
19 A. I did not.
20 Q. How long were you there?
21 A. I was there one semester.
22 Q. Why did you leave?
23 A. I really didn't like living in downtown D.C.,

DEPOSITION OF RICHARD EMANUEL

| Page 10 |
| --- |

1    and the program wasn't what I had really
2    thought it would be.
3    Q.  What did you do after that experience?
4    A.  I went to Auburn University.
5    Q.  Well, I have here that you were at George
6    Washington University in 1982, and then you
7    graduated in '84.  So did you go immediately
8    from George Washington to Auburn?
9    A.  I did.
10   Q.  And began your studies for your master's in
11   speech communication; is that right?
12   A.  That's correct.
13   Q.  And you received that degree in 1984?
14   A.  Yes.
15   Q.  Did you immediately follow that with your
16   pursuit of your doctoral degree at Florida
17   State?
18   A.  No, it did not immediately follow.
19   Q.  Tell me about that.  What did you do?  What
20   did you do after Auburn?
21   A.  I taught at Tift College in Forsyth, Georgia.
22   Q.  What did you teach there?
23   A.  I taught speech and theatre courses.

| Page 11 |
| --- |

1    Q.  As an adjunct?
2    A.  No.
3    Q.  As a what?
4    A.  Full-time instructor.  Actually, I was the
5    acting chair of the Fine Arts Department and
6    full-time instructor.
7    Q.  And Tift is what kind of college?
8    A.  It was a private Baptist women's college.
9    Q.  Four-year college?
10   A.  Yes.
11   Q.  From '84 to '86?
12   A.  Yes.  That's when I taught there if that's
13   what you're asking?
14   Q.  Yes, that's what I'm asking.  And why did you
15   leave?
16   A.  I wanted to pursue a higher degree.
17   Q.  Were you ever disciplined or anything like
18   that at Tift?
19   A.  No.
20   Q.  What were the circumstances of your
21   departure, a resignation letter?
22   A.  Yes.
23   Q.  After Tift, did you start your doctoral

| Page 12 |
| --- |

1    studies?
2    A.  Yes.
3    Q.  That's at Florida State?
4    A.  Yes.
5    Q.  All right.  By the way, I meant to tell you
6    if you ever need to take a break throughout
7    this process, please feel free to let me know
8    and we'll stop and take a break, okay?
9    A.  Okay.
10   Q.  It's not an endurance competition.
11   A.  Okay.
12   Q.  Your doctoral degree was in Communication
13   Theory and Research; is that right?
14   A.  Yes.
15   Q.  Were you on schedule in terms of completing
16   that degree?
17   A.  I don't understand the question.
18   Q.  Did it take longer than normal?
19   A.  No.
20   Q.  Does it generally -- how long does a doctoral
21   degree in this field at this University
22   generally take?
23   A.  Approximately two to three years.  There are

| Page 13 |
| --- |

1    a number of factors that could affect that;
2    but generally speaking, two to three years.
3    Q.  How long did it take you?
4    A.  I think it was two years.  I don't -- I don't
5    really recall exactly now, but I think it's
6    two years.
7    Q.  Did you teach while you were pursuing this
8    degree?
9    A.  Yes.
10   Q.  Where did you teach?
11   A.  At Florida State University.
12   Q.  What did you teach there?
13   A.  I taught primarily an introduction -- large
14   lecture introduction to communication course.
15   Q.  As an adjunct or full time?
16   A.  As a graduate teaching assistant was the
17   title, but yes, as an adjunct.
18   Q.  And you taught one course?
19   A.  At least one per term.  I also taught public
20   speaking.
21   Q.  Okay.
22   A.  I may have taught some other courses.  It's
23   been so long.

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 14

1  Q. Did you teach for two years or three years?
2     How long did you teach at Florida State?
3  A. I honestly don't recall.
4  Q. I have graduate student instructor '86 to '89
5     here in your CV. That looks to be about
6     three years.
7  A. Okay.
8  Q. Does that sound right?
9  A. That sounds right.
10 Q. After obtaining your doctoral degree, what
11    did you do next?
12 A. I went to work teaching at Enterprise State
13    Junior College.
14 Q. So we'll talk now about your work
15    experience. I assume that was the last level
16    of education you attained?
17 A. That's correct.
18 Q. So let's talk about your work experience.
19    Your next job was at Enterprise Community
20    College here in Alabama; is that right?
21 A. That's correct.
22 Q. And it looks like you taught there for 10
23    years?

Page 15

1  A. Yes.
2  Q. Tell me about the positions that you held
3     there as an instructor.
4  A. Such as -- I don't understand what you're --
5  Q. Well, that's actually a bad question. Tell
6     me about what jobs you did at Enterprise
7     Community College in chronological order.
8  A. I'm still not clear on what you're asking.
9  Q. You were hired as a --
10 A. As an instructor of communication.
11 Q. And you worked in the speech department?
12 A. It was the Department of English, Foreign
13    Languages and Literature or something like
14    that.
15 Q. What kind of professor were you? I mean what
16    level?
17 A. All of the --
18 Q. Associate professor?
19 A. All of the instructors are instructors.
20    Their rank or their title is instructor.
21    It's --
22 Q. Okay. How many classes did you teach upon
23    your arrival?

Page 16

1  A. I don't recall. It would be either -- I -- I
2     just don't recall. It was a full load,
3     whatever that was at the time.
4  Q. This was your full-time job?
5  A. Yes.
6  Q. Did you have any other jobs at that time?
7  A. At which time exactly?
8  Q. When you were at Enterprise.
9  A. When I first arrived or upon being there --
10 Q. During your time at Enterprise, did you work
11    other jobs?
12 A. I did.
13 Q. We'll cover those one at a time.
14 A. Okay.
15 Q. And I see that some of the committees that
16    you chaired here -- if you'll look at your CV
17    there -- and some of the programs that you
18    instituted or were a part of, is there
19    anything that's not contained in your CV that
20    you did at Enterprise?
21 A. There -- there may be. I just don't recall.
22    I mean, if you have some sort of document
23    that might --

Page 17

1  Q. I don't.
2  A. -- refresh my memory. I just don't recall if
3     there were some other things. There may have
4     been.
5  Q. What other jobs did you have while you were
6     working at Enterprise?
7  A. I also taught as an adjunct instructor.
8  Q. At what college?
9  A. Faulkner University and --
10 Q. Let's talk about that one first.
11 A. Okay.
12 Q. That was in 1993?
13 A. Yes.
14 Q. Was that for one summer or how did that work?
15 A. I don't recall. I think that was a fall --
16    it was an evening class located there in
17    Enterprise.
18 Q. Faulkner had a class in Enterprise?
19 A. Yes.
20 Q. Is there a University there?
21 A. There is not.
22 Q. It's just sort of a satellite class or
23    something?

DEPOSITION OF RICHARD EMANUEL

| Page 18 |
|---|
| 1　A. Yes. |
| 2　Q. One class? |
| 3　A. Yes. |
| 4　Q. And you were hired as an adjunct? |
| 5　A. Yes. |
| 6　Q. All right. And that was a contract to teach |
| 7　　one class? |
| 8　A. Correct. |
| 9　Q. And when that semester was over, did you do |
| 10　　any more teaching for Faulkner? |
| 11　A. Not that I recall. |
| 12　Q. Any other teaching that you did or work of |
| 13　　any kind that you did while you worked at |
| 14　　Enterprise? |
| 15　A. I believe Troy University. |
| 16　Q. What did you do at Troy? |
| 17　A. I taught a public speaking class. |
| 18　Q. One class? |
| 19　A. I don't recall. It -- it may have been two, |
| 20　　but I don't recall. |
| 21　Q. Was it one semester or is it a night class? |
| 22　　Or tell me about it. |
| 23　A. One semester. I don't remember any |

| Page 19 |
|---|
| 1　　particulars about the class. |
| 2　Q. How can you teach an adjunct course at Troy |
| 3　　and still carry a full load at Enterprise? |
| 4　　Was it a night thing or -- |
| 5　A. Same way I did at Faulkner. |
| 6　Q. Well, Faulkner was a night class? |
| 7　A. One -- one or two classes. |
| 8　Q. Faulkner was a night class, right? |
| 9　A. Uh-huh. |
| 10　Q. Is that what Troy was? |
| 11　A. I don't recall what time of day it was. |
| 12　Q. And was that contract just for one semester? |
| 13　A. Yes. To the best of my recollection, I |
| 14　　believe it was just one semester. |
| 15　Q. And for Faulkner and for Troy, what was the |
| 16　　reason for discontinuing your work with |
| 17　　them? |
| 18　A. The end of the contract. |
| 19　Q. Any discipline of any kind with Troy or |
| 20　　Faulkner? |
| 21　A. No. |
| 22　Q. Controversy of any kind? |
| 23　A. No. |

| Page 20 |
|---|
| 1　Q. Anywhere else that you worked while you |
| 2　　worked at Enterprise? |
| 3　A. No. |
| 4　Q. All right. |
| 5　A. Not that I recall. |
| 6　Q. I see Michael E. Stephens College of Business |
| 7　　in Montevallo in 1999 through 2000. Was that |
| 8　　following your employment at Enterprise? |
| 9　A. Yes. |
| 10　Q. Let's talk about your departure from |
| 11　　Enterprise. Why did you leave? |
| 12　A. I had an opportunity for employment at |
| 13　　University of Montevallo. |
| 14　Q. Any other reasons? |
| 15　A. I'm sure there are a number of factors that |
| 16　　may have affected my decision to leave, |
| 17　　but -- but I -- primary was that I had an |
| 18　　opportunity for employment at Montevallo. |
| 19　Q. That was the main reason? |
| 20　A. That was my main reason. |
| 21　Q. What was that opportunity at Montevallo? Was |
| 22　　it a -- |
| 23　A. Full-time instructor. |

| Page 21 |
|---|
| 1　Q. Was it more pay? |
| 2　A. It was not more pay. |
| 3　Q. Why was it a better opportunity? |
| 4　A. My alma mater. |
| 5　Q. Is that the only reason, your alma mater? |
| 6　A. Yeah, an opportunity to build a communication |
| 7　　program. |
| 8　Q. At that college? |
| 9　A. Yes. |
| 10　Q. Did you like working at Enterprise? |
| 11　A. Yes, generally. |
| 12　Q. Any problems? |
| 13　A. I don't quite understand your question. |
| 14　Q. Weren't you asked to leave Enterprise by the |
| 15　　president of that college? |
| 16　A. I know that he wanted me to. |
| 17　Q. Weren't you asked to leave Enterprise by the |
| 18　　president of that college? |
| 19　A. I resigned from Enterprise. |
| 20　Q. I appreciate that response. My question is |
| 21　　actually more specific. Didn't the president |
| 22　　ask you to leave? |
| 23　A. I don't recall unless you have some sort of |

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 22

1  document that might refresh my memory. I
2  just really don't recall.
3  Q. You don't remember that?
4  A. Unh-unh.
5  Q. You don't remember -- or do you remember any
6  allegations of sexual impropriety on your
7  part toward the students at Enterprise
8  Community College? Remember any of those
9  allegations?
10  A. I remember one allegation.
11  Q. Who was that made by?
12  A. It was made by the college, actually.
13  Q. The president?
14  A. Well, the -- the president alleged that I had
15  done something, yes.
16  Q. Did he confront you about something?
17  A. Confront me?
18  Q. Yeah. Did he confront you about some sort of
19  allegation of impropriety on your part?
20  A. He did.
21  Q. Tell me about that confrontation.
22  A. He handed me a letter that basically said
23  that he was investigating a complaint.

Page 23

1  Q. What was the complaint that was reported to
2  you?
3  A. It was a complaint of sexual harassment.
4  Q. By a student?
5  A. By a student.
6  Q. And wasn't there more than one complaint by
7  more than one student?
8  A. No.
9  Q. Not communicated to you?
10  A. Not communicated to me.
11  Q. To your understanding it was one student?
12  A. Yes.
13  Q. Was it one circumstance or multiple
14  circumstances?
15  A. One.
16  Q. And you were never informed about any other
17  students besides this one who claimed that
18  you had engaged in some sort of sexually
19  inappropriate conduct?
20  A. I don't recall any other allegations from any
21  other students. If you have a document that
22  might refresh my memory, that would be very
23  helpful.

Page 24

1  Q. Do you have --
2  A. Do you have a document that might refresh my
3  memory?
4  Q. If I need to refresh your recollection with a
5  document, I'll make sure I provide it to you,
6  okay?
7  A. Okay.
8      MR. PORTER: Let me ask you this. Did
9      you get any documents from your
10      subpoena to Enterprise State?
11  MR. CHRISTMAN: Yeah.
12  MR. PORTER: I didn't receive those.
13      Can I get a copy of those?
14  MR. CHRISTMAN: Sure. Did you ask me
15      for them?
16  MR. PORTER: Yeah.
17  MR. CHRISTMAN: Yeah, you should have
18      gotten all of that.
19  MR. PORTER: Well, I got documents from
20      everybody else but not them.
21  MR. CHRISTMAN: Not from Enterprise?
22  MR. PORTER: Right.
23  MR. CHRISTMAN: Matt, would you make --

Page 25

1      would you go get a copy of those
2      right now for him?
3  MR. GRIFFITH: Yes.
4  MR. CHRISTMAN: Thank you. I
5      apologize. You should already
6      have those along with every other
7      one.
8  MR. PORTER: I do have the rest -- I
9      think the rest of them. What else
10      did we get?
11      This is off the record,
12      right?
13      (Off-the-record discussion)
14  Q. Dr. Emanuel, we were talking about your
15  departure from Enterprise Community College,
16  and I was asking about the circumstances of
17  your departure. You testified that you -- it
18  was your understanding that you were accused
19  of one incident with one student of sexual
20  impropriety, which was the basis of the
21  accusation of Dr. Thompson; is that right?
22  A. That's correct.
23  Q. He actually sent -- he actually sent you a

DEPOSITION OF RICHARD EMANUEL

| Page 26 |
|---|
| 1  termination letter, didn't he? |
| 2  A. Yes, I did receive a termination letter. |
| 3  Q. So your testimony today that the reason you |
| 4    left Enterprise was for a better opportunity |
| 5    is really not terribly accurate, is it? |
| 6  A. I would not characterize it that way. I |
| 7    would characterize it as an accurate |
| 8    statement. |
| 9  Q. You don't think the fact that you had been |
| 10   accused of sexual impropriety and the |
| 11   president attempted to terminate your |
| 12   employment was a motivating factor behind |
| 13   your leaving Enterprise? |
| 14  A. I would say that it certainly was a motivator |
| 15   in my seeking other employment, but it was |
| 16   not the motivating -- primary motivating |
| 17   factor in my leaving. |
| 18  Q. It's your -- you understand you're under |
| 19   oath? |
| 20  A. I do understand that. |
| 21  Q. And it's your testimony that you left for a |
| 22   better opportunity and not because you were |
| 23   being fired? |

| Page 28 |
|---|
| 1  didn't have anything to do with your leaving? |
| 2  A. I'm sorry -- |
| 3    MR. PORTER: Object to the form. |
| 4  Q. You can answer the question. |
| 5    THE WITNESS: I'm sorry? |
| 6    MR. PORTER: I said object to the |
| 7    form. You can answer. |
| 8  A. I don't really understand your question. |
| 9  Q. All right. Well, let's just look at some |
| 10   documents and we'll see if we can flesh it |
| 11   out. |
| 12    Defendant's #2 is a letter dated January |
| 13   8th addressed to you. Take a look at that |
| 14   letter. You've seen that letter before, |
| 15   haven't you? |
| 16  A. Yes. |
| 17  Q. And then a few weeks later, January 26th, you |
| 18   received another termination letter that I'll |
| 19   label as Defendant's #3 from the president of |
| 20   Enterprise. Do you recall seeing that |
| 21   letter? |
| 22  A. Yes. |
| 23  Q. Look at the basis for the termination there |

| Page 27 |
|---|
| 1  A. That's correct. |
| 2  Q. All right. Wasn't there a settlement |
| 3    agreement entered between you and the |
| 4    college? |
| 5  A. Yes. |
| 6  Q. And didn't that settlement agreement include |
| 7    a term that said that you were going to |
| 8    resign? |
| 9  A. Yes, it did. |
| 10  Q. So wasn't the reason you left because you |
| 11   entered into a settlement agreement that said |
| 12   that you would leave? |
| 13  A. I wouldn't -- could you repeat that? I'm |
| 14   sorry. |
| 15  Q. Isn't the reason you left Enterprise because |
| 16   you had entered into a settlement agreement |
| 17   saying that you were going to resign? |
| 18  A. No. I had already received an opportunity |
| 19   for employment at another institution. |
| 20  Q. And the fact that there's a settlement |
| 21   agreement out there with your name on it |
| 22   whereby you settled a termination proceeding |
| 23   with the agreement that you would resign |

| Page 29 |
|---|
| 1  in the most recent termination letter. |
| 2  A. I'm sorry. Which termination letter -- |
| 3  Q. The most recent. |
| 4  A. -- the first one or the second one? |
| 5  Q. The most recent. |
| 6  A. The most recent? Okay. |
| 7  Q. Read off the first basis for termination |
| 8    It's a bullet. |
| 9  A. This letter says unwelcome sexual advances |
| 10   toward female students. |
| 11  Q. That says students plural, doesn't it? |
| 12  A. It does. |
| 13  Q. Read the next one. |
| 14  A. It says solicitation of sexual favors from |
| 15   female students in exchange for grades or |
| 16   grade changes. |
| 17  Q. That says students plural, doesn't it? |
| 18  A. It does. |
| 19  Q. Read the next one. |
| 20  A. Engaging -- engaging in sexual intercourse |
| 21   with a female student on college property. |
| 22  Q. Read the next one. |
| 23  A. Making degrading and other sexually demeaning |

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 30

1    and unnecessary comments about and to female
2    students in the classroom and in the faculty
3    office.
4    Q. That's students plural, isn't it?
5    A. It is.
6    Q. Read the next one.
7    A. Stalking female students.
8    Q. Students plural?
9    A. Yes, it is.
10   Q. Is that the last one?
11   A. No, there are three other bulleted items.
12   Q. Continue.
13   A. Using college equipment for unwelcome sexual
14      advances toward a female student.
15   Q. The next one?
16   A. Failure to heed the counsel of the Dean of
17      Instruction to cease inappropriate behavior
18      toward female students.
19   Q. Plural?
20   A. Yes, students is plural.
21   Q. Students is plural. Okay. Next one?
22   A. Failure to act in conformance with sexual
23      harassment training provided by the college.

Page 31

1    Q. As early as January 8th, 1999 and here
2       later in -- later in January of the same
3       year, you were aware that the college was
4       accusing you of sexual impropriety with more
5       than one student, weren't you?
6    A. I was aware that their claim suggested more
7       than one student, but I was unaware of more
8       than one claim.
9    Q. Well, there are multiple instances of alleged
10      sexual impropriety in the letter that you
11      hold in your hand, are there not?
12   A. There are multiple bulleted items if that's
13      what you mean.
14   Q. In other words, it's not a single event.
15      There's sexual intercourse with a student on
16      campus, right? That's in there, isn't it?
17   A. Engaging in sexual intercourse with a female
18      student on college property is the third
19      bulleted item.
20   Q. And then there's stalking students. That's
21      in there, right?
22   A. Stalking female students is on here, yes.
23   Q. There are -- we just went through them.

Page 32

1    There are a number of other claims of sexual
2    impropriety on your part toward female
3    students in that letter; isn't that right?
4    A. I don't understand the question. I'm
5       wondering if you could rephrase it for me.
6    Q. Okay. There are a number of other
7       circumstances detailed in those bullets
8       accusing you of sexual impropriety against
9       female students, right?
10   A. The claims on this letter do indicate
11      students plural.
12   Q. And there are different claims, different
13      types of activity that you're accused of,
14      right?
15   A. Those are -- yes, there are different claims
16      listed here.
17   Q. And earlier today you told me it was one
18      claim about one student that you were
19      advised about; isn't that true?
20   A. Yes, that is true.
21   Q. Well, how do you explain the fact that this
22      letter here has multiple claims against
23      multiple students?

Page 33

1    A. Because I was only made aware of one.
2    Q. Well, as early as this letter you were made
3       aware of all of those claims against students
4       plural. I just don't understand the
5       disparity in your testimony.
6    A. Well, I wouldn't characterize it as disparity
7       at all, sir. I was only made aware of one
8       complaint from one student at one time.
9    Q. Were you made aware of this letter?
10   A. I was.
11   Q. Is that one complaint against one student at
12      one time?
13   A. I'm not sure what these claims represent, to
14      tell you the truth. I was only made aware of
15      one complaint from one student at one time.
16   Q. Is that one complaint against one student at
17      one time in your opinion?
18   A. Well, there are several bulleted items here.
19   Q. And is it one complaint?
20   A. I'm not sure what this frankly represents.
21   Q. Well, you can see the complaints.
22   A. I do see them.
23   Q. Is it just one?

DEPOSITION OF RICHARD EMANUEL

Page 34

1  A. No, there are multiple items listed here.
2  Q. Is it one student?
3  A. I don't know who this represents.
4  Q. Does it refer to one student?
5  A. It uses the word students plural, uh-huh.
6  Q. Didn't you request -- when you left
7     Enterprise, didn't you request a copy of all
8     of the college's files associated with the
9     termination proceeding and their allegations
10    against you?
11 A. Yes, I did.
12 Q. Did you receive that?
13 A. I never did.
14 Q. Is today the first day you've ever seen the
15    documents associated with the allegations
16    against you relating to student misconduct --
17    excuse me -- relating to sexual misconduct
18    against students by you?
19 A. Could you rephrase that question? I'm sorry.
20 Q. Is today the first day you've ever seen the
21    documents supporting the allegations of
22    sexual misconduct by you against a student?
23        MR. PORTER: Object to the form.

Page 35

1  A. There are documents that I've seen for the
2     first time today. Now, what they represent,
3     I'm not clear on; but I -- it's the first
4     time I've seen several of the documents that
5     you provided me and my counsel today.
6  Q. But you never received anything from the
7     college -- when I say college, I mean
8     Enterprise.
9  A. No, I didn't, even after repeated requests.
10 Q. All right. Defendant's #4, this is a letter
11    to you from Stafford Thompson saying that
12    you're under investigation for claims of
13    sexual misconduct against students. You see
14    that?
15 A. Yes.
16 Q. Do you remember getting that letter?
17 A. I remember getting this letter, yes.
18 Q. And you see that it refers to students
19    plural, don't you?
20 A. I see the word students in the letter.
21 Q. And it's your understanding that they're
22    investigating -- was it your understanding
23    after having received this letter that they

Page 36

1     were investigating complaints from more than
2     one student?
3  A. I wasn't clear what they were investigating.
4  Q. Well, what more did you need to know after
5     reading that letter that they were
6     investigating complaints from more than one
7     student?
8  A. I needed to know who had made a claim against
9     me. I needed to know what the nature of the
10    claim was, what the behavior -- alleged
11    behavior was. I received none of that.
12 Q. That might have been helpful for you to
13    understand the exact nature of the
14    allegations, right?
15 A. It certainly would have.
16 Q. You didn't need to know anything more than
17    what that letter says to know that there was
18    more than one student who had made an
19    allegation against you, did you?
20 A. I didn't know what -- who had made
21    allegations nor how many. And the only thing
22    I was provided was one complaint from one
23    student at one time.

Page 37

1  Q. I want to talk to you about that. I really
2     do. But my question is fairly focused. And
3     I know your communications -- your area of
4     expertise and focus in education has been in
5     communication. So I'm going to ask you to
6     zero in on my question and answer my
7     question.
8  A. Okay.
9  Q. My question to you I don't think is
10    complicated, but I'll try to be as plain as I
11    can. You didn't need anything else other
12    than that letter to know they were
13    investigating -- they claim to be
14    investigating claims from more than one
15    student?
16 A. That is what they claim to be doing, it
17    appears from this letter.
18 Q. Tell me what was communicated to you about
19    the one claim against the one student. Who
20    communicated to you that allegation?
21 A. Dr. Joan Newman did. She was the interim
22    dean, and she communicated it to me.
23 Q. You can put that down.

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 38

1   A. Okay.
2   Q. Joan Newman was the interim dean?
3   A. Uh-huh.
4   Q. At what point in the investigation slash
5      termination process was that communicated to
6      you?
7   A. I don't recall exactly, but I would guess it
8      was something on the order of six weeks after
9      the -- after this letter was received.
10          MR. PORTER: Refer to the exhibit
11             number if you would.
12  A. I'm sorry. Defendant's Exhibit #4, a letter
13     dated November 13th from Dr. Thompson.
14  Q. Was this conversation in person or on the
15     phone?
16  A. In person.
17  Q. Tell me about it.
18  A. I was in her office, or in her outer office,
19     and she presented me with a copy of a
20     document that is -- I've seen here -- a copy
21     of a document that she claims was a compliant
22     from a student against me.
23  Q. Did you read the document?

Page 39

1   A. I did.
2   Q. What was the complaint?
3   A. I didn't see a complaint on the document.
4      What I saw was what appeared to be a -- a
5      note or a letter -- typewritten note or
6      letter. There was no to or from. It was --
7      or date. It was simply contents that looked
8      like a letter.
9   Q. Was there an accusation in the letter?
10  A. I did not see an accusation in the letter.
11  Q. Was there a complaint of any kind in the
12     letter?
13  A. Not in that letter, no.
14  Q. So what -- what was -- what was in the
15     letter?
16  A. The letter -- well, I don't recall exactly,
17     but it's here. It was really nonsensical
18     information in there. I mean, it was --
19     asked about can beans make a meal and, I
20     mean, just bizarre things like -- you know,
21     like that.
22  Q. I'm going to mark a composite exhibit here.
23     And if you'll just thumb through it, maybe

Page 40

1   it's in there and we can look at it briefly.
2   I don't want to spend a lot of time on it.
3   Frankly, we have a lot to talk about today.
4   Actually, I really don't want to cover that.
5   We've got too much to talk about today.
6       But did you understand there to be a
7   specific complaint that was being
8   communicated to you by the interim dean?
9   A. Well, I -- sort of. What I understood her to
10  be saying is that as part of the contents of
11  that letter, the person reading the letter
12  was being -- as you read it, was being asked
13  for a birthday kiss. That was one of the --
14  that was a request in the letter. And so my
15  understanding was that the complaint against
16  me was a claim that I had somehow created
17  this document and that I had somehow
18  communicated this document to a student
19  asking for a birthday kiss. That was the
20  gist of my understanding of the complaint.
21  Q. And it was your understanding from the
22  interim dean that her concern was there might
23  be a complaint that you had asked for a

Page 41

1   birthday kiss from a student?
2   A. That was my understanding.
3   Q. And you deny that?
4   A. That's correct, I deny that.
5   Q. That's the only specific allegation of
6      wrongdoing associated with this termination
7      proceeding that you were made aware of?
8   A. That's the only specific complaint that I was
9      made aware of.
10  Q. You saw in the documents I produced to you
11     and your lawyer today a section of the
12     subpoena production labeled Student
13     Complaints Regarding Dr. Emanuel. Did you
14     have a chance to look at those documents?
15  A. I glanced over them, yes.
16         MR. CHRISTMAN: This is Exhibit #5,
17             Composite Exhibit #5, and this is
18             the -- for the purposes of the
19             record and plaintiff's counsel,
20             this is a -- this is just the
21             collection of documents following
22             a cover page that says Student
23             Complaints Regarding Dr. Emanuel,

DEPOSITION OF RICHARD EMANUEL

Page 42

1          okay?
2          MR. PORTER: Okay.
3          MR. CHRISTMAN: And it goes to the end
4              of the production.
5      Q. Had you never seen any of those student
6          complaints against you before today?
7      A. I do remember seeing this document. It's a
8          letter to Dr. Newman from Suzanne Dubose
9          dated November 13th.
10     Q. Let's mark it separately.
11     A. And this was the document that I was
12         referring to a moment ago that appeared as
13         though it was a letter to someone.
14     Q. Let me mark that one separately, too.
15     A. This is what I was aware of.
16     Q. Is the last one on there #5?
17     A. Yes.
18     Q. So this is #6? This is a November 13th, 1998
19         letter from Dr. Newman -- excuse me -- from
20         Susan Dubose addressed to Joan Newman?
21     A. Yes.
22     Q. You've seen that before?
23     A. Those are the two documents that were

Page 43

1          provided me some six weeks after the letter,
2          Exhibit #4. Those are the two things that
3          were provided.
4      Q. Exhibit #7 will be the -- this is the letter
5          that was shown to you by Joan Newman?
6      A. That's correct.
7      Q. That you said you didn't write?
8      A. That's correct.
9      Q. The same question would still be on the table
10         for you as to whether you have seen any of
11         the other complaints?
12     A. No, I have not seen any of these documents
13         before today. Did you ask -- no, I've not
14         seen these documents before today.
15     Q. Defendant's #8, settlement agreement. What
16         did you understand -- please look at
17         Defendant's #8. Is that settlement agreement
18         familiar to you?
19     A. Yes, it is.
20     Q. That's the settlement agreement you entered
21         into with Stafford Thompson associated with
22         your departure from the college; is that
23         true?

Page 44

1      A. Yes.
2      Q. What --
3      A. Well, it is a settlement agreement I entered
4          into with Dr. Thompson.
5      Q. What was being settled? What was the
6          settlement agreement intended to dispose of?
7      A. Well, according to this settlement agreement,
8          it was a compromise of a doubtful and
9          disputed claim.
10     Q. There was a termination proceeding instituted
11         against you, wasn't there, from which you
12         took an appeal?
13     A. There was a termination letter received.
14     Q. And you noticed an appeal of the termination,
15         right?
16     A. I'm sorry?
17         MR. PORTER: Object to the form.
18     Q. Your lawyer noticed an appeal and a motion
19         for appointment of an employee review panel
20         following the termination?
21         MR. PORTER: Object to the form.
22     A. I don't know what the attorney appealed to.
23     Q. Well, did you hire an attorney to handle your

Page 45

1          termination?
2      A. I handled -- I hired an attorney to help me
3          handle the complaint against me and the
4          procedures, or lack thereof, that the college
5          was following.
6      Q. Was that notice of appeal filed on your
7          behalf by your lawyers?
8      A. Yes, it appears to be.
9      Q. And does this appear to be a motion to
10         dismiss the termination filed on your behalf
11         by your lawyers, Defendant's #10?
12     A. That's what it appears to be.
13     Q. And #11 would have been a motion to bar
14         further prosecution against you filed by your
15         lawyers on your behalf? Is that what your
16         understanding of that document is,
17         Defendant's #11?
18     A. Yes. It does appear to be a motion to bar
19         further prosecution.
20     Q. And is it your understanding that Defendant's
21         #8, which is the settlement agreement, was
22         designed to essentially settle the dispute to
23         which your lawyers were writing and

DEPOSITION OF RICHARD EMANUEL

Page 46

1    representing you?
2    A. My understanding was that the settlement
3    agreement was to -- may I?
4    Q. Sure.
5    A. Was to do what I just read, that it was a
6    compromise of a doubtful and disputed claim.
7    Q. And that claim was this claim that was being
8    litigated by your lawyers, your termination,
9    right?
10   A. Well, I -- I thought the claim was the -- was
11   the complaint from the student. That's my
12   understanding.
13   Q. That resulted in a termination letter written
14   to you by the college, right?
15   A. I -- I can't presume to know what all
16   factored into their decision.
17   Q. Well, you can read their letters, right?
18   A. I can read their letters.
19   Q. And their letters say that they're
20   terminating you based upon all those bullets
21   that we read, right?
22   A. I assume that was their reasoning.
23   Q. And you would agree with me that the

Page 47

1    settlement was designed to resolve the
2    dispute over your termination and the claims
3    that gave rise to it?
4    A. I wouldn't agree to that. I wouldn't
5    characterize it that way at all. My
6    understanding of the settlement agreement was
7    that it was simply to -- I think the words
8    were "buy their peace" or basically say this
9    is a resolution of a doubtful and disputed
10   claim -- a doubtful and disputed claim. And
11   that's what I interpreted it to mean.
12   Q. And it's your testimony that you left the
13   college for a better opportunity at
14   Montevallo and not because of the impending
15   termination based upon sexual misconduct?
16       MR. PORTER: Object to the form.
17   Q. That's your testimony?
18   A. Could you -- could you rephrase the
19   question?
20   Q. I can ask it again. Is there something wrong
21   with the first --
22   A. I didn't understand the question.
23   Q. It's your testimony today that the reason you

Page 48

1    left Enterprise was because of a better
2    opportunity at Montevallo rather than a
3    settlement associated with your termination
4    and claims of sexual misconduct on your part?
5    A. What --
6        MR. PORTER: Object to the form.
7    A. What I'm saying is that there were a number
8    of reasons I wanted to leave. Primary among
9    those was that I had an employment
10   opportunity at the University of Montevallo.
11   Q. Isn't it true that if you hadn't entered into
12   this settlement, you would have been -- you
13   would have continued to be involved in a
14   termination dispute over your employment at
15   Enterprise?
16   A. I honestly don't know what the college would
17   have done next.
18   Q. Well, you had been --
19   A. I don't know.
20   Q. Excuse me. I didn't mean to interrupt you.
21   Go ahead.
22   A. I said I just don't know what they would do.
23   Q. You had been terminated?

Page 49

1    A. I had not been.
2    Q. You received a letter of termination?
3    A. I did receive a letter of termination.
4    Q. And your lawyers appealed it, as we saw in
5    the documents?
6    A. The letter of termination, yes.
7    Q. And if you hadn't entered into this
8    settlement agreement, that dispute would have
9    resolved naturally either in your favor or
10   against you?
11   A. I assume it would have eventually resolved
12   one way or the other.
13   Q. Defendant's #11 -- pardon me -- Defendant's
14   #12, this appears to be a letter that you --
15   excuse me -- a letter that Stafford Thompson
16   received from Vickie Barrows with the United
17   States Department of Education associated
18   with a civil rights claim that you may have
19   made against Enterprise. You may never have
20   seen that letter before. Have you ever seen
21   that before?
22   A. Not until today, no.
23   Q. What is that -- what is the underlying EEOC

DEPOSITION OF RICHARD EMANUEL

| Page 50 | Page 52 |
|---|---|
| 1  claim against Enterprise about? Did you make | 1  did not do that. |
| 2  an EEOC claim against Enterprise? | 2  Q. Did they issue you a right-to-sue letter? |
| 3  A. I did. | 3  A. I believe that they did. |
| 4      MR. CHRISTMAN: Has that been produced? | 4  Q. All right. Do you still have that? |
| 5      MR. PORTER: I don't have anything. | 5  A. I don't know. I will look. I will look. |
| 6      MR. CHRISTMAN: You don't have an EEOC | 6  Q. Did you file a lawsuit against Enterprise? |
| 7      claim from Enterprise -- against | 7  A. Not beyond -- I don't recall doing so. Not |
| 8      Enterprise? | 8  beyond writing the letters of complaint to |
| 9      MR. PORTER: No. | 9  EEOC. |
| 10     MR. CHRISTMAN: Didn't I ask you for | 10 Q. All right. And I'm referring to United |
| 11     any prior -- | 11 States District Court lawsuit like you filed |
| 12     MR. PORTER: I don't have it. | 12 in this case. Did you file a lawsuit against |
| 13 Q. Do you have any records associated with your | 13 Enterprise? |
| 14 EEOC claim against Enterprise Community | 14 A. I don't recall having done so, no. |
| 15 College? | 15 Q. Why not? Why didn't you file a lawsuit? |
| 16 A. I don't recall. I might. I just don't | 16 A. Why did I not? |
| 17 recall. | 17 Q. Yes, sir. |
| 18 Q. If you can locate those documents, will you | 18 A. I don't have the -- did not have the |
| 19 please provide those to your lawyer? | 19 financial resources to put into hiring |
| 20 A. Uh-huh. | 20 attorneys and pursuing it. |
| 21 Q. Yes? | 21 Q. And you don't remember any of the grounds for |
| 22 A. I'm sorry. Yes. | 22 your allegations of race and sex |
| 23 Q. Tell me a little bit about this EEOC claim | 23 discrimination against Enterprise? |

| Page 51 | Page 53 |
|---|---|
| 1  against Enterprise. | 1  A. I don't remember specifically, no. I mean |
| 2  A. It was an attempt on my part to complain | 2  I -- I'll try to look for any documents I may |
| 3  formally that the college had -- well, it | 3  have, but I don't recall exactly. |
| 4  says here discriminated against me on the | 4  Q. Do you remember feeling like they were |
| 5  basis of race and sex in the area of | 5  discriminating against you based upon your |
| 6  employment. I -- | 6  race and your gender? |
| 7  Q. That's the same thing you're complaining | 7  A. Yes. |
| 8  about in this case, isn't it? | 8  Q. Defendant's #13, this appears to be your |
| 9  A. Yes, it is. | 9  resignation letter dated April 8th, 1999 from |
| 10 Q. What was the basis of your claims against | 10 Enterprise; is that right? |
| 11 Enterprise? | 11 A. Yes. |
| 12 A. I don't recall all the particulars now. | 12 Q. Did you appreciate -- let me ask you this |
| 13 Q. How was that EEOC claim resolved? | 13 way. Did you like being accused of sexual |
| 14 A. I -- I don't recall exactly, but I think they | 14 impropriety by Stafford Thompson? |
| 15 said -- I -- I just don't recall. I would | 15 A. No, sir. |
| 16 have to go back and -- if I have any records, | 16 Q. Did you feel like those allegations against |
| 17 I could go look; but I don't recall. It did | 17 you were serious? |
| 18 not result in the EEOC pursuing the court | 18 A. Yes, sir. |
| 19 case against them. | 19 Q. Did you get the impression that -- and I'm |
| 20 Q. It's your understanding the EEOC did not | 20 just asking for your impression. Did you get |
| 21 charge the college with discrimination and | 21 the impression that Stafford Thompson thought |
| 22 file its own lawsuit? | 22 they were serious? |
| 23 A. Right. That is my understanding, that they | 23 A. I did get that impression, yes. |

14 (Pages 50 to 53)

DEPOSITION OF RICHARD EMANUEL

Page 54

1   Q. Reports by a student that a professor is
2      sexually harassing them or making
3      inappropriate sexual advances is a matter a
4      college president should take seriously,
5      isn't it?
6   A. I would agree with that.
7   Q. If a college -- would you agree that a
8      college president should promptly and
9      carefully handle claims of sexual misconduct
10     by one of the professors?
11  A. I would -- I would say so, yes.
12  Q. Would it be a concern of yours as a professor
13     if one of your graduate students -- if there
14     was a complaint to you by one of your
15     students that one of your graduate assistants
16     was sexually harassing a student?
17  A. Yes.
18  Q. Would that concern you?
19  A. Yes.
20  Q. If one of your colleagues who had previously
21     used a graduate -- this particular graduate
22     assistant informed you this graduate
23     assistant is a problem and you need to be

Page 55

1      careful about using this graduate assistant,
2      would you take that seriously?
3   A. Well, I'm not sure how to take that
4      hypothetical that you presented. What does
5      "is a problem" mean? And in what context is
6      it taken. And I -- I would need to know
7      certainly more information than that.
8   Q. Well, what if you didn't get any more
9      information? What if that's all the
10     information you had? Would it cause you
11     pause associated with that graduate student?
12  A. Cause me pause?
13  Q. Yeah. Concern you?
14  A. I would simply make a mental note that that's
15     their perception of that individual graduate
16     teaching assistant. Beyond that, I'm not
17     sure. I think, you know, there's still a lot
18     left unanswered there.
19  Q. Certainly. It might --
20  A. Or maybe --
21  Q. It might cause you some concern, though, if
22     one of your colleagues said that graduate
23     assistant is a problem and you're going to

Page 56

1      have a problem if you use that graduate
2      assistant? That would provide you some
3      concern, wouldn't it?
4   A. I don't know frankly. It just depends on --
5      on --
6   Q. Fair enough.
7   A. -- what they meant by "is a problem".
8   Q. Let me finish up with your education, and
9      then let's move on to your lawsuit.
10        Following Enterprise, you went to work
11     for the University of Montevallo --
12  A. Yes.
13  Q. -- right?
14  A. Yes.
15  Q. '99 to 2002?
16  A. Yes.
17  Q. Did the college president at the University
18     of Montevallo know about the student
19     complaints of sexual misconduct at Enterprise
20     when you were hired, to your knowledge?
21  A. I'm sorry. Could you repeat that?
22  Q. Yeah. Did the college president at the
23     University of Montevallo know that you had

Page 57

1      been accused of sexual misconduct when you
2      were at Enterprise?
3   A. I don't know what the college president
4      knew.
5   Q. You taught there for -- was it three academic
6      years?
7   A. Yes, it was.
8   Q. And we see here in your CV the various
9      responsibilities that you had in terms of
10     your memberships in advisory capacity and
11     chair capacity in certain committees?
12  A. Uh-huh.
13  Q. And I won't go over those in detail with you.
14     I would ask you a similar question to what I
15     asked you before. Are you aware of anything
16     that's not listed in here that you could tell
17     us about that -- you know, that should be in
18     the list but didn't make it in the list for
19     some reason?
20  A. There may be. I just don't recall.
21  Q. And then your next area of employment or time
22     of employment was Alabama State --
23  A. Yes.

DEPOSITION OF RICHARD EMANUEL

Page 58

1  Q.  -- where you currently work?
2  A.  Yes.
3  Q.  That was 2002 to present, right?
4  A.  Correct.
5  Q.  That's a four-year college, right?
6  A.  That is correct.
7  Q.  And what is your position there currently?
8  A.  I'm Associate Professor of Communication.
9  Q.  Tell me about the rank of professorship at
10    your institution.
11  A.  It's fairly typical of what you would find in
12    an institution of higher education, four-year
13    institution.  It ranks all the way from a
14    lectureship to an instructor to an assistant
15    professor to an associate professor, and then
16    finally the highest rank would be full
17    professor referred simply to then as
18    professor.
19  Q.  So how many ranks do you need to ascend
20    before you're at the top of the schedule?
21  A.  One more.  I'm an associate now, and full
22    professor would be the next rank up.
23  Q.  Are you up for that soon?

Page 59

1  A.  I will be.
2  Q.  When will you be up for that?
3  A.  This fall I will make application for that.
4  Q.  Do you have any reason to believe you won't
5    receive that?
6  A.  No reason whatsoever.
7  Q.  All right.  Let's talk about the Wallace
8    College job opportunity.  Tell me about your
9    first knowledge of that job's availability.
10  A.  I don't recall exactly the dates, but I check
11    the Alabama College System website where they
12    announce their jobs at the various community
13    colleges.  I check that website probably once
14    a week, if not more frequently.
15  Q.  Why?
16  A.  I'm curious.
17  Q.  Why are you curious?
18  A.  I'm just curious to know what's happening in
19    the two-year college system in terms of
20    employment, you know, how many speech faculty
21    members are being hired, you know -- it's
22    just interesting to me.  It's just
23    interesting.

Page 60

1  Q.  Are you looking to move?
2  A.  I'm really not.  I mean, that's not
3    motivating my interest in the website if
4    that's what you mean.
5  Q.  That's what I mean.  I mean, why would you
6    look at job postings if you're not interested
7    in going somewhere else?
8  A.  I'm interested in the two-year college
9    system.
10  Q.  Well, there's lots of things that you can
11    read about the two-year college system
12    besides job postings if you're interested in
13    the college, right?
14  A.  That's true.
15  Q.  So what makes you interested in the job
16    postings if you're not looking to leave?
17  A.  Well, it lets me know a little bit about how
18    many colleges are hiring speech communication
19    instructors, for example.  It let's me --
20    tells me something about the health of the
21    profession and how the two-year colleges
22    are -- what kind of turnover is happening
23    in -- in our particular discipline.  So those

Page 61

1    are some of the reasons.  There are probably
2    others I can think of.
3  Q.  And what did you find when you were looking
4    on the posting?
5  A.  I found an opening for a speech instructor at
6    Wallace Community College.
7  Q.  All right.  I'm going to mark as Defendant's
8    #14 a vacancy announcement and ask you if
9    you've seen this before.  Your lawyer
10    actually produced this to me.  And this is a
11    four-page exhibit.
12  A.  Uh-huh.  Uh-huh.
13  Q.  Is that what you saw?
14  A.  Well, I thought you were asking about this
15    most recent job announcement.  This was a
16    previous job announcement in -- what's the
17    date on this?  In -- with a start date of
18    2002.
19  Q.  So that's a former -- that's an earlier
20    announcement --
21  A.  That's correct.
22  Q.  -- that you had applied for?
23  A.  That's correct.

16  (Pages 58 to 61)

DEPOSITION OF RICHARD EMANUEL

| Page 62 |
|---|

1   Q. All right. Defendant's #15, this is the
2      more recent announcement which is what we're
3      here about today, right?
4   A. This is -- I have seen this if that's what
5      you're asking. This is dated August -- start
6      date August 2006, so this is the more recent.
7   Q. Is that how you found out about the
8      availability of the position at Wallace?
9   A. On the website, uh-huh.
10  Q. Did it look something like this, like what
11     I've showed you?
12  A. Yes, yes.
13  Q. Did you have --
14  A. I --
15  Q. I'm sorry.
16  A. Yes.
17  Q. I didn't mean to cut you off.
18  A. That's okay.
19  Q. Did you have any concerns about the job
20     announcement?
21  A. No.
22  Q. No complaints about the job announcement?
23  A. No.

| Page 63 |
|---|

1   Q. And at the back of this exhibit, just for the
2      record, is a June 5th, 2006 letter from you
3      to the members of the selection committee,
4      right?
5   A. I believe so. Yes. Yes.
6      MR. CHRISTMAN: I'm actually going to
7         take that out of the exhibit. I
8         think it confuses it a little
9         bit. So #15 is just the job
10        announcement.
11  Q. What did you understand to be the job
12     available at Wallace?
13  A. Full-time instructor of speech.
14  Q. And the qualifications are set out in this
15     job announcement, right?
16  A. Yes.
17  Q. I say the qualifications. The necessary or
18     minimum qualifications to apply for this job
19     are set out in the announcement, right?
20  A. Well, all of the qualifications are set out
21     in the job announcement.
22  Q. And those are the minimum qualifications; is
23     that your understanding?

| Page 64 |
|---|

1   A. Well, they are all of the qualifications that
2      are listed there.
3   Q. Well, when I say minimum, I just mean you may
4      have more -- there may be more qualifications
5      than listed here; but the qualifications
6      listed are the minimum that are required for
7      the job --
8         MR. PORTER: Object to the form.
9   A. Well --
10  Q. -- right?
11  A. -- I'm not really sure. What I see here is
12     that there are qualifications, and there are
13     required qualifications and preferred
14     qualifications.
15  Q. Fair enough. And it's your testimony or your
16     belief that you met all of the required
17     qualifications?
18  A. Yes.
19  Q. And you met some or all of the preferred
20     qualifications?
21  A. Yes.
22  Q. Did you have any prior relationship to
23     anybody in the Wallace system before you

| Page 65 |
|---|

1      applied for this job?
2   A. No, not that I know of. By Wallace system,
3      you mean Wallace --
4   Q. College.
5   A. -- Community College?
6   Q. Yes.
7   A. No, not that I know of.
8   Q. You did interview for this job, right?
9   A. I did.
10  Q. How many times did you interview?
11  A. Well, I interviewed a total of three times if
12     I recall correctly. Three.
13  Q. Tell me about the first time.
14  A. The first time I met with a committee of
15     either four or five individuals. I don't
16     recall how many now, but it's four or five, I
17     believe, a panel, and they each asked
18     questions and -- that were obviously related
19     to the job and the job requirements.
20  Q. How did you think you performed in that
21     evaluation or that -- excuse me -- that
22     interview?
23  A. I -- I thought I did well. I thought that I

DEPOSITION OF RICHARD EMANUEL

Page 66

1  answered the questions completely and
2  honestly and accurately, and I thought I did
3  well.
4  Q. Were there any questions asked of you during
5    that interview that caused you any concern?
6  A. Not that I recall.
7  Q. Nothing directed inappropriately at your
8    race?
9  A. Not that I recall.
10  Q. Your gender.
11  A. Not that I recall.
12  Q. You claim in this case that you've been
13    discriminated against based upon your race
14    and your gender; is that right?
15  A. Yes. And age, I believe.
16  Q. It's your understanding that you're also
17    claiming age discrimination?
18  A. I believe so.
19  Q. Tell me about the second interview.
20  A. The second interview was the same day as the
21    first. I don't remember exactly how much
22    later, but -- I don't know if it was an hour
23    later or how much later; but it was the same

Page 67

1    day, and it was an interview with three
2    individuals.
3  Q. Different individuals --
4  A. Different --
5  Q. -- than the last?
6  A. Yes, different individuals. And if I
7    remember correctly these individuals
8    identified themselves as like Dean Leavell.
9    I got the impression that these -- and I'm
10    sorry, I don't remember exactly at this point
11    but that they were of higher up in the -- in
12    the administration versus faculty and staff.
13    That was my impression. They identified
14    themselves; I just don't recall right now.
15  Q. Did they call it the final review team or the
16    final interview team?
17  A. I don't remember what they called
18    themselves. It just -- that was the second
19    interview of that day.
20  Q. How did you think you performed in that
21    interview?
22  A. Again, I felt as though I did fairly well.
23  Q. Any questions asked of you during that

Page 68

1    interview that caused you any concern?
2  A. I don't recall any.
3  Q. Don't recall anything inappropriately asked
4    about age?
5  A. Not that I recall.
6  Q. Race?
7  A. Not that I recall.
8  Q. Gender.
9  A. Not that I recall.
10  Q. All right. And then you had another
11    interview?
12  A. Yes.
13  Q. It was a telephone interview?
14  A. Yes.
15  Q. Tell me about that.
16  A. I was a supervisor at a youth camp -- church
17    youth camp. And I couldn't pick up cell
18    phone reception, so I had to drive down the
19    road so that I could get a cell phone signal
20    at a particular time that President Young was
21    to interview me by phone. And she did that,
22    and so it was an interview in my car on the
23    cell phone.

Page 69

1  Q. Tell me about that interview.
2  A. I remember her being -- being very
3    professional and pleasant and I thought her
4    questions -- I don't recall the questions
5    just now but my impression was that they were
6    the kinds of questions that might, you know,
7    indicate -- you know, are you -- know about
8    Dothan and this area, questions about maybe,
9    you know, how I would like working at
10    Wallace-Dothan, things like that. These are
11    impressions, mind you, not -- I don't
12    remember exact questions. But it -- I think
13    it lasted 20, 30 minutes maybe, something
14    like that.
15  Q. How do you think it went in terms of your
16    performance?
17  A. I felt very good about the conversation. I
18    felt like it was a professional yet very
19    cordial conversation.
20  Q. How do you think you performed?
21  A. I think I performed well.
22  Q. Were there any questions asked of you that
23    you felt were inappropriate?

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 70

1  A. I don't recall any.
2  Q. Recall any inappropriate questions
3     specifically about your age?
4  A. No, I don't recall any.
5  Q. Your race?
6  A. I don't recall any.
7  Q. Your gender?
8  A. I don't recall any questions about my gender.
9  Q. Did you have any other contact with the
10    college after that interview?
11 A. I don't really recall. It seems like I wrote
12    either an email or a letter to Terry
13    Schembera, but I may be thinking of a
14    previous application at Wallace-Dothan. So
15    forgive me if I'm getting them confused. But
16    I may have sent a letter basically saying
17    thanks for the interview and the experience
18    and that sort of thing.
19 Q. Kind of a thank you for the interview?
20 A. Yeah, thank you for the interview, uh-huh.
21 Q. And what was the next thing you heard from
22    the college?
23 A. I believe the next thing I received was a

Page 71

1     letter indicating that someone had been
2     selected to fill the position for which I had
3     applied.
4  Q. I show you Defendant's Exhibit #16. Is that
5     the letter you're referring to?
6  A. Yes, I believe it is, uh-huh.
7  Q. Did you ever call up to the college and say
8     you were updating your data base and inquire
9     as to who got this job?
10 A. I do remember calling Ms. Shatangi Wear --
11    I'm not sure I'm pronouncing her name
12    correctly, Ms. Wear, as the new communication
13    or speech instructor at Wallace-Dothan. I do
14    remember calling her, yes.
15 Q. Do you remember calling anyone else besides
16    Ms. Wear at the college before you got this
17    letter saying you were updating your data
18    base and you just needed to find out?
19 A. No, I don't recall that.
20 Q. You don't remember that?
21 A. No, I don't.
22 Q. It may have happened; you just don't
23    remember?

Page 72

1  A. It may have. I certainly don't remember it.
2  Q. Have you ever applied for a job before and
3     tried to find out what the results were
4     before they came out?
5  A. No, not that I recall.
6  Q. You don't remember doing that in this case?
7  A. No.
8  Q. You filed a charge of discrimination November
9     6th, 2006, which would have been a few months
10    after the letter you got from Wallace saying
11    that someone else got the job; is that right?
12 A. I -- I assume that's the case of dates.
13 Q. You're just not sure about the date?
14 A. Yeah, right.
15 Q. Is this your charge of discrimination that
16    I've marked as Defendant's #17?
17 A. I believe it is.
18 Q. What made you think that you had been
19    discriminated against after you got the
20    letter from Wallace saying that you didn't
21    get the job?
22 A. Well, I knew that they had hired a younger
23    black female who had a master's degree and

Page 73

1     who I thought -- I believe was not as
2     qualified as I. And it raised a question in
3     my mind, why; why would they hire a lesser
4     qualified individual for their position?
5  Q. Yes.
6  A. And so that was the beginning --
7  Q. Right.
8  A. -- of my concern.
9  Q. Well, were there any other reasons that you
10    thought you were discriminated against other
11    than the fact that you felt like your
12    qualifications outweighed those of the one
13    hired?
14 A. Well, yeah. I noticed that there seemed to
15    be what I perceived to be a -- a pattern of
16    hiring more minorities and females and
17    minority females. And that led to my
18    learning more about the Shuford-Johnson
19    Consent Decrees and more about the State
20    Board Uniform Guidelines, and those documents
21    confirmed for me that it seems to me that the
22    college and the system are engaging in hiring
23    practices that seem to me discriminatory.

DEPOSITION OF RICHARD EMANUEL

|  | Page 74 |
|---|---|
| 1 | Q. So once you got -- well, first, let me ask |
| 2 | you, how did you find out what Ms. Wear's |
| 3 | qualifications were? |
| 4 | A. When I was speaking with her on the phone |
| 5 | updating my data base, two-year college |
| 6 | speech instructors as part of my |
| 7 | responsibilities for Alabama State |
| 8 | Representative for the National Communication |
| 9 | Association Community College Section |
| 10 | Research Board, I asked her how do you like |
| 11 | it there? By the way, what are you |
| 12 | directing? What plays are you directing? |
| 13 | And she said, oh, I'm not directing any or |
| 14 | words to that effect. And I said, Oh. And |
| 15 | she basically disclosed to me that she didn't |
| 16 | have any theatrical directing production |
| 17 | experience. And beyond that, I could just do |
| 18 | internet searches to find background |
| 19 | activities like conference presentations, |
| 20 | things like that. |
| 21 | Q. Did you have any knowledge or information |
| 22 | about her qualifications prior to that |
| 23 | telephone call with her? |

|  | Page 75 |
|---|---|
| 1 | A. I probably had already gone to the internet |
| 2 | and looked up -- as soon as I discovered who |
| 3 | it was, I could look at the college website |
| 4 | and see who the new instructor was. I think |
| 5 | I probably had gone to the internet and |
| 6 | looked up the name and said, you know, what |
| 7 | do I know about this person. |
| 8 | Q. Were you able to find on the internet any |
| 9 | other qualifying information about her for |
| 10 | the position? |
| 11 | A. I wouldn't describe it as qualifying |
| 12 | information, no. I did find information |
| 13 | about her. |
| 14 | Q. Did that information that you found make you |
| 15 | suspicious that she might be less qualified |
| 16 | than you? |
| 17 | A. Yes. |
| 18 | Q. So when you called her saying that you were |
| 19 | updating your data base, that was kind of a |
| 20 | subterfuge for what you were really doing, |
| 21 | wasn't it? |
| 22 | A. No. It was the reason for the call. |
| 23 | Q. The real reason for your call was that you |

|  | Page 76 |
|---|---|
| 1 | were trying to find out what her |
| 2 | qualifications were so that you could |
| 3 | challenge those qualifications? |
| 4 | MR. PORTER: Object to the form. |
| 5 | A. No. |
| 6 | Q. That's not why? |
| 7 | A. No. The reason for the call was to update |
| 8 | the data base. |
| 9 | Q. And it was just sort of a lucky byproduct |
| 10 | that you were able to find out all the other |
| 11 | information about her qualifications? |
| 12 | A. I wouldn't describe it as a lucky byproduct. |
| 13 | I would describe it as friendly and |
| 14 | professional conversation. |
| 15 | Q. That you would later use to sue the college |
| 16 | with? |
| 17 | A. I wouldn't characterize it that way at all. |
| 18 | Q. That's exactly what you did, though, right? |
| 19 | MR. PORTER: Object to the form. |
| 20 | A. No, I wouldn't agree with that either. |
| 21 | Q. You wouldn't agree that you used the |
| 22 | information that you obtained from Shatangi |
| 23 | about her qualifications as the basis for |

|  | Page 77 |
|---|---|
| 1 | your lawsuit? |
| 2 | A. I -- I -- what I'm saying is that I did have |
| 3 | a conversation with her on the phone, and |
| 4 | that conversation was for the purpose of |
| 5 | updating my data base for the State of |
| 6 | Alabama. |
| 7 | Q. Your charge of discrimination here, |
| 8 | Defendant's #17, has in the middle here |
| 9 | "cause of discrimination based on" and then |
| 10 | there are a selection of boxes there. Do you |
| 11 | see that? |
| 12 | A. Yes. |
| 13 | Q. And there are two boxes that have "x" marks |
| 14 | in them. Do you see that? |
| 15 | A. I do. |
| 16 | Q. And they are race; is that right? |
| 17 | A. Yes. |
| 18 | Q. And what's the other one? |
| 19 | A. It says sex. |
| 20 | Q. Sex? |
| 21 | A. Meaning gender. |
| 22 | Q. And there's an age box there that's not |
| 23 | checked; isn't that right? |

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 78

1  A. That is correct.
2  Q. So at least with the EEOC, you hadn't
3     challenged age as a basis for the
4     discrimination you claim to have suffered by
5     Wallace?
6  A. It appears not.
7  Q. Thank you.
8  A. May I?
9  Q. Sure.
10 A. Yes.
11 Q. Now, your lawyer received this letter that
12    I'm going to show you, and I presume that you
13    have seen it at some time, Defendant's #18.
14    This is a letter addressed to your lawyer
15    from Devoralyn McGhee, investigator for the
16    EEOC, dated March 6th, 2007.
17 A. Okay.
18 Q. Have you seen that before?
19 A. I -- I may have. I don't recall, but I
20    probably have.
21 Q. Did you have a chance to read it just now?
22 A. I did. In fact, I found it interesting that
23    they referred to her instead of him, but I

Page 79

1     did just read it.
2  Q. Referred to who as her?
3  A. It says this correspondence is submitted in
4     reference to your client's charge of
5     employment discrimination filed on the basis
6     of her race.
7  Q. Oh, I see.
8  A. Versus his race. I thought that was
9     interesting, but --
10 Q. All right. Do you understand, having read
11    that document, that the EEOC was essentially
12    making a determination that they were not
13    going to go forward with a charge against the
14    college?
15    MR. PORTER: Object to the form.
16 Q. Tell me what you understand that letter to be
17    saying.
18 A. It appears to be this individual's opinion --
19    this Devoralyn McGhee, an investigator for
20    the EEOC -- it appears to be their opinion
21    that they think it is unlikely that further
22    investigation would result in a finding that
23    the law was violated. I don't know who this

Page 80

1     person is, but apparently, that's an
2     expression of their opinion in this letter.
3     I don't think that's a -- I mean, I don't
4     know -- I don't mean to use the word opinion
5     in a legal sense. It was a personal opinion.
6  Q. Well, it's a letter written on EEOC
7     letterhead, right?
8  A. It is, that's correct.
9  Q. And it references your charge of
10    discrimination?
11 A. It does.
12 Q. I want to back up a minute and talk some more
13    about your investigation of the consent
14    decrees and the employment policies of the
15    Board of Postsecondary Education. After you
16    became suspicious about the disparity in
17    qualifications and began to look into the
18    Shuford decrees, is that the -- is that what
19    you said you did?
20 A. That is part of what I did, yes.
21 Q. How did you go about doing that?
22 A. Internet searches. I may have even called
23    the Department of Postsecondary Ed asking for

Page 81

1     a copy, things like that.
2  Q. And what is your understanding of what the
3     Shuford-Kennedy-Johnson Consent Decrees are?
4  A. My understanding is that they were complaints
5     by mid level administrators who were passed
6     over for administrative positions, and they
7     claimed discrimination based on race and
8     gender, combined race and gender. That was
9     my understanding.
10 Q. And the consent decrees, what was your
11    understanding as to the purpose of their
12    implementation?
13 A. What exactly do you mean?
14 Q. Why did the court issue the consent decree?
15 A. My understanding was that they ordered the
16    consent decree to stay out of further
17    litigation and be sued, that it was a -- my
18    understanding of the consent decree was that
19    it was essentially some kind of settlement
20    agreement between the two.
21 Q. Did you understand there to be a perception
22    by the Court and the parties that there was a
23    racial imbalance in the two-year college

DEPOSITION OF RICHARD EMANUEL

Page 82

1  system?
2  A. My understanding was that some of the -- that
3    the plaintiffs claimed that there was a
4    racial imbalance in hiring or promotion for
5    their particular salary scale.
6  Q. Do you agree that the Shuford-Johnson-Kennedy
7    Consent Decrees were recognizing a racial
8    imbalance in the two-year college system as a
9    whole; is that what your understanding is?
10 A. That is not my understanding. My
11   understanding is that it was a settlement
12   agreement to avoid any further litigation,
13   and that it was something that the parties
14   could all agree to. I did not understand it
15   to be an admission of responsibility, guilt
16   or any sort of under-representation or
17   anything of that nature that you -- unh-unh,
18   that was not my understanding at all.
19 Q. Well, do you think that there was racial
20   imbalance that needed to be corrected by the
21   Shuford-Johnson-Kennedy Consent Decrees?
22 A. Not as it relates to salary schedule D.
23 Q. Wait. Only with respect to that salary

Page 83

1  schedule?
2  A. I can't speak to the other ones. I didn't
3    really investigate those.
4  Q. You just investigated salary schedule D?
5  A. I did.
6  Q. All right. So you read the decrees. What
7    kind of research did you do about the
8    decrees? You just -- you read the decrees?
9  A. Uh-huh.
10 Q. Anything else associated with the decrees in
11   your research?
12 A. Yes. I went to the Alabama College System
13   website and I clicked on -- there is a link
14   there under publications, I believe it is,
15   that says Shuford. And they provided, for at
16   least a period of time, records, reports,
17   each -- they meaning the colleges in the
18   two-year college system -- reports about
19   their hiring, how many males and females,
20   black, white, how many did they have
21   currently in the various salary scales in
22   their -- at their college, that sort of
23   thing.

Page 84

1  Q. Right. So you read the reports?
2  A. I did.
3  Q. Shuford reports?
4  A. Yes.
5  Q. And the reports that you read were reports
6    submitted by the two-year college system to
7    the Court?
8  A. I -- I'm not really sure. I simply read them
9    on the Community College System, Alabama
10   College System website. They were simply
11   posted there. I do believe that they were in
12   compliance with something in the consent
13   decree but I don't know that for sure.
14 Q. Oh, you mean they were required by the
15   consent decree to be posted --
16 A. To report in some way, I think is what it
17   said.
18 Q. You don't contend that those reports reflect
19   that the goals established by the consent
20   decrees were always met by the colleges, do
21   you?
22 A. I believe the reports themselves indicate if
23   and when and whether goals had been met or

Page 85

1  not.
2  Q. That's in the reports, isn't it?
3  A. I believe it is.
4  Q. And you read those reports, right?
5  A. Yes.
6  Q. In fact, you have written a lengthy -- I'm
7    going to call it lengthy; maybe it's not
8    lengthy to a Ph.D. It's lengthy to me.
9    You've written what you've termed as My
10   Arguments Supporting my Claims of Gender and
11   Race Discrimination. I'll mark it as #19.
12   Take a look at that and see if I'm right
13   about what that document is and make sure
14   it's complete. I don't want to misrepresent
15   its total content.
16 A. With the exception of pages 14 to 17 I would
17   agree that that's -- that's up-to-date. I
18   believe up-to-date and complete was your
19   question.
20 Q. What's wrong with 14 and 17?
21 A. It's still ongoing.
22 Q. What do you mean by that?
23 A. Well, 14 to 17 is what I believe I would be

22 (Pages 82 to 85)

5/30/2008

DEPOSITION OF RICHARD EMANUEL

| Page 86 |
|---|
| 1     entitled to in the absence of discrimination, |
| 2     and that has yet to be settled. And so by |
| 3     that, I mean it's still an ongoing fluid |
| 4     situation. And so it's not complete in the |
| 5     sense that it's still ongoing. |
| 6   Q. We'll talk some more about this in a minute. |
| 7     Other than reviewing the reports and the |
| 8     consent decrees, what other investigation did |
| 9     you do that gave you the impression that you |
| 10    were the object of discrimination? |
| 11   A. I also looked at the state board policies |
| 12    concerning hiring and also the uniform |
| 13    guidelines. That may not be the complete |
| 14    title of the document, but I requested a copy |
| 15    of that and was provided a copy of that as |
| 16    well. |
| 17   Q. You've worked in the two-year college system |
| 18    before? |
| 19   A. Yes, I have. |
| 20   Q. And you've worked in the four-year college |
| 21    system before? |
| 22   A. Yes, I have. |
| 23   Q. You understand that those guidelines that you |

| Page 87 |
|---|
| 1     were reviewing are guidelines issued by the |
| 2     Department of Postsecondary Education? |
| 3   A. Which guidelines are you referring to? |
| 4   Q. The ones that you were looking at. |
| 5   A. The uniform guidelines? |
| 6   Q. Yeah. |
| 7   A. My understanding is that those are guidelines |
| 8    that are to be followed by all of the |
| 9    two-year colleges in the system and that they |
| 10    were approved by the State Board of |
| 11    Education. |
| 12   Q. Right. Which is the highest level of |
| 13    decision making with respect to educational |
| 14    policy in Alabama? |
| 15   A. The state board currently is, yes. |
| 16   Q. When the two-year college, the chancellor's |
| 17    office and the Board issue these uniform |
| 18    guidelines, it's expected that every college |
| 19    in the two-year college system comply with |
| 20    those guidelines; isn't that right? |
| 21   A. I don't know. |
| 22   Q. Is that your understanding? |
| 23   A. That's -- that would be a fair assumption. |

| Page 88 |
|---|
| 1   Q. You've read them? |
| 2   A. I'm sorry? |
| 3   Q. You've read them, the guidelines? |
| 4   A. The guidelines? I have. |
| 5   Q. And you understand that the scope of |
| 6    application is all the colleges in the |
| 7    two-year college system? |
| 8   A. That's my understanding. |
| 9   Q. And is it your understanding that the various |
| 10    two-year colleges, the community colleges |
| 11    like Enterprise and Wallace, don't have the |
| 12    discretion to deviate from those guidelines |
| 13    at their discretion? |
| 14   A. I don't know what they -- I assume -- I don't |
| 15    know what they have the authority to do in |
| 16    terms of deviation from the guidelines -- |
| 17   Q. Do you have any -- |
| 18   A. -- or the repercussions for doing so. I |
| 19    don't know. |
| 20   Q. Do you have any evidence that Wallace or any |
| 21    other two-year college could deviate from the |
| 22    requirements of the uniform guidelines at |
| 23    their discretion? |

| Page 89 |
|---|
| 1   A. Well, I -- if -- if a college had not met |
| 2    their goals, that might be considered |
| 3    deviation from the guidelines. One might |
| 4    interpret it that way. If one had exceeded |
| 5    the goals, one might interpret that as |
| 6    deviation. So I really -- I really don't |
| 7    know how to answer your question. |
| 8   Q. What do you understand the goals of the |
| 9    Shuford Consent Decrees which were |
| 10    incorporated in the uniform guidelines -- |
| 11    well, let me back up. I don't want to assume |
| 12    something that's not in evidence. You |
| 13    understand that some of the goals provided |
| 14    for in the Shuford-Johnson-Kennedy Consent |
| 15    Decrees were adopted into the uniform |
| 16    guidelines? |
| 17   A. Yes, I do understand that. |
| 18   Q. And you understand that the goals for race, |
| 19    gender and -- race and gender targets are not |
| 20    to be considered quotas under the terms of |
| 21    the decree; did you understand that? |
| 22   A. I don't understand that at all to be the |
| 23    case. I don't know how they're interpreted |

23 (Pages 86 to 89)

DEPOSITION OF RICHARD EMANUEL

Page 90

1  or applied.
2  Q. We could probably read the consent decree for
3     ourselves to know whether it's a quota or not
4     a quota, right?
5         MR. PORTER: Object to the form.
6  A. I don't know what you could find from it.
7  Q. We can just read it, and whatever it says, it
8     says.
9  A. I guess that's a matter for courts and others
10    to determine what's a quota and what's not.
11 Q. Do you understand that the consent decrees
12    provide latitude for colleges to make those
13    goals or not make those goals depending upon
14    various circumstances?
15 A. I would assume that that would be the case,
16    considering the fact that some of the
17    colleges had not met their goals at any given
18    year.
19 Q. Well, let me zero you in a little bit because
20    I don't want you to assume something that you
21    don't have to assume.
22 A. Okay.
23 Q. You read the consent decree, right?

Page 91

1  A. Yes.
2  Q. Did you read the part where it says that the
3     goals aren't quotas? Did you read that part?
4  A. I don't recall that statement, no.
5  Q. Was it your understanding that those goals
6     were quotas?
7  A. My understanding is that those were goals.
8  Q. What is your understanding of that, the term
9     goals?
10 A. Well, my understanding of it -- I don't
11    think -- I don't see how it's relevant here,
12    but it seems like the college's understanding
13    is what's relevant; but I don't under -- I
14    don't know. You know, if -- as the consent
15    decree says, they have to provide an
16    accounting annually; and if they don't meet
17    goals, they could be hauled before the court
18    or the judge. Is that a goal
19    or target or whatever you call it? I don't
20    know. I would think it has to do with how
21    it's applied or -- I don't know.
22 Q. You don't know how it's applied?
23 A. Well, I -- what I'm saying is I don't know

Page 92

1  how one might define or construe goal.
2  Q. Do you know if it's okay if they don't make
3     the goal?
4         MR. PORTER: Object to the form.
5  A. I don't know what's okay and not concerning
6     goals.
7         MR. PORTER: Is this a good break time?
8         MR. CHRISTMAN: Sure.
9         (Brief recess)
10 Q. I want to talk some more about what gave you
11    the impression that you had been
12    discriminated against. We've talked about
13    the qualification disparity that came to your
14    attention. We've talked about your
15    investigation of the Shuford-Johnson-Kennedy
16    Consent Decrees.
17        MR. CHRISTMAN: I'm just going to call
18        them the Shuford decrees; is that
19        okay?
20        MR. PORTER: Sure.
21 Q. You read those?
22 A. Yes.
23 Q. And then you read the uniform guidelines

Page 93

1  issued by the Department of Postsecondary
2  Education?
3  A. Yes.
4  Q. And I'd asked you if it was your
5     understanding that that was a -- the uniform
6     guidelines --
7         (Brief interruption)
8  Q. Was it your understanding that the uniform
9     guidelines are not issued by Wallace
10    Community College?
11 A. That is my understanding.
12 Q. They're issued by the entity that oversees
13    all of the community colleges, right?
14 A. That's my understanding.
15 Q. Anything else that you reviewed or researched
16    in arriving at the conclusion that you
17    suffered discrimination?
18 A. There may have been some -- some other
19    things, but I -- I just can't recall right
20    now what they may have been.
21 Q. And the context of your claim of
22    discrimination is specifically with respect
23    to hiring; is that right?

24 (Pages 90 to 93)

DEPOSITION OF RICHARD EMANUEL

Page 94

1  A. Yes.
2  Q. Do you have any complaints about the hiring
3     process used by Wallace that you participated
4     in?
5  A. Part of my complaint is the composition of
6     search committees.
7  Q. What's the problem?
8  A. That search committee composition is dictated
9     by uniform guidelines to have a certain
10    percentage of female members and a certain
11    percentage of African American members
12    without reason, purpose or rationale; and I
13    have an issue with that. I think that there
14    is research to support, or suggest, rather,
15    that there may be some demonstrable bias in
16    hiring decisions. I could pull up that
17    research for you, but -- for -- anyway, I'll
18    leave it there.
19 Q. Well, this is my chance to take your
20    deposition, so I would like to know what the
21    basis of that research is.
22 A. Okay. I don't --
23 Q. This is your argument. Is that going to help

Page 95

1     you?
2  A. Yes. It may be in here, yes. Yeah. Part
3     of the argument, I think, is that the uniform
4     guidelines provide no rationale or purpose
5     for such a composition, and it seems to me
6     that that composition necessitates an under-
7     representation of other demographics if
8     they're requiring representation by a
9     percentage of a certain gender or race. You
10    know, there is no rationale provided for
11    that. Let me turn to --
12 Q. When you get there, I have a question for
13    you, but I don't want you to have to do two
14    things at once.
15 A. Thank you.
16 Q. So when you get there, let me know.
17 A. Thank you. Okay.
18 Q. You there?
19 A. Yes.
20 Q. Hold your finger right there.
21 A. All right. Go ahead.
22 Q. The provision of the guidelines controlling
23    the makeup of committees is another

Page 96

1     incorporated term of the decrees; isn't that
2     true?
3  A. I believe that's true.
4  Q. And you don't contend here today that Wallace
5     is responsible for determining the racial or
6     gender composition of the search committees,
7     do you?
8  A. I -- I'm not sure what Wallace is
9     specifically responsible for, too. All I'm
10    saying is that my issue -- I think you asked
11    about procedures, hiring procedures.
12 Q. Yes.
13 A. And my concern -- my concern is the required
14    composition of committees including the one
15    that I sat in front of.
16 Q. Yes. I think I understand your concern.
17 A. Okay.
18 Q. But what I want to understand in terms of
19    your understanding or get you to agree with
20    me about is that Wallace doesn't decide -- is
21    not the one who set up how the committees
22    will be -- how the committees will be
23    composed in terms of gender or race.

Page 97

1  A. That's probably the case.
2  Q. Because it comes out of the uniform
3     guidelines?
4  A. I assume it does.
5  Q. Well, that's where you read it, isn't --
6  A. That is where I read it, yes.
7  Q. And Wallace, as far as you know, didn't write
8     those guidelines?
9  A. As far as I know, they did not.
10 Q. So to the extent that you have a problem with
11    the composition of search committees, that is
12    a complaint about the guidelines and not
13    about Wallace, isn't that true?
14 A. My complaint and concern is about the
15    composition of the search committees.
16    Specifically, the one I sat in front of.
17 Q. Well, let's talk about that before you read
18    that so we can nail it down, and then we'll
19    talk about -- don't lose your place there. I
20    don't want you to forget your thought. What
21    was the composition of the first search
22    committee that you appeared in front of, if
23    you recall?

DEPOSITION OF RICHARD EMANUEL

1  A. Let's see. It looks like the initial
2     interview search committee was three females,
3     one male. I don't have -- don't see in here
4     notes about race. Second interview, two
5     females -- two males -- excuse me. Two
6     males, one female. Third and final
7     interview, of course, with the president who
8     is female. So five females, three males. I
9     don't have the racial information here.
10 Q. What is your understanding as to the purpose
11    of the first search committee?
12 A. I assume that the purpose is to provide an
13    initial screening whereby they could forward
14    promising applicants on to the next level of
15    interviews.
16 Q. What do you base that assumption on?
17 A. I -- I have nothing to base it on other than
18    just --
19 Q. Blind assumption?
20 A. Just a blind assumption about the way hiring
21    processes generally work is that they become
22    increasingly more selective as the process
23    goes on.

1  Q. Did you know that the first search committee
2     was in place to only determine that the
3     applicants met the minimum qualifications?
4  A. I wasn't aware of that.
5  Q. Assume with me that that's true and they will
6     pass on any applicants who meet the minimum
7     qualifications on to the next stage. Does
8     the composition of the search committee
9     matter?
10 A. Apparently, it does, else the uniform
11    guidelines wouldn't specify it.
12 Q. Well, I'm talking about in -- the purpose of
13    the uniform guidelines is a matter determined
14    by the individuals who implemented those
15    guidelines, right?
16    MR. PORTER: Object to the form.
17 A. Can you rephrase the question?
18 Q. Well, you may have an idea of what you think
19    the purpose of the guidelines are, right?
20 A. Okay.
21 Q. Somebody determined why to put the guidelines
22    in place, right?
23 A. I assume so.

1  Q. It wasn't you?
2  A. It wasn't me.
3  Q. Well, if -- regardless of the purpose of
4     implementing a particular composition of a
5     search committee, if the first search
6     committee's sole function is to pass on
7     minimum qualified applicants, it doesn't
8     really matter what the composition of the
9     search committee is, does it?
10 A. Well, I --
11    MR. PORTER: Object to the form.
12 A. I don't know for a fact what the sole purpose
13    of the initial committee is.
14 Q. Oh, yes, I understand. And I'm not asking
15    you --
16 A. And I don't know how to answer such a
17    hypothetical. If --
18 Q. Well, then, just assume with me -- it's one
19    fact I want you to assume with me.
20 A. Okay.
21 Q. Assume that the only purpose of the first
22    search committee is to assure that the
23    applicants meet the minimum qualifications.

1  A. Well, that's where I have a problem
2     understanding your question because it's
3     hypothetical in nature. I don't know that to
4     be the case.
5  Q. Well, I'm just saying assume it is the case,
6     okay?
7  A. Okay.
8  Q. You with me?
9  A. Yes, sir.
10 Q. All right. If you assume that that's their
11    function and that they will pass on every
12    applicant who meets the minimum
13    qualifications -- you with me?
14 A. Okay.
15 Q. It doesn't matter what their race and gender
16    is, does it?
17 A. I don't know if it does or not.
18 Q. Well, it's not going to matter what the race
19    and gender of the applicants are if they will
20    be passed on so long as they meet the minimum
21    qualifications?
22 A. I don't know that. Why would we have to do a
23    teaching demonstration if that's the case?

26 (Pages 98 to 101)

DEPOSITION OF RICHARD EMANUEL

Page 102

1   Q. Second search -- well, first search committee
2      had three females, one male. What is your
3      concern about that?
4   A. It was the totality of the composition that
5      was concerning to me. It is the requirement
6      that there is a certain percentage
7      composition of males, females -- females and
8      minorities and minority females on the
9      committee and that that necessarily, then,
10     results in under-representation of other
11     groups.
12  Q. Do you claim that you --
13  A. And that there is no rationale for doing so.
14     There seems to be no rationale or purpose in
15     doing so.
16  Q. Do you have a problem with the composition of
17     the first search committee?
18  A. As it pertains to the -- I do, inasmuch as it
19     is adhering to proportions that are required
20     that are, in my view, discriminatory.
21  Q. I'm going to paraphrase you -- what I think
22     your concern is and if I'm right -- wrong,
23     just straighten me out. Your concern is that

Page 103

1      the uniform guidelines provide composition
2      requirements of search committees?
3   A. That do not provide a rationale for that
4      composition and for which, then, those
5      guide -- those proportions necessitate
6      under-representation of other groups.
7   Q. Do you have a problem with this search
8      committee, the first one that interviewed
9      you?
10  A. I -- my only problem is in the required
11     composition of search committees of which
12     this is one.
13  Q. Is it problematic for you that there were
14     three females and one male?
15  A. It is problematic for me inasmuch as it is
16     one of those search committees that is
17     attempting to meet or is meeting the
18     proportions required by the uniform
19     guidelines.
20  Q. Do you think that the result of having three
21     females and one male in this search committee
22     resulted in you suffering discrimination?
23  A. I think that it is -- that the composition is

Page 104

1      discriminatory against males, and white males
2      in particular; and I think that there may be
3      a research that would suggest gender
4      similarity bias in hiring decisions.
5   Q. We'll talk about that research in just a
6      minute. I want you to zero in on my question
7      though. It's a very direct question.
8   A. Okay.
9   Q. Do you think that having three females and
10     one male on your first committee resulted in
11     you being discriminated against? You.
12  A. It may have.
13  Q. What evidence do you have -- and it may be
14     these articles; but what evidence do you have
15     that the composition of this committee
16     resulted in you being discriminated?
17  A. Well, the composition was not representative
18     of the composition of salary D employees at
19     the college. It was not representative of
20     qualified faculty members in the relevant
21     labor pool. It was not --
22  Q. Let's take those one at a time, if we can.
23  A. Okay.

Page 105

1   Q. What do you mean when you say it was not
2      representative?
3   A. I mean, if they took proportions of males,
4      females, blacks, whites and other races from
5      the salary D employees of Wallace Community
6      College, I -- I don't believe they would come
7      up with that composition of a committee. I
8      believe what they were trying to do is comply
9      to -- with uniform guidelines that they
10     themselves are discriminatory against males
11     and white males in particular.
12  Q. This first committee was three females, one
13     male, so it's 25 percent male, 75 percent
14     female?
15  A. Right.
16  Q. What do you think the salary D composition
17     is?
18  A. Of Wallace-Dothan?
19  Q. Right.
20  A. Well, at that time -- at that time, I believe
21     that 56 percent of their salary D employees
22     were females and about 44 percent were males.
23  Q. How do you know --

DEPOSITION OF RICHARD EMANUEL

Page 106

1  A. And about 40 percent were white males.
2  Q. How do you know that?
3  A. Based on the Wallace-Dothan's Shuford report.
4  Q. Which one?
5  A. 2004-2005. That was as of September 2005.
6  Q. Do you think that if every search committee
7     does not precisely reflect the population of
8     individuals on the salary scale at issue that
9     there is discrimination at play?
10 A. I think it has the potential.
11 Q. How do you get -- what did you say the males
12    was? 56 percent?
13 A. Females, 56 percent; males, 44 percent at
14    Wallace-Dothan. White males, 40 percent.
15 Q. How do you get 40 percent composition of
16    males on a four-member panel?
17 A. I don't know.
18 Q. Second committee, two males and one female?
19 A. Uh-huh.
20 Q. Do you have a problem with that, the
21    composition of that committee?
22 A. It doesn't seem consistent with the
23    composition of the salary D schedule

Page 107

1     employees at Wallace-Dothan. But again, I
2     remind you, my concern is with the overall
3     hiring process.
4  Q. I understand. On the second committee there
5     were two males, 66 percent male, 33 percent
6     female?
7  A. Uh-huh.
8  Q. That's not reflected on the population of the
9     salary D schedule either, is it?
10 A. That's correct.
11 Q. And in fact it's heavily weighted in the
12    favor of males?
13 A. It is.
14 Q. Of which you are a member?
15 A. Yes.
16 Q. Do you think that resulted in you being
17    discriminated against?
18 A. I don't know.
19 Q. To the extent that you have a problem with
20    the composition of the search committees that
21    you sat in front of and I want to separate
22    out right now your concern about the uniform
23    guidelines composition requirements. I want

Page 108

1     to talk about the committees that you
2     interviewed with. Are you with me?
3  A. Uh-huh.
4  Q. Yes?
5  A. Yes. I'm sorry.
6  Q. The first committee you think was potentially
7     problematic with three females, one male?
8  A. Potentially.
9  Q. The second committee, two males, one female,
10    do you think that was problematic?
11 A. I don't know.
12 Q. You don't know? Would you agree with me that
13    the second search committee with two males,
14    one female did not necessarily comply with
15    the composition requirements of the search
16    committees as annunciated in the uniform
17    guidelines?
18 A. Well, you know, maybe it's a semantic issue.
19    The uniform guidelines specify proportions of
20    females and minorities on search committees.
21    Did I meet in front of three search
22    committees or was the process the search
23    committee? I guess that would be part of the

Page 109

1     answer to the question.
2  Q. Well, you said three.
3  A. Well, I said I had three interviews. I
4     didn't say that there were three inter --
5     three search committees. I said I had three
6     interviews.
7  Q. Do you contest the fact that there were two
8     search committees and one president
9     interview?
10 A. I'm sorry?
11 Q. Do you contest the fact that you interviewed
12    in front of two search committees and one
13    president?
14 A. I don't contest that fact. I'm saying it may
15    simply be a semantic argument about whether
16    or not two search committees and a president
17    comprise -- two interviews and an interview
18    with the president comprised one search
19    committee or three search committees. What
20    I'm saying is what constitutes the
21    committee? Is it the three interviews and
22    all the people involved in asking the
23    questions in those interviews or are those

28 (Pages 106 to 109)

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 110

1    three separate committees? A committee of
2    one seems a little odd but -- so my point
3    here is more about the composition of the
4    search committee. What is the search
5    committee? Is it all of the people involved
6    or is it each interview instance?
7  Q. What evidence do you have that search
8    committee one collaborated at all with search
9    committee two?
10 A. I don't have data one way or the other.
11 Q. What evidence do you have that search
12   committee one collaborated in any way with
13   the president in her interview?
14 A. I don't have data either way other than my
15   name was forwarded from each level to the
16   president.
17 Q. Along with two others?
18 A. Correct.
19 Q. In fact there were three people who applied
20   that were interviewed, right?
21 A. Which interview?
22 Q. The first one, second one, third one, all
23   three.

Page 111

1  A. I -- I assume all three of the final
2    candidates were interviewed all three times.
3  Q. There were only three candidates who met the
4    minimum qualifications for this job at this
5    posting, did you know that?
6  A. I did not know that. You're saying there
7    were only three minimally qualified?
8  Q. I'm asking if you knew that. Did you know
9    that?
10 A. I didn't know that.
11 Q. Did you know that all three minimally
12   qualified applicants were passed on at every
13   stage of the interview process, did you know
14   that?
15 A. I did not know that.
16 Q. Do you think there could be any possibility
17   of discrimination if every candidate who met
18   the minimum qualifications that was set out
19   in the job announcement were passed on to
20   every level of the interview not including
21   the final decision?
22 A. I don't know.
23 Q. Can you think of any way there could be

Page 112

1    discrimination if every applicant moves on to
2    the next stage?
3  A. I don't know. I can't. I don't know.
4  Q. Tell me about your -- tell me about your
5    research that you say supports the idea that
6    the composition of a search committee can
7    result in a discrimination if that's what you
8    say that research indicates.
9  A. Well, an examination of the gender
10   composition of search committees throughout
11   the two-year college system reveals a
12   dramatic under-representation of males and
13   the empirical evidence suggests that gender
14   similarity is often a more important or
15   salient characteristic in judgement processes
16   of women than of men.
17 Q. Hold it --
18 A. As much as we would hate to --
19 Q. I'm sorry.
20 A. -- hear that.
21 Q. Stop right there. I need to take these one
22   at a time and talk to you about them because
23   some of these may be above my hay grade.

Page 113

1    Tell me about the first -- you're reading
2    from Defendant's Exhibit --
3  A. I'm.
4  Q. What is that, 19?
5  A. 19, page 11.
6  Q. Why don't you read that first sentence
7    again? Let's take this in pieces.
8  A. It says an examination of the gender
9    composition of search committees throughout
10   the two-year college system reveals a
11   dramatic under-representation of males.
12 Q. What do you mean by that?
13 A. That means that males are not represented on
14   search committees in proportion to what they
15   exist either in salary schedule D systemwide
16   and certainly not in proportion with what
17   they're available in the relevant labor
18   market. But I think what's more relevant
19   here is the proportion of males that are
20   employed in salary D in the two-year college
21   system.
22 Q. How do you know that?
23 A. Just based on their reports of how many males

DEPOSITION OF RICHARD EMANUEL

Page 114

1    and females are in the system.
2    Q. How do you know how many males and females
3       are on the search committees at Wallace
4       Community College in comparison to the number
5       of males and females on salary D schedule?
6    A. Part of the Shuford report that they post on
7       their website shows who was serving on the
8       search committees and for what position and
9       what salary schedule.
10   Q. Can we look at that? I have a copy of what
11      you produced to us that I presume is what you
12      were working from?
13   A. Uh-huh.
14   Q. I'm going to mark it as Defendant's #20.
15      Would you please direct me and this is --
16      this is a collection of documents that you
17      produced to me that I've kept in the -- in
18      the same collection. I think it was a PDF
19      file and I've printed it out and I believe
20      it's as complete as whatever you sent me. So
21      tell me what you base the statement that
22      search committees at Wallace do not reflect
23      the salary D population ratios systemwide.

Page 115

1    And if you don't mind, when you find it I
2    want to come around and look at it.
3    A. Okay.
4    Q. I don't want to hover over somebody's client.
5    A. This is one that shows the composition of
6       search committees and it lists the names of
7       the members of the search committee and their
8       race and gender and what the vacancy was for
9       which they -- they were serving.
10   Q. This is part of Defendant's Exhibit #20. We
11      are looking at bates number Emanuel 0159.
12   A. And there should be a similar kind of report
13      for each of the new hires and you can see
14      that it indicates whether or not it's C or D
15      salary schedule and so my research focused
16      only on the D salary schedule as I previously
17      indicated it did.
18   Q. Is this the only page that you used?
19   A. I -- I don't know if it is or not. I don't
20      know how complete or if this is complete.
21      But what I did do is I went to the college --
22      Alabama College System website under the
23      Shuford reports and it included -- as I said,

Page 116

1    it included these lists of who served -- who
2    was hired at what salary schedule and who
3    served on the search committee and what their
4    race and gender was.
5    Q. Well, how did you come up with that statement
6       though? What did you do to come up with the
7       statement that white males or -- I mean I
8       don't want to misrepresent the statement.
9       What did you say?
10   A. I said that the gender composition of the
11      search committees throughout the two-year
12      college system reveals a dramatic
13      under-representation of males.
14   Q. How did you come up with that? Tell me --
15      tell me -- obviously you made a calculation?
16   A. I did.
17   Q. Tell me about it.
18   A. Let me get to it. The Alabama College System
19      website that showed the Shuford reports from
20      each of the colleges as well as a composite
21      report of all of the colleges indicates the
22      selection committees in most instances were
23      four, five or maybe six-member committees.

Page 117

1    So this is what the Shuford report calls a
2    selection committee. And what I did is I
3    went through and I counted for a period of
4    time 2001 through 2005 of Wallace-Dothan and
5    of the entire two-year college system. I
6    counted the number on the search committee
7    for salary D hires, the number of males on
8    search committees and the number -- and the
9    number and percent of males on search
10   committees and the number and percent of
11   women on search committees. And --
12   Q. And found what?
13   A. And found that for example at Wallace-Dothan
14      --
15   Q. Tell us what page you're reading from.
16   A. Yes. I'm looking at this Defendant's Exhibit
17      #19 and I'm looking at page 18.
18   Q. There should be a bates number on the very
19      bottom.
20   A. Yes. It's Emanuel 0028. And on that page
21      I'm looking at table 2 which provides the
22      total number on search committees and
23      remember this is only for salary D for

DEPOSITION OF RICHARD EMANUEL

| Page 118 |
|---|
| 1  faculty. The number of males on search |
| 2  committees, the number and percent of males |
| 3  and number and percent of women, females on |
| 4  search committees. And what it shows here is |
| 5  that there were a total of 363 members on |
| 6  search committees during this period from |
| 7  2001 to 2005 and that of those 363, 133 were |
| 8  men, that is 37 percent were men. |
| 9     I misspoke earlier. I'm sorry. Let me |
| 10  correct myself. What this shows rather than |
| 11  women it shows the number and percent of |
| 12  men and the number and percent of white men |
| 13  on the search committees. I misspoke |
| 14  earlier. And it also shows of -- of those |
| 15  363 members of faculty -- I'll call them |
| 16  salary D faculty search committees only 70 |
| 17  were white males, that is only 19 percent |
| 18  were white males. And that is not reflective |
| 19  of the proportion of males or white males at |
| 20  Wallace-Dothan nor is it reflective of the |
| 21  number of males and white males in the |
| 22  relevant labor pool and it is an |
| 23  under-representation of males and white males |

| Page 120 |
|---|
| 1  Q.  That's -- |
| 2  A.  That's based on Emanuel 0029. That's at |
| 3     table 5 on that page. So my point is it was |
| 4     not reflective of the composition of faculty |
| 5     at Wallace-Dothan. It clearly |
| 6     under-represented males and white males in |
| 7     particular. |
| 8  Q.  And -- |
| 9  A.  And these are things that -- again, this -- |
| 10     this is -- well, leave it there. |
| 11  Q.  Then the next statement you made in your |
| 12     argument there? |
| 13  A.  It says this is significant because empirical |
| 14     evidence suggests that gender similarity is |
| 15     often a more salient characteristic in the |
| 16     judgement processes of women than of men. |
| 17  Q.  What does that mean? |
| 18  A.  That means that if you are the same gender |
| 19     that I'm, it may be more likely to be an |
| 20     important factor in my ultimate decision |
| 21     about you. And it seems to be more the case |
| 22     for women than it does so for men. |
| 23  Q.  How do you know that? |

| Page 119 |
|---|
| 1     in search committees. |
| 2  Q.  This is a system -- you're looking at table 2 |
| 3     here -- |
| 4  A.  I'm. |
| 5  Q.  -- on Emanuel 28? |
| 6  A.  Yes. And this is specific to Wallace-Dothan. |
| 7  Q.  What do you mean specific to Wallace-Dothan? |
| 8  A.  In other words, this is not systemwide. I |
| 9     didn't count search committees for all salary |
| 10     D hires systemwide, only for Wallace-Dothan. |
| 11  Q.  Let's go to the next statement that you |
| 12     made. So based upon these calculations, |
| 13     you've come up with a 19 percent -- |
| 14  A.  Yes. |
| 15  Q.  -- composition of white males in search |
| 16     committees -- |
| 17  A.  Yes. |
| 18  Q.  -- as opposed to a population of white males |
| 19     at Wallace? |
| 20  A.  Yes. |
| 21  Q.  Of what? |
| 22  A.  I believe that was 40 -- let me turn to it |
| 23     again. That was white males, 40 percent. |

| Page 121 |
|---|
| 1  A.  I don't. But Elkins in this research |
| 2     article, Sex Roles: A Journal of Research, |
| 3     Volume 44, pages 1 through 15 provides an |
| 4     empirical research study that suggests that. |
| 5  Q.  So you relied upon this empirical research |
| 6     data? |
| 7  A.  Yeah. And I said I think that this is |
| 8     significant because this data suggests that |
| 9     gender similarity may play a role. And if |
| 10     you have what I perceive to be a gross |
| 11     under-representation of males and in |
| 12     particular white males on search committees, |
| 13     it could certainly have bearing on decisions |
| 14     that are made. |
| 15  Q.  What is this source that you used? |
| 16  A.  It's Elkins, Teri J., in the journal, Sex |
| 17     Roles, A Journal of Research, Volume 44, |
| 18     pages 1 through 15. |
| 19  Q.  What journal is that? |
| 20  A.  What journal. |
| 21  Q.  Yeah. Where -- |
| 22  A.  It's -- it's -- |
| 23  Q.  Where did you get that? |

DEPOSITION OF RICHARD EMANUEL

Page 122

1  A. It's an academic journal. Sex Roles, A
2     Journal of Research. It's a reputable
3     academic journal.
4  Q. Where did you get it? How did you know about
5     it?
6  A. I found it out on the internet.
7  Q. How do you know it's reputable?
8  A. Because I read the inside cover of the
9     journal that says how long it's been in
10    circulation and all that kind of stuff. I
11    don't have that here.
12 Q. Do you know anything about the study that
13    they did to determine their empirical
14    results?
15 A. I don't have it here in front of me.
16 Q. But that's what you based your assumption on
17    that it may matter who's --
18 A. Well, there is another study --
19 Q. Just a minute before you continue. That's
20    what you based your statement on that it may
21    matter who's on the search committee in terms
22    of gender, particularly female?
23 A. That is one of the things, yes.

Page 123

1  Q. What else?
2  A. The fact that it obviously mattered to the
3     consent decree enough to put in required
4     percentages and it obviously mattered enough
5     to the State Board to pick up those very same
6     percentages in their uniform guidelines. If
7     it didn't matter then it seems illogical that
8     they would require such percentages.
9  Q. What else?
10 A. The other thing was a study by Dillingham,
11    Ferber & Hamer -- Hamermesh in Industrial and
12    Labor Relations Review. And it showed that
13    there is a greater potential for a favorable
14    female bias in candidate selection than there
15    is for a favorable male bias. And it's
16    similar to the Elkins article in talking
17    about gender similarity and its potential
18    impact in decisions particularly in this case
19    in hiring.
20 Q. And so your argument or contention is that --
21    that if you have females on the panel,
22    they're more likely to choose females than
23    males are likely to choose males?

Page 124

1  A. I'm saying that that -- there is a greater
2     potential for that. At least I'm saying here
3     that there is evidence that suggests that
4     there is a greater potential -- empirical
5     evidence that suggests there may be a greater
6     potential.
7  Q. Do you believe that women are less fair than
8     men when it comes down to selection?
9  A. I don't know.
10 Q. You don't know?
11 A. I can just read what the research says about
12    it.
13 Q. Well, I mean but are you contending in this
14    lawsuit that having more women on your panel
15    is going to result in they're probably going
16    to want to choose a woman over you; is that
17    what you're contending?
18 A. I'm contending that there is a
19    disproportionate make up composition of
20    search committees.
21 Q. Women can't be as objective about it as men
22    --
23 A. I'm not saying that.

Page 125

1  Q. -- is that your contention? That's what your
2     empirical evidence seems to show?
3  A. That's not my empirical evidence. It's the
4     empirical evidence that I'm citing from
5     others.
6  Q. It's empirical evidence you're relying on?
7  A. It is.
8  Q. You didn't do the study, right?
9  A. No, I did not.
10 Q. But you cited it to us today --
11 A. Yes.
12 Q. -- as one of the reason that you think that
13    there is a problem with these search
14    committees, right?
15 A. The problem has to do with disproportion of
16    representation.
17 Q. And the reason that's a problem is because
18    women are not as fair as men when it comes to
19    section of candidates?
20    MR. PORTER: Object to the form.
21 A. That's not what I'm saying. What I'm saying
22    is that -- that I think that this
23    under-representation of males and white males

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 126

1    on search committees is significant because
2    there is empirical evidence that suggests
3    that there may be some of these outcomes that
4    I've just described based on this research.
5  Q. Do you contend that if you had more males on
6    your search committee you would have this
7    job?
8  A. I contend if there had not been
9    discrimination I would have this job.
10  Q. Do you contend that if you had more males on
11    the search committee you would have this job?
12  A. I don't know.
13  Q. Well, we know you had more males than females
14    on the second committee, right?
15  A. Again, it depends on what you call a
16    committee. There were in the second
17    interview, that's correct. I would simply
18    add to my answer that according to Shuford
19    reports, there is but one selection
20    committee. While there may be more than one
21    interview --
22  Q. What are you --
23  A. -- the selection committees and their

Page 127

1    composition and their names are outlined or
2    are stated right here in the Shuford report.
3  Q. What in this report indicates that in a given
4    hiring circumstance there is only one
5    committee?
6  A. This report itself does. If there was more
7    than one committee it seems logical that they
8    would list it here.
9  Q. Do you see your committee in there?
10  A. This was 2001. 2004. No, this report only
11    goes through September of 2005.
12  Q. Do you know if that report reflects only
13    final search committees or does it reflect
14    all of the search committees that
15    participated throughout the entire job
16    search?
17  A. The report simply says recruiting and
18    selection committees.
19  Q. We know for sure you gave three interviews?
20  A. I did.
21  Q. Two of those interviews were in front of a
22    panel of people?
23  A. Yes.

Page 128

1  Q. And they were two different panels?
2  A. Yes.
3  Q. With two different racial and gender
4    compositions?
5  A. Yes.
6  Q. Is there anything else about the composition
7    of search committees that you believe to be
8    problematic?
9  A. Well, inasmuch as the results of those search
10    committees were hiring rates of females and
11    minorities and minority females and
12    disproportionate numbers and percentages. In
13    other words, the result, the outcome of the
14    committees is disproportionate.
15  Q. Show me that calculation, please.
16  A. Yeah. Yes. It's on Emanuel 0028 beginning
17    with table 3. Again, these are -- this data
18    is based on the Wallace-Dothan Shuford
19    reports 2001 to 2005. It shows the total
20    number of hires. This is for salary D only.
21    It shows the number of female hires and the
22    percent of female hires, the number and
23    percent of male hires during that period.

Page 129

1    And of the 57 total hires on salary D during
2    that time period, only 14 were -- were males
3    or 25 percent versus 75 percent of the hires
4    were female.
5  Q. And you believe that to be related or caused
6    by the composition of the search committee?
7  A. Well, what I concluded is that that seemed to
8    be one of the outcomes or seemed to support
9    my concern with the composition of the
10    committees.
11  Q. What else? Anything else that you have in
12    terms of concern about the composition of
13    search committees? Systemwide now, right?
14    We're talking about systemwide?
15  A. Well, systemwide and with Wallace-Dothan
16    since they're part of the system.
17  Q. Well, let's talk about systemwide first
18    because I want to talk to you specific --
19    well, I'll just go ahead and talk to you
20    specifically about this one. We know for
21    sure that females out numbered males at a
22    rate of 75 percent, 25 percent in the first
23    committee that you sat in front of, right?

DEPOSITION OF RICHARD EMANUEL

| Page 130 | Page 132 |
|---|---|
| 1  A. I believe that's correct.<br>2  Q. And you moved on to the second committee,<br>3   right?<br>4  A. Yes.<br>5  Q. You weren't washed out by that first<br>6   committee, were you?<br>7  A. I was not.<br>8  Q. So you don't claim that there's been any<br>9   discrimination as a result of the racial<br>10   composition for you individually as a result<br>11   of the make up of the first committee because<br>12   they didn't wash you out, right?<br>13  A. All I know is that I went on to the next<br>14   level.<br>15  Q. The second committee had two males and one<br>16   female so we got 66 percent to 33 percent in<br>17   favor of males in that committee, right?<br>18  A. Uh-huh. That particular interview<br>19   experience, yes.<br>20  Q. Well, I'm going to call it a committee; is<br>21   that okay?<br>22  A. I wouldn't agree to characterize it that way.<br>23  Q. Why would you disagree to characterize it | 1  A. Yes.<br>2  Q. Before the president and the committees that<br>3   made recommendations or that you interviewed<br>4   in front of prior to the president, you got<br>5   three females in the first, one female in the<br>6   second. So you got a combined total of four<br>7   in those two committees, right?<br>8  A. All I know is the people that I interviewed<br>9   in front of, there were five females and<br>10   three males.<br>11  Q. My questions are very direct. I think<br>12   they're simple --<br>13  A. I'm trying to answer --<br>14  Q. You're really not though. You're really not<br>15   answering this particular question. The<br>16   first committee had three females? The first<br>17   interview had three females?<br>18  A. Yes.<br>19  Q. The second interview had one female?<br>20  A. Yes.<br>21  Q. That's a combined total of 4?<br>22  A. Yes.<br>23  Q. The first interview had one male and the |

| Page 131 | Page 133 |
|---|---|
| 1   that way?<br>2  A. Well, two things. Number one, the Shuford<br>3   reports provide committees and names of<br>4   committees and the first committee that I sat<br>5   in front of was called the selection<br>6   committee. Again, it may be a semantic<br>7   issue. I don't know. But that's what they<br>8   call it. The second thing is that if all of<br>9   the people involved in the interview process<br>10   constitute the committee then to take<br>11   compositions of any one step in that process<br>12   would be incomplete and you would need to<br>13   take the composition of all of the people<br>14   involved in the hiring process.<br>15  Q. Well, if we do that here, we got four females<br>16   and three males in the combined two<br>17   committees, right?<br>18  A. Five. The president was the fifth.<br>19  Q. Well, the president is a female, right?<br>20  A. Yes.<br>21  Q. And she did a final interview, right?<br>22  A. That's correct.<br>23  Q. And she did it all by herself, didn't she? | 1   second interview had two males, right?<br>2  A. Yes.<br>3  Q. That's a combined total of three?<br>4  A. Yes.<br>5  Q. Not considering the president who is the<br>6   final decision maker yet. And just talking<br>7   about people who aren't final decision makers<br>8   for the sake of this question. There were<br>9   four females, three males?<br>10  A. Yes.<br>11  Q. Would you think that that's out of balance<br>12   associated with the representation of females<br>13   and males on a salary D schedule?<br>14  A. Four to three? I would simply look at the<br>15   percentages of faculty members at<br>16   Wallace-Dothan to respond to that. And it<br>17   looks like there were 56 percent females and<br>18   44 percent males and 40 percent of those were<br>19   white males.<br>20  Q. So would you agree with me that that's about<br>21   as close as we're going to get to a<br>22   reflective break out -- if we're not taking<br>23   the president into consideration as part of |

DEPOSITION OF RICHARD EMANUEL

Page 134

1  the process, okay? Would you agree with me
2  that four females and three males is about as
3  close as we're going to get to this racial
4  composi -- racial and gender composition?
5  A. I would simply say that the president was
6  part of the process and that --
7  Q. Well, but I'm asking you to disregard that so
8  please listen to my question. Taking her out
9  of the equation -- because see, she can't
10  appoint somebody else to do her job as the
11  president, can she? Do you know?
12  A. I don't know.
13  Q. Do you know if the president is allowed to
14  just shirk her responsibilities and delegate
15  them to someone else?
16  A. I wouldn't characterize it as shirking but I
17  do think the president has the authority to
18  delegate some responsibilities, certainly.
19  Q. Yeah. Do you think because she's a woman she
20  has to give that responsibility to someone
21  else instead of making the decision as the
22  president because she's a woman?
23  A. I don't think so at all. I know that I've

Page 135

1  interviewed at Wallace-Dothan before and
2  never got to meet the president.
3  Q. Well, you did this time, didn't you?
4  A. No, I didn't. This is the first time I've
5  met her.
6  Q. Well, you talked to her on the telephone?
7  A. I did talk to her on the phone, yes.
8  Q. Did you know or do you know that the
9  president for Wallace is the final decision
10  maker on who gets hired?
11  A. I knew it in this case, yes.
12  Q. And you don't dispute that fact?
13  A. I don't dispute that fact.
14  Q. Well, taking the president of the equation as
15  the final decision maker, you would agree
16  with me that four females to three males in
17  the combined two committees is about as close
18  as we're going to get to the population break
19  out on a salary D schedule at Wallace
20  Community College, would you agree with that?
21  A. I don't know. I mean I --
22  Q. You don't know?
23  A. I would have to -- what I'm saying is I would

Page 136

1  have to run numbers to see how closely it
2  aligns with the proportions of faculty
3  members at Wallace-Dothan.
4  Q. Well, you just told me what they were.
5  A. Yeah, but I don't have in my head what four
6  to three would be. I just said that --
7  Q. Well, Dr. Emanuel, with all do respect, you
8  put together some pretty sophisticated
9  calculations here at tables 1, 2, 3, 4, 5,
10  and 6?
11  A. Yes.
12  Q. This is not I don't think above your pay
13  grade.
14  A. Well, maybe you can help me by figuring out
15  what four-seventh would be percentage wise.
16  Q. Well, can you split a person into more than
17  one?
18  A. No, you can not and I think that speaks to
19  the -- to the real issues and problems with
20  having these percentages dictated in the
21  first place.
22  Q. Well --
23  A. But the fact is that I do believe that males

Page 137

1  and white males in particular were clearly
2  under-represented both at Wallace-Dothan in
3  search committees and systemwide.
4  Q. Well, taking the president out of the
5  equation, they weren't with respect to your
6  interview, were they?
7  A. I don't know. I don't know what the
8  percentage was four to three?
9  Q. You don't know?
10  A. I don't know what 4-sevenths is in
11  percentages. I'd have to calculate it.
12  Q. Well, what do you need to calculate it?
13  A. A calculator.
14      MR. CHRISTMAN: Anybody got a
15      calculator?
16      THE WITNESS: I don't know how to do
17      the divide on this. Maybe you can
18      show me.
19      MR. GRIFFITH: Sure.
20  A. All right. So 57 percent were females
21  apparently based on those numbers.
22  Q. And 42 percent --
23      MR. PORTER: Three.

DEPOSITION OF RICHARD EMANUEL

Page 138

1  Q. -- 43 percent would then be males?
2  A. Right. Now I know the answer to the
3     question. 57 percent female and 43 percent
4     were male.
5  Q. Pretty darn close?
6  A. It looks to be within one percentage point.
7  Q. That's almost spot on, isn't it?
8  A. It looks like it's pretty consistent with the
9     percentage of males and females at -- at
10    Wallace-Dothan.
11 Q. In light of that fact, you don't have a
12    problem excluding the president with the make
13    up or the composition of the search committee
14    that interviewed you, do you?
15 A. I do in the sense that the president was part
16    of the composition of the committees and
17    individuals that interviewed me.
18 Q. So to make it more fair, she should have
19    delegated that responsibility to interviewing
20    you to a man; is that your testimony?
21 A. That's not my testimony.
22       MR. PORTER: Object to the form.
23 Q. Well, what is your testimony? How should the

Page 139

1     president have dealt with that since she had
2     four females, three males in the two
3     committees below? What should the president
4     have done to make sure that you felt okay
5     about the composition?
6  A. I wouldn't presume to guess what the
7     president should or should not have done.
8  Q. Well, you're suing the college for
9     discrimination.
10 A. Yes.
11 Q. And part of it you said is based upon the
12    composition of search committees?
13 A. Yes.
14 Q. So if that's true, what should have
15    happened -- I'm looking for your testimony
16    here about this. What should have happened?
17    When it got to the president, what should she
18    have done? Should she have delegated that to
19    a male so you would feel better about it?
20 A. What should have happened in my opinion is
21    that the composition of the hiring committees
22    -- and by hiring committee, I mean hiring
23    committee is all the people involved in the

Page 140

1     hiring process, all those people that
2     interview and ask questions in the process,
3     that that composition ought to be reflective
4     of not only the males and white males that
5     are employed at that college -- well, that's
6     what they should be representative of.
7  Q. Well, what do you base your contention on
8     that the president or the final decision
9     maker is part of the committee?
10 A. Because she interviewed me.
11 Q. Well, show me in the Shuford decree where any
12    of the named members of those committees was
13    the president?
14 A. There were not.
15 Q. There were not, were they?
16 A. No. Neither was the second group that you're
17    mentioning.
18 Q. I'm not sure what you mean.
19 A. The second group of three that you're
20    including in your calculation.
21 Q. They weren't the president either?
22 A. And they were also not the committee either.
23 Q. Well, how do you know they're weren't the

Page 141

1     committee?
2  A. Because they're not stated in the Shuford
3     reports that you just pointed out.
4  Q. Well, none of them are stated in the reports
5     we looked at here on your committee, right?
6  A. Not my committee.
7  Q. None of your committee is in here?
8  A. No, but I know what their gender was because
9     I sat in front of them.
10 Q. Well, how do you know in the report that may
11    or may not have gone to Shuford -- I don't
12    know if there was even a report about your
13    committee. How do you know that the
14    committee or committees that you reported or
15    that you interviewed in front of wouldn't
16    have been comprised of everybody you
17    interviewed in front of?
18 A. Well, because all of the Shuford reports
19    indicate that the selection committees, it
20    says here, were the four or five-member
21    committees.
22 Q. As opposed to seven-member committees?
23 A. As opposed to seven or the president.

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 142

1  Q. Well --
2  A. And if you look at the composition of just
3     the first group, you're talking about three
4     females and one male. So now you're talking
5     about 75 percent versus 25 percent.
6  Q. Yeah, and then the second one we're looking
7     at 66 percent versus 33?
8  A. And that's just the point. They're not
9     included in committees according --
10 Q. How do you know that?
11 A. According to Shuford reports.
12 Q. Where in Shuford does it say that the second
13    committee that you interviewed in front of is
14    not a part of the committee?
15 A. Maybe you have a document from the college
16    that is their Shuford report for '06, '07, is
17    that what it would be -- the '05, '06 that
18    would clarify this for us.
19 Q. I don't.
20 A. I don't either.
21 Q. So you don't any evidence?
22 A. Yes, I do. The evidence is right here.
23 Q. Show me the evidence that says the committee

Page 143

1     for the purposes of Shuford didn't make up
2     the first and second committees that you were
3     involved with.
4  A. Well, because every selection committee
5     presented in the Shuford report was simply
6     the four or five-member first level selection
7     committee.
8  Q. How do you know there was a first level
9     committee?
10 A. Okay. Let's see if we can't find this.
11 Q  Let me know when you find it. I have another
12    question for you.
13 A. Okay.  I interviewed for speech instructor
14    position at Wallace-Dothan in the Summer of
15    2001 I think it was and their members of
16    their search committee are listed here and
17    there is a black female -- two black females
18    and two white males on this particular search
19    committee and this was a four-member search
20    committee.
21 Q. You only had one interview then, didn't you?
22 A. No -- well, no, I believe that I had a second
23    interview in that process.

Page 144

1  Q. Who were the members of the second committee?
2  A. I don't recall.
3  Q. You don't have any evidence of it one way or
4     the other?
5  A. I don't. But my point is this, to answer
6     your question, this Shuford report lists
7     recruiting and selection committees and the
8     only names that are listed are these four
9     members.
10 Q. You don't dispute that there were two
11    committees that involved in your selection
12    process, do you?
13 A. I do dispute that and I dispute it simply
14    because I believe that the committees -- as
15    defined by this document, the committee is
16    the search committee, the initial search
17    committee or if that's --
18 Q. How does this document define what a search
19    committee is?
20 A. The --
21 Q. It's only -- that it limits it to one
22    committee of only five to seven members or
23    four to five members and nothing else?

Page 145

1  A. Well, because they're having to comply with
2     uniform guidelines that say search committees
3     must meet a certain composition and this is
4     the evidence that the college provides,
5     Wallace-Dothan provides to demonstrate that
6     they've met that composition.
7  Q. What is the evidence that committees have to
8     be one committee, one committee and no more
9     than five people?
10 A. Well --
11      MR. PORTER: Object to the form.
12 A. -- I don't understand your question exactly.
13    All I know is that Wallace-Dothan says that
14    these are the members of their recruiting and
15    selection committee and they list the names.
16 Q. Who do you think should be excluded from the
17    selection committee that you sat in front of
18    in terms of official Shuford committee?
19 A. I don't know.
20 Q. You don't know?
21 A. I don't understand your question.
22 Q. Seven people interviewed you before you got
23    to the president?

DEPOSITION OF RICHARD EMANUEL

Page 146

1  A.  Okay, yes, yes.
2  Q.  Who do you think should be cut out of the
3     numbers or the consideration for who was on
4     your committee?
5  A.  I -- I don't know.
6  Q.  Anything else about the composition of search
7     committees that you complain resulted in
8     discrimination for you?
9  A.  Not that I can think of.
10  Q.  Any other complaints besides the composition
11     of search committees that you believe is the
12     basis of discrimination against you?
13  A.  Not that I can think of right now.
14  Q.  Just the committees?
15  A.  I'm sorry?
16  Q.  Just the committees?  Is that the only
17     problem you have with Wallace?
18  A.  Would you repeat your question?
19  Q.  Yes, sir, I'll.  What other basis of
20     discrimination do you have against Wallace
21     other than the composition of the search
22     committees?
23  A.  The hiring rates.

Page 147

1  Q.  All right.  Let's talk about it.  What do you
2     mean, hiring rates?
3  A.  Well, based on the data that I collected from
4     the Shuford reports, I compiled numbers of
5     males and females and also by gen -- by race
6     and looked at what were the hiring rates over
7     that period of 2001 to 2005.
8  Q.  Show me what you're looking at.
9  A.  Okay.  I'm looking at Emanuel 0028.
10  Q.  Plaintiff's -- Defendant's Exhibit #19?
11  A.  Yes, Exhibit #19, Emanuel 0028.  And I'm
12     looking now at tables 3 and 4 and 5 and 6 on
13     the next page as well.
14        MR. CHRISTMAN:  Before we go into that,
15        let's take a quick break.  I drank
16        too much water.
17        (Brief recess)
18  Q.  All right.  We were just about to talk about
19     the second concern that you have with the
20     hiring process that you claim resulted in
21     discrimination.  And what you pointed me to
22     is the basic results of hiring
23     institutionalized by Wallace or just on the

Page 148

1     salary D level?
2  A.  Just on salary D.
3  Q.  All right.  And you were showing me on
4     Defendant's #19, Emanuel 0028, tables 1
5     through 6 onto page 0029?
6  A.  Uh-huh.
7  Q.  And are these computations basically just
8     trying to show that more -- there was an
9     under-representation of white males hired?
10  A.  Males and white males, a disproportionate
11     number.  And I put on there compared to
12     the 80 percent threshold that I understand
13     EEOC uses as a bench mark or basic measure.
14  Q.  Do you know how many of the applicants were
15     white male?
16  A.  I don't know that.  That information was not
17     included in the Shuford reports on which I
18     base my data.
19  Q.  Doesn't that matter?
20  A.  I think it -- it doesn't matter for this --
21     mainly for this reason, there was and is
22     still an applicant pool that is made up of
23     females and minorities, blacks, females but

Page 149

1     not whites.  I misspoke.  Not white males.
2     Females, black males, black females, not
3     white males.  They routinely annually purge
4     all white male applicants on this applicant
5     pool and what the applicant pool does -- and
6     that's part of the Shuford decree as well.
7  Q.  Right.
8  A.  What it -- what it basically does is that any
9     time there is a position for which they
10     indicated that they would be interested in
11     or qualified, they would be notified
12     immediately.  And it does not of course --
13     well, and so white males are excluded from
14     that applicant pool.
15  Q.  How does that detrimentally -- how does that
16     create a problem?
17  A.  Well, it simply means that if a white male is
18     interested in a position they have to -- they
19     have to put forth far more effort than a
20     member of the applicant pool would in being
21     able to read or locate rather the job
22     announcement.
23  Q.  Didn't slow you down much though, did it?

DEPOSITION OF RICHARD EMANUEL

Page 150

1  A. It didn't. And I'll simply go back to what I
2     said earlier, I just have this interest in
3     looking at the Alabama College System
4     website, their job announcement page that I
5     routinely look at.
6  Q. So you have a concern about the applicant
7     pool?
8  A. Uh-huh.
9  Q. The composition of it?
10 A. Well, my question is if Shuford was intended
11    to be inclusive and not exclusive, why would
12    they exclude white males from their applicant
13    pool and it seems to me that that would skew
14    them or potentially skew the -- the number of
15    white male applicants.
16 Q. What do you mean inclusive instead of
17    exclusive?
18 A. Well, my understanding is that -- that
19    Shuford attempted at least to appear as
20    though they were being inclusive in -- in
21    what they were determining as their policies
22    and procedures rather than exclusive. I
23    don't see how they can claim that and support

Page 151

1     that if they have certain percentages for
2     composition, if they have certain percentage
3     for hiring goals and that they purge white
4     males from the applicant pool. I don't
5     understand how purging white males does
6     anything to include white males --
7  Q. Well --
8  A. -- in the process.
9  Q. And the, you know, the decrees will speak for
10    themselves accordingly to their own terms.
11    But it wasn't your understanding -- it isn't
12    your understanding that the decrees were
13    designed to correct a history of
14    under-representation by a particular race and
15    gender; isn't that your understanding?
16 A. My understanding is that that's what they
17    claimed to be doing but as it relates to
18    salary D, there is no evidence to suggest
19    that there ever was any under-representation.
20    All you do is look at the numbers.
21 Q. Well, how do you know there isn't a number of
22    under-representation -- or there wasn't an
23    under-representation of blacks, females and

Page 152

1     black females on the salary D schedule?
2  A. By looking at the percentages reported and
3     comparing that to the percentages provided by
4     US Census Data about educational data.
5  Q. Well, we need to back up and look at that
6     because you're basing your belief that there
7     was not an under-representation of the
8     protected class or class of individuals in
9     Shuford on the salary D schedule?
10 A. That's correct.
11 Q. Well, what data -- you're going to have to
12    point me to the data that you rely upon for
13    the notion that there wasn't an imbalance or
14    under-representation. Because what you're
15    saying is Shuford was totally unnecessary for
16    the salary D schedule; is that your argument?
17 A. That would be one of my arguments, yes.
18 Q. Okay.
19 A. I'm still looking at Defendant's
20    Exhibit #19. I'm at Emanuel 0014 and it
21    starts by saying no evidence was presented to
22    identify or describe these quote historical
23    circumstances or the systematic -- in another

Page 153

1     place they call them systemic which would be
2     more appropriate -- barriers. No statistical
3     evidence such as the proportion of blacks and
4     females in the relevant labor pool of any
5     kind was ever presented or considered in the
6     Shuford-Johnson-Kennedy Consent Decree case.
7  Q. Now, how do you know that?
8  A. Because I read the consent decree and I read
9     the footnotes and the judge said in the
10    footnotes that he never considered or was
11    presented any evidence, statistical evidence,
12    in basing his decision. Renee Culverhouse,
13    the college's top attorney at that time
14    defended the system's hiring records. I'm
15    continuing to read. She questioned whether,
16    in fact -- this was in the record -- whether,
17    in fact, there was any systemic
18    discrimination by the two-year college
19    system. And then also, entered as evidence
20    in the gender portion of the consent decree
21    that in 1995 women comprised 45 percent of
22    all salary D employees throughout the system,
23    statewide system. And it says here, this is

DEPOSITION OF RICHARD EMANUEL

Page 154

1    important because at that time women that --
2    women comprised only 46 percent of those in
3    the relevant labor pool. And I should cite
4    that that comes from US Census Data.
5  Q. What US Census Data?
6  A. US Census Data --
7  Q. What is the relevant labor pool so we'll know
8    what we're talking about.
9  A. Yes, good point. The relevant labor pool is
10    the people in this country who have at least
11    a master's degree or higher. And that is
12    what is unique in my view about salary D
13    employees that is not a requirement of salary
14    A, B, C and if there is an E, these other
15    salary scales. You can be a president of a
16    college and not have a master's degree or
17    higher.
18  Q. Well, but you would agree that the percentage
19    of females with a master's degree or higher
20    is not going to be the same state to state,
21    you would agree with that, wouldn't you?
22  A. I would agree with that.
23  Q. Do you have any evidence or statistics

Page 155

1    showing that the relevant labor pool in this
2    area, in the state of Alabama, for example --
3    what are your -- what are your statistics or
4    data associated with Alabama's labor pool?
5  A. Right. I did look for that and I tried to
6    contact the census bureau to get that
7    information for Alabama specifically and I
8    have not been able to locate it. What I do
9    say in answer to your question is that the
10    searches for salary D employees are not state
11    searches. They are national searches. In
12    fact, I believe ads typically go in the part
13    of higher education which is national
14    publication. They are not state searches and
15    so the relevant labor pool would necessarily
16    then be the national data of those who have
17    obtained a master's degree or higher, which
18    is required for minimum qualification to
19    teach as a faculty member -- as a full-time
20    faculty member at a community college.
21    That's what's different and distinctive about
22    salary D.
23  Q. Is what?

Page 156

1  A. Is the fact that they have to have a master's
2    degree or higher. And so when you look at
3    the proportions of the relevant labor market,
4    those in our country who obtained a master's
5    degree or higher, what you find is that 46 --
6    at that time 46 percent of those in the
7    relevant labor pool were women.
8  Q. Where is that -- where is that data?
9  A. It's US Census Data Educational Attainment.
10    I'm sorry. I don't have the chart number in
11    front of me. But it's US Census Data. You
12    can get it online.
13  Q. Is that where you got it?
14  A. Uh-huh, uscensusdata.gov I think. It's US
15    Census Data Educational Attainment. And so
16    the point I'm making here is that at the time
17    their making this claim, the plaintiffs in
18    the consent decree, women already comprised
19    45 percent of salary D employees throughout
20    the system and women comprised 46 percent of
21    those in the labor pool. So I guess they
22    could have argued the one percentage point
23    and been valid. But other than that, there

Page 157

1    was no gross under-representation or systemic
2    barriers. If they existed it seems like
3    those percentages would be much different
4    than they are.
5  Q. Well, your complaint here then is with the
6    court's determination about whether this
7    consent decree should apply to the salary D
8    schedule?
9        MR. PORTER: Object to the form.
10  A. No.
11  Q. You're complaining -- well, I don't know why
12    you're saying no. You're complaining that
13    the salary D schedule should not be under the
14    consent decree in terms of these goals
15    because the labor pools haven't been proven
16    to be problematic?
17  A. What I'm saying is that there was no
18    evidence, statistical evidence, provided
19    during the Shuford Consent Decree to support
20    a claim of discrimination against salary D
21    employees, in -- among salary D employees.
22  Q. And if the district judge in that case along
23    with the parties applied goals to salary D,

DEPOSITION OF RICHARD EMANUEL

Page 158

1    they got it wrong?
2  A. I think that the -- the -- the percentages
3     of -- of salary D employees throughout the
4     state two-year college system for female --
5     female faculty members was consist with the
6     relevant labor pool at the time.
7  Q. The goals that were applied in the Shuford
8     decree to salary D you think are wrong?
9  A. I think that they certainly are not
10    consistent with the data.
11 Q. You think they're wrong, don't you?
12 A. I think that they're not consistent with the
13    data. If -- if -- if the goal was to correct
14    discrimination or under-representation, there
15    was no evidence provided here that would
16    support that claim. The other thing I would
17    point out is that the claim was that women
18    had been denied powerful positions, policy
19    making positions -- you're read it -- a high
20    level of administrative positions. And
21    faculty members are not these positions.
22    These are not high administrative positions
23    or administrative positions or policy making

Page 159

1     decisions.
2  Q. Well, these determinations were made by
3     somebody other than Wallace, right?
4  A. The consent decree was, yes.
5  Q. Wallace didn't -- Wallace Community College
6     didn't have anything to do with evaluating
7     labor pools, right?
8  A. I presume not.
9  Q. Wallace didn't have anything to do with the
10    setting the goals that were imposed upon the
11    salary D schedule as far as you know?
12 A. As far as I know. I don't know.
13 Q. And you haven't -- you don't any evidence
14    here today that Wallace can do anything about
15    the goals associated with the consent decree,
16    do you?
17 A. I'm sorry. Could you rephrase?
18 Q. You don't have any evidence that Wallace
19    Community College can do anything about the
20    goals that were imposed upon the two-year
21    college system through the consent decree?
22 A. I don't know what Wallace can and cannot do.
23    If I may, back to your original question on

Page 160

1     Emanuel 0028, what it shows here is that the
2     total number of hires during that period 2001
3     to 2005 for salary D was 57. Of those only
4     14 were male, that is --
5  Q. Show me where we are.
6  A. I'm sorry. We're on Defendant's Exhibit #19,
7     0028. We're looking at table number 3 which
8     is the hiring rates at Wallace-Dothan
9     compared to the 80 percent threshold. So
10    what I did is I looked at the total number of
11    hires for the years 2001 through 2005 on
12    salary D only and there were 57.
13 Q. What is the 80 percent threshold mean?
14 A. That -- I don't -- that's an EEOC thing and I
15    believe -- it -- it says that you should have
16    a hiring rate of at least 80 percent of the
17    highest hiring rate, that is in this case for
18    females, that that should be the hiring rate
19    for males. But that's a bench mark and that
20    less than that would reflect or could reflect
21    discrimination. That's my understanding of
22    the 80 percent rule.
23 Q. Do you think that Wallace was wrong in

Page 161

1     following the Shuford Consent Decree and the
2     guidelines that adopted it?
3  A. I think that the pattern of hiring at Wallace
4     discriminated against males and white males
5     in particular.
6  Q. That's totally unresponsive --
7  A. I'm sorry.
8  Q. -- to my question. Do you think that Wallace
9     was wrong in following the Shuford Consent
10    Decree and the uniform guidelines that
11    adopted its terms?
12 A. Do I think it was wrong?
13 Q. For Wallace to follow the decree and the
14    guidelines that adopted it?
15 A. Yes, I do. Inas --
16 Q. Do you contend that by Wallace following the
17    terms of that decree you suffered
18    discrimination?
19 A. I believe that I was discriminated against in
20    this hiring decision, yes.
21 Q. I understand. I understand. I would really
22    like an answer to my question though. My
23    question is, do you believe that Wallace

DEPOSITION OF RICHARD EMANUEL

Page 162

1  following the terms of the Shuford Consent
2  Decree and the guidelines implementing its
3  terms resulted in your discrimination?
4  A. I would say that that's -- that's true.
5  Q. What do you think they should have done? Do
6  you think they shouldn't have followed the
7  guidelines and should have just ignored them?
8  A. I think that they should have -- I think they
9  should have been cognizant of the relevant
10  labor market and I think the decisions ought
11  to be made relevant to that rather than any
12  other method that may have been used.
13  Q. Do you think Wallace should have disregarded
14  the uniform guidelines inasmuch as they have
15  these goals?
16  A. It appears as though they -- I don't know the
17  answer to the question.
18  Q. But you do contend that they -- they've
19  followed these guidelines?
20  A. It appears as though they did and --
21  Q. And that resulted in your discrimination?
22  A. Yes. And in fact, the -- just about every
23  document that I saw related to this hiring

Page 163

1  process says that the two-year college quote
2  doesn't discriminate based on these things.
3  However -- however, it also goes on to say
4  that they are looking to increase -- in the
5  Shuford reports and other places. They're
6  looking to increase the representation of
7  blacks and females and black females in all
8  salary scales and -- and -- how -- how can
9  you do one and the other at the same time?
10  Q. I understand what you're saying. There is a
11  statement in -- in -- there has been
12  statements that you've read from Wallace that
13  they will not discriminate based on race
14  gender --
15  A. But in fact --
16  Q. Right. But there's that statement out there,
17  right? That statement exists?
18  A. That statement exists as well as the other
19  accompanying statement.
20  Q. There's another statement that says we are
21  actively seeking to hire blacks and females
22  and black females?
23  A. Yes.

Page 164

1  Q. And you believe those two statements to be
2  mutually exclusive --
3  A. And at odds with one another and that's what
4  these tables attempt to show.
5  Q. Well, it sounds to me like your main
6  complaint about -- against Wallace is really
7  that Shuford and the guidelines adopting
8  Shuford are defective, not anything Wallace
9  is doing in particular but the fact that
10  they're following the guidelines, that's what
11  you think is the problem, right?
12  A. I -- I'm sorry. I'm getting a little tired.
13  Can you repeat the question?
14  Q. I understand. That's fine. Sure. Sure,
15  I'll. I hear your complaints to be and I'm
16  characterizing them so straighten me out if
17  I'm wrong. I hear your complaints to be not
18  as to any particular employment practice
19  employed by Wallace but the fact that Wallace
20  is implementing terms of the Shuford decree
21  and the uniform guidelines that you believe
22  to be discriminatory and problematic on their
23  face?

Page 165

1  A. I'm not sure what's motivating Wallace-Dothan
2  in their decision. What I do see is that
3  they hired someone who is less qualified than
4  me who is a black female -- happens to be a
5  black female and when I start looking at the
6  data and the numbers of females and black
7  females hired or the lack of males and white
8  males hired, it seems to me clearly that
9  whites and particularly white males are being
10  under-represented at every turn particularly
11  in hiring.
12  Q. So the basis of your discrimination claim
13  with respect to your hiring and this
14  position -- well, I don't want to
15  recharacterize what you said. Do you have
16  any evidence that Dr. Linda Young didn't hire
17  you because you're white and male other than
18  the statistics that you've compiled for us?
19  A. I -- I don't have anything to that effect.
20  If you have a -- what I'm saying is if you
21  have a document or something that might help
22  me refresh my memory about an EEOC file I've
23  claimed or a -- a --

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 166

1  Q. I --
2  A. -- something else like that.
3  Q. No. I don't understand what you're saying.
4  A. Maybe I don't understand your question.
5     Could you repeat the question?
6  Q. Sure, sure. What I'm here to do today is I'm
7     here to find out what evidence you have that
8     you've been discriminated against based upon
9     your gender and your race.
10 A. Yes.
11 Q. I want to know what evidence you have.
12 A. Yes.
13 Q. Because we contend that that's not what
14    happened. So I'm exploring that and we've
15    talked at some length about statistics that
16    you believe reflect a discriminatory
17    pattern. Am I right so far?
18 A. Okay, yes.
19 Q. What I want to know is, is there any other
20    evidence besides this statistical data that
21    you've provided to us associated with
22    composition of search committees and then the
23    overall hiring on the salary D schedule, is

Page 167

1     there any other evidence that you have that
2     Dr. Linda Young didn't hire you because
3     you're white and male?
4  A. Well, the fact that she hired a black female
5     who is lesser qualified would be evidence as
6     well.
7  Q. Anything else?
8  A. There may be but I can't recall right now.
9     I'm sorry. I'm a little tired. I -- I just
10    cannot recall right this minute. There may
11    be something else.
12 Q. Well, I really need -- we can take a break
13    and you can look through the documents. I
14    got one shot at you. Your lawyer is not
15    going to bring you back. Today is the day
16    that I learn what evidence you have that
17    Linda Young discriminated against you.
18 A. If you will permit that break, I'll gladly
19    appreciate it.
20 Q. Let me roll through a few more of these
21    questions and then I'm going to let you take
22    that break and I want to see what your answer
23    to that question is.

Page 168

1     Who do you claim was involved -- who
2     with Wallace do you claim was involved in
3     your discrimination?
4  A. Well, I assume everyone involved in the
5     hiring process.
6  Q. And who do you claim was involved in the
7     hiring process?
8  A. I believe everyone who interviewed me and
9     anyone who checked references or had a hand
10    in my application.
11 Q. And do you understand those individuals to be
12    the people in the -- that interviewed you?
13 A. I'm sorry?
14 Q. Well, I represent to you the people that I
15    know of that were involved in your selection
16    or not are the people involved in these
17    committees and Dr. Young. Do you know of
18    anybody else that was involved or are you
19    going to allege that anyone else was
20    involved?
21 A. No. I don't know of anyone else that was
22    involved. I don't -- I'm -- I'm making an
23    assumption that the people that we've just

Page 169

1     described and discussed are the only ones
2     that had any input in the decision.
3  Q. And I'm just trying to explore with your
4     knowledge about evidence.
5  A. Yeah. I mean if there were others that were
6     involved in the decision I'm unaware of it or
7     influencing the decision, I'm unaware of it.
8  Q. Understood. Have we talked about all of the
9     employment practices that you claim are the
10    subject -- no -- that you claim caused you to
11    be discriminated against because if we
12    haven't I need to cover them.
13    MR. PORTER: Object to the form.
14 A. I really don't understand your question.
15    Have I -- do I object to what?
16 Q. No, no, no. Have we discussed --
17 A. Have we discussed?
18 Q. Have you told me about all of the employment
19    practices that you claim resulted in your
20    discrimination?
21 A. I'm frankly unfamiliar with all of the
22    employment practices. I've only spoken to
23    those I'm familiar with at this point.

DEPOSITION OF RICHARD EMANUEL

| Page 170 | Page 172 |
|---|---|
| 1 Q. Is there anything that we haven't spoken of<br>2 that you're familiar with?<br>3 A. There may be.<br>4 MR. PORTER: Excuse me. When you say<br>5 practice, do you mean decisions or<br>6 things that they did with it?<br>7 MR. CHRISTMAN: I'm talking about<br>8 policies. I'm talking about --<br>9 you know, in some cases there are<br>10 tests administered to people and<br>11 there's allegations that the test<br>12 created discrimination. I mean<br>13 I'm looking for the practice.<br>14 Q. What is the cohesive cogent thing or things<br>15 that resulted in you being discriminated<br>16 against? That's what I'm interested in.<br>17 A. I'm not familiar with all of the policies and<br>18 practices of their hiring process.<br>19 Q. Well, what --<br>20 A. I've only spoken to those that I'm familiar<br>21 with.<br>22 Q. Yes.<br>23 A. Am I missing it? | 1 three applicants and everybody moved on from<br>2 the first search committee -- we'll just talk<br>3 about the committee you believe is the only<br>4 valid one I think that you think is the first<br>5 one, right?<br>6 A. It's the only one Shuford believes is too.<br>7 Q. Is that right?<br>8 A. Yes. As far as calling them a search<br>9 committee, we've been over that.<br>10 Q. Yes, we've been over that. We know for sure<br>11 that the three people that applied and were<br>12 interviewed all went and had another<br>13 interview, right?<br>14 A. That's what you said.<br>15 Q. Do you know that to be true?<br>16 A. You told me that. That's the only way I know<br>17 it to be true.<br>18 Q. Do you have any evidence that it's not true?<br>19 A. No.<br>20 Q. So if everybody that applies and interviews<br>21 goes on to the next level, the subjective<br>22 evaluation part becomes a little irrelevant,<br>23 don't you agree? |

| Page 171 | Page 173 |
|---|---|
| 1 Q. No, no. And I'm just interested to know, is<br>2 there -- have we talked about everything you<br>3 say had a hand in your discrimination?<br>4 A. As far as I know. There may be something<br>5 else that I cannot recall right now.<br>6 Q. We've discussed all the specific procedures<br>7 which are allegedly discriminatory -- that's<br>8 the terminology I was looking for.<br>9 A. And again, I don't know. As far as I know.<br>10 There may be others but I just can't recall<br>11 right now.<br>12 Q. You would agree with me that the evaluation<br>13 process can be subjective in terms of -- let<br>14 me start over. You agree with me that the<br>15 interview process involves subjective<br>16 evaluations of the candidates performance?<br>17 A. Well, I would agree that there are certain<br>18 criteria that selection committee members<br>19 look at and rate on a scale of say one to<br>20 five and inasmuch as circling a two instead<br>21 of a three is subjective, I would agree with<br>22 that.<br>23 Q. In this particular case since there were | 1 A. I don't know. I guess. I don't know.<br>2 Q. Have we discussed everything about the<br>3 affirmative action plan in place that you<br>4 believe to be discriminatory?<br>5 A. I don't understand. What affirmative action<br>6 plan are you referring to?<br>7 Q. Shuford. I'm sorry. I'm referring to the<br>8 decrees. I'm going to refer -- do you<br>9 understand the decrees to be an affirmative<br>10 action plan? Do you know what that word<br>11 means? I won't use it if you --<br>12 A. I honestly don't know what it means. I mean<br>13 I understand the words affirmative action but<br>14 I truly do not understand what it means.<br>15 Q. Forget it. Have we discussed everything<br>16 about the decrees that you believe to be<br>17 discriminatory?<br>18 A. As far as I know we have.<br>19 Q. You didn't take some kind of test or anything<br>20 like that as part of the weed out process,<br>21 did you?<br>22 A. Are you asking about the interview process?<br>23 Q. No, I'm talking about a test. You never took |

44 (Pages 170 to 173)

DEPOSITION OF RICHARD EMANUEL

Page 174

1      a test --
2   A. I'm saying, you're asking about taking a test
3      during the interview process?
4   Q. Well, before it or after it.
5   A. I don't remember any test. We had a teaching
6      demonstration.
7   Q. During the interview?
8   A. Yes.
9   Q. Five minutes?
10  A. I think that's what it was.
11  Q. How did you feel like you did on that?
12  A. Fine.
13  Q. Do you deny doing all that stuff that was
14     alleged against you at Enterprise?
15  A. Yes, sir.
16  Q. Any of it you admit to?
17  A. No, sir.
18  Q. You deny having intercourse with a student on
19     campus?
20  A. Yes, sir.
21  Q. We covered earlier that you had filed an EEOC
22     charge against Enterprise around -- actually
23     following the termination exchange --

Page 175

1      MR. PORTER: Object to the form.
2      MR. CHRISTMAN: The termination
3      procedure?
4      MR. PORTER: I don't think it was
5      following, was it?
6      THE WITNESS: I don't know what the
7      question is.
8   Q. That letter that you got from -- or that
9      Stafford Thompson got that we covered from
10     the EEOC?
11  A. Are you referring to the one where I filed an
12     EEOC complaint against Enterprise State?
13  Q. You're right. That's what I'm talking
14     about.
15  A. I believe that that was in the summer or even
16     perhaps fall when I was already employed at
17     the University of Montevallo.
18  Q. Oh, okay. So you had already left the
19     college?
20  A. Uh-huh.
21  Q. And we don't remember any of the specifics
22     associated with that charge?
23  A. Unh-unh.

Page 176

1   Q. Have you filed a charge against anybody else?
2   A. I don't believe so.
3   Q. Well, you would remember, wouldn't you?
4   A. I would. It seems like I handle a
5      lot of papers but I don't remember a charge
6      against anyone else.
7      MR. PORTER: You're talking about an
8      EEOC charge, right?
9   A. EEOC charge.
10  Q. A complaint of discrimination, how about
11     that?
12  A. Other than the one that we're referring to,
13     the EEOC complaint against Enterprise, I
14     don't recall.
15  Q. Let me make it more plain. That's a bad
16     question. I want to know about formal EEOC
17     charges. I want to know about lawsuits and I
18     want to know about regular 'ole I went to my
19     supervisor and said this stinks, okay? Let's
20     talk about lawsuits. Have you ever filed
21     another lawsuit?
22  A. No, I have not.
23  Q. Have you ever filed any other EEOC charges

Page 177

1      other than the ones we've talked about?
2   A. No.
3   Q. And you would remember now if you had?
4   A. Well, I know as strange as it may seem, you
5      would think I would remember. I do not
6      recall filing any other EEOC complaints.
7   Q. How about an informal complaint to your
8      supervisor?
9   A. Yes.
10  Q. Tell me about that.
11  A. Well --
12  Q. And I'm going to start with the earliest one
13     and we're going to work our way through
14     time. When was the first time you ever did
15     it?
16  A. Oh, my goodness.
17  Q. Was there a whole bunch of them?
18  A. No. I'm just trying to -- I only -- one
19     comes to mind and its been 22 years of
20     teaching.
21  Q. Well, now you would agree with me that's it's
22     not an everyday occurrence that you go to
23     your supervisor and say I'm the object and

DEPOSITION OF RICHARD EMANUEL

Page 178

1    target of discrimination, is it?
2    A. It is not. It is not.
3    Q. And that's usually a memorable event in the
4       life of an employee, isn't it?
5    A. Yes, I would think it would be.
6    Q. So how many times have you done that,
7       complained to your supervisor or someone at
8       your work, I'm a target of discrimination.
9    A. Oh, I misunderstood your earlier question.
10   Q. I'm sorry. It's probably my fault.
11   A. No. I thought you were asking did I ever go
12      to my supervisor about a complaint.
13   Q. No, no. I'm talking about a discrimination.
14   A. No, no. I've never done that that I recall,
15      never.
16   Q. Never?
17   A. I don't recall ever having done so.
18   Q. Have you been arrested?
19   A. No, I have not.
20   Q. Well, if you've never been arrested you've
21      never been convicted?
22   A. That's right. Now, there was the water
23      balloon incident one time when I was a

Page 179

1    teenager but I was never arrested.
2    Q. We'll let that go.
3    A. Thank you. We -- yeah. No, I never have.
4    Q. We've talked about any prior discrimination
5       claims filed with a government agency of any
6       kind, have we not?
7    A. I think we've discussed that.
8    Q. All right. What witnesses if any do you
9       think would support you in your claim of
10      discrimination? And I mean support in the
11      most laymen's generalized version of that
12      word as you can think.
13   A. What witnesses would support --
14   Q. You.
15   A. Me.
16   Q. Let me break it down for you, maybe it will
17      help.
18   A. Okay.
19   Q. Do you need me to break it down or --
20   A. Please, if you would.
21   Q. If you were going to -- if we were going to
22      go try this case and you needed to tell your
23      lawyer, here's who you need to put on the

Page 180

1    stand for me, who would that be?
2    A. Well, I'm sure I won't come up with a
3       comprehensive list, but included in that list
4       might be members of the State Board of
5       Education.
6    Q. Who?
7    A. The members of the State Board of Education
8       that approved the uniform guidelines.
9    Q. They would testify for you? On your behalf?
10   A. I thought you said just witnesses.
11   Q. Support you.
12   A. Oh, that would support me? Well, I think
13      they would support me if I asked them
14      questions about why they approved the uniform
15      guideline hiring percentage policy.
16   Q. Who else?
17   A. Perhaps even some of the plaintiffs in the
18      Shuford-Johnson-Kennedy Consent Decree and
19      maybe even the judge about what evidence did
20      you consider.
21   Q. You think Judge Thompson will support you?
22   A. I -- I think if I ask the right question,
23      that the answer might, yes.

Page 181

1    Q. Hopefully, he would if your lawyer asked the
2       right questions.
3    A. Yeah, that's true. That's what I meant,
4       through the attorney.
5    Q. Anybody else that you --
6    A. Probably a number of unnamed white males who
7       have been passed over or not hired, but I
8       couldn't name them.
9    Q. Well, I need to know names. If you're going
10      to call them as witnesses, I'd like to know
11      who they are. I know your lawyer is going to
12      present me with a list of witnesses; but if
13      you have any in mind right now, I'm entitled
14      to ask you about them. None right now?
15   A. I can't recall right -- I mean I don't know
16      right now. I --
17   Q. Anybody else?
18   A. -- perhaps could have prepared a list, but I
19      don't -- no one else comes to mind right this
20      minute. Perhaps Renee Culverhouse, you know,
21      since she was the one that was making the
22      statements that defend my position that there
23      really was no systemic representation for

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 182

1    discrimination in hiring. I mean, as I think
2    about it, people like that may come to mind.
3    Q. Well, just keep blurting them out as they
4    come to mind, I'll write them down.
5    A. Okay.
6    Q. Have you met with or consulted with any
7    statistics experts?
8    A. No statistic experts, no. I did hand some
9    data to a statistics teacher at Alabama
10   State, and it was couched in red players and
11   blue players.
12   Q. Who was the person you handed it to?
13   A. She has a very unique name.
14   Q. Well, what is it?
15   A. It's -- well, I couldn't even pronounce it,
16   was the thing.
17   Q. Oh, really?
18   A. Yeah. Her -- her area is in educational
19   statistics, I believe, or maybe just straight
20   statistics.
21   Q. She works at --
22   A. At Alabama State.
23   Q. -- Alabama State?

Page 183

1    A. Yeah. And basically, my question to her was
2    what statistical test -- I thought I already
3    knew the answer, but I just wanted someone
4    else to -- I said, What statistical test
5    would determine statistical significance for
6    these differences, for the under-
7    representation? You know, the 80 percent is
8    a threshold. But I -- I thought I already
9    knew it was the number of standard
10   deviations, and that's basically what she
11   said.
12   Q. Did she work any numbers for you?
13   A. She did not.
14   Q. Did she give you anything?
15   A. She did not.
16   Q. She didn't write you an email?
17   A. She did not.
18   Q. She didn't write anything?
19   A. Unh-unh. She handed it back to me. In fact,
20   it was hard to catch up with her because I
21   just saw her between class on occasion.
22   Q. And you only talked to her?
23   A. Uh-huh. I handed her -- yes. I handed her

Page 184

1    the red players and blue players, and I said
2    what would be the way that you would do
3    this? That was my question. And she said,
4    I'll take it and look at it. She was on the
5    run. And so I saw her several weeks later
6    and I finally said, oh, it's good -- because
7    I didn't know -- she was a new faculty
8    member, I think, new at our institution. And
9    I said, Have you had the chance to go over
10   that, and she said, No, not really. And
11   basically, she said you would just use, you
12   know, standard deviations. And I said, Well,
13   that's what I thought. I just wanted
14   somebody else removed from -- and again, I
15   used hypothetical kinds of red players and
16   blue players to describe the data.
17   Q. You got her name yet?
18   A. No.
19   Q. Not coming?
20   A. Oh, I doubt that it will, but it's -- it's --
21   it's Esinch (phonetic), I think is her first
22   name.
23   Q. Esinch?

Page 185

1    A. Esinch. And I can't recall the last name.
2    Q. Well, we can narrow her down if that's her
3    first name.
4    A. Like I said, it's a very unique name.
5    MR. PORTER: Can you spell that?
6    THE WITNESS: Oh, I couldn't pretend to
7    spell it. I have no idea.
8    Esinch. (phonetic)
9    Q. Anybody else that you've consulted with or
10   discussed statistics with?
11   A. No.
12   Q. Anybody else that you've discussed this case
13   with? And I don't know want to know about
14   conversations with your lawyer.
15   A. No.
16   Q. Anybody else that you've discussed the data
17   involved in this case, even if you talked
18   about red and blue and not the case?
19   A. Uh-huh, uh-huh.
20   Q. Anybody else you've talked to?
21   A. Well, at a more general level, I spoke
22   with -- and I believe it was Vicky Strength
23   who works at Alabama -- the Department of

DEPOSITION OF RICHARD EMANUEL

Page 186

1  Postsecondary Ed. And I may have the wrong
2  person, but if she is the current monitor,
3  what they call the monitor for this, then I
4  have the right person. But it's the person
5  who was hired as the monitor for the Shuford
6  Consent Decree. And I asked her -- this has
7  been a couple of years ago, at least, before
8  all of this started up. I asked her the
9  question, you know, why is it that the
10  percentages are clearly discriminating
11  against males and white males in terms of
12  under-representation in the faculty.
13  Q. I want to know more about this. Was it on
14     the phone?
15  A. It was on the phone, yes.
16  Q. How many conversations?
17  A. One.
18  Q. And your specific inquiry was why is --
19  A. Yeah, I was basically, I think, venting to
20     some extent. You know, here she's the
21     monitor for this. And I said -- I think I
22     was asking sort of leading questions, like
23     Vicky -- or Ms. Strength, don't you think

Page 187

1     it's, you know, odd that --
2  Q. And what did she say?
3  A. I -- I don't recall that she had anything to
4     say. I think she was probably well-trained
5     and was just listening to me vent and didn't
6     really comment.
7  Q. She did not comment?
8  A. I don't remember any comment from her at all.
9  Q. That's the kind of stuff I'm interested in,
10     those types of conversations. Any other
11     conversations with the Department of
12     Postsecondary Education about this general
13     subject matter?
14  A. Unh-unh. Other than when I requested the
15     copy of the uniform guidelines, and I went
16     and picked that up in person. And I believe
17     it was Vicky Strength that handed it to me.
18     I don't know.
19  Q. Well, you just asked for the guidelines,
20     right?
21  A. That's all I did.
22  Q. You didn't have a discussion about the
23     strengths or weaknesses of your case?

Page 188

1  A. No.
2  Q. Any other conversations with the Department
3     of Postsecondary Education?
4  A. No.
5  Q. Any conversations with anybody at Wallace?
6  A. No. I mean, other than the phone
7     conversation I had with Ms. Wear that -- that
8     we've already discussed but not about the
9     case.
10  Q. And you don't remember a conversation with
11     anybody else updating your data base at
12     Wallace?
13  A. I beg your pardon? I didn't understand the
14     question.
15  Q. You don't remember any other conversations
16     where you told the person on the other end
17     I'm updating my data base; who got this job?
18  A. Oh, no, no. I may have asked Terry Schembera
19     a question about the data base about his
20     information but not about the case or about
21     the new hire.
22  Q. Not Terry. You don't remember anybody else?
23  A. Unh-unh.

Page 189

1  Q. All right. Have we talked about all the
2     statistical comparisons that you intend to
3     make in this case? I need to make sure we've
4     discussed it.
5  A. Well, I -- I don't know how to answer that.
6     And what I -- the reason I don't is -- I
7     mean, if my attorney chooses to get some whiz
8     bank statistical person that corroborates
9     even further what I've -- I -- I don't know
10     how to answer that.
11  Q. Well, I'm just wondering if we -- if you and
12     I have discussed the statistical comparisons
13     that you have gone through and developed.
14  A. These are the only ones that I have
15     developed.
16  Q. And we've discussed them, right?
17  A. Well, we have not discussed that Exhibit #19,
18     the last few tables or the last few pages of
19     that document.
20  Q. Let's talk about it.
21  A. I'm looking at Emanuel 0029. And what this
22     table 5 shows is based on as of September
23     2005 the number in percent of male and female

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 190

1  faculty members at Wallace-Dothan compared to
2  the proportions in the relevant labor market
3  as I've already described the relevant labor
4  market. And what it basically shows is that
5  in order to make the adjustments so that
6  there is -- I think the word is parity so
7  that there is proportionate representation
8  among the faculty -- I'm only talking salary
9  D -- that there would need to be an increase
10 of 14 white males among the faculty in order
11 to make their faculty proportionate so that
12 no one group would be under-represented.
13 Q. Proportionate to what you claim is the
14 relevant labor market being the national
15 labor market of a particular educational
16 attainment?
17 A. Correct. Correct. Master's degree or higher
18 is what SACS and others require.
19 Q. Understood.
20 A. The next table -- incidentally, I'll just
21 point out on that same table 5 that the
22 proportions of males and females in the labor
23 market as compared to the composition of

Page 191

1  males and females in the faculty at
2  Wallace-Dothan as of September 2005 were --
3  were almost exactly identically flip
4  flopped. In other words, 56 percent were
5  females, 44 percent males; whereas, in the
6  labor market it was 54 males, 46 females. It
7  was almost reversed.
8  Q. How do you know what's in the labor market?
9  A. Because I look at US Census Bureau Data of
10 Educational Attainment in the United States.
11 Q. And it describes how many of those people are
12 in the labor market?
13 A. It describes how many of those have earned a
14 master's degree or higher.
15 Q. Well, how do you know when they're -- even if
16 they've obtained a degree that they're in the
17 labor market and they're not staying at home
18 with their kids?
19 A. Well, all I'm doing is looking at the number
20 of people who are potential hires or the
21 proportions, rather, that are potential
22 hires. By the way, you mentioned earlier
23 about state versus national. If this were a

Page 192

1  state search, I think the statistics would be
2  even more damaging to your client's position.
3  Q. Based upon what?
4  A. Well, I think if you look at educational
5  attainment in the state of Alabama, what
6  you'll find is even greater disparity in
7  attainment based on race and gender that
8  would support a position that I'm taking
9  here.
10 Q. And why do you think that?
11 A. Well, because I think you will find a smaller
12 percentage of females and minorities
13 completing master's degree or higher in the
14 state of Alabama based on educational
15 completion rates, period, of those
16 demographics.
17 Q. I'm asking how do you know any of that other
18 than just your speculation?
19 A. No, I have been able to locate what is the
20 overall educational attainment -- what is the
21 high school graduation rate of males,
22 females, blacks, whites in the state of
23 Alabama. And if you just look at just that

Page 193

1  data you can find it on the state website, I
2  believe, then there's no way that you could
3  have any larger proportion of graduates if
4  that proportion never graduated high school.
5  Q. Well, you know that's not true, right?
6  A. Well, what I'm saying is that if --
7  Q. Well, you know it's true that -- I mean, in
8  terms of your last statement that there's no
9  way you can have more graduating from college
10 if they didn't graduate from high school --
11 A. You can --
12 Q. You understand --
13 A. -- have a larger proportion.
14 Q. Well, you understand that you could have --
15 you could have people that didn't graduate
16 from high school getting a GED and doing
17 something better than not graduating from
18 high school?
19 A. Yes, you could, certainly could.
20 Q. And you've not actually run those numbers?
21 A. I have not run state numbers, that's
22 correct. So my point was the disparity, the
23 flip flop there.

DEPOSITION OF RICHARD EMANUEL

Page 194

1    The next table 6 is systemwide, not just
2    Wallace-Dothan. And what it shows is that
3    white males, in order to be proportionately
4    represented among faculty, there would need
5    to be an additional 293 white males. And I
6    say additionally -- it really wouldn't be
7    additionally. It would be 293 white males
8    that would replace these other --
9  Q. You would have to go fire --
10 A. Or wait until they retire or whatever. But
11    my point is, you know, you have a -- what
12    this data reflects is a clear, I think,
13    under-representation of males and white
14    males --
15 Q. Table --
16 A. -- systemwide.
17 Q. Excuse me. I didn't mean to interrupt.
18 A. That's all right.
19 Q. Table 6, clearly to the extent that you rely
20    on it, no question about table 6; this is not
21    a Wallace-specific problem that you're trying
22    to point out here. This is an
23    institution-wide problem, right?

Page 195

1  A. That's what table 6 does, yes.
2  Q. And you attribute this, what you believe to
3    be a problem, to the system adopting the
4    consent decree goals? Is that what you're
5    saying?
6  A. I'm saying that -- that -- that for there to
7    be proportionate representation, there would
8    need to be a dramatic change in the number of
9    males.
10 Q. Well, I know you're saying that. My question
11    is not what has to change. My question is
12    what do you attribute the problem to. That's
13    my question.
14 A. I attribute the problem to hiring a
15    disproportionate number of females and blacks
16    and black females.
17 Q. All right. Well, what do you attribute that
18    hiring practice to? Do you attribute it to
19    the implementation of Shuford in the uniform
20    guidelines?
21 A. I think that that certainly would play a
22    role, yes, I think it would play a role.
23 Q. Well, do you have any other things that would

Page 196

1    play a role?
2  A. Well, I can't pretend to understand what goes
3    on behind the doors of those who make the
4    decisions in community colleges. I don't
5    know.
6  Q. Fair enough. I don't either. But I'm
7    looking for an answer.
8  A. But I certainly would think that knowing that
9    they're held to a goal and so forth, the fact
10    that they claim that they are looking to hire
11    blacks and females and black females seems to
12    me that they're pretty clearly advertising,
13    you know what -- and the fact that they're
14    purging white males from the applicant pool
15    seems to clearly indicate that, you know,
16    they're not too interested in hiring males
17    and white males in particular.
18    Table 7 simply shows systemwide the
19    proportion of female faculty members, and you
20    can see that they're, as of the end of this
21    04-05 Shuford report as of September 2005,
22    there were only two community colleges who
23    had the proportion of female faculty members

Page 197

1    that were -- was in line with or even
2    slightly below the relevant labor pool of --
3    of female faculty members. I mean, you know,
4    when you have upper 60 percent of -- of their
5    faculty female, it suggests to me a clear
6    under-representation of males.
7  Q. You recognize in Defendant's #19 this
8    argument in one section, and it bears out in
9    the Shuford report as well, that Wallace has
10    never met its goal in hiring black females on
11    the salary D schedule, have they?
12 A. Right.
13 Q. In fact, you claim the relevant labor pool
14    for black females from a salary D schedule is
15    about in the 4 percent range. That's what
16    you claim, right?
17 A. That's based on the -- the educational
18    attainment, yes.
19 Q. National census data?
20 A. Yes.
21 Q. And you recognized in your argument and is
22    reflected in the Shuford report that the
23    percentage of black females hired and

50 (Pages 194 to 197)

DEPOSITION OF RICHARD EMANUEL

| | Page 198 |
|---|---|
| 1 | reported to Shuford by Wallace has been 4 |
| 2 | percent and has never reached higher than 4 |
| 3 | percent; isn't that right? |
| 4 | A. That may be correct. That based on the data |
| 5 | that I had as of September 15th, 2005, that's |
| 6 | where their proportion of black women was was |
| 7 | at 4 percent. |
| 8 | Q. And the goal of Shuford is far higher than 4 |
| 9 | percent; isn't it? |
| 10 | A. Exactly. It's 10.5 percent and specifically |
| 11 | for Wallace-Dothan. |
| 12 | Q. And as to the Shuford reports you've seen, |
| 13 | Wallace has never attained that goal? |
| 14 | A. Yes. And I think that that is -- in fact, |
| 15 | the last document of Emanuel 0032, it's table |
| 16 | 9 here. I think that points out exactly what |
| 17 | you're saying. And if you look at that, it |
| 18 | looks as though only Southern Union and Jeff |
| 19 | Davis are the only two colleges that are |
| 20 | lagging at or behind Wallace-Dothan in |
| 21 | attaining that goal, which I would argue puts |
| 22 | even more pressure on Wallace-Dothan and |
| 23 | makes them look bad in not meeting the goals; |

| | Page 199 |
|---|---|
| 1 | and therefore, they must hire more black |
| 2 | females in order to meet the goal |
| 3 | Q. Well -- |
| 4 | A. Which I would claim is discrimination based |
| 5 | on race and gender. |
| 6 | Q. Well, let's just -- if you just look at the |
| 7 | reports, how many report years are you |
| 8 | working with there? |
| 9 | A. This particular one is as of September 15th, |
| 10 | 2005. And as you claim, they've never been |
| 11 | above 4 percent, as you just said. And |
| 12 | again, if their goal is 10.5, which didn't |
| 13 | change, by the way, then it seems to me that |
| 14 | they again -- it looks bad for Wallace-Dothan |
| 15 | if they're trying to meet the goals, and so |
| 16 | they better hurry up and get with it. |
| 17 | Q. Well, they never have hurried up and got with |
| 18 | it, though, have they? |
| 19 | A. Well, it looks like they did in my case. |
| 20 | Q. Well, did they? Tell me the statistics. |
| 21 | Have they met their goal? |
| 22 | A. I don't know. But I do know that they hired |
| 23 | a lesser qualified black female when I |

| | Page 200 |
|---|---|
| 1 | interviewed for the position. |
| 2 | Q. You don't claim that Shatangi Wear did not |
| 3 | meet the minimum qualifications for the |
| 4 | position, do you? |
| 5 | A. I -- I don't know what she met. I haven't |
| 6 | really studied her application. |
| 7 | Q. Well, then, you don't claim -- okay. Fair |
| 8 | enough. You claim that you're more qualified |
| 9 | than she is? |
| 10 | A. Yes. In fact, the Southern Association of |
| 11 | Colleges and Schools which accredits this |
| 12 | institution and all of the others that are |
| 13 | accredited in the state, state schools, |
| 14 | clearly indicates in their document that |
| 15 | when it comes to hiring decisions, the |
| 16 | person with the highest degree should be |
| 17 | preferred. No -- that's their language. |
| 18 | So it seems to me that by making this |
| 19 | decision in this particular case, Wallace- |
| 20 | Dothan could potentially jeopardize their |
| 21 | re-accreditation. |
| 22 | Q. What evidence do you have that Wallace or |
| 23 | Dr. Young prefers only the candidates with |

| | Page 201 |
|---|---|
| 1 | the highest level of qualification? |
| 2 | A. All I know is in this particular case, she |
| 3 | hired someone with a master's degree over |
| 4 | someone with a doctoral degree. |
| 5 | Q. Is that all you got? Is that it? |
| 6 | A. Well, all I'm speaking to -- |
| 7 | MR. PORTER: Is that it for what? |
| 8 | Q. Is that the only evidence you have that |
| 9 | Dr. Young prefers or has a practice of not |
| 10 | preferring people with the highest degree of |
| 11 | qualifications? |
| 12 | A. No. What I said was that the SACS -- the |
| 13 | SACS statement says that when it comes to |
| 14 | faculty hiring, that the one with the highest |
| 15 | degree should be preferred. And I'm simply |
| 16 | pointing out that in this case, Wallace- |
| 17 | Dothan did not follow what SACS clearly says |
| 18 | should be the procedure. And that is that |
| 19 | the person with the highest degree should be |
| 20 | preferred over the one with the lesser |
| 21 | degree. |
| 22 | Q. Well, let's say, for example -- and this is |
| 23 | just an example. Let's say you're hiring a |

DEPOSITION OF RICHARD EMANUEL

Page 202

1  janitor and you have an applicant who's
2  minimally qualified for that job but doesn't
3  have but a high school diploma and will cost
4  $20,000 a year to hire them. And then you've
5  got somebody with two master's degrees and 15
6  years' experience. Is there any reason that
7  the college could not select the person who's
8  minimally qualified over the person who is
9  more qualified in terms of experience and
10  education?
11       MR. PORTER: Object to the form.
12       MR. CHRISTMAN: I'm not finished with
13            the question. It's a super
14            compound question.
15  Q. In an effort to save some money; is that a
16  problem?
17       MR. PORTER: Object to the form.
18  A. Well, I don't know. That was a rather long
19  question. I'm not sure I understand the
20  question. But I would say this, that that's
21  the same mistake the judge made, because what
22  I was simply describing was faculty, not
23  janitor, faculty. And SACS speaks

Page 203

1  specifically to faculty hires.
2  Q. The judge made a mistake, did he?
3  A. Well, maybe I misspoke about that. I'm just
4  saying that --
5  Q. Well, maybe he did, maybe he didn't.
6  A. I'm just saying that my statement had to do
7  with the SACS statement concerning faculty
8  hires. Your hypothetical was with a janitor.
9  Q. Let's wrap up. Any other statistical
10  analysis that you think is important to
11  support your claim of discrimination that we
12  haven't discussed? I don't want to discuss
13  the stuff we already covered.
14  A. I think we've discussed all of the tables
15  that I included in this Defendant's
16  Exhibit #19.
17  Q. Is that all -- the tables contain all of the
18  statistical analysis that you have generated?
19  A. That's correct. The only additional
20  statistical information would be included in
21  Defendant's Exhibit #19. That may or may not
22  be represented in the tables. For example,
23  we discussed the composition of the search

Page 204

1  committee at Wallace-Dothan and that
2  information is in here but may or may not
3  appear.
4  Q. Well, I hope we've beat that --
5  A. We have covered that already.
6  Q. You were issued a right to sue letter by the
7  EEOC, were you not?
8  A. I believe that I was.
9  Q. Did I attach that? We need to cover a couple
10  of things very quickly. You claim that
11  you've lost wages as a result of not getting
12  this job, right?
13  A. Yes.
14  Q. The basis for your claim of lost wages, as I
15  understand it, is essentially that you have
16  more experience in the two-year college
17  system than you do in the four-year college
18  system?
19  A. I do not understand that question.
20  Q. The basis for your lost wages -- you've got a
21  job right now? You're gainfully employed?
22  A. Yes.
23  Q. Full time?

Page 205

1  A. Yes.
2  Q. So the reason you say you've lost wages by
3  not being hired to this job as opposed to the
4  one you already have is because you had more
5  experience in the two-year system than in the
6  four-year system and you were going to get
7  paid higher if you went to the two-year
8  system; is that right?
9  A. Well, no.
10  Q. Well, help me.
11  A. The -- the -- the claim for lost wages is the
12  difference between what I currently earn and
13  what I would have earned had I been placed on
14  salary D in the absence of discrimination.
15  Q. Well, I thought that's what I said.
16  A. Well, you said something about experience in
17  two-year and four-year, and I wasn't quite
18  sure what you meant by that.
19  Q. Well, the reason you would make more at the
20  two-year system than the four-year system is
21  because you have more experience in the
22  two-year system and be higher on the salary
23  scale; isn't that the way it works?

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 206

1  A. Well, my experience is my experience. At the
2     four-year institution where I'm currently
3     employed, the number of years of experience
4     on my contract covers all of my teaching
5     experience. It makes no distinction between
6     whether it was two-year experience or four-
7     year experience.
8  Q. Then why would you make more at the two-year
9     college than at your four-year college that
10    you currently work at?
11 A. Because the salary D schedule salaries are
12    higher than what I currently earn.
13 Q. In the two-year system?
14 A. Yes.
15 Q. Can you explain why the two-year college
16    system pays higher than the four-year college
17    system?
18 A. If I could do that, I could probably sell a
19    number of books. I do not have an answer for
20    that.
21 Q. It has nothing to do with your experience?
22 A. The salary D scale is based on your rank and
23    years of teaching experience and --

Page 207

1  Q. You're not getting discounted in terms of
2     your pay at the four-year level because they
3     haven't taken certain years of experience --
4     they failed to take certain years of
5     experience into account?
6  A. That's correct. They -- they've counted all
7     of my teaching experience as teaching
8     experience.
9  Q. Two-year system is just a higher pay bracket,
10    bottom line?
11 A. Well, I thought your question had to do with
12    my claim for loss, and the answer is yes,
13    they pay more at my level rank and years
14    teaching experience, that salary is higher in
15    salary D than what I currently earn.
16 Q. All right. And all of the calculations that
17    you've made, you've made them all the way
18    through retirement, right?
19 A. Yes. I made them in the absence of
20    discrimination what would it look like.
21 Q. Assuming you didn't die or quit before --
22 A. Yes.
23 Q. -- whatever you --

Page 208

1  A. And if I die, none of this matters in so many
2     ways.
3        MR. PORTER: Wait, wait. Hold on, now.
4  A. Yeah, I hear you. But to answer your
5     question, yes, all the way through
6     retirement.
7  Q. You expect the college to pay you the
8     difference in your salary from now until the
9     time you retire plus a drop plan plus your
10    kid's waiver benefits?
11 A. You know, the total amount I really haven't
12    determined yet.
13 Q. What have you determined other than --
14 A. I have determined that there is -- are you
15    talking about in terms of --
16 Q. Damages.
17 A. -- damages? Uh-huh. Basically I've computed
18    difference in salary so far -- well, it's all
19    here, health and dental insurance
20    differences, these other damages that are
21    listed here and personal leave times and so
22    forth and so on.
23 Q. You've asked for back pay? Yes?

Page 209

1  A. Yes, I'm sorry. Yes.
2  Q. Front pay?
3  A. Yes.
4  Q. Retirement benefits?
5  A. Yes.
6  Q. Drop plan benefits?
7  A. Yes.
8  Q. What does all of this add up to?
9  A. What I would have been entitled to in the
10    absence of discrimination.
11 Q. I'm asking for a number.
12 A. I don't know the number.
13 Q. Could you add up -- would we add up 489,000
14    and 833,000? I'm sorry. $489,833 to $54,038
15    to $120,349. If we added those up, would
16    that be your number?
17 A. I don't know. I honestly don't know. I
18    don't know.
19 Q. The numbers I'm referring to are on page --
20    Defendant's Exhibit #19, Emanuel 0026, page
21    16.
22 A. The reason I don't know is, for example, that
23    0026, the page that you just referred to,

DEPOSITION OF RICHARD EMANUEL

Page 210

1    about 10 lines from the bottom or so, it says
2    future lost retirement income is estimated to
3    be at least 1688 per month every month
4    Emanuel is retired.  And I don't know how
5    many months that will be.  That's one
6    instance where I can't really give you a
7    definitive number.  I don't know and that's
8    the reason I don't know, that's one of the
9    reasons.
10   Q.  At a minimum, if we just add those three
11       numbers together, we're in the $600,000 mark,
12       aren't we?
13   A.  I don't know.
14   Q.  Well, we can add the numbers together and
15       we'll know, right?
16   A.  Yes, sir.  Yes, sir.
17   Q.  It's at least that?  Is that your allegation,
18       maybe more?
19   A.  I would think so.
20   Q.  Yeah.
21   A.  It's whatever I would have gotten had I not
22       been discriminated against.
23   Q.  You are gainfully employed now though, right?

Page 211

1    A.  I am.
2    Q.  And are these numbers reflective of the
3        difference or are they --
4    A.  Yes.
5    Q.  They're the difference?
6    A.  Yes, sir.
7    Q.  Is there any other information about -- I'm
8        trying to save us a little time.  Is there
9        any information about your lost wages that
10       you haven't included in pages 24, 25 and 26
11       of Defendant's Exhibit #19?
12   A.  What were those pages again?  I'm sorry.  24,
13       25, 26?
14   Q.  Right.  That's what I saw to be your damage
15       figures.  I just want to make sure.  If there
16       is anything else, we need to kind of get to
17       it.
18   A.  It would also include 27.  You may have said
19       that.
20   Q.  I didn't.  What's on 27?  Here we go.  I
21       see.  Tenure, seniority, dependent benefits.
22       This is for your kids, the $9,900 dependent
23       benefits?

Page 212

1    A.  Uh-huh.
2    Q.  Are you married?
3    A.  Yes.
4    Q.  You're currently married?
5    A.  Yes.
6    Q.  Have you ever been divorced?
7    A.  No.
8    Q.  And you have two children?
9    A.  Yes.
10   Q.  And then, of course, you want some attorney
11       fees and expenses?
12   A.  Yes.  And the last two items as well.
13   Q.  Those are injunctive in nature and not damage
14       related; is that right?
15   A.  I don't --
16   Q.  You don't know what that word means?
17   A.  Injunctive in nature?  I don't know that
18       phrase.
19   Q.  I understand.  That's okay.  Your lawyer can
20       tell you what it means.  They're not -- it's
21       not money.
22   A.  That's right.
23   Q.  And your recitation here in your argument

Page 213

1    includes all of the job benefit that you
2    claim you've been denied, right?
3    A.  I think it does not include minor things,
4       which is sick leave during summer terms,
5       which I wasn't aware that they did.  But
6       yeah, it doesn't include that.  It's the only
7       thing that I know of at this time.
8    Q.  Do you claim any physical injury as a result
9        of this discrimination?
10   A.  No physical.
11   Q.  Well, any other injury?  I don't want to
12       characterize my question so narrowly that
13       you're not going to tell me about all your
14       damages.  I want to know about them all.
15   A.  Well, on Emanuel 0025, we've already covered
16       the -- what would be the third paragraph on
17       the page.  You already said that was
18       included.
19   Q.  Right.
20   A.  Yeah, that's it.
21       MR. PORTER:  What was that?
22       MR. CHRISTMAN:  Sick leave benefit.
23   Q.  You've not received any medical treatment or

DEPOSITION OF RICHARD EMANUEL

Page 214

1    anything that you're claiming as part of this
2    case, right?
3    A. No. Not -- no.
4    Q. The injunctive relief or the relief that you
5    asked for in paragraph 8 and 9?
6    A. Yes.
7    Q. That's what you want to happen that you want
8    the judge to order --
9    A. Yes.
10   Q. -- with respect to the two-year college
11   system, right?
12   A. Yes.
13   Q. And those two items are specifically directed
14   to Alabama's two-year college system, aren't
15   they?
16   A. Yes, yes.
17   Q. They're not really Wallace-Dothan specific?
18   A. Of which Wallace is a member, yes.
19   Q. But they're not Wallace-specific? You want
20   it systemwide?
21   A. Yes, I do.
22   Q. Understood. All right. The attorney for
23   whom you are seeking fees is Mr. Porter?

Page 215

1    A. Yes.
2    Q. Any other lawyers that are working for you?
3    A. No.
4    Q. Does he bill you by the hour?
5    A. No.
6    Q. What's your arrangement?
7    A. I'm not sure how to describe the arrangement.
8    Q. Is it contingency?
9    A. Yes.
10   Q. Did he tell you what his bill of rate was,
11   hourly rate?
12   A. I don't recall seeing it.
13   Q. Do you have a particular number you're
14   looking for in attorney fees that you know of
15   apart from what your lawyer is paid?
16   A. I don't know what that would be at this time.
17   Q. Do you know if he has any partners or
18   associates that are working on this case for
19   you?
20   A. As far as I know, he does not. I don't know,
21   but as far as I know, he does not.
22   Q. I'm just going to ask about what you know. I'm not
23   allowed to ask him questions. Have you hired

Page 216

1    any experts in this case or has your lawyer
2    on your behalf?
3    A. No, I have not; and as far as I know, he has
4    not.
5    Q. What is the contingent basis of the early
6    contingent arrangement for attorney fees in
7    this case with you and Mr. Porter?
8    A. What is the contingent arrangement?
9    Q. 20 percent, 30 percent, 40 percent?
10   A. Honestly, I can't recall it right now. I
11   think it's on the order of 30 or 40, but I
12   can't recall. I'm sure he will.
13   Q. I have no doubt. I wouldn't forget what I
14   had.
15   A. I understand.
16   Q. Just to be clear, you didn't have any
17   problems with the interviews themselves in
18   terms of the content of the interviews? I
19   asked you that, I think.
20   A. Right. I don't recall having any problems
21   with the content of the interviews.
22        MR. CHRISTMAN: All right. I'm going
23        to -- give me about 5 minutes.

Page 217

1         I'm going to look through my
2         records and make sure I have
3         admitted into evidence everything
4         I need as part of his deposition.
5         (Brief recess)
6    Q. I'm going to show you a few more documents
7    that I'm going to admit as exhibits to your
8    deposition. I'm going to leave them in this
9    folder so I can take them downstairs, make a
10   copy of them and give them to her. They need
11   to stay in my book. But I've marked
12   Defendant's #21 here. That's the right to
13   sue letter that you received, right?
14   A. Yes.
15   Q. All right. Go to the next red tab. You see
16   the tab at the top?
17   A. This tab?
18   Q. Uh-huh, the red -- go to the next one. What
19   is this document here? This is a composite
20   exhibit, multiple pages. What is it? I
21   believe you drafted it; is that right?
22   A. Well, this appears to be the faculty salary
23   computation worksheet from Alabama State

DEPOSITION OF RICHARD EMANUEL

Page 218

1    University for my employment for academic
2    year 2006-2007. It is something that the
3    vice president of communication affairs
4    office produces and provides for us. And
5    basically in lieu of a contract they provide
6    us this.
7  Q. What does the front page of that say?
8  A. It says Emanuel's 2006-2007 income, and
9    somebody wrote and 2007-2008. So maybe that
10   follows.
11 Q. Did you write that?
12 A. Excuse me?
13 Q. Did you write that?
14 A. I didn't write that, 2007-2008.
15 Q. I think that was on the PDF.
16 A. I -- unless it includes 2007 -- it does. It
17   includes -- here's another page. Emanuel
18   0148. That is the 2007-2008 salary.
19 Q. So that document reflects your income?
20 A. Yes, it does.
21 Q. Go to the next red tab. And by the way,
22   that's Defendant's Exhibit --
23 A. #22.

Page 219

1  Q. --#22. Go to the next one at the top.
2  A. All right. Yes.
3  Q. Read the first page there that --
4  A. The cover of this?
5  Q. Yeah, the cover.
6  A. It's Defendant's Exhibit #23.
7  Q. What is it?
8  A. It says loss of income computations.
9  Q. And these are computations that you've
10   developed and put into tables?
11 A. Yes, that's correct.
12 Q. And this is -- these are basically tables
13   talking about the loss of income figures and
14   stuff we've been talking about.
15 A. Right. And projected based on -- what it
16   says here, based on salary history trends and
17   so forth.
18 Q. And there is multiple pages of this exhibit
19   as well, right?
20 A. Yes. Yes, there are multiple pages.
21 Q. Will you just read the range in terms of the
22   bates number on the bottom?
23 A. Yes. It's Emanuel 0233 through Emanuel 0241.

Page 220

1  Q. Would that be basically everything we need to
2    know about your computation of damages for
3    lost income and opportunity for not being
4    hired?
5  A. I don't know. There may be some other
6    figures. And as I said, it -- you know,
7    earlier when I said that there were certain
8    figures that were based on, you know, this
9    amount every month, and so I don't know how
10   many months every months will turn out to be
11   and so.
12 Q. Well, if you -- if you come up with any new
13   numbers, will you please provide it to your
14   lawyer so he can give it to me?
15 A. Uh-huh.
16 Q. Yes?
17 A. Yes. I'm sorry. I forgot.
18 Q. I asked you a question earlier and said do
19   you remember -- or can you tell me any other
20   basis upon which you have been discriminated
21   other than what we talked about. I said I
22   would come back to you later and ask you that
23   question again. I'm back.

Page 221

1  A. I can't think of any right now. My attorney
2    may have others -- other evidence,
3    information, reasons. But I -- I can't think
4    of any others right now.
5  Q. And you've had time to think about that?
6  A. I have had some time to think about it.
7  Q. You've produced to me a document called
8    Documentation of Alabama's First Online
9    Public Speaking Class offered by Emanuel,
10   Summer 1998, and I haven't marked that as an
11   exhibit yet. First of all, I want to know
12   why did you attach that, what is that?
13 A. One of the requirements, qualifications for
14   the position I believe was something to do
15   with demonstrated --
16 Q. Online?
17 A. -- experience with technology and that sort
18   of thing. I think it may have even specified
19   WebCT but I don't recall exactly right now.
20   And so I simply provide this to demonstrate I
21   had made a statement that I had pilot tested
22   the very first communication course, online
23   communication course using WebCT and I just

ee1cea76-d5d9-409a-8b2d-1f206945fbc5

DEPOSITION OF RICHARD EMANUEL

Page 222

1    offered this as evidence, documentary
2    evidence to show --
3  Q. Of your qualification in that regard?
4  A. That I had done so, that I had pilot tested
5    that course.
6  Q. I'm not going to attach that exhibit.
7  A. And that was back in, what's that '98?
8  Q. That's what it says. You also attached
9    Emanuel 273 through 275 and it's titled
10   Wallace-Dothan Summer 2007 Class Schedule
11   showing us where you taught Summer 2007.
12   What is the relevance of that document? I
13   don't understand why you produced that.
14 A. Yeah. That is particularly relevant. One of
15   the things to their credit that
16   Wallace-Dothan does is they require a
17   fundamentals of oral communication course, a
18   speech 106 course as part of their core
19   requirements and I applaud them for that. I
20   think that is absolutely on target, a
21   tremendous thing that they do. The result of
22   that however is that every student pursuing a
23   degree there and even transferring on comes

Page 223

1    through is required to take that speech 106
2    course. The reason that's relevant is in
3    order to accommodate the number of students
4    that they have, in order to teach that
5    course, it -- it then would require them to
6    teach some sections during the summer. It
7    almost ensures them that the full-time
8    faculty members in speech have summer
9    employment which means additional income.
10   And -- and this just shows that Ms. Wear was
11   employed that particular summer and I think
12   is scheduled to be employed this particular
13   summer. And it makes sense that she would be
14   because of the way the curriculum is set up.
15 Q. I'm not going to attach that as an exhibit.
16 A. I do applaud them for that, by the way.
17 Q. Good. I'm glad we have a little bit of
18   accolade as part of this deposition.
19 A. Yeah, I think they're absolutely on track
20   with that.
21 Q. And so you're dismissing your case?
22 A. No. Sorry.
23      MR. PORTER: Just the accolade.

Page 224

1      MR. CHRISTMAN: Just the accolade?
2    We'll take it.
3  Q. We've already talked about the job
4    announcement, right?
5  A. Yes.
6  Q. That was something we looked at at the very
7    beginning of your deposition, do you recall
8    that?
9  A. Yes. May I see the document now?
10 Q. Sure.
11 A. Yes. That was where we talked about the
12   statement of that increasing representation
13   of blacks and women, yes.
14 Q. I'm going to mark this #24, and this is the
15   dependent tuition waiver that you would have
16   received in the absence -- that you claim you
17   would have received in the absence of
18   discrimination?
19 A. Yes.
20 Q. It's that $9,900 tuition thing for your kids,
21   it's a computation of it, right?
22 A. Yes.
23 Q. Make that an exhibit. And I'll mark as #25

Page 225

1    two-year college salary schedule D and this
2    is basically just the salary schedule that
3    we've been talking about all day long, salary
4    schedule D, right?
5  A. Yes. And that's for the year 2007-2008.
6  Q. When you left Enterprise, that was a two-year
7    college, right?
8  A. That's correct.
9  Q. When you went to Montevallo, that was a four-
10   year college, wasn't it?
11 A. Yes.
12 Q. The two-year college system you say you make
13   more money than in the four-year college
14   system?
15 A. As a matter of a fact, I would.
16 Q. But Montevallo was a better opportunity for
17   you, wasn't it?
18 A. Yes, it was for the reasons I stated earlier.
19      MR. CHRISTMAN: I think I'm done.
20      MR. PORTER: I have a question.
21        CROSS-EXAMINATION
22 BY MR. PORTER:
23 Q. Rich, in talking about your damages, have you

DEPOSITION OF RICHARD EMANUEL

Page 226

1  also suffered any type of emotional damages?
2  A. Yes, I have.
3      MR. PORTER: Do you want to ask him
4      about that? If you do, I'll give
5      the floor to you.
6      MR. CHRISTMAN: Sure.
7      REDIRECT EXAMINATION
8  BY MR. CHRISTMAN:
9  Q. Tell me about your emotional damage.
10 A. Well, upon not being hired and discovering
11    that a lesser qualified black female was
12    hired and after doing all of this research,
13    it certainly was, to say the least,
14    disheartening, discouraging, not to be
15    melodramatic, but emotionally traumatizing to
16    me professionally, personally. That's in a
17    nutshell how I would describe my
18    disappointment and my emotional turmoil as a
19    result of what -- what happened.
20 Q. What kind of --
21 A. I felt very positive about the whole thing up
22    until the decision, you know, and thought
23    that the interviews had gone well and all of

Page 227

1     that. Couldn't imagine with degrees and
2     experience and all of the rest of it -- it
3     just really was discouraging and
4     disheartening.
5  Q. The only decision that would have saved you
6     from your emotional turmoil would have been
7     for you to be hired, right?
8  A. Right.
9  Q. And whether you had been -- that's all.
10    MR. CHRISTMAN: That's all I have.
11    MR. PORTER: Thank you.
12       (The deposition concluded
13       at 5:30 p.m.)
14    * * * * * * * * * *
15    FURTHER DEPONENT SAITH NOT
16    * * * * * * * * * *
17
18
19
20
21
22
23

Page 228

1        REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  CHILTON COUNTY
4     I, Wendy Lewis, Court Reporter and
5  Commissioner for the State of Alabama at Large,
6  hereby certify that on Friday, May 30, 2008, I
7  reported the deposition of RICHARD CECIL EMANUEL,
8  Ph.D., who was first duly sworn or affirmed to
9  speak the truth in the matter of the foregoing
10 cause, and that pages 4 through 227 contain a
11 true and accurate transcription of the
12 examination of said witness by counsel for the
13 parties set out herein.
14    I further certify that I'm neither of kin nor
15 of counsel to any of the parties to said cause,
16 nor in any manner interested in the results
17 thereof.
18    This 13th day of June, 2008.
19
20    _____
      WENDY LEWIS, Court Reporter
21    Commissioner for the State
      of Alabama at Large
22    Alabama License No. 444
23    MY COMMISSION EXPIRES: 7/16/11

Page 229

1        SIGNATURE OF WITNESS
2     I, RICHARD CECIL EMANUEL, Ph.D., hereby
3  certify that I have read the transcript of my
4  deposition consisting of pages 4 through 227, and
5  except for the corrections listed below, certify
6  that it is a true and correct transcription.
7
8  _____
   RICHARD CECIL EMANUEL, Ph.D.
9
10
   SWORN TO AND SUBSCRIBED before me
11 this _____ day of _____, 2008.
12
13 _____
   NOTARY PUBLIC
14
      * * * * * * * * * *
15
   Page Line  Correction and reason therefor
16
17
18
19
20
21
22
23

58 (Pages 226 to 229)

DEPOSITION OF RICHARD EMANUEL

| A | | | | |
|---|---|---|---|---|
| **able** 75:8 76:10 149:21 155:8 192:19 | **additionally** 194:6 194:7 | 130:22 133:20 134:1 135:15,20 154:18,21,22 171:12,14,17,21 172:23 177:21 | 208:11 220:9 **analysis** 203:10,18 **Andrew** 2:7 **announce** 59:12 | **appeared** 39:4 42:12 97:22 **appears** 37:17 45:8 45:12 49:14 53:8 78:6 79:18,20 |
| **absence** 86:1 205:14 207:19 209:10 224:16,17 | **address** 6:7 **addressed** 28:13 42:20 78:14 **adhering** 102:19 | **agreed** 2:20 3:12 **agreement** 1:16 27:3,6,11,16,21 | **announcement** 61:8,15,16,20 62:2,20,22 63:10 63:15,19,21 | 162:16,20 217:22 **applaud** 222:19 223:16 |
| **absolutely** 222:20 223:19 | **adjunct** 11:1 13:15 13:17 17:7 18:4 19:2 | 27:23 43:15,17,20 44:3,6,7 45:21 46:3 47:6 49:8 | 111:19 149:22 150:4 224:4 **annual** 9:5 | **applicant** 101:12 112:1 148:22 149:4,5,14,20 |
| **academic** 57:5 122:1,3 218:1 | **adjustments** 190:5 **administered** 170:10 | 81:20 82:12 **ahead** 48:21 95:21 129:19 | **annually** 91:16 149:3 **annunciated** | 150:6,12 151:4 196:14 202:1 **applicants** 98:14 |
| **academics** 7:19 **accolade** 223:18,23 224:1 | **administration** 67:12 **administrative** | **Alabama** 1:2,18,21 2:5,9 3:3 14:20 57:22 59:11 74:7 | 108:16 **answer** 4:22 5:1,9 28:4,7 37:6 89:7 | 99:3,6 100:7,23 101:19 111:12 148:14 149:4 |
| **accommodate** 223:3 | 81:6 158:20,22,23 **administrators** 81:5 | 77:6 83:12 84:9 87:14 115:22 116:18 150:3 | 100:16 109:1 126:18 132:13 138:2 144:5 155:9 | 150:15 172:1 **application** 59:3 70:14 88:6 168:10 |
| **accompanying** 163:19 | **admission** 82:15 **admit** 174:16 217:7 | 155:2,7 182:9,22 182:23 185:23 | 161:22 162:17 167:22 180:23 | 200:6 **applied** 61:22 65:1 |
| **account** 207:5 **accounting** 91:16 | **admitted** 217:3 **adopted** 89:15 | 192:5,14,23 217:23 228:2,5,21 | 183:3 189:5,10 196:7 206:19 | 71:3 72:2 90:1 91:21,22 110:19 |
| **accredited** 200:13 **accredits** 200:11 | 161:2,11,14 **adopting** 164:7 | 228:22 **Alabama's** 155:4 | 207:12 208:4 **answered** 66:1 | 157:23 158:7 172:11 |
| **accurate** 26:5,7 228:11 | 195:3 **ads** 155:12 | 214:14 221:8 **Algernon** 7:15 | **answering** 132:15 **anybody** 64:23 | **applies** 172:20 **apply** 63:18 157:7 |
| **accurately** 66:2 **accusation** 25:21 | **advances** 29:9 30:14 54:3 | **aligns** 136:2 **allegation** 22:10,19 | 137:14 168:18 176:1 181:5,17 | **appoint** 134:10 **appointment** 44:19 |
| 39:9,10 **accused** 25:18 | **advertising** 196:12 **advised** 32:19 | 36:19 37:20 41:5 210:17 | 185:9,12,16,20 188:5,11,22 | **appreciate** 21:20 53:12 167:19 |
| 26:10 32:13 53:13 57:1 | **advisor** 8:5 **advisory** 57:10 | **allegations** 22:6,9 23:20 34:9,15,21 | **anytime** 4:23 **anyway** 94:17 | **appropriate** 153:2 **approved** 87:10 |
| **accusing** 31:4 32:8 **act** 30:22 | **affairs** 218:3 **affect** 13:1 | 36:14,21 52:22 53:16 170:11 | **apart** 215:15 **apologize** 25:5 | 180:8,14 **Approximately** |
| **acting** 11:5 **action** 173:3,5,10 | **affirmative** 173:3,5 173:9,13 | **allege** 168:19 **alleged** 22:14 31:9 | **apparently** 80:1 99:10 137:21 | 12:23 **April** 53:9 |
| 173:13 **actively** 163:21 | **affirmed** 228:8 **African** 94:11 | 36:10 174:14 **allegedly** 171:7 | **appeal** 44:12,14,18 45:6 | **area** 37:3 51:5 57:21 69:8 155:2 |
| **activities** 8:12 74:19 | **age** 66:15,17 68:4 70:3 77:22 78:3 | **allowed** 134:13 215:23 | **appealed** 44:22 49:4 | 182:18 **argue** 198:21 |
| **activity** 32:13 **Adam** 2:3,3 | **agency** 179:5 **ago** 42:12 186:7 | **alma** 21:4,5 **Alpha** 8:23 | **appear** 45:9,18 150:19 204:3 | **argued** 156:22 **argument** 94:23 |
| **add** 126:18 209:8 209:13,13 210:10 | **agree** 46:23 47:4 54:6,7 76:20,21 | **American** 94:11 **amount** 5:18 | **APPEARANCES** 2:1 | 95:3 109:15 120:12 123:20 |
| 210:14 **added** 209:15 | 82:6,14 85:17 96:19 108:12 | | | |
| **additional** 194:5 203:19 223:9 | | | | |

DEPOSITION OF RICHARD EMANUEL
Page 2

152:16 197:8,21
212:23
**arguments** 85:10
152:17
**arrangement** 215:6
215:7 216:6,8
**arrested** 178:18,20
179:1
**arrival** 15:23
**arrived** 16:9
**arriving** 93:16
**article** 121:2
123:16
**articles** 104:14
**Arts** 11:5
**ascend** 58:19
**asked** 21:14,17
39:19 40:12,23
57:15 65:17 66:4
67:23 68:3 69:22
74:10 93:4 96:10
180:13 181:1
186:6,8 187:19
188:18 208:23
214:5 216:19
220:18
**asking** 4:13 11:13
11:14 15:8 25:16
40:19 53:20 61:14
62:5 80:23 100:14
109:22 111:8
134:7 173:22
174:2 178:11
186:22 192:17
209:11 215:22
**assistant** 13:16
54:22,23 55:1,16
55:23 56:2 58:14
**assistants** 54:15
**associate** 15:18
58:8,15,21
**associated** 34:8,15
41:6 43:21 48:3
49:17 50:13 55:11
83:10 133:12
155:4 159:15

166:21 175:22
**associates** 215:18
**Association** 74:9
200:10
**assume** 5:10 14:15
46:22 49:11 72:12
88:14 89:11 90:15
90:20,21 97:4
98:12 99:5,23
100:18,19,21
101:5,10 111:1
168:4
**Assuming** 207:21
**assumption** 87:23
98:16,19,20
122:16 168:23
**assure** 100:22
**attach** 5:15 204:9
221:12 222:6
223:15
**attached** 222:8
**attained** 14:16
198:13
**attaining** 198:21
**attainment** 156:9
156:15 190:16
191:10 192:5,7,20
197:18
**attempt** 51:2 164:4
**attempted** 26:11
150:19
**attempting** 103:17
**attended** 6:23
**attention** 92:14
**attorney** 2:4 44:22
44:23 45:2 153:13
181:4 189:7
212:10 214:22
215:14 216:6
221:1
**attorneys** 2:8 52:20
**attribute** 195:2,12
195:14,17,18
**Auburn** 10:4,8,20
**August** 62:5,6
**authority** 88:15

134:17
**availability** 59:9
62:8
**available** 63:12
113:17
**Avenue** 2:4
**avoid** 82:12
**award** 7:15,16,23
**awards** 7:7
**aware** 31:3,6 33:1,3
33:7,9,14 41:7,9
42:15 57:15 99:4
213:5
**a.m** 1:22

——————————
**B**
——————————
**B** 154:14
**bachelor** 7:3
**back** 51:16 63:1
80:12 89:11 150:1
152:5 159:23
167:15 183:19
208:23 220:22,23
222:7
**background** 6:12
74:18
**bad** 15:5 176:15
198:23 199:14
**balance** 133:11
**balloon** 178:23
**bank** 1:19 2:8
189:8
**Baptist** 11:8
**bar** 45:13,18
**barriers** 153:2
157:2
**Barrows** 49:16
**base** 71:8,18 74:5
75:19 76:8 77:5
98:16,17 114:21
140:7 148:18
188:11,17,19
**based** 8:12 46:20
47:15 53:5 66:13
77:9 81:7 106:3
113:23 119:12

120:2 122:16,20
126:4 128:18
137:21 139:11
147:3 163:2,13
166:8 189:22
192:3,7,14 197:17
198:4 199:4
206:22 219:15,16
220:8
**bases** 9:17
**basic** 147:22
148:13
**basically** 22:22
47:8 70:16 74:15
148:7 149:8 183:1
183:10 184:11
186:19 190:4
208:17 218:5
219:12 220:1
225:2
**basing** 152:6
153:12
**basis** 25:20 28:23
29:7 51:5,10
76:23 78:3 79:5
94:21 146:12,19
165:12 204:14,20
216:5 220:20
**bates** 115:11
117:18 219:22
**beans** 39:19
**bearing** 121:13
**bears** 197:8
**beat** 204:4
**beg** 188:13
**began** 9:18 10:10
80:17
**beginning** 73:6
128:16 224:7
**behalf** 45:7,10,15
180:9 216:2
**behavior** 30:17
36:10,11
**belief** 64:16 152:6
**believe** 18:15 19:14
52:3 59:4 63:5

65:17 66:15,18
70:23 71:6 72:17
73:1 83:14 84:11
84:22 85:3,18,23
96:3 105:6,8,20
114:19 119:22
124:7 128:7 129:5
130:1 136:23
143:22 144:14
146:11 155:12
160:15 161:19,23
164:1,21 166:16
168:8 172:3 173:4
173:16 175:15
176:2 182:19
185:22 187:16
193:2 195:2 204:8
217:21 221:14
**believes** 172:6
**bench** 148:13
160:19
**benefit** 213:1,22
**benefits** 208:10
209:4,6 211:21,23
**best** 19:13
**better** 21:3 26:4,22
47:13 48:1 139:19
193:17 199:16
225:16
**beyond** 52:7,8
55:16 74:17
**bias** 94:15 104:4
123:14,15
**bill** 215:4,10
**Birmingham** 2:5
**birth** 6:9
**birthday** 40:13,19
41:1
**bit** 50:23 60:17
63:9 90:19 223:17
**bizarre** 39:20
**black** 72:23 83:20
143:17,17 149:2,2
152:1 163:7,22
165:4,5,6 167:4
195:16 196:11

DEPOSITION OF RICHARD EMANUEL

197:10,14,23
198:6 199:1,23
226:11
**blacks** 105:4
148:23 151:23
153:3 163:7,21
192:22 195:15
196:11 224:13
**blind** 98:19,20
**blue** 182:11 184:1
184:16 185:18
**blurting** 182:3
**board** 73:20 74:10
80:15 86:11 87:10
87:15,17 123:5
180:4,7
**book** 217:11
**books** 206:19
**bottom** 117:19
207:10 210:1
219:22
**box** 77:22
**boxes** 77:10,13
**bracket** 207:9
**break** 12:6,8 92:7
133:22 135:18
147:15 167:12,18
167:22 179:16,19
**Brief** 92:9 93:7
147:17 217:5
**briefly** 40:1
**bring** 167:15
**BS** 7:8
**build** 21:6
**Building** 1:20 2:8
**bullet** 29:8
**bulleted** 30:11
31:12,19 33:18
**bullets** 32:7 46:20
**bunch** 177:17
**bureau** 155:6 191:9
**Business** 20:6
**buy** 47:8
**byproduct** 76:9,12

─────── **C** ───────

**C** 1:8 115:14
154:14
**calculate** 137:11,12
**calculation** 116:15
128:15 140:20
**calculations** 119:12
136:9 207:16
**calculator** 137:13
137:15
**call** 67:15 71:7
74:23 75:22,23
76:7 85:7 91:19
92:17 118:15
126:15 130:20
131:8 153:1
181:10 186:3
**called** 67:17 75:18
80:22 131:5 221:7
**calling** 71:10,14,15
172:8
**calls** 117:1
**camp** 68:16,17
**campus** 8:13 31:16
174:19
**candidate** 111:17
123:14
**candidates** 111:2,3
125:19 171:16
200:23
**capacity** 57:10,11
**car** 68:22
**careful** 55:1
**carefully** 54:9
**carry** 19:3
**case** 1:7 3:14,15
51:8,19 52:12
66:12 72:6,12
89:23 90:15 97:1
101:4,5,23 120:21
123:18 135:11
153:6 157:22
160:17 171:23
179:22 185:12,17
185:18 187:23
188:9,20 189:3
199:19 200:19

201:2,16 214:2
215:18 216:1,7
223:21
**cases** 170:9
**catch** 183:20
**cause** 55:10,12,21
77:9 228:10,15
**caused** 66:5 68:1
129:5 169:10
**cease** 30:17
**Cecil** 1:14 2:15,22
4:1 6:4 228:7
229:2,8
**cell** 68:17,19,23
**census** 152:4 154:4
154:5,6 155:6
156:9,11,15 191:9
197:19
**certain** 57:11 94:9
94:10 95:9 102:6
145:3 151:1,2
171:17 207:3,4
220:7
**certainly** 26:14
36:15 55:7,19
72:1 113:16
121:13 134:18
158:9 193:19
195:21 196:8
226:13
**CERTIFICATE**
228:1
**Certified** 1:16 3:2
**certify** 228:6,14
229:3,5
**chair** 11:5 57:11
**chaired** 16:16
**challenge** 76:3
**challenged** 78:3
**chance** 41:14 78:21
94:19 184:9
**chancellor's** 87:16
**change** 195:8,11
199:13
**changes** 29:16
**characteristic** 7:21

112:15 120:15
**characterize** 26:6,7
33:6 47:5 76:17
130:22,23 134:16
213:12
**characterizing**
164:16
**charge** 51:21 72:8
72:15 77:7 79:4
79:13 80:9 174:22
175:22 176:1,5,8
176:9
**charges** 176:17,23
**chart** 156:10
**check** 59:10,13
**checked** 77:23
168:9
**children** 212:8
**CHILTON** 228:3
**choose** 123:22,23
124:16
**chooses** 189:7
**Christman** 1:19 2:7
2:7,16,17 4:6
24:11,14,17,21,23
25:4 41:16 42:3
50:4,6,10 63:6
92:8,17 137:14
147:14 170:7
175:2 202:12
213:22 216:22
224:1 225:19
226:6,8 227:10
**chronological** 15:7
**church** 68:16
**circling** 171:20
**circulation** 122:10
**circumstance** 23:13
127:4
**circumstances**
11:20 23:14 25:16
32:7 90:14 152:23
**cite** 154:3
**cited** 125:10
**citing** 125:4
**civil** 2:23 3:10,17

49:18
**claim** 31:6,8 32:18
36:8,10 37:13,16
37:19 40:16 44:9
46:6,7,7,10 47:10
47:10 49:18 50:1
50:2,7,14,23
51:13 66:12 78:4
93:21 102:12
130:8 147:20
150:23 156:17
157:20 158:16,17
165:12 168:1,2,6
169:9,10,19 179:9
190:13 196:10
197:13,16 199:4
199:10 200:2,7,8
203:11 204:10,14
205:11 207:12
213:2,8 224:16
**claimed** 23:17 81:7
82:3 151:17
165:23
**claiming** 66:17
214:1
**claims** 32:1,10,12
32:15,22 33:3,13
35:12 37:14 38:21
47:2 48:4 51:10
54:9 85:10 179:5
**clarify** 142:18
**class** 17:16,18,22
18:2,7,17,18,21
19:1,6,8 152:8,8
183:21 221:9
222:10
**classes** 15:22 19:7
**classroom** 30:2
**clear** 4:18,21 15:8
35:3 36:3 194:12
197:5 216:16
**clearly** 4:22 120:5
137:1 165:8
186:10 194:19
196:12,15 200:14
201:17

DEPOSITION OF RICHARD EMANUEL
Page 4

clicked 83:13
client 115:4
client's 79:4 192:2
close 133:21 134:3
  135:17 138:5
closely 136:1
cogent 170:14
cognizant 162:9
cohesive 170:14
collaborated 110:8
  110:12
colleagues 54:20
  55:22
collected 147:3
collection 41:21
  114:16,18
college 1:8 4:15
  10:21 11:7,8,9
  14:13,20 15:7
  17:8 20:6 21:8,15
  21:18 22:8,12
  25:15 27:4 29:21
  30:13,23 31:3,18
  35:7,7 43:22 45:4
  46:14 47:13 48:16
  50:15 51:3,21
  54:4,7,8 56:17,22
  57:3 58:5 59:8,11
  59:19 60:8,11,13
  61:6 65:4,5 70:10
  70:22 71:7,16
  73:22 74:5,9 75:3
  76:15 79:14 81:23
  82:8 83:12,18,22
  84:6,9,10 86:17
  86:20 87:16,18,19
  88:7,21 89:1
  93:10 104:19
  105:6 112:11
  113:10,20 114:4
  115:21,22 116:12
  116:18 117:5
  135:20 139:8
  140:5 142:15
  145:4 150:3
  153:18 154:16

155:20 158:4
159:5,19,21 163:1
175:19 193:9
202:7 204:16,17
206:9,9,15,16
208:7 214:10,14
225:1,7,10,12,13
colleges 59:13
  60:18,21 83:17
  84:20 87:9 88:6
  88:10,10 90:12,17
  93:13 116:20,21
  196:4,22 198:19
  200:11
college's 34:8 91:12
  153:13
combined 81:8
  131:16 132:6,21
  133:3 135:17
come 3:20 105:6
  115:2 116:5,6,14
  119:13 180:2
  182:2,4 220:12,22
comes 97:2 124:8
  125:18 154:4
  177:19 181:19
  200:15 201:13
  222:23
coming 184:19
commencing 1:21
comment 187:6,7,8
comments 30:1
Commerce 1:20 2:9
commission 3:4
  228:23
Commissioner 1:17
  3:3 228:5,21
committee 63:3
  65:14 94:8 97:22
  98:2,11 99:1,8
  100:5,9,13,22
  102:1,9,17 103:8
  103:21 104:10,15
  105:7,12 106:6,18
  106:21 107:4
  108:6,9,13,23

109:19,21 110:1,4
110:5,8,9,12
112:6 115:7 116:3
117:2,6 122:21
126:6,11,14,16,20
127:5,7,9 129:6
129:23 130:2,6,11
130:15,17,20
131:4,6,10 132:16
138:13 139:22,23
140:9,22 141:1,5
141:6,7,13,14
142:13,14,23
143:4,7,9,16,19
143:20 144:1,15
144:16,17,19,22
145:8,8,15,17,18
146:4 171:18
172:2,3,9 204:1
committees 16:15
  57:11 94:6 95:23
  96:6,14,21,22
  97:11,15 103:2,11
  103:16 107:20
  108:1,16,20,22
  109:5,8,12,16,19
  110:1 112:10
  113:9,14 114:3,8
  114:22 115:6
  116:11,22,23
  117:8,10,11,22
  118:2,4,6,13,16
  119:1,9,16 121:12
  124:20 125:14
  126:1,23 127:13
  127:14,18 128:7
  128:10,14 129:10
  129:13 131:3,4,17
  132:2,7 135:17
  137:3 138:16
  139:3,12,21
  140:12 141:14,19
  141:21,22 142:9
  143:2 144:7,11,14
  145:2,7 146:7,11
  146:14,16,22

166:22 168:17
committee's 100:6
communicated
  23:9,10 37:18,20
  37:22 38:5 40:8
  40:18
communicating
  4:22
communication
  8:16 10:11 12:12
  13:14 15:10 21:6
  37:5 58:8 60:18
  71:12 74:8 218:3
  221:22,23 222:17
communications
  8:15 37:3
community 1:8
  4:15 14:19 15:7
  22:8 25:15 50:14
  59:12 61:6 65:5
  74:9 84:9 88:10
  93:10,13 105:5
  114:4 135:20
  155:20 159:5,19
  196:4,22
compared 148:11
  160:9 190:1,23
comparing 152:3
comparison 114:4
comparisons 189:2
  189:12
competition 12:10
compiled 147:4
  165:18
complain 51:2
  146:7
complained 178:7
complaining 51:7
  157:11,12
complaint 22:23
  23:1,3,6 33:8,11
  33:15,16,19 36:22
  39:2,3,11 40:7,15
  40:20,23 41:8
  45:3 46:11 52:8
  54:14 94:5 97:12

97:14 157:5 164:6
175:12 176:10,13
177:7 178:12
complaints 33:21
  36:1,6 41:13,23
  42:6 43:11 56:19
  62:22 81:4 94:2
  146:10 164:15,17
  177:6
complete 85:14,18
  86:4,13 114:20
  115:20,20
completely 66:1
completing 12:15
  192:13
completion 192:15
compliance 84:12
compliant 38:21
complicated 37:10
comply 87:19 105:8
  108:14 145:1
composed 96:23
composi 134:4
composite 39:22
  41:17 116:20
  217:19
composition 94:5,8
  95:5,6 96:6,14
  97:11,15,21 99:8
  100:4,8 102:4,7
  102:16 103:1,4,11
  103:23 104:15,17
  104:18 105:7,16
  106:15,21,23
  107:20,23 108:15
  110:3 112:6,10
  113:9 115:5
  116:10 119:15
  120:4 124:19
  127:1 128:6 129:6
  129:9,12 130:10
  131:13 134:4
  138:13,16 139:5
  139:12,21 140:3
  142:2 145:3,6
  146:6,10,21 150:9

DEPOSITION OF RICHARD EMANUEL

151:2 166:22 190:23 203:23
**compositions** 128:4 131:11
**compound** 202:14
**comprehensive** 180:3
**comprise** 109:17
**comprised** 109:18 141:16 153:21 154:2 156:18,20
**compromise** 44:8 46:6
**computation** 217:23 220:2 224:21
**computations** 148:7 219:8,9
**computed** 208:17
**Computers** 9:17
**concern** 40:22 54:12,18 55:13,21 56:3 66:5 68:1 73:8 96:13,13,16 97:14 102:3,22,23 107:2,22 129:9,12 147:19 150:6
**concerning** 86:12 92:5 102:5 203:7
**concerns** 62:19
**concluded** 129:7 227:12
**conclusion** 93:16
**conduct** 23:19
**conference** 74:19
**confirmed** 73:21
**conformance** 30:22
**confront** 22:16,17 22:18
**confrontation** 22:21
**confused** 70:15
**confuses** 63:8
**confusing** 4:20
**consent** 73:19 80:13 81:3,10,14

81:16,18 82:7,21 84:12,15,19 86:8 89:9,14 90:2,11 90:23 91:14 92:16 123:3 153:6,8,20 156:18 157:7,14 157:19 159:4,15 159:21 161:1,9 162:1 180:18 186:6 195:4
**consider** 180:20
**consideration** 133:23 146:3
**considered** 89:2,20 153:5,10
**considering** 90:16 133:5
**consist** 158:5
**consistent** 106:22 138:8 158:10,11
**consisting** 229:4
**constitute** 131:10
**constitutes** 109:20
**construe** 92:1
**consulted** 182:6 185:9
**contact** 70:9 155:6
**contain** 203:17 228:10
**contained** 16:19
**contend** 84:18 96:4 126:5,8,10 161:16 162:18 166:13
**contending** 124:13 124:17,18
**content** 85:15 216:18,21
**contention** 123:20 125:1 140:7
**contents** 39:7 40:10
**contest** 109:7,11,14
**context** 55:5 93:21
**contingency** 215:8
**contingent** 216:5,6 216:8
**continue** 30:12

122:19
**continued** 48:13
**continuing** 153:15
**contract** 18:6 19:12 19:18 206:4 218:5
**controlling** 95:22
**Controversy** 19:22
**conversation** 38:14 69:17,19 76:14 77:3,4 188:7,10
**conversations** 185:14 186:16 187:10,11 188:2,5 188:15
**convicted** 178:21
**copy** 5:14 24:13 25:1 34:7 38:19 38:20 81:1 86:14 86:15 114:10 187:15 217:10
**cordial** 69:19
**core** 222:18
**correct** 8:17,22 10:12 14:17,21 18:8 25:22 27:1 41:4 43:6,8 58:4,6 61:21,23 78:1 80:8 107:10 110:18 118:10 126:17 130:1 131:22 151:13 152:10 158:13 190:17,17 193:22 198:4 203:19 207:6 219:11 225:8 229:6
**corrected** 82:20
**Correction** 229:15
**corrections** 229:5
**correctly** 65:12 67:7 71:12
**correspondence** 79:3
**corroborates** 189:8
**cost** 202:3
**couched** 182:10

**counsel** 2:21 3:13 30:16 35:5 41:19 228:12,15
**count** 119:9
**counted** 117:3,6 207:6
**country** 154:10 156:4
**County** 6:16 228:3
**couple** 186:7 204:9
**course** 13:14,18 19:2 98:7 149:12 212:10 221:22,23 222:5,17,18 223:2 223:5
**courses** 10:23 13:22
**court** 1:1,16 3:2 51:18 52:11 81:14 81:22 84:7 91:17 228:4,20
**courts** 90:9
**court's** 157:6
**cover** 5:18 16:13 40:4 41:22 122:8 169:12 204:9 219:4,5
**covered** 174:21 175:9 203:13 204:5 213:15
**covers** 206:4
**create** 149:16
**created** 40:16 170:12
**credit** 222:15
**criteria** 171:18
**CROSS** 2:16
**CROSS-EXAMI...** 225:21
**Culverhouse** 153:12 181:20
**Cum** 8:3
**curious** 59:16,17 59:18
**current** 186:2
**currently** 6:5 58:1

58:7 83:21 87:15 205:12 206:2,10 206:12 207:15 212:4
**curriculum** 223:14
**cut** 62:17 146:2
**CV** 5:14,17 14:5 16:16,19 57:8

**D**

**D** 82:22 83:4 104:18 105:5,16 105:21 106:23 107:9 113:15,20 114:5,23 115:14 115:16 117:7,23 118:16 119:10 128:20 129:1 133:13 135:19 148:1,2 151:18 152:1,9,16 153:22 154:12 155:10,22 156:19 157:7,13 157:20,21,23 158:3,8 159:11 160:3,12 166:23 190:9 197:11,14 205:14 206:11,22 207:15 225:1,4
**damage** 211:14 212:13 226:9
**damages** 208:16,17 208:20 213:14 220:2 225:23 226:1
**damaging** 192:2
**darn** 138:5
**data** 9:17 71:8,17 74:5 75:19 76:8 77:5 110:10,14 121:6,8 128:17 147:3 148:18 152:4,4,11,12 154:4,5,6 155:4 155:16 156:8,9,11 156:15 158:10,13

DEPOSITION OF RICHARD EMANUEL
Page 6

165:6 166:20
182:9 184:16
185:16 188:11,17
188:19 191:9
193:1 194:12
197:19 198:4
**date** 6:9 39:7 61:17
61:17 62:6 72:13
**dated** 28:12 38:13
42:9 53:9 62:5
78:16
**dates** 59:10 72:12
**Davis** 198:19
**day** 5:9 19:11 34:14
34:20 66:20 67:1
67:19 167:15
225:3 228:18
229:11
**dealt** 139:1
**dean** 30:16 37:22
38:2 40:8,22 67:8
**decide** 96:20
**decision** 20:16
46:16 87:13
111:21 120:20
133:6,7 134:21
135:9,15 140:8
153:12 161:20
165:2 169:2,6,7
200:19 226:22
227:5
**decisions** 94:16
104:4 121:13
123:18 159:1
162:10 170:5
196:4 200:15
**decree** 81:14,16,18
84:13,15 89:21
90:2,23 91:15
123:3 140:11
149:6 153:6,8,20
156:18 157:7,14
157:19 158:8
159:4,15,21 161:1
161:10,13,17
162:2 164:20

180:18 186:6
195:4
**decrees** 73:19
80:14,18 81:3,10
82:7,21 83:6,8,8
83:10 84:20 86:8
89:9,15 90:11
92:16,18 96:1
151:9,12 173:8,9
173:16
**defective** 164:8
**defend** 181:22
**Defendant** 1:9 2:6
**Defendant's** 5:19
28:12,19 35:10
38:12 43:15,17
45:11,17,20 49:13
49:13 53:8 61:7
62:1 71:4 72:16
77:8 78:13 113:2
114:14 115:10
117:16 147:10
148:4 152:19
160:6 197:7
203:15,21 209:20
211:11 217:12
218:22 219:6
**defended** 153:14
**define** 92:1 144:18
**defined** 144:15
**definitive** 210:7
**degrading** 29:23
**degree** 7:3,9 10:13
10:16 11:16 12:12
12:16,21 13:8
14:10 72:23
154:11,16,19
155:17 156:2,5
190:17 191:14,16
192:13 200:16
201:3,4,10,15,19
201:21 222:23
**degrees** 202:5
227:1
**delegate** 134:14,18
**delegated** 138:19

139:18
**Delta** 8:8,20
**demeaning** 29:23
**demographics** 95:7
192:16
**demonstrable**
94:15
**demonstrate** 145:5
221:20
**demonstrated**
221:15
**demonstration**
101:23 174:6
**denied** 158:18
213:2
**dental** 208:19
**deny** 41:3,4 174:13
174:18
**department** 11:5
15:11,12 49:17
80:23 87:2 93:1
185:23 187:11
188:2
**departure** 11:21
20:10 25:15,17
43:22
**dependent** 211:21
211:22 224:15
**depending** 90:13
**depends** 56:4
126:15
**DEPONENT**
227:15
**deposition** 1:14
2:22 3:1,8,14 4:8
4:9 94:20 217:4,8
223:18 224:7
227:12 228:7
229:4
**describe** 75:11
76:12,13 152:22
184:16 215:7
226:17
**described** 126:4
169:1 190:3
**describes** 191:11

191:13
**describing** 202:22
**designed** 45:22
47:1 151:13
**detail** 5:17 57:13
**detailed** 32:7
**determination**
79:12 157:6
**determinations**
159:2
**determine** 90:10
99:2 122:13 183:5
**determined** 99:13
99:21 208:12,13
208:14
**determining** 96:5
150:21
**detrimentally**
149:15
**developed** 189:13
189:15 219:10
**deviate** 88:12,21
**deviation** 88:16
89:3,6
**deviations** 183:10
184:12
**Devoralyn** 78:15
79:19
**dictated** 94:8
136:20
**die** 207:21 208:1
**difference** 205:12
208:8,18 211:3,5
**differences** 183:6
208:20
**different** 32:12,12
32:15 67:3,4,6
128:1,3 155:21
157:3
**Dillingham** 123:10
**diploma** 202:3
**direct** 2:16 4:5
104:7 114:15
132:11
**directed** 66:7
214:13

**directing** 74:12,12
74:13,16
**disagree** 130:23
**disappointment**
226:18
**discipline** 19:19
60:23
**disciplined** 11:17
**disclosed** 74:15
**discontinuing**
19:16
**discounted** 207:1
**discouraging**
226:14 227:3
**discovered** 75:2
**discovering** 226:10
**discretion** 88:12,13
88:23
**discriminate** 163:2
163:13
**discriminated** 51:4
66:13 72:19 73:10
92:12 104:11,16
107:17 161:4,19
166:8 167:17
169:11 170:15
210:22 220:20
**discriminating**
53:5 186:10
**discrimination**
51:21 52:23 66:17
72:8,15 77:7,9
78:4 79:5 80:10
81:7 85:11 86:1
86:10 93:17,22
103:22 106:9
111:17 112:1,7
126:9 130:9 139:9
146:8,12,20
147:21 153:18
157:20 158:14
160:21 161:18
162:3,21 165:12
168:3 169:20
170:12 171:3
176:10 178:1,8,13

179:4,10 182:1
199:4 203:11
205:14 207:20
209:10 213:9
224:18
**discriminatory**
73:23 102:20
104:1 105:10
164:22 166:16
171:7 173:4,17
**discuss** 203:12
**discussed** 169:1,16
169:17 171:6
173:2,15 179:7
185:10,12,16
188:8 189:4,12,16
189:17 203:12,14
203:23
**discussion** 25:13
187:22
**disheartening**
226:14 227:4
**dismiss** 45:10
**dismissing** 223:21
**disparity** 33:5,6
80:16 92:13 192:6
193:22
**dispose** 44:6
**disproportion**
125:15
**disproportionate**
124:19 128:12,14
148:10 195:15
**dispute** 45:22 47:2
48:14 49:8 135:12
135:13 144:10,13
144:13
**disputed** 44:9 46:6
47:9,10
**disregard** 134:7
**disregarded** 162:13
**distinction** 206:5
**distinctive** 155:21
**district** 1:1,2 52:11
157:22
**divide** 137:17

**DIVISION** 1:3
**divorced** 212:6
**doctoral** 10:16
11:23 12:12,20
14:10 201:4
**document** 16:22
22:1 23:21 24:2,5
38:20,21,23 39:3
40:17,18 42:7,11
45:16 79:11 85:13
86:14 142:15
144:15,18 162:23
165:21 189:19
198:15 200:14
217:19 218:19
221:7 222:12
224:9
**documentary** 222:1
**Documentation**
221:8
**documents** 24:9,19
28:10 34:15,21
35:1,4 41:10,14
41:21 42:23 43:12
43:14 49:5 50:18
53:2 73:20 114:16
167:13 217:6
**doing** 37:16 52:7
72:6 75:20 80:21
88:18 102:13,15
151:17 164:9
174:13 191:19
193:16 226:12
**doors** 196:3
**Dothan** 69:8
200:20 201:17
**doubt** 184:20
216:13
**doubtful** 44:8 46:6
47:9,10
**downstairs** 217:9
**downtown** 9:23
**Dr** 4:7 25:14,21
37:21 38:13 41:13
41:23 42:8,19
44:4 136:7 165:16

167:2 168:17
200:23 201:9
**drafted** 217:21
**dramatic** 112:12
113:11 116:12
195:8
**drank** 147:15
**drive** 6:8 68:18
**drop** 208:9 209:6
**Dubose** 42:8,20
**dues** 9:6
**duly** 4:2 228:8
**D.C** 9:11,23

— — — — — —
**E**
E 20:6 154:14
**earlier** 32:17 61:19
118:9,14 150:2
174:21 178:9
191:22 220:7,18
225:18
**earliest** 177:12
**early** 31:1 33:2
216:5
**earn** 205:12 206:12
207:15
**earned** 191:13
205:13
**Ed** 80:23 186:1
**education** 5:13
14:16 37:4 49:17
56:8 58:12 80:15
87:2,11 93:2
155:13 180:5,7
187:12 188:3
202:10
**educational** 6:12
87:13 152:4 156:9
156:15 182:18
190:15 191:10
192:4,14,20
197:17
**EEOC** 49:23 50:2,6
50:14,23 51:13,18
51:20 52:9 78:2
78:16 79:11,20

80:6 148:13
160:14 165:22
174:21 175:10,12
176:8,9,13,16,23
177:6 204:7
**effect** 74:14 165:19
**effort** 149:19
202:15
**either** 3:16 16:1
49:9 65:15 70:12
76:20 107:9
110:14 113:15
140:21,22 142:20
196:6
**Elkins** 121:1,16
123:16
**email** 70:12 183:16
**Emanuel** 1:5,14
2:15,22 4:1,7 6:4
25:14 41:13,23
115:11 117:20
119:5 120:2
128:16 136:7
147:9,11 148:4
152:20 160:1
189:21 198:15
209:20 210:4
213:15 218:17
219:23,23 221:9
222:9 228:7 229:2
229:8
**Emanuel's** 218:8
**emotional** 226:1,9
226:18 227:6
**emotionally** 226:15
**empirical** 112:13
120:13 121:4,5
122:13 124:4
125:2,3,4,6 126:2
**employed** 113:20
140:5 164:19
175:16 204:21
206:3 210:23
223:11,12
**employee** 44:19
178:4

**employees** 104:18
105:5,21 107:1
153:22 154:13
155:10 156:19
157:21,21 158:3
**employment** 20:8
20:12,18 26:12,15
27:19 48:9,14
51:6 57:21,22
59:20 79:5 80:14
164:18 169:9,18
169:22 218:1
223:9
**endurance** 12:10
**engaged** 23:18
**engaging** 29:20,20
31:17 73:22
**English** 8:20 15:12
**ensures** 223:7
**entered** 27:3,11,16
43:20 44:3 48:11
49:7 153:19
**Enterprise** 14:12
14:19 15:6 16:8
16:10,20 17:6,17
17:18 18:14 19:3
20:2,8,11 21:10
21:14,17,19 22:7
24:10,21 25:15
26:4,13 27:15
28:20 34:7 35:8
48:1,15 49:19
50:1,2,7,8,14 51:1
51:11 52:6,13,23
53:10 56:10,19
57:2 88:11 174:14
174:22 175:12
176:13 225:6
**entire** 117:5 127:15
**entitled** 86:1
181:13 209:9
**entity** 93:12
**equation** 134:9
135:14 137:5
**equipment** 30:13
**Esinch** 184:21,23

DEPOSITION OF RICHARD EMANUEL
Page 8

185:1,8
**essentially** 45:22
79:11 81:19
204:15
**established** 84:19
**estimated** 210:2
**Eta** 8:14
**Eva** 2:12
**evaluating** 159:6
**evaluation** 65:21
171:12 172:22
**evaluations** 171:16
**evening** 17:16
**event** 31:14 178:3
**eventually** 49:11
**everybody** 24:20
141:16 172:1,20
**everyday** 177:22
**evidence** 3:9 88:20
89:12 104:13,14
110:7,11 112:13
120:14 124:3,5
125:2,3,4,6 126:2
142:21,22,23
144:3 145:4,7
151:18 152:21
153:3,11,11,19
154:23 157:18,18
158:15 159:13,18
165:16 166:7,11
166:20 167:1,5,16
169:4 172:18
180:19 200:22
201:8 217:3 221:2
222:1,2
**exact** 36:13 69:12
**exactly** 13:5 16:7
38:7 39:16 51:14
53:3 59:10 66:21
67:10 76:18 81:13
145:12 191:3
198:10,16 221:19
**examination** 2:14
4:5 112:9 113:8
226:7 228:12
**example** 60:19

117:13 155:2
201:22,23 203:22
209:22
**exceeded** 89:4
**exception** 85:16
**exchange** 29:15
174:23
**exclude** 150:12
**excluded** 145:16
149:13
**excluding** 138:12
**exclusive** 150:11,17
150:22 164:2
**excuse** 34:17 42:19
48:20 49:15 65:21
98:5 170:4 194:17
218:12
**exhibit** 5:15 38:10
38:12 39:22 41:16
41:17 43:2,4
61:11 63:1,7 71:4
113:2 115:10
117:16 147:10,11
152:20 160:6
189:17 203:16,21
209:20 211:11
217:20 218:22
219:6,18 221:11
222:6 223:15
224:23
**exhibits** 217:7
**exist** 113:15
**existed** 157:2
**exists** 163:17,18
**expect** 208:7
**expected** 87:18
**expenses** 212:11
**experience** 10:3
14:15,18 70:17
74:17 130:19
202:6,9 204:16
205:5,16,21 206:1
206:1,3,5,6,7,21
206:23 207:3,5,7
207:8,14 221:17
227:2

**expertise** 37:4
**experts** 182:7,8
216:1
**EXPIRES** 228:23
**explain** 32:21
206:15
**explained** 4:12
**explore** 169:3
**exploring** 166:14
**expression** 80:2
**extent** 97:10 107:19
186:20 194:19

_____

**F**
**face** 164:23
**fact** 26:9 27:20
32:21 73:11 78:22
85:6 90:16 100:12
100:19 107:11
109:7,11,14
110:19 123:2
135:12,13 136:23
138:11 153:16,17
155:12 156:1
162:22 163:15
164:9,19 167:4
183:19 196:9,13
197:13 198:14
200:10 225:15
**factor** 26:12,17
120:20
**factored** 46:16
**factors** 13:1 20:15
**faculty** 30:2 59:20
67:12 104:20
118:1,15,16 120:4
133:15 136:2
155:19,20 158:5
158:21 184:7
186:12 190:1,8,10
190:11 191:1
194:4 196:19,23
197:3,5 201:14
202:22,23 203:1,7
217:22 223:8
**failed** 207:4

**Failure** 30:16,22
**fair** 5:18 56:6 64:15
87:23 124:7
125:18 138:18
196:6 200:7
**fairly** 7:22 37:2
58:11 67:22
**fall** 17:15 59:3
175:16
**familiar** 43:18
169:23 170:2,17
170:20
**far** 97:7,9 149:19
159:11,12 166:17
171:4,9 172:8
173:18 198:8
208:18 215:20,21
216:3
**Faulkner** 17:9,18
18:10 19:5,6,8,15
19:20
**fault** 178:10
**favor** 49:9 107:12
130:17
**favorable** 123:13
123:15
**favors** 29:14
**Federal** 2:23 3:10
3:17
**feel** 12:7 53:16
139:19 174:11
**feeling** 53:4
**fees** 212:11 214:23
215:14 216:6
**felt** 67:22 69:17,18
69:23 73:11 139:4
226:21
**female** 7:18 29:10
29:15,21 30:1,7
30:14,18 31:17,22
32:2,9 72:23
94:10 98:6,8
105:14 106:18
107:6 108:9,14
122:22 123:14
128:21,22 129:4

130:16 131:19
132:5,19 138:3
143:17 158:4,5
165:4,5 167:4
189:23 196:19,23
197:3,5 199:23
226:11
**females** 73:16,17
83:19 98:2,5,8
102:2,7,7,8
103:14,21 104:9
105:4,12,22
106:13 108:7,20
114:1,2,5 118:3
123:21,22 126:13
128:10,11 129:21
131:15 132:5,9,16
132:17 133:9,12
133:17 134:2
135:16 137:20
138:9 139:2 142:4
143:17 147:5
148:23,23 149:2,2
151:23 152:1
153:4 154:19
160:18 163:7,7,21
163:22 165:6,7
190:22 191:1,5,6
192:12,22 195:15
195:16 196:11,11
197:10,14,23
199:2
**Ferber** 123:11
**field** 7:5 8:18 12:21
**fifth** 131:18
**figures** 211:15
219:13 220:6,8
**figuring** 136:14
**file** 51:22 52:6,12
52:15 114:19
165:22
**filed** 45:6,10,14
52:11 72:8 79:5
174:21 175:11
176:1,20,23 179:5
**files** 34:8

DEPOSITION OF RICHARD EMANUEL

filing 177:6
fill 71:2
final 67:15,16 98:6
  111:1,21 127:13
  131:21 133:6,7
  135:9,15 140:8
finally 58:16 184:6
financial 52:19
find 58:11 61:3
  71:18 72:3 74:2
  74:18 75:8,12
  76:1,10 90:6
  115:1 143:10,11
  156:5 166:7 192:6
  192:11 193:1
finding 79:22
fine 11:5 164:14
  174:12
finger 95:20
finish 9:18 56:8
finished 202:12
fire 194:9
fired 26:23
first 4:2 6:11 16:9
  17:10 29:4,7
  34:14,20 35:2,3
  47:21 59:9 65:13
  65:14 66:21 74:1
  97:21 98:11 99:1
  100:5,21 102:1,17
  103:8 104:10
  105:12 108:6
  110:22 113:1,6
  129:17,22 130:5
  130:11 131:4
  132:5,16,16,23
  135:4 136:21
  142:3 143:2,6,8
  172:2,4 177:14
  184:21 185:3
  219:3 221:8,11,22
  228:8
five 65:15,16 98:8
  116:23 131:18
  132:9 144:22,23
  145:9 171:20

174:9
five-member
  141:20 143:6
flesh 28:10
flip 191:3 193:23
floor 226:5
flop 193:23
flopped 191:4
Florida 10:16 12:3
  13:11 14:2
fluid 86:3
focus 37:4
focused 37:2
  115:15
folder 217:9
follow 10:15,18
  161:13 201:17
followed 87:8
  162:6,19
following 20:8
  41:21 44:20 45:5
  56:10 161:1,9,16
  162:1 164:10
  174:23 175:5
follows 4:4 218:10
footnotes 59:9,10
foregoing 228:9
Foreign 15:12
forget 5:6 97:20
  173:15 216:13
forgive 70:15
forgot 220:17
form 3:6 28:3,7
  34:23 44:17,21
  47:16 48:6 64:8
  76:4,19 79:15
  90:5 92:4 99:16
  100:11 125:20
  138:22 145:11
  157:9 169:13
  175:1 202:11,17
formal 176:16
formality 3:4
formally 51:3
former 61:19
Forsyth 10:21

forth 149:19 196:9
  208:22 219:17
forward 79:13
  98:13
forwarded 110:15
found 61:5 62:7
  75:14 78:22
  117:12,13 122:6
four 65:15,16
  116:23 131:15
  132:6 133:9,14
  134:2 135:16
  136:5 137:8 139:2
  141:20 143:6
  144:8,23 206:6
  225:9
four-member
  106:16 143:19
four-page 61:11
four-seventh
  136:15
four-year 11:9 58:5
  58:12 86:20
  204:17 205:6,17
  205:20 206:2,9,16
  207:2 225:13
frankly 33:20 40:3
  56:4 169:21
free 12:7
frequently 59:14
Friday 1:21 228:6
friendly 76:13
front 96:15 97:16
  97:22 107:21
  108:21 109:12
  122:15 127:21
  129:23 131:5
  132:4,9 141:9,15
  141:17 142:13
  145:17 156:11
  209:2 218:7
full 6:2 13:15 16:2
  19:3 58:16,21
  204:23
full-time 11:4,6
  16:4 20:23 63:13

155:19 223:7
function 100:6
  101:11
fundamentals
  222:17
further 3:12 45:14
  45:19 79:21 81:16
  82:12 189:9
  227:15 228:14
future 210:2

**G**

gainfully 204:21
  210:23
GED 193:16
gen 147:5
gender 53:6 66:10
  66:14 68:8 70:7,8
  77:21 81:8,8
  85:10 89:19,19
  95:9 96:6,23
  101:15,19 104:3
  112:9,13 113:8
  115:8 116:4,10
  120:14,18 121:9
  122:22 123:17
  128:3 134:4 141:8
  151:15 153:20
  163:14 166:9
  192:7 199:5
general 185:21
  187:12
generalized 179:11
generally 12:20,22
  13:2 21:11 98:21
generated 203:18
George 1:8 9:10
  10:5,8
Georgia 10:21
getting 35:16,17
  70:15 164:12
  193:16 204:11
  207:1
Gidiere 1:18 2:7
gist 40:20
give 7:17 134:20

183:14 210:6
  216:23 217:10
  220:14 226:4
given 4:8 7:16
  90:17 127:3
glad 223:17
gladly 167:18
glanced 41:15
go 5:22 10:7 25:1
  48:21 51:16,17
  57:13 79:13 80:21
  95:21 119:11
  129:19 147:14
  150:1 155:12
  177:22 178:11
  179:2,22 184:9
  194:9 211:20
  217:15,18 218:21
  219:1
goal 91:18 92:1,3
  158:13 196:9
  197:10 198:8,13
  198:21 199:2,12
  199:21
goals 84:19,23 89:2
  89:5,8,13,18
  90:13,13,17 91:3
  91:5,7,9,17 92:6
  151:3 157:14,23
  158:7 159:10,15
  159:20 162:15
  195:4 198:23
  199:15
goes 42:3 98:23
  127:11 163:3
  172:21 196:2
going 3:19 4:7,11
  4:13 5:13,14,16
  6:11 27:7,17 37:5
  39:22 55:23 60:7
  61:7 63:6 78:12
  79:13 85:7 92:17
  94:23 101:18
  102:21 114:14
  124:15,15 130:20
  133:21 134:3

DEPOSITION OF RICHARD EMANUEL
Page 10

135:18 152:11
154:20 167:15,21
168:19 173:8
177:12,13 179:21
179:21 181:9,11
205:6 213:13
216:22 217:1,6,7
217:8 222:6
223:15 224:14
**good** 69:17 92:7
154:9 184:6
223:17
**goodness** 177:16
**gotten** 24:18
210:21
**government** 179:5
**grade** 29:16 112:23
136:13
**grades** 29:15
**graduate** 7:17,22
13:16 14:4 54:13
54:15,21,21,22
55:1,11,15,22
56:1 193:10,15
**graduated** 5:21
6:17 7:1 9:7 10:7
193:4
**graduates** 193:3
**graduating** 193:9
193:17
**graduation** 192:21
**greater** 123:13
124:1,4,5 192:6
**Griffith** 2:12 25:3
137:19
**gross** 121:10 157:1
**grounds** 52:21
**group** 140:16,19
142:3 190:12
**groups** 102:11
103:6
**guess** 38:7 90:9
108:23 139:6
156:21 173:1
**guide** 103:5
**guideline** 180:15

**guidelines** 73:20
86:13,23 87:1,3,5
87:7,18,20 88:3,4
88:12,16,22 89:3
89:10,16 92:23
93:6,9 94:9 95:4
95:22 97:3,8,12
99:11,13,15,19,21
103:1,19 105:9
107:23 108:17,19
123:6 145:2 161:2
161:10,14 162:2,7
162:14,19 164:7
164:10,21 180:8
187:15,19 195:20
**guilt** 82:15

### H

**Hamer** 123:11
**Hamermesh**
123:11
**hand** 31:11 168:9
171:3 182:8
**handed** 22:22
182:12 183:19,23
183:23 187:17
**handle** 44:23 45:3
54:9 176:4
**handled** 45:2
**happen** 214:7
**happened** 71:22
139:15,16,20
166:14 226:19
**happening** 59:18
60:22
**happens** 165:4
**harassing** 54:2,16
**harassment** 23:3
30:23
**hard** 183:20
**hate** 112:18
**hauled** 91:17
**hay** 112:23
**head** 5:2 136:5
**health** 60:20
208:19

**hear** 112:20 164:15
164:17 208:4
**heard** 70:21
**heavily** 107:11
**heed** 30:16
**held** 15:2 196:9
**help** 45:2 94:23
136:14 165:21
179:17 205:10
**helpful** 5:6 23:23
36:12
**hereto** 3:16
**Herndon** 1:19 2:7
**high** 5:22,22 6:1,13
6:14,18,21 158:19
158:22 192:21
193:4,10,16,18
202:3
**higher** 11:16 58:12
67:11 154:11,17
154:19 155:13,17
156:2,5 190:17
191:14 192:13
198:2,8 205:7,22
206:12,16 207:9
207:14
**highest** 58:16 87:12
160:17 200:16
201:1,10,14,19
**Hinton** 1:19 2:7
**hire** 44:23 73:3
163:21 165:16
167:2 188:21
196:10 199:1
202:4
**hired** 15:9 18:4
45:2 56:20 59:21
72:22 73:13 116:2
135:10 148:9
165:3,7,8 167:4
181:7 186:5
197:23 199:22
201:3 205:3
215:23 220:4
226:10,12 227:7
**hires** 115:13 117:7

119:10 128:20,21
128:22,23 129:1,3
160:2,11 191:20
191:22 203:1,8
**hiring** 52:19 60:18
73:16,22 82:4
83:19 86:12 93:23
94:2,16 96:11
98:20 104:4 107:3
123:19 127:4
128:10 131:14
139:21,22,22
140:1 146:23
147:2,6,20,22
151:3 153:14
160:8,16,17,18
161:3,20 162:23
165:11,13 166:23
168:5,7 170:18
180:15 182:1
195:14,18 196:16
197:10 200:15
201:14,23
**historical** 152:22
**history** 151:13
219:16
**hold** 31:11 95:20
112:17 208:3
**home** 191:17
**honestly** 14:3 48:16
66:2 173:12
209:17 216:10
**honor** 8:9,10,15,20
8:23
**hope** 204:4
**Hopefully** 181:1
**hour** 66:22 215:4
**hourly** 215:11
**hover** 115:4
**Huntsville** 6:16
**hurried** 199:17
**hurry** 199:16
**hypothetical** 55:4
100:17 101:3
184:15 203:8

### I

**idea** 99:18 112:5
185:7
**identically** 191:3
**identified** 67:8,13
**identify** 152:22
**ignored** 162:7
**illogical** 123:7
**imagine** 227:1
**imbalance** 81:23
82:4,8,20 152:13
**immediately** 10:7
10:15,18 149:12
**impact** 123:18
**impending** 47:14
**implementation**
81:12 195:19
**implemented** 99:14
**implementing**
100:4 162:2
164:20
**important** 112:14
120:20 154:1
203:10
**imposed** 159:10,20
**impression** 53:19
53:20,21,23 67:9
67:13 69:5 86:9
92:11
**impressions** 69:11
**impropriety** 22:6
22:19 25:20 26:10
31:4,10 32:2,8
53:14
**inappropriate**
23:19 30:17 54:3
69:23 70:2
**inappropriately**
66:7 68:3
**Inas** 161:15
**inasmuch** 102:18
103:15 128:9
162:14 171:20
**incident** 25:19
178:23
**incidentally** 190:20

DEPOSITION OF RICHARD EMANUEL

include 27:6 151:6
  211:18 213:3,6
included 115:23
  116:1 142:9
  148:17 180:3
  203:15,20 211:10
  213:18
includes 213:1
  218:16,17
including 96:14
  111:20 140:20
inclusive 150:11,16
  150:20
income 210:2 218:8
  218:19 219:8,13
  220:3 223:9
incomplete 131:12
incorporated 89:10
  96:1
increase 163:4,6
  190:9
increasing 224:12
increasingly 98:22
INDEX 2:14
indicate 32:10 69:7
  84:22 141:19
  196:15
indicated 115:17
  149:10
indicates 112:8
  115:14 116:21
  127:3 200:14
indicating 71:1
individual 55:15
  73:4
individually 130:10
individuals 65:15
  67:2,3,6,7 99:14
  106:8 138:17
  152:8 168:11
individual's 79:18
inducted 8:11
Industrial 123:11
influencing 169:7
informal 177:7
information 9:13

9:15 39:18 55:7,9
  55:10 74:21 75:9
  75:12,12,14 76:11
  76:22 98:9 148:16
  155:7 188:20
  203:20 204:2
  211:7,9 221:3
informed 23:16
  54:22
initial 98:1,13
  100:13 144:16
injunctive 212:13
  212:17 214:4
injury 213:8,11
input 169:2
inquire 71:8
inquiry 186:18
inside 122:8
instance 110:6
  210:6
instances 31:9
  116:22
instituted 16:18
  44:10
institution 7:22
  27:19 58:10,12,13
  184:8 200:12
  206:2
institutionalized
  147:23
institution-wide
  194:23
Instruction 30:17
instructor 11:4,6
  14:4 15:3,10,20
  17:7 20:23 58:14
  61:5 63:13 71:13
  75:4 143:13
instructors 15:19
  15:19 60:19 74:6
insurance 208:19
intend 189:2
intended 44:6
  150:10
inter 109:4
intercourse 29:20

31:15,17 174:18
interest 60:3 150:2
interested 7:13
  60:6,8,12,15
  149:10,18 170:16
  171:1 187:9
  196:16 228:16
interesting 59:22
  59:23 78:22 79:9
interim 37:21 38:2
  40:8,22
internet 74:18 75:1
  75:5,8 80:22
  122:6
interpret 89:4,5
interpreted 47:11
  89:23
interrupt 48:20
  194:17
interruption 93:7
interview 65:8,10
  65:22 66:5,19,20
  67:1,16,19,21
  68:1,11,13,21,22
  69:1 70:10,17,19
  70:20 98:2,4,7
  109:9,17 110:6,13
  110:21 111:13,20
  126:17,21 130:18
  131:9,21 132:17
  132:19,23 133:1
  137:6 140:2
  143:21,23 171:15
  172:13 173:22
  174:3,7
interviewed 65:11
  103:8 108:2
  109:11 110:20
  111:2 132:3,8
  135:1 138:14,17
  140:10 141:15,17
  142:13 143:13
  145:22 168:8,12
  172:12 200:1
interviewing
  138:19

interviews 98:15
  109:3,6,17,21,23
  127:19,21 172:20
  216:17,18,21
  226:23
introduced 3:14
introduction 13:13
  13:14
investigate 83:3
investigated 83:4
investigating 22:23
  35:22 36:1,3,6
  37:13,14
investigation 35:12
  38:4 79:22 80:13
  86:8 92:15
investigator 78:15
  79:19
involved 48:13
  109:22 110:5
  131:9,14 139:23
  143:3 144:11
  168:1,2,4,6,15,16
  168:18,20,22
  169:6 185:17
involves 171:15
irrelevant 172:22
issue 52:2 81:14
  87:17 94:13 96:10
  106:8 108:18
  131:7
issued 87:1 93:1,9
  93:12 204:6
issues 136:19
item 31:19
items 30:11 31:12
  33:18 34:1 212:12
  214:13

J

J 121:16
janitor 202:1,23
  203:8
January 28:12,17
  31:1,2
Jeff 198:18

jeopardize 200:20
Joan 37:21 38:2
  42:20 43:5
job 14:19 16:4 59:8
  60:6,12,15 61:15
  61:16 62:19,22
  63:9,11,15,18,21
  64:7 65:1,8,19,19
  71:9 72:2,11,21
  111:4,19 126:7,9
  126:11 127:15
  134:10 149:21
  150:4 188:17
  202:2 204:12,21
  205:3 213:1 224:3
jobs 15:6 16:6,11
  17:5 59:12
job's 59:9
journal 121:2,16
  121:17,19,20
  122:1,2,3,9
judge 91:18 153:9
  157:22 180:19,21
  202:21 203:2
  214:8
judgement 112:15
  120:16
June 63:2 228:18
Junior 14:13

K

Kappa 8:8
keep 182:3
kept 9:6 114:17
kids 191:18 211:22
  224:20
kid's 208:10
kin 228:14
kind 5:7 11:7 15:15
  18:13 19:19,22
  39:11 60:22 70:19
  75:19 81:19 83:7
  115:12 122:10
  153:5 173:19
  179:6 187:9
  211:16 226:20

DEPOSITION OF RICHARD EMANUEL
Page 12

kinds 69:6 184:15
kiss 40:13,19 41:1
knew 57:4 72:22
  111:8 135:11
  183:3,9
know 4:16,20 12:7
  21:16 34:3 36:4,8
  36:9,16,17,20
  37:3,12 39:20
  44:22 46:15 48:16
  48:19,22 52:5
  55:6,17 56:4,18
  56:23 57:3,17
  59:18,20,21 60:17
  65:2,7 66:22 69:6
  69:7,7,9 75:6,7
  79:23 80:4 84:13
  87:21 88:14,15,19
  89:7,23 90:3,6
  91:14,14,18,20,21
  91:22,23 92:2,5
  94:20 95:10,16
  97:7,9 99:1
  100:12,16 101:3
  101:17,22 105:23
  106:2,17 107:18
  108:11,12,18
  111:5,6,8,10,11
  111:13,15,22
  112:3,3 113:22
  114:2 115:19,20
  120:23 122:4,7,12
  124:9,10 126:12
  126:13 127:12,19
  129:20 130:13
  131:7 132:8
  134:11,12,13,23
  135:8,8,21,22
  137:7,7,9,10,16
  138:2 140:23
  141:8,10,12,13
  142:10 143:8,11
  145:13,19,20
  146:5 148:14,16
  151:9,21 153:7
  154:7 157:11

159:11,12,12,22
162:16 166:11,19
168:15,17,21
170:9 171:1,4,9,9
172:10,15,16
173:1,1,10,12,18
175:6 176:16,17
176:18 177:4
181:9,10,11,15,20
183:7 184:7,12
185:13,13 186:9
186:13,20 187:1
187:18 189:5,9
191:8,15 192:17
193:5,7 194:11
195:10 196:5,13
196:15 197:3
199:22,22 200:5
201:2 202:18
208:11 209:12,17
209:17,18,22
210:4,7,8,13,15
212:16,17 213:7
213:14 215:14,16
215:17,20,20,21
215:22 216:3
220:2,5,6,8,9
221:11 226:22
knowing 196:8
knowledge 56:20
  59:9 74:21 169:4

_____ L _____
label 28:19
labeled 41:12
labor 104:21
  113:17 118:22
  123:12 153:4
  154:3,7,9 155:1,4
  155:15 156:3,7,21
  157:15 158:6
  159:7 162:10
  190:2,3,14,15,22
  191:6,8,12,17
  197:2,13
lack 45:4 165:7

lagging 198:20
Lambda 8:14
language 200:17
Languages 15:13
large 1:18 3:3
  13:13 228:5,21
larger 193:3,13
lasted 69:13
latitude 90:12
Laude 8:3
law 1:18 2:3,4,8
  79:23
lawsuit 4:14 51:22
  52:6,11,12,15
  56:9 77:1 124:14
  176:21
lawsuits 176:17,20
lawyer 4:12 5:5
  41:11 44:18 50:19
  61:9 78:11,14
  167:14 179:23
  181:1,11 185:14
  212:19 215:15
  216:1 220:14
lawyers 45:7,11,15
  45:23 46:8 49:4
  215:2
laymen's 179:11
leader 7:21
leadership 7:20 8:9
  8:10,12
leading 186:22
learn 167:16
learning 73:18
leave 9:22 11:15
  20:11,16 21:14,17
  21:22 27:12 48:8
  60:16 94:18
  120:10 208:21
  213:4,22 217:8
Leavell 67:8
leaving 26:13,17
  28:1
lecture 13:14
lectureship 58:14
led 73:17

left 26:4,21 27:10
  27:15 34:6 47:12
  48:1 55:18 175:18
  225:6
legal 80:5
length 166:15
lengthy 85:6,7,8,8
lesser 73:3 167:5
  199:23 201:20
  226:11
letter 11:21 22:22
  26:1,2 28:12,14
  28:14,18,21 29:1
  29:2,9 31:10 32:3
  32:10,22 33:2,9
  35:10,16,17,20,23
  36:5,17 37:12,17
  38:9,12 39:5,6,8,9
  39:10,12,13,15,16
  40:11,11,14 42:8
  42:13,19 43:1,4
  44:13 46:13 49:2
  49:3,6,14,15,20
  52:2 53:9 63:2
  70:12,16 71:1,5
  71:17 72:10,20
  78:11,14 79:16
  80:2,6 175:8
  204:6 217:13
letterhead 80:7
letters 46:17,18,19
  52:8
let's 7:14 14:18
  17:10 20:10 28:9
  42:10 56:9 59:7
  60:19 97:17 98:1
  104:22 113:7
  119:11 129:17
  143:10 147:1,15
  176:19 189:20
  199:6 201:22,23
  203:9
level 14:15 15:16
  81:5 87:12 98:14
  110:15 111:20
  130:14 143:6,8

148:1 158:20
172:21 185:21
201:1 207:2,13
Lewis 1:16 3:2
228:4,20
License 228:22
lieu 218:5
life 178:4
light 138:11
limits 144:21
Linda 2:11 165:16
167:2,17
line 197:1 207:10
229:15
lines 210:1
link 83:13
list 57:18,18 127:8
145:15 180:3,3
181:12,18
listed 32:16 34:1
57:16 64:2,5,6
143:16 144:8
208:21 229:5
listen 134:8
listening 187:5
listing 7:7
lists 115:6 116:1
144:6
Literature 15:13
litigated 46:8
litigation 81:17
82:12
little 50:23 60:17
63:8 90:19 110:2
164:12 167:9
172:22 211:8
223:17
live 6:5
living 9:23
load 16:2 19:3
locate 50:18 149:21
155:8 192:19
located 17:16
logical 127:7
long 9:20 12:20
13:3,23 14:2

DEPOSITION OF RICHARD EMANUEL

101:20 122:9
202:18 225:3
**longer** 12:18
**look** 16:16 28:9,13
28:23 40:1 41:14
43:16 51:17 52:5
52:5 53:2 60:6
62:10 75:3 80:17
85:12 114:10
115:2 133:14
142:2 150:5
151:20 152:5
155:5 156:2
167:13 171:19
184:4 191:9 192:4
192:23 198:17,23
199:6 207:20
217:1
**looked** 39:7 75:2,6
86:11 141:5 147:6
160:10 224:6
**looking** 60:1,16
61:3 87:4 115:11
117:16,17,21
119:2 139:15
142:6 147:8,9,12
150:3 152:2,19
160:7 163:4,6
165:5 170:13
171:8 189:21
191:19 196:7,10
215:14
**looks** 14:5,22 98:1
133:17 138:6,8
198:18 199:14,19
**lose** 9:5 97:19
**loss** 207:12 219:8
219:13
**lost** 204:11,14,20
205:2,11 210:2
211:9 220:3
**lot** 40:2,3 55:17
176:5
**lots** 60:10
**loud** 5:1
**lucky** 76:9,12

**M**
**Madison** 6:16
**Magna** 8:3
**main** 20:19,20
164:5
**maker** 133:6
135:10,15 140:9
**makers** 133:7
**makeup** 95:23
**making** 29:23 54:2
79:12 87:13
134:21 156:16,17
158:19,23 168:22
181:21 200:18
**male** 7:18 98:3
102:2 103:14,21
104:10 105:13,13
107:5 108:7
123:15 128:23
132:23 138:4
139:19 142:4
148:15 149:4,17
150:15 160:4
165:17 167:3
189:23
**males** 83:19 98:5,6
98:8 102:7 104:1
104:1 105:3,10,11
105:22 106:1,11
106:13,14,16,18
107:5,12 108:9,13
112:12 113:11,13
113:19,23 114:2,5
116:7,13 117:7,9
118:1,2,17,18,19
118:19,21,21,23
118:23 119:15,18
119:23 120:6,6
121:11,12 123:23
123:23 125:23,23
126:5,10,13 129:2
129:21 130:15,17
131:16 132:10
133:1,9,13,18,19
134:2 135:16
136:23 137:1

138:1,9 139:2
140:4,4 143:18
147:5 148:9,10,10
149:1,2,3,13
150:12 151:4,5,6
160:19 161:4,4
165:7,8,9 181:6
186:11,11 190:10
190:22 191:1,5,6
192:21 194:3,5,7
194:13,14 195:9
196:14,16,17
197:6
**man** 138:20
**manner** 3:15
228:16
**March** 78:16
**mark** 5:19 39:22
42:10,14 61:7
85:11 114:14
148:13 160:19
210:11 224:14,23
**marked** 72:16
217:11 221:10
**market** 113:18
156:3 162:10
190:2,4,14,15,23
191:6,8,12,17
**marks** 77:13
**married** 212:2,4
**master's** 10:10
72:23 154:11,16
154:19 155:17
156:1,4 190:17
191:14 192:13
201:3 202:5
**mater** 21:4,5
**Matt** 2:12 24:23
**matter** 54:3 90:9
99:9,13 100:8
101:15,18 122:17
122:21 123:7
148:19,20 187:13
225:15 228:9
**mattered** 123:2,4
**matters** 208:1

**McGhee** 78:15
79:19
**meal** 39:19
**mean** 8:18 15:15
16:22 31:13 35:7
39:18,20 47:11
48:20 53:1 55:5
60:2,4,5,5 62:17
64:3 65:3 80:3,4
81:13 84:14 85:22
86:3 105:1,3
113:12 116:7
119:7 120:17
124:13 135:21
139:22 140:18
147:2 150:16
160:13 169:5
170:5,12 173:12
179:10 181:15
182:1 188:6 189:7
193:7 194:17
197:3
**meaning** 77:21
83:17
**means** 4:16 113:13
120:18 149:17
173:11,12,14
212:16,20 223:9
**meant** 12:5 56:7
181:3 205:18
**measure** 148:13
**medical** 213:23
**meet** 91:16 99:6
100:23 101:20
103:17 108:21
135:2 145:3 199:2
199:15 200:3
**meeting** 103:17
198:23
**meets** 101:12
**melodramatic**
226:15
**member** 107:14
149:20 155:19,20
184:8 214:18
**members** 9:2 59:21

63:3 94:10,11
104:20 115:7
118:5,15 133:15
136:3 140:12
143:15 144:1,9,22
144:23 145:14
158:5,21 171:18
180:4,7 190:1
196:19,23 197:3
223:8
**membership** 9:5
**memberships**
57:10
**memorable** 178:3
**memory** 17:2 22:1
23:22 24:3 165:22
**men** 112:16 118:8,8
118:12,12 120:16
120:22 124:8,21
125:18
**mental** 55:14
**mentioned** 191:22
**mentioning** 140:17
**met** 64:16,19 65:14
84:20,23 89:1
90:17 99:3 111:3
111:17 135:5
145:6 182:6
197:10 199:21
200:5
**method** 162:12
**Michael** 20:6
**mid** 81:5
**middle** 1:2 77:8
**mind** 69:11 73:3
115:1 177:19
181:13,19 182:2,4
202:2,8
**minimally** 111:7,11
202:2,8
**minimum** 63:18,22
64:3,6 99:3,6
100:7,23 101:12
101:20 111:4,18
155:18 200:3
210:10
**minor** 213:3

DEPOSITION OF RICHARD EMANUEL
Page 14

| | | | | |
|---|---|---|---|---|
| **minorities** 73:16 | **motivator** 26:14 | 211:16 217:4,10 | 128:20,21,22 | 38:18,18 87:17 |
| 102:8 108:20 | **move** 56:9 60:1 | 220:1 | 131:2 148:11 | 218:4 |
| 128:11 148:23 | **moved** 130:2 172:1 | **needed** 36:8,9 | 150:14 151:21 | **Offices** 1:18 |
| 192:12 | **moves** 112:1 | 71:18 82:20 | 156:10 160:2,7,10 | **official** 145:18 |
| **minority** 73:17 | **multiple** 23:13 31:9 | 179:22 | 181:6 183:9 | **Off-the-record** |
| 102:8 128:11 | 31:12 32:22,23 | **neither** 140:16 | 189:23 191:19 | 25:13 |
| **minute** 80:12 86:6 | 34:1 217:20 | 228:14 | 195:8,15 206:3,19 | **oh** 74:13,14 79:7 |
| 104:6 122:19 | 219:18,20 | **never** 4:10 23:16 | 209:11,12,16 | 84:14 100:14 |
| 167:10 181:20 | **mutually** 164:2 | 34:13 35:6 42:5 | 210:7 215:13 | 175:18 177:16 |
| **minutes** 69:13 | | 49:19 135:2 | 219:22 223:3 | 178:9 180:12 |
| 174:9 216:23 | **N** | 153:10 173:23 | **numbered** 129:21 | 182:17 184:6,20 |
| **misconduct** 34:16 | **nail** 97:18 | 178:14,15,16,20 | **numbers** 128:12 | 185:6 188:18 |
| 34:17,22 35:13 | **name** 6:3 27:21 | 178:21 179:1,3 | 136:1 137:21 | **okay** 4:23 5:3,11 |
| 47:15 48:4 54:9 | 71:11 75:6 110:15 | 193:4 197:10 | 146:3 147:4 | 12:8,9,11 13:21 |
| 56:19 57:1 | 181:8 182:13 | 198:2,13 199:10 | 151:20 165:6 | 14:7 15:22 16:14 |
| **misrepresent** 85:14 | 184:17,22 185:1,3 | 199:17 | 183:12 193:20,21 | 17:11 24:6,7 29:6 |
| 116:8 | 185:4 | **new** 71:12 75:4 | 209:19 210:11,14 | 30:21 32:6 37:8 |
| **missing** 170:23 | **named** 140:12 | 115:13 184:7,8 | 211:2 220:13 | 38:1 42:1,2 62:18 |
| **misspoke** 118:9,13 | **names** 115:6 127:1 | 188:21 220:12 | **nutshell** 226:17 | 78:17 90:22 92:2 |
| 149:1 203:3 | 131:3 144:8 | **Newman** 37:21 | | 92:5,19 94:22 |
| **mistake** 202:21 | 145:15 181:9 | 38:2 42:8,19,20 | **O** | 95:17 96:17 99:20 |
| 203:2 | **narrow** 185:2 | 43:5 | **oath** 4:15 26:19 | 100:20 101:6,7,14 |
| **misunderstood** | **narrowly** 213:12 | **night** 18:21 19:4,6 | **object** 28:3,6 34:23 | 104:8,23 115:3 |
| 178:9 | **national** 8:8,10,14 | 19:8 | 44:17,21 47:16 | 130:21 134:1 |
| **moment** 42:12 | 74:8 155:11,13,16 | **nod** 5:1 | 48:6 64:8 76:4,19 | 139:4 143:10,13 |
| **money** 202:15 | 190:14 191:23 | **nonsensical** 39:17 | 79:15 86:10 90:5 | 146:1 147:9 |
| 212:21 225:13 | 197:19 | **normal** 12:18 | 92:4 99:16 100:11 | 152:18 166:18 |
| **monitor** 186:2,3,5 | **naturally** 49:9 | **NORTHERN** 1:3 | 125:20 138:22 | 175:18 176:19 |
| 186:21 | **nature** 36:9,13 | **NOTARY** 229:13 | 145:11 157:9 | 179:18 182:5 |
| **Montevallo** 6:23 | 82:17 101:3 | **note** 39:5,5 55:14 | 169:13,15 175:1 | 200:7 212:19 |
| 9:8 20:7,13,18,21 | 212:13,17 | **notes** 98:4 | 177:23 202:11,17 | **ole** 176:18 |
| 47:14 48:2,10 | **near** 6:16 | **notice** 45:6 | **objections** 3:5,5 | **Omega** 8:23 |
| 56:11,18,23 | **necessarily** 102:9 | **noticed** 44:14,18 | **objective** 124:21 | **Omicron** 8:8 |
| 175:17 225:9,16 | 108:14 155:15 | 73:14 | **obtained** 76:22 | **once** 59:13 74:1 |
| **Montgomery** 1:20 | **necessary** 63:17 | **notified** 149:11 | 155:17 156:4 | 95:14 |
| 2:9 | **necessitate** 103:5 | **notify** 3:22 | 191:16 | **ones** 83:2 87:4 |
| **month** 210:3,3 | **necessitates** 95:6 | **notion** 152:13 | **obtaining** 14:10 | 169:1 177:1 |
| 220:9 | **need** 3:6 5:18,20 | **November** 38:13 | **obviously** 65:18 | 189:14 |
| **months** 72:9 210:5 | 12:6 24:4 36:4,16 | 42:9,18 72:8 | 116:15 123:2,4 | **ongoing** 85:21 86:3 |
| 220:10,10 | 37:11 54:23 55:6 | **no's** 5:6 | **occasion** 183:21 | 86:5 |
| **Morris** 2:4 | 58:19 112:21 | **number** 13:1 20:15 | **occurrence** 177:22 | **online** 156:12 221:8 |
| **motion** 44:18 45:9 | 131:12 137:12 | 32:1,6 38:11 48:7 | **odd** 110:2 187:1 | 221:16,22 |
| 45:13,18 | 152:5 167:12 | 114:4 115:11 | **odds** 164:3 | **opening** 61:5 |
| **motivating** 26:12 | 169:12 179:19,23 | 117:6,7,8,9,10,18 | **offered** 3:8 221:9 | **opinion** 33:17 |
| 26:16,16 60:3 | 181:9 189:3 190:9 | 117:22 118:1,2,3 | 222:1 | 79:18,20 80:2,4,5 |
| 165:1 | 194:4 195:8 204:9 | 118:11,12,21 | **office** 2:3 3:21 30:3 | 139:20 |

DEPOSITION OF RICHARD EMANUEL

opportunity 20:12
  20:18,21 21:3,6
  26:4,22 27:18
  47:13 48:2,10
  59:8 220:3 225:16
opposed 119:18
  141:22,23 205:3
oral 222:17
order 15:7 38:8
  190:5,10 194:3
  199:2 214:8
  216:11 223:3,4
ordered 81:15
original 159:23
ought 140:3 162:10
outcome 128:13
outcomes 126:3
  129:8
outer 38:18
outlined 127:1
outstanding 7:17
  7:21
outweighed 73:12
overall 107:2
  166:23 192:20
oversees 93:12

P
page 41:22 113:5
  115:18 117:15,17
  117:20 120:3
  147:13 148:5
  150:4 209:19,20
  209:23 213:17
  218:7,17 219:3
  229:15
pages 85:16 121:3
  121:18 189:18
  211:10,12 217:20
  219:18,20 228:10
  229:4
paid 205:7 215:15
painful 5:17
panel 44:19 65:17
  106:16 123:21
  124:14 127:22

panels 128:1
papers 176:5
paragraph 213:16
  214:5
paraphrase 102:21
pardon 49:13
  188:13
parity 190:6
part 16:18 22:7,19
  32:2 40:10 48:4
  51:2 74:6 80:20
  91:2,3 94:5 95:2
  108:23 114:6
  115:10 129:16
  133:23 134:6
  138:15 139:11
  140:9 142:14
  149:6 155:12
  172:22 173:20
  214:1 217:4
  222:18 223:18
participated 94:3
  127:15
particular 7:12
  54:21 60:23 68:20
  82:5 100:4 104:2
  105:11 120:7
  121:12 130:18
  132:15 137:1
  143:18 151:14
  161:5 164:9,18
  171:23 190:15
  196:17 199:9
  200:19 201:2
  215:13 223:11,12
particularly 8:16
  122:22 123:18
  165:9,10 222:14
particulars 19:1
  51:12
parties 2:21 3:13
  81:22 82:13
  223:12 228:13,15
partners 215:17
party 3:16
pass 99:6 100:6

101:11
passed 81:5 101:20
  111:12,19 181:7
pattern 73:15
  161:3 166:17
pause 55:11,12
pay 21:1,2 136:12
  207:2,9,13 208:7
  208:23 209:2
pays 206:16
PDF 114:18 218:15
peace 47:8
people 109:22
  110:5,19 127:22
  131:9,13 132:8
  133:7 139:23
  140:1 145:9,22
  154:10 168:12,14
  168:16,23 170:10
  172:11 182:2
  191:11,20 193:15
  201:10
perceive 121:10
perceived 73:15
percent 105:13,13
  105:21,22 106:1
  106:12,13,13,14
  106:15 107:5,5
  117:9,10 118:2,3
  118:8,11,12,17
  119:13,23 128:22
  128:23 129:3,3,22
  129:22 130:16,16
  133:17,18,18
  137:20,22 138:1,3
  138:3 142:5,5,7
  148:12 153:21
  154:2 156:6,19,20
  160:9,13,16,22
  183:7 189:23
  191:4,5 197:4,15
  198:2,3,7,9,10
  199:11 216:9,9,9
percentage 94:10
  94:11 95:9 102:6
  136:15 137:8

138:6,9 151:2
  154:18 156:22
  180:15 192:12
  197:23
percentages 123:4
  123:6,8 128:12
  133:15 136:20
  137:11 151:1
  152:2,3 157:3
  158:2 186:10
perception 55:15
  81:21
performance 69:16
  171:16
performed 65:20
  67:20 69:20,21
period 83:16 117:3
  118:6 128:23
  129:2 147:7 160:2
  192:15
permit 167:18
person 38:14,16
  40:11 75:7 80:1
  136:16 182:12
  186:2,4,4 187:16
  188:16 189:8
  200:16 201:19
  202:7,8
personal 80:5
  208:21
personally 226:16
pertains 102:18
phone 38:15 68:18
  68:19,21,23 74:4
  77:3 135:7 186:14
  186:15 188:6
phonetic 184:21
  185:8
phrase 212:18
physical 213:8,10
Ph.D 1:15 2:15,22
  4:1 85:8 228:8
  229:2,8
Pi 8:14
pick 68:17 123:5
picked 187:16

pieces 113:7
pilot 221:21 222:4
place 97:19 99:2,22
  136:21 153:1
  173:3
placed 205:13
places 163:5
plain 37:10 176:15
Plaintiff 1:6 2:2
plaintiffs 82:3
  156:17 180:17
plaintiff's 41:19
  147:10
plan 173:3,6,10
  208:9 209:6
play 106:9 121:9
  195:21,22 196:1
players 182:10,11
  184:1,1,15,16
plays 74:12
pleasant 69:3
please 6:3 12:7
  43:16 50:19
  114:15 128:15
  134:8 179:20
  220:13
plural 29:11,17
  30:4,8,19,20,21
  32:11 33:4 34:5
  35:19
plus 208:9,9
point 38:4 67:10
  110:2 120:3 138:6
  142:8 144:5
  152:12 154:9
  156:16,22 158:17
  169:23 190:21
  193:22 194:11,22
pointed 141:3
  147:21
pointing 201:16
points 198:16
policies 80:14
  86:11 150:21
  170:8,17
policy 87:14 158:18

DEPOSITION OF RICHARD EMANUEL
Page 16

158:23 180:15
pool 104:21 118:22
  148:22 149:5,5,14
  149:20 150:7,13
  151:4 153:4 154:3
  154:7,9 155:1,4
  155:15 156:7,21
  158:6 196:14
  197:2,13
pools 157:15 159:7
population 106:7
  107:8 114:23
  119:18 135:18
Porter 2:3,3,16
  3:19 24:8,12,16
  24:19,22 25:8
  28:3,6 34:23
  38:10 42:2 44:17
  44:21 47:16 48:6
  50:5,9,12 64:8
  76:4,19 79:15
  90:5 92:4,7,20
  99:16 100:11
  125:20 137:23
  138:22 145:11
  157:9 169:13
  170:4 175:1,4
  176:7 185:5 201:7
  202:11,17 208:3
  213:21 214:23
  216:7 223:23
  225:20,22 226:3
  227:11
portion 153:20
position 58:7 62:8
  71:2 73:4 75:10
  114:8 143:14
  149:9,18 165:14
  181:22 192:2,8
  200:1,4 221:14
positions 15:2 81:6
  158:18,19,20,21
  158:22,23
positive 226:21
possibility 111:16
post 114:6

posted 84:11,15
posting 61:4 111:5
postings 60:6,12,16
  218:3
Postsecondary
  80:15,23 87:2
  93:1 186:1 187:12
  188:3
potential 106:10
  123:13,17 124:2,4
  124:6 191:20,21
potentially 108:6,8
  150:14 200:20
powerful 158:1
practice 164:18
  170:5,13 195:18
  201:9
practices 73:23
  169:9,19,22
  170:18
Prattville 6:6
precisely 106:7
preferred 64:13,19
  200:17 201:15,20
preferring 201:10
prefers 200:23
  201:9
prepared 181:18
present 2:10 58:3
  181:12
presentations
  74:19
presented 38:19
  55:4 143:5 152:21
  153:5,11
president 8:6 21:15
  21:18,21 22:13,14
  26:11 28:19 54:4
  54:8 56:17,22
  57:3 68:20 98:7
  109:8,13,16,18
  110:13,16 131:18
  131:19 132:2,4
  133:5,23 134:5,11
  134:13,17,22
  135:2,9,14 137:4
  138:12,15 139:1,3

139:7,17 140:8,13
  140:21 141:23
  145:23 154:15
  218:3
pressure 198:22
prestigious 7:23
presume 46:15
  78:12 114:11
  139:6 159:8
pretend 185:6
  196:2
pretty 136:8 138:5
  138:8 196:12
previous 61:16
  70:14
previously 54:20
  115:16
primarily 13:13
primary 20:17
  26:16 48:8
printed 114:19
prior 50:11 64:22
  74:22 132:4 179:4
private 11:8
probably 59:13
  61:1 75:1,5 78:20
  90:2 97:1 124:15
  178:10 181:6
  187:4 206:18
problem 54:23 55:5
  55:23 56:1,7 94:7
  97:10 101:1
  102:16 103:7,10
  106:20 107:19
  125:13,15,17
  138:12 146:17
  149:16 164:11
  194:21,23 195:3
  195:12,14 202:16
problematic 103:13
  103:15 108:7,10
  128:8 157:16
  164:22
problems 21:12
  136:19 216:17,20
procedure 3:1,11

3:17 175:3 201:18
procedures 45:4
  96:11,11 150:22
  171:6
proceeding 27:22
  34:9 41:7 44:10
process 4:13 12:7
  38:5 94:3 98:22
  107:3 108:22
  111:13 131:9,11
  131:14 134:1,6
  140:1,2 143:23
  144:12 147:20
  151:8 163:1 168:5
  168:7 170:18
  171:13,15 173:20
  173:22 174:3
processes 98:21
  112:15 120:16
produced 41:10
  50:4 61:10 114:11
  114:17 221:7
  222:13
produces 218:4
production 41:12
  42:4 74:16
profession 60:21
professional 69:3
  69:18 76:14
professionally
  226:16
professor 15:15,18
  54:1,12 58:8,15
  58:15,17,18,22
professors 54:10
professorship 58:9
program 9:13 10:1
  21:7
programs 16:17
projected 219:15
promising 98:14
promotion 82:4
promptly 54:8
pronounce 182:15
pronouncing 71:11
property 29:21

31:18
proportion 113:14
  113:16,19 118:19
  153:3 193:3,4,13
  196:19,23 198:6
proportionate
  190:7,11,13 195:7
proportionately
  194:3
proportions 102:19
  103:5,18 105:3
  108:19 136:2
  156:3 190:2,22
  191:21
prosecution 45:14
  45:19
protected 152:8
proven 157:15
provide 24:5 50:19
  56:2 90:12 91:15
  95:4 98:12 103:1
  103:3 131:3 218:5
  220:13 221:20
provided 3:10,16
  30:23 35:5 36:22
  43:1,3 83:15
  86:15 89:13 95:10
  152:3 157:18
  158:15 166:21
provides 117:21
  121:3 145:4,5
  218:4
provision 95:22
Psi 8:23
public 13:19 18:17
  221:9 229:13
publication 155:14
publications 83:14
pull 94:16
purge 149:3 151:3
purging 151:5
  196:14
purpose 3:9 77:4
  81:11 94:12 95:4
  98:10,12 99:12,19
  100:3,12,21

DEPOSITION OF RICHARD EMANUEL

| | | | | |
|---|---|---|---|---|
| 102:14 | 104:6,7 109:1 | 151:14 163:13 | 40:4 60:2 64:11 | **receive** 24:12 26:2 |
| **purposes** 41:18 | 132:15 133:8 | 166:9 192:7 199:5 | 70:11 75:20 83:3 | 34:12 49:3 59:5 |
| 143:1 | 134:8 138:3 | **races** 105:4 | 84:8 89:6,6 100:8 | **received** 10:13 |
| **pursuant** 1:15 2:23 | 143:12 144:6 | **racial** 81:23 82:4,7 | 132:14,14 161:21 | 27:18 28:18 35:6 |
| **pursue** 11:16 | 145:12,21 146:18 | 82:19 96:5 98:9 | 164:6 167:12 | 35:23 36:11 38:9 |
| **pursuing** 13:7 | 150:10 155:9 | 128:3 130:9 134:3 | 169:14 181:23 | 44:13 49:2,16 |
| 51:18 52:20 | 159:23 161:8,22 | 134:4 | 182:17 184:10 | 70:23 78:11 |
| 222:22 | 161:23 162:17 | **raised** 73:2 | 187:6 194:6 200:6 | 213:23 217:13 |
| **pursuit** 10:16 | 164:13 166:4,5 | **range** 197:15 | 208:11 210:6 | 224:16,17 |
| **put** 37:23 52:19 | 167:23 169:14 | 219:21 | 214:17 227:3 | **receiving** 7:8 |
| 99:21 123:3 136:8 | 175:7 176:16 | **rank** 15:20 58:9,16 | **reason** 19:16 20:19 | **reception** 68:18 |
| 148:11 149:19 | 178:9 180:22 | 58:22 206:22 | 20:20 21:5 26:3 | **recess** 92:9 147:17 |
| 179:23 219:10 | 183:1 184:3 186:9 | 207:13 | 27:10,15 47:23 | 217:5 |
| **puts** 198:21 | 188:14,19 194:20 | **ranks** 58:13,19 | 57:19 59:4,6 | **recharacterize** |
| **p.m** 227:13 | 195:10,11,13 | **rate** 129:22 160:16 | 75:22,23 76:7 | 165:15 |
| | 202:13,14,19,20 | 160:17,18 171:19 | 94:12 125:12,17 | **recitation** 212:23 |
| _____ | 204:19 207:11 | 192:21 215:10,11 | 148:21 189:6 | **recognize** 197:7 |
| **Q** | 208:5 213:12 | **rates** 128:10 146:23 | 202:6 205:2,19 | **recognized** 197:21 |
| **qualification** 92:13 | 220:18,23 225:20 | 147:2,6 160:8 | 209:22 210:8 | **recognizing** 82:7 |
| 155:18 201:1 | **questioned** 153:15 | 192:15 | 223:2 229:15 | **recollection** 19:13 |
| 222:3 | **questions** 3:5,6 | **rationale** 94:12 | **reasoning** 46:22 | 24:4 |
| **qualifications** | 4:14,18 5:10 | 95:4,10 102:13,14 | **reasons** 20:14 48:8 | **recommendations** |
| 63:14,17,18,20,22 | 65:18 66:1,4 | 103:3 | 61:1 73:9 210:9 | 132:3 |
| 64:1,4,5,12,13,14 | 67:23 69:4,4,6,8 | **ratios** 114:23 | 221:3 225:18 | **record** 6:3 25:11 |
| 64:17,20 73:12 | 69:12,22 70:2,8 | **reached** 198:2 | **recall** 13:5 14:3 | 41:19 63:2 153:16 |
| 74:3,22 76:2,3,11 | 109:23 132:11 | **read** 3:19 29:7,13 | 16:1,2,21 17:2,15 | **records** 50:13 |
| 76:23 80:17 99:3 | 140:2 167:21 | 29:19,22 30:6 | 18:11,19,20 19:11 | 51:16 83:16 |
| 99:7 100:23 | 180:14 181:2 | 38:23 40:12 46:5 | 20:5 21:23 22:2 | 153:14 217:2 |
| 101:13,21 111:4 | 186:22 215:23 | 46:17,18,21 60:11 | 23:20 28:20 38:7 | **recruiting** 127:17 |
| 111:18 200:3 | **quick** 147:15 | 78:21 79:1,10 | 39:16 50:16,17 | 144:7 145:14 |
| 201:11 221:13 | **quickly** 204:10 | 83:6,8 84:1,5,8 | 51:12,14,15,17 | **red** 182:10 184:1 |
| **qualified** 73:2,4 | **quit** 207:21 | 85:4 88:1,3 90:2,7 | 52:7,14 53:3 | 184:15 185:18 |
| 75:15 100:7 | **quite** 21:13 205:17 | 90:23 91:2,3 | 57:20 59:10 65:12 | 217:15,18 218:21 |
| 104:20 111:7,12 | **quota** 90:23 91:4 | 92:21,23 97:5,6 | 65:16 66:6,9,11 | **REDIRECT** 2:17 |
| 149:11 165:3 | **quotas** 89:20 91:3,6 | 97:17 113:6 122:8 | 67:14 68:2,3,5,7,9 | 226:7 |
| 167:5 199:23 | **quote** 152:22 163:1 | 124:11 149:21 | 69:4 70:1,2,4,6,8 | **refer** 5:20 34:4 |
| 200:8 202:2,8,9 | | 153:8,8,15 158:19 | 70:11 71:19 72:5 | 38:10 173:8 |
| 226:11 | _____ | 163:12 219:3,21 | 78:19 91:4 93:19 | **reference** 79:4 |
| **qualifying** 75:9,11 | **R** | 229:3 | 97:23 144:2 167:8 | **references** 80:9 |
| **qualities** 7:20 | **race** 51:5 52:22 | **reading** 36:5 40:11 | 167:10 171:5,10 | 168:9 |
| **question** 4:23 12:17 | 53:6 66:8,13 68:6 | 113:1 117:15 | 176:14 177:6 | **referred** 58:17 |
| 15:5 21:13,20 | 70:5 77:16 79:6,8 | **ready** 3:23 | 178:14,17 181:15 | 78:23 79:2 209:23 |
| 28:4,8 32:4 34:19 | 81:7,8 85:11 | **real** 75:23 136:19 | 185:1 187:3 | **referring** 42:12 |
| 37:2,6,7,9 43:9 | 89:18,19 95:9 | **really** 9:23 10:1 | 215:12 216:10,12 | 52:10 71:5 87:3 |
| 47:19,22 57:14 | 96:23 98:4 101:15 | 13:5 22:2 26:5 | 216:20 221:19 | 173:6,7 175:11 |
| 73:2 85:19 89:7 | 101:18 115:8 | 28:8 37:1 39:17 | 224:7 | 176:12 209:19 |
| 95:12 99:17 101:2 | 116:4 147:5 | | | |

DEPOSITION OF RICHARD EMANUEL
Page 18

refers 35:18
reflect 84:18 106:7
  114:22 127:13
  160:20,20 166:16
reflected 107:8
  197:22
reflective 118:18
  118:20 120:4
  133:22 140:3
  211:2
reflects 127:12
  194:12 218:19
refresh 17:2 22:1
  23:22 24:2,4
  165:22
regard 222:3
Regarding 41:13
  41:23
regardless 100:3
Regions 1:19 2:8
regular 176:18
related 65:18 129:5
  162:23 212:14
relates 82:22
  151:17
relating 34:16,17
Relations 123:12
relationship 64:22
relevance 222:12
relevant 91:11,13
  104:20 113:17,18
  118:22 153:4
  154:3,7,9 155:1
  155:15 156:3,7
  158:6 162:9,11
  190:2,3,14 197:2
  197:13 222:14
  223:2
relied 121:5
relief 214:4,4
rely 152:12 194:19
relying 125:6
remember 5:8
  18:23 22:3,5,5,8
  22:10 35:16,17
  42:7 52:21 53:1,4

66:21 67:7,10,17
  69:2,12 71:10,14
  71:15,20,23 72:1
  72:6 117:23 174:5
  175:21 176:3,5
  177:3,5 187:8
  188:10,15,22
  220:19
remind 5:4,5,9
  107:2
removed 184:14
Renee 153:12
  181:20
repeat 27:13 56:21
  146:18 164:13
  166:5
repeated 35:9
repercussions
  88:18
rephrase 32:5
  34:19 47:18 99:17
  159:17
replace 194:8
report 84:16 106:3
  114:6 115:12
  116:21 117:1
  127:2,3,6,10,12
  127:17 141:10,12
  142:16 143:5
  144:6 196:21
  197:9,22 199:7
reported 23:1
  141:14 152:2
  198:1 228:7
Reporter 1:17 3:2
  3:22 228:4,20
REPORTER'S
  228:1
reports 54:1 83:16
  83:18 84:1,3,5,5
  84:18,22 85:2,4
  86:7 113:23
  115:23 116:19
  126:19 128:19
  131:3 141:3,4,18
  142:11 147:4

148:17 163:5
  198:12 199:7
represent 33:13
  35:2 168:14
representation
  95:7,8 125:16
  133:12 163:6
  181:23 183:7
  190:7 195:7
  224:12
representative 74:8
  104:17,19 105:2
  140:6
represented 113:13
  194:4 203:22
representing 2:21
  3:13 46:1
represents 33:20
  34:3
reputable 122:2,7
request 34:6,7
  40:14
requested 86:14
  187:14
requests 35:9
require 123:8
  190:18 222:16
  223:5
required 64:6,13
  64:16 84:14 96:13
  102:19 103:10,18
  123:3 155:18
  223:1
requirement 102:5
  154:13
requirements
  65:19 88:22 103:2
  107:23 108:15
  221:13 222:19
requiring 95:8
research 12:13
  74:10 83:7,11
  94:14,17,21 104:3
  104:5 112:5,8
  115:15 121:1,2,4
  121:5,17 122:2

124:11 126:4
  226:12
researched 93:15
reserved 3:7
resign 27:8,17,23
resignation 11:21
  53:9
resigned 21:19
resolution 47:9
resolve 47:1
resolved 49:9,11
  51:13
resources 52:19
respect 8:16 82:23
  87:13 93:22 136:7
  137:5 165:13
  214:10
respond 133:16
response 21:20
responsibilities
  57:9 74:7 134:14
  134:18
responsibility
  82:15 134:20
  138:19
responsible 96:5,9
rest 25:8,9 227:2
result 51:18 79:22
  103:20 112:7
  124:15 128:13
  130:9,10 204:11
  213:8 222:21
  226:19
resulted 46:13
  103:22 104:10,16
  107:16 146:7
  147:20 162:3,21
  169:19 170:15
results 72:3 102:10
  122:14 128:9
  147:22 228:16
retire 194:10 208:9
retired 210:4
retirement 207:18
  208:6 209:4 210:2
reveals 112:11

113:10 116:12
reversed 191:7
review 44:19 67:15
  123:12
reviewed 93:15
reviewing 86:7
  87:1
re-accreditation
  200:21
Rich 225:23
Richard 1:5,14
  2:15,22 4:1 6:4
  228:7 229:2,8
right 6:21 7:1,9 8:6
  8:21 9:7,15 10:11
  12:5,13 14:8,9,20
  18:6 19:8 20:4
  24:22 25:2,12,21
  27:2 28:9 31:16
  31:21 32:3,9,14
  35:10 36:14 44:15
  46:9,14,17,21
  51:23 52:4,10
  53:10 56:13 58:3
  58:5 59:7 60:13
  61:7 62:1,3 63:4
  63:15,19 64:10
  65:8 66:14 67:14
  68:10 72:11,14
  73:7 76:18 77:16
  77:23 79:10 80:7
  83:6 84:1 85:4,12
  87:12,20 90:4,23
  93:13,19,23 95:20
  95:21 99:15,19,22
  101:10 102:22
  105:15,19 107:22
  110:20 112:21
  125:8,14 126:14
  127:2 129:13,23
  130:3,12,17
  131:17,19,21
  132:7 133:1
  137:20 138:2
  141:5 142:22
  146:13 147:1,18

DEPOSITION OF RICHARD EMANUEL

148:3 149:7 155:5
159:3,7 163:16,17
164:11 166:17
167:8,10 171:5,11
172:5,7,13 175:13
176:8 178:22
179:8 180:22
181:2,13,14,15,16
181:19 186:4
187:20 189:1,16
193:5 194:18,23
195:17 197:12,16
198:3 204:6,12,21
205:8 207:16,18
210:15,23 211:14
212:14,22 213:2
213:19 214:2,11
214:22 216:10,20
216:22 217:12,13
217:15,21 219:2
219:15,19 221:1,4
221:19 224:4,21
225:4,7 227:7,8
**rights** 49:18
**right-to-sue** 52:2
**rise** 47:3
**road** 68:19
**role** 121:9 195:22
195:22 196:1
**Roles** 121:2,17
122:1
**roll** 167:20
**routinely** 149:3
150:5
**rule** 160:22
**Rules** 2:23 3:10,17
**ruling** 3:7
**run** 136:1 184:5
193:20,21

**S**

**SACS** 190:18
201:12,13,17
202:23 203:7
**SAITH** 227:15
**sake** 133:8

**salaries** 206:11
**salary** 82:5,22,23
83:4,21 104:18
105:5,16,21 106:8
106:23 107:9
113:15,20 114:5,9
114:23 115:15,16
116:2 117:7,23
118:16 119:9
128:20 129:1
133:13 135:19
148:1,2 151:18
152:1,9,16 153:22
154:12,13,15
155:10,22 156:19
157:7,13,20,21,23
158:3,8 159:11
160:3,12 163:8
166:23 190:8
197:11,14 205:14
205:22 206:11,22
207:14,15 208:8
208:18 217:22
218:18 219:16
225:1,2,3
**salient** 112:15
120:15
**Sasser** 2:12
**sat** 96:15 97:16
107:21 129:23
131:4 141:9
145:17
**satellite** 17:22
**save** 5:16 202:15
211:8
**saved** 227:5
**saw** 39:4 41:10
49:4 61:13 162:23
183:21 184:5
211:14
**saying** 27:17 35:11
40:10 48:7 70:16
71:17 72:10,20
75:18 77:2 79:17
91:23 96:10 101:5
109:14,20 111:6

124:1,2,23 125:21
125:21 135:23
152:15,21 157:12
157:17 163:10
165:20 166:3
174:2 193:6 195:5
195:6,10 198:17
203:4,6
**says** 29:9,11,14,17
36:17 41:22 51:4
77:19 79:3 83:15
90:7,8 91:2,15
113:8 120:13
122:9 124:11
127:17 141:20
142:23 145:13
153:23 160:15
163:1,20 201:13
201:17 210:1
218:8 219:8,16
222:8
**scale** 82:5 106:8
171:19 205:23
206:22
**scales** 83:21 154:15
163:8
**schedule** 12:15
58:20 82:22 83:1
83:4 106:23 107:9
113:15 114:5,9
115:15,16 116:2
133:13 135:19
152:1,9,16 157:8
157:13 159:11
166:23 197:11,14
206:11 222:10
225:1,2,4
**scheduled** 223:12
**Schembera** 70:13
188:18
**school** 5:22,23 6:1
6:13,14,18,22
192:21 193:4,10
193:16,18 202:3
**schools** 200:11,13
**science** 7:3

**scope** 88:5
**screening** 98:13
**search** 94:6,8 96:6
97:11,15,21 98:2
98:11 99:1,8
100:5,5,9,22
102:1,1,17 103:2
103:7,11,16,21
106:6 107:20
108:13,15,20,21
108:22 109:5,8,12
109:16,18,19
110:4,4,7,8,11
112:6,10 113:9,14
114:3,8,22 115:6
115:7 116:3,11
117:6,8,9,11,22
118:1,4,6,13,16
119:1,9,15 121:12
122:21 124:20
125:13 126:1,6,11
127:13,14,16
128:7,9 129:6,13
137:3 138:13
139:12 143:16,18
143:19 144:16,16
144:18 145:2
146:6,11,21
166:22 172:2,8
192:1 203:23
**searches** 74:18
80:22 155:10,11
155:11,14
**second** 29:4 66:19
66:20 67:18 98:4
102:1 106:18
107:4 108:9,13
110:22 126:14,16
130:2,15 131:8
132:6,19 133:1
140:16,19 142:6
142:12 143:2,22
144:1 147:19
**section** 41:11 74:9
125:19 197:8
**sections** 223:6

**see** 7:7 16:15 20:6
28:10 33:21,22
35:13,18,20 39:3
39:10 57:8 64:11
75:4 77:11,14
79:7 85:12 91:11
98:1,3 115:13
127:9 134:9 136:1
143:10 150:23
165:2 167:22
196:20 211:21
217:15 224:9
**seeing** 28:20 42:7
215:12
**seeking** 26:15
163:21 214:23
**seen** 28:14 34:14,20
35:1,4 38:20 42:5
42:22 43:10,12,14
49:20,20 61:9
62:4 78:13,18
198:12
**select** 202:7
**selected** 71:2
**selection** 63:3
77:10 116:22
117:2 123:14
124:8 126:19,23
127:18 131:5
141:19 143:4,6
144:7,11 145:15
145:17 168:15
171:18
**selective** 98:22
**sell** 206:18
**semantic** 108:18
109:15 131:6
**semester** 9:21 18:9
18:21,23 19:12,14
**seniority** 211:21
**sense** 4:19 80:5
86:5 138:15
223:13
**sent** 25:23,23 70:16
114:20
**sentence** 113:6

DEPOSITION OF RICHARD EMANUEL
Page 20

separate 107:21
  110:1
separately 42:10,14
September 106:5
  127:11 189:22
  191:2 196:21
  198:5 199:9
serious 53:17,22
seriously 54:4 55:2
served 116:1,3
serving 114:7 115:9
set 63:14,19,20
  96:21 111:18
  223:14 228:13
setting 159:10
settle 45:22
settled 27:22 44:5
  86:2
settlement 27:2,6
  27:11,16,20 43:15
  43:17,20 44:3,6,7
  45:21 46:2 47:1,6
  48:3,12 49:8
  81:19 82:11
seven 141:23
  144:22 145:22
seven-member
  141:22
sex 51:5 52:22
  77:19,20 121:2,16
  122:1
sexual 22:6 23:3
  25:19 26:10 29:9
  29:14,20 30:13,22
  31:4,10,15,17
  32:1,8 34:17,22
  35:13 47:15 48:4
  53:13 54:3,9
  56:19 57:1
sexually 23:18
  29:23 54:2,16
Shatangi 71:10
  76:22 200:2
shirk 134:14
shirking 134:16
shot 167:14

show 71:4 78:12
  125:2 128:15
  137:18 140:11
  142:23 147:8
  148:8 160:5 164:4
  217:6 222:2
showed 62:11
  116:19 123:12
showing 148:3
  155:1 222:11
shown 43:5
shows 114:7 115:5
  118:4,10,11,14
  128:19,21 160:1
  189:22 190:4
  194:2 196:18
  223:10
Shuford 80:18
  83:15 84:3 89:9
  92:18 106:3 114:6
  115:23 116:19
  117:1 126:18
  127:2 128:18
  131:2 140:11
  141:2,11,18
  142:11,12,16
  143:1,5 144:6
  145:18 147:4
  148:17 149:6
  150:10,19 152:9
  152:15 157:19
  158:7 161:1,9
  162:1 163:5 164:7
  164:8,20 172:6
  173:7 186:5
  195:19 196:21
  197:9,22 198:1,8
  198:12
Shuford-Johnson
  73:18
Shuford-Johnso...
  82:6,21 89:14
  92:15 153:6
  180:18
Shuford-Kenned...
  81:3

sick 213:4,22
Sigma 8:20
sign 3:20
signal 68:19
SIGNATURE
  229:1
significance 183:5
significant 120:13
  121:8 126:1
similar 57:14
  115:12 123:16
similarity 104:4
  112:14 120:14
  121:9 123:17
simple 132:12
simply 39:7 47:7
  55:14 58:17 84:8
  84:10 109:15
  126:17 127:17
  133:14 134:5
  143:5 144:13
  149:17 150:1
  196:18 201:15
  202:22 221:20
single 31:14
sir 33:7 52:17
  53:15,18 101:9
  146:19 174:15,17
  174:20 210:16,16
  211:6
situation 86:4
six 38:8 43:1
six-member 116:23
skew 150:13,14
slash 38:4
slightly 197:2
slow 149:23
smaller 192:11
societies 9:2
society 8:9,10,15,20
  8:23
sole 100:6,12
solicitation 29:14
somebody 99:21
  134:10 159:3
  184:14 202:5

218:9
somebody's 115:4
soon 58:23 75:2
sophisticated 136:8
sorry 6:2 27:14
  28:2,5 29:2 34:19
  38:12 44:16 50:22
  56:21 62:15 67:10
  88:2 108:5 109:10
  112:19 118:9
  146:15 156:10
  159:17 160:6
  161:7 164:12
  167:9 168:13
  173:7 178:10
  209:1,14 211:12
  220:17 223:22
sort 16:22 17:22
  21:23 22:18 23:18
  40:9 70:18 76:9
  82:16 83:22
  186:22 221:17
sound 14:8
sounds 14:9 164:5
source 121:15
Southern 198:18
  200:10
Sparkman 6:1,14
speak 4:3 83:2
  151:9 228:9
speaking 13:2,20
  18:17 74:4 201:6
  221:9
speaks 136:18
  202:23
specific 21:21 40:7
  41:5,8 119:6,7
  129:18 171:6
  186:18 214:17
specifically 53:1
  70:3 93:22 96:9
  97:16 129:20
  155:7 198:10
  203:1 214:13
specifics 175:21
specified 221:18

specify 99:11
  108:19
speculation 192:18
speech 7:6 10:11,23
  15:11 59:20 60:18
  61:5 63:13 71:13
  74:6 143:13
  222:18 223:1,8
spell 185:5,7
spend 40:2
split 136:16
spoke 185:21
spoken 169:22
  170:1,20
spot 138:7
staff 67:12
Stafford 35:11
  43:21 49:15 53:14
  53:21 175:9
stage 99:7 111:13
  112:2
stalking 30:7 31:20
  31:22
stand 180:1
standard 183:9
  184:12
start 5:13 11:23
  61:17 62:5 165:5
  171:14 177:12
started 186:8
starts 152:21
state 1:17 3:3 10:17
  12:3 13:11 14:2
  14:12 24:10 57:22
  73:19 74:7 77:5
  86:11 87:10,15
  123:5 154:20,20
  155:2,10,14 158:4
  175:12 180:4,7
  182:10,22,23
  191:23 192:1,5,14
  192:22 193:1,21
  200:13,13 217:23
  228:2,5,21
stated 127:2 141:2
  141:4 225:18

DEPOSITION OF RICHARD EMANUEL

statement 26:8
91:4 114:21 116:5
116:7,8 119:11
120:11 122:20
163:11,16,17,18
163:19,20 193:8
201:13 203:6,7
221:21 224:12
statements 163:12
164:1 181:22
States 1:1 49:17
52:11 191:10
statewide 153:23
statistic 182:8
statistical 153:2,11
157:18 166:20
183:2,4,5 189:2,8
189:12 203:9,18
203:20
statistics 154:23
155:3 165:18
166:15 182:7,9,19
182:20 185:10
192:1 199:20
stay 81:16 217:11
staying 191:17
step 131:11
Stephens 20:6
stinks 176:19
stipulated 2:20
3:12
stipulation 1:15
STIPULATIONS
2:19
stop 12:8 112:21
straight 182:19
straighten 102:23
164:16
strange 177:4
Street 1:20 2:9
Strength 185:22
186:23 187:17
strengths 187:23
student 8:5 14:4
23:4,5,7,11 25:19
29:21 30:14 31:5

31:7,15,18 32:18
33:8,11,15,16
34:2,4,16,22 36:2
36:7,18,23 37:15
37:19 38:22 40:18
41:1,12,22 42:5
46:11 54:1,16
55:11 56:18
174:18 222:22
students 22:7 23:17
23:21 29:10,11,15
29:17 30:2,4,7,8
30:18,20,21 31:20
31:22 32:3,9,11
32:23 33:3 34:5
34:18 35:13,18,20
54:13,15 223:3
studied 200:6
studies 8:15 10:10
12:1
study 121:4 122:12
122:18 123:10
125:8
stuff 122:10 174:13
187:9 203:13
219:14
subject 169:10
187:13
subjective 171:13
171:15,21 172:21
submitted 79:3
84:6
subpoena 24:10
41:12
SUBSCRIBED
229:10
subterfuge 75:20
sue 76:15 204:6
217:13
sued 81:17
suffered 78:4 93:17
161:17 226:1
suffering 103:22
suggest 94:14 104:3
151:18
suggested 31:6

suggests 112:13
120:14 121:4,8
124:3,5 126:2
197:5
suing 139:8
Suite 2:4
Sullivan 7:15
summer 17:14
143:14 175:15
213:4 221:10
222:10,11 223:6,8
223:11,13
super 202:13
supervisor 68:16
176:19 177:8,23
178:7,12
support 94:14
129:8 150:23
157:19 158:16
179:9,10,13
180:11,12,13,21
192:8 203:11
supporting 34:21
85:10
supports 112:5
sure 3:22 4:12 9:4
20:15 24:5,14
33:13,20 46:4
55:3,17 64:11
71:11 72:13 78:9
84:8,13 85:13
92:8,20 96:8
127:19 129:21
137:19 139:4
140:18 164:14,14
165:1 166:6,6
172:10 180:2
189:3 202:19
205:18 211:15
215:7 216:12
217:2 224:10
226:6
Susan 42:20
suspicious 75:15
80:16
Suzanne 42:8

sworn 4:3 228:8
229:10
Sydney 7:15
system 59:11,19
60:9,11 64:23
65:2 73:22 82:1,8
83:12,18 84:6,9
84:10 86:17,21
87:9,19 88:7
112:11 113:10,21
114:1 115:22
116:12,18 117:5
119:2 129:16
150:3 153:19,22
153:23 156:20
158:4 159:21
195:3 204:17,18
205:5,6,8,20,20
205:22 206:13,16
206:17 207:9
214:11,14 225:12
225:14
systematic 152:23
systemic 153:1,17
157:1 181:23
systems 9:13,15
systemwide 113:15
114:23 119:8,10
129:13,14,15,17
137:3 194:1,16
196:18 214:20
system's 153:14

_____
            T
tab 217:15,16,17
218:21
table 43:9 117:21
119:2 120:3
128:17 160:7
189:22 190:20,21
194:1,15,19,20
195:1 196:18
198:15
tables 136:9 147:12
148:4 164:4
189:18 203:14,17

203:22 219:10,12
take 4:7 5:2 12:6,8
12:18,22 13:3
28:13 54:4 55:2,3
63:7 85:12 94:19
104:22 112:21
113:7 131:10,13
147:15 167:12,21
173:19 184:4
207:4 217:9 223:1
224:2
taken 1:15 2:23 3:1
55:6 207:3
talk 6:11 14:14,18
17:10 20:10 37:1
40:3,5 59:7 80:12
86:6 92:10 97:17
97:19 104:5 108:1
112:22 129:17,18
129:19 135:7
147:1,18 172:2
176:20 189:20
talked 92:12,14
135:6 166:15
169:8 171:2 177:1
179:4 183:22
185:17,20 189:1
220:21 224:3,11
talking 25:14 99:12
123:16 129:14
133:6 142:3,4
154:8 170:7,8
173:23 175:13
176:7 178:13
190:8 208:15
219:13,14 225:3
225:23
tapped 8:11
Tara 6:8
target 91:19 178:1
178:8 222:20
targets 89:19
Tau 8:20
taught 10:21,23
11:12 13:13,18,19
13:22 14:22 17:7

DEPOSITION OF RICHARD EMANUEL
Page 22

18:17 57:5 222:11
teach 10:22 13:7,10
  13:12 14:1,2
  15:22 18:6 19:2
  155:19 223:4,6
teacher 182:9
teaching 13:16
  14:12 18:10,12
  55:16 101:23
  174:5 177:20
  206:4,23 207:7,7
  207:14
team 67:15,16
technology 9:14,16
  221:17
teenager 179:1
telephone 68:13
  74:23 135:6
tell 4:11 6:2 7:11
  10:19 12:5 15:2,5
  18:22 22:21 33:14
  37:18 38:17 50:23
  57:16 58:9 59:8
  65:13 66:19 68:15
  69:1 79:16 112:4
  112:4 113:1
  114:21 116:14,15
  116:17 117:15
  177:10 179:22
  199:20 212:20
  213:13 215:10
  220:19 226:9
tells 60:20
Tenure 211:21
Teri 121:16
term 13:19 27:7
  91:8 96:1
termed 85:9
terminate 26:11
terminated 48:23
terminating 46:20
termination 26:1,2
  27:22 28:18,23
  29:1,2,7 34:9 38:5
  41:6 44:10,13,14
  44:20 45:1,10

46:8,13 47:2,15
48:3,14 49:2,3,6
  174:23 175:2
terminology 171:8
terms 12:15 57:9
  59:19 69:15 88:16
  89:20 96:18,23
  122:21 129:12
  145:18 151:10
  157:14 161:11,17
  162:1,3 164:20
  171:13 186:11
  193:8 202:9 207:1
  208:15 213:4
  216:18 219:21
terribly 26:5
Terry 70:12 188:18
  188:22
test 170:11 173:19
  173:23 174:1,2,5
  183:2,4
tested 221:21 222:4
testified 4:4 25:17
testify 180:9
testimony 26:3,21
  33:5 47:12,17,23
  64:15 138:20,21
  138:23 139:15
tests 170:10
thank 25:4 70:19
  70:20 78:7 95:15
  95:17 179:3
  227:11
thanks 70:17
theater 8:23
theatre 7:6 10:23
theatrical 74:16
Theory 12:13
therefor 229:15
thereof 45:4 228:17
thing 5:8 6:11 8:4
  19:4 36:21 51:7
  70:18,21,23 83:23
  123:10 131:8
  158:16 160:14
  170:14 182:16

213:7 221:18
222:21 224:20
226:21
things 9:17 17:3
  39:20 43:2 60:10
  69:10 74:20 81:1
  93:19 95:14 120:9
  122:23 131:2
  163:2 170:6,14
  195:23 204:10
  213:3 222:15
think 13:4,5 17:15
  25:9 26:9 37:9
  47:7 51:14 55:17
  61:2 63:8 65:20
  67:20 69:12,15,20
  69:21 72:18 75:4
  79:21 80:3 82:19
  84:16 91:11,20
  94:13 95:3 96:10
  96:16 99:18
  102:21 103:20,23
  104:2,9 105:16
  106:6,10 107:16
  108:6,10 111:16
  111:23 113:18
  114:18 121:7
  125:12,22 132:11
  133:11 134:17,19
  134:23 136:12,18
  143:15 145:16
  146:2,9,13 148:20
  156:14 158:2,8,9
  158:11,12 160:23
  161:3,8,12 162:5
  162:6,8,8,10,13
  164:11 172:4,4
  174:10 175:4
  177:5 178:5 179:7
  179:9,12 180:12
  180:21,22 182:1
  184:8,21 186:19
  186:21,23 187:4
  190:6 192:1,4,10
  192:11 194:12
  195:21,22 196:8

198:14,16 203:10
203:14 210:19
  213:3 216:11,19
  218:15 221:1,3,5
  221:6,18 222:20
  223:11,19 225:19
thinking 70:13
third 31:18 98:6
  110:22 213:16
Thompson 25:21
  35:11 38:13 43:21
  44:4 49:15 53:14
  53:21 175:9
  180:21
thought 10:2 46:10
  53:21 61:14 65:23
  65:23 66:2 69:3
  73:1,10 79:8
  97:20 178:11
  180:10 183:2,8
  184:13 205:15
  207:11 226:22
three 12:23 13:2
  14:1,6 30:11 57:5
  65:11,12 67:1
  98:2,8 102:2
  103:14,20 104:9
  105:12 108:7,21
  109:2,3,4,5,5,19
  109:21 110:1,19
  110:23 111:1,2,3
  111:7,11 127:19
  131:16 132:5,10
  132:16,17 133:3,9
  133:14 134:2
  135:16 136:6
  137:8,23 139:2
  140:19 142:3
  171:21 172:1,11
  210:10
threshold 148:12
  160:9,13 183:8
thumb 39:23
Tift 10:21 11:7,18
  11:23
time 3:7,8 5:16 9:4

13:15 16:3,6,7,10
16:13 19:11 33:8
  33:12,15,17 35:2
  35:4 36:23 40:2
  57:21 65:13,14
  68:20 78:13 83:16
  92:7 104:22
  105:20,20 112:22
  117:4 129:2 135:3
  135:4 149:9
  153:13 154:1
  156:6,16 158:6
  163:9 177:14,14
  178:23 204:23
  208:9 211:8 213:7
  215:16 221:5,6
times 65:10,11
  111:2 178:6
  208:21
tired 164:12 167:9
title 13:17 15:20
  86:14
titled 222:9
today 4:8,15 26:3
  32:17 34:14,20
  35:2,5 40:3,5
  41:11 42:6 43:13
  43:14 47:23 49:22
  62:3 96:4 125:10
  159:14 166:6
  167:15
told 32:17 136:4
  169:18 172:16
  188:16
top 58:20 153:13
  217:16 219:1
total 65:11 85:15
  117:22 118:5
  128:19 129:1
  132:6,21 133:3
  160:2,10 208:11
totality 102:4
totally 152:15
  161:6
track 223:19
training 30:23

DEPOSITION OF RICHARD EMANUEL

transcript 3:23
  229:3
transcription
  228:11 229:6
transferring
  222:23
traumatizing
  226:15
treatment 213:23
tremendous 222:21
trends 219:16
trial 3:15
tried 72:3 155:5
Troy 18:15,16 19:2
  19:10,15,19
true 32:19,20 43:23
  48:11 60:14 96:2
  96:3 97:13 99:5
  139:14 162:4
  172:15,17,18
  181:3 193:5,7
  228:11 229:6
truly 173:14
truth 4:3,3,4 33:14
  228:9
try 5:4,5,8,15 37:10
  53:2 179:22
trying 76:1 105:8
  132:13 148:8
  169:3 177:18
  194:21 199:15
  211:8
tuition 224:15,20
turmoil 226:18
  227:6
turn 95:11 119:22
  165:10 220:10
turnover 60:22
two 7:17 12:23 13:2
  13:4,6 14:1 18:19
  19:7 42:23 43:2
  77:13 81:20 95:13
  98:4,5,5 106:18
  107:5 108:9,13
  109:7,12,16,17
  110:9,17 127:21

128:1,3 130:15
131:2,16 132:7
133:1 135:17
139:2 143:17,18
144:10 164:1
171:20 196:22
198:19 202:5
212:8,12 214:13
two-year 59:19
  60:8,11,21 74:5
  81:23 82:8 83:18
  84:6 86:17 87:9
  87:16,19 88:7,10
  88:21 112:11
  113:10,20 116:11
  117:5 153:18
  158:4 159:20
  163:1 204:16
  205:5,7,17,20,22
  206:6,8,13,15
  207:9 214:10,14
  225:1,6,12
type 226:1
types 32:13 187:10
typewritten 39:5
typical 58:11
typically 155:12

———————————
U

uh-huh 5:7 19:9
  34:5 38:3 50:20
  57:12 61:12,12
  62:9 70:20 71:6
  83:9 106:19 107:7
  108:3 114:13
  130:18 148:6
  150:8 156:14
  175:20 183:23
  185:19,19 208:17
  212:1 217:18
  220:15
ultimate 120:20
unanswered 55:18
unaware 31:7
  169:6,7
underlying 49:23

understand 12:17
  15:4 21:13 26:18
  26:20 28:8 32:4
  33:4 36:13 40:6
  43:16 47:22 63:11
  79:10,16 81:21
  82:14 86:23 88:5
  89:8,13,17,18,21
  89:22 90:11 96:16
  96:18 100:14
  107:4 145:12,21
  148:12 151:5
  161:21,21 163:10
  164:14 166:3,4
  168:11 169:14
  173:5,9,13,14
  188:13 193:12,14
  196:2 202:19
  204:15,19 212:19
  216:15 222:13
understanding
  23:11 25:18 35:21
  35:22 40:15,20,21
  41:2 45:16,20
  46:2,12 47:6
  51:20,23 63:23
  66:16 81:2,4,9,11
  81:15,18 82:2,9
  82:10,11,18 87:7
  87:22 88:8,9 91:5
  91:7,8,10,12 93:5
  93:8,11,14 96:19
  98:10 101:2
  150:18 151:11,12
  151:15,16 160:21
understood 5:11
  40:9 169:8 190:19
  214:22
under-represent...
  82:16 102:10
  103:6 112:12
  113:11 116:13
  118:23 121:11
  125:23 148:9
  151:14,19,22,23
  152:7,14 157:1

158:14 186:12
194:13 197:6
under-represented
  120:6 137:2
  165:10 190:12
unfamiliar 169:21
unh-unh 5:7 22:4
  82:17 175:23
  183:19 187:14
  188:23
uniform 73:20
  86:12 87:5,17
  88:22 89:10,15
  92:23 93:5,8 94:9
  95:3 97:2 99:10
  99:13 103:1,18
  105:9 107:22
  108:16,19 123:6
  145:2 161:10
  162:14 164:21
  180:8,14 187:15
  195:19
Union 198:18
unique 154:12
  182:13 185:4
United 1:1 49:16
  52:10 191:10
University 6:23 8:6
  9:8,10 10:4,6
  12:21 13:11 17:9
  17:20 18:15 20:13
  48:10 56:11,17,23
  175:17 218:1
unnamed 181:6
unnecessary 30:1
  152:15
unresponsive 161:6
unwelcome 29:9
  30:13
update 76:7
updating 71:8,17
  74:5 75:19 77:5
  188:11,17
upper 197:4
up-to-date 85:17
  85:18

uscensusdata.gov
  156:14
use 56:1 76:15 80:4
  173:11 184:11
uses 34:5 148:13
usually 178:3

———————————
V

vacancy 61:8 115:8
valedictorian 8:1
valid 156:23 172:4
various 57:8 59:12
  83:21 88:9 90:14
vent 187:5
venting 186:19
version 179:11
versus 67:12 79:8
  129:3 142:5,7
  191:23
vice 218:3
Vickie 49:16
Vicky 185:22
  186:23 187:17
view 102:20 154:12
violated 79:23
Volume 121:3,17
vs 1:7

———————————
W

wages 204:11,14,20
  205:2,11 211:9
wait 82:23 194:10
  208:3,3
waiver 208:10
  224:15
walk 7:14
Wallace 1:8 4:14
  59:7 61:6 62:8
  63:12 64:23 65:2
  65:3 72:10,20
  78:5 88:11,20
  93:9 94:3 96:4,8
  96:20 97:7,13
  105:5 114:3,22
  119:19 135:9,19
  146:17,20 147:23
  159:3,5,5,9,14,18

DEPOSITION OF RICHARD EMANUEL
Page 24

159:22 160:23
161:3,8,13,16,23
162:13 163:12
164:6,8,19,19
168:2 188:5,12
197:9 198:1,13
200:19,22 201:16
214:18
**Wallace-Dothan**
69:10 70:14 71:13
105:18 106:14
107:1 117:4,13
118:20 119:6,7,10
120:5 128:18
129:15 133:16
135:1 136:3 137:2
138:10 143:14
145:5,13 160:8
165:1 190:1 191:2
194:2 198:11,20
198:22 199:14
204:1 214:17
222:10,16
**Wallace-Dothan's**
106:3
**Wallace-specific**
194:21 214:19
want 4:21 37:1
40:2,4 80:12
85:14 89:11 90:20
92:10 95:13 96:18
97:20 100:19
104:6 107:21,23
115:2,4 116:8
124:16 129:18
165:14 166:11,19
167:22 176:16,17
176:18 185:13
186:13 203:12
211:15 212:10
213:11,14 214:7,7
214:19 221:11
226:3
wanted 11:16 21:16
48:8 183:3 184:13
wash 130:12

washed 130:5
Washington 9:10
9:11 10:6,8
wasn't 10:1 23:6
27:2,10 36:3
44:11 75:21 99:4
100:1,2 151:11,22
152:13 205:17
213:5 225:10,17
water 147:16
178:22
way 4:20 12:5 19:5
26:6 47:5 49:12
53:13 58:13 74:11
76:17 84:16 89:4
98:20 110:10,12
110:14 111:23
130:22 131:1
144:3 172:16
177:13 184:2
191:22 193:2,9
199:13 205:23
207:17 208:5
218:21 223:14,16
ways 208:2
weaknesses 187:23
Wear 71:10,12,16
188:7 200:2
223:10
Wear's 74:2
WebCT 221:19,23
website 59:11,13
60:3 62:9 75:3
83:13 84:10 114:7
115:22 116:19
150:4 193:1
weed 173:20
week 59:14
weeks 28:17 38:8
43:1 184:5
weighted 107:11
well-trained 187:4
Wendy 1:16 3:2
228:4,20
went 6:12 9:10 10:4
14:12 31:23 56:10

69:15 83:12
115:21 117:3
130:13 172:12
176:18 187:15
205:7 225:9
weren't 21:14,17
31:5 130:5 137:5
140:21,23
we'll 3:22 12:8
14:14 16:13 28:10
86:6 97:18 104:5
154:7 172:2 179:2
210:15 224:2
we're 4:7,11,22
5:13 62:2 129:14
133:21,22 134:3
135:18 142:6
154:8 160:6,7
176:12 177:13
210:11
we've 40:5 92:12
92:14 166:14
168:23 171:6
172:9,10 177:1
179:4,7 188:8
189:3,16 203:14
204:4 213:15
219:14 224:3
225:3
whatsoever 59:6
white 83:20 104:1
105:11 106:1,14
116:7 118:12,17
118:18,19,21,23
119:15,18,23
120:6 121:12
125:23 133:19
137:1 140:4
143:18 148:9,10
148:15 149:1,3,4
149:13,17 150:12
150:15 151:3,5,6
161:4 165:7,9,17
167:3 181:6
186:11 190:10
194:3,5,7,13

196:14,17
whites 105:4 149:1
165:9 192:22
whiz 189:7
wise 136:15
witness 4:2 28:5
137:16 175:6
185:6 228:12
229:1
witnesses 179:8,13
180:10 181:10,12
woman 124:16
134:19,22
women 112:16
117:11 118:3,11
120:16,22 124:7
124:14,21 125:18
153:21 154:1,2
156:7,18,20
158:17 198:6
224:13
women's 11:8
won 7:8
wondering 32:5
189:11
word 34:5 35:20
80:4 173:10
179:12 190:6
212:16
words 31:14 47:7
74:14 119:8
128:13 173:13
191:4
work 14:12,14,18
16:10 17:14 18:12
19:16 56:10 58:1
98:21 177:13
178:8 183:12
206:10
worked 15:11
18:13 20:1,2
86:17,20
working 17:6 21:10
69:9 114:12 199:8
215:2,18
works 182:21

185:23 205:23
worksheet 217:23
wouldn't 27:13
33:6 47:4,4 56:3
75:11 76:12,17,20
76:21 99:11
130:22 134:16
139:6 141:15
154:21 176:3
194:6 216:13
wrap 203:9
write 43:7 97:7
182:4 183:16,18
218:11,13,14
writing 45:23 52:8
written 46:13 80:6
85:6,9
wrong 47:20 85:20
102:22 158:1,8,11
160:23 161:9,12
164:17 186:1
wrongdoing 41:6
wrote 70:11 218:9

_____
**X**
_____
x 77:13

_____
**Y**
_____
yeah 21:6 22:18
24:11,16,17 55:13
56:22 70:20 72:14
73:14 87:6 95:2
121:7,21 128:16
134:19 136:5
142:6 169:5 179:3
181:3 182:18
183:1 186:19
208:4 210:20
213:6,20 219:5
222:14 223:19
year 7:18 31:3
90:18 202:4 206:7
218:2 225:5,10
years 12:23 13:2,4
13:6 14:1,1,6,23
57:6 160:11
177:19 186:7

DEPOSITION OF RICHARD EMANUEL

199:7 202:6 206:3
206:23 207:3,4,13
**Young** 2:11 68:20
165:16 167:2,17
168:17 200:23
201:9
**younger** 72:22
**youth** 68:16,17

---

**Z**

**zero** 37:6 90:19
104:6

---

**$**

**$120,349** 209:15
**$20,000** 202:4
**$489,833** 209:14
**$54,038** 209:14
**$600,000** 210:11
**$9,900** 211:22
224:20

---

**#**

**#1** 5:19
**#10** 45:11
**#11** 45:13,17 49:13
**#12** 49:14
**#13** 53:8
**#14** 61:8
**#15** 62:1 63:9
**#16** 71:4
**#17** 72:16 77:8
**#18** 78:13
**#19** 85:11 117:17
147:10,11 148:4
152:20 160:6
189:17 197:7
203:16,21 209:20
211:11
**#2** 28:12
**#20** 114:14 115:10
**#21** 217:12
**#22** 218:23 219:1
**#23** 219:6
**#24** 224:14
**#25** 224:23
**#3** 28:19

**#4** 35:10 38:12 43:2
**#5** 41:16,17 42:16
**#6** 42:18
**#7** 43:4
**#8** 43:15,17 45:21

---

**0**

**0O26** 209:20
**0014** 152:20
**0025** 213:15
**0026** 209:23
**0028** 117:20 128:16
147:9,11 148:4
160:1,7
**0029** 120:2 148:5
189:21
**0032** 198:15
**0148** 218:18
**0159** 115:11
**0233** 219:23
**0241** 219:23
**04-05** 196:21
**05** 142:17
**06** 142:16,17
**07** 142:16
**07-819-WKW** 1:7

---

**1**

**1** 121:3,18 136:9
148:4
**10** 14:22 210:1
**10.5** 198:10 199:12
**102** 2:4
**106** 222:18 223:1
**11** 113:5
**13th** 38:13 42:9,18
218:18
**133** 118:7
**14** 85:16,20,23
129:2 160:4
190:10
**15** 121:3,18 202:5
**15th** 198:5 199:9
**16** 209:21
**1688** 210:3
**17** 85:16,20,23
**18** 117:17

**19** 113:4,5 118:17
119:13
**1937** 6:8
**1978** 6:20
**1982** 7:1 9:8 10:6
**1984** 10:13
**1993** 17:12
**1995** 153:21
**1998** 42:18 221:10
**1999** 20:7 31:1 53:9

---

**2**

**2** 117:21 119:2
136:9
**20** 69:13 216:9
**2000** 20:7
**2001** 117:4 118:7
127:10 128:19
143:15 147:7
160:2,11
**2002** 56:15 58:3
61:18
**2004** 127:10
**2004-2005** 106:5
**2005** 106:5 117:4
118:7 127:11
128:19 147:7
160:3,11 189:23
191:2 196:21
198:5 199:10
**2006** 62:6 63:2 72:9
**2006-2007** 218:2,8
**2007** 78:16 218:16
222:10,11
**2007-2008** 218:9,14
218:18 225:5
**2008** 1:21 228:6,18
229:11
**22** 177:19
**225** 2:16
**226** 2:17
**227** 228:10 229:4
**2301** 2:4
**24** 211:10,12
**25** 105:13 129:3,22
142:5 211:10,13

**26** 211:10,13
**26th** 28:17
**27** 211:18,20
**273** 222:9
**275** 222:9
**28** 119:5
**293** 194:5,7

---

**3**

**3** 128:17 136:9
147:12 160:7
**30** 1:21 69:13 216:9
216:11 228:6
**33** 107:5 130:16
142:7
**35203** 2:5
**36104** 2:9
**363** 118:5,7,15
**37** 118:8

---

**4**

**4** 2:16 132:21 136:9
147:12 197:15
198:1,2,7,8
199:11 228:10
229:4
**4-sevenths** 137:10
**40** 106:1,14,15
119:22,23 133:18
216:9,11
**42** 137:22
**43** 138:1,3
**44** 105:22 106:13
121:3,17 133:18
191:5
**444** 228:22
**45** 153:21 156:19
**46** 154:2 156:5,6,20
191:6
**489,000** 209:13

---

**5**

**5** 120:3 136:9
147:12 189:22
190:21 216:23
**5th** 63:2
**5:30** 227:13

**54** 191:6
**56** 105:21 106:12
106:13 133:17
191:4
**57** 129:1 137:20
138:3 160:3,12

---

**6**

**6** 136:10 147:12
148:5 194:1,19,20
195:1
**6th** 72:9 78:16
**60** 1:20 2:9 197:4
**66** 107:5 130:16
142:7

---

**7**

**7** 196:18
**7/16/11** 228:23
**70** 118:16
**75** 105:13 129:3,22
142:5

---

**8**

**8** 214:5
**8th** 28:13 31:1 53:9
**80** 148:12 160:9,13
160:16,22 183:7
**833,000** 209:14
**84** 10:7 11:11
**86** 11:11 14:4
**89** 14:4

---

**9**

**9** 198:16 214:5
**9/11/1960** 6:10
**9:45** 1:22
**904** 1:19 2:8
**98** 222:7
**99** 56:15



**ALABAMA COLLEGE SYSTEM**

APPLICATION No. *1442*

# APPLICATION FOR EMPLOYMENT

**WALLACE COMMUNITY COLLEGE-DOTHAN**

**Position Information**

Title of position for which you are applying: Speech Instructor

5/19/06
Date of Application

**Personal Information**

| | | | |
|---|---|---|---|
| Last Name Ware | First Name Shatangi | Middle Initial T. | Social Security Number ▓▓▓▓▓ |

Address P.O. Box 611487    City Birmingham    State AL    ZIP 35261

Contact Information

Phone (205) 617-5646 Home    (205) 853-1200 Work    Cell    E-mail Address Shatangiware@hotmail.com

**Secondary and Postsecondary Education**

| | School/College | Dates Attended From/To | Major | Minor | Degree(s) Earned |
|---|---|---|---|---|---|
| High School/ GED | Northview High School Dothan, AL | Aug 00 - May 04 | | | Yes |
| College | Troy State University Troy, AL | Sept. 94 | Mar. 95 | Broadcast Journalism | No |
| College | Jeff. State Community College B'ham, AL | June 99 | Aug 00 | Public Relations | Yes (A.A.) |
| College | University of Alabama Tuscaloosa, AL | Aug. 00 | May 02 | Public Relations | Business Yes (B.A.) |
| Other (Specify) | University of Alabama Tuscaloosa, AL | Aug. 03 | Dec. 04 | Communication Studies | Yes (M.A.) |

**Employment History**

Please list most recent employment experience first.

Employer JSCC    Telephone Number (205) 853-1200    Job Duties Prepare and deliver lectures on topics such as public speaking. Evaluate students' assignment and speeches.

Address 2601 Carson Road B'ham, AL 35206    Dates of Employment Aug. 05 - present

Title Speech Instructor    ☐ Full-time  ☑ Part-time    Hourly Rate/Salary $1275/class    Advise students on academic and career issues.

Reason for Leaving    Supervisor Evla Thompson

RECEIVED

MAY 2 5 2006

DEFENDANT'S EXHIBIT
28
Blumberg No. 5116

EMANUEL-0106-PLF DOX

**Employment History (Continued)**

| Employer Self-employed | Telephone Number (205) 617-5646 | Job Duties Produced public relations communication for individual clients. |
| Address 3021-A Division Ave B'ham, AL | Dates of Employment May 02-present | Designed and implemented solutions to clients' communication problems. |
| Title ☐Full-time ☒Part-time Public Relations Consultant | Hourly Rate/Salary Commensurate with job requested | |
| Reason for Leaving | Supervisor | |

| Employer University of Alabama | Telephone Number (205) 348-7158 | Job Duties Worked with Dr. Braman to help improve students' performance on exams. |
| Address 412 Reese Phifer Tuscaloosa, AL | Dates of Employment Aug. 00 - Jan. 01 | Led after-class discussions to prepare students for exams |
| Title ☐Full-time ☒Part-time Undergraduate T.A. | Hourly Rate/Salary Volunteer | |
| Reason for Leaving Professor left UA | Supervisor Dr. Sandra Braman | |

| Employer Wal-Mart | Telephone Number (205) 945-8692 | Job Duties Assisted over 200 customers daily. |
| Address 209 Lakeshore Pkwy B'ham, AL | Dates of Employment March 98 - Jun 99 | Handled over $2000 in cash daily, accurately. |
| Title ☐Full-time ☒Part-time Customer Service Associate | Hourly Rate/Salary $7.50/hr | Trained and supervised many new sales associates. |
| Reason for Leaving started school full-time | Supervisor Lisa Jones | |

| Employer | Telephone Number | Job Duties |
| Address | Dates of Employment | |
| Title ☐Full-time ☐Part-time | Hourly Rate/Salary | |
| Reason for Leaving | Supervisor | |

Attach additional page if needed

**May we contact your current employer?**  ☒ Yes  ☐ No

**Skills, Certifications, Awards or Professional Activities**

Lambda Pi Eta, 2005; National Communication Association, 2005; & Southern States Communication Association, 2005. Proficiency in WebCT, Windows XP( Word, Powerpoint, & Excel), and Quark Xpress. I have judged debate competitions.

EMANUEL--0107--PLF DOX

| References | Please list three reliable references, other than relatives, who can provide information verifying qualifications, character, or work experience | | |
|---|---|---|---|
| | Name and Title | Address | Phone Number |
| | Evla Thompson Division Chair | JSCC, Dept. of Communication 2601 Carson Road | (205) 856-7826 |
| | Dr. Valerie Palmer-Mehta Assistant Professor | Oakland University 316 Wilson Hall Rochester, MI 48309 | (248) 370-2139 |
| | Dr. Marsha Houston Prof. & Chair of Communication Studies | University of Alabama Box 870172 Tuscaloosa, AL 35487 | (205) 348-8078 |

**Felony Conviction(s)**

Have you ever been convicted of or pled no contest or guilty to any felony or any crime involving theft, dishonesty, violence, or sexual misconduct?   ☐ Yes   ☑ No
If yes, explain below:

_____

_____

**Consent Agreement**

I represent and warrant that the information I have given on this application is full and true to the best of my knowledge and belief. I further acknowledge that I understand that I must provide documented verification of education, experience, and required certifications and/or licensures. And further, I represent and warrant that I have answered fully and truthfully all questions regarding criminal convictions/records. I hereby expressly request, and give permission to, former employers and any persons who may have pertinent information concerning this application to furnish such information to college officials. I agree to hold such persons harmless, and I do hereby release them from any and all liability for damage of any nature whatsoever for furnishing such information. I understand that failure to provide full and true information on this application may result in disqualification or dismissal.

_____     May 19, 2006
Signature of Applicant                              Date

Return to:     Wallace Community College
Attention: Office of Personnel
1141 Wallace Drive
Dothan, Alabama 36303
334-556-2425

It is the policy of the Alabama Department of Postsecondary Education including all postsecondary institutions under the control of the Alabama State Board of Education, that no person shall, on the grounds of race, color, disability, sex, religion, creed, national origin, or age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, activity, or employment. (Each institution will make reasonable accommodations for qualified disabled applicants or employees.)

EMANUEL--0108--PLF DOX

## EQUAL EMPLOYMENT OPPORTUNITY INFORMATION

The following information is gathered solely for reporting purposes and will not be used to evaluate the applicant's qualifications, suitability, or desirability for employment.

Name _____ *Ware* _____ *Shatangi* _____ *T.* _____
             Last               First                   Middle

Date of Birth *03 / 22 / 76*

Ethnic Background (check one):

( ) Native American
( ) White, not of Hispanic origin
( ) Hispanic
(✓) Black, not of Hispanic origin
( ) Asian/Pacific Islander
( ) Multi-racial
( ) Other

Gender (check one):

( ) Male
(✓) Female

## MISCELLANEOUS INFORMATION

Have you ever been employed by the College? ( ) Yes    (✓) No

Position: _____    Employed from _____ to _____

Name(s), relationship, and department of relative(s) presently employed by the College:

_____



ALABAMA COLLEGE SYSTEM

APPLICATION No. *1190*

# APPLICATION FOR EMPLOYMENT

## WALLACE COMMUNITY COLLEGE-DOTHAN

**Position Information**

Title of position for which you are applying: *Speech Instructor*

*5 June 2006*
Date of Application

**Personal Information**

| Last Name | First Name | Middle Initial | Social Security Number |
|---|---|---|---|
| *Emanuel* | *Richard* | *C.* | |

| Address | City | State | ZIP |
|---|---|---|---|
| *1937 Tara Drive* | *Prattville* | *AL* | *36066* |

*Contact Information*

| Phone Home | Work | Cell | E-mail Address |
|---|---|---|---|
| *334·491·1269* | *334·229·4370* | | *Rich_Emanuel@yahoo.com* |

**Secondary Postsecondary Education**

| | School/College | Dates Attended From/To | | Major | Minor | Degree(s) Earned |
|---|---|---|---|---|---|---|
| High School/GED | *Sparkman High School* | | | | | *Diploma* |
| College | *Univ. of Montevallo* | *1978* | *1982* | *Speech Theater* | *Math & English* | *B.S. degree* |
| College | *George Washington University* | *Aug 1982* | *Dec 1982* | *Computer Science* | *—* | *—* |
| College | *Auburn University* | *1983* | *1984* | *Speech Comm.* | *—* | *M.S.C. degree* |
| Other (Specify) | *Florida State University* | *1986* | *1989* | *Comm.* | *—* | *Ph.D. degree* |

**Employment History**

Please list most recent employment experience first.

| Employer | Telephone Number | Job Duties |
|---|---|---|
| Alabama State University | 334-229-4493 | Teach Public Speaking, Honors Courses and Voice & Diction; and fulfill various |
| **Address** P.O. Box 271 Montgomery, AL 36101 | **Dates of Employment** 2002-Present | departmental, college, and university committee responsibilities; Chair - Forensics Program |
| **Title** Full-time  Part-time Assistant Professor | **Hourly Rate/Salary** ~$50,000 / 9 months | |
| **Reason for Leaving** NA | **Supervisor** Dr. David Okeowo | |

RECEIVED

JUN 7  2006



DEFENDANT'S
EXHIBIT
*29*

EMANUEL--0059--PLF DOX

**Employment History (Continued)**

| Employer | Telephone Number | Job Duties |
|---|---|---|
| Auburn University - Montgomery | 334-244-3357 | Teach the Introduction to Communication course |
| **Address**<br>P.O. 244023<br>Montgomery, AL  36124 | **Dates of Employment**<br>2005-Present | |
| **Title**    Full-time    Part-time<br>Adjunct Instructor | **Hourly Rate/Salary**<br>$2,000 / class | |
| **Reason for Leaving**<br>NA | **Supervisor**<br>Dr. Donnie Nobles | |

| Employer | Telephone Number | Job Duties |
|---|---|---|
| Trenholm State Technical College | 334-420-4359 | Teach the Introduction to Communication course |
| **Address**<br>3920 Troy Highway<br>Montgomery, AL  36116 | **Dates of Employment**<br>Summer 2005 - Fall 2005 | |
| **Title**    Full-time    Part-time<br>Adjunct Instructor | **Hourly Rate/Salary**<br>$2,000 / class | |
| **Reason for Leaving**<br>Contract ended | **Supervisor**<br>Dr. Julliana Probst | |

| Employer | Telephone Number | Job Duties |
|---|---|---|
| Lurleen B. Wallace Community College | 334-222-6591 | Teach the Introduction to Communication course |
| **Address**<br>P.O. Box 1418<br>Andalusia, AL  36420 | **Dates of Employment**<br>2003-2005 | |
| **Title**    Full-time    Part-time<br>Adjunct Instructor | **Hourly Rate/Salary**<br>$2,000 / class | |
| **Reason for Leaving**<br>Contract ended | **Supervisor**<br>Dr. Mike Daniel | |

| Employer | Telephone Number | Job Duties |
|---|---|---|
| Huntingdon College | 334-833-4236 | Teach Public Speaking |
| **Address**<br>Cloverdale 134 / Box 120<br>Montgomery, AL  36106 | **Dates of Employment**<br>Spring 2005 | |
| **Title**    Full-time    Part-time<br>Adjunct Instructor | **Hourly Rate/Salary**<br>$2,500 / class | |
| **Reason for Leaving**<br>Contract ended | **Supervisor**<br>None | |

Attach additional page if needed. —— *See additional pages*

May we contact your current employer?     ☐ Yes     ☐ No *Only if offering a contract.*

**Skills, Certifications, Awards or Professional Activities**

*Algernon Sydney Sullivan Award ; Founder of Alabama Speeches—*
*Alabama's first on-line journal ; Active member of*
*the National Communication Association.*
*— See Vita —*

EMANUEL--0060--PLF DOX

| Employer | Telephone Number | Job Duties |
|---|---|---|
| Wallace State Community College | 334-876-9270 | Teach the Introduction to Communication course |
| **Address** | **Dates of Employment** | |
| 3000 Earl Goodwin Parkway | Summer 2003 | |
| Selma, AL  36702 | | |
| **Title**  Full-time  Part-time | **Hourly Rate/Salary** | |
| Adjunct Instructor | $2,000 / class | |
| **Reason for Leaving** | **Supervisor** | |
| Contract ended | None | |
| **Employer** | **Telephone Number** | **Job Duties** |
| University of Montevallo | 205-665-6533 | Teach the Introduction to Communication course; Teach upper division communication |
| **Address** | **Dates of Employment** | courses; Teach Business Communication |
| Montevallo, AL  35115 | 1999-2002 | courses; Sponsor Communication Honor Society; Build the Communication major |
| **Title**  Full-time  Part-time | **Hourly Rate/Salary** | |
| Assistant Professor | ~$44,000 / 9 months | |
| **Reason for Leaving** | **Supervisor** | |
| New employment at Alabama State Univ. | Dr. Nancy Bell | |
| **Employer** | **Telephone Number** | **Job Duties** |
| Shelton State Community College | 205-391-2966 | Teach Public Speaking courses |
| **Address** | **Dates of Employment** | |
| 9500 Old Greensboro Road | 2002 | |
| Tuscaloosa, AL  35405 | | |
| **Title**  Full-time  Part-time | **Hourly Rate/Salary** | |
| Adjunct Instructor | $2,000 / class | |
| **Reason for Leaving** | **Supervisor** | |
| Contract ended | Dr. Bruce Bizzoco | |
| **Employer** | **Telephone Number** | **Job Duties** |
| Troy State University | 334-670-3714 | Teach Public Speaking |
| **Address** | **Dates of Employment** | |
| Wright Hall, Suite 215 | Spring 1999 | |
| Troy, AL  36082 | | |
| **Title**  Full-time  Part-time | **Hourly Rate/Salary** | |
| Adjunct Instructor | $2,000 / class | |
| **Reason for Leaving** | **Supervisor** | |
| Contract ended | Dr. Jim Vickrey | |
| **Employer** | **Telephone Number** | **Job Duties** |
| Enterprise State Junior College | 334-347-2623 | Teach all communication and journalism courses; Advise student publications; Administer |
| **Address** | **Dates of Employment** | journalism internship program; Administer |
| P.O. Box 1300 | 1989 -1999 | student publications scholarship program; Chair MIS |
| Enterprise, AL  36331 | | committee; Serve on various committees |
| **Title**  Full-time  Part-time | **Hourly Rate/Salary** | |
| Instructor | ~$47,000 / 9 months | |
| **Reason for Leaving** | **Supervisor** | |
| New employment at the Univ. of Montevallo | Dr. Scott Smith | |

EMANUEL–0061–PLF DOX

| Employer<br>Faulkner University | Telephone Number<br>334-272-5820 | Job Duties<br>Teach Public Speaking |
|---|---|---|
| Address<br>5345 Atlanta Highway<br>Montgomery, AL 36109 | Dates of Employment<br>Fall 1993 | |
| Title        Full-time        Part-time<br>Adjunct Instructor | Hourly Rate/Salary<br>$2,000 / class | |
| Reason for Leaving<br>Contract ended | Supervisor<br>None | |
| Employer<br>Florida State University | Telephone Number<br>850-644-9698 | Job Duties<br>Teach Introduction to Communication; Teach Interpersonal Communication |
| Address<br>P.O. Box 1530<br>Tallahassee, FL 32306 | Dates of Employment<br>1986 -1989 | |
| Title        Full-time        Part-time<br>Graduate Teaching Assistant | Hourly Rate/Salary<br>$1,500 / class | |
| Reason for Leaving<br>Graduated; Contract ended | Supervisor<br>None | |
| Employer<br>Tift College | Telephone Number<br>478-301-2024 | Job Duties<br>Teach all Speech and Theater courses; Direct Theater |
| Address<br>1400 Coleman Ave.<br>Macon, GA 31207 | Dates of Employment<br>1984 -1986 | |
| Title        Full-time        Part-time<br>Chair, Fine Arts;   Theater Director | Hourly Rate/Salary<br>~$30,000 / 9 months | |
| Reason for Leaving<br>Entered doctoral program at FSU | Supervisor<br>Dr. Robert Richardson | |
| Employer<br>Central Alabama Community College | Telephone Number<br>334-347-2623 | Job Duties<br>Teach the Introduction to Communication course |
| Address<br>P.O. Box 699<br>Alexander City, AL 35011 | Dates of Employment<br>Fall 1983 | |
| Title        Full-time        Part-time<br>Adjunct Instructor | Hourly Rate/Salary<br>$1,500 / class | |
| Reason for Leaving<br>Contract ended | Supervisor<br>None | |
| Employer<br>Auburn University | Telephone Number<br>334-844-2727 | Job Duties<br>Teach Public Speaking |
| Address<br>213 Tichenor Hall<br>Auburn, AL 36849 | Dates of Employment<br>Spring 1983 - Spring 1984 | |
| Title        Full-time        Part-time<br>Graduate Teaching Assistant | Hourly Rate/Salary<br>$1,500 / class | |
| Reason for Leaving<br>Graduated; New employment at Tift College | Supervisor<br>None | |

EMANUEL--0062--PLF DOX

**References**

Please list three reliable references, other than relatives, who can provide information verifying qualifications, character, or work experience.

| Name and Title | Address | Phone Number |
|---|---|---|
| Dr. Donnie Nobles | AUM - P.O. Box 244023 Montgomery, AL 36124 | 334.244.3357 |
| Dr. Julliana Probst | Trenholm Tech - 3920 Troy Hwy. Montgomery, AL 36116 | 334.420.4359 |
| Mr. Jim Adams | Troy State University Troy, AL 36082 | 334.670.3714 |

**Felony Conviction(s)**

Have you ever been convicted of or pled no contest or guilty to any felony or any crime involving theft, dishonesty, violence, or sexual misconduct?    ☐ Yes    ☑ No
If yes, explain below:

_____

_____

_____

**Consent Agreement**

I represent and warrant that the information I have given on this application is full and true to the best of my knowledge and belief. I further acknowledge that I understand that I must provide documented verification of education, experience, and required certifications and/or licensures. And further, I represent and warrant that I have answered fully and truthfully all questions regarding criminal convictions/records. I hereby expressly request, and give permission to, former employers and any persons who may have pertinent information concerning this application to furnish such information to college officials. I agree to hold such persons harmless, and I do hereby release them from any and all liability for damage of any nature whatsoever for furnishing such information. I understand that failure to provide full and true information on this application may result in disqualification or dismissal.

Richard C. Emanuel
Signature of Applicant

5 June 2006
Date

Return to:    Wallace Community College
Attention: Office of Personnel
1141 Wallace Drive
Dothan, Alabama 36303
334-556-2425

It is the policy of the Alabama Department of Postsecondary Education including all postsecondary institutions under the control of the Alabama State Board of Education, that no person shall, on the grounds of race, color, disability, sex, religion, creed, national origin, or age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, activity, or employment. (Each institution will make reasonable accommodations for qualified disabled applicants or employees.)

EMANUEL--0063--PLF DOX

EQUAL EMPLOYMENT OPPORTUNITY INFORMATION

The following information is gathered solely for reporting purposes and will not be used to evaluate the applicant's qualifications, suitability, or desirability for employment.

Name    _Emanuel_____    _Richard_____    _C._____
             Last                        First                      Middle

Date of Birth  _9- 11- 1960_____

Ethnic Background (check one):                Gender (check one):

( )     Native American                          (✓)    Male
(✓)    White, not of Hispanic origin           ( )    Female
( )     Hispanic
( )     Black, not of Hispanic origin
( )     Asian/Pacific Islander
( )     Multi-racial
( )     Other

MISCELLANEOUS INFORMATION

ave you ever been employed by the College?  ( )  Yes    (✓) No

Position: _____   Employed from _____to _____

Name(s), relationship, and department of relative(s) presently employed by the College:

_____