IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RICH EMANUEL,                          )
                                       )
        Plaintiff,                     )
                                       )
    v.                                 )    CASE NO. 2:07-CV-819-WKW [WO]
                                       )
GEORGE C. WALLACE                      )
COMMUNITY COLLEGE,                     )
                                       )
        Defendant.                     )

**MEMORANDUM OPINION AND ORDER**

This case is before the court on Defendant's Motion for Summary Judgment (Doc. #

18).   Plaintiff filed a brief in opposition to summary judgment (Doc. # 24), to which

Defendant replied (Doc. # 25).   After careful consideration of the arguments of counsel, the

relevant law and the record as a whole, the court finds that motion is due to be granted.

**I.  JURISDICTION AND VENUE**

The court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331 for all

claims arising under federal law.  The court also has original jurisdiction over claims based

upon violations of civil rights.  *See* 28 U.S.C. § 1343.  The parties do not contest personal

jurisdiction or venue, and the court finds that there are allegations sufficient to support both.

**II.  FACTS AND PROCEDURAL HISTORY**

On September 12, 2007, Plaintiff Dr. Rich Emanuel ("Emanuel") filed suit against

Defendant George C. Wallace Community College ("GCWCC") alleging one count of race

and gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§§ 2000(e)-2000e-17 ("Title VII"). (Doc. # 1 ¶ 15.) Emanuel claims GCWCC "pass[ed] him
over for the position of Speech Instructor" because he is a Caucasion male, and hired a less
qualified African-American female instead. (Doc. # 1 ¶¶ 5, 15.) He is requesting declaratory
and injunctive relief, reinstatement, back pay, reimbursement for lost benefits, compensatory
damages, attorney's fees, and litigation expenses. (Doc. # 1, at 3.)

In January 2002, GCWCC announced that it was hiring a full-time Speech Instructor
for its Sparks Campus in Eufaula, Alabama. (Doc. # 19 ¶ 10 & Ex. 15; Doc. # 24 ¶ 10.) The
job vacancy announcement listed required and preferred qualifications for the position.
(Doc. # 19 Ex. 14.) The applicant was required to have "18 graduate semester hours or 27
quarter hours in Speech" (or an alternative option not applicable in this case), and the
preferred qualifications were: (1) an "additional 18 graduate semester hours or 27 graduate
quarter hours in English, reading, or another closely related subject"; (2) "[t]eaching
experience in a community college"; and (3) a "[d]emonstrated commitment to, and
experience in, integrating technological innovations into the curriculum." (Doc. # 19 Ex.
14.) Emanuel applied for the position and participated in three rounds of interviews, one
with the selection committee responsible for interviewing all minimally qualified applicants,
one with the final interview committee, which is selected by the president of GCWCC, and
one with the current president of GCWCC, Dr. Linda C. Young ("Young"). (Doc. # 19 ¶¶
11, 12.) Emanuel was part of a final candidates list that also included Shatangi Ware

2

("Ware") and Jill Coons.  (Doc. # 19 ¶ 11; Doc. # 24 ¶ 11.)

Emanuel has a doctorate in communication theory and research from Florida State University ("Florida State"), in addition to a master's degree and a bachelor of science degree from Auburn University ("Auburn") and University of Montevallo respectively.  (Doc. # 23 Ex. 12.)  His teaching experience includes jobs as an associate professor at Alabama State University, University of Montevallo College of Fine Arts, Enterprise Junior College, and Tift College of Mercer University, in addition to jobs as an instructor with the USAF Air Command and Staff College and Huntingdon College, and as a graduate student with Florida State and Auburn.  (Doc. # 23 Ex. 12.)  Ware has an associate of arts degree in public relations, a bachelor of arts degree from the University of Alabama in business, and a master's degree in communication studies from the University of Alabama.  (Doc. # 23 Ex. 10.)  She also has teaching experience as a speech instructor at a community college.  (Doc. # 23 Ex. 10.)

Young selected Ware for the Speech Instructor position.  In a "Statement to the Search File for Speech Instructor" ("Statement") dated June 22, 2006, Young announced that she had selected Ware as the top candidate after interviewing the finalists.[1]  In the Statement, Young enumerated the following as her reasons for selecting Ware:  (1) her "obvious enthusiasm for her discipline"; (2) her "obvious concern for students and the teaching and

---

[1] According to Young's deposition, the purpose of the Statement, which was required by law, was to "make a statement to the file as to why [GCWCC] select[ed] a certain candidate for the job" and to document that for the record.  (Young Dep. 178:5-10, June 13, 2008.)

learning process"; (3) her record of "successful teaching" in the courses GCWCC would have her teach; (4) her "strong record of involvement in professional development activities in her discipline, including presentations to the Southern States Communication Association"; (5) her "strong understanding of and support for the community college philosophy"; (6) her experience "with technology in her discipline, including the use of WebCT and the Internet"; and (7) the fact that her qualifications "seemed to be the best match for the needs of the institution." (Doc. # 23 Ex. 9.) Emanuel subsequently filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") for race and gender discrimination in the hiring decision. In response, GCWCC claimed it had followed hiring procedures and described the reasons why Young selected Ware. (Doc. # 23 Ex. 17 at 2-3.) Those reasons are essentially a recitation of the reasons from the Statement, with some exceptions discussed later. (*See* Doc. # 23 Ex. 17.) The EEOC denied Emanuel's claims and sent him a right-to-sue letter. (Doc. # 19 Exs. 18, 21.)

## III. STANDARD OF REVIEW

This case is before the court on a summary judgment motion. "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. Rule 56(c), as amended December 1, 2007 (Summary

judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").[2]   The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a

---

[2] Effective December 1, 2007, "[t]he language of Rule 56[was] amended . . . to make the rule[ ] more easily understood and to make style and terminology consistent throughout the rules. These changes . . . are stylistic only." Fed. R. Civ. P. 56 advisory committee notes.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and therefore, all cases citing the prior rule remain equally applicable to the current rule.

genuine issue for trial."). What is material is determined by the substantive law applicable to the case. *Celotex*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). Furthermore, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (to establish a genuine issue of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). If the evidence on which the nonmoving party relies, however, "is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted), and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986).  Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment.  *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (per curiam) (Plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("[M]ere verification of a party's own conclusory allegations is not sufficient to oppose a motion for summary judgment . . . .").  Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party.  *Celotex*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Sw. Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate.).

Thus, in cases where the evidence before the court is admissible on its face or can be reduced to admissible form and indicates there is no genuine issue of material fact, and where the party moving for summary judgment is entitled to it as a matter of law, summary

judgment is proper.  *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact).

## IV. DISCUSSION

Emanuel based his Title VII discrimination charge on two theories – disparate impact and disparate treatment – but has since dropped the disparate impact theory.  (Doc. # 24, at 1.)  In a Title VII discrimination action brought for disparate treatment on the basis of race or gender, a plaintiff must prove with either direct or indirect evidence that the employer intentionally discriminated against the plaintiff.  *Cooper v. Southern Co.*, 390 F.3d 695, 723 (11th Cir. 2004), *overrruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) (per curiam).  If proving discrimination with circumstantial evidence, as is the case here, the plaintiff may rely on the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Cooper*, 390 F.3d at 723-24.  The plaintiff first must establish a prima facie case of discrimination.  *Id.* at 724-25.  Under the *McDonnell Douglas* framework, a prima facie case for failure to hire requires the plaintiff to establish "[(1)] that she or he is a member of a protected class; [(2)] that she or he applied and was qualified for a job for which the employer was seeking applicants; [(3)] that despite her or his qualifications, she or he was rejected; and [(4)] that after this rejection the position remained open or was filled by a person not within the protected class."  *Welborn v. Reynolds Metals Co.*, 810 F.2d 1026, 1028 (11th Cir. 1987) (per curiam) (citing *McDonnell Douglas*, 411 U.S.

8

at 802).

Once a prima facie case has been established, a defendant can rebut it by offering a "legitimate, non-discriminatory reason for the allegedly discriminatory act." *Cooper*, 390 F.3d at 725. "To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). "'[T]he employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had *not* been motivated by discriminatory animus.'" *Id.* (quoting *Burdine*, 450 U.S. at 258). Even a "subjective" reason for the employment decision will suffice as long as the employer "articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." *Chapman v. Al Transp.*, 229 F.3d 1012, 1034 (11th Cir. 2000) (listing examples of traits like "ambition, loyalty, and tact" that are "essential to an individual's success" but "often must be assessed primarily in a subjective fashion"). "Personal qualities . . . factor heavily into employment decisions concerning . . . professional positions," *id.* at 1033, but "criteria . . . only capable of subjective evaluation . . . . can be just as valid as objective reasons," *id.* at 1034.

If the defendant successfully rebuts the prima facie case, "'the presumption of discrimination is eliminated.'" *Cooper*, 390 F.3d at 725 (citing *Chapman*, 229 F.3d at 1024). Once the presumption is eliminated, to survive summary judgment, the plaintiff must come

forward with evidence sufficient to permit a reasonable factfinder to conclude that the reasons for the adverse employment decision were pretextual.[3]  *Id.*  A plaintiff cannot establish pretext "simply by showing that [he] is more qualified" than the candidate who was hired.  *Id.* at 732.  "[F]ederal courts do not sit to second-guess the business judgment of employers. . . . [A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where . . . the reason is one that might motivate a reasonable employer."  *Combs*, 106 F.3d at 1543; *see also Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair.").  The plaintiff must meet the employer's legitimate reason "head on" and not by "simply quarreling with the wisdom of that reason."  *Chapman*, 229 F.3d at 1030.  Thus, to meet the evidentiary burden on pretext, the plaintiff must demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1071 (3d Cir. 1996) (*en banc*)).

Pretext can be established by demonstrating a disparity in qualifications.  In 2006, the Supreme Court rejected the Eleventh Circuit's rule that "'the disparity in qualifications [must

---

[3] The plaintiff must produce evidence sufficient to show pretext as to each legitimate interest the defendant offers in rebuttal.  *See Chapman*, 229 F.3d at 1037 n.30 (recognizing Eleventh Circuit case law on this point and declining to rule on whether exceptions exist).

be] so apparent as virtually to jump off the page and slap you in the face.'" *Ash*, 546 U.S. at 456-57 (citing Eleventh Circuit opinion below, 129 F. App'x 529, 533 (2005)).  The Court called the "visual image of words jumping off the page to slap . . . a court . . . unhelpful and imprecise," but noted other presumably more palatable standards used by circuit courts.[4]  *See Ash*, 546 U.S. at 457-58; *Drakeford v. Ala. Coop. Extension Sys.*, 425 F. Supp. 2d 1274, 1276 (M.D. Ala. 2006) (Albritton, J.).  One of those circuit standards is from the Eleventh Circuit: To establish pretext by comparing qualifications, "'disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"  *Id.* at 457 (quoting *Cooper*, 390 F.3d at 732).[5]  The Eleventh Circuit has applied this standard since *Ash*, explicitly noting that *Ash* approved it.  *See Brooks v. County Comm'n*, 446 F.3d 1160, 1163 (11th Cir. 2006).

Pretext also can be shown by producing evidence of an employer's inconsistent statements.  *Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir. 1998); *see also Combs*, 106 F.3d at 1538.  "[T]he existence of a possible additional non-discriminatory basis for [the plaintiff's] [adverse employment action] does not, however, prove pretext."  *Tidwell*, 135

---

[4] The Court, however, declined to articulate a more specific standard in resolving that case.  *Ash*, 546 U.S. at 458.

[5] *Cooper* contained both the face-slapping standard and the standard *Ash* more favorably cited. 390 F.3d at 732.  Indeed, this district in *Drakeford* noted that *Ash* was "really an issue of language and clarity, rather than a substantive change to the legal threshold required to prove pretext" because the more favorably-cited *Cooper* standard was used in prior cases to "explain and clarify" the face-slapping language.  425 F. Supp. 2d at 1276-77.

F.3d at 1428; *see also Moore v. Jefferson County Dep't of Human Res.*, 277 F. App'x 857, 859 (11th Cir. 2008) ("[E]vidence that an employer had additional reasons for terminating an employee does not prove pretext."). In a recent unpublished opinion, the Eleventh Circuit required employers' reasons to be "fundamentally inconsistent in order to constitute evidence of pretext." *Philips v. Aaron Rents, Inc.*, 262 F. App'x 202, 210 (11th Cir. 2008) (per curiam) (citing *Zaben v. Air Prods. & Chems.*, 129 F.3d 1453 (11th Cir. 1997) (per curiam)).

### *GCWCC's Reasons for Hiring Ware*

The parties agree that Emanuel has established a prima facie case of disparate treatment in violation of Title VII's anti-discrimination provisions. (Doc. # 19, at 23.) The burden thus shifts to GCWCC to provide legitimate, non-discriminatory reasons for its decision to hire Ware instead of Emanuel. GCWCC offers three reasons for its hiring decision. First, prior to selecting Ware, Young received a telephone call from Stafford Thompson ("Thompson"), the president of Enterprise-Ozark Community College, "warning her that employing [Emanuel] might pose a problem for GCWCC." (Doc. # 19, at 23.) Second, Ware was a "better fit" for GCWCC. (Doc. # 19, at 23.) Ware would be "more effective at relating to the student body in light of the fact that she was from the area, had attended and graduated from a two-year institution, and recently taught part-time at a two[-]year institution." (Doc. # 19, at 24.) Her "enthusiasm, level of education, and experience at the time made her a more suitable candidate." (Doc. # 19, at 24.) Ware's interview was more impressive than Emanuel's. (Doc. # 19, at 24.) And though Emanuel has a higher

degree and teaching experience at a four-year college, those credentials would be "of little

benefit" given the "small rural campus" at Eufaula and the exclusive focus for the job on

teaching as opposed to research.  (Doc. # 19, at 23.)  Third and finally, hiring Ware over

Emanuel would save GCWCC approximately $33,000 a year in salary, and Young could not

justify a higher expenditure "[i]n light of the needs of [GCWCC] for the particular position."

(Doc. # 19, at 23.)

> In her deposition, Young testified to the reasons why she hired Ware:
>
> I selected her, Ms. Ware because I believed that she was the best suited for this particular job because she had graduated from a community college, she was from the Dothan area,[6] she had the qualifications of a master's degree that I felt was suitable for teaching this level of courses in speech communication and that we could employ her at $33,000 a year less than Dr. Emanuel and that I had gotten the call from [Thompson] indicating there's a problem with him at Enterprise and I did not want to inherit a problem and pay $33,000 more a year and have a problem.[7]

(Young Dep. 139:16-23-140:1-6, June 13, 2008.)  Young also testified that her impression

of Ware after her telephone interview with her was "very favorable"; Ware was "very

articulate and impressive on the phone" and "exhuberant in her voice," "[e]xcited," and she

---

[6] Incidentally, Plaintiff quibbles with Young's citing Ware's Dothan background as suitable for the job on the more rural Eufaula campus.  (Doc. # 24, at 4 n.2.)  GCWCC has two campuses, however, one in Dothan and one in Eufaula.  By virtue of having lived in Dothan, Ware arguably is more familiar with GCWCC and its students than someone who has not lived in Dothan.  (Young Dep. 12:19-13:16.)  Furthermore, Young testified that though the teaching position was for the Eufaula campus, faculty teaching at the Eufaula campus were expected to teach at the Dothan campus if necessary.  (Young Dep, 14:4-8.)

[7] The Statement confirms this explanation except with respect to the telephone call from Thompson and the $33,000 difference in salary, issues the court takes up below, *see infra* pp. 19, 21-22.

spoke "clearly" and "enunciate[d] well" with "[a] lot of inflection in her voice." (Young Dep. 95:4-7, 95:18-21, 96:1-4; 97:5-9.) Young reiterated that she thought Ware's having graduated from a community college would help her to identify with GCWCC's students. (Young Dep. 120:18-23.) More specifically, she explained, a teacher who was a student in a two-year college "undestand[s] how instructors relate to students and how they should relate to students because . . . of . . . more one-on-one attention" at a two-year college. (Young Dep. 149:17-150:19.) Young also testified that the other interviewers supported Ware's candidacy. (Young Dep. 121:5-7.) As for Ware's lacking a doctorate, Young noted that GCWCC is not a research but a teaching institution, "so [that] there's really no need for [Emanuel's] background." (Young Dep. 121:13-122:6.)

Young based her hiring decision, however, not only on her positive impressions of Ware, but also on the negative impression Thompson's telephone call gave of Emanuel. Young testified to a telephone conversation she claims she had with Thompson prior to hiring Ware. (*See* Young Dep. 78-86.) She said it was "out of the ordinary" for Thompson to call her (Young Dep. 83:17-18) and that he stated he understood Emanuel was applying for a position at GCWCC and that she "'didn't need this problem' or something to that effect." (Young Dep. 82:19-23, 85:20-21.) She interpreted Thompson as referring to a legal problem related to Emanuel's employment at Thompson's school where Emanuel had previously worked. (Young Dep. 84:16-23, 85:20-86:2.) In her affidavit, Young describes the telephone call this way:

14

> [Thompson] telephoned me . . . and indicated that employing [Emanuel] could be a potential problem for me and the college.  This was an interesting phone call to me . . . .  The fact that [Thompson] called at all alarmed me as to the gravity of the potential problem [Emanuel] may pose to the college if hired.  Although [Thompson] did not elaborate as to the particular nature of the problem, I knew that [Emanuel] no longer worked for [Thompson's school].  I inferred from [Thompson's] comments that [Emanuel] had been a problem while working at [the school] and would likewise be a problem if employed at GCWCC.  I certainly do not inherit or hire problems knowingly.  It was my judgment, based on my conversation with [Thompson], that hiring [Emanuel] would be a mistake and would cause problems for the institution.

(Doc. # 19 Ex. 33 at 2-3.)

According to Emanuel, what is disputable is whether the conversation took place prior to Young's selection.  (Doc. # 24 ¶ 22.)  Emanuel points to Young's admission in her deposition that she was not "sure" whether the telephone conversation took place before she selected Ware but that she "believe[d]" it did.  (Doc. # 24 ¶ 22 (citing Young Dep. 189:10-190:11).)  Other portions of the deposition, however, shore up Young's claim that the call occurred prior to her selection.  Young answered when asked about whether she received the telephone call on July 12, "I would have, I received it before I made the decision."  (Young Dep. 82:12-16.)  Later, in response to the question of whether she was certain Thompson's telephone call predated the hiring decision, she stated simply in the affirmative.  (Young Dep. 158:18-21.)  In her affidavit dated July 7, 2008, Young stated again, that although she could not recall the exact date Thompson called, "it would have been sometime before I made the decision to hire [Ware]."  (Doc. # 19 Ex. 33 at 3.)

Emanuel argues that Young's affidavit should be stricken because it is "inconsistent

15

with her prior deposition testimony that she does *not* know when [the call] occurred." (Doc. # 24, at 6.)  A district court may ignore sham affidavits.  "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  The flip side of the *Van T. Junkins* scenario is present in this case – Emanuel is not accusing GCWCC of creating a genuine issue of material fact with a sham affidavit, but of avoiding one.  That being the case, Emanuel fails to show that Young's deposition testimony gives a clear answer on when she received Thompson's telephone call that the affidavit later contradicts.[8]  To the contrary, the court reads Young's affidavit only to clarify that though she does not recall the exact date of the call, it must have been before hiring Ware.  Emanuel offers no evidence to the contrary, from Thompson, or from any other source.[9]

Even were the court to find, however, that GCWCC failed to show that Thompson's telephone call occurred prior to Young's selection, GCWCC would succeed in meeting its production burden.  With or without the Thompson telephone call, GCWCC has met its

---

[8] The court notes that to testify one knows when an event occurred and to testify one believes, though cannot be sure, when that event occurred is not inconsistent.  It is reasonable to say one knows something without being sure of it; sureness expresses complete confidence in one's memory.

[9] GCWCC submitted with its reply brief an additional affidavit given by Thompson stating that his conversation with Young "took place prior to her having made an employment decision."  (Doc. # 25 Ex.)  Emanuel moved to strike the affidavit (Doc. # 26), which the court denied (Doc. # 31).  The court, however, need not, and thus does not, rely on the Thompson affidavit that Emanuel opposes.

burden to offer a legitimate, non-discriminatory reason for hiring Ware instead of Emanuel.

A candidate's enthusiasm, excitement, familiarity with the institution and with the type of

students at the institution, and cheaper salary are all plausible reasons that would motivate

a reasonable employer in selecting a candidate.  Ware met the minimum qualifications for

the job.  She did not meet all of the preferred qualifications, but there would be no point in

labeling those qualifications "preferred" if no reasonable employer would hire a candidate

without them.  Young gave specific and clear reasons for her favorable impressions of Ware.

From these facts, a reasonable factfinder could conclude that GCWCC, in hiring Ware

instead of Emanuel, was not motivated by discriminatory animus but had chosen a candidate

that fit the institution more suitably, impressed the president, and cost less than another

candidate.

***Emanuel's Rebuttal Evidence on Pretext***

Thus, because the burden has shifted, Emanuel's evidence must create a genuine issue

of pretext to survive summary judgment.[10]  Emanuel's arguments for why the evidence points

---

[10] Emanuel encourages the court to view GCWCC's selection against an "organizational backdrop."  (Doc. # 24, at 13.)  The court is unclear, however, on what role the backdrop has in this analysis, and whether Emanuel intended it as affirmative evidence of pretext.  Emanuel appears to ask the court to focus on the Department of Post-Secondary Education's ("Department") guidelines for hiring African-Americans and females that Young "admit[ted] that she had and has an obligation to try to meet."  (Doc. # 24, at 13.)  He argues that Young testified to the Department's urging her to comply with the guideline goals.  The court declines to delve into the details of the guidelines in its pretext analysis. As Young testified, none of the binding policies required her to consider race or gender in hiring a candidate and though she followed the required hiring processes, she never hired based on race and gender.  (Young Dep. 26:4-29:7.)  Because Emanuel points to no evidence that Young prioritized any racial or gender hiring goals over implementing the required process, and because Emanuel does not focus on or develop this argument in his brief opposing summary judgment, the court acknowledges this background but does not factor it into the pretext analysis.

to a genuine issue of pretext address each proffered non-discriminatory reason in turn. Emanuel says Thompson's telephone call is pretextual because the conversation did not occur prior to the selection and because GCWCC failed to mention the telephone call in the Statement or GCWCC's position on Emanuel's EEOC charge but relied on that reason later. Emanuel argues the money saving reason is pretextual because GCWCC has been inconsistent in asserting this reason by leaving it out of the Statement and GCWCC's position on the EEOC charge, and because GCWCC would be flouting binding rules by not considering the candidate with the highest degree.[11]  Finally, Emanuel argues Ware's hiring based on suitability is pretextual because it is "preposterous" that GCWCC was served well by hiring a "vastly inferior" candidate, and again, because GCWCC would be flouting binding rules by not considering the candidate with the highest degree.[12]  (Doc # 24, at 13-16.)

Emanuel challenges whether the Thompson telephone call occurred prior to Young's selection and argues that GCWCC's statements on the telephone call have been inconsistent. The court has already addressed whether the telephone call occurred before Young selected

---

[11] Emanuel asserts that under the Southern Association of Colleges and Schools' ("SACS") policy, "primary consideration should have been given to the candidate with the most advanced degree." (Doc. # 24, at 15 (internal quotation marks omitted).)  According to Emanuel, GCWCC is supposed to follow SACS's rules, and SACS's Comprehensive Standard 3.7.1 states: "'When determining acceptable qualifications of its faculty, an institution gives primary consideration to the highest earned degree in the discipline.'" (Doc. # 24 ¶¶ 11-12 (quoting the rule).)

[12] *See supra* note 11 (explaining rules that are supposedly binding GCWCC).

Ware in its analysis of GCWCC's production burden.[13]   The court found that Young's deposition and affidavit, absent evidence to the contrary, confirmed that the telephone call had occurred prior to her selecting Ware, and that regardless, the court's summary judgment finding stands, even setting aside the Thompson telephone call.  *See supra* p. 16.  Emanuel argues separately that GCWCC's position on the Thompson telephone call has been inconsistent.  (Doc. # 24, at 14 ("Young failed to mention the [telephone call] reason in her [Statement] shortly after the decision[,] . . . [and] [s]he also failed to mention it in GCWCC's response to the EEOC charge preceding this case, which she admittedly participated in drafting, reviewing, and signing.").)   "'[S]hifting reasons allow the jury to question . . . credibility,'" Emanuel argues, and he lists a few Eleventh Circuit cases he claims supports his point.  (Doc. # 24, at 14 (quoting *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189 (11th Cir. 2004)).)

What Emanuel fails to argue, however, is precisely *how* GCWCC is offering shifting explanations for hiring Ware.  Emanuel does not address the possibility – and he bears the burden of proof on pretext – that GCWCC had valid reasons to not disclose Thompson's telephone call in the Statement or in the EEOC charge.  Indeed, Young in her deposition offers reasons why the Thompson telephone call was not in the earlier statements.  Young testified that the Thompson telephone call was not in the Statement because the Statement

---

[13]  The court had to ascertain at that point when the telephone call took place in order to determine whether GCWCC's reason for hiring Ware was legitimate and non-discriminatory.

addresses the affirmative reasons for Ware's employment (Young Dep. 179:6-9) and that she never refers to other candidates when she lists the reasons for hiring them (Young Dep. 181: 11-10). In the Statement, she only discusses the candidates' strengths. (Young Dep. 182:3-4.) As for the EEOC position letter, Young admitted that she "consciously made a decision not to make any reference to the conversation," but it was because she "didn't want to go there," not knowing exactly what the problem with Emanuel's prior employment was. (Young Dep. 191:20-192:3.) She testified that she wanted to protect GCWCC from hiring a problematic candidate but that she also "didn't want to get [Emanuel] in trouble." (Young Dep. 192:13-18.)

These explanations do not reinforce Emanuel's position – they provide a cogent explanation of why Young chose not to broadcast the warning concerning Emanuel's prior employment, a warning Young knew was serious enough to prompt Thompson's telephone call but was sensitive enough to warrant discreet handling. Emanuel's only evidence that Young's explanation veils a discriminatory animus is that Young waited to disclose this information until after the Statement and EEOC position letter. An employer's proffering of a reason additional to those previously disclosed, however, is not an inconsistency. In *Tidwell*, the Eleventh Circuit concluded that though a jury could find an employer's reason for an employment action was "an additional, but undisclosed, reason for the decision[,] the existence of a possible additional non-discriminatory basis for [the employment action] [did] not . . . prove pretext." 135 F.3d at 1428. Even if an employer gives different reasons for

an employment action, "'its reasons are not . . . necessarily inconsistent.'" *Id.* (quoting *Zaben*, 129 F.3d at 1458).[14]  GCWCC never made the statement that its Statement or EEOC position letter accounted for the sole legitimate reasons for hiring Ware.  Nor did GCWCC explicitly validate Emanuel's reputation among his prior employers or otherwise indicate that its hiring of Ware had nothing to do with its evaluation of other candidates.  Young simply chose to discuss in the Statement only those reasons for hiring Ware related to her positive attributes, and chose to raise with the EEOC only those qualifications that were affirmative grounds for hiring Ware.  The court finds that Emanuel has failed to show with sufficient and appropriate evidence that there is a genuine issue as to whether GCWCC's reliance on the Thompson telephone call was pretextual.[15]

Inconsistency in GCWCC's reasons is also Emanuel's argument for why the salary

---

[14] In *Tidwell*,  the EEOC's "no cause" determination mentioned the plaintiff's performance as a reason why he was terminated.  135 F.3d at 1427-28.  The employer, on the other hand, maintained that reorganization and an evaluation of its geographic needs were the reasons for the termination.  *Id.* at 1427.  The plaintiff argued that the two positions were inconsistent and signaled pretext.  *Id.* at 1427-28.  The court disagreed.  *Id.* at 1428.  The most a jury could find, the court concluded, was an additional reason for the termination, not an inconsistent one.  *Id.*

Furthermore, contrary to Emanuel's suggestion (Doc. # 19, at 14), Emanuel's case is quite different from *Cleveland*, where the employer's shifting reasons did not foreclose finding against summary judgment.  *Cleveland*, 369 F.3d at 1191-92, 1194 (reversing the district court for reviewing the facts in the light most favorable to the movant).  There, the employer's reasons at trial for its employment action shifted from relying on a contract forbidding certain conduct to a non-compete agreement to an unwritten policy to standard industry practice, and the plaintiff offered affirmative evidence rebutting those charges.  *Id.* at 1192.  The employer's reasons changed with respect to a focused point.  In this case, GCWCC has only offered *additional* evidence, and that evidence has not changed the plausibility and credibility of the previously offered reasons.

[15] Even if the court were to find otherwise, however, Emanuel's evidence would fail to create an issue of pretext with respect to GCWCC's other reasons for hiring Ware.

expense reason for hiring Ware is pretextual.  Young testified that she hired Ware instead of Emanuel because there was a $33,000/year salary difference between employing the two candidates, *see supra* p. 13, but neither the Statement nor the EEOC position cited the salary difference, and Emanuel argues that the absence creates a genuine issue of fact on pretext. (Doc. # 24, at 15.)  That the salary difference was a previously undisclosed reason for hiring Ware, however, does not make it an inconsistent one.   "[T]he existence of a possible additional non-discriminatory basis for [the employment action] does not . . . prove pretext." *Tidwell*, 135 F.3d at 1428.  In fact, Young testified as to why the $33,000 salary difference was not in the EEOC letter.  She left the salary difference out of the EEOC position letter because she "didn't feel like it was important [as] [Emanuel] was concerned about the race and gender."  (Young Dep. 199:6-7.)  She acknowledges that she should have put the $33,000 salary difference in the letter, and that she failed to tell the attorney drafting the letter of this reason.  (Young Dep. 199:9-200:13.)  The court nevertheless finds that Young's failure to mention the salary difference in the letter does not give rise to an inconsistency. And presumably, some of the same reasons for not including the Thompson call in the Statement – that the Statement's function is to highlight the affirmative, not negative or comparative reasons for hiring a candidate – apply to the absence of the salary difference in the Statement.  *See supra* pp. 19-20.

Emanuel also attempts to show pretext by pointing to the SACS policies that supposedly bound GCWCC in the hiring process; those policies allegedly require GCWCC

to give "primary consideration to the candidate with the most advanced degree." (Doc. # 24, at 15.)  SACS accredits elementary, secondary, and higher education institutions in several southern states.  (Doc. # 24 ¶ 10; Young Dep. 105:10-19.)  SACS is the crediting body for GCWCC and imposes regulations GCWCC must follow.  (Doc. # 24 ¶¶ 9-10; Young Dep. 105:20-106:2.)  Emanuel argues that SACS's Comprehensive Standard 3.7.1 ("Standard"), which requires institutions to give "primary consideration to the highest earned degree in the discipline" when "determining acceptable qualifications of its faculty" applied to GCWCC's hiring.[16]  (Doc. # 24 ¶¶ 11-12; Doc. # 24, at 15.)  Young disputes the Standard's applicability to hiring faculty.  (Young Dep. 107:3-4 (She understood the policy "to mean that it has nothing to do with the hiring process.").)  According to Young, this Standard applies to SACS's review of an institution's faculty members' credentials; SACS looks to the highest degree earned by each faculty member to verify her credentials.  (Young Dep. 107:6-16, 14-19, 109:6-111:22.)  Young points out that if the Standard required what Emanuel argues it requires, then GCWCC "would have to employ anybody in [its] search that has a doctorate degree over anybody else any time [GCWCC] [had] a search."  (Young Dep. 109:8-12.)

Neither party has presented useful outside evidence on how to interpret the SACS Standard.  Even if the court were to interpret the Standard in favor of Emanuel's reading, however, it would not create a genuine issue as to pretext.  First of all, the Standard requires

---

[16] Comprehensive Standard 3.7.1 of the *Principles of Accreditation* reads in relevant part: "The institution employs competent faculty members qualified to accomplish the mission and goals of the institution.  When determining acceptable qualifications for its faculty, an institution gives primary consideration to the highest earned degree in the discipline."

only that the institution give "*primary* consideration" to the highest degree in the discipline. The standard lists other considerations – "competence, effectiveness, and capacity, including, as appropriate, undergraduate and graduate degrees, related work experiences in the field, professional licensure and certifications, honors and awards, continuous documented excellence in teaching, or other demonstrated competencies and achievements *that contribute to effective teaching and student learning outcomes*." (Doc. # 23 Ex. 14 (emphasis added).) As the language suggests, the end goal of the Standard is to ensure effective teaching and student learning.  It would turn that purpose on its head if the Standard instructed institutions to give determinative consideration to the highest degree even at the expense of compromising effective teaching and student learning outcomes.  The court declines to read the Standard to *require* an institution to choose the candidate with the highest degree when other considerations suggest that effective teaching and student learning outcomes are better achieved through hiring another candidate.  Because hiring the candidate with the highest degree is not required, and because there is no evidence of the applicability of the Standard in this instance, GCWCC's decision to hire Ware despite Emanuel's higher qualification is not pretextual solely because of the SACS Standard.

Emanuel relies on the SACS standard to discredit Young's third set of reasons for hiring Ware – that she was a better fit for GCWCC.  (*See* Doc. # 24, at 16.)  As just explained, the SACS policy does not signal pretext.  The majority of Emanuel's challenge, however, relies on comparing his qualifications with Ware's.  In Emanuel's words, Ware is

24

a "greatly inferior candidate" and is "obviously much less-experienced than Emanuel," and it is "preposterous" and "defies logic" that Ware was preferable to Emanuel. (Doc. # 24, at 15-16.)  Emanuel argues that because Ware's credentials are "vastly inferior" to his, GCWCC's reason for hiring Ware as a better fit "is downright spurious"; in particular, because Ware does not meet all of the preferred qualifications as he did, and because she has only one year of part-time teaching experience as compared to his twenty years of teaching experience, the court should "pierce the veil of deference" usually afforded employers. (Doc. # 24, at 16.)

To establish pretext by comparing qualifications, "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Cooper*, 390 F.3d at 732; *see* discussion *supra* pp. 10-11.  Emanuel fails to meet this standard.  According to *his* definition of "qualifications," the disparity in qualifications seems greater than it really is, but his argument is circular.  Emanuel assumes without argument that certain credentials are the only viable qualifications for the position, and based on those "qualifications," concludes that he is more qualified than other candidates.  But he focuses primarily on credentials mentioned in the list of minimum and preferred qualifications, and common sense dictates that the qualifications for this job extend beyond those on that list. Employers that hire to serve the public must consider factors beyond those credentials. Emanuel seems to sidestep qualifications related to attitude, affability, and affordability, and

underestimates how they should factor into hiring for that position.  It is not unreasonable for an educational institution to look beyond paper qualifications or quantifiable criteria to select its faculty (*see* Doc. # 23 Ex. 8 (interview score card sheet as an example of the quantifiable criteria that favor Emanuel)).

Even if the court, however, were to rely only on the qualifications Emanuel highlights, the disparity between his qualifications and Ware's would not be egregious enough.  Despite Emanuel's protestations, the choice between a candidate with a doctorate and one with only a master's degree is not a clear one.  GCWCC is a teaching, not a research institution, so as Young testified, GCWCC has less need for or interest in faculty with doctorates.  (Young Dep. 122:1-6.)  Furthermore, a doctorate is not a perfect proxy for adequate teaching capabilities.[17]  Though years of teaching experience complement Emanuel's degree, that experience is compromised by Thompson's warning.  Moreover, Ware's qualifications were satisfactory for the job.  She had an advanced degree, and she met some of the preferred qualifications.  (Young Dep. 130:11-13.)  Emanuel's evidence, at most, "question[s] the wisdom of the GCWCC's reasons," *Combs*, 106 F.3d at 1543; it does not create a genuine issue as to whether GCWCC's reasons were pretextual.

In conclusion, the court finds that Emanuel has not met his burden on summary

---

[17] Even Young, who herself has a doctorate, admitted as much.  In response to the question of whether she learned more by earning a doctorate, Young responded, "Not necessarily."  (Young Dep. 114:17-19.)  And when asked whether she learned anything, presumably about teaching, when she received her doctorate, she candidly stated, "Not much . . . I don't think that necessarily having a doctorate makes you a better teacher."  (Young Dep. 114:20-118:1.)

judgment to create a genuine issue as to whether each of GCWCC's legitimate reasons for hiring Ware instead of Emanuel was pretextual.  Emanuel has offered nothing more on pretext than a "mere scintilla of evidence," *Walker*, 911 F.2d at 1577.

## V.  CONCLUSION

For the foregoing reasons, it is ORDERED that Defendant's Motion for Summary Judgment (Doc. # 18) is GRANTED.

DONE this 27th day of October, 2008.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE

27